```
                                         FILED
                              CLER'. U.S. DISTRICT COURT

                                     MAY - 6 2003

                                 ...CT OF CALIFORNIA
                                         DEPUTY
```

```
          ENTERED
    CLERK, U.S. DISTRICT COURT

         MAY - 7 2003

    CENTRAL DISTRICT OF CALIFORNIA
```

✓ Priority
✓ Send
___ Clsd
✓ Enter
___ JS-5/JS-6
___ JS-2/JS-3

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Revolution Eyewear, Inc., | CV 02-1087 LGB (CWx) |
| Plaintiff, | |
| v. | ORDER CONSTRUING CLAIMS OF |
| | U.S. PATENTS 6,343,858 AND |
| Aspex Eyewear, Inc. et al., | RE 37,545 |
| Defendants. | |

## I.   INTRODUCTION

In the present action, plaintiff Revolution Eyewear, Inc. ("Plaintiff" or "Revolution") alleges that defendants Aspex Eyewear, Inc. ("Aspex"), Thierry Ifergan ("Ifergan"), Real Eyes Optical ("REO") and Scott Strenk ("Strenk")[1] infringe its U.S. Patent No. 6,343,858 (the "'858 Patent"). Defendant and counterclaimant Aspex contends that Plaintiff infringes U.S.

_____

[1] Aspex, Thierry, REO and Strenk are collectively referred to as "Defendants."

1   Patent No. RE 37,545E (the "'545 Patent") issued to Aspex,

2   Manhattan Design Studio, Inc., Contour Optik, Inc. and Asahi

3   Optical Co., Ltd. (collectively "Counterclaimants").

4   This matter is before the Court for the purpose of interpreting

5   the disputed claims of the '858 and '545 patents.

6

7   **II.   FACTUAL AND PROCEDURAL HISTORY**

8        For purposes of the instant motion, the Court finds the

9   following facts to be relevant.  The technology at issue in this

10  case involves a spectacle frame that supports an auxiliary frame,

11  enabling the user to securely fasten a second set of lenses

12  (e.g., sunglass lenses) onto the primary frame (often holding

13  prescription lenses).  Plaintiff's '858 Patent, which issued on

14  February 5, 2002, is directed to a method and apparatus for

15  mounting auxiliary eyeglasses on conventional eyeglasses in which

16  magnets are attached to appendages on the auxiliary eyeglasses

17  mating with magnets mounted on the temple extensions of

18  conventional eye-glasses.

19       Counterclaimants' '545 Patent, which issued on February 12,

20  2002, is directed to a spectacle frame that supports an auxiliary

21  lens frame through an arrangement using magnetic members.  The

22  '545 is a reissue of Counterclaimants' original U.S. Patent No.

23  5,568,207 (the "'207 Patent"), which has now been surrendered.[2]

24

25  _____

26  [2] This Court has previously found on summary judgement, in a related case, that Revolution does

27  not infringe Aspex's original '207 patent issued to Chao.  See Aspex Eyewear, Inc. v.

28  Revolution Eyewear, Inc., CV 99-1623, Order Granting Defendant's Motion for Summary

1    For purposes of the Court's claim construction endeavor

2  here, it suffices to note that Plaintiff accuses Defendants of

3  infringing the '858 Patent and Counterclaimants accuse Plaintiff

4  of infringing the '545 Patent.   Pursuant to the Court's February

5  28, 2003 Minute Order, the parties, on March 12, 2003, submitted

6  two Joint Claim Construction Statements, one for the '858 Patent

7  ("JS-'858") and the second for the '545 Patent ("JS-'545").   On

8  March 19, 2003, Revolution and Counterclaimants filed their

9  respective Opening Claim Construction Briefs.   On March 26, 2003,

10  Counterclaimants filed their joint Responsive Brief to

11  Revolution's Opening Claim Construction Brief.   On March 27,

12  2003, Revolution filed its Responsive Brief to Counterclaimants'

13  Opening Claim Construction Brief.[3]  Also on March 27, 2003,

14  defendants REO and Strenk filed their joint Responsive Brief to

15  Revolution's Opening Claim Construction Brief.[4]  On April 2,

16  2003, Revolution and Counterclaimants filed their respective

17  Reply briefs.

18  ///

19  ///

---

Judgment on Plaintiff's Claim of Patent Infringement, June 4, 2001, Docket Entry No. 184.  The Federal Circuit affirmed this Court's finding of non-infringement.  See Case No. CV-1623, Docket Entry No. 217.  In the instant case, Counterclaimants allege that Revolution infringes claims 6, 22 and 34 of the '207 Reissue Patent - the '545 Patent.

[3] Although Revolution's Responsive Brief was filed a day late, the Court deems it to have been timely filed.

[4] Like Revolution's Responsive Brief, REO and Strenk's joint responsive Brief was filed a day late; however, the court deems it to have been timely filed.

1 | III. LEGAL STANDARDS AND ANALYSIS

2 |     A.    Legal Standards

3 |     In <u>Markman v. Westview Instruments, Inc.</u>, 517 U.S. 370

4 | (1996), the Supreme Court held that the interpretation of a

5 | patent claim-the portion of the patent document that defines the

6 | scope of the patentee's rights-is a matter of law exclusively

7 | within the scope of the court and is not a factual question for

8 | the jury. <u>Id.</u> at 372. The <u>Markman</u> decision suggested that a trial

9 | court could consider various types of evidence when interpreting

10 | a patent, including expert testimony.  <u>See</u> <u>id.</u> at 388-90. Shortly

11 | after the Supreme Court handed down <u>Markman</u>, the Federal Circuit,

12 | in <u>Vitronics Corp. v. Conceptronic, Inc.</u>, 90 F.3d 1576 (Fed. Cir.

13 | 1996), expanded on the Court's dicta concerning evidence

14 | available to a trial court in interpreting patent claims.  <u>See</u>

15 | <u>id.</u> at 1581-83.  The Federal Circuit held that if intrinsic

16 | evidence can, by itself, resolve ambiguity in a patent term, then

17 | a court may not rely on extrinsic evidence, such as expert

18 | testimony, to construe the term. <u>See</u> <u>id.</u> at 1583.  A trial court

19 | may only use extrinsic evidence when intrinsic evidence fails to

20 | illuminate the meaning of the disputed claim. <u>Id.</u> Moreover,

21 | extrinsic evidence cannot broaden the reach of a claim or

22 | contradict explicit language.  <u>Id.</u> The policy rationale

23 | supporting this evidentiary limitation is that prospective

24 | patentees must have access to public records concerning the

25 | patent to "design around" a prior art. <u>Id.</u> If expert testimony

26 | or other extrinsic evidence were permitted to alter the record,

4

1   then this public benefit would be frustrated. Id. Thus, a court

2   can only examine extrinsic evidence if the evidence does not

3   contradict the claim language, the specification, or the

4   prosecution history but instead supplements it. Id. at 1584-85.

