# EXHIBIT E

Case 2:02-cv-01087-VAP-CW   Document 206   Filed 08/07/2003   Page 1 of 34

ORIGINAL

CLERK, U.S. DISTRICT COURT
AUG - 7 2003
CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

INTERNE
CLERK, U.S. DISTRICT COURT
AUG - 6 2003
CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

Priority ___
Send ___
Enter ___
Closed ___
JS-5/JS-6 ___
JS-2/JS-3 ___
Scan Only ___

1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

9

CENTRAL DISTRICT OF CALIFORNIA

10

11   Revolution Eyewear, Inc.,

12                    Plaintiff,

13        v.

14   Aspex Eyewear, Inc. et al.,

15                    Defendants.

16

17

18   **I.   INTRODUCTION**

| | |
|---|---|
| CV 02-1087 LGB (CWx) | |

ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

19        In the present action, plaintiff Revolution Eyewear, Inc.

20   ("Plaintiff" or "Revolution") alleges that defendants Aspex

21   Eyewear, Inc. ("Aspex"), Thierry Ifergan ("Ifergan"), Real Eyes

22   Optical ("REO") and Scott Strenk ("Strenk") infringe its U.S.

23   Patent No. 6,343,858 (the "'858 Patent").       Defendant and

24   counterclaimant Aspex contend that Revolution infringes U.S.

25   Patent No. RE 37,545E (the "'545 Patent") issued to Aspex,

26   Manhattan Design Studio, Inc., Contour Optik, Inc. and Asahi

27   Optical Co., Ltd. (collectively "Counterclaimants").  Presently

28

1



DEPOSITION EXHIBIT
10

206

REV 00932

1  before the Court is Revolution's motion seeking summary judgment

2  against Counterclaimants[1] for non-infringement of the '545 Patent

3  and against defendant Aspex for infringement of the '858 Patent.[2]

4

5  II.  FACTUAL AND PROCEDURAL HISTORY

6       A.   Factual Background

7       For purposes of the instant motion, the Court finds the

8  following facts to be relevant.  The technology at issue in this

9  case involves a spectacle frame that supports an auxiliary frame,

10 enabling the user to securely fasten a second set of lenses

11 (e.g., sunglass lenses) onto the primary frame (often holding

12 prescription lenses).  Revolution's '858 Patent, which issued on

13 February 5, 2002, is directed to a method and apparatus for

14 mounting auxiliary eyeglasses on conventional eyeglasses in which

15 magnets are attached to appendages on the auxiliary eyeglasses

16 mating with magnets mounted on the temple extensions of

17 conventional eye-glasses.

18

19      Aspex's '545 Patent, which issued on February 12, 2002, is

20 directed to a spectacle frame that supports an auxiliary lens

21 frame through an arrangement using magnetic members.  The '545 is

22

23

24

25 ────────────────

26 [1]  Although Revolution moved for summary judgment as to Aspex only, the Court will presume
   that, as to the '545 Patent, Revolution is moving for summary judgment of non-infringement

27 against all Counterclaimants.

28 [2]  In this Order, the Court will refer to defendant Aspex and to Counterclaimants as "Aspex."

2

REV 00933



1  a reissue of Aspex's original U.S. Patent No. 5,568,207 (the

2  "'207 Patent"), which has now been surrendered.[1]

3       B.   Procedural Background

4       On May 5, 2003, this Court issued its order construing the

5  claims in dispute in the '545 and the '858 Patents (the "Claim

6  Construction Order").   The instant Motion for Summary Judgment

7  was filed on June 30, 2003 (the "Motion").   On July 14, 2003,

8  Aspex filed its Opposition (the "Opposition").   On July 21, 2003,

9  Revolution filed its Reply (the "Reply").   The Court now rules on

10  Revolution's Motion for Summary Judgment.

11

12

13  III. LEGAL STANDARDS

14       A.   Summary Judgment Standard

15       Rule 56 of the Federal Rules of Civil Procedure provides

16  that a court shall grant a motion for summary judgment if "the

17  pleadings,   depositions,   answers   to   interrogatories,   and

18  admissions on file, together with the affidavits, if any, show

19  that there is no genuine issue as to any material fact and that

20  the moving party is entitled to judgment as a matter of law."

21  Fed. R. Civ. P. 56(c). Material facts are those that may affect

22

23

24  [1] This Court has previously found on summary judgement, in a related case, that Revolution does

25  not infringe Aspex's original '207 patent issued to Chao. See Aspex Eyewear, Inc. v.

26  Revolution Eyewear, Inc., CV 99-1623, Order Granting Defendant's Motion for Summary
   Judgment on Revolution's Claim of Patent Infringement, June 4, 2001, Docket Entry No. 184.

27  The Federal Circuit affirmed this Court's finding of non-infringement. See Case No. CV-1623,
   Docket Entry No. 217. In the instant case, Aspex alleges that Revolution infringes claims 6, 22

28  and 34 of the '207 Reissue Patent - the '545 Patent.

3

REV 00934

1  the outcome of the case. See Anderson v. Liberty Lobby, Inc., 477

2  U.S. 242, 248 (1986). A dispute as to a material fact is genuine

3  if there is sufficient evidence for a reasonable jury to return a

4  verdict for the nonmoving party. Id.

5      The party moving for summary judgment bears the initial

6  burden of informing the district court the basis of the summary

7  judgment motion, and of demonstrating the absence of a genuine

8  issue of material fact for trial. See Celotex Corp. v. Catrett,

9  477 U.S. 317, 323 (1986); Katz v. Children's Hosp. of Orange

10 County, 28 F.3d 1520, 1534 (9th Cir. 1994). On an issue for which

11 the nonmoving party has the burden of proof at trial, the moving

12 party need only point out "that there is an absence of evidence

13 to support the nonmoving party's case." Celotex, 477 U.S. at 325.

