# EXHIBIT F





____ Priority
____ Send
____ Clsd
____ Enter
____ JS-5/JS-6
____ JS-2/JS-3

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Revolution Eyewear, Inc., | CV 02-1087 LGB (CWx) |
| Plaintiff, | |
| v. | ORDER CONSTRUING CLAIMS OF U.S. PATENTS 6,343,858 AND RE 37,545 |
| Aspex Eyewear, Inc. et al., | |
| Defendants. | |

## I.   INTRODUCTION

In the present action, plaintiff Revolution Eyewear, Inc. ("Plaintiff" or "Revolution") alleges that defendants Aspex Eyewear, Inc. ("Aspex"), Thierry Ifergan ("Ifergan"), Real Eyes Optical ("REO") and Scott Strenk ("Strenk")[1] infringe its U.S. Patent No. 6,343,858 (the "'858 Patent"). Defendant and counterclaimant Aspex contends that Plaintiff infringes U.S.

---

[1] Aspex, Thierry, REO and Strenk are collectively referred to as "Defendants."

1



DEPOSITION
EXHIBIT
69



(145)

1  Patent No. RE 37,545E (the "'545 Patent") issued to Aspex,
2  Manhattan Design Studio, Inc., Contour Optik, Inc. and Asahi
3  Optical Co., Ltd. (collectively "Counterclaimants").
4  This matter is before the Court for the purpose of interpreting
5  the disputed claims of the '858 and '545 patents.
6
7
8  II.  **FACTUAL AND PROCEDURAL HISTORY**
9      For purposes of the instant motion, the Court finds the
10  following facts to be relevant.  The technology at issue in this
11  case involves a spectacle frame that supports an auxiliary frame,
12  enabling the user to securely fasten a second set of lenses
13  (e.g., sunglass lenses) onto the primary frame (often holding
14  prescription lenses).  Plaintiff's '858 Patent, which issued on
15  February 5, 2002, is directed to a method and apparatus for
16  mounting auxiliary eyeglasses on conventional eyeglasses in which
17  magnets are attached to appendages on the auxiliary eyeglasses
18  mating with magnets mounted on the temple extensions of
19  conventional eye-glasses.
20
21      Counterclaimants' '545 Patent, which issued on February 12,
22  2002, is directed to a spectacle frame that supports an auxiliary
23  lens frame through an arrangement using magnetic members.  The
24  '545 is a reissue of Counterclaimants' original U.S. Patent No.
25  5,568,207 (the "'207 Patent"), which has now been surrendered.[2]
26
27  ―――――――――――
    [2] This Court has previously found on summary judgement, in a related case, that Revolution does
    not infringe Aspex's original '207 patent issued to Chao.  See Aspex Eyewear, Inc. v.
28  Revolution Eyewear, Inc., CV 99-1623, Order Granting Defendant's Motion for Summary

REV 00002

REV 00844

1      For purposes of the Court's claim construction endeavor
2  here, it suffices to note that Plaintiff accuses Defendants of
3  infringing the '858 Patent and Counterclaimants accuse Plaintiff
4  of infringing the '545 Patent.  Pursuant to the Court's February
5  28, 2003 Minute Order, the parties, on March 12, 2003, submitted
6  two Joint Claim Construction Statements, one for the '858 Patent
7  ("JS-'858") and the second for the '545 Patent ("JS-'545").  On
8  March 19, 2003, Revolution and Counterclaimants filed their
9  respective Opening Claim Construction Briefs.  On March 26, 2003,
10 Counterclaimants filed their joint Responsive Brief to
11 Revolution's Opening Claim Construction Brief.  On March 27,
12 2003, Revolution filed its Responsive Brief to Counterclaimants'
13 Opening Claim Construction Brief.[3]  Also on March 27, 2003,
14 defendants REO and Strenk filed their joint Responsive Brief to
15 Revolution's Opening Claim Construction Brief.[4]  On April 2,
16 2003, Revolution and Counterclaimants filed their respective
17 Reply briefs.
18 ///
19 ///
20
21

---

22

23 Judgment on Plaintiff's Claim of Patent Infringement, June 4, 2001, Docket Entry No. 184. The
   Federal Circuit affirmed this Court's finding of non-infringement. See Case No. CV-1623,
24 Docket Entry No. 217.  In the instant case, Counterclaimants allege that Revolution infringes
   claims 6, 22 and 34 of the '207 Reissue Patent - the '545 Patent.
25

26 [3] Although Revolution's Responsive Brief was filed a day late, the Court deems it to have been
   timely filed.

27 [4] Like Revolution's Responsive Brief, REO and Strenk's joint responsive Brief was filed a day
28 late; however, the court deems it to have been timely filed.

3

REV 00003

REV 00845

III. **LEGAL STANDARDS AND ANALYSIS**

    A.   **Legal Standards**

    In Markman v. Westview Instruments, Inc., 517 U.S. 370 (1996), the Supreme Court held that the interpretation of a patent claim—the portion of the patent document that defines the scope of the patentee's rights—is a matter of law exclusively within the scope of the court and is not a factual question for the jury. Id. at 372. The Markman decision suggested that a trial court could consider various types of evidence when interpreting a patent, including expert testimony. See id. at 388-90. Shortly after the Supreme Court handed down Markman, the Federal Circuit, in Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576 (Fed. Cir. 1996), expanded on the Court's dicta concerning evidence available to a trial court in interpreting patent claims. See id. at 1581-83. The Federal Circuit held that if intrinsic evidence can, by itself, resolve ambiguity in a patent term, then a court may not rely on extrinsic evidence, such as expert testimony, to construe the term. See id. at 1583. A trial court may only use extrinsic evidence when intrinsic evidence fails to illuminate the meaning of the disputed claim. Id. Moreover, extrinsic evidence cannot broaden the reach of a claim or contradict explicit language. Id. The policy rationale supporting this evidentiary limitation is that prospective patentees must have access to public records concerning the patent to "design around" a prior art. Id. If expert testimony or other extrinsic evidence were permitted to alter the record,

4

REV 00004

REV 00846

1  then this public benefit would be frustrated. Id. Thus, a court

2  can only examine extrinsic evidence if the evidence does not

3  contradict the claim language, the specification, or the

4  prosecution history but instead supplements it. Id. at 1584-85.

5      The Federal Circuit detailed a hierarchy of specific types

6  of evidence that a court may consider. Thus, when interpreting a

7  patent, a trial court must first look at the language of the

8  claim itself. See id. at 1582.  Courts should typically construe

9  terms by their common, customary meaning, but a patentee is

10 allowed to define her own terms in the specification section of

11 the patent.  See id. Therefore, courts must always review the

12 specification, which, when setting forth an embodiment of the

13 invention, frequently provides explicit definitions of the claim

14 terms.  See id.  The language in the specification is

15 dispositive, and "it is the single best guide to the meaning of

16 the disputed term."  Id.  However, a patent's claims are not

17 limited to the specification's best mode, preferred embodiment,

18 specific objects, or illustrative examples, and it is erroneous

19 to read limitations from the specification into the claims. See

20 Laitram Corp. v. Cambridge Wire Cloth Co., 863 F.2d 855, 865

21 (Fed. Cir. 1988)("References to a preferred embodiment, such as

22 those often present in a specification, are not claim

23 limitations."); Rolls-Royce Ltd. v. GTE Valeron Corp., 800 F.2d

24 1101, 1108 (Fed. Cir. 1987)("Reference to an object does not

25 constitute in itself a limitation in the claims."). In addition,

26 a court may consider the prosecution history of the patent as

5

1  evidence of meaning. Id. This history contains the complete

2  record of all the filings and examinations before the Patent and

3  Trademark Office ("PTO"), including representations made by the

4  applicant regarding the significance of claims and terms. Id. The

5  history also limits the interpretation of terms by recording the

6  exclusion of any term definition disclaimed during the

7  prosecution. Id.

8      B.   Analysis

9          1.   The claims in dispute

10      Pursuant to the Joint Statement, the following claims of the

11  '858 and the '545 patents contain terms that are disputed by the

12  parties.[5]

13          a.   Disputed claims in the '858 Patent

14  Claim 1:

15  Apparatus for attaching auxiliary eyeglasses to conventional

16  eyeglasses comprising:

17      a plurality of sockets formed on temple extensions of

18  said conventional eyeglasses;

19      a plurality of magnets mounted in said sockets on said

20  conventional eyeglasses;

21      a plurality of sockets formed on appendages on said

22  auxiliary sunglasses, said appendages construed and arranged

23  to fit below said temple extensions;

_____

[5] The disputed terms are shown in bold.

6

REV 00006

REV 00848

1  a plurality of magnets mounted in said plurality of

2  sockets on said appendages;

3  said plurality of magnets mounted on said conventional

4  eyeglasses and said plurality of magnets mounted on said

5  auxiliary eyeglasses being oriented such that the maximum

6  magnetic attractive force between said magnets is oriented

7  approximately parallel to lenses in said conventional

8  eyeglasses;

9

10  a first pair of said plurality of sockets having said

11  plurality of magnets mounted to form recesses in said first

12  pair of sockets;

13  a second pair of said plurality of sockets having said

14  plurality of magnets mounted to extend out of said pair of

15  sockets, said magnets constructed and arranged to fit into

16  said recesses in said first pair of sockets;

17  whereby said extended magnets in said second pair of

18  sockets engage said recesses to automatically align and

19  secure said auxiliary eyeglasses when mated with said

20  magnets forming said recesses in said first pair of sockets

21  providing maximum resistance to downward movement of said

22  auxiliary eyeglasses thereby preventing detachment of said

23  auxiliary eyeglasses from said conventional eyeglasses.

24

25

26  Claim 2:

27  The apparatus according to claim 1 in which said first

28  pair of sockets having said magnets mounted to form a recess

7

REV 00007

REV 00849

are on said conventional eyeglass temple extensions; and
said second pair of sockets with magnets extended out
therefrom are mounted on said appendages on said auxiliary
eyeglasses.

Claim 3:

The apparatus according to claim 2 including a
protective and decorative coating material on exposed sides
of said plurality of magnets.

Claim 4:

The apparatus according to claim 3 in which said
protective and decorative coating material matches the
frames of said conventional and auxiliary eyeglasses.

    b.    Disputed claims in the '545 Patent

Claim 6:

An eyeglass device comprising:

a primary spectacle frame for supporting primary lenses
therein;

the primary spectacle frame including two side portion
extensions extended therefrom for pivotally coupling a leg
thereto; and

the primary spectacle frame including two first
magnetic members respectively having a horizontal surface
and being secured to one of the side portions extensions of
the primary spectacle frame; and

8

REV 00008

REV 00850

1   an auxiliary spectacle frame for supporting auxiliary

2   lenses therein, and for disposing in front of the primary

3   spectacle frame, the auxiliary spectacle frame including two

4   auxiliary side portions, wherein the auxiliary spectacle

5   frame further includes two second magnetic members each

6   secured to one of the auxiliary side portions and having a

7   horizontal surface for coupling a corresponding surface of

8   one of the first magnetic members so as to secure the

9   auxiliary spectacle frame to the primary spectacle frame.

10  Claim 22:

11

12      A primary spectacle frame for supporting primary lenses

13  therein and having two side portion extensions extending

14  rearwardly therefrom and having a front side, a rear side, a

15  top side, and a rear end, each of said rear ends pivotally

16  coupling a leg configured to conform to a user at a distal

17  end thereof, each of said extensions of said primary

18  spectacle frame further having a projection attached to each

19  of said rear sides, and a pair of first magnetic members

20  respectively secured in said projections, said first

21  magnetic members capable of engaging second magnetic members

22  of an auxiliary spectacle frame so that lenses of an

23  auxiliary spectacle are located in front of said primary

24  lenses.

25

26  Claim 34:

27      An eyeglass device comprising:

28

9

REV 00009

REV 00851

a primary spectacle frame having two side portion

extensions with a front side, a rear side and a first

magnetic member;

an auxiliary spectacle frame including two side

portions each having an arm extended therefrom, each of said

arms containing a second magnetic member, said arms

extending across a respective extension from said front side

to said rear side so that said first and second magnetic

members engage one another whereby said auxiliary spectacle

frame is supported by said primary spectacle frame.

2.   The disputed terms

The Court first considers the disputed claim terms in the

'858 Patent, followed by the disputed terms in the '545 Patent.

a.   Disputed terms in the '858 Patent

The following terms or combination of terms are in

dispute:(1) "plurality of sockets," in claim 1 (2) "magnets" in

claims 1-3; (3) "being oriented such that the maximum magnetic

attractive force between said magnets is oriented approximately

parallel to lenses in said conventional eyeglasses" in claim 1;

(4) "mounted to form recesses in said first pair of sockets," in

claim 1; (5) "whereby said extended magnets in said second pair

of sockets engage said recesses to automatically align and secure

said auxiliary eyeglasses when mated with said magnets forming

said recesses in said first pair or sockets," in claim 1, (6)

10

REV 00010

REV 00852

1   "providing maximum resistance to a downward movement of said

2   auxiliary eyeglasses thereby preventing detachment of said

3   auxiliary eyeglasses from said conventional eyeglasses," in claim

4   1; (7) "a protective and decorative coating material on exposed

5   sides of said plurality of magnets," in claim 3; and (8)

6   "matches" in claim 4.

7

8        (1)  "plurality of sockets" (claim 1)

9        Plaintiff Revolution argues that the phrase "plurality of

10  sockets" in claim 1 of the '858 means "two or more openings or

11  recesses formed in the temple extensions." JS-'858, Exh. 1 at 1.

12  Conversely, Counterclaimants⁶ argue that the instant phrase

13  should be construed to mean "two or more housings or openings

14  into which inserted parts are designed to fit."  JS-'858, Exh. 2

15  at 1.

16

17       Preliminarily, the Court notes that Revolution's

18  construction is counter-productive because it defines the word

19  "sockets" as "recesses"; and the word "recesses" is a separate

20  element of claim 1.  See Declaration of Michael A. Nicodema

21  Submitting Documents and Exhibits in Support of

22  Defendants'/Counterclaimants' Responsive Claim Construction Brief

23  for U.S. Patent No. 6,343,858 ("Nicodema Decl. I"), Exh. 1, '858

24  Patent, Col. 8, ll. 38-40.  Additionally, and contrary to

25

26  _____

27  ⁶ REO and Strenk's arguments in their joint claim construction brief are identical to those made
    by Counterclaimants.  Therefore, and for the sake of brevity, only Counterclaimants' briefs will
28  be cited to in this Order.

                              11

1  Counterclaimants' proposed construction, the word "housing" is

2  not used by the inventor to define "sockets."  See

3  Counterclaimants' Responsive Brief Re. '858 patent at 8:14-17

4  (citing the '858 Patent at Col. 7, ll. 19-21).

5      The '858 patent specification and prosecution history do not

6  define the word "socket"; they simply use the word.  There is no

7  special meaning of "socket" set out in the intrinsic record which

8  would warrant a construction that departs from the ordinary and

9  customary definition of the word.  Accordingly, the dictionary

10 definition should control.  See Texas Digital Systems, Inc. v.

11 Telegenix, Inc., 308 F.3d 1193, 1203 (Fed. Cir. 2002) (stating

12 that dictionaries, encyclopedias and treatises "may be the most

13 meaningful sources of information to aid judges in better

14 understanding both the technology and the terminology used by

15 those skilled in the art to describe the technology.").  The

16 dictionary definition of "socket" is "[a]n opening into which an

17 inserted part is designed to fit."  Webster's II New College

18 Dictionary ("Webster's"), Nicodema Decl. I, Exh. 3 at 43.

19

20     Based on the foregoing the Court construes the phrase

21 "plurality of sockets" to mean two or more openings into which an

22 inserted part is designed to fit.

23

24

25     (2)  "magnets" (claims 1-3)

26     Plaintiffs argue that the term "magnets" in claims 1-3 of

27 the '858 Patent means "a permanent magnet, or ferromagnetic

28

12

1  material capable of acting as a magnet, or equivalents." JS-

2  '858, Exh. 1 at 3.  Conversely, Counterclaimants argue that the

3  instant phrase means "permanent magnets." JS-'858, Exh. 2 at 3.

4      In its proposed construction of "magnets," Revolution relies

5  upon this Court's construction of the phrase "magnetic members"

6  in the case of <u>Aspex Eyewear, Inc. v. Miracle Optics, Inc.</u>, CV

7  01-10396, Order Construing Claims of U.S. Patents RE 37,545 and

8  6,109,747, February 14, 2003, attached to the Declaration of

9  Michael Nicodema Submitting Documents and Exhibits in Support of

10  Claim Construction Analysis of the '545 Patent ("Nicodema Decl.

11  II"), Exh. 8 (hereinafter "<u>Miracle</u> Claim Construction Order").

12  In that case, the Court was construing the claims of

13  Counterclaimants' '545 and '747 patents, not the claims of

14  Revolution's '858 Patent.  Contrary to Revolution's assertion,

15  the Court's claim construction order in the <u>Miracle</u> case does not

16  "estop" Counterclaimants from asserting that the ordinary meaning

17  of the word "magnet," as used in the '858 Patent, does not

18  include ferromagnetic materials.  The words used in the claims of

19  the '858 and the '545 patents are different; as are their

20  intrinsic records.  Nowhere in the <u>Miracle</u> Claim Construction

21  Order did the Court state or suggest that it was construing the

22  noun "magnet"; let alone any element of the '858 Patent claims.

23      In the claims at issue in the '858 Patent, the operative

24  word is the noun "magnet," not the adjective "magnetic."  The

25  only word used in the '858 Patent specification to describe the

26  magnets of the asserted claims is "magnet"; not "magnetic

13

REV 00013

REV 00855

1   members," "magnetic material," or "ferromagnetic material." The

2   '858 patent specification and prosecution history do not define

3   the word "magnet"; they simply use the word.  The ordinary

4   meaning of the word "magnet" is: "1. A body that attracts certain

5   materials, as iron, by virtue of a surrounding field of force

6   created by the motion of its atomic electrons and the alignment

7   of its atoms.  2. An electromagnet. 3. One that attracts."

8   Webster's, Nicodema Decl. I, Exh. 3 at 34.  Thus, the ordinary

9   meaning of "magnet" is essentially a permanent magnet; it cannot

10  be  ferromagnetic material because it needs to have the ability

11  to attract certain material like iron.[7]

12

13       The Court also notes that various portions of the '858

14  patent specification support the position that the word "magnet"

15  should be given its ordinary dictionary definition – i.e., a

16  permanent magnet.  See Nicodema Decl. I, Exh. 1, '858 Patent at

17  Col. 7, 11. 47-49, stating that "the key feature here is the

18  orientation of magnets 26 and 30 so that the maximum magnetic

19  attractive force along their axis (i.e. poles) 34 is vertically

20  oriented or parallel with conventional eyeglass frame 20"; and

21  Col. 3, 11. 22-27, stating that "[c]omplementary mating magnets

22  ... are also oriented with the plane of the magnets horizontal

23  and their axis (i.e. poles) vertical or approximately parallel to

24  the plane of the conventional eyeglasses."

25

26  _____

27  [7] A ferromagnetic material is a material that is attracted by a permanent magnet, e.g., iron, nickel

28  and cobalt. See Miracle Claim Construction Order at 19 n. 9.

14

REV 00014

REV 00856

1   Revolution argues that its construction is supported by the

2   fact that "a review of the entire file history of the '858 Patent

3   demonstrates that no rejection can be found based upon the type

4   of magnetic material used." Revolution's Opening Brief at 7:2-4.

5   This argument by Revolution is at best irrelevant to the instant

6   issue. The mere fact that the patent examiner did not issue a

7   rejection based on the type of magnetic material used has no

8   bearing on the interpretation of the term "magnets." The patent

9   applicant in this case used the term "magnets" in his

10   application; and the most logical assumption is that the patent

11   examiner simply considered "magnets" to mean permanent magnets,

12   and thus would have had no reason to consider other

13   interpretations of that term.

14

15   In its Reply Brief, Revolution states:

16   The Webster's definition of magnet is '1 ... a body having

17   the property of attracting iron and producing a magnetic

18   field external to itself; *specif*: a mass of iron, steel, or

19   alloy that has this property artificially imparted 2:

20   something that attracts.' Webster's New Collegiate

21   Dictionary, 1980 Edition.... Under the dictionary

22   definition, a magnet includes a metal having an external

23   magnetic field to be artificially imparted. For the

24   magnetic field to be artificially imparted to the metal, it

25   is a necessary and logical precondition that the particular

26   metal be capable of being magnetized. Therefore, the

27   Court's prior definition in the Miracle Optics case is

28

15

REV 00015

REV 00857

equally applicable here: magnet means a permanent magnet or

any ferromagnetic material capable of acting as a magnet.'

Revolution's Reply Brief at 2:14-28.   Revolution's argument

misses the mark.   The operative phrase in the dictionary

definition is that a magnet has the property of <u>attracting iron</u>

<u>and producing a magnetic field external to itself</u>. A

ferromagnetic material, such as iron, "is a material that is

<u>attracted by</u> a permanent magnet," it does not attract other

material.   <u>See Miracle</u> Claim Construction Order at 19 n. 9

(emphasis added).

Based on the foregoing, the Court construes the word

"magnets" in claims 1-3 of the '858 Patent to mean permanent

magnets.

      (3)   "being oriented such that the maximum magnetic

              attractive force between said magnets is oriented

              approximately parallel to lenses in said

              conventional eyeglasses" (claim 1).

Revolution contends that the phrase "bring oriented such

that the maximum magnetic attractive force between said magnets

is oriented approximately parallel to lenses in said conventional

eyeglasses" in claim 1 of the '858 Patent means "contained on the

respective conventional frame and auxiliary frame parallel to the

---

' Incidentally, this Court construed "magnetic member" in <u>Miracle</u> to mean "a permanent magnet
or a ferromagnetic member, but at least either the first or second magnetic members must be a
permanent magnet." <u>Miracle</u> Claim Construction Order at 20:5-8.

16

REV 00016

REV 00858

1  plane of the lenses, which is the orientation that results in the
2  maximum orientation." JS-'858, Exh. 1 at 7-8. Conversely,
3  Counterclaimants argue that the phrase in question means that
4  "when the auxiliary eyeglasses are attached to the conventional
5  eyeglasses, the permanent magnets mounted on the conventional
6  eyeglasses are positioned relative to the magnets mounted on the
7  auxiliary eyeglasses such that the greatest possible amount of
8  magnetic attractive force between the magnets attainable will be
9  in the plane approximately parallel to the plane of the lenses of
10  the conventional eyeglasses." JS-'858, Exh. 2 at 7.
11
12      In its Reply Brief, Revolution states:
13      The parties may be closer on this issue than first imagined.
14      ...
15      Revolution's concern is that the defendants are attempting
16      to add language requiring the magnets have maximum magnetic
17      force in order to argue later that the strongest possible
18      magnets must be used.... Given that the parties appear to
19      agree that the orientation causes the maximum magnetic
20      attraction, Revolution's proposed claim construction is most
21      appropriate because it does not open up any inappropriate
22      issues concerning the gauss strength of the magnets.
23  Revolution's Reply Brief at 3:17-4:19. It is clear to the Court
24  from reviewing the parties' briefs that Counterclaimants do not
25  seek to add language requiring that the magnets have a particular
26  gauss strength. Instead, Counterclaimants' construction, like
27  Revolution's, seek to construe the instant phrase to mean that
28

17

REV 00017

REV 00859

1  the primary and auxiliary frame magnets are oriented in such a

2  way as to achieve maximum magnetic attraction.*

3  See Counterclaimant's Responsive Brief at 12:13-22.

4      Therefore, the Court construes the instant phrase to mean

5  that when the auxiliary eyeglasses are attached to the

6  conventional eyeglasses, the permanent magnets mounted on the

7  conventional eyeglasses are positioned relative to the magnets

8  mounted on the auxiliary eyeglasses such that the greatest

9  possible amount of magnetic force attainable between the magnets

10  will be in a plane approximately parallel to the plane of the

11  lenses of the conventional eyeglasses.  See Webster's, Nicodema

12  Decl. I, Exh. 3 at 36, defining "maximum" as "the greatest

13  possible, quantity, degree, or number."

14

15

16        (4)  "mounted to form recesses in said first pair of

17             sockets" ( claim 1)

18      Revolution contends that the phrase "mounted to form

19  recesses in said first pair of sockets" in claim 1 of the '858

20  Patent means "mounted in a first pair of sockets so that the

21  socket still contains a recess."  JS-'858, Exh. 1 at 10.

22

23  _____

24  *This, of course, begs the question of why the parties could not
have simply resolved this issue during their meet-and-confer

25  session on claim construction, which was specifically ordered by
the Court in its February 28, 2003 Minute Order.  The Court also

26  reminds the parties of their obligation under Local Rule 7-3 "to

27  discuss thoroughly...the substance of the contemplated motion and
any potential resolution" before filing such motion with the

28  Court.

18

REV 00018

REV 00860

1  Counterclaimants argue that the instant phrase means "positioned
2  sufficiently below the outer peripheral edges of the sockets so
3  as to define an opening between the mating surfaces and the outer
4  peripheral edges." JS-'858, Exh. 2 at 9.

5      In its Reply Brief, Revolution states:
6      Defendants' definition of this term improperly includes the
7      term 'mating surfaces.' 'Mating surfaces' does not appear
8      in the claim, and it is unnecessary to the understanding of
9      the claim. No reason has been given for borrowing this term
10     from the specification. For this reason alone, the
11     defendants' interpretation of the claim is improper. If
12     'mating surfaces' were deleted from the defendants'
13     definition of the term, then Revolution would agree to the
14     definition.
15

16 Revolution's Reply Brief at 4:21-28 (emphasis added).
17 Preliminarily, the Court notes that, in their Responsive Claim
18 Construction Brief, Counterclaimants place no emphasis at all on
19 the use of the term "mating surfaces" in their construction of
20 the instant phrase. See Counterclaimants' Responsive Brief at
21 13:5-15. The Court agrees with Revolution that the term "mating
22 surfaces" is not necessary to construe the instant phrase. Thus,
23 the Court adopts Counterclaimants' construction without the term
24 "mating surfaces." Therefore the Court construes the instant
25 phrase to mean positioned sufficiently below the outer peripheral
26 edges of the sockets so as to define an opening between the
27 magnets and the outer peripheral edges.

REV 00019

REV 00861

1        (5)  "whereby said extended magnets in said second pair

2            of sockets engage said recesses to automatically

3            align and secure said auxiliary eyeglasses when

4            mated with said magnets forming said recesses in

5            said first pair of sockets" (claim 1)

6    Plaintiffs contend that the phrase "whereby said extended

7 magnets in said second pair of sockets engage said recesses to

8 automatically align and secure said auxiliary eyeglasses when

9 mated with said magnets forming said recesses inn said first pair

10 of sockets" in claim 1 of the '858 Patent means that "when

11 extended magnet clicks into place in the recess, the user

12 automatically knows that the auxiliary eyeglasses have been

13 properly positioned for use."  JS-'858, Exh. 1 at 13.

14    Counterclaimants construe the instant claim element to mean

15 that "when the magnets forming the recesses and the extended

16 magnets contact each other and join together through magnetic

17 attractive forces, the extended magnets will also contact

18 interior surfaces of the recesses, and this contact between the

19 extended magnets and the recesses, in combination with the mating

20 contact of the extended magnets and the magnets forming the

21 recesses, causes the auxiliary eyeglasses to be firmly attached

22 to the conventional eyeglasses, and the lenses of the auxiliary

23 eyeglasses to align with the lenses of the conventional

24 eyeglasses without any independent assistance of the wearer."

25 JS-'858, Exh. 2 at 12-13.

26

27

28

20

REV 00020

REV 00862

1   Revolution's construction seeks to reduce the functionality
2   of this elements to the "click[ing]" of the extended magnet into
3   the recess, even though the patent does not use any form of the
4   word "click."[18]  Revolution also fails to construe the following
5   elements of claim 1: 1) that the extended magnets "engage said
6   recesses"; 2) that the extended magnets be "mated" with the
7   magnets forming the recesses; and 3) that the alignment of the
8   frames be "automatic."  Revolution cites to Texas Instruments,
9   Inc. v. U.S. Int'l Trade Commn., 988 F.2d 1165, 1772 (Fed. Cir.
10  1993) to argue that "functional statements, [like the 'whereby'
11  element here], which merely state the result of the limitation
12  are not to be construed as limitations themselves."  Revolution's
13  Opening Brief Re '858 Patent at 9:23-10:4.  Contrary to
14  Revolution's argument, the instant claim element contains
15  additional structural features not present in any other part of
16  the claim - features that are necessary to describe how the
17  conventional and auxiliary eyeglasses interconnect - i.e., the
18  extended magnets "engage said recesses", and the extended magnets
19  are "mated" with the magnets forming the recesses.  These
20  structural features are necessary to show how the other recited
21  elements cooperate to secure the auxiliary sunglasses to the
22  conventional eyeglasses; and thus, are necessary to complete the
23  invention claimed.  Indeed, the inventor emphasized in the
24  patents specification that these features constituted a "unique
25
26
27  ───────────────
28  [18] The Court also finds the term "click" to be ambiguous as applied to the instant invention.

REV 00021

REV 00863

1  and important improvement" to ensure "secure attachment and

2  alignment of auxiliary eyeglass frames 10 with conventional

3  eyeglass frame 12." Nicodema Decl. I, Exh. 1, '858 Patent, Col.

4  7, ll. 15-27.

5      The decision in Texas Instruments is completely

6  distinguishable.  There, the Federal Circuit held that the

7  "whereby/to preclude" clauses were not claim elements because the

8  clauses "[did] not contain any limitations not inherent to the

9  process found in" the claims.  Texas Instruments, 988 F.2d at

10  1172.  Here, in contrast, the requirements that the extended

11  magnets "engage the recesses," and that the extended magnets be

12  "mated" with the magnets forming the recesses only appear in the

13  "whereby" clause, and are not inherent parts of the eyeglass

14  structure recited in other portions of the claim.

15      In this case, the part of the specification relevant to the

16  phrase being construed states:

17      One can easily see the auxiliary eyeglasses approaching the

18      conventional eyeglasses with the appendages on the auxiliary

19      eyeglasses below the temple of the conventional eyeglass

20      frame.  Then with a very slight upward movement the magnets

21      attract and the auxiliary eyeglass frame is firmly attached.

22      This can be done simply and easily with one hand without any

23      feeling or fumbling that previous arrangements required.

24      The orientation is nearly automatic and doesn't require the

25

26

27

28

22

REV 00022

REV 00864

1   more careful alignment that is required of other

2   magnetically fastened auxiliary eyeglasses.[11]

3   Nicodema Decl., Exh. 1, '858 Patent, Col. 3, ll. 42-51.  Based on

4   the foregoing, the Court construes the instant phrase to mean

5   that when the magnets forming the recesses and the extended

6   magnets contact each other, this contact between the extended

7   magnets and the recesses causes the auxiliary eyeglasses to align

8   and secure to the conventional eyeglasses with little assistance

9   from the wearer.

10

11           (6)   "providing maximum resistance to downward movement

12                 of said auxiliary eyeglasses thereby preventing

13                 detachment of said auxiliary eyeglasses from said

14                 conventional eyeglasses" (claim 1)

15

16       Plaintiff argues that the phrase "providing maximum

17   resistance to downward movement of said auxiliary eyeglasses

18   thereby preventing detachment of said auxiliary eyeglasses from

19   said conventional eyeglasses" in claim 1 of the '858 Patent means

20   that "the orientation of the magnetic forces recited earlier in

21   the claim will result in maximum resistance to downward movement

22   of the auxiliary eyeglasses."  JS-'858, Exh. 1 at 14-15.

23

24   [11] In the "Background of the Invention" section of the '858 Patent, the inventor describes the

25   "problem" with some of the prior art as requiring "that the auxiliary eyeglass extensions ... be
     carefully placed above the temple hinge connections, [which] makes it [a] little more difficult to

26   attach the auxiliary frames to be sure that the extensions are placed carefully above the hinge
     connections of the conventional eyeglass.  In most cases a wearer has to remove his conventional

27   eyeglasses to attach the auxiliary lenses." Nicodema Decl. I, Exh. 1, '858 Patent, Col. 2, ll. 12-

28   19.

REV 00023

REV 00865

1  Conversely, Counterclaimants argue that the instant phrase means

2  that "the mated magnets provide the greatest possible amount of

3  resistance to downward movement of the auxiliary eyeglasses so as

4  to keep the auxiliary eyeglasses from separating from the

5  conventional eyeglasses." JS-'858, Exh. 2 at 14.

6      The Court notes that Revolution's proposed construction

7  merely repeats the claim element in question, and fails to

8  construe its terms. Revolution again relies on Texas

9  Instruments to argue that the instant claim term is merely a

10  functional statement and not a claim limitation.

11  See Revolution's Opening brief for the '858 Patent at 9:11-10:4.

12  The Court disagrees.  An important part of this invention, as

13  expressed in the patent itself, is that the alignment of the

14  magnets provides maximum resistance to the downward detachment of

15  the auxiliary frame from the conventional frame.  See Nicodema

16  Decl. I, Exh. 1, '858 Patent, Col. 7, ll. 15-24.  Thus, the

17  present claim language dealing with the resistance to downward

18  movement, language not present anywhere else in the claim, is

19  part of the claim limitation.  The Court finds that

20  Counterclaimant's construction is consistent with the patent

21  documents and the ordinary meaning of the words.  Therefore, the

22  Court adopts Counterclaimants' construction and construes the

23  instant phrase to mean providing the greatest possible amount of

24  resistance to downward movement of the auxiliary eyeglasses so as

25

26

27

28

24

REV 00024

REV 00866

1   to keep the auxiliary eyeglasses from separating from the

2   conventional eyeglasses.[12]

3

4                    (7) "a protective and decorative coating material

5                    on exposed sides of said plurality of magnets"

6                    (claim 3)

7        Revolution construes the phrase "a protective and decorative

8   coating material on exposed sides" in claim 3 of the '858 Patent

9   to mean that "the exposed surfaces of magnets or ferromagnetic

10  [sic] are substantially covered with a coating."  JS-'858, Exh. 1

11  at 16.  Counterclaimants, conversely, construe the instant phrase

12  to mean that "all visible sides of the magnets that are not

13  enclosed by the sockets formed on the temple extensions and the

14  appendages are covered with a layer of material that enhances the

15  aesthetic appearance of the magnets and provides protection from

16  normal wear and tear."  JS-'858, Exh. 2 at 16.

17       Preliminarily, the Court notes that, contrary to

18  Counterclaimants' assertion, it is not necessary to construe the

19  terms "decorative" and "protective."  The Court also notes that

20  Revolution's proposed construction improperly seeks to inject

21  into the claim element an apparent broadening requirement of

22

23

24

25

26

27  _____

28  [12] As previously discussed, see supra section "III B 2 a (3)," the interpretation of the terms
    "maximum resistance" to mean "greatest possible amount of resistance" does not infer that a
    magnet with a particular gauss strength must be used.

REV 00025

REV 00867

1  "substantial[ity]" that is unsupported by the patent documents.[13]

2  The relevant dictionary definitions of the terms in dispute are:

3  1) coat: "a layer of covering material: coating"; Webster's,

4  Nicodema Decl. I, Exh. 3 at 29; and 2) expose: "to make visible."

5  Id. at 33.  Based on the foregoing the Court construes the

6  instant phrase to mean a layer of protective and decorative

7  covering material on the visible sides of said plurality of

8  magnets.

9

10

11              (8)  "matches" (claim 4)

12       Revolution contends that the term "matches" in dependent

13  claim 4 means "is aesthetically consistent with the color"  JS-

14  '858, Exh. 1 at 17.  Conversely, Counterclaimants contend that

15  the instant term means "is the exact color."  JS-'858, Exh. 2 at

16  18.

17       The only reference in the specification that is relevant to

18  the instant term describes one of the preferred embodiments by

19  stating:

20       This embodiment improves the appearance of the magnets in

21       the conventional eyeglass frame 12' by covering the exposed

22       surface with a protective and decorative coating of material

23       72 configured to match the color and appearance of the

24       conventional eyeglass frames 12'.

25

26

27  _____

[13] It is not clear if Revolution acquiesced to the proposed construction by Counterclaimants as

28  Revolution did not address the construction of the instant phrase in its Reply Brief.

26

REV 00026

REV 00868

1  Nicodema Decl. I, Exh. 1, '858 Patent Col. 7, ll. 5-9.  The

2  dictionary definition of the verb "to match" is "1. a. to be

3  exactly like: correspond precisely. b. to be like with respect to

4  specified qualities.  2. To resemble or harmonize with <The

5  lipstick *matches* the nail polish.>."  Nicodema Decl. I,

6  Webster's, Exh. 3 at 35.  The dispute between the parties boils

7  down to whether the court should adopt the first definition in

8  Webster's, i.e., "to be exactly like," or the second definition,

9  i.e., "to resemble or harmonize."  The Court finds that the first

10  definition, which is sought by Counterclaimants, is unnecessarily

11  restrictive.  There is no requirement in the patent documents

12  that the color of the coating material on the magnets be exactly

13  like the color of the frames; instead, a harmonization of the

14  colors is encompassed by the claimed invention.  Therefore, the

15  Court adopts the second definition in Webster's and construes

16  "matches" to mean resembles or harmonizes with.

17

18

19          b.   Disputed terms in the '545

20          The following terms and combination of terms in claims 6, 22

21  and 34 of the '545 patent are disputed: (1) "having a horizontal

22  surface" (claim 6); (2) "secured in said projections" (claim 22);

23  (3) "said first magnetic members capable of engaging second

24  magnetic members of an auxiliary spectacle frame" (claim 22);

25  (4) "said arms extending across a respective extension" (claim

26  34), and (5) "said first and second magnetic members engage one

27

28

                                    27

1  another" (claim 34).  The Court now addresses each of these

2  disputed terms.

3

4                    (1)  "having a horizontal surface"  (claim 6)

5       Claim 6 of the '545 Patent uses the phrase "having a

6  horizontal surface" in two contexts.  First, the claim refers to

7  the first magnetic members of the primary spectacle frame as

8  "having a horizontal surface."  Nicodema Decl. II, Exh. 1, '545

9  Patent, Col. 4, ll. 35-36.  Second, the claim refers to the

10  second magnetic members of the auxiliary frame as "having a

11  horizontal surface."  Id. at Col. 4, ll.  The Court will address

12  separately each use of the instant phrase.

13

14

15                    (a)  "having a horizontal surface" - first

16                         magnetic members in the primary frame

17       Counterclaimants construe the phrase "having a horizontal

18  surface" as used with the magnetic members of the primary frame

19  to mean "ha[ving] a surface that lies in a plane substantially

20  perpendicular to the plane of the lenses of the primary

21  spectacle frame."  JS-'545, Exh. 1 at 5.  Conversely, Revolution

22  contends that the instant phrase means that "the first magnetic

23  members each have an upperwardly [sic][14] facing surface that lies

24  in a plane that is substantially perpendicular to the plane of

25

26

27  _____

28  [14] Presumably, Revolution meant to say "upwardly."

                              28

REV 00028

REV 00870

1  the lenses of the primary spectacle frame."  JS-'545, Exh. 2 at

2  26 (emphasis added).

3      The crux of the dispute between the parties is whether or

4  not the invention claimed in the '545 Patent is limited to a top-

5  mounting design.[15]  Counterclaimants contend that the '545 Patent

6  covers both a top and bottom-mounted designs; conversely,

7  Revolution argues that only a top-mounting design is covered by

8  the invention.

9      In this case, the specification of the '545 Patent describes

10  the attachment of the auxiliary frame in terms of top-mounting as

11  shown by the following:

12

13      The arms are engaged with and supported on the upper portion

14      of the primary spectacle frame so as to allow the auxiliary

15      spectacle frame to be stably supported on the primary

16      spectacle frame and so as to prevent the auxiliary spectacle

17      frame from moving downward....

18  '545 Patent, Nicodema Decl. II, Exh. 1, '545 Patent, Col 1, 11.

19  62-67 (emphasis added)

20      It is to be noted that the arms 21 are engaged with and are

21      supported on the upper portion of the primary spectacle

22      frame 10 such that the auxiliary spectacle frame 20 may be

23      stable supported and secured to the primary spectacle frame

24      10.

25

26  Id., Col. 2, 11. 49-56 (emphasis added).

27  [15] A "top-mounting design" is one where the magnetic members of the auxiliary frame mount on

28  top of the magnetic members of the primary frame.

29

1   [T]he arm 21 securing the magnetic member 22 is supported on

2   an underline side portion of the primary spectacle frame 10.  As

3   shown in FIG. 7, the upper side portion can be an upper part

4   of the side portion securing the projection 13.

5   Id., Col. 3, ll. 14-18. (emphasis added).

6   While it is true, as Counterclaimants argue, that the claims

7   are generally not limited by the disclosed embodiments in the

8   patent, see Electro Med. Sys., S.A. v. Cooper Life Sciences.

9   Inc., 34 F.3d 1048, 1054 (Fed. Cir. 1994), it does not, however,

10  follow that the patentee has a monopoly over the entire universe

11  of embodiments that may be created - whether or not such

12  embodiments are encompassed by the disclosed invention.

13

14  See Netword LLC v. Centraal Corp., 242 F.3d 1347, 1352 (Fed. Cir.

15  2001) ("Although the specification need not present every

16  embodiment or permutation of the invention and the claims are not

17  limited to the preferred embodiment of the invention, neither do

18  the claims enlarge what is patented beyond what the inventor has

19  described as the invention.") (internal citations omitted); see

20  also Slimfold Mfg. Co. v. Kinkead Indus., Inc., 810 F.2d 1113,

21  1116 (Fed. Cir. 1987) ("Claims are not interpreted in a vacuum,

22  but are part and are read in light of the specification.").

23  Indeed, the specification may limit the scope that a patent claim

24  is accorded in circumstances where no broader scope of the claim

25  is described or enabled by the embodiments disclosed therein.

26

27  See e.g, Kraft Foods. Inc. v. Int'l Trading Co., 203 F.3d 1362,

28  1367-69 (Fed. Cir. 2000) (limiting "back panel" to the "rigid"

30

1    back panel described in every embodiment in the specification and

2    excluding the "flexible back panel of the accused device").[16]

3    Here, the invention described is clearly for a top-mounting

4    design: the written description only describes a top-mounting

5    design, the drawings only show a top-mounting configuration and

6    nothing in the prosecution history shows that the inventor

7    envisioned anything other than a top-mounting design.[17]

8

9        Based on the foregoing, the Court adopts the construction

10   proposed by Revolution and construes the instant phrase to mean

11   that the first magnetic members each have an upwardly facing

12   surface that lies in a plane that is substantially perpendicular

13   to the plane of the lenses of the primary spectacle frame.[18]

14

---

15   [16] At Oral Argument, on May 2, 2003, Counterclaimants' counsel argued that Texas Digital
16   Systems, Inc. v. Telegenix, Inc., 308 F.3d 1193, 1201-03 (Fed. Cir. 2002), instructs that the
     focus of claim construction should be on the claims themselves. See also Mem. of P's & A's in
17   Support of Counterclaimants' Opening Brief at 3:22-27 (citing Texas Digital Systems, Inc., 308
     F.3d at 1202). The Court notes that the argument proffered by Counterclaimants as to claim
18   construction is quite unremarkable. Indeed, this Court, in its Miracle Claim Construction Order,
19   stated with regard to the steps involved in construing claims: "First a court must look to the
     words of the claims themselves, both asserted and non-asserted, to define the scope of the
20   patented invention." Miracle Claim Construction Order at 16:1-3. In the instant case, the Court
     is not deviating from well-established Federal Circuit precedent requiring that "[i]n construing
21   claims, the focus ... begin and remain centered on the language of the claims themselves." Texas
22   Digital, Inc., 308 F.3d at 1201. Instead, the Court is also incorporating into its analysis Federal
     Circuit precedent that instructs that the claims, although they are the focus of claim construction,
23   are not to be construed in a vacuum, i.e., without regard to what the inventor disclosed as his
24   invention. See Slimfold Mfg. Co., 810 F.2d at 1116.

25   [17] Incidentally, in the Miracle Claim Construction Order, this Court also limited claims 12 and 16
     to a top-mounting design. See Miracle Claim Construction Order at 27-28.
26

27   [18] The Court need not reach the other arguments raised by Revolution in support of its proposed
     construction, including the arguments regarding the interference proceedings of the '207 Patent
28   and the prosecution history of the '858 Patent.

31

REV 00031

REV 00873

1              (b)   "having a horizontal surface" - second

2                 magnetic members in the auxiliary frame

3

4     Counterclaimants construe the phrase "having a horizontal

surface" as used with the magnetic members in the auxiliary frame

5 to mean "ha[ving] a surface that lies in a plane substantially

6 perpendicular to the plane of the lenses of the auxiliary

7 spectacle frame." JS-'545 Patent, Exh. 1 at 5. Conversely,

8 Revolution construes the instant phrase to mean "ha[ving] a

9 downwardly facing surface that lies in a plane substantially

10 perpendicular to the plane of the lenses of the auxiliary

11 spectacle frame." JS-'545 Patent, Exh. 2 at 6 (emphasis added).

12

13     Here again, the dispute between the parties centers on

14 whether the disclosed invention is limited to a top-mounting

15 design. As the Court already held above, see supra section "III

16 B 2 b(1)(a)," the invention disclosed in the '545 Patent is

17 limited to a top-mounting design. Therefore, the Court adopts

18 Revolution's proposed construction and construes the instant

19 phrase to mean having a downwardly facing surface that lies in a

20 plane substantially perpendicular to the plane of the lenses of

21 the auxiliary spectacle frame.

22

23

24              (2)   "secured in said projections" (claim 22)

25

26     Counterclaimants contend that the phrase "secured in said

27 projections" in claim 22 of the '545 Patent means that "each

28 first magnetic member is inserted into and firmly connected to a

REV 00032

REV 00874

1   corresponding projection in a manner such that the connection is
2   not likely to fail or give way." JS-'545, Exh. 1 at 11.
3   Revolution, on the other hand, construes the instant phrase to
4   mean that "each first magnetic member is inserted into and firmly
5   connected to a corresponding projection in a manner that permits
6   it attract [sic] a second magnetic member when placed _above_ the
7   first magnetic member." JS-'545, Exh. 2 at 12 (emphasis added).
8       Again, the parties' dispute centers on whether the invention
9   is limited to a top-mounting design.  However, this particular
10  element of claim 22 need not address the issue of top-mounting as
11  it only deals with the connection of the first magnetic members
12  to the projections of the primary spectacle frame.  Instead, the
13  top-mounting limitation is more appropriately addressed in the
14  element of claim 22 dealing with the auxiliary spectacle frame,
15  which the court addresses next.
16      Consistent with the Court's _Miracle_ Claim Construction
17  Order, the Court adopts Counterclaimants' construction of
18  "secured" to mean not likely to fail or give away.  _See Miracle_
19  Claim Construction Order at 22:3-9.  Therefore, the Court
20  construes the instant phrase to mean that each first magnetic
21  member is inserted into and firmly connected to a corresponding
22  projection in a manner such that the connection is not likely to
23  fail or give.
24
25
26
27
28

                                    33

REV 00033

REV 00875

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

(3)   "said first magnetic members capable of
engaging second magnetic members of an
auxiliary spectacle frame" (claim 22)

Counterclaimants construe the phrase "said magnetic members
capable of engaging second magnetic members of an auxiliary
spectacle frame" in claim 22 of the '545 Patent to mean that "the
first magnetic members have the ability to magnetically attract
corresponding magnetic members of an auxiliary spectacle frame,
with or without actual contact." JS-'545, Exh.1 at 12-13.
Conversely, Revolution argues that the instant phrase means that
"the first magnetic members have the ability to magnetically
attract the corresponding second magnetic members of an auxiliary
spectacle frame when placed _above_ the first magnetic member, with
or without actual contact." JS-'545, Exh. 2 at 14 (emphasis
added).

Again, the dispute between the parties hinges on whether the
claimed invention is limited to a top-mounting design. For the
reasons stated above, _see_ _supra_ section "III B 2 b(1)(a)," the
Court adopts Revolution's construction and interprets the instant
phrase to mean the first magnetic members have the ability to
magnetically attract the corresponding second magnetic members of
an auxiliary spectacle frame when placed above the first magnetic
member, with or without actual contact.

34

REV 00034

REV 00876

(4)   "said arms extending across a respective extension" (claim 34)

Counterclaimants construe the phrase "said arms extending across a respective extension" in claim 34 of the '545 Patent to mean that "at least some portion of each arm reaches across the corresponding extension." JS-'545, Exh. 1 at 17. Revolution contends that the instant phrase means that "at least some portion of each arm reaches across the top of the corresponding extension." JS-'545, Exh. 2 at 18 (emphasis added).

Here again, the dispute between the parties hinges on whether the claimed invention describes a top-mounting design. For the reasons set forth above, see supra section "III B 2 b(1)(a)," the Court adopts Revolution's construction and construes the instant phrase to mean that at least some portion of each arm reaches across the top of the corresponding extension.

(5)   "said first and second magnetic members engage one another" (claim 34)

Counterclaimants construe the phrase "said first and second magnetic members engage one another" in claim 34 fo the '545 Patent to mean that the "first and second magnetic members magnetically attract one another, with or without actual contact." JS-'545, Exh. 1 at 20. Revolution, however, construes the instant phrase to mean that "the first and second magnetic

35

1   members are magnetically attracted to each other when the second

2   magnetic member is placed in proximity <u>above</u> the first magnet

3   [sic].[19]"  JS-'545, Exh. 2 at 20.

4

5       The crux of the parties dispute is again whether the design

6   disclosed by the invention is top-mounting.  For the reasons set

7   forth above, <u>see</u> <u>supra</u> section "III B 2 b(1)(a)," the Court

8   adopts Revolution's construction and construes the instant phrase

9   to mean that the first and second magnetic members are

10  magnetically attracted to each other when the second magnetic

11  member is placed in proximity above the first magnetic member.

12  IV.  CONCLUSION

13      Based on the foregoing, the Court concludes that:

14

15      1.   "plurality of sockets" in claim 1 of the '858 Patent

16           means two or more openings into which an inserted part

17           is designed to fit;

18      2.   "magnets" in claims 1-3 of the '858 Patent means

19           permanent magnets;

20

21      3.   "being oriented such that the maximum magnetic

22           attractive force between said magnets is oriented

23           approximately parallel to lenses in said conventional

24           eyeglasses" in claim 1 of the '858 Patent means that

25           when the auxiliary eyeglasses are attached to the

26           conventional eyeglasses, the permanent magnets mounted

27  _____

28  [19] Presumably, Revolution meant to say "magnetic member."

REV 00036

REV 00878

on the conventional eyeglasses are positioned relative
to the magnets mounted on the auxiliary eyeglasses such
that the greatest possible amount of magnetic force
attainable between the magnets will be in a plane
approximately parallel to the plane of the lenses of
the conventional eyeglasses;

4.  "mounted to form recesses in said first pair of
sockets" in claim 1 of the '858 Patent means positioned
sufficiently below the outer peripheral edges of the
sockets so as to define an opening between the magnets
and the outer peripheral edges;

5.  "whereby said extended magnets in said second pair of
sockets engage said recesses to automatically align and
secure said auxiliary eyeglasses when mated with said
magnets forming said recesses in said first pair of
sockets" in claim 1 of the '858 Patent means that when
the magnets forming the recesses and the extended
magnets contact each other, this contact between the
extended magnets and the recesses causes the auxiliary
eyeglasses to align and secure to the conventional
eyeglasses with little assistance from the wearer;

6.  "providing maximum resistance to a downward movement of
said auxiliary eyeglasses thereby preventing detachment
of said auxiliary eyeglasses from said conventional
eyeglasses" in claim 1 of the '858 Patent means

37

REV 00037

REV 00879

providing the greatest possible amount of resistance to
downward movement of the auxiliary eyeglasses so as to
keep the auxiliary eyeglasses from separating from the
conventional eyeglasses;

7.  "a protective and decorative coating material on
exposed sides of said plurality of magnets" in claim 3
of the '858 Patent means a layer of protective and
decorative covering material on the visible sides of
said plurality of magnets;

8.  "matches" in claim 4 of the '858 Patent means resembles
or harmonizes with;

9.  "having a horizontal surface" as used with the first
magnetic members in the primary frame in claim 6 of the
'545 Patent means that the first magnetic members each
have an upwardly facing surface that lies in a plane
that is substantially perpendicular to the plane of the
lenses of the primary spectacle frame;

10. "having a horizontal surface" as used with the second
magnetic members of the auxiliary frame in claim 6 of
the '545 patent means having a downwardly facing
surface that lies in a plane substantially
perpendicular to the plane of the lenses of the
auxiliary spectacle frame;

11. "secured in said projections" in claim 22 of the '545
Patent means that each first magnetic member is

38

REV 00038

REV 00880



inserted into and firmly connected to a corresponding
projection in a manner such that the connection is not
likely to fail or give;

12. "said first magnetic members capable of engaging second
magnetic members of an auxiliary spectacle frame" in
claim 22 of the '545 Patent means the first magnetic
members have the ability to magnetically attract the
corresponding second magnetic members of an auxiliary
spectacle frame when placed above the first magnetic
member, with or without actual contact;

13. "said arms extending across a respective extension" in
claim 34 of the '545 Patent means that at least some
portion of each arm reaches across the top of the
corresponding extension; and

14. "said first and second magnetic members engage one
another" in claim 34 of the '545 Patent means that the
first and second magnetic members are magnetically
attracted to each other when the second magnetic member
is placed in proximity above the first magnetic member.

IT IS SO ORDERED.

Dated: May 5, 2003

LOURDES G. BAIRD
United States District Judge

39

REV 00039

REV 00881