# EXHIBIT K

*ASPEX EYEWEAR, INC. VS.*

*HARDY LIFE, LLC*

———————————————————————————————

*THIERRY IFERGAN 30(b)(6)*

*April 23, 2010*

*CONFIDENTIAL - ATTORNEYS' EYES ONLY*

———————————————————————————————



**Ellen Grauer**

**COURT REPORTING**

Co. LLC

126 East 56th Street, Fifth Floor New York, New York 10022

PHONE: (212) 750-6434  FAX: (212) 750-1097

www.ELLENGRAUER.com

*Original File 93226B.TXT*

*Min-U-Script® with Word Index*

CONFIDENTIAL - ATTORNEYS' EYES ONLY                    1

```
 1   UNITED STATES DISTRICT COURT

 2   SOUTHERN DISTRICT OF FLORIDA
     -------------------------------------------------x
 3   ASPEX EYEWEAR, INC., and
     CONTOUR OPTIK, INC.,
 4
                      Plaintiffs,
 5
         -vs-
 6
     HARDY LIFE, LLC., MARCHON EYEWEAR, INC.
 7   NIKE, INC., REVOLUTION EYEWEAR, INC., and
     GARY MARTIN ZELMAN, an individual,
 8
                      Defendants.
 9
     CASE NO.: 09-61515-civ-Cooke
10   -------------------------------------------------x

11
          * * * CONFIDENTIAL - ATTORNEYS' EYES ONLY * * *
12

13                        1221 Brickell Avenue
                          Miami, Florida
14
                          April 23, 2010
15                        4:14 p.m.

16

17        VIDEOTAPED REVOLUTION 30(b)(6) DEPOSITION

18   OF THIERRY IFERGAN, as reported by KELLI ANN WILLIS,

19   a Registered Professional, Certified Realtime Reporter

20   and Notary Public within and for The State of Florida.

21

22

23        ELLEN GRAUER COURT REPORTING CO. LLC
              126 East 56th Street, Fifth Floor
24               New York, New York 10022
                      212-750-6434
25                    Ref:  93226B
```

CONFIDENTIAL ATTORNEYS' EYES ONLY                2

```
 1   A P P E A R A N C E S:

 2

 3   On behalf of the Plaintiff:

 4   GREENBERG TRAURIG, LLP

 5        1221 Brickell Avenue
          Miami, Florida   33131
 6   BY:  BARRY SCHINDLER, ESQ.
          305.597.0500
 7        schindlerb@gtlaw.com

 8

 9   On behalf of the Defendants Marchon and Nike:

10   FROMMER LAWRENCE & HAUG, LLP

11        745 Fifth Avenue
          New York, New York   10151
12   BY:  EDWARD HAUG, ESQ. and
          PORTER F. FLEMING, ESQ.
13        212.588.0800
          pfleming@flhlaw.com
14        ehaug@flhlaw.com

15

16   On behalf of the Defendants Revolution and Zelman:

17   SHEPPARD MULLIN RICHTER & HAMPTON, LLP

18        650 Town Center Drive
          Fourth Floor
19        Costa Mesa, California   92626
     BY:  STEVEN M. HANLE, ESQ. and
20        JENNIFER TRUSSO, ESQ.
          714.513.5100
21        shanle@sheppardmullin.com
          jtrusso@sheppardmullin.com
22

23   Also Present:

24        Dave Zeber, Videographer

25        Jose Pena, Esq.
```

CONFIDENTIAL ATTORNEYS' EYES ONLY                    6

```
 1              IFERGAN 30(b)(6) - CONFIDENTIAL
 2    correct?
 3              MR. SCHINDLER:  You say Topic No. 3 has
 4         not been designated?
 5              MS. TRUSSO:  I believe we received an
 6         objection from yourself saying that Topic No.
 7         3 -- that you weren't going to produce a
 8         witness.  Is that not --
 9              MR. SCHINDLER:  No, that's not -- it is
10         only as to the part that says "products of
11         non-parties."
12              MS. TRUSSO:  Okay.
13              MR. SCHINDLER:  We are producing him as to
14         the other part of deposition Topic 3.
15    BY MS. TRUSSO:
16         Q.   So for all topics, and for it says limited
17    Topic 3, you are being offered as the 30(b)(6)
18    designee, correct?
19         A.   That is correct.
20              MS. TRUSSO:  Let's mark as Exhibit --
21         actually let's not mark it.  Let's wait.  We
22         will mark it in a second.
23    BY MS. TRUSSO:
24         Q.   I'm going to put before you what I'm going
25    to represent is an auxilliary frame of Revolution
```

CONFIDENTIAL ATTORNEYS' EYES ONLY 7

```
1              IFERGAN 30(b)(6) - CONFIDENTIAL
2    Eyewear.
3              My question to you is, Mr. Ifergan, is it
4    Aspex's contention that what I placed before you is
5    an auxilliary frame?
6         A.   Yes.
7         Q.   Is it Aspex's contention that what I put
8    before you is an auxillary spectacle frame for
9    supporting auxillary lenses?
10        A.   Yes.
11        Q.   Okay.  Is it Aspex's contention that what
12   I put before you is an auxillary spectacle frame
13   including a front side?
14        A.   Yes.
15        Q.   Is it Aspex's contention that what I put
16   before you is an auxillary spectacle frame including
17   a rear side?
18        A.   Yes.
19        Q.   Is it Aspex's contention that what I put
20   before you is an auxillary spectacle frame including
21   an oppositely positioned side portions?
22             Let me clear that up.
23             Is it Aspex's contention that what I put
24   before you is an auxillary spectacle frame
25   containing oppositely positioned side portions?
```

CONFIDENTIAL ATTORNEYS' EYES ONLY                8

```
 1              IFERGAN 30(b)(6) - CONFIDENTIAL
 2         A.    Yes.
 3         Q.    Okay.  Is it Aspex's contention that what
 4    I put before you is an auxillary spectacle frame
 5    wherein the oppositely positioned side portions have
 6    side portions having an extended -- an arm extended
 7    therefrom?
 8         A.    Yes.
 9         Q.    Okay.  Is it Aspex's contention that what
10    I have put before you is an auxillary spectacle
11    frame wherein the arms have a rearwardly directed
12    free end?
13         A.    Yes.
14         Q.    Is it Aspex's contention that what I have
15    put before you is an auxillary spectacle frame
16    wherein the arms, having a rearwardly directed free
17    end, secures magnetic members?
18         A.    Yes.
19         Q.    Is it Aspex's contention that what I have
20    placed before you is an auxillary spectacle frame
21    wherein the arms, having a rearwardly directed free
22    end for securing a magnetic member, has a horizontal
23    surface?
24         A.    Yes.
25         Q.    Is it Aspex's contention that what I have
```

CONFIDENTIAL-ATTORNEYS' EYES ONLY                    9

```
1              IFERGAN 30(b)(6) - CONFIDENTIAL
2    placed before you is an auxillary spectacle frame
3    wherein the pair of magnetic members secured in the
4    free end of said arms are adapted to extend across
5    respective side portions of a primary spectacle
6    frame?
7         A.   Yes.
8         Q.   Is it Aspex's contention that what I have
9    placed before you is an auxilliary spectacle frame
10   wherein the side portions that extend across the
11   respective side portions of a primary spectacle
12   frame have a horizontal surface that can vertically
13   engage corresponding magnetic members on a primary
14   spectacle frame?
15        A.   Can you please repeat the question?
16        Q.   Is it Aspex's contention that what I have
17   placed before you is an auxilliary spectacle frame
18   that has a pair of magnetic members having a
19   horizontal surface that can vertically engage
20   corresponding magnetic members -- I'm sorry, member
21   surfaces on a primary spectacle frame?
22             THE WITNESS:  I'm sorry.  "Member
23        surfaces," can you just ---
24   BY MS. TRUSSO:
25        Q.   Certainly.  Is it Aspex's contention that
```

CONFIDENTIAL ATTORNEYS' EYES ONLY
10

```
 1              IFERGAN 30(b)(6) - CONFIDENTIAL
 2   what I've placed before you is an auxilliary
 3   spectacle frame that has a pair of magnetic members
 4   having a horizontal surface that can vertically
 5   engage corresponding magnetic member services on a
 6   primary spectacle frame?
 7        A.    Yes.
 8        Q.    Is it Aspex's contention that what I have
 9   placed before you is an auxilliary spectacle frame
10   wherein said magnetic members of said auxilliary
11   spectacle frame are magnets?
12        A.    Yes.
13              I'm sorry.  Can I have a paper clip?
14        Q.    A paper clip?
15        A.    Yes.
16              MR. HANLE:  Here.
17              THE WITNESS:  Thank you.
18              Yeah, they are magnets.
19              MS. TRUSSO:  So I'm going to mark this now
20        as Exhibit 83.  This is the IMF auxilliary
21        frames.  I'm going to wrap this around it like
22        we have done in the past.
23              (Thereupon, the referred-to frame was
24        marked by the court reporter for Identification
25        as T. Ifergan Deposition Exhibit 83.)
```

```
 1              IFERGAN 30(b)(6) - CONFIDENTIAL
 2              MS. TRUSSO:  What I'm going to do as part
 3        of Exhibit 83, I'm going to attach the IMF
 4        auxilliary frame to the primary frame that it
 5        corresponds to.
 6              I'm going to mark the primary frame as
 7        Exhibit 84.  That is for IMF model number 435.
 8              (Thereupon, the referred-to frame was
 9        marked by the court reporter for Identification
10        as T. Ifergan Deposition Exhibit 84.)
11   BY MS. TRUSSO:
12        Q.    Mr. Ifergan, you testified that you
13   reviewed a number of documents in preparation for
14   your deposition as noticed by Marchon and Nike,
15   correct?
16        A.    Correct.
17        Q.    Okay.  Have you also reviewed documents in
18   preparation for your deposition to be taken by my
19   clients?
20        A.    Yes.
21        Q.    Okay.  And other than the documents that
22   were provided to us by your counsel that I believe
23   was in a notebook that you prepared in preparation
24   for your deposition today, were there any other
25   documents that you reviewed?
```

```
 1              IFERGAN 30(b)(6) - CONFIDENTIAL
 2   Yinkai Chao in Support of Counterclaimant's Motion
 3   for Partial Summary Judgment that Revolution
 4   Literally Infringes Claim 22 of the '545 Patent.
 5              If you can please look at that, and then
 6   let me know whether that refreshes your recollection
 7   as to whether Aspex constructed auxilliary frames to
 8   fit on Revolution's accused primary frames in order
 9   to support its infringement claim.
10              MR. SCHINDLER:  Objection to the form of
11         the question.
12              THE WITNESS:  I have no problem with my
13         recollection of the, quote/unquote, specially
14         constructed auxilliary frame at all.
15              The answer I gave you was I don't know
16         that we had to do it for the frame to meet all
17         of the limitations of the claim.
18   BY MS. TRUSSO:
19         Q.   Okay.  The frame that you did construct,
20   that David Chao constructed on behalf of Aspex, that
21   was a top-mounting auxilliary frame, correct?
22         A.   Correct.
23         Q.   And the auxilliary frames that were sold
24   with the primary frames accused of infringement in
25   the California action, those were bottom-mounting
```

CONFIDENTIAL ATTORNEYS' EYES ONLY                    26

```
 1              IFERGAN 30(b)(6) - CONFIDENTIAL
 2    auxilliary frames, correct?
 3         A.    Accused in the counterclaim.
 4         Q.    Thank you.
 5               Accused in the counterclaim.
 6         A.    Yes.
 7         Q.    Did Aspex accuse Revolution's auxilliary
 8    frames of infringement in the California action?
 9         A.    I don't recall what -- I remember there
10    were three claims asserted against Revolution in the
11    California action.  I don't specifically recall what
12    the two claims that were eliminated at the summary
13    judgment level talked about.
14         Q.    Let me try to refresh your memory as to
15    the other claims that were at issue in that case.
16               Did I place before you the Court's claim
17    construction order, Exhibit 69, yet?
18         A.    No, I don't think so.
19         Q.    I'm going to place before you the
20    Deposition Exhibit 69 marked earlier today.  I
21    believe this order was part of the package that you
22    reviewed in preparation for today's depo, so, as
23    well.
24               But let me direct your attention to Page 2
25    of Exhibit 69.  In particular, I'm going to direct
```

```
 1              IFERGAN 30(b)(6) - CONFIDENTIAL
 2       second.
 3              THE VIDEOGRAPHER:  We are off the record.
 4              (Thereupon, a recess was taken, after
 5       which the following proceedings were held:)
 6              THE VIDEOGRAPHER:  We are on the record.
 7   BY MS. TRUSSO:
 8       Q.    Mr. Ifergan, I'm going to place before you
 9   what has been identified as Exhibit 73A and Exhibit
10   74A.
11       A.    Uh-huh.
12       Q.    Can you identify, when I say "you," I'm
13   referring to Aspex, any differences between 73A and
14   74A?
15       A.    Now, I think that in the binder here, we
16   have a tab that discusses the difference between the
17   old -- the old auxilliary frames and the new
18   auxilliary frames.
19              But just to look at them without the
20   primary frames that go with these, I can see a small
21   difference in the arm and the size of the magnet and
22   the -- the -- let me use the right terms here.  The
23   free ends, as they are called, I guess, in claim 23.
24       Q.    And you said there was a difference in the
25   free ends of claim 23?  I'm sorry.  I don't
```

1          IFERGAN 30(b)(6) - CONFIDENTIAL

2     understand your testimony.

3          A.    No, no, the size.  The size of the magnet

4     housing, if you want, at the end of the arm here.

5          Q.    Now, does Aspex contend that the

6     auxilliary frames of 73A and the auxilliary frames

7     of 74A both have free ends?

8          A.    Yes.

9          Q.    Does claim 23 have a limitation regarding

10    the size of what you call the magnet housing?

11         A.    No.

12         Q.    You also said that one of the differences

13    was the arm of the auxilliary frame.

14              Can you tell me specifically what is

15    different between the arm of the auxilliary frame of

16    73A and the arm of the auxilliary frame of 74A?

17         A.    The -- I guess the radius of the curve

18    on -- on these -- on 73A and 74A are different.  It

19    appears to be the distance -- it appears to me that

20    the distance between the lens and the magnet on 73A

21    is greater than the distance between the lens and

22    the magnet on 74A.

23         Q.    Okay.  Does claim 23 have a limitation

24    regarding the distance between the lens and the

25    magnet on the auxilliary frame?

```
 1              IFERGAN 30(b)(6) - CONFIDENTIAL
 2      A.    No.
 3      Q.    Okay.  Does claim 23 have a limitation
 4 regarding the radius of the curve on the arms of the
 5 auxilliary frame?
 6      A.    No.
 7      Q.    I'm going to direct your attention back to
 8 the court's claim construction order, which is
 9 Exhibit 69.  And if I could direct your attention to
10 Page 28 of Exhibit 69.
11      A.    Uh-huh.
12      Q.    In particular, I'm going to direct your
13 attention to heading A, lower case A, having a
14 horizontal surface, first magnetic members of the
15 primary frame.
16            Are you there?
17      A.    Yes.
18      Q.    Okay.  Now, in the 2002 California action,
19 Aspex construed the "having a horizontal surface as
20 it relates to the primary frame" as having a
21 horizontal surface -- I'm sorry, having a surface
22 that lies in a plane substantially perpendicular to
23 the plane of the lenses of the primary spectacle
24 frame.
25            Do you see that?
```

```
 1              IFERGAN 30(b)(6) - CONFIDENTIAL
 2              THE WITNESS:  I don't really remember.
 3      I -- I --- I'm not sure what the -- what the
 4      Court decided with the two claims that were
 5      dismissed at the summary judgment level.
 6              As I sit here today, I -- you know.
 7 BY MS. TRUSSO:
 8      Q.   I just want to make sure I'm clear as to
 9 your testimony as an Aspex designee, 30(b)(6)
10 designee.  Okay?
11      A.   Yes.
12      Q.   Is it your testimony that Aspex has no
13 opinion about what the claim construction order was
14 in the California 2002 case?
15      A.   I mean, the claim construction order is
16 what it is.  It is there.  Am I going to comment on
17 what the Court decided?  Aspex is not qualified
18 to -- to -- to opine on whether the Court was right
19 or wrong.  The Court said what the Court said.
20      Q.   Okay.  Is Aspex bound by the Court's claim
21 construction order in the 2002 case?
22              MR. SCHINDLER:  Objection, calls for a
23      legal conclusion.
24              Answer the question without disclosing
25      information, privileged information.
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY                                46

```
 1              IFERGAN 30(b)(6) - CONFIDENTIAL
 2              THE WITNESS:  Yes, I believe so.
 3    BY MS. TRUSSO:
 4        Q.    Okay.  Now, if you go to Page 29 of
 5    Exhibit 69, the very first full paragraph says, "The
 6    crux of the dispute between the parties is whether
 7    or not the invention claimed in the '545 patent is
 8    limited to a top-mounting design."
 9              Do you see that?
10        A.    Uh-huh.
11        Q.    And it says, "Counterclaimants," which
12    includes Aspex, "contend that the '545 patent covers
13    both top and bottom-mounted designs.  Conversely,
14    Revolution argues that only a top-mounting design is
15    covered by the invention."
16              Do you know, does Aspex -- well, scratch
17    that.
18              Do you know whether the Court agreed with
19    counterclaimant's contentions or Revolution's
20    contentions as to whether the '545 patent is limited
21    to a top-mounting design?
22              MR. SCHINDLER:  Objection to the form of
23         the question.
24              THE WITNESS:  If I know?  I don't know.
25    BY MS. TRUSSO:
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY                                    58

```
 1              IFERGAN 30(b)(6) - CONFIDENTIAL

 2        A.   Correct.

 3        Q.   Okay.  Was Exhibit 73A designed to engage

 4   a primary frame from the top?

 5             You can pick it up and look at it.

 6             You testified earlier it was bottom

 7   mounting.  So --

 8        A.   Correct.  Yes.  Right.  No.

 9        Q.   Okay.  The same question for 74A.  Is 74A

10   designed to engage a primary frame from the top?

11        A.   No.  But they both meet the limitations of

12   the asserted claims.

13        Q.   What limitations of what claim?

14        A.   Of the claims that we asserted in the

15   suit.

16        Q.   In the current suit?

17        A.   Yes.

18        Q.   I'm sorry.  When you say both, you said

19   they both meet the limitations of the asserted

20   claims, you are referring to 73A and 74A that have

21   been placed before you?

22             You said both.  You are referring to 73A

23   and 74A when you said both?

24        A.   Yeah, I'm not -- I'm not --- I'm not sure.

25   I would have to relook at them.
```

*ASPEX EYEWEAR, INC. VS.*
*HARDY LIFE, LLC*

---

*THIERRY IFERGAN 30(b)(6*
*May 13, 2010*

---



# Ellen Grauer
## COURT REPORTING
### Co. LLC

126 East 56th Street, Fifth Floor New York, New York 10022
PHONE: (212) 750-6434   FAX: (212) 750-1097
**www.ELLENGRAUER.com**

*Original File 93441.TXT*
*Min-U-Script® with Word Index*

1    UNITED STATES DISTRICT COURT

2    SOUTHERN DISTRICT OF FLORIDA
     ------------------------------------------------x
3    ASPEX EYEWEAR, INC., and
     CONTOUR OPTIK, INC.,
4
                    Plaintiffs,
5
         -vs-
6
     HARDY LIFE, LLC., MARCHON EYEWEAR, INC.
7    NIKE, INC., REVOLUTION EYEWEAR, INC., and
     GARY MARTIN ZELMAN, an individual,
8
                    Defendants.
9
     CASE NO.: 09-61515-civ-Cooke
10   ------------------------------------------------x

11

12                            1221 Brickell Avenue
                              Miami, Florida 33131
13
                              May 13, 2010
14                            9:52 a.m.

15

16            CONTINUED VIDEOTAPED DEPOSITION OF

17   THIERRY IFERGAN 30(b)(6), as reported by Maria Reeder,

18   Shorthand Reporter and Notary Public of the State

19   of Florida.

20

21

22

23        ELLEN GRAUER COURT REPORTING CO. LLC
            126 East 56th Street, Fifth Floor
24             New York, New York 10022
                     212-750-6434
25                    Ref: 93441

```
 1    A P P E A R A N C E S:

 2

 3    On behalf of the Plaintiff:

 4    Greenberg Traurig, LLP

 5         1221 Brickell Avenue
           Miami, Florida   33131
 6
      BY:   BARRY SCHINDLER, ESQ.
 7           305.597.0500
             schindlerb@gtlaw.com
 8

 9    On behalf of the Defendants Marchon and Nike:

10    Frommer Lawrence & Haug, LLP

11         745 Fifth Avenue
           New York, New York   10151
12
      BY:   PORTER F. FLEMING, ESQ.
13           212.588.0800
             pfleming@flhlaw.com
14

15    On behalf of the Defendants Revolution and Zelman:

16    Sheppard Mullin Richter & Hampton, LLP

17         650 Town Center Drive, Fourth Floor
           Costa Mesa, California   92626
18
      BY: JENNIFER TRUSSO, ESQ.
19         714.513.5100
           jtrusso@sheppardmullin.com
20

21    Also Present:

22    Jose Pena, Esquire

23

24

25
```

96

1                          IFERGAN 30(b)(6)

2      frames of Exhibit 74 designed to fit above the primary

3      frames of Exhibit 74?

4          A     Designed to fit.  I didn't design them, but I

5      don't think so.

6          Q     Okay.  And are the -- would you agree that the

7      arms on Revolution's auxiliary frames are designed to

8      extend underneath the side portions of the primary

9      frames?

10             MR. SCHINDLER:  Objection; compound question.

11         A     Please repeat.

12         Q     (By Ms. Trusso) Sure.  Do you agree that

13     the arms of Revolution's auxiliary frames,

14     Exhibit 74-A, are designed to extend underneath the

15     side portions of the primary frames?

16         A     Again, like I said, I didn't design these

17     frames, but they -- I would say that, yes, they are

18     designed to fit underneath.

19         Q     Okay.  To extend underneath the side portions

20     of the primary frame?

21             MR. SCHINDLER:  Objection; asked and answered.

22         A     Yes.

23         Q     (By Ms. Trusso) And do you agree that the

24     arms on Revolution's auxiliary frames are not

25     adapted to extend across the top of the side

IFERGAN 30(b)(6)

1
2   portions of the primary frames?

3          MR. SCHINDLER:  And, again, I'm going to

4      instruct you to only answer on behalf of Thierry

5      Ifergan, not Aspex since it goes to the 722 patent.

6          MS. TRUSSO:  No, it doesn't.  I'm talking

7      about Revolution's frames.  What are you talking

8      about?

9          MR. SCHINDLER:  And you're not reading on the

10     722 patent?

11          MS. TRUSSO:  No.

12          MR. SCHINDLER:  Okay.  That's fine.

13   A    Please repeat that.  I'm sorry.

14   Q    (By Ms. Trusso) Sure.  Do you agree that

15  the arms on Revolution's auxiliary frames are not

16  adapted to extent across the top of the side

17  portions of Revolution's primary frames?

18   A    And in general you're asking me, or are you

19  asking me about this Exhibit 74-A?

20   Q    74-A.

21   A    74-A was not -- I'm sorry, not designed --

22   Q    Do you agree that the arms on Revolution's

23  auxiliary frames, 74-A, are not adapted to extend across

24  the top side portions of Revolution's primary frames?

25   A    Yes.  They are not adapted, correct.

IFERGAN 30(b)(6)

1
                IFERGAN 30(b)(6)

2    frame or all frames?  You keep mixing and matching.

3         MS. TRUSSO:  Well, state your objection.

4         MR. SCHINDLER:  Objection; vague and

5    ambiguous.

6       Q    (By Ms. Trusso) Okay.  Do you understand

7    my question, Mr. Ifergan?

8       A    Please repeat it.

9       Q    Okay.  Looking at Exhibit 74 --

10       A    Yes.

11       Q    -- are the auxiliary frames of Exhibit 74

12    designed to extend across the top of the side portions

13    of the primary frames?

14       A    I was not part of the design team, or I didn't

15    have any discussions with whoever designed Exhibit 74.

16    But just from my looking at it like this, it doesn't

17    look like it was designed to fit on top of the primary

18    frame.

19       Q    Now, are you aware of any Revolution product

20    that was designed -- scratch that.

21         Are you aware of any Revolution product

22    wherein the auxiliary frame was designed to fit on the

23    top of the primary frame?

24       A    I'm not very familiar with Revolution's entire

25    line, so...

```
 1                    IFERGAN 30(b)(6)
 2          MR. SCHINDLER:  The witness answered your
 3      question, you may not like the answer.
 4          MS. TRUSSO:  Okay.  You're done.  You're done
 5      with your objection.
 6          MR. SCHINDLER:  No, I will finish my objection
 7      and then you will talk.
 8      A    Okay.  I'm not aware of what goes through the
 9   mind of the people designing the frames for Revolution.
10      Q    (By Ms. Trusso) I'm not asking you to be a
11   clairvoyant.  I'm simply asking if you are aware of,
12   as someone in the industry, of any product of
13   Revolution's that was designed to fit -- the
14   auxiliary frame was designed to fit above the
15   primary frame?
16          MR. SCHINDLER:  Objection; asked and answered
17      third time.
18      A    No.
19      Q    (By Ms. Trusso) Are you aware of any
20   product -- well, scratch that.
21          Are you aware of any Marchon product wherein
22   the auxiliary frame is designed to fit on top of the
23   primary frame?
24          MR. SCHINDLER:  And as to this, you can
25      testify as to Thierry Ifergan.  You're right now in
```

IFERGAN 30(b)(6)

1

2    a -- do you think there's also a magnet on the bottom?

3         A    I believe it's the same magnet.

4         Q    Okay.  Do you know if the -- but you can't see

5    the magnet on the bottom, correct, of Exhibit 74-A?

6         A    Correct.

7         Q    Okay.  Do you know if the magnetic attraction

8    on the top of the horizontal surfaces that you've

9    identified is stronger than the magnetic attraction on

10   the bottom of the arms of 74-A?

11        A    Yes, I believe it is.

12        Q    Okay.  And do you know if the magnet -- you

13   believe -- you said you believe it's one magnet; is that

14   correct, on each arm?

15        A    Yes.

16        Q    Okay.  And the surface of the magnet is

17   exposed on the top but not on the bottom; is that

18   correct?

19        A    Correct.

20        Q    So if you were to mount the 74-A to the top of

21   74-B, the unexposed surface of 74-A on the auxiliary

22   frame is not being engaged with the primary frame,

23   correct?

24             MR. SCHINDLER:  Objection; compound question.

25        A    Can you repeat the question.

IFERGAN 30(b)(6)

1

2       Q     And starting on lines 38 -- or line 38.

3  Sorry.

4       A     Yeah.

5       Q     It says, "An auxiliary spectacle frame 20" --

6       A     I'm sorry.  One second.  Line 38, 35, 36, 37.

7  Okay.  Okay.  Yup.

8       Q     "An auxiliary spectacle frame 20 is provided

9  for supporting the auxiliary lenses therein and includes

10  two side portions each having an arm 21 extended

11  rearward therefrom for extending over and for engaging

12  with the upper portion of the primary spectacle frame

13  10, Figures 5 and 6."

14       A     Okay.

15       Q     Now, based on that description, is -- is

16  Figure 5 a top-mounting or bottom-mounting

17  configuration?

18       A     Okay.  Yes, that's a top -- top-mounted

19  according to the description.

20       Q     Now, let's move down to line 53, Column 2.

21       A     Uh-huh.

22       Q     It says, "The auxiliary spectacle frame 20

23  will not move downward relative to the primary spectacle

24  frame" --

25       A     I'm sorry.  Hold on just one second.  Okay.

IFERGAN 30(b)(6)

1

2   scope.  Let me try to clean it up.

3          Do you recall providing information in

4   response to discovery relating to when Aspex first

5   became aware of the products accused in this action?

6      A    I don't recall.

7      Q    When did Aspex become aware of the products

8   accused in this action?  And let me actually scratch

9   that.  Let me ask it differently.

10          When did Aspex become aware of the Revolution

11  products that are accused in this action?

12     A    I would say in general, nonspecifically.  The

13  models, Gary had told me that he found a new way to -- a

14  new design that had no projections and that doesn't

15  infringe on Claim 22 and all of that, you know, all of

16  that stuff.

17     Q    And when was that discussion?

18     A    This was -- it was during the last lawsuit.

19  During the last case.

20     Q    Do you recall if it was before or after the

21  trial on damages in the last case?

22     A    Before.

23     Q    And do you recall if Aspex examined the

24  products that Gary referred to shortly after this

25  conversation?

IFERGAN 30(b)(6)

1

2     A     He showed me his first prototypes that had

3  come in with square magnets instead of round magnets,

4  but he never came out with that collection ever.

5     Q     And when was the first time that you saw a

6  Revolution product that had the magnetics embedded as

7  opposed to in a projection?

8     A     Well, that was the first time I had seen that

9  from Revolution was in Las Vegas with the square magnets

10  as prototypes, he showed me.

11     Q     And you said that was prior to the trial on

12  damages in the California case?

13     A     Yeah.  I think that was -- if I even recall,

14  it was prior to the summary judgment of infringement.

15     Q     Okay.  And did you see, when he showed you

16  that prototype, was it a combination, auxiliary/primary

17  frame?

18     A     Yes.

19     Q     And after that instance where you saw the

20  embedded magnetic member in the primary frame, when was

21  the next time that you saw a frame, a Revolution frame

22  that had an embedded magnetic member?

23     A     I don't remember exactly.

24     Q     Was it before or after the trial in the

25  California 2002 case?

**IFERGAN 30(b)(6)**

1

2      A      Before the, you're talking about the trial,

3   the damages?

4      Q      Yes, that's correct.

5      A      Before.

6      Q      And same question:  Was that a combination

7   auxiliary/primary frame that you saw?

8      A      It's the accused product.

9      Q      And was that before or after the summary

10  judgment motion that you saw the accused products?

11     A      Was it before?  I don't know.  I don't

12  remember.  It was before the -- I think it was after the

13  summary of infringements.

14     Q      But before trial on damages?

15     A      Before the trial on damages, yes.

16     Q      Do you recall if it was shortly after the --

17  well, scratch that.

18            You don't recall specifically whether it was

19  before or after the summary judgment motion; is that

20  right?

21     A      I recall that it was before the summary

22  judgment of infringement.

23     Q      Do you recall if it was -- if the -- if the

24  accused products that you saw before summary judgment,

25  what the purpose was of your examination of those

```
 1                    IFERGAN 30(b)(6)
 2  before March 3, 2009?
 3       A     Any understanding that I have with regards to
 4  the reexamination or the reasons why our litigation
 5  strategy is conducted one way or another can only come
 6  from discussions that I have with my attorney,
 7  attorneys.  And, therefore, I don't know how to answer
 8  your questions without disclosing those discussions.
 9       Q     Just so that the record is clear, the reason
10  why you're not answering my question is because you
11  believe it would reveal communications with your
12  attorney; is that correct?
13       A     That is correct.
14       Q     And if that information wasn't protected by
15  the attorney-client communication, do you think you'd be
16  able to answer my question?
17       A     If it wasn't protected by the attorney-client
18  privilege, I wouldn't have the information to begin
19  with.
20       Q     So Aspex doesn't have any knowledge about why
21  it didn't accuse Revolution's products that are at issue
22  in this case prior to March 3, 2009 that's independent
23  of what it has been told by its attorneys?
24            MR. SCHINDLER:  Objection.  Misstates what the
25        witness stated.  Attorneys don't tell him anything.
```

IFERGAN 30(b)(6)

1

2          MS. TRUSSO:  Thanks for testifying.

3          MR. SCHINDLER:  Well, then don't misstate what

4      his answers are.

5          MS. TRUSSO:  Just state your objection.

6          MR. SCHINDLER:  Objection.  You're misstating

7      the testimony.

8      A      The reasons why we -- why we filed this

9  lawsuit is because we believe that our patents remain

10  infringed.  That our patent remains infringed even after

11  the damages trial by this new configuration.

12      Q      (By Ms. Trusso) When did Aspex form that

13  belief?

14      A      When did Aspex form that belief?

15      Q      Yes, that this new configuration infringed

16  Aspex's patent?

17      A      The belief has been since the frames were

18  first released.  The...

19      Q      Did you tell anyone that the square magnetic

20  design infringed the 505 [sic] patent, the one that was

21  shown to you by Gary?  The 545, I'm sorry.

22          Did you tell anyone that the square magnetic

23  design infringed the 545 patent?

24      A      Did I tell anyone?  I don't remember telling

25  anyone.