UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 09-61515-CIV-COOKE/BANDSTRA

ASPEX EYEWEAR, INC. and
CONTOUR OPTIK, INC.,

    Plaintiffs,

vs.

HARDY LIFE, LLC, MARCHON
EYEWEAR, INC., NIKE, INC.,
REVOLUTION EYEWEAR, INC., and
GARY MARTIN ZELMAN, an
individual,

    Defendants.
_____/

## DECLARATION OF THIERRY IFERGAN

I, Thierry Ifergan, depose and state under oath as follows:

1. I am the Executive Vice President of Aspex Eyewear, Inc, ("Aspex"). Among my other responsibilities, since at least as early as the mid-1990's, I have been responsible for the day-to-day operations of Aspex. I am over the age of eighteen (18) and have personal knowledge of the matters set forth herein.

2. Aspex obtained three models of auxiliary spectacle frames sold by Revolution Eyewear (Revolution auxiliary spectacle frame, eg "Revolution clip-on"); Marchon Eyewear, Inc. (Marchon Flexon auxiliary spectacle frame, eg "Marchon clip-on"); and by Marchon Eyewear, Inc. under the Nike brand (Nike auxiliary spectacle frame, eg "Nike clip on") from retailers who returned these products to Aspex based on the mistaken belief that they were being offered for sale by Aspex. These three models were not offered for sale by Aspex.

3.  I inspected each of the Revolution, Nike, and Marchon clip-on models personally. I observed that each set of eyeglasses had an auxiliary spectacle frame for supporting auxiliary lenses therein. Each model's auxiliary frame included a front side, a rear side, and oppositely positioned side portions. Each model's side portions had an arm extended therefrom, each of said arms having a rearwardly directed free end securing a magnet with horizontal surfaces. Each model's arms and respective pair of magnets were suitable for extending across the respective side portions of a primary spectacle frame. When the auxiliary frames were coupled to the primary frames the pair of magnets (having a horizontal surface) engage the corresponding horizontal magnets' surfaces on the primary spectacle frame so that the magnetic poles engaged in a vertical direction.

4.  I was given specific instructions to: (a) demonstrate that the auxiliary frames were suitable for mounting to the top of a primary without any modification to the auxiliary frame; and (b) whether primary frames could be constructed such that each of the three auxiliary frames were suitable for mounting to the top of the constructed primary frames without modifying the auxiliary frames in any way. I was stressed that these primary frames were to be made without modification of the auxiliary spectacle frames' magnets, without removal of the decorative coating, and without modification of any other part of the auxiliary spectacle frames.

5.  The Revolution, Nike, and Marchon clip-on models were returned to me by with a newly constructed primary frame onto which the Revolution, Nike, and Marchon clip-on models -- in unmodified form-- could be attached. I again inspected each auxiliary spectacle frame model, and observed they were not changed in any way, and were in the same or substantially the same condition as when I originally inspected them. I specifically observed that there was no modification of the auxiliary spectacle frame models' magnets, removal of the decorative coating, or modification of any other part of the auxiliary spectacle frame model.

6.  I then attached each of the unmodified auxiliary frame models to the newly-constructed primary frame from above. I observed that, for each of these products, the unmodified auxiliary frame model's magnets magnetically engaged (vertically) the corresponding magnets of the newly-constructed primary frame, such that the auxiliary frame was aligned with the primary frame. This magnetic engagement was achieved without modifying the Revolution, Nike or Marchon auxiliary frames in any way.

7.  I also sent the Revolution, Nike, and Marchon clip-on models to Greenberg Traurig, LLP. I understand that Greenberg Traurig LLP then provided the Revolution, Nike, and Marchon clip-on models to Mr. Lee Zaro. I have reviewed the accompanying Declaration of Lee Zaro, and confirm that the photographs in the Zaro Declarations are photographs of the Revolution, Nike, and Marchon clip-on models that I inspected and then sent to Greenberg Traurig.

8.  In response to a 30(b)(6) deposition notice that Revolution served on Aspex asking that Aspex identify "[a]ll products accused of infringement in this action ... including all commercial designations ....," I was appointed as Aspex's corporate designee. At the Aspex 30(b)(6) deposition on April 23, 2010 I provided Revolution's counsel with a list in which all the accused models were highlighted. A true and correct copy of the highlighted list is attached as Exhibit 1.

9.  In response to a 30(b)(6) deposition notice that Marchon served on Aspex asking that Aspex identify "[a]ll products accused of infringement in this action ... including all commercial designations ....," I was appointed as Aspex's corporate designee. At the Aspex 30(b)(6) deposition on April 23, 2010, I provided Marchon's counsel a list in which all the accused models were highlighted. A true and correct copy of the highlighted list is attached as Exhibit 2.

CASE NO. 09-61515-CIV-COOKE/BANDSTRA

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on May 20, 2010 in Pembroke Park, Florida.

_____
THIERRY IFERGAN