ORIGINAL



FILED
CLERK, U S DISTRICT COURT

AUG - 7 2003

CENTRAL DISTRICT OF CALIFORNIA
BY_____DEPUTY

Priority     X
Send         X
Enter        X
Closed       ___
JS-5/JS-6    ___
JS-2/JS-3    ___
Scan Only    ___

ENTERED
CLERK, U.S. DISTRICT COURT

AUG - 8 2003

CENTRAL DISTRICT OF CALIFORNIA
BY_____DEPUTY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Revolution Eyewear, Inc.,<br><br>               Plaintiff,<br><br>   v.<br><br>Aspex Eyewear, Inc. et al.,<br><br>               Defendants. | CV 02-1087 LGB (CWx)<br><br>ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT |

## I.   INTRODUCTION

In the present action, plaintiff Revolution Eyewear, Inc. ("Plaintiff" or "Revolution") alleges that defendants Aspex Eyewear, Inc. ("Aspex"), Thierry Ifergan ("Ifergan"), Real Eyes Optical ("REO") and Scott Strenk ("Strenk") infringe its U.S. Patent No. 6,343,858 (the "'858 Patent"). Defendant and counterclaimant Aspex contend that Revolution infringes U.S. Patent No. RE 37,545E (the "'545 Patent") issued to Aspex, Manhattan Design Studio, Inc., Contour Optik, Inc. and Asahi Optical Co., Ltd. (collectively "Counterclaimants"). Presently

1

206

1   before the Court is Revolution's motion seeking summary judgment

2   against Counterclaimants[1] for non-infringement of the '545 Patent

3   and against defendant Aspex for infringement of the '858 Patent.[2]

4

5   **II.   FACTUAL AND PROCEDURAL HISTORY**

6       **A.   Factual Background**

7       For purposes of the instant motion, the Court finds the

8   following facts to be relevant.   The technology at issue in this

9   case involves a spectacle frame that supports an auxiliary frame,

10  enabling the user to securely fasten a second set of lenses

11  (e.g., sunglass lenses) onto the primary frame (often holding

12  prescription lenses).   Revolution's '858 Patent, which issued on

13  February 5, 2002, is directed to a method and apparatus for

14  mounting auxiliary eyeglasses on conventional eyeglasses in which

15  magnets are attached to appendages on the auxiliary eyeglasses

16  mating with magnets mounted on the temple extensions of

17  conventional eye-glasses.

18

19      Aspex's '545 Patent, which issued on February 12, 2002, is

20  directed to a spectacle frame that supports an auxiliary lens

21  frame through an arrangement using magnetic members.   The '545 is

22

23

24

25  _____

26  [1] Although Revolution moved for summary judgment as to Aspex only, the Court will presume
    that, as to the '545 Patent, Revolution is moving for summary judgment of non-infringement

27  against all Counterclaimants.

28  [2] In this Order, the Court will refer to defendant Aspex and to Counterclaimants as "Aspex."

1  a reissue of Aspex's original U.S. Patent No. 5,568,207 (the

2  "'207 Patent"), which has now been surrendered.[3]

3      **B.   Procedural Background**

4      On May 5, 2003, this Court issued its order construing the

5  claims in dispute in the '545 and the '858 Patents (the "Claim

6  Construction Order").   The instant Motion for Summary Judgment

7  was filed on June 30, 2003 (the "Motion").   On July 14, 2003,

8  Aspex filed its Opposition (the "Opposition").   On July 21, 2003,

9

10  Revolution filed its Reply (the "Reply").   The Court now rules on

11  Revolution's Motion for Summary Judgment.

12

13  **III. LEGAL STANDARDS**

14      **A.   Summary Judgment Standard**

15      Rule 56 of the Federal Rules of Civil Procedure provides

16  that a court shall grant a motion for summary judgment if "the

17  pleadings, depositions, answers to interrogatories, and

18  admissions on file, together with the affidavits, if any, show

19  that there is no genuine issue as to any material fact and that

20  the moving party is entitled to judgment as a matter of law."

21

22  Fed. R. Civ. P. 56(c). Material facts are those that may affect

23

---

24  [3] This Court has previously found on summary judgement, in a related case, that Revolution does

25  not infringe Aspex's original '207 patent issued to Chao. See Aspex Eyewear, Inc. v.

    Revolution Eyewear, Inc., CV 99-1623, Order Granting Defendant's Motion for Summary

26  Judgment on Revolution's Claim of Patent Infringement, June 4, 2001, Docket Entry No. 184.

    The Federal Circuit affirmed this Court's finding of non-infringement. See Case No. CV-1623,

27  Docket Entry No. 217. In the instant case, Aspex alleges that Revolution infringes claims 6, 22

28  and 34 of the '207 Reissue Patent - the '545 Patent.

3

the outcome of the case. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. Id.

The party moving for summary judgment bears the initial burden of informing the district court the basis of the summary judgment motion, and of demonstrating the absence of a genuine issue of material fact for trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Katz v. Children's Hosp. of Orange County, 28 F.3d 1520, 1534 (9th Cir. 1994). On an issue for which the nonmoving party has the burden of proof at trial, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case." Celotex, 477 U.S. at 325. Once this initial burden is satisfied, the non-moving party is required to "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate 'specific facts' showing that there is a genuine issue for trial." Celotex, 477 U.S. at 324 (internal quotations omitted); see Nilsson, Robbins, Dalgarn, Berliner, Carson & Wurst v. Louisiana Hydrolec, 854 F.2d 1538, 1544 (9th Cir. 1988). Where the standard of proof at trial is preponderance of the evidence, the non-moving party's evidence must be such that a "fair-minded jury could return a verdict for the [non-moving party] on the evidence presented." Anderson, 477 U.S. at 252.

**B.   Patent Infringement**

4

The determination of infringement is a two-step process. First, the court must construe the asserted claims as a matter of law to ascertain their meaning and scope. Dawn Equip. Co. v. Kentucky Farms Inc., 140 F.3d 1009, 1014 (Fed. Cir. 1998). Second, the claims as construed are compared to the allegedly infringing device. Id. To infringe a claim, each claim limitation must be present in the accused product, either literally or equivalently. Sofamor Danek Group, Inc. v. DePuy-Motech, Inc., 74 F.3d 1216, 1220 (Fed. Cir. 1996).

Under the doctrine of equivalents, an accused product which does not literally infringe a claim may infringe "if it performs substantially the same function in substantially the same way to obtain the same result." Graver Tank & Mfg. Co. v. Linde Air Prods. Co., 339 U.S. 605, 608 (1950). To work "insubstantially the same way," all the limitations of the claim must be satisfied at least equivalently. Becton Dickinson and Co. v. C.R. Bard, Inc., 922 F.2d 792, 798 (Fed. Cir. 1990).

## IV.   ANALYSIS

By the instant motion, Revolution moves for summary judgment of non-infringement, either literally or equivalently, of claims 6, 22 and 34 of the '545 Patent, the only three claims asserted by Aspex.   Revolution also moves for partial summary judgment against Aspex for infringement of claim 1 of the '858 Patent. The Court will first address Revolution's motion as to the '545 Patent.

**A.   Revolution's Motion for Summary Judgment as to the '545 Patent**

In its moving papers, Revolution asserts that its accused product, a physical sample of which is attached as Exhibit 4 to the Declaration of Gary Zelman ("Zelman Decl."), does not infringe claims 6, 22 and 34 of the '545 Patent.  Aspex opposes Revolution's motion for summary judgment only as to claim 22 of the '545 Patent.   Therefore, since Aspex has not opposed Revolution's summary judgment motion as to claims 6 and 34, and thus failed to raise a genuine issue of material fact as to whether Revolution's accused product infringes claims 6 and 34 of their '545 Patent, the Court hereby grants Revolution's motion for partial summary judgment of non-infringement, either literally or equivalently, of claims 6 and 34 of the '545 Patent. The Court now addresses Revolution's motion as to claim 22.

Claim 22 of the '545 Patent states:

A primary spectacle frame for supporting primary lenses therein and having two side portion extensions extending rearwardly therefrom and having a front side, a rear side, a top side, and a rear end, each of said rear ends pivotally coupling a leg configured to conform to a user at a distal end thereof, each of said extensions of said primary spectacle frame further having a projection attached to each of said rear sides, and a pair of first magnetic members respectively **secured in said projections, said first**

6

**magnetic members capable of engaging second magnetic members of an auxiliary spectacle frame**[4] so that lenses of an auxiliary spectacle are located in front of said primary lenses.

In its Claim Construction Order, the Court construed the following terms in claim 22:

1) "secured in said projections" means that each first magnetic member is inserted into and firmly connected to a corresponding projection in a manner such that the connection is not likely to fail or give; and

2) "said first magnetic members capable of engaging second magnetic members of an auxiliary spectacle frame" means the first magnetic members have the ability to magnetically attract the corresponding second magnetic members of an auxiliary spectacle frame when placed above the first magnetic member, with or without actual contact.

Claim Construction Order at 38:27-39:5. Thus, the Court has construed claim 22 to require that (a) the pair of first magnetic members must be inserted into and firmly connected to a corresponding projection in a manner such that the connection is not likely to fail or give, and (b) the first magnetic members in the primary frame must have the ability to magnetically attract the corresponding second magnetic members in the auxiliary frame

_____

[4] The disputed terms that were construed by the Court are shown in bold.

7

1  when these second magnetic members in the auxiliary frame are

2  placed above the first magnetic members such that the lenses of

3  the auxiliary frame are located in the front of the primary

4  lenses. The Court now addresses the following issues raised by

5  Revolution in its Motion: 1) whether Aspex is collaterally

6  estopped from asserting infringement of the '545 Patent; 2)

7  whether Revolution's accused product[5] literally infringes claim

8  22 of the '545 Patent; and 3) whether Revolution's accused

9  product infringes claim 22 of the '545 Patent under the doctrine

10  of equivalents.

11

12  1.  Whether Aspex is collaterally estopped from

13  asserting infringement of the '545 Patent?

14  In its moving papers, Revolution argues that Aspex is

15  collaterally estopped from asserting infringement of the '545

16  Patent in light of the Court's summary judgment ruling in the

17  '207 Patent case and the Court's Claim Construction Order in this

18  case. The doctrine of collateral estoppel, commonly referred to

19  as issue preclusion, prevents the re-litigation of issues argued

20  and decided in prior proceedings. See Blonder-Tongue Labs. v.

21  Univ. of Ill. Found., 402 U.S. 313, 329 (1971). Issue preclusion

22  is appropriate if (1) the issue is identical to that decided in

23  the former proceeding; (2) the issue was actually litigated in

24  the former proceeding; (3) resolution of the issue was essential

25

26  _____

27  [5] The parties do not specify which of Revolution's products are accused of infringing the '545 Patent. Revolution did provide the Court with one exemplar with "IMF306" as its "style." See Zelman Decl., Exh. 4.

28

to a final judgment in the former proceeding; and (4) the party against whom preclusion is sought had a full and fair opportunity to litigate the issue in the first proceeding. <u>A.B. Dick. Co. v. Burroughs Corp.</u>, 713 F.2d 700, 702 (Fed. Cir. 1983).   None of these elements is present in this instant case.

The infringement issues with respect to claim 22 of the '545 Patent are not identical to the infringement issue in the '207 Patent case; and the issue here with respect to infringement of claim 22 was not actually litigated in the '207 Patent case.   The '207 Patent contained only 2 claims, and the claim at issue was claim 1.   At the time the '207 Patent case was being litigated against Revolution, neither the '545 Patent nor claim 22 of that patent was in existence.   Claim 1 of the '207 Patent recited a combination primary frame and auxiliary frame.   Claim 1 recited specific structures and functions, not just the capacity to perform a function.   Here, in contrast, claim 22 of the '545 Patent is a claim to a primary spectacle frame only, not a primary frame/auxiliary frame combination.   In further contrast, claim 22, as construed by the Court, only requires that the magnetic members of the primary frame be capable of, or have the ability to, magnetically attract corresponding magnetic members of an auxiliary frame when placed above the first magnetic members.

In addition, because claim 1 of the '207 Patent was to a combination primary frame/auxiliary frame, the infringement issue

1  centered around the question of whether the misalignment caused
2  by taking Revolution's bottom-mounted auxiliary frame and placing
3  it on top of the primary frame was a reasonable modification that
4  caused the accused product to be capable of infringing claim 1 of
5  the '207 Patent.    Here, in contrast, because there is a
6  "capability" requirement built into claim 22, and the claim is
7  just to a primary frame, reasonable modification or any
8  modification of Revolution's primary frame is not an issue.   The
9  only question is whether Revolution's primary frame satisfies all
10 the requirements or limitations of claim 22.

11     Further, since: (1) claim 22 of the '545 Patent did not
12 exist during the '207 Patent litigation against Revolution; and
13 (2) there was no claim of the '207 patent of comparable scope,
14 i.e., a claim to a primary frame only with a "capability"
15 requirement built into it, resolution of the infringement issue
16 respecting claim 22 could not have been essential to a final
17 judgment in the '207 Patent case; and Aspex could not have had a
18 full and fair opportunity to litigate claim 22 in that
19 proceeding.

20     At Oral Argument, on August 6, 2003, Revolution's counsel
21 argued that the Court, in its June 4, 2001 Order in the '207
22 Patent case, effectively decided the issue of whether
23 Revolution's accused product is capable of top mounting.   The
24 Court has spent considerable time reviewing its ruling in the
25 '207 Patent case.   As already noted, in the '207 Patent case, the

10

claim in question was to a combination primary frame and auxiliary frame. As such, in the June 4, 2001 Order, the Court focused on the misalignment of the auxiliary frame when placed on top of the primary frame and the instability that results from such configuration. See June 4, 2001 Order at 11-12. In this case, however, and consistent with claim 22, the focus is simply on Revolution's primary frame. Aspex has offered evidence to show that an auxiliary frame can be constructed to fit on top of Revolution's accused primary frame without causing a misalignment between the lenses of the two frames. See Ifergan Decl., ¶¶ 4-6.

Accordingly, since the patent claims and infringement issues in both proceedings are different, the Court's summary judgment order in the '207 Patent case does not have any collateral estoppel effect here.

### 2. Whether Revolution's accused product literally infringes claim 22 of the '545 Patent?

In its moving papers, Revolution argues that the auxiliary frame in the accused product sold by Revolution is not designed to attach to the primary frame from the top. Instead, and as can be seen from the physical sample submitted by Revolution, see Zelman Decl., Exh. 4, the first magnetic members in the primary frame attract the second magnetic members in the auxiliary frame when the second magnetic members are placed below the first magnetic members.

1    Relying on <u>Intel v. U.S. Int'l Trade Comm'n</u>, 946 F.2d 821

2  (Fed. Cir. 1991), and its progeny, Aspex argues in its Opposition

3  that Revolution's accused product literally infringes claim 22 of

4  the '545 Patent.  Specifically, Aspex states:

5      Claim 22 is directed only to the primary spectacle frame,

6      not the primary/auxiliary frame combination.  No limitations

7      respecting the auxiliary spectacle frame appear in claim 22

8      other than that the first magnetic members of the primary

9      frame be capable of engaging second magnetic members [of] an

10      auxiliary frame so that lenses of an auxiliary spectacle

11      frame are located in front of the primary lenses.  Because

12      claim 22 is directed to the primary frame alone, the Patent

13      Office found the primary frame to be an independently

14      patentable invention.

15

16  Opposition at 20:15-21.  At bottom, Aspex is arguing that

17  because the auxiliary frame of the accused product can be placed

18  above the primary frame such that the magnetic members of the

19  auxiliary frame are attracted to the corresponding magnetic

20  members of the primary frame, Revolution's accused product

21  infringes claim 22.  Thus, Aspex contends, "[i]f Revolution

22  wanted to prevent its primary frames from having the 'capacity'

23  or 'ability' to magnetically engage corresponding magnets, it

24  should have designed the primary frames so as to eliminate the

25  magnetically attractive capability of the upper surfaces of the

26  primary frame magnets."  Opposition at 22:5-11.

27

28

The analysis of whether Revolution's accused product infringes claim 22 is covered by an area of patent law commonly referred to as "capacity for infringing use." See generally Donald S. Chisum, Chisum on Patents, Vol. 5 § 16.02 [3][c] (hereinafter "Chisum on Patents").

Preliminarily, the Court finds it helpful to set forth the applicable law on "capacity for infringing use" as stated by Professor Donald S. Chisum:

> Federal Circuit decisions focus on what the patent claim in question requires; if the claim only requires that a device have the capacity to perform a function, one who makes a device with that capacity without the patent owner's authority is a direct infringer even though the maker's customers do not use the capacity. On the other hand, if the claim requires a structure or function, one who makes a device without that structure or function is not a direct infringer even though the customers can modify the device to obtain the structure or function.

Chisum on Patents, Vol. 5 § 16.02 [3][c] at 16-42. In High Tech Med. Instrumentation, Inc. v. New Image Indus., Inc., 49 F.3d 1551 (Fed. Cir. 1995), the patent concerned a hand-held endoscope for dental work. The endoscope included a video camera in a tube, which a dentist could place in a patient's mouth to video screen images of oral cavity areas. The claim at issue required a body member, a camera disposed in the body member, and the

camera "being rotatably coupled to said body member." _Id._ at 1553.   In granting a preliminary injunction, the District Court, relying upon _Intel,_ found that the patentee established a likelihood of success on infringement, holding that because the defendant's camera "can be rotated within its housing when the set screws are loosened, the [accused] camera must be considered 'rotatably coupled' to the body member." _Id._ at 1553-54.   The Federal Circuit reversed, ruling as follows:

> _Intel_ does not support so broad a holding.   All that was required by the limitation at issue in _Intel_ was that the claimed invention, an integrated circuit memory device, was "programmable" to operate in a certain manner.   The accused device, although not specifically designed or sold to operate in that manner, could be programmed to do so; that is, it was "programmable" to operate in the designated mode. The claim at issue in _Intel_ therefore read on the accused device, as made and sold.   The [defendant's] AcuCam camera, by contrast, is not rotatable within its housing unless the AcuCam is altered, at least to the extent of removing or loosening the set screws that secure the camera to the housing.

_Id._ at 1555.   In this case, claim 22 is directed only to the primary spectacle frame, not the primary/auxiliary frame combination.   Claim 22 has a "capability" requirement as part of its plain language: "said first magnetic members capable of

14

engaging second magnetic members of an auxiliary spectacle frame." The Court construed this phrase to mean that "the first magnetic members have the ability to magnetically attract the corresponding second magnetic members of an auxiliary spectacle frame when placed above the first magnetic member, with or without actual contact." Claim Construction Order at 34:22-25. Thus, in construing claim 22, the Court recognized that the magnetic members of the primary frame need only be capable of, or "have the ability to," magnetically attract magnetic members on an auxiliary spectacle frame placed above the first magnetic members.

In support of its Opposition, Aspex has offered evidence to show that, although the top surfaces of the primary frame magnets of the accused products have a thin, decorative coating, this coating was placed on the magnets for aesthetic purposes. See Zelman Depo. at 54:1-8 and 107:4-9, attached as Exh. 3 to the Declaration of Barry J. Schindler ("Schindler Decl."). Aspex has also offered evidence to show that Revolution has no test data or any other evidence establishing that the decorative coating hinders the magnetically attractive capability of the top surfaces of the primary frame magnetic members in any way. See Zelman Depo. at 216:9-217:2, attached as Exh. 3 to the Schindler Decl. Furthermore, Aspex has offered the declaration of Aspex's Vice President Thierry Ifergan ("Ifergan Decl."), who states that the magnets of Revolution's primary frames presently have the

ability, without modification of the magnets, removal of the decorative coating, or modification of any other part of the primary spectacle frame, to magnetically attract the corresponding second magnetic members of the an auxiliary frame when placed above the first magnetic members.  See Ifergan Decl., ¶ 4.  Indeed, and as shown by the photographs of Revolution's primary frame attached to Ifergan's declaration, a pair of auxiliary frames can be constructed with magnets that can magnetically engage the corresponding magnets of the primary frame when placed above the primary frame magnets, such that the auxiliary frame will be aligned with and stably supported on the primary frame, and without modifying the primary frame in any way.  Id. at ¶¶ 4-6.

In its Reply, Revolution argues that "[a]s defined by the court, [the] first magnetic members [of the primary frame] must be upwardly facing ... [and] be capable of engaging second, downwardly facing, magnetic members of an auxiliary frame from the top of primary frame *such that the lenses of the auxiliary frame are located in front of said primary lenses in the primary frame*."  Pl.'s Reply at 5:15-19 (emphasis in original).  Although the Court did state in its Claim Construction Order that the first magnetic members, located in the primary frame, must each have an upwardly facing surface, and the second magnetic members, located in the auxiliary frame, must each have a downwardly facing surface, that construction was in relation to claim 6 and

1  not claim 22 of the '545 Patent.  See Claim Construction Order at
2  38:13-39:11.  As already noted above, the relevant limitation
3  placed by the Court on claim 22 is that the first magnetic
4  members in the primary frame must have the ability to
5  magnetically attract the corresponding second magnetic members in
6  the auxiliary frame when these second magnetic members in the
7  auxiliary frame are placed above the first magnetic members such
8  that the lenses of the auxiliary frame are located in the front
9  of the primary lenses.  No limitation with respect to downward
10 and/or upward orientation was placed by the Court on the first
11 magnetic members.
12
13     Revolution also argues that "when the eyewear sold by
14 Revolution is used as suggested by Aspex, the lenses of the
15 auxiliary frame are not located in front of said primary frame."
16 Pl.'s Reply at 6:1-2.  Instead, Revolution contends, the lenses
17 of the auxiliary frame "are positioned merely adjacent to the
18 primary lenses, at least a half-inch above the primary lenses."
19 Id. at 6:2-3.  This argument, however, presupposes that the
20 auxiliary frame of Revolution's accused product is considered in
21 ascertaining whether the entire accused product, i.e., the
22 primary frame/auxiliary frame combination, infringes claim 22.
23 To the contrary, claim 22 is simply directed to a primary frame
24 that is able to magnetically attract an auxiliary frame when said
25 auxiliary frame is placed on top of the primary frame.  The focus
26 is simply on the primary frame.  Here, Aspex has offered evidence
27
28

17

to show that an auxiliary frame can be manufactured to fit on top of Revolution's primary frame without any modifications to the primary frame, and   by allowing the lenses of the auxiliary frames to be aligned and located in front of the lenses of the primary frames.    See Ifergan's Decl. at ¶¶ 5-6 and Exh. 3. Thus, Aspex has offered evidence to raise a genuine issue of material fact as to whether Revolution's accused primary frames satisfy the limitations of claim 22 as construed by the Court. Therefore, the Court denies Revolution's motion for partial summary judgment of non-literal infringement of claim 22 of the '545 Patent.

> 3.   **Whether Revolution's accused product infringes claim 22 of the '545 Patent under the doctrine of equivalents?**

In its moving papers, Revolution argues that the asserted claims of the '545 Patent cannot be infringed under the doctrine of equivalents for the following reasons: (1) the Court construed claim 22 as being limited to an embodiment in which the auxiliary frame attached to the primary frame from the top; and (2) in view of this construction, Revolution's eyewear cannot be encompassed under the doctrine of equivalents because to do so would vitiate the claim limitations imposed by the Court and render them meaningless.

The Court notes that Revolution's moving argument under the doctrine of equivalents avoids the critical claim construction and infringement issue respecting claim 22, *i.e.*, that claim 22 only requires that the magnetic members of the primary frame have the capability of, or ability to, magnetically attract the corresponding magnetic members of an auxiliary frame when placed above the primary frame magnetic members. Thus, Revolution, as the moving party, has failed to meet its initial burden of demonstrating the absence of a genuine issue of material fact for trial. See Celotex, 477 U.S. at 323. Therefore, the Court denies Revolution's motion for partial summary judgment on the issue of whether its accused product infringes claim 22 of the '545 Patent under the doctrine of equivalents.

C.    **Revolution's Motion for Partial Summary Judgment as to the '858 Patent**

Revolution moves for partial summary judgment of infringement of claim 1 of the '858 Patent by Aspex's recessed bottom-mounted "Cool Clip." In its Opposition, Aspex proffers two arguments: 1) the asserted claims of the '858 Patent are invalid for violation of the best mode requirement of 35 U.S.C. § 112; and 2) Revolution has failed to prove that the mated primary and auxiliary frame magnets of Aspex's recess-mounted eyewear provided "maximum resistance to downward movement of said auxiliary eyeglasses thereby preventing detachment of said auxiliary eyeglasses from said conventional eyeglasses." Since

invalidity is a threshold question, the Court will address that issue first.

>    1.    Whether the asserted claims of the '858 Patent are invalid for violation of the best mode requirement of 35 U.S.C. § 112?

Patents are, by statute, presumed to be valid.   See 35 U.S.C. § 282.  Aspex thus has the burden of establishing by clear and convincing evidence that the asserted claims of the '858 Patent are invalid.  See United States Gypsum Co. v. Nat'l Gypsum Co., 74 F.3d 1209, 1212 (Fed. Cir. 1996) (citing Transco Prods., Inc. v. Performance Contracting, Inc., 38 F.3d 551, 560 (Fed. Cir. 1994)).  35 U.S.C. § 112 provides, in relevant part, that the specification of a patent "shall set forth the best mode contemplated by the inventor of carrying out his invention."  35 U.S.C. § 112 ¶ 1.  In United States Gypsum, the Federal Circuit set forth the test for determining whether the best mode requirement of 35 U.S.C. § 112 ¶ 1 has been met:

>    Determining whether a patent complies with the best mode requirement involves two underlying factual inquiries. First, it must be determined whether, at the time the patent application was filed, the inventor had a best mode of practicing the claimed invention.  This inquiry is wholly subjective and addresses whether the inventor must disclose any facts in addition to those sufficient for enablement. Second, if the inventor had a best mode of practicing the

claimed invention, it must be determined whether the specification adequately disclosed what the inventor contemplated as the best mode so that those having ordinary skill in that art could practice it. The latter question is largely an objective inquiry that depends upon the scope of the claimed invention and the level of skill in the art. United States Gypsum, 74 F.3d at 1213.

In its Opposition, Aspex contends that before his patent application was filed, Zelman, the inventor of the '858 Patent, "selected a specific magnet with a specific gaussian strength as the best mode for practicing his invention." Opposition at 11:19-21 (citing the deposition testimony of Zelman at 70:25-72:10; 88:20-89:5). Thus, Aspex contends, the first inquiry under United States Gypsum is met - Zelman intended that a magnet with particular gaussian strength be used in his invention.

As to the second inquiry under United States Gypsum, Aspex contends that "there is no genuine dispute that the patent specification does not disclose Mr. Zelman's best mode." Opposition at 12:1-2. Instead, Aspex states, "[t]he '858 Patent specification merely states that 'preferably magnets 26 and 30 are at least four millimeters (4 mm) in diameter,' and that 'it was found that by mounting magnets 26 and 30 approximately 4 mm in diameter having a strong magnetic force vertically oriented is sufficient to hold auxiliary eyeglass frame 10 in place and to prevent downward movement.'" Opposition at 12:2-8 (quoting the

'858 Patent at col. 5, l. 52 - col. 6, l. 2).   Thus, Aspex correctly points out that the '858 Patent does not teach that a magnet with a particular gaussian strength must be used to practice the invention.

In considering the relevant limitation of claim 1, this Court stated in the Claim Construction Order that "an important part of this invention, as expressed in the patent itself, is that the alignment of the magnets provides maximum resistance to downward detachment of the auxiliary frame from the conventional frame."   Claim Construction Order at 24:13-16.   Moreover, the Court specifically stated that this limitation does not infer that a magnet of particular gaussian strength must be used. <u>Id.</u> at 25 n. 12.

As stated by Zelman in his deposition, he simply tried different magnets of various strengths and sizes using a particular prototype and selected magnets for that prototype; but, his invention is not necessarily limited to the attributes of this prototype.   Of course, the magnets selected would vary depending upon the actual physical embodiment and the specific weight of the auxiliary lenses.   As Zelman testified at his deposition:

Q:   Okay, other than that, you have used the same magnet from 1999 through today?

A:   I used - I have been using a 4-millimeter magnet in my IMF frames.   I use a little bit of a slightly larger

magnet in my Revolution Sun frame, and I use a much smaller magnet in my Revolution Airs frame; and usually the reason being is because of the weight of the clipon. That is the determining factor.

Q:   so the way you chose the 4-millimeter magnet for your IMF frames was based on weight?

A:   It was based on the ability to hold the clipon up by itself without falling to the ground.

Q:   And for that reason you chose a 4-mm for the IMF frames?

A:   Yes. But you have to remember that the size of the magnets means nothing. It is the gauss frame that is within the size of the magnet.

Zelman Depo. at 88:11-25 and 89:1-3. Thus, it is clear that the weight of the auxiliary frames in any particular embodiment will dictate the actual gaussian strength of the magnet used. The "best mode" requirement in this case does not require that the inventor disclose the best magnets to be used in terms of their gaussian strength for every particular embodiment; it only requires that Zelman disclose the best mode known to him at the time of invention for practicing the claimed invention.

In this case, the claimed invention merely requires that the gaussian strength of the magnets be sufficient to prevent the auxiliary frames from falling off of the primary frames. The

specification of the '858 Patent specifically states that 4 mm magnets having sufficient magnetic force to prevent the dislodging of the auxiliary lenses would be the "best mode" for carrying out the invention. See the '858 Patent, Col. 5, l. 65 - Col. 6, l. 5.  Information known to those skilled in the art, here the particular gaussian strength that is needed, need not be disclosed to satisfy the "best mode" requirement.[6]   See Fonar Corp. v. General Electric Co., 107 F.3d 1543, 1549 (Fed. Cir. 1997) ("It is well established that what is within the skill of the art need not be disclosed to satisfy the best mode requirement as long as that best mode is described.").   The 4 millimeter description was set forth because this particular magnet size provided an actual benefit independent of the gaussian strength of the magnet.  Specifically, this particular size magnet added certain stability when actually inserted in the sockets.  See Zelman Depo. at 89:7-16.  To hold Revolution to a standard of disclosing and describing particular gaussian

---

[6] In its Opposition, Aspex argues that "Zelman should be estopped from arguing that those of ordinary skill in the art would have known how to select the specific magnet with the 'enabling' strength." Opposition at 12:21-23. In support of its argument, Aspex cites to a portion of the specification of the '858 Patent, which discusses the alleged drawbacks of the prior art. Specifically, that portion of the specification states that "what was not recognized [by the '207 Patent inventor] was that magnets have a very strong attraction in a direction perpendicular to their axis. That is, with very strong magnets it is difficult to separate them by pulling them straight apart." The '858 Patent at col. 3, ll. 2-6. The Court notes that this portion of the patent specification merely discusses that the prior art did not recognize what the optimum orientation of the magnets should be; it does not however suggest that a person skilled in the art does not know how to select a magnet with an enabling strength, i.e., a strength sufficient to prevent the auxiliary frame from falling off.

24

strength magnets to be used in every possible physical embodiment is not part of the "best mode" requirement.  See Fonar, 107 F.3d at 1550 (finding "best mode" not violated for failure to specifically identify a particular manufacturer's chip where patent specification specifically disclosed the functions of the chip).

At Oral Argument, on August 6, 2003, Aspex's counsel argued that a letter from Zelman to the eyewear prototype manufacturer shows that Zelman intended that a particular gaussian strength magnet be used in the invention.  In that letter, dated August 6, 1998, Zelman states in part:

> Your most recent sample of my "bottom Mounted" magnetic clip-on set is absolutely perfect!  I love it, I love it, I love it!!!  This is it, this is the one!  Forget about my "Bottom Mounted" bridge method for now.  Vision Expo is only a few weeks off.  This unique method is completely different from everyone else's; yet is [sic] has a better hold than even Aspex or Manhattan Design Studio.

August 6, 1998 Letter, Schindler Decl., Exh. 1.  The Court is not convinced that the letter from Zelman in conjunction with his deposition testimony that Aspex cites to, see Opposition at 8-11, are sufficient grounds to overcome the strong statutory presumption in favor of the validity of a patent.  As the Court already noted, the weight of the auxiliary frames in any particular embodiment will dictate the actual gaussian strength

of the magnet used. Although a particular magnet with a specific gaussian strength may have worked best for Zelman's prototype, Zelman was not required to disclose the best magnets to be used in terms of their gaussian strength for every particular embodiment of his invention. A person skilled in the art would have known how to select a magnet with a sufficient gaussian strength to maintain the auxiliary frame on the primary frame; and as such, Zelman was not required to disclose that information in his patent application. See Fonar, 107 F.3d at 1549.

Based on the foregoing, the Court finds that Aspex has failed to provide clear and convincing evidence of invalidity based upon failure to disclose the "best mode" for practicing the claimed invention.

### 2. Whether Aspex's accused product infringes claim 1 of the '858 Patent?

Revolution moves for summary judgment against Aspex for infringement of claim 1 of the '858 Patent, which states:

> Apparatus for attaching auxiliary eyeglasses to conventional eyeglasses comprising:
>
> a **plurality of sockets** formed on temple extensions of said conventional eyeglasses;
>
> a plurality of **magnets** mounted in said sockets on said conventional eyeglasses;

a **plurality of sockets** formed on appendages on said auxiliary sunglasses, said appendages construed and arranged to fit below said temple extensions;

a plurality of **magnets** mounted in said **plurality of sockets** on said appendages;

said plurality of magnets mounted on said conventional eyeglasses and said plurality of magnets mounted on said auxiliary eyeglasses being oriented such that the maximum magnetic attractive force between said magnets is oriented approximately parallel to lenses in said conventional eyeglasses;

a first pair of said **plurality of sockets** having said plurality of **magnets** mounted to **form recesses** in said first pair of sockets;

a second pair of said **plurality of sockets** having said plurality of **magnets** mounted to extend out of said pair of sockets, said **magnets constructed and arranged** to fit into said recesses in said first pair of sockets;

whereby said extended magnets in said second pair of sockets engage said recesses to automatically align and secure said auxiliary eyeglasses when mated with said magnets forming said recesses in said first pair of sockets providing maximum resistance to downward movement of said auxiliary eyeglasses thereby

27

preventing detachment of said auxiliary eyeglasses from said conventional eyeglasses.

In the Claim Construction Order, the Court construed the disputed terms in claim 1 as follows:

1. "plurality of sockets" means two or more openings into which an inserted part is designed to fit;

2. "magnets" means permanent magnets;

3. "being oriented such that the maximum magnetic attractive force between said magnets is oriented approximately parallel to lenses in said conventional eyeglasses" means that when the auxiliary eyeglasses are attached to the conventional eyeglasses, the permanent magnets mounted on the conventional eyeglasses are positioned relative to the magnets mounted on the auxiliary eyeglasses such that the greatest possible amount of magnetic force attainable between the magnets will be in a plane approximately parallel to the plane of the lenses of the conventional eyeglasses;

4. "mounted to form recesses in said first pair of sockets" means positioned sufficiently below the outer peripheral edges of the sockets so as to define an opening between the magnets and the outer peripheral edges;

28

5. "whereby said extended magnets in said second pair of sockets engage said recesses to automatically align and secure said auxiliary eyeglasses when mated with said magnets forming said recesses in said first pair of sockets" means that when the magnets forming the recesses and the extended magnets contact each other, this contact between the extended magnets and the recesses causes the auxiliary eyeglasses to align and secure to the conventional eyeglasses with little assistance from the wearer; and

6. "providing maximum resistance to a downward movement of said auxiliary eyeglasses thereby preventing detachment of said auxiliary eyeglasses from said conventional eyeglasses" means providing the greatest possible amount of resistance to downward movement of the auxiliary eyeglasses so as to keep the auxiliary eyeglasses from separating from the conventional eyeglasses.

Claim Construction Order at 36:14-38:4.

In the instant motion, Plaintiff argues that Aspex's recessed bottom-mounted Cool Clip,[7] i.e., the accused product,

---

[7] Another product is Aspex's flush bottom-mounted Cool Clip. The difference between the two products being that in the recessed bottom-mounted Cool Clip, the magnets are "recessed" within their respective sockets; whereas in the flush bottom-mounted Cool Clip, the magnets are flush-mounted with the outer peripheral edges of the sockets. In a separate motion, Aspex moved for summary judgment that its flush bottom-mounted Cool Clip does not infringe the '858 Patent. Revolution responded by asserting that it never claimed that the flush bottom-

29

infringes claim 1 of the '858 patent.  Citing to the deposition of Aspex's Vice President, Ifergan, Revolution asserts that Aspex has admitted under oath of selling eyewear that contains all of the claim limitations set forth in claim 1 of the '858 Patent, with the exception of the following two limitations:

> said plurality of magnets mounted on said conventional eyeglasses and said plurality of magnets mounted on said auxiliary eyeglasses being oriented such that the maximum magnetic attractive force between said magnets is oriented approximately parallel to lenses in said conventional eyeglasses;[8] and

> whereby said extended magnets in said second pair of sockets engage said recesses to automatically align and secure said auxiliary eyeglasses when mated with said magnets forming said recesses in said first pair of sockets providing maximum resistance to downward movement of said auxiliary eyeglasses thereby preventing detachment of said auxiliary eyeglasses from said conventional eyeglasses.[9]

Pl.'s Motion at 17:15-28.  Regarding the first disputed limitation, Aspex argues that Revolution has not shown that the

---

mounted Cool Clip infringe the '858 Patent. The Court has taken that motion under submission and will be deciding whether Aspex is entitled to attorney's fees.

[8] This will be referred to as the "first disputed limitation."

[9] This will be referred to as the "second disputed limitation."

engaged primary and auxiliary frame magnets of Aspex's recessed bottom-mounted eyewear provides the greatest possible amount of resistance to downward movement of the auxiliary frames so as to keep the auxiliary frames from separating from the conventional frames. Specifically, Aspex argues that claim 1 of the '858 Patent requires magnets of a specific gaussian strength designed to provide the greatest possible amount of resistance, and since Revolution has never tested the magnets used in the accused eyewear, Aspex does not infringe. Opposition at 14:14-15:4.

As already noted above, in the Claim Construction Order, this Court specifically stated that claim 1 does not require magnets of any specific gaussian strength. See Claim Construction Order at 25, n. 12. All that is required is that the magnets be oriented such that they provide the greatest possible amount of resistance. Id. at 24-25. Aspex does not argue that the magnets in their recessed bottom-mounted eyewear could have been aligned in a different fashion such that the greatest possible amount of resistance would have been achieved. Nor does it argue that the magnets used in its accused product were incapable of supporting the auxiliary frames and preventing downward movement and detachment of the auxiliary frames.[10] It is clear that the recessed bottom-mounted eyewear sold by Aspex includes magnets having sufficient strength to support the

---

[10] Shortly after the '858 Patent issued, and "out of an abundance of caution,"Aspex withdrew from the market its recessed bottom-mounted Cool Clip. Opposition at 3:2-4:3.

auxiliary frames. <u>See</u> Declaration of Dylan C. Dang ("Dang Decl."), Exh. 2, Photographs of Aspex's recessed bottom-mounted eyewear. Otherwise, the auxiliary frames would not stay on the conventional frames. Additionally, it is undisputed that orienting magnets in a parallel fashion and perpendicular to the lenses provides the greatest resistance. Aspex has provided no evidence that any other orientation would provide greater resistance. At bottom, it is undisputed that the magnets in the Aspex eyewear are oriented in a parallel fashion and perpendicular to the lenses, thereby providing the greatest possible resistance toward movement of the auxiliary frames.

Regarding the second disputed limitation, Aspex apparently took the position, though not in its Opposition,[11] that its accused product does not infringe the '858 Patent because: 1) when the second pair of magnets which extend from the primary glasses engage the sockets in the auxiliary glasses, they do not automatically align, and 2) the first and second pair of magnets may not actually make contact so that they are mated. <u>See</u> Motion at 20:3-8.

This Court has construed this final limitation of claim 1 in the '858 Patent as requiring that when "the magnets forming the recesses and the extended magnets contact each other, this contact between the extended magnets and the recesses causes the

---

[11] The only non-infringement argument raised by Aspex in its Opposition is with regard to the "maximum resistance" issue, which the Court has already addressed.

auxiliary glasses to align and secure to the conventional eyeglasses with little or no assistance from the wearer" thereby "providing the greatest possible amount of resistance to downward movement of the auxiliary eyeglasses so as to keep the auxiliary eyeglasses from separating from the conventional eyeglass." Claim Construction Order at 23:3-25:2.

The photographs of the infringing eyewear sold by Aspex clearly show that the claim construction applied by the Court to this particular limitation is met by the Aspex eyewear either literally or equivalently. First, there are magnets forming recesses in the primary frame. See Dang Decl., Exh. 2, photos 2-3. Second, there are magnets disposed within sockets in the auxiliary frame that extend outward and upward from the auxiliary frames. Id., photos 4-8. Finally, the extended magnets clearly fit into the recesses and make contact with the magnets that form the recesses, in order to align and secure the auxiliary glasses to the conventional glasses with little or no resistance from the wearer. Id., photos 9-20. Aspex has not offered any evidence to show that such construction of its accused product is not for the benefit of keeping the auxiliary eyeglasses from separating from the conventional eyeglass. This is all that is required of claim 1 in the '858 Patent.

Based on the foregoing, the Court finds that Aspex has not raised a genuine issue of material fact as to whether its recessed bottom-mounted Cool Clip eyewear does not meet any of

the limitations of claim 1 of the '858 Patent.  Therefore, the Court grants Revolution partial summary judgement for infringement of claim 1 of the '858 Patent by Aspex's recessed bottom-mounted Cool Clip eyewear.

**V.   CONCLUSIONS**

Based on the foregoing, the Court:

1)   GRANTS Revolution's motion for partial summary judgment of non-infringement of claims 6 and 34 of the '545 Patent;

2)   DENIES Revolution's motion for partial summary judgment of non-infringement of claim 22 of the '545 Patent; and

3)   GRANTS Revolution's motion for partial summary judgment of infringement of claim 1 of the '858 Patent by Aspex's recessed bottom-mounted Cool Clip product.

IT IS SO ORDERED.

Dated: _August 7, 2003_

_Lourdes G. Baird_
LOURDES G. BAIRD
United States District Judge

34