5       The Federal Circuit detailed a hierarchy of specific types

6   of evidence that a court may consider. Thus, when interpreting a

7   patent, a trial court must first look at the language of the

8   claim itself. See id. at 1582. Courts should typically construe

9   terms by their common, customary meaning, but a patentee is

10  allowed to define her own terms in the specification section of

11  the patent.  See id. Therefore, courts must always review the

12  specification, which, when setting forth an embodiment of the

13  invention, frequently provides explicit definitions of the claim

14  terms.  See id.  The language in the specification is

15  dispositive, and "it is the single best guide to the meaning of

16  the disputed term."  Id.  However, a patent's claims are not

17  limited to the specification's best mode, preferred embodiment,

18  specific objects, or illustrative examples, and it is erroneous

19  to read limitations from the specification into the claims. See

20  Laitram Corp. v. Cambridge Wire Cloth Co., 863 F.2d 855, 865

21  (Fed. Cir. 1988)("References to a preferred embodiment, such as

22  those often present in a specification, are not claim

23  limitations."); Rolls-Royce Ltd. v. GTE Valeron Corp., 800 F.2d

24  1101, 1108 (Fed. Cir. 1987)("Reference to an object does not

25  constitute in itself a limitation in the claims."). In addition,

26  a court may consider the prosecution history of the patent as

1  evidence of meaning. Id. This history contains the complete

2  record of all the filings and examinations before the Patent and

3  Trademark Office ("PTO"), including representations made by the

4  applicant regarding the significance of claims and terms. Id. The

5  history also limits the interpretation of terms by recording the

6  exclusion of any term definition disclaimed during the

7  prosecution. Id.

8      B.   Analysis

9          1.   The claims in dispute

10      Pursuant to the Joint Statement, the following claims of the

11  '858 and the '545 patents contain terms that are disputed by the

12  parties.[5]

13          a.   Disputed claims in the '858 Patent

14  Claim 1:

15  Apparatus for attaching auxiliary eyeglasses to conventional

16  eyeglasses comprising:

17          a **plurality of sockets** formed on temple extensions of

18  said conventional eyeglasses;

19          a plurality of **magnets** mounted in said sockets on said

20  conventional eyeglasses;

21          a **plurality of sockets** formed on appendages on said

22  auxiliary sunglasses, said appendages construed and arranged

23  to fit below said temple extensions;

24

25

26

27  _____

28  [5] The disputed terms are shown in bold.

6

a plurality of **magnets** mounted in said **plurality of sockets** on said appendages;

said **plurality of magnets mounted on said** conventional **eyeglasses** and said **plurality of magnets mounted on said auxiliary eyeglasses being** oriented such that the **maximum magnetic attractive force between said magnets is** oriented **approximately parallel to lenses in said** conventional **eyeglasses;**

a first pair of said **plurality of sockets** having said plurality of **magnets** mounted **to form recesses** in said first pair of sockets;

a second pair of said **plurality of sockets** having said plurality of **magnets** mounted to extend out of said pair of sockets, said **magnets constructed and arranged to fit into said recesses** in said first pair of sockets;

whereby said extended magnets in said second pair of sockets engage said recesses to automatically align and secure said auxiliary eyeglasses when mated with said magnets forming said recesses in said first pair of sockets providing maximum resistance to downward movement of said auxiliary eyeglasses thereby preventing detachment of said auxiliary eyeglasses from said conventional eyeglasses.

**Claim 2:**

The apparatus according to claim 1 in which said first pair of sockets having said **magnets** mounted to form a recess

7

are on said conventional eyeglass temple extensions; and said second pair of sockets with **magnets** extended out therefrom are mounted on said appendages on said auxiliary eyeglasses.

**Claim 3:**

The apparatus according to claim 2 including a **protective and decorative coating material** on exposed sides of said plurality of **magnets**.

**Claim 4:**

The apparatus according to claim 3 in which said protective and decorative coating material **matches** the frames of said conventional and auxiliary eyeglasses.

**b.   Disputed claims in the '545 Patent**

**Claim 6:**

An eyeglass device comprising:

a primary spectacle frame for supporting primary lenses therein;

the primary spectacle frame including two side portion extensions extended therefrom for pivotally coupling a leg thereto; and

the primary spectacle frame including two first magnetic members respectively having a **horizontal surface** and being secured to one of the side portions extensions of the primary spectacle frame; and

an auxiliary spectacle frame for supporting auxiliary lenses therein, and for disposing in front of the primary spectacle frame, the auxiliary spectacle frame including two auxiliary side portions, wherein the auxiliary spectacle frame further includes two second magnetic members each secured to one of the auxiliary side portions and having a **horizontal surface** for coupling a corresponding surface of one of the first magnetic members so as to secure the auxiliary spectacle frame to the primary spectacle frame.

**Claim 22:**

A primary spectacle frame for supporting primary lenses therein and having two side portion extensions extending rearwardly therefrom and having a front side, a rear side, a top side, and a rear end, each of said rear ends pivotally coupling a leg configured to conform to a user at a distal end thereof, each of said extensions of said primary spectacle frame further having a projection attached to each of said rear sides, and a pair of first magnetic members respectively **secured in said projections, said first magnetic members capable of engaging second magnetic members of an auxiliary spectacle frame** so that lenses of an auxiliary spectacle are located in front of said primary lenses.

**Claim 34:**

An eyeglass device comprising:

1    a primary spectacle frame having two side portion

2    extensions with a front side, a rear side and a first

3    magnetic member;

4    an auxiliary spectacle frame including two side

5    portions each having an arm extended therefrom, each of said

6    arms containing a second magnetic member, **said arms**

7    **extending across a respective extension** from said front side

8    to said rear side so that **said first and second magnetic**

9    **members engage one another** whereby said auxiliary spectacle

10    frame is supported by said primary spectacle frame.

11

12

13    **2.   The disputed terms**

14    The Court first considers the disputed claim terms in the

15  '858 Patent, followed by the disputed terms in the '545 Patent.

16

17    **a.  Disputed terms in the '858 Patent**

18    The following terms or combination of terms are in

19  dispute:(1) "plurality of sockets," in claim 1 (2) "magnets" in

20  claims 1-3; (3) "being oriented such that the maximum magnetic

21  attractive force between said magnets is oriented approximately

22  parallel to lenses in said conventional eyeglasses" in claim 1;

23  (4) "mounted to form recesses in said first pair of sockets," in

24  claim 1; (5) "whereby said extended magnets in said second pair

25  of sockets engage said recesses to automatically align and secure

26  said auxiliary eyeglasses when mated with said magnets forming

27  said recesses in said first pair or sockets," in claim 1, (6)

28

1   "providing maximum resistance to a downward movement of said

2   auxiliary eyeglasses thereby preventing detachment of said

3   auxiliary eyeglasses from said conventional eyeglasses," in claim

4   1; (7) "a protective and decorative coating material on exposed

5   sides of said plurality of magnets," in claim 3; and (8)

6   "matches" in claim 4.

7

8           (1)   "plurality of sockets" (claim 1)

9

10      Plaintiff Revolution argues that the phrase "plurality of

11  sockets" in claim 1 of the '858 means "two or more openings or

12  recesses formed in the temple extensions."  JS-'858, Exh. 1 at 1.

13  Conversely, Counterclaimants[6] argue that the instant phrase

14  should be construed to mean "two or more housings or openings

15  into which inserted parts are designed to fit."  JS-'858, Exh. 2

16  at 1.

17      Preliminarily, the Court notes that Revolution's

18  construction is counter-productive because it defines the word

19  "sockets" as "recesses"; and the word "recesses" is a separate

20  element of claim 1.  See Declaration of Michael A. Nicodema

21  Submitting Documents and Exhibits in Support of

22  Defendants'/Counterclaimants' Responsive Claim Construction Brief

23  for U.S. Patent No. 6,343,858 ("Nicodema Decl. I"), Exh. 1, '858

24  Patent, Col. 8, ll. 38-40.  Additionally, and contrary to

25

26  ───────────────────

27  [6] REO and Strenk's arguments in their joint claim construction brief are identical to those made
    by Counterclaimants.  Therefore, and for the sake of brevity, only Counterclaimants' briefs will

28  be cited to in this Order.

1  Counterclaimants' proposed construction, the word "housing" is

2  not used by the inventor to define "sockets."   See

3  Counterclaimants' Responsive Brief Re. '858 patent at 8:14-17

4  (citing the '858 Patent at Col. 7, ll. 19-21).

5      The '858 patent specification and prosecution history do not

6  define the word "socket"; they simply use the word.   There is no

7  special meaning of "socket" set out in the intrinsic record which

8  would warrant a construction that departs from the ordinary and

9  customary definition of the word.   Accordingly, the dictionary

10  definition should control.   See Texas Digital Systems, Inc. v.

11  Telegenix, Inc., 308 F.3d 1193, 1203 (Fed. Cir. 2002) (stating

12  that dictionaries, encyclopedias and treatises "may be the most

13  meaningful sources of information to aid judges in better

14  understanding both the technology and the terminology used by

15  those skilled in the art to describe the technology.").   The

16  dictionary definition of "socket" is "[a]n opening into which an

17  inserted part is designed to fit."   Webster's II New College

18  Dictionary ("Webster's"), Nicodema Decl. I, Exh. 3 at 43.

19

20      Based on the foregoing the Court construes the phrase

21  "plurality of sockets" to mean two or more openings into which an

22  inserted part is designed to fit.

23

24

25      (2)   "magnets" (claims 1-3)

26      Plaintiffs argue that the term "magnets" in claims 1-3 of

27  the '858 Patent means "a permanent magnet, or ferromagnetic

28

1  material capable of acting as a magnet, or equivalents." JS-

2  '858, Exh. 1 at 3.  Conversely, Counterclaimants argue that the

3  instant phrase means "permanent magnets." JS-'858, Exh. 2 at 3.

4        In its proposed construction of "magnets," Revolution relies

5  upon this Court's construction of the phrase "magnetic members"

6  in the case of Aspex Eyewear, Inc. v. Miracle Optics, Inc., CV

7  01-10396, Order Construing Claims of U.S. Patents RE 37,545 and

8  6,109,747, February 14, 2003, attached to the Declaration of

9  Michael Nicodema Submitting Documents and Exhibits in Support of

10  Claim Construction Analysis of the '545 Patent ("Nicodema Decl.

11  II"), Exh. 8 (hereinafter "Miracle Claim Construction Order").

12  In that case, the Court was construing the claims of

13  Counterclaimants' '545 and '747 patents, not the claims of

14  Revolution's '858 Patent.  Contrary to Revolution's assertion,

15  the Court's claim construction order in the Miracle case does not

16  "estop" Counterclaimants from asserting that the ordinary meaning

17  of the word "magnet," as used in the '858 Patent, does not

18  include ferromagnetic materials.  The words used in the claims of

19  the '858 and the '545 patents are different; as are their

20  intrinsic records.  Nowhere in the Miracle Claim Construction

21  Order did the Court state or suggest that it was construing the

22  noun "magnet"; let alone any element of the '858 Patent claims.

23        In the claims at issue in the '858 Patent, the operative

24  word is the noun "magnet," not the adjective "magnetic." The

25  only word used in the '858 Patent specification to describe the

26  magnets of the asserted claims is "magnet"; not "magnetic

1  members," "magnetic material," or "ferromagnetic material."  The

2  '858 patent specification and prosecution history do not define

3  the word "magnet"; they simply use the word.  The ordinary

4  meaning of the word "magnet" is: "1. A body that attracts certain

5  materials, as iron, by virtue of a surrounding field of force

6  created by the motion of its atomic electrons and the alignment

7  of its atoms.  2. An electromagnet. 3. One that attracts."

8  Webster's, Nicodema Decl. I, Exh. 3 at 34.  Thus, the ordinary

9  meaning of "magnet" is essentially a permanent magnet; it cannot

10 be  ferromagnetic material because it needs to have the ability

11 to attract certain material like iron.[7]

12

13     The Court also notes that various portions of the '858

14 patent specification support the position that the word "magnet"

15 should be given its ordinary dictionary definition - i.e., a

16 permanent magnet.  See Nicodema Decl. I, Exh. 1, '858 Patent at

17 Col. 7, ll. 47-49, stating that "the key feature here is the

18 orientation of magnets 26 and 30 so that the maximum magnetic

19 attractive force along their axis (i.e. poles) 34 is vertically

20 oriented or parallel with conventional eyeglass frame 20"; and

21 Col. 3, ll. 22-27, stating that "[c]omplementary mating magnets

22 ... are also oriented with the plane of the magnets horizontal

23 and their axis (i.e. poles) vertical or approximately parallel to

24 the plane of the conventional eyeglasses."

25

26

27 _____

[7] A ferromagnetic material is a material that is attracted by a permanent magnet, *e.g.*, iron, nickel

28 and cobalt.  See Miracle Claim Construction Order at 19 n. 9.

1    Revolution argues that its construction is supported by the
2    fact that "a review of the entire file history of the '858 Patent
3    demonstrates that no rejection can be found based upon the type
4    of magnetic material used." Revolution's Opening Brief at 7:2-4.
5    This argument by Revolution is at best irrelevant to the instant
6    issue. The mere fact that the patent examiner did not issue a
7    rejection based on the type of magnetic material used has no
8    bearing on the interpretation of the term "magnets." The patent
9    applicant in this case used the term "magnets" in his
10   application; and the most logical assumption is that the patent
11   examiner simply considered "magnets" to mean permanent magnets,
12   and thus would have had no reason to consider other
13   interpretations of that term.
14       In its Reply Brief, Revolution states:

15       The Webster's definition of magnet is '1 ... a body having
16       the property of attracting iron and producing a magnetic
17       field external to itself; *specif*: a mass of iron, steel, or
18       alloy that has this property artificially imparted 2:
19       something that attracts.' Webster's New Collegiate
20       Dictionary, 1980 Edition.... Under the dictionary
21       definition, a magnet includes a metal having an external
22       magnetic field to be artificially imparted. For the
23       magnetic field to be artificially imparted to the metal, it
24       is a necessary and logical precondition that the particular
25       metal be capable of being magnetized. Therefore, the
26       Court's prior definition in the Miracle Optics case is

15

1   equally applicable here: magnet means a permanent magnet or

2   any ferromagnetic material capable of acting as a magnet.[8]

3   Revolution's Reply Brief at 2:14-28.  Revolution's argument

4   misses the mark.  The operative phrase in the dictionary

5   definition is that a magnet has the property of <u>attracting iron</u>

6   <u>and producing a magnetic field external to itself</u>.  A

7   ferromagnetic material, such as iron, "is a material that is

8   <u>attracted by</u> a permanent magnet," it does not attract other

9   material.  <u>See</u> <u>Miracle</u> Claim Construction Order at 19 n. 9

10  (emphasis added).

11  Based on the foregoing, the Court construes the word

12  "magnets" in claims 1-3 of the '858 Patent to mean permanent

13  magnets.

14

15

16          (3)   "being oriented such that the maximum magnetic

17                attractive force between said magnets is oriented

18                approximately parallel to lenses in said

19                conventional eyeglasses" (claim 1).

20  Revolution contends that the phrase "bring oriented such

21  that the maximum magnetic attractive force between said magnets

22  is oriented approximately parallel to lenses in said conventional

23  eyeglasses" in claim 1 of the '858 Patent means "contained on the

24  respective conventional frame and auxiliary frame parallel to the

25

26  _____

27  [8] Incidentally, this Court construed "magnetic member" in <u>Miracle</u> to mean "a permanent magnet
    or a ferromagnetic member, but at least either the first or second magnetic members must be a

28  permanent magnet." <u>Miracle</u> Claim Construction Order at 20:5-8.

1  plane of the lenses, which is the orientation that results in the

2  maximum orientation."  JS-'858, Exh. 1 at 7-8.  Conversely,

3  Counterclaimants argue that the phrase in question means that

4  "when the auxiliary eyeglasses are attached to the conventional

5  eyeglasses, the permanent magnets mounted on the conventional

6  eyeglasses are positioned relative to the magnets mounted on the

7  auxiliary eyeglasses such that the greatest possible amount of

8  magnetic attractive force between the magnets attainable will be

9  in the plane approximately parallel to the plane of the lenses of

10  the conventional eyeglasses."  JS-'858, Exh. 2 at 7.

11

12       In its Reply Brief, Revolution states:

13       The parties may be closer on this issue than first imagined.

14       . . .

15       Revolution's concern is that the defendants are attempting

16       to add language requiring the magnets have maximum magnetic

17       force in order to argue later that the strongest possible

18       magnets must be used.... Given that the parties appear to

19       agree that the orientation causes the maximum magnetic

20       attraction, Revolution's proposed claim construction is most

21       appropriate because it does not open up any inappropriate

22       issues concerning the gauss strength of the magnets.

23  Revolution's Reply Brief at 3:17-4:19.  It is clear to the Court

24  from reviewing the parties' briefs that Counterclaimants do not

25  seek to add language requiring that the magnets have a particular

26  gauss strength.  Instead, Counterclaimants' construction, like

27  Revolution's, seek to construe the instant phrase to mean that

28

1   the primary and auxiliary frame magnets are oriented in such a

2   way as to achieve maximum magnetic attraction.[9]

3   <u>See</u> Counterclaimant's Responsive Brief at 12:13-22.

4    Therefore, the Court construes the instant phrase to mean

5   that when the auxiliary eyeglasses are attached to the

6   conventional eyeglasses, the permanent magnets mounted on the

7   conventional eyeglasses are positioned relative to the magnets

8   mounted on the auxiliary eyeglasses such that the greatest

9   possible amount of magnetic force attainable between the magnets

10  will be in a plane approximately parallel to the plane of the

11  lenses of the conventional eyeglasses.   <u>See</u> Webster's, Nicodema

12  Decl. I, Exh. 3 at 36, defining "maximum" as "the greatest

13  possible, quantity, degree, or number."

14

15

16    (4)   "mounted to form recesses in said first pair of

17      sockets" ( claim 1)

18   Revolution contends that the phrase "mounted to form

19  recesses in said first pair of sockets" in claim 1 of the '858

20  Patent means "mounted in a first pair of sockets so that the

21  socket still contains a recess."   JS-'858, Exh. 1 at 10.

22

_____

[9] This, of course, begs the question of why the parties could not
have simply resolved this issue during their meet-and-confer
session on claim construction, which was specifically ordered by
the Court in its February 28, 2003 Minute Order.   The Court also
reminds the parties of their obligation under Local Rule 7-3 "to
discuss thoroughly...the substance of the contemplated motion and
any potential resolution" before filing such motion with the
Court.

1  Counterclaimants argue that the instant phrase means "positioned
2  sufficiently below the outer peripheral edges of the sockets so
3  as to define an opening between the mating surfaces and the outer
4  peripheral edges." JS-'858, Exh. 2 at 9.

5      In its Reply Brief, Revolution states:

6      Defendants' definition of this term improperly includes the
7      term 'mating surfaces.' 'Mating surfaces' does not appear
8      in the claim, and it is unnecessary to the understanding of
9      the claim.  No reason has been given for borrowing this term
10     from the specification.  For this reason alone, the
11     defendants' interpretation of the claim is improper.  <u>If
12     'mating surfaces' were deleted from the defendants'</u>
13     <u>definition of the term, then Revolution would agree to the</u>
14     <u>definition.</u>

15  Revolution's Reply Brief at 4:21-28 (emphasis added).
16  Preliminarily, the Court notes that, in their Responsive Claim
17  Construction Brief, Counterclaimants place no emphasis at all on
18  the use of the term "mating surfaces" in their construction of
19  the instant phrase.  <u>See</u> Counterclaimants' Responsive Brief at
20  13:5-15.  The Court agrees with Revolution that the term "mating
21  surfaces" is not necessary to construe the instant phrase.  Thus,
22  the Court adopts Counterclaimants' construction without the term
23  "mating surfaces."  Therefore the Court construes the instant
24  phrase to mean positioned sufficiently below the outer peripheral
25  edges of the sockets so as to define an opening between the
26  magnets and the outer peripheral edges.

19

1         (5)   "whereby said extended magnets in said second pair

2                 of sockets engage said recesses to automatically

3                 align and secure said auxiliary eyeglasses when

4                 mated with said magnets forming said recesses in

5                 said first pair of sockets" (claim 1)

6       Plaintiffs contend that the phrase "whereby said extended

7 magnets in said second pair of sockets engage said recesses to

8 automatically align and secure said auxiliary eyeglasses when

9 mated with said magnets forming said recesses inn said first pair

10 of sockets" in claim 1 of the '858 Patent means that "when

11 extended magnet clicks into place in the recess, the user

12 automatically knows that the auxiliary eyeglasses have been

13 properly positioned for use."  JS-'858, Exh. 1 at 13.

14       Counterclaimants construe the instant claim element to mean

15 that "when the magnets forming the recesses and the extended

16 magnets contact each other and join together through magnetic

17 attractive forces, the extended magnets will also contact

18 interior surfaces of the recesses, and this contact between the

19 extended magnets and the recesses, in combination with the mating

20 contact of the extended magnets and the magnets forming the

21 recesses, causes the auxiliary eyeglasses to be firmly attached

22 to the conventional eyeglasses, and the lenses of the auxiliary

23 eyeglasses to align with the lenses of the conventional

24 eyeglasses without any independent assistance of the wearer."

25 JS-'858, Exh. 2 at 12-13.

26

27

28

1   Revolution's construction seeks to reduce the functionality

2   of this elements to the "click[ing]" of the extended magnet into

3   the recess, even though the patent does not use any form of the

4   word "click."[10]  Revolution also fails to construe the following

5   elements of claim 1: 1) that the extended magnets "engage said

6   recesses"; 2) that the extended magnets be "mated" with the

7   magnets forming the recesses; and 3) that the alignment of the

8   frames be "automatic."  Revolution cites to Texas Instruments,

9   Inc. v. U.S. Int'l Trade Commn., 988 F.2d 1165, 1772 (Fed. Cir.

10   1993) to argue that "functional statements, [like the 'whereby'

11   element here], which merely state the result of the limitation

12   are not to be construed as limitations themselves."  Revolution's

13   Opening Brief Re '858 Patent at 9:23-10:4.  Contrary to

14   Revolution's argument, the instant claim element contains

15   additional structural features not present in any other part of

16   the claim - features that are necessary to describe how the

17   conventional and auxiliary eyeglasses interconnect - i.e., the

18   extended magnets "engage said recesses", and the extended magnets

19   are "mated" with the magnets forming the recesses.  These

20   structural features are necessary to show how the other recited

21   elements cooperate to secure the auxiliary sunglasses to the

22   conventional eyeglasses; and thus, are necessary to complete the

23   invention claimed.  Indeed, the inventor emphasized in the

24   patents specification that these features constituted a "unique

25

26

27   _____

28   [10] The Court also finds the term "click" to be ambiguous as applied to the instant invention.

21

1  and important improvement" to ensure "secure attachment and

2  alignment of auxiliary eyeglass frames 10 with conventional

3  eyeglass frame 12." Nicodema Decl. I, Exh. 1, '858 Patent, Col.

4  7, ll. 15-27.

5       The decision in <u>Texas Instruments</u> is completely

6  distinguishable.  There, the Federal Circuit held that the

7  "whereby/to preclude" clauses were not claim elements because the

8  clauses "[did] not contain any limitations not inherent to the

9  process found in" the claims.  <u>Texas Instruments</u>, 988 F.2d at

10 1172.  Here, in contrast, the requirements that the extended

11 magnets "engage the recesses," and that the extended magnets be

12 "mated" with the magnets forming the recesses only appear in the

13 "whereby" clause, and are not inherent parts of the eyeglass

14 structure recited in other portions of the claim.

15

16      In this case, the part of the specification relevant to the

17 phrase being construed states:

18      One can easily see the auxiliary eyeglasses approaching the

19      conventional eyeglasses with the appendages on the auxiliary

20      eyeglasses below the temple of the conventional eyeglass

21      frame.  Then with a very slight upward movement the magnets

22      attract and the auxiliary eyeglass frame is firmly attached.

23      This can be done simply and easily with one hand without any

24      feeling or fumbling that previous arrangements required.

25      The orientation is nearly automatic and doesn't require the

26

27

28

1    more careful alignment that is required of other

2    magnetically fastened auxiliary eyeglasses.[11]

3    Nicodema Decl., Exh. 1, '858 Patent, Col. 3, ll. 42-51.  Based on

4    the foregoing, the Court construes the instant phrase to mean

5    that when the magnets forming the recesses and the extended

6    magnets contact each other, this contact between the extended

7    magnets and the recesses causes the auxiliary eyeglasses to align

8    and secure to the conventional eyeglasses with little assistance

9    from the wearer.

10

11              (6)   "providing maximum resistance to downward movement

12                    of said auxiliary eyeglasses thereby preventing

13                    detachment of said auxiliary eyeglasses from said

14                    conventional eyeglasses" (claim 1)

15

16        Plaintiff argues that the phrase "providing maximum

17   resistance to downward movement of said auxiliary eyeglasses

18   thereby preventing detachment of said auxiliary eyeglasses from

19   said conventional eyeglasses" in claim 1 of the '858 Patent means

20   that "the orientation of the magnetic forces recited earlier in

21   the claim will result in maximum resistance to downward movement

22   of the auxiliary eyeglasses."  JS-'858, Exh. 1 at 14-15.

23

24   [11] In the "Background of the Invention" section of the '858 Patent, the inventor describes the

25   "problem" with some of the prior art as requiring "that the auxiliary eyeglass extensions ... be
     carefully placed above the temple hinge connections, [which] makes it [a] little more difficult to

26   attach the auxiliary frames to be sure that the extensions are placed carefully above the hinge
     connections of the conventional eyeglass.  In most cases a wearer has to remove his conventional

27   eyeglasses to attach the auxiliary lenses."  Nicodema Decl. I, Exh. 1, '858 Patent, Col. 2, ll. 12-

28   19.

Conversely, Counterclaimants argue that the instant phrase means that "the mated magnets provide the greatest possible amount of resistance to downward movement of the auxiliary eyeglasses so as to keep the auxiliary eyeglasses from separating from the conventional eyeglasses." JS-'858, Exh. 2 at 14.

The Court notes that Revolution's proposed construction merely repeats the claim element in question, and fails to construe its terms. Revolution again relies on <u>Texas Instruments</u> to argue that the instant claim term is merely a functional statement and not a claim limitation. <u>See</u> Revolution's Opening brief for the '858 Patent at 9:11-10:4. The Court disagrees. An important part of this invention, as expressed in the patent itself, is that the alignment of the magnets provides maximum resistance to the downward detachment of the auxiliary frame from the conventional frame. <u>See</u> Nicodema Decl. I, Exh. 1, '858 Patent, Col. 7, ll. 15-24. Thus, the present claim language dealing with the resistance to downward movement, language not present anywhere else in the claim, is part of the claim limitation. The Court finds that Counterclaimant's construction is consistent with the patent documents and the ordinary meaning of the words. Therefore, the Court adopts Counterclaimants' construction and construes the instant phrase to mean providing the greatest possible amount of resistance to downward movement of the auxiliary eyeglasses so as

1   to keep the auxiliary eyeglasses from separating from the

2   conventional eyeglasses.[12]

3

4                    (7) "a protective and decorative coating material

5                    on exposed sides of said plurality of magnets"

6                    (claim 3)

7        Revolution construes the phrase "a protective and decorative

8   coating material on exposed sides" in claim 3 of the '858 Patent

9   to mean that "the exposed surfaces of magnets or ferromagnetic

10  [sic] are substantially covered with a coating."   JS-'858, Exh. 1

11  at 16.   Counterclaimants, conversely, construe the instant phrase

12  to mean that "all visible sides of the magnets that are not

13  enclosed by the sockets formed on the temple extensions and the

14  appendages are covered with a layer of material that enhances the

15  aesthetic appearance of the magnets and provides protection from

16  normal wear and tear."   JS-'858, Exh. 2 at 16.

17

18       Preliminarily, the Court notes that, contrary to

19  Counterclaimants' assertion, it is not necessary to construe the

20  terms "decorative" and "protective."   The Court also notes that

21  Revolution's proposed construction improperly seeks to inject

22  into the claim element an apparent broadening requirement of

23

24

25

26  _____

27  [12] As previously discussed, see supra section "III B 2 a (3)," the interpretation of the terms
    "maximum resistance" to mean "greatest possible amount of resistance" does not infer that a

28  magnet with a particular gauss strength must be used.

1  "substantial[ity]" that is usupported by the patent documents.[13]
2  The relevant dictionary definitions of the terms in dispute are:
3  1) coat: "a layer of covering material: coating"; Webster's,
4  Nicodema Decl. I, Exh. 3 at 29; and 2) expose: "to make visible."
5  Id. at 33.  Based on the foregoing the Court construes the
6  instant phrase to mean a layer of protective and decorative
7  covering material on the visible sides of said plurality of
8  magnets.
9

10
11               (8)  "matches" (claim 4)
12      Revolution contends that the term "matches" in dependent
13  claim 4 means "is aesthetically consistent with the color"  JS-
14  '858, Exh. 1 at 17.  Conversely, Counterclaimants contend that
15  the instant term means "is the exact color."  JS-'858, Exh. 2 at
16  18.
17      The only reference in the specification that is relevant to
18  the instant term describes one of the preferred embodiments by
19  stating:
20      This embodiment improves the appearance of the magnets in
21      the conventional eyeglass frame 12' by covering the exposed
22      surface with a protective and decorative coating of material
23      72 configured to match the color and appearance of the
24      conventional eyeglass frames 12'.
25

26
27  _____
   [13] It is not clear if Revolution acquiesced to the proposed construction by Counterclaimants as
28  Revolution did not address the construction of the instant phrase in its Reply Brief.

Nicodema Decl. I, Exh. 1, '858 Patent Col. 7, ll. 5-9.  The dictionary definition of the verb "to match" is "1. a. to be exactly like: correspond precisely. b. to be like with respect to specified qualities.  2. To resemble or harmonize with <The lipstick *matches* the nail polish.>."  Nicodema Decl. I, Webster's, Exh. 3 at 35.  The dispute between the parties boils down to whether the court should adopt the first definition in Webster's, i.e., "to be exactly like," or the second definition, i.e., "to resemble or harmonize."  The Court finds that the first definition, which is sought by Counterclaimants, is unnecessarily restrictive.  There is no requirement in the patent documents that the color of the coating material on the magnets be exactly like the color of the frames; instead, a harmonization of the colors is encompassed by the claimed invention.  Therefore, the Court adopts the second definition in Webster's and construes "matches" to mean resembles or harmonizes with.

### b.   Disputed terms in the '545

The following terms and combination of terms in claims 6, 22 and 34 of the '545 patent are disputed: (1) "having a horizontal surface" (claim 6); (2) "secured in said projections" (claim 22); (3) "said first magnetic members capable of engaging second magnetic members of an auxiliary spectacle frame" (claim 22); (4) "said arms extending across a respective extension" (claim 34), and (5) "said first and second magnetic members engage one

27

1  another" (claim 34).   The Court now addresses each of these

2  disputed terms.

3

4       (1)  "having a horizontal surface"   (claim 6)

5   Claim 6 of the '545 Patent uses the phrase "having a

6  horizontal surface" in two contexts.   First, the claim refers to

7  the first magnetic members of the primary spectacle frame as

8  "having a horizontal surface."   Nicodema Decl. II, Exh. 1, '545

9  Patent, Col. 4, ll. 35-36.   Second, the claim refers to the

10  second magnetic members of the auxiliary frame as "having a

11  horizontal surface."   Id. at Col. 4, ll.   The Court will address

12  separately each use of the instant phrase.

13

14

15       (a)  "having a horizontal surface" - first

16         magnetic members in the primary frame

17   Counterclaimants construe the phrase "having a horizontal

18  surface" as used with the magnetic members of the primary frame

19  to mean "ha[ving] a surface that lies in a plane substantially

20  perpendicular to the plane of the lenses of the primary

21  spectacle frame."  JS-'545,  Exh. 1 at 5.  Conversely, Revolution

22  contends that the instant phrase means that "the first magnetic

23  members each have an _upperwardly_ [sic][14] facing surface that lies

24  in a plane that is substantially perpendicular to the plane of

25

26

27  _____

28  [14] Presumably, Revolution meant to say "upwardly."

1  the lenses of the primary spectacle frame." JS-'545, Exh. 2 at

2  26 (emphasis added).

3      The crux of the dispute between the parties is whether or

4  not the invention claimed in the '545 Patent is limited to a top-

5  mounting design.[15]  Counterclaimants contend that the '545 Patent

6  covers both a top and bottom-mounted designs; conversely,

7  Revolution argues that only a top-mounting design is covered by

8  the invention.

9      In this case, the specification of the '545 Patent describes

10  the attachment of the auxiliary frame in terms of top-mounting as

11

12  shown by the following:

13      The arms are engaged with and supported on the upper portion

14      of the primary spectacle frame so as to allow the auxiliary

15      spectacle frame to be stably supported on the primary

16      spectacle frame and so as to prevent the auxiliary spectacle

17      frame from moving downward....

18  '545 Patent, Nicodema Decl. II, Exh. 1, '545 Patent, Col 1, ll.

19  62-67 (emphasis added)

20      It is to be noted that the arms 21 are engaged with and are

21      supported on the upper portion of the primary spectacle

22      frame 10 such that the auxiliary spectacle frame 20 may be

23      stable supported and secured to the primary spectacle frame

24      10.

25

26  Id., Col. 2, ll. 49-56 (emphasis added).

----

27  [15] A "top-mounting design" is one where the magnetic members of the auxiliary frame mount on

28  top of the magnetic members of the primary frame.

29

[T]he arm 21 securing the magnetic member 22 is supported on
an <u>upper side</u> portion of the primary spectacle frame 10.  As
shown in FIG. 7, the upper side portion can be an upper part
of the side portion securing the projection 13.

<u>Id.</u>, Col. 3, ll. 14-18. (emphasis added).

While it is true, as Counterclaimants argue, that the claims
are generally not limited by the disclosed embodiments in the
patent, <u>see</u> <u>Electro Med. Sys., S.A. v. Cooper Life Sciences,
Inc.</u>, 34 F.3d 1048, 1054 (Fed. Cir. 1994), it does not, however,
follow that the patentee has a monopoly over the entire universe
of embodiments that may be created - whether or not such
embodiments are encompassed by the disclosed invention.
<u>See</u> <u>Netword LLC v. Centraal Corp.</u>, 242 F.3d 1347, 1352 (Fed. Cir.
2001) ("Although the specification need not present every
embodiment or permutation of the invention and the claims are not
limited to the preferred embodiment of the invention, neither do
the claims enlarge what is patented beyond what the inventor has
described as the invention.") (internal citations omitted); <u>see</u>
<u>also</u> <u>Slimfold Mfg. Co. v. Kinkead Indus., Inc.</u>, 810 F.2d 1113,
1116 (Fed. Cir. 1987) ("Claims are not interpreted in a vacuum,
but are part and are read in light of the specification.").
Indeed, the specification may limit the scope that a patent claim
is accorded in circumstances where no broader scope of the claim
is described or enabled by the embodiments disclosed therein.
<u>See e.g.</u>, <u>Kraft Foods, Inc. v. Int'l Trading Co.</u>, 203 F.3d 1362,
1367-69 (Fed. Cir. 2000) (limiting "back panel" to the "rigid"

1   back panel described in every embodiment in the specification and

2   excluding the "flexible back panel of the accused device").[16]

3   Here, the invention described is clearly for a top-mounting

4   design: the written description only describes a top-mounting

5   design, the drawings only show a top-mounting configuration and

6   nothing in the prosecution history shows that the inventor

7   envisioned anything other than a top-mounting design.[17]

8

9       Based on the foregoing, the Court adopts the construction

10  proposed by Revolution and construes the instant phrase to mean

11  that the first magnetic members each have an upwardly facing

12  surface that lies in a plane that is substantially perpendicular

13  to the plane of the lenses of the primary spectacle frame.[18]

14

---

15  [16] At Oral Argument, on May 2, 2003, Counterclaimants' counsel argued that Texas Digital

16  Systems, Inc. v. Telegenix, Inc., 308 F.3d 1193, 1201-03 (Fed. Cir. 2002), instructs that the
    focus of claim construction should be on the claims themselves. See also Mem. of P's & A's in

17  Support of Counterclaimants' Opening Brief at 3:22-27 (citing Texas Digital Systems, Inc., 308
    F.3d at 1202). The Court notes that the argument proffered by Counterclaimants as to claim

18  construction is quite unremarkable. Indeed, this Court, in its Miracle Claim Construction Order,
    stated with regard to the steps involved in construing claims: "First a court must look to the

19  words of the claims themselves, both asserted and non-asserted, to define the scope of the
    patented invention." Miracle Claim Construction Order at 16:1-3. In the instant case, the Court

20  is not deviating from well-established Federal Circuit precedent requiring that "[i]n construing
    claims, the focus ... begin and remain centered on the language of the claims themselves." Texas

21  Digital, Inc., 308 F.3d at 1201. Instead, the Court is also incorporating into its analysis Federal

22  Circuit precedent that instructs that the claims, although they are the focus of claim construction,
    are not to be construed in a vacuum, i.e., without regard to what the inventor disclosed as his

23  invention. See Slimfold Mfg. Co., 810 F.2d at 1116.

24

25  [17] Incidentally, in the Miracle Claim Construction Order, this Court also limited claims 12 and 16
    to a top-mounting design. See Miracle Claim Construction Order at 27-28.

26

27  [18] The Court need not reach the other arguments raised by Revolution in support of its proposed
    construction, including the arguments regarding the interference proceedings of the '207 Patent

28  and the prosecution history of the '858 Patent.

1
2

(b)  "having a horizontal surface" - second

magnetic members in the auxiliary frame

3
4
5
6
7
8
9
10
11
12

Counterclaimants construe the phrase "having a horizontal surface" as used with the magnetic members in the auxiliary frame to mean "ha[ving] a surface that lies in a plane substantially perpendicular to the plane of the lenses of the auxiliary spectacle frame." JS-'545 Patent, Exh. 1 at 5.  Conversely, Revolution construes the instant phrase to mean "ha[ving] a downwardly facing surface that lies in a plane substantially perpendicular to the plane of the lenses of the auxiliary spectacle frame." JS-'545 Patent, Exh. 2 at 6 (emphasis added).

13
14
15
16
17
18
19
20
21
22

Here again, the dispute between the parties centers on whether the disclosed invention is limited to a top-mounting design.  As the Court already held above, see supra section "III B 2 b(1)(a)," the invention disclosed in the '545 Patent is limited to a top-mounting design.  Therefore, the Court adopts Revolution's proposed construction and construes the instant phrase to mean having a downwardly facing surface that lies in a plane substantially perpendicular to the plane of the lenses of the auxiliary spectacle frame.

23
24
25

(2)  "secured in said projections" (claim 22)

26
27
28

Counterclaimants contend that the phrase "secured in said projections" in claim 22 of the '545 Patent means that "each first magnetic member is inserted into and firmly connected to a

32

1   corresponding projection in a manner such that the connection is

2   not likely to fail or give way." JS-'545, Exh. 1 at 11.

3   Revolution, on the other hand, construes the instant phrase to

4   mean that "each first magnetic member is inserted into and firmly

5   connected to a corresponding projection in a manner that permits

6   it attract [sic] a second magnetic member when placed <u>above</u> the

7   first magnetic member." JS-'545, Exh. 2 at 12 (emphasis added).

8

9       Again, the parties' dispute centers on whether the invention

10   is limited to a top-mounting design. However, this particular

11   element of claim 22 need not address the issue of top-mounting as

12   it only deals with the connection of the first magnetic members

13   to the projections of the primary spectacle frame. Instead, the

14   top-mounting limitation is more appropriately addressed in the

15   element of claim 22 dealing with the auxiliary spectacle frame,

16   which the court addresses next.

17       Consistent with the Court's <u>Miracle</u> Claim Construction

18   Order, the Court adopts Counterclaimants' construction of

19   "secured" to mean not likely to fail or give away. <u>See</u> <u>Miracle</u>

20   Claim Construction Order at 22:3-9. Therefore, the Court

21   construes the instant phrase to mean that each first magnetic

22   member is inserted into and firmly connected to a corresponding

23   projection in a manner such that the connection is not likely to

24   fail or give.

25

26

27

28

33

(3)  "said first magnetic members capable of
engaging second magnetic members of an
auxiliary spectacle frame" (claim 22)

Counterclaimants construe the phrase "said magnetic members capable of engaging second magnetic members of an auxiliary spectacle frame" in claim 22 of the '545 Patent to mean that "the first magnetic members have the ability to magnetically attract corresponding magnetic members of an auxiliary spectacle frame, with or without actual contact."  JS-'545, Exh.1 at 12-13. Conversely, Revolution argues that the instant phrase means that "the first magnetic members have the ability to magnetically attract the corresponding second magnetic members of an auxiliary spectacle frame when placed above the first magnetic member, with or without actual contact."  JS-'545, Exh. 2 at 14 (emphasis added).

Again, the dispute between the parties hinges on whether the claimed invention is limited to a top-mounting design. For the reasons stated above, see supra section "III B 2 b(1)(a)," the Court adopts Revolution's construction and interprets the instant phrase to mean the first magnetic members have the ability to magnetically attract the corresponding second magnetic members of an auxiliary spectacle frame when placed above the first magnetic member, with or without actual contact.

34

(4)  "said arms extending across a respective extension" (claim 34)

Counterclaimants construe the phrase "said arms extending across a respective extension" in claim 34 of the '545 Patent to mean that "at least some portion of each arm reaches across the corresponding extension." JS-'545, Exh. 1 at 17. Revolution contends that the instant phrase means that "at least some portion of each arm reaches across the top of the corresponding extension." JS-'545, Exh. 2 at 18 (emphasis added).

Here again, the dispute between the parties hinges on whether the claimed invention describes a top-mounting design. For the reasons set forth above, see supra section "III B 2 b(1)(a)," the Court adopts Revolution's construction and construes the instant phrase to mean that at least some portion of each arm reaches across the top of the corresponding extension.

(5)  "said first and second magnetic members engage one another" (claim 34)

Counterclaimants construe the phrase "said first and second magnetic members engage one another" in claim 34 fo the '545 Patent to mean that the "first and second magnetic members magnetically attract one another, with or without actual contact." JS-'545, Exh. 1 at 20. Revolution, however, construes the instant phrase to mean that "the first and second magnetic

35

1  members are magnetically attracted to each other when the second

2  magnetic member is placed in proximity <u>above</u> the first magnet

3  [sic].[19]"   JS-'545, Exh. 2 at 20.

4      The crux of the parties dispute is again whether the design

5  disclosed by the invention is top-mounting.  For the reasons set

6  forth above, <u>see</u> <u>supra</u> section "III B 2 b(1)(a)," the Court

7  adopts Revolution's construction and construes the instant phrase

8  to mean that the first and second magnetic members are

9  magnetically attracted to each other when the second magnetic

10  member is placed in proximity above the first magnetic member.

11

12  **IV.   CONCLUSION**

13      Based on the foregoing, the Court concludes that:

14

15      1.   "plurality of sockets" in claim 1 of the '858 Patent

16           means two or more openings into which an inserted part

17           is designed to fit;

18      2.   "magnets" in claims 1-3 of the '858 Patent means

19           permanent magnets;

20

21      3.   "being oriented such that the maximum magnetic

22           attractive force between said magnets is oriented

23           approximately parallel to lenses in said conventional

24           eyeglasses" in claim 1 of the '858 Patent means that

25           when the auxiliary eyeglasses are attached to the

26           conventional eyeglasses, the permanent magnets mounted

27  _____

28  [19] Presumably, Revolution meant to say "magnetic member."

36

on the conventional eyeglasses are positioned relative to the magnets mounted on the auxiliary eyeglasses such that the greatest possible amount of magnetic force attainable between the magnets will be in a plane approximately parallel to the plane of the lenses of the conventional eyeglasses;

4.  "mounted to form recesses in said first pair of sockets" in claim 1 of the '858 Patent means positioned sufficiently below the outer peripheral edges of the sockets so as to define an opening between the magnets and the outer peripheral edges;

5.  "whereby said extended magnets in said second pair of sockets engage said recesses to automatically align and secure said auxiliary eyeglasses when mated with said magnets forming said recesses in said first pair of sockets" in claim 1 of the '858 Patent means that when the magnets forming the recesses and the extended magnets contact each other, this contact between the extended magnets and the recesses causes the auxiliary eyeglasses to align and secure to the conventional eyeglasses with little assistance from the wearer;

6.  "providing maximum resistance to a downward movement of said auxiliary eyeglasses thereby preventing detachment of said auxiliary eyeglasses from said conventional eyeglasses" in claim 1 of the '858 Patent means

37

providing the greatest possible amount of resistance to downward movement of the auxiliary eyeglasses so as to keep the auxiliary eyeglasses from separating from the conventional eyeglasses;

7.    "a protective and decorative coating material on exposed sides of said plurality of magnets" in claim 3 of the '858 Patent means a layer of protective and decorative covering material on the visible sides of said plurality of magnets;

8.    "matches" in claim 4 of the '858 Patent means resembles or harmonizes with;

9.    "having a horizontal surface" as used with the first magnetic members in the primary frame in claim 6 of the '545 Patent means that the first magnetic members each have an upwardly facing surface that lies in a plane that is substantially perpendicular to the plane of the lenses of the primary spectacle frame;

10.   "having a horizontal surface" as used with the second magnetic members of the auxiliary frame in claim 6 of the '545 patent means having a downwardly facing surface that lies in a plane substantially perpendicular to the plane of the lenses of the auxiliary spectacle frame;

11.   "secured in said projections" in claim 22 of the '545 Patent means that each first magnetic member is

38

inserted into and firmly connected to a corresponding projection in a manner such that the connection is not likely to fail or give;

12. "said first magnetic members capable of engaging second magnetic members of an auxiliary spectacle frame" in claim 22 of the '545 Patent means the first magnetic members have the ability to magnetically attract the corresponding second magnetic members of an auxiliary spectacle frame when placed above the first magnetic member, with or without actual contact;

13. "said arms extending across a respective extension" in claim 34 of the '545 Patent means that at least some portion of each arm reaches across the top of the corresponding extension; and

14. "said first and second magnetic members engage one another" in claim 34 of the '545 Patent means that the first and second magnetic members are magnetically attracted to each other when the second magnetic member is placed in proximity above the first magnetic member.

IT IS SO ORDERED.

Dated: _May 5, 2003_

_Lourdes G. Baird_

LOURDES G. BAIRD
United States District Judge