14 Once this initial burden is satisfied, the non-moving party is

15 required to "go beyond the pleadings and by her own affidavits,

16 or by the depositions, answers to interrogatories, and admissions

17 on file, designate 'specific facts' showing that there is a

18 genuine issue for trial." Celotex, 477 U.S. at 324 (internal

19 quotations omitted); see Nilsson, Robbins, Dalgarn, Berliner,

20 Carson & Wurst v. Louisiana Hydrolec, 854 F.2d 1538, 1544 (9th

21 Cir. 1988). Where the standard of proof at trial is preponderance

22 of the evidence, the non-moving party's evidence must be such

23 that a "fair-minded jury could return a verdict for the [non-

24 moving party] on the evidence presented." Anderson, 477 U.S. at

25 252.

26 B.   Patent Infringement

27

28

4

REV 00935

1    The determination of infringement is a two-step process.
2  First, the court must construe the asserted claims as a matter of
3  law to ascertain their meaning and scope. Dawn Equip. Co. v.
4  Kentucky Farms Inc., 140 F.3d 1009, 1014 (Fed. Cir. 1998).
5  Second, the claims as construed are compared to the allegedly
6  infringing device. Id. To infringe a claim, each claim limitation
7  must be present in the accused product, either literally or
8  equivalently. Sofamor Danek Group, Inc. v. DePuy-Motech, Inc., 74
9
10  F.3d 1216, 1220 (Fed. Cir. 1996).

11    Under the doctrine of equivalents, an accused product which
12  does not literally infringe a claim may infringe "if it performs
13  substantially the same function in substantially the same way to
14  obtain the same result." Graver Tank & Mfg. Co. v. Linde Air
15  Prods. Co., 339 U.S. 605, 608 (1950). To work "insubstantially
16  the same way," all the limitations of the claim must be satisfied
17  at least equivalently. Becton Dickinson and Co. v. C.R. Bard,
18  Inc., 922 F.2d 792, 798 (Fed. Cir. 1990).
19

20
21  IV.  ANALYSIS

22    By the instant motion, Revolution moves for summary judgment
23  of non-infringement, either literally or equivalently, of claims
24  6, 22 and 34 of the '545 Patent, the only three claims asserted
25  by Aspex.   Revolution also moves for partial summary judgment
26  against Aspex for infringement of claim 1 of the '858 Patent.
27  The Court will first address Revolution's motion as to the '545
28  Patent.

REV 00936

1  **A.  Revolution's Motion for Summary Judgment as to the '545**

2      **Patent**

3      In its moving papers, Revolution asserts that its accused

4  product, a physical sample of which is attached as Exhibit 4 to

5  the Declaration of Gary Zelman ("Zelman Decl."), does not

6  infringe claims 6, 22 and 34 of the '545 Patent.  Aspex opposes

7  Revolution's motion for summary judgment only as to claim 22 of

8  the '545 Patent.    Therefore, since Aspex has not opposed

9  Revolution's summary judgment motion as to claims 6 and 34, and

10 thus failed to raise a genuine issue of material fact as to

11 whether Revolution's accused product infringes claims 6 and 34 of

12 their '545 Patent, the Court hereby grants Revolution's motion

13 for partial summary judgment of non-infringement, either

14 literally or equivalently, of claims 6 and 34 of the '545 Patent.

15 The Court now addresses Revolution's motion as to claim 22.

16     Claim 22 of the '545 Patent states:

17 A primary spectacle frame for supporting primary lenses

18    therein and having two side portion extensions extending

19    rearwardly therefrom and having a front side, a rear side, a

20    top side, and a rear end, each of said rear ends pivotally

21    coupling a leg configured to conform to a user at a distal

22    end thereof, each of said extensions of said primary

23    spectacle frame further having a projection attached to each

24    of said rear sides, and a pair of first magnetic members

25    respectively secured in said projections, said first

26

27

28

6

1   magnetic members capable of engaging second magnetic members
2   of an auxiliary spectacle frame⁴ so that lenses of an
3   auxiliary spectacle are located in front of said primary
4   lenses.
5
6   In its Claim Construction Order, the Court construed the
7   following terms in claim 22:
8       1)   "secured in said projections" means that each first
9            magnetic member is inserted into and firmly connected
10           to a corresponding projection in a manner such that the
11           connection is not likely to fail or give; and
12      2)   "said first magnetic members capable of engaging second
13           magnetic members of an auxiliary spectacle frame" means
14           the first magnetic members have the ability to
15           magnetically attract the corresponding second magnetic
16           members of an auxiliary spectacle frame when placed
17           above the first magnetic member, with or without actual
18           contact.
19
20  Claim Construction Order at 38:27-39:5.  Thus, the Court has
21  construed claim 22 to require that (a) the pair of first magnetic
22  members must be inserted into and firmly connected to a
23  corresponding projection in a manner such that the connection is
24  not likely to fail or give, and (b) the first magnetic members in
25  the primary frame must have the ability to magnetically attract
26  the corresponding second magnetic members in the auxiliary frame
27  _____
28  ⁴ The disputed terms that were construed by the Court are shown in bold.

7

1  when these second magnetic members in the auxiliary frame are
2  placed above the first magnetic members such that the lenses of
3  the auxiliary frame are located in the front of the primary
4  lenses.   The Court now addresses the following issues raised by
5  Revolution in its Motion: 1) whether Aspex is collaterally
6  estopped from asserting infringement of the '545 Patent; 2)
7  whether Revolution's accused product[3] literally infringes claim
8  22 of the '545 Patent; and 3) whether Revolution's accused
9  product infringes claim 22 of the '545 Patent under the doctrine
10  of equivalents.
11
12      1.   Whether Aspex is collaterally estopped from
13           asserting infringement of the '545 Patent?
14      In its moving papers, Revolution argues that Aspex is
15  collaterally estopped from asserting infringement of the '545
16  Patent in light of the Court's summary judgment ruling in the
17  '207 Patent case and the Court's Claim Construction Order in this
18  case.  The doctrine of collateral estoppel, commonly referred to
19  as issue preclusion, prevents the re-litigation of issues argued
20  and decided in prior proceedings.  See Blonder-Tongue Labs. v.
21  Univ. of Ill. Found., 402 U.S. 313, 329 (1971).  Issue preclusion
22  is appropriate if (1) the issue is identical to that decided in
23  the former proceeding; (2) the issue was actually litigated in
24  the former proceeding; (3) resolution of the issue was essential
25
26  ────────────
27  [3] The parties do not specify which of Revolution's products are accused of infringing the '545
    Patent. Revolution did provide the Court with one exemplar with "IMF306" as its "style." See
28  Zelman Decl., Exh. 4.

8

REV 00939



1  to a final judgment in the former proceeding; and (4) the party
2  against whom preclusion is sought had a full and fair opportunity
3  to litigate the issue in the first proceeding.  A.B. Dick. Co. v.
4  Burroughs Corp., 713 F.2d 700, 702 (Fed. Cir. 1983).  None of
5  these elements is present in this instant case.
6
7      The infringement issues with respect to claim 22 of the '545
8  Patent are not identical to the infringement issue in the '207
9  Patent case; and the issue here with respect to infringement of
10  claim 22 was not actually litigated in the '207 Patent case.  The
11  '207 Patent contained only 2 claims, and the claim at issue was
12  claim 1.  At the time the '207 Patent case was being litigated
13  against Revolution, neither the '545 Patent nor claim 22 of that
14  patent was in existence.  Claim 1 of the '207 Patent recited a
15  combination primary frame and auxiliary frame.  Claim 1 recited
16  specific structures and functions, not just the capacity to
17  perform a function.  Here, in contrast, claim 22 of the '545
18  Patent is a claim to a primary spectacle frame only, not a
19  primary frame/auxiliary frame combination.  In further contrast,
20  claim 22, as construed by the Court, only requires that the
21  magnetic members of the primary frame be capable of, or have the
22  ability to, magnetically attract corresponding magnetic members
23  of an auxiliary frame when placed above the first magnetic
24  members.
25
26      In addition, because claim 1 of the '207 Patent was to a
27  combination primary frame/auxiliary frame, the infringement issue
28

9

REV 00940

1  centered around the question of whether the misalignment caused
2  by taking Revolution's bottom-mounted auxiliary frame and placing
3  it on top of the primary frame was a reasonable modification that
4  caused the accused product to be capable of infringing claim 1 of
5  the '207 Patent.   Here, in contrast, because there is a
6  "capability" requirement built into claim 22, and the claim is
7  just to a primary frame, reasonable modification or any
8  modification of Revolution's primary frame is not an issue.   The
9  only question is whether Revolution's primary frame satisfies all
10 the requirements or limitations of claim 22.
11
12        Further, since: (1) claim 22 of the '545 Patent did not
13 exist during the '207 Patent litigation against Revolution; and
14 (2) there was no claim of the '207 patent of comparable scope,
15 i.e., a claim to a primary frame only with a "capability"
16 requirement built into it, resolution of the infringement issue
17 respecting claim 22 could not have been essential to a final
18 judgment in the '207 Patent case; and Aspex could not have had a
19 full and fair opportunity to litigate claim 22 in that
20 proceeding.
21
22        At Oral Argument, on August 6, 2003, Revolution's counsel
23 argued that the Court, in its June 4, 2001 Order in the '207
24 Patent case, effectively decided the issue of whether
25 Revolution's accused product is capable of top mounting.   The
26 Court has spent considerable time reviewing its ruling in the
27 '207 Patent case. As already noted, in the '207 Patent case, the
28

REV 00941



1   claim in question was to a combination primary frame and
2   auxiliary frame. As such, in the June 4, 2001 Order, the Court
3   focused on the misalignment of the auxiliary frame when placed on
4   top of the primary frame and the instability that results from
5   such configuration. See June 4, 2001 Order at 11-12. In this
6   case, however, and consistent with claim 22, the focus is simply
7   on Revolution's primary frame. Aspex has offered evidence to
8   show that an auxiliary frame can be constructed to fit on top of
9   Revolution's accused primary frame without causing a misalignment
10  between the lenses of the two frames. See Ifergan Decl., ¶¶ 4-6.
11        Accordingly, since the patent claims and infringement issues
12  in both proceedings are different, the Court's summary judgment
13  order in the '207 Patent case does not have any collateral
14  estoppel effect here.
15
16
17        2.   Whether Revolution's accused product literally
18             infringes claim 22 of the '545 Patent?
19        In its moving papers, Revolution argues that the auxiliary
20  frame in the accused product sold by Revolution is not designed
21  to attach to the primary frame from the top. Instead, and as can
22  be seen from the physical sample submitted by Revolution, see
23  Zelman Decl., Exh. 4, the first magnetic members in the primary
24  frame attract the second magnetic members in the auxiliary frame
25  when the second magnetic members are placed below the first
26  magnetic members.
27
28

11

REV 00942

1    Relying on <u>Intel v. U.S. Int'l Trade Comm'n</u>, 946 F.2d 821
2  (Fed. Cir. 1991), and its progeny, Aspex argues in its Opposition
3  that Revolution's accused product literally infringes claim 22 of
4  the '545 Patent.  Specifically, Aspex states:
5        Claim 22 is directed only to the primary spectacle frame,
6        not the primary/auxiliary frame combination.  No limitations
7        respecting the auxiliary spectacle frame appear in claim 22
8        other than that the first magnetic members of the primary
9        frame be capable of engaging second magnetic members [of] an
10        auxiliary frame so that lenses of an auxiliary spectacle
11        frame are located in front of the primary lenses.  Because
12        claim 22 is directed to the primary frame alone, the Patent
13        Office found the primary frame to be an independently
14        patentable invention.
15
16  Opposition at 20:15-21.  At bottom, Aspex is arguing that
17  because the auxiliary frame of the accused product can be placed
18  above the primary frame such that the magnetic members of the
19  auxiliary frame are attracted to the corresponding magnetic
20  members of the primary frame, Revolution's accused product
21  infringes claim 22.  Thus, Aspex contends, "[i]f Revolution
22  wanted to prevent its primary frames from having the 'capacity'
23  or 'ability' to magnetically engage corresponding magnets, it
24  should have designed the primary frames so as to eliminate the
25  magnetically attractive capability of the upper surfaces of the
26  primary frame magnets."  Opposition at 22:5-11.
27
28

12



1    The analysis of whether Revolution's accused product
2  infringes claim 22 is covered by an area of patent law commonly
3  referred to as "capacity for infringing use." See generally
4  Donald S. Chisum, Chisum on Patents, Vol. 5 § 16.02 [3] [c]
5  (hereinafter "Chisum on Patents").

6    Preliminarily, the Court finds it helpful to set forth the
7  applicable law on "capacity for infringing use" as stated by
8  Professor Donald S. Chisum:

9    Federal Circuit decisions focus on what the patent claim in
10    question requires; if the claim only requires that a device
11    have the capacity to perform a function, one who makes a
12    device with that capacity without the patent owner's
13    authority is a direct infringer even though the maker's
14    customers do not use the capacity. On the other hand, if
15    the claim requires a structure or function, one who makes a
16    device without that structure or function is not a direct
17    infringer even though the customers can modify the device to
18    obtain the structure or function.

19 Chisum on Patents, Vol. 5 § 16.02 [3] [c] at 16-42. In High Tech
20 Med. Instrumentation, Inc. v. New Image Indus., Inc., 49 F.3d
21 1551 (Fed. Cir. 1995), the patent concerned a hand-held endoscope
22 for dental work. The endoscope included a video camera in a
23 tube, which a dentist could place in a patient's mouth to video
24 screen images of oral cavity areas. The claim at issue required
25 a body member, a camera disposed in the body member, and the

13

REV 00944

1  camera "being rotatably coupled to said body member."  Id. at
2  1553.  In granting a preliminary injunction, the District Court,
3  relying upon Intel, found that the patentee established a
4  likelihood of success on infringement, holding that because the
5  defendant's camera "can be rotated within its housing when the
6  set screws are loosened, the [accused] camera must be considered
7  'rotatably coupled' to the body member."  Id. at 1553-54.  The
8  Federal Circuit reversed, ruling as follows:
9
10     Intel does not support so broad a holding.  All that was
11     required by the limitation at issue in Intel was that the
12     claimed invention, an integrated circuit memory device, was
13     "programmable" to operate in a certain manner.  The accused
14     device, although not specifically designed or sold to
15     operate in that manner, could be programmed to do so; that
16     is, it was "programmable" to operate in the designated mode.
17     The claim at issue in Intel therefore read on the accused
18     device, as made and sold.  The [defendant's] AcuCam camera,
19     by contrast, is not rotatable within its housing unless the
20     AcuCam is altered, at least to the extent of removing or
21     loosening the set screws that secure the camera to the
22     housing.
23
24  Id. at 1555.  In this case, claim 22 is directed only to the
25  primary spectacle frame, not the primary/auxiliary frame
26  combination.  Claim 22 has a "capability" requirement as part of
27  its plain language: "said first magnetic members capable of
28



1  engaging second magnetic members of an auxiliary spectacle
2  frame." The Court construed this phrase to mean that "the first
3  magnetic members have the ability to magnetically attract the
4  corresponding second magnetic members of an auxiliary spectacle
5  frame when placed above the first magnetic member, with or
6  without actual contact." Claim Construction Order at 34:22-25.
7  Thus, in construing claim 22, the Court recognized that the
8  magnetic members of the primary frame need only be capable of, or
9  "have the ability to," magnetically attract magnetic members on
10 an auxiliary spectacle frame placed above the first magnetic
11 members.

12     In support of its Opposition, Aspex has offered evidence to
13 show that, although the top surfaces of the primary frame magnets
14 of the accused products have a thin, decorative coating, this
15 coating was placed on the magnets for aesthetic purposes. See
16 Zelman Depo. at 54:1-8 and 107:4-9, attached as Exh. 3 to the
17 Declaration of Barry J. Schindler ("Schindler Decl."). Aspex has
18 also offered evidence to show that Revolution has no test data or
19 any other evidence establishing that the decorative coating
20 hinders the magnetically attractive capability of the top
21 surfaces of the primary frame magnetic members in any way. See
22 Zelman Depo. at 216:9-217:2, attached as Exh. 3 to the Schindler
23 Decl. Furthermore, Aspex has offered the declaration of Aspex's
24 Vice President Thierry Ifergan ("Ifergan Decl."), who states that
25 the magnets of Revolution's primary frames presently have the
26
27
28

15

REV 00946

1   ability, without modification of the magnets, removal of the
2   decorative coating, or modification of any other part of the
3   primary spectacle frame, to magnetically attract the
4   corresponding second magnetic members of the an auxiliary frame
5   when placed above the first magnetic members. See Ifergan Decl.,
6   ¶ 4. Indeed, and as shown by the photographs of Revolution's
7   primary frame attached to Ifergan's declaration, a pair of
8   auxiliary frames can be constructed with magnets that can
9   magnetically engage the corresponding magnets of the primary
10  frame when placed above the primary frame magnets, such that the
11  auxiliary frame will be aligned with and stably supported on the
12  primary frame, and without modifying the primary frame in any
13  way. Id. at ¶¶ 4-6.
14
15      In its Reply, Revolution argues that "[a]s defined by the
16  court, [the] first magnetic members [of the primary frame] must
17  be upwardly facing ... [and] be capable of engaging second,
18  downwardly facing, magnetic members of an auxiliary frame from
19  the top of primary frame *such that the lenses of the auxiliary*
20  *frame are located in front of said primary lenses in the primary*
21  *frame.*" Pl.'s Reply at 5:15-19 (emphasis in original). Although
22  the Court did state in its Claim Construction Order that the
23  first magnetic members, located in the primary frame, must each
24  have an upwardly facing surface, and the second magnetic members,
25  located in the auxiliary frame, must each have a downwardly
26  facing surface, that construction was in relation to claim 6 and
27
28

                                    16

REV 00947



1  not claim 22 of the '545 Patent. See Claim Construction Order at

2  38:13-39:11. As already noted above, the relevant limitation

3  placed by the Court on claim 22 is that the first magnetic

4  members in the primary frame must have the ability to

5  magnetically attract the corresponding second magnetic members in

6  the auxiliary frame when these second magnetic members in the

7  auxiliary frame are placed above the first magnetic members such

8  that the lenses of the auxiliary frame are located in the front

9  of the primary lenses. No limitation with respect to downward

10 and/or upward orientation was placed by the Court on the first

11 magnetic members.

12

13     Revolution also argues that "when the eyewear sold by

14 Revolution is used as suggested by Aspex, the lenses of the

15 auxiliary frame are not located in front of said primary frame."

16 Pl.'s Reply at 6:1-2. Instead, Revolution contends, the lenses

17 of the auxiliary frame "are positioned merely adjacent to the

18 primary lenses, at least a half-inch above the primary lenses."

19 Id. at 6:2-3. This argument, however, presupposes that the

20 auxiliary frame of Revolution's accused product is considered in

21 ascertaining whether the entire accused product, i.e., the

22 primary frame/auxiliary frame combination, infringes claim 22.

23 To the contrary, claim 22 is simply directed to a primary frame

24 that is able to magnetically attract an auxiliary frame when said

25 auxiliary frame is placed on top of the primary frame. The focus

26 is simply on the primary frame. Here, Aspex has offered evidence

27

28

17

1   to show that an auxiliary frame can be manufactured to fit on top
2   of Revolution's primary frame without any modifications to the
3   primary frame, and  by allowing the lenses of the auxiliary
4   frames to be aligned and located in front of the lenses of the
5   primary frames.    See Ifergan's Decl. at ¶¶ 5-6 and Exh. 3.
6   Thus, Aspex has offered evidence to raise a genuine issue of
7   material fact as to whether Revolution's accused primary frames
8   satisfy the limitations of claim 22 as construed by the Court.
9   Therefore, the Court denies Revolution's motion for partial
10  summary judgment of non-literal infringement of claim 22 of the
11  '545 Patent.
12
13
14
15       3.   Whether Revolution's accused product infringes
16            claim 22 of the '545 Patent under the doctrine of
17            equivalents?
18       In its moving papers, Revolution argues that the asserted
19  claims of the '545 Patent cannot be infringed under the doctrine
20  of equivalents for the following reasons: (1) the Court construed
21  claim 22 as being limited to an embodiment in which the auxiliary
22  frame attached to the primary frame from the top; and (2) in view
23  of this construction, Revolution's eyewear cannot be encompassed
24  under the doctrine of equivalents because to do so would vitiate
25  the claim limitations imposed by the Court and render them
26  meaningless.
27
28

18

REV 00949

1   The Court notes that Revolution's moving argument under the
2   doctrine of equivalents avoids the critical claim construction
3   and infringement issue respecting claim 22, i.e., that claim 22
4   only requires that the magnetic members of the primary frame have
5   the capability of, or ability to, magnetically attract the
6   corresponding magnetic members of an auxiliary frame when placed
7   above the primary frame magnetic members.  Thus, Revolution, as
8   the moving party, has failed to meet its initial burden of
9   demonstrating the absence of a genuine issue of material fact for
10  trial.  See Celotex, 477 U.S. at 323.  Therefore, the Court
11  denies Revolution's motion for partial summary judgment on the
12  issue of whether its accused product infringes claim 22 of the
13  '545 Patent under the doctrine of equivalents.
14
15      C.   Revolution's Motion for Partial Summary Judgment as to
16           the '858 Patent
17
18      Revolution moves for partial summary judgment of
19  infringement of claim 1 of the '858 Patent by Aspex's recessed
20  bottom-mounted "Cool Clip."  In its Opposition, Aspex proffers
21  two arguments: 1) the asserted claims of the '858 Patent are
22  invalid for violation of the best mode requirement of 35 U.S.C. §
23  112; and 2) Revolution has failed to prove that the mated primary
24  and auxiliary frame magnets of Aspex's recess-mounted eyewear
25  provided "maximum resistance to downward movement of said
26  auxiliary eyeglasses thereby preventing detachment of said
27  auxiliary eyeglasses from said conventional eyeglasses."  Since

19

REV 00950

1  invalidity is a threshold question, the Court will address that

2  issue first.

3          1.  Whether the asserted claims of the '858 Patent are

4              invalid for violation of the best mode requirement

5              of 35 U.S.C. § 112?

6      Patents are, by statute, presumed to be valid.  See 35

7  U.S.C. § 282.  Aspex thus has the burden of establishing by clear

8  and convincing evidence that the asserted claims of the '858

9  Patent are invalid.  See United States Gypsum Co. v. Nat'l Gypsum

10 Co., 74 F.3d 1209, 1212 (Fed. Cir. 1996) (citing Transco Prods.,

11 Inc. v. Performance Contracting, Inc., 38 F.3d 551, 560 (Fed.

12 Cir. 1994)).  35 U.S.C. § 112 provides, in relevant part, that

13 the specification of a patent "shall set forth the best mode

14 contemplated by the inventor of carrying out his invention."  35

15 U.S.C. § 112 ¶ 1.  In United States Gypsum, the Federal Circuit

16 set forth the test for determining whether the best mode

17 requirement of 35 U.S.C. § 112 ¶ 1 has been met:

18     Determining whether a patent complies with the best mode

19     requirement involves two underlying factual inquiries.

20     First, it must be determined whether, at the time the patent

21     application was filed, the inventor had a best mode of

22     practicing the claimed invention.  This inquiry is wholly

23     subjective and addresses whether the inventor must disclose

24     any facts in addition to those sufficient for enablement.

25     Second, if the inventor had a best mode of practicing the

26

27

28

                          20



1  claimed invention, it must be determined whether the
2  specification adequately disclosed what the inventor
3  contemplated as the best mode so that those having ordinary
4  skill in that art could practice it.  The latter question is
5  largely an objective inquiry that depends upon the scope of
6  the claimed invention and the level of skill in the art.
7  United States Gypsum, 74 F.3d at 1213.
8
9       In its Opposition, Aspex contends that before his patent
10 application was filed, Zelman, the inventor of the '858 Patent,
11 "selected a specific magnet with a specific gaussian strength as
12 the best mode for practicing his invention."  Opposition at
13 11:19-21 (citing the deposition testimony of Zelman at 70:25-
14 72:10; 88:20-89:5).  Thus, Aspex contends, the first inquiry
15 under United States Gypsum is met - Zelman intended that a magnet
16 with particular gaussian strength be used in his invention.
17
18      As to the second inquiry under United States Gypsum, Aspex
19 contends that "there is no genuine dispute that the patent
20 specification does not disclose Mr. Zelman's best mode."
21 Opposition at 12:1-2.  Instead, Aspex states, "[t]he '858 Patent
22 specification merely states that 'preferably magnets 26 and 30
23 are at least four millimeters (4 mm) in diameter,' and that 'it
24 was found that by mounting magnets 26 and 30 approximately 4 mm
25 in diameter having a strong magnetic force vertically oriented is
26 sufficient to hold auxiliary eyeglass frame 10 in place and to
27 prevent downward movement.'" Opposition at 12:2-8 (quoting the
28

21

REV 00952

'858 Patent at col. 5, l. 52 - col. 6, l. 2). Thus, Aspex correctly points out that the '858 Patent does not teach that a magnet with a particular gaussian strength must be used to practice the invention.

In considering the relevant limitation of claim 1, this Court stated in the Claim Construction Order that "an important part of this invention, as expressed in the patent itself, is that the alignment of the magnets provides maximum resistance to downward detachment of the auxiliary frame from the conventional frame." Claim Construction Order at 24:13-16. Moreover, the Court specifically stated that this limitation does not infer that a magnet of particular gaussian strength must be used. Id. at 25 n. 12.

As stated by Zelman in his deposition, he simply tried different magnets of various strengths and sizes using a particular prototype and selected magnets for that prototype; but, his invention is not necessarily limited to the attributes of this prototype. Of course, the magnets selected would vary depending upon the actual physical embodiment and the specific weight of the auxiliary lenses. As Zelman testified at his deposition:

Q: Okay, other than that, you have used the same magnet from 1999 through today?

A: I used - I have been using a 4-millimeter magnet in my IMF frames. I use a little bit of a slightly larger

22

REV 00953



1   magnet in my Revolution Sun frame, and I use a much
2   smaller magnet in my Revolution Airs frame; and usually
3   the reason being is because of the weight of the
4   clipon.  That is the determining factor.
5   Q:   so the way you chose the 4-millimeter magnet for your
6        IMF frames was based on weight?
7   A:   It was based on the ability to hold the clipon up by
8        itself without falling to the ground.
9
10  Q:   And for that reason you chose a 4-mm for the IMF
11       frames?
12
13  A:   Yes.  But you have to remember that the size of the
14       magnets means nothing.  It is the gauss frame that is
15       within the size of the magnet.
16  Zelman Depo. at 88:11-25 and 89:1-3.  Thus, it is clear that the
17  weight of the auxiliary frames in any particular embodiment will
18  dictate the actual gaussian strength of the magnet used.  The
19  "best mode" requirement in this case does not require that the
20  inventor disclose the best magnets to be used in terms of their
21  gaussian strength for every particular embodiment; it only
22  requires that Zelman disclose the best mode known to him at the
23  time of invention for practicing the claimed invention.
24
25      In this case, the claimed invention merely requires that the
26  gaussian strength of the magnets be sufficient to prevent the
27  auxiliary frames from falling off of the primary frames.  The
28

23

1   specification of the '858 Patent specifically states that 4 mm
2   magnets having sufficient magnetic force to prevent the
3   dislodging of the auxiliary lenses would be the "best mode" for
4   carrying out the invention. See the '858 Patent, Col. 5, l. 65 -
5   Col. 6, l. 5.   Information known to those skilled in the art,
6   here the particular gaussian strength that is needed, need not be
7   disclosed to satisfy the "best mode" requirement.[6]  See Fonar
8   Corp. v. General Electric Co., 107 F.3d 1543, 1549 (Fed. Cir.
9   1997) ("It is well established that what is within the skill of
10  the art need not be disclosed to satisfy the best mode
11  requirement as long as that best mode is described.").   The 4
12  millimeter description was set forth because this particular
13  magnet size provided an actual benefit independent of the
14  gaussian strength of the magnet.   Specifically, this particular
15  size magnet added certain stability when actually inserted in the
16  sockets.  See Zelman Depo. at 89:7-16.   To hold Revolution to a
17  standard of disclosing and describing particular gaussian
18
19
20  _____

21  [6] In its Opposition, Aspex argues that "Zelman should be estopped from arguing that those of
22  ordinary skill in the art would have known how to select the specific magnet with the 'enabling'
    strength." Opposition at 12:21-23.  In support of its argument, Aspex cites to a portion of the
23  specification of the '858 Patent, which discusses the alleged drawbacks of the prior art.
    Specifically, that portion of the specification states that "what was not recognized [by the '207
24  Patent inventor] was that magnets have a very strong attraction in a direction perpendicular to
25  their axis. That is, with very strong magnets it is difficult to separate them by pulling them
    straight apart." The '858 Patent at col. 3, ll. 2-6. The Court notes that this portion of the patent
26  specification merely discusses that the prior art did not recognize what the optimum orientation
    of the magnets should be; it does not however suggest that a person skilled in the art does not
27  know how to select a magnet with an enabling strength, i.e., a strength sufficient to prevent the
28  auxiliary frame from falling off.

24

1  strength magnets to be used in every possible physical embodiment
2  is not part of the "best mode" requirement. See Fonar, 107 F.3d
3  at 1550 (finding "best mode" not violated for failure to
4  specifically identify a particular manufacturer's chip where
5  patent specification specifically disclosed the functions of the
6  chip).
7
8      At Oral Argument, on August 6, 2003, Aspex's counsel argued
9  that a letter from Zelman to the eyewear prototype manufacturer
10  shows that Zelman intended that a particular gaussian strength
11  magnet be used in the invention.  In that letter, dated August 6,
12  1998, Zelman states in part:

13      Your most recent sample of my "bottom Mounted" magnetic
14      clip-on set is absolutely perfect!  I love it, I love it, I
15      love it!!!  This is it, this is the one!  Forget about my
16      "Bottom Mounted" bridge method for now.  Vision Expo is only
17      a few weeks off.  This unique method is completely different
18      from everyone else's; yet is [sic] has a better hold than
19      even Aspex or Manhattan Design Studio.
20
21  August 6, 1998 Letter, Schindler Decl., Exh. 1.  The Court is
22  not convinced that the letter from Zelman in conjunction with his
23  deposition testimony that Aspex cites to, see Opposition at 8-11,
24  are sufficient grounds to overcome the strong statutory
25  presumption in favor of the validity of a patent.  As the Court
26  already noted, the weight of the auxiliary frames in any
27  particular embodiment will dictate the actual gaussian strength
28

25

REV 00956

1  of the magnet used. Although a particular magnet with a specific

2  gaussian strength may have worked best for Zelman's prototype,

3  Zelman was not required to disclose the best magnets to be used

4  in terms of their gaussian strength for every particular

5  embodiment of his invention. A person skilled in the art would

6  have known how to select a magnet with a sufficient gaussian

7  strength to maintain the auxiliary frame on the primary frame;

8  and as such, Zelman was not required to disclose that information

9  in his patent application. See Fonar, 107 F.3d at 1549.

10

11    Based on the foregoing, the Court finds that Aspex has

12  failed to provide clear and convincing evidence of invalidity

13  based upon failure to disclose the "best mode" for practicing the

14  claimed invention.

15

16      2.   Whether Aspex's accused product infringes claim 1

17           of the '858 Patent?

18  Revolution moves for summary judgment against Aspex for

19  infringement of claim 1 of the '858 Patent, which states:

20  Apparatus for attaching auxiliary eyeglasses to conventional

21  eyeglasses comprising:

22        a plurality of sockets formed on temple extensions of

23        said conventional eyeglasses;

24        a plurality of magnets mounted in said sockets on said

25        conventional eyeglasses;

26

27

28

REV 00957



1   a plurality of sockets formed on appendages on said

2   auxiliary sunglasses, said appendages construed and

3   arranged to fit below said temple extensions;

4   a plurality of magnets mounted in said plurality of

5   sockets on said appendages;

6

7   said plurality of magnets mounted on said conventional

8   eyeglasses and said plurality of magnets mounted on

9   said auxiliary eyeglasses being oriented such that the

10  maximum magnetic attractive force between said magnets

11  is oriented approximately parallel to lenses in said

12  conventional eyeglasses;

13  a first pair of said plurality of sockets having said

14  plurality of magnets mounted to form recesses in said

15  first pair of sockets;

16  a second pair of said plurality of sockets having said

17  plurality of magnets mounted to extend out of said pair

18  of sockets, said magnets constructed and arranged to

19  fit into said recesses in said first pair of sockets;

20  whereby said extended magnets in said second pair of

21  sockets engage said recesses to automatically align and

22  secure said auxiliary eyeglasses when mated with said

23  magnets forming said recesses in said first pair of

24  sockets providing maximum resistance to downward

25  movement of said auxiliary eyeglasses thereby

26

27

28



27

REV 00958

preventing detachment of said auxiliary eyeglasses from said conventional eyeglasses.

In the Claim Construction Order, the Court construed the disputed terms in claim 1 as follows:

1.  "plurality of sockets" means two or more openings into which an inserted part is designed to fit;

2.  "magnets" means permanent magnets;

3.  "being oriented such that the maximum magnetic attractive force between said magnets is oriented approximately parallel to lenses in said conventional eyeglasses" means that when the auxiliary eyeglasses are attached to the conventional eyeglasses, the permanent magnets mounted on the conventional eyeglasses are positioned relative to the magnets mounted on the auxiliary eyeglasses such that the greatest possible amount of magnetic force attainable between the magnets will be in a plane approximately parallel to the plane of the lenses of the conventional eyeglasses;

4.  "mounted to form recesses in said first pair of sockets" means positioned sufficiently below the outer peripheral edges of the sockets so as to define an opening between the magnets and the outer peripheral edges;

28

REV 00959

5.   "whereby said extended magnets in said second pair of sockets engage said recesses to automatically align and secure said auxiliary eyeglasses when mated with said magnets forming said recesses in said first pair of sockets" means that when the magnets forming the recesses and the extended magnets contact each other, this contact between the extended magnets and the recesses causes the auxiliary eyeglasses to align and secure to the conventional eyeglasses with little assistance from the wearer; and

6.   "providing maximum resistance to a downward movement of said auxiliary eyeglasses thereby preventing detachment of said auxiliary eyeglasses from said conventional eyeglasses" means providing the greatest possible amount of resistance to downward movement of the auxiliary eyeglasses so as to keep the auxiliary eyeglasses from separating from the conventional eyeglasses.

Claim Construction Order at 36:14-38:4.

In the instant motion, Plaintiff argues that Aspex's recessed bottom-mounted Cool Clip,[7] i.e., the accused product,

---

[7] Another product is Aspex's flush bottom-mounted Cool Clip. The difference between the two products being that in the recessed bottom-mounted Cool Clip, the magnets are "recessed" within their respective sockets; whereas in the flush bottom-mounted Cool Clip, the magnets are flush-mounted with the outer peripheral edges of the sockets. In a separate motion, Aspex moved for summary judgment that its flush bottom-mounted Cool Clip does not infringe the '858 Patent. Revolution responded by asserting that it never claimed that the flush bottom-

29

REV 00960

1  infringes claim 1 of the '858 patent.  Citing to the deposition
2  of Aspex's Vice President, Ifergan, Revolution asserts that Aspex
3  has admitted under oath of selling eyewear that contains all of
4  the claim limitations set forth in claim 1 of the '858 Patent,
5  with the exception of the following two limitations:

6
7      said plurality of magnets mounted on said conventional
8      eyeglasses and said plurality of magnets mounted on said
9      auxiliary eyeglasses being oriented such that the maximum
10     magnetic attractive force between said magnets is oriented
11     approximately parallel to lenses in said conventional
12     eyeglasses;' and
13
14     whereby said extended magnets in said second pair of sockets
15     engage said recesses to automatically align and secure said
16     auxiliary eyeglasses when mated with said magnets forming
17     said recesses in said first pair of sockets providing
18     maximum resistance to downward movement of said auxiliary
19     eyeglasses thereby preventing detachment of said auxiliary
20     eyeglasses from said conventional eyeglasses.'
21
22 Pl.'s Motion at 17:15-28.  Regarding the first disputed
23 limitation, Aspex argues that Revolution has not shown that the
24 _____
25 mounted Cool Clip infringe the '858 Patent. The Court has taken that motion under submission
26 and will be deciding whether Aspex is entitled to attorney's fees.
27  * This will be referred to as the "first disputed limitation."
28  * This will be referred to as the "second disputed limitation."

30

Case 0:09-cv-61515-MGC   Document 112-3   Entered on FLSD Docket 05/20/2010   Page 32 of 35

Case 2:02-cv-01087-VAP-CW   Document 206   Filed 08/07/2003   Page 31 of 34

engaged primary and auxiliary frame magnets of Aspex's recessed bottom-mounted eyewear provides the greatest possible amount of resistance to downward movement of the auxiliary frames so as to keep the auxiliary frames from separating from the conventional frames.   Specifically, Aspex argues that claim 1 of the '858 Patent requires magnets of a specific gaussian strength designed to provide the greatest possible amount of resistance, and since Revolution has never tested the magnets used in the accused eyewear, Aspex does not infringe.   Opposition at 14:14-15:4.

As already noted above, in the Claim Construction Order, this Court specifically stated that claim 1 does not require magnets of any specific gaussian strength.   See Claim Construction Order at 25, n. 12.  All that is required is that the magnets be oriented such that they provide the greatest possible amount of resistance.   Id. at 24-25.   Aspex does not argue that the magnets in their recessed bottom-mounted eyewear could have been aligned in a different fashion such that the greatest possible amount of resistance would have been achieved. Nor does it argue that the magnets used in its accused product were incapable of supporting the auxiliary frames and preventing downward movement and detachment of the auxiliary frames.[10]   It is clear that the recessed bottom-mounted eyewear sold by Aspex includes magnets having sufficient strength to support the

---

[10] Shortly after the '858 Patent issued, and "out of an abundance of caution," Aspex withdrew from the market its recessed bottom-mounted Cool Clip.  Opposition at 3:2-4:3.

31

1  auxiliary frames.  See Declaration of Dylan C. Dang ("Dang
2  Decl."), Exh. 2, Photographs of Aspex's recessed bottom-mounted
3  eyewear.  Otherwise, the auxiliary frames would not stay on the
4  conventional frames.  Additionally, it is undisputed that
5  orienting magnets in a parallel fashion and perpendicular to the
6  lenses provides the greatest resistance.  Aspex has provided no
7  evidence that any other orientation would provide greater
8  resistance.  At bottom, it is undisputed that the magnets in the
9  Aspex eyewear are oriented in a parallel fashion and
10 perpendicular to the lenses, thereby providing the greatest
11 possible resistance toward movement of the auxiliary frames.
12

13      Regarding the second disputed limitation, Aspex apparently
14 took the position, though not in its Opposition,[11] that its
15 accused product does not infringe the '858 Patent because: 1)
16 when the second pair of magnets which extend from the primary
17 glasses engage the sockets in the auxiliary glasses, they do not
18 automatically align, and 2) the first and second pair of magnets
19 may not actually make contact so that they are mated.  See Motion
20 at 20:3-8.
21

22      This Court has construed this final limitation of claim 1 in
23 the '858 Patent as requiring that when "the magnets forming the
24 recesses and the extended magnets contact each other, this
25 contact between the extended magnets and the recesses causes the
26

27 _____
28 [11] The only non-infringement argument raised by Aspex in its Opposition is with regard to the
   "maximum resistance" issue, which the Court has already addressed.

32



1    auxiliary glasses to align and secure to the conventional
2    eyeglasses with little or no assistance from the wearer" thereby
3    "providing the greatest possible amount of resistance to downward
4    movement of the auxiliary eyeglasses so as to keep the auxiliary
5    eyeglasses from separating from the conventional eyeglass."
6    Claim Construction Order at 23:3-25:2.
7
8      The photographs of the infringing eyewear sold by Aspex
9    clearly show that the claim construction applied by the Court to
10   this particular limitation is met by the Aspex eyewear either
11   literally or equivalently.  First, there are magnets forming
12   recesses in the primary frame.  See Dang Decl., Exh. 2, photos 2-
13   3.  Second, there are magnets disposed within sockets in the
14   auxiliary frame that extend outward and upward from the auxiliary
15   frames.  Id., photos 4-8.  Finally, the extended magnets clearly
16   fit into the recesses and make contact with the magnets that form
17   the recesses, in order to align and secure the auxiliary glasses
18   to the conventional glasses with little or no resistance from the
19   wearer.  Id., photos 9-20.  Aspex has not offered any evidence to
20   show that such construction of its accused product is not for the
21   benefit of keeping the auxiliary eyeglasses from separating from
22   the conventional eyeglass.  This is all that is required of claim
23   1 in the '858 Patent.
24
25      Based on the foregoing, the Court finds that Aspex has not
26   raised a genuine issue of material fact as to whether its
27   recessed bottom-mounted Cool Clip eyewear does not meet any of
28

REV 00964

1   the limitations of claim 1 of the '858 Patent.   Therefore, the

2   Court   grants   Revolution   partial   summary   judgement   for

3   infringement of claim 1 of the '858 Patent by Aspex's recessed

4   bottom-mounted Cool Clip eyewear.

5

6   **V.   CONCLUSIONS**

7       Based on the foregoing, the Court:

8       1)   GRANTS Revolution's motion for partial summary judgment

9            of non-infringement of claims 6 and 34 of the '545

10           Patent;

11

12      2)   DENIES Revolution's motion for partial summary judgment

13           of non-infringement of claim 22 of the '545 Patent; and

14      3)   GRANTS Revolution's motion for partial summary judgment

15           of infringement of claim 1 of the '858 Patent by

16           Aspex's recessed bottom-mounted Cool Clip product.

17

18  IT IS SO ORDERED.

19  Dated: *August 7, 2003*

20

21                                  LOURDES G. BAIRD

                                    United States District Judge

22

23

24

25

26

27

28

                                    34