UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No.: 00 Civ. 7067 (Moreno/Dube)

| | |
|---|---|
| ASPEX EYEWEAR, INC., MANHATTAN DESIGN STUDIO, INC., CONTOUR OPTIK, INC., CHIC OPTIC, INC., and ASAHI OPTICAL CO., LTD., | ) ) ) ) |
| Plaintiffs/Counterdefendants, | ) ) |
| vs. | ) ) |
| CONCEPTS IN OPTICS, INC., | ) ) |
| Defendant/Counterclaimant. | ) ) ) |

## DECLARATION OF DAVID YINKAI CHAO

I, David Yinkai Chao, declare as follows:

1.  I am the Director of International Sales for Contour Optik Inc. (Contour). Contour is a Taiwanese corporation with its principal business office located at 6 Industrial Fifth Rd., Tou-Chiau Industrial Park, Chiayi 621, Taiwan, Republic of China. Contour is in the business of designing, manufacturing and marketing eyewear throughout the world including primary eyeglass frames with magnetic "clip-on" sunglasses. I have been employed by Contour since 1989 and have been the Director of International Sales since 1996. I am also one of Contour's shareholders and a corporate officer.

2.  My brother, Richard Chao, also works for Contour. He invented the eyewear product described and claimed in U.S. Patent Nos. 5,568,207 (207 patent) and RE 37,545 E (545 patent). Contour is a co-owner of the 207 and 545 patents.

3.  I have been involved in the design of eyewear since 1990. I am the named sole or joint inventor on over 25 U.S. and foreign patents in the eyewear field.

4.  I am qualified to render the opinions set forth below because of my previous

practical experience in the optical frame industry, designing and selling optical frames to numerous buyers around the world, and obtaining patents for eyewear products. In addition, for approximately a four year period, I was the person at Contour primarily responsible for supervising approximately fifteen employees who were involved in the design and preparation of sketches of optical frames and participating in international sales activity.

5. The technology or "art" to which the 545 patent relates is the design and manufacture of clip-on eyewear that includes primary and auxiliary spectacle frames for supporting lenses; and more particularly, clip-on eyewear where the auxiliary frame is attached to the primary frame through the use of cooperating magnets or magnetic material.

6. In my opinion, a person of ordinary skill in the art of designing and manufacturing clip-on eyewear in general, and magnetic clip-on eyewear in particular, is someone who had at least four years of practical experience working for a manufacturer of optical frames in the 1994 - early 1995 time frame, when the 545 patent was invented. I am a person of at least ordinary skill in the art of designing and manufacturing eyewear, including primary spectacle frames having magnetic clip-on auxiliary frames.

7. I make this Declaration in support of Plaintiffs' opposition to Defendant Concepts' motion for summary judgment that the 545 patent is invalid, unenforceable, and non-infringed. Because Concepts' motion covers many areas that I wish to address in this declaration, I have used topic headings below to make the declaration easier to read.

### A. Richard Chao's Invention And My Efforts To bring It Into The United States

8. Around the middle of 1994, I became aware of a front-mounted magnetic clip-on eyeglass device in the marketplace. This front-mounted device had magnets on the front of the primary frame and magnets on the back of the auxiliary frame. The frames were attached by connecting the magnets on the auxiliary frame to the magnets on the primary frame. It was my opinion at the time that this front-mounted system was not workable because the auxiliary frame could easily drop off the primary frame. Nevertheless, because I thought magnetic clip-on

eyewear was an interesting product, Contour sold front-mounted clip-ons for a period of time.

9. Sometime in the summer of 1994, my brother, Richard Chao, told me about an idea he had for a magnetic clip-on eyewear product. In his design, magnetic members would be secured in housings or "projections" mounted at the temple portions of the primary frame, and the auxiliary frame would include arms containing downwardly extending magnetic members. When the frames were connected, the auxiliary arms would extend over the upper side portions of the primary frame, and the auxiliary frame magnetic members would magnetically engage the primary frame magnetic members to stably secure the auxiliary frame to the primary frame.

10. On September 5, 1994, after hearing Richard's idea and discussing it with him, I drew a figure in my 1994 day planner to illustrate what I thought Richard had invented and communicated to me. Exhibit 1 to my declaration is a true and correct copy of the page from my 1994 day planner containing the drawing that I made on September 5, 1994.

11. On October 20, 1994, I drew another illustration in my day planner to depict what I thought Richard had invented and communicated to me. Exhibit 2 to my declaration is a true and correct copy of the page from my 1994 day planner containing the drawing that I made on October 20, 1994.

12. As shown in Exhibits 1 and 2, the drawings I made on September 5, 1994 and October 20, 1994 illustrate a magnetic member extending downwardly from an arm of the auxiliary frame toward a projection on the primary frame holding a magnetic member. In my opinion, the eyeglass device invented by Richard, as communicated to me in our conversations, and as illustrated in my 1994 day planner, satisfied all the requirements of claims 1 and 17 of the 545 patent.

13. In about February of 1995, Richard asked me to have a prototype of his invention made. On February 13, 1995, a two-page sample-making form for making the prototype was prepared by Contour employee Yang Chen Lin under my instructions. Exhibit 3 to my declaration is a true and correct copy of that sample-making form. It was decided to use components of front-mounted magnetic frames that Contour was selling at the time to

manufacture the first prototype. Exhibit 4 to my declaration is a true and correct copy of a Contour technical drawing of the components of the front-mounted magnetic frames that were used to manufacture the first prototype of Richard's invention.

14. Exhibits 5 through 8 to my declaration are true and correct copies of photographs of the prototype of Richard's invention that was made by Contour's prototype shop in February of 1995. Exhibit 5 is a top-view of the primary frame and the auxiliary frame. As shown in Exhibit 5, the auxiliary frame has arms containing magnetic members; and primary frame has projections containing magnetic members which are secured to the rear sides of the extensions and the sides of the lens rims. Exhibit 6 is a top view of the prototype showing the auxiliary frame engaged to the primary frame. Exhibit 7 is a front view of the prototype showing the auxiliary frame engaged to the primary frame. As shown in Exhibit 7, the magnetic members of the primary and auxiliary frames engage one another, and the arms of the auxiliary frame contact the extensions of the primary frame. Exhibit 8 is a top view of one side of the primary and auxiliary frames showing a close-up of the arms and projections of the prototype. In my opinion, the prototype shown in these photographs satisfies every element of claims 1 and 17.

15. In September 1994, after I made the September 5 drawing in my day planner of what I thought Richard had invented and communicated to me, I traveled to the United States. I remember that I had my 1994 day planner with me because it was my practice to routinely take my day planner when I traveled on business in my capacity as Contour's Director of International Sales, and in my capacity as Contour's Sales Manager. Exhibit 9 to my declaration contains true and correct copies of business records verifying that I was in the United States in September of 1994. These business records include a copy of my American Express bill, which has a closing date of October 11, 1994, and identifies charges I made in California, Virginia and Pennsylvania that September.

16. On March 25, 1995, I made a second trip to the United States. Exhibit 10 to my declaration is a true and correct copy of the pertinent pages from my 1995 Chinese passport showing that I left Taiwan for the United States on March 25, 1995. Due to the 13 hour time

difference, I arrived in the United States on the same day. During that second trip, I brought with me the prototype of Richard's invention shown in the photographs of Exhibits 5-8. Exhibit 11 to my declaration contains true and correct copies of business records further verifying that I was in the United States in late March and April of 1995. These business records include a copy of my American Express bill, which has a closing date of April 11, 1995, and identifies charges I made in California and Virginia in late March and early April of 1995.

17. On April 5, 1995, I made a trip to Chicago, Illinois to visit Mr. Icek Benz of Benglo, a wholesale optical frame company. During my visit with Mr. Benz, I showed him the prototype of Richard's invention pictured in Exhibits 5-8 to my declaration. As shown in my credit card statements attached as Exhibit 11, I was in Virginia on April 3, 1995 and in California on April 6, 1995. I have a specific memory of meeting Mr. Benz in Chicago before my trip to California, and that I met Mr. Benz in his office on April 5, 1995.

### B. The Twincome Eyeglass Device

18. As I understand it, Concepts is arguing that Twincome Documents A-F attached as Exhibit 4 to Concepts' Exhibit AI disclose every element of claims 1 and 17 of the 545 patent. Although I do not believe that the Twincome device is prior art to the 545 patent because the 545 patent was invented first, I have assumed for purposes of my opinions below that the Twincome device is prior art. With that assumption, I disagree with Concepts that the Twincome documents disclose all the elements of claims 1 and 17.

19. As acknowledged in paragraph 4 of the declaration of Mr. Fukuwa (Concepts Exhibit T at ¶7), "[t]he main frame included magnetic elements located on the upper and outer side portions of the frame, near the areas where the eyeglass arms are pivoted to the frames". As a result, the Twincome device does not meet all the requirements of claims 1 and 17 because its magnetic members are not housed in "projections" that are secured to "rear and side portions" of the primary frame as required by claim 1, and are not secured to the rear sides of the extensions as required by claim 17.

20. Instead, as shown in Documents A-F, the Twincome magnets are embedded in extension elements that are part of the "upper and outer side portions" of the primary frame. Document F in particular states that the magnets are "embedded" in the frames.

21. In my opinion, a person skilled in the art would not be able to construct a complete and operational Twincome eyeglass device from Documents A-F without a written description of the device illustrated in the drawings.

C. **The Julie Madison Drawings**

22. It is also my opinion that a person of ordinary skill in the art would not be able to construct a complete and operative magnetic clip-on eyeglass device from the Madison drawings in Concepts' Exhibit O. These drawings are merely rough sketches of bits and pieces of unidentified parts. The drawings do not show complete primary and auxiliary frames, and no written description of the rough sketches is provided that would inform someone skilled in the art what Madison had in mind. In my opinion, the Madison drawings do not disclose at least the following features of claims 1 and 17: (1) complete primary and auxiliary spectacle frames; (2) projections secured to rear and side portions of the primary frame; (3) magnetic members secured to the rear sides of the extensions; and (4) auxiliary frame arms that extend over upper side portions or the extensions of the primary frame.

23. I understand that Ms. Madison has testified during a deposition in this case that I told her that Richard Chao was not the true inventor of the 207 patent. I never made such a statement to Ms. Madison. I also understand that Concepts is arguing that I knew about Julie Madison's invention and failed to disclose it to the Patent Office during the Patent Office proceedings involving the 207 and 545 patents. I understand that Ms. Madison has testified that I learned of her invention because I obtained a copy of her patent application before it issued. Ms. Madison is not telling the truth. I never obtained a copy of her patent application while it was pending in the Patent Office. Also, I never knew about any so called Julie Madison top mounted magnetic eyewear invention before the 207 patent or 545 patent was filed.

### D. The Combination Of Twincome, Madison, Sunreeve, Boston Club And <u>Murai</u>

24.     I also understand that Concepts is arguing that claims 1 and 17 are invalid because they would have been obvious over the combination of Twincome, Madison, Sunreeve, Boston Club and Murai at the time Richard Chao's invention was made. As I understand it, the test for determining whether an invention would have been obvious over the prior art involves a determination of: (1) the scope and content of the prior art; (2) the level of ordinary skill in the art; (3) the differences between the claimed invention and the prior art; and (4) any objective evidence of obviousness, such as commercial success of the invention, a long felt need for the invention, a failure of others working in the field to arrive at the invention, and copying of the invention by others. I also understand that in determining obviousness, there must be some suggestion or motivation in the prior art documents that would induce a person of ordinary skill to modify the prior art to arrive at the patented invention. Applying this test, I disagree with Concepts' conclusion that claims 1 and 17 would have been obvious. Before I address the combination of Concepts' references, I will address the Boston Club, Sunreeve and Murai references individually.

#### 1.     The Boston Club Reference

25.     Boston Club discloses a complicated and inefficient hooking ball and hook hole assembly mechanism. I do not agree that Boston Club is prior art to claims 1 and 17 because I believe the 545 patent was invented first. However, assuming that Boston Club is prior art, it is my opinion that the reference fails to disclose at least the following elements of claims 1 and 17: (a) magnetic members on the primary and auxiliary frames (claims 1 and 17); and (b) projections for housing the primary frame magnetic members secured to rear and side portions of the primary frame (claim 1).

#### 2.     The Sunreeve Reference

26.     Sunreeve discloses a front-mounted design in which the primary frame magnetic members are embedded in the front parts of the extensions. I is my opinion that Sunreeve fails to

disclose at least the following elements of claims 1 and 17: (1) auxiliary frame arms that extend over the "upper side portions" of the primary frame (claim 1) or the "top side" of the primary frame extensions (claim 17); (2) magnetic members secured in projections that are in turn secured to rear and side portions of the primary frame (claim 1); and (3) magnetic members secured to the rear sides of the extensions (claim 17).

### 3. The Murai Reference

27. The Murai reference discloses a front-mounted design in which the primary frame magnetic members are secured to side edges of the lens rims, below the temple pieces and extensions. In my opinion, Murai fails to disclose at least the following elements of claims 1 and 17: (1) auxiliary frame arms which extend over the "upper side portion" of the primary frame (claim 1) or over the "top side" of the extensions (claim 17); and (2) projections for securing magnetic members that are in turn secured to "rear and side portions" of the primary frame (claim 1) or the rear sides of the extensions (claim 17).

### 4. Combining Boston Club, Twincome, Madison, Sunreeve And Murai

28. Assuming all of Concepts' references qualify as prior art, it is my opinion that a person of ordinary skill in the art at the time of Richard Chao's invention would not have been motivated to combine these references to arrive at the eyeglass device of claims 1 and 17, because the references contain no teaching or suggestion to make the combination. Since the Madison drawings of Concepts' Exhibit O are uninformative and in many cases unintelligible, I have been asked to consider the drawings of Madison's 269 patent for this analysis.

29. The Boston Club does not disclose the use of magnetic members. There is no teaching, suggestion, or motivation in Boston Club that would induce a person of ordinary skill in the art to modify the reference to replace the hook ball/hook hole assembly with magnetic members. Rather, a person of ordinary skill would conclude that Boston Club's elaborate fixation assembly is necessary to ensure that the frames stay engaged, and would not conclude that the Boston Club design could or should be modified to a design using magnetic members.

As a result, there would be no motivation for a person of ordinary skill to combine Boston Club with Concepts' other references, which all employ magnetic members on the primary and auxiliary frames.

30. As to Twincome and Sunreeve, because these references both employ "embedded" magnets, rather than magnetic members housed in projections secured to "rear and side potions" of the primary frame or to the rear sides of the extensions, Twincome and Sunreeve suffer from the same disadvantage as the Sadler and Meeker patents discussed in the 545 patent specification. Specifically, like Sadler and Meeker, the extensions of Twincome and Sunreeve would have to be excavated to form cavities to accommodate the magnets; which would decrease the strength of the primary frame. The 545 patent's use of separate projections for securing the magnetic members overcomes this problem. As a result, a person skilled in the art would have no motivation to combine neither Twincome or Sunreeve with the monoblock design of Madison or the design of Murai, because Madison and Murai do not use embedded magnets. Also, since Sunreeve is a front-mounted design in which the auxiliary frame does not have arms for extending over the primary frame, a person skilled in the art would not be motivated to combine Sunreeve with Madison or Twincome, both of which include auxiliary frame arms.

31. As to the Madison reference, Madison's own 269 patent distinguishes her monoblock invention from Richard Chao's invention for a variety of reasons. As a result, assuming Madison is a person of ordinary skill, her patent demonstrates that a person of ordinary skill in the art would not be motivated to combine Madison with Concepts' other references to arrive at the Richard Chao's invention.

32. Finally, as to the Murai reference, the auxiliary frame of Murai does not include arms for extending over portions of the primary frame, and the primary and auxiliary frames are connected in a front-mounted configuration. Also, the primary frame magnetic members of Murai are secured to the edges of the lens rims only, below the temple pieces and extensions, and not to the extensions themselves. As a result, a person of ordinary skill would not be motivated to combine Murai with Madison, Twincome or Sunreeve since Madison and Twincome both

include arms on the auxiliary frame, and all three references secure the primary frame magnetic members in the extensions.

33. I am aware that the Twincome device has never been successfully marketed in the United States. I am also aware that neither Murai, Sunreeve or Boston Club has ever been successfully marketed in the United States.

### E. Enablement, Written Description, Best Mode, and New Matter

#### 1. Enablement

34. As I understand it, Concepts is arguing that a person skilled in the art reading the 545 patent would not have been able to construct the preferred embodiment of the invention shown in the drawings because: (a) the patent does not disclose the "split optical block and screw assembly" necessary for insertion of prescription lenses; (b) the block and screw need to be located at a position other than the conventional location between the extension and the lens rim; and (c) the patent does not show where the block and screw would be located. I disagree. In the optical industry, people skilled in the art refer to the split optical screw and block assembly as a "rim lock." A person skilled in the art reading the 545 patent would easily be able to reproduce the preferred embodiment of the invention shown in the drawings. A person skilled in the art would understand from reading the 545 patent that in the preferred embodiment shown in the drawings, the rim lock would have to be moved from its "conventional" location. A person skilled in the art would be able to manufacture the device with the rim lock in a "non-conventional" location without an inordinate amount of experimentation or design work. In addition, a person skilled in the art reading the 545 patent would also understand that he would have the following options: (a) making a flexible, rimless, or semi-rimless primary frame without a rim lock where the lenses can be fit into and removed from the frame; and (b) simply moving the projection away from the lens rim and keeping the rim lock in the conventional position.

#### 2. Written Description

35. As I understand it, Concepts is arguing that that a person skilled in the art reading

the 545 patent would not conclude that Richard Chao invented a magnetic clip-on eyeglass device in which the primary frame includes a split optical black and screw assembly. I disagree. A person skilled in the art would conclude that claims 1 and 17 cover eyeglass devices in which the primary frame includes a rim lock because: (1) the claims do not exclude such designs; (2) the claims include primary frames having prescription lenses, and persons skilled in the art would know that prescription frames typically include a rim lock; and (3) nothing in the patent specification requires that the primary frame be constructed without a rim lock.

3. **Best Mode**

36. As I understand it, Concepts is arguing that the 545 patent does not disclose the inventor's "best mode" of practicing the invention for the same reasons discussed in paragraph 34 of my declaration. Again, I disagree for the same reasons discussed in paragraph 34.

4. **New Matter**

37. As I understand it, Concepts also argues that claim 17 is invalid for including the following "new matter" not defined in the patent: (1) "extensions extending laterally away from one another and rearwardly of said frame"; and (2) "each of said extensions having a top side a front side, and a rear side with a first magnetic member secured to said rear side". I disagree. As shown in Exhibit 12 to my declaration, Figure 3 of the patent illustrates the extensions, which extend laterally away from one another and rearwardly of the lens rim portions of the primary frame. As shown in Exhibit 13 to my declaration, Figure 3 also illustrates the front side, top side, and rear side of each extension; as well as the first magnetic members 14 secured to the rear sides of the extensions 11.

38. As I also understand it, Concepts is arguing that the patent is invalid because the specifications and claims also contains the following new matter: (1) "engaging surfaces" (specification); (2) "upper side portion" (claim 1); and (3) "two side portion extensions" (claim 17. I again disagree. As for the term "engaging surfaces," the patent discloses that the primary frame and auxiliary frame magnetic members engage each other. In my opinion, a person skilled

in the art would readily understand that engaging magnetic members have "surfaces" that attract one another. I am informed that Concepts also argues that the phrase "In one embodiment, as shown in Figure 7" added to column 3, line 11 of the specification is also new matter because it implies that the engaging surfaces shown in Figure 6 "do touch," when the patent is limited to magnetic members that engage without touching. Again, I disagree. In my opinion, a person of ordinary skill reading the patent specification would readily understand that the magnetic members can engage by touching, or through magnetic attractive forces without touching.

39.  I also disagree with Concepts' argument that the phrase "upper side portion" used in claim 1 is not disclosed in the specification. The specification uses the terms "side portions" and "upper portion" with regard to the primary frame. Since the side portions of the primary frame, like most objects, have an upper surface and a lower surface, one skilled in the art would readily conclude from the specification what the "upper side portion" is. In my opinion, one skilled in the art reading the patent specification would interpret the phrase "upper side portion" to mean the top portion of the primary frame that is visible when viewing the frame from the top, including the top portions of the lens rims, extensions, projections and magnetic members. Claim 1 requires the auxiliary frame arms to engage the "upper side portion" of the primary frame. As an example of what is meant by the "upper side portion," Figure 7 illustrates one embodiment of the invention in which the arms 21 engage the upper side of the extensions 11.

40.  I also disagree with Concepts' argument that the phrase "two side portion extensions" is not disclosed in the specification. I interpret this phrase to mean the same thing as the following phrase in claim 1, which is disclosed in the specification: "two side portions each having an extension extended therefrom."

**J.   Direct Comparison Between Concepts' Products And Claims 1 and 17**

41.  I have evaluated samples of Concepts' accused eyewear sold under the Nino Balli® brand name. My interpretation of claims 1 and 17 as a person skilled in the art is consistent with the interpretation of the disputed claim elements set out in the Plaintiffs' opening

and responsive claim construction memoranda filed on October 11, 2002 and October 21, 2002. Based on that claim interpretation, and my evaluation of Concepts' products, it is my opinion that Concepts' eyewear satisfies all the requirements of claims 1 and 17. My opinions are summarized in the following charts.

| Claim 1 | Concepts' Nino Bali® Eyewear |
|---|---|
| An eyeglass device comprising: | Concepts' products are eyeglass devices because they are optical devices with lenses used to assist vision. |
| a primary spectacle frame for supporting primary lenses therein, said primary spectacle frame including two side portions each having an extension extended therefrom for pivotally coupling a leg means thereto, said primary spectacle frame including two rear and side portions each having a projection secured thereto, said primary spectacle frame including an upper side portion, | Concepts' products include a primary spectacle frame for supporting lenses. The primary frame includes two side portions, each having an extension or end-piece extended therefrom.<br><br>The extensions in Concepts' products extend away from the lens rims and rearwardly to pivotally connect with legs or "temple pieces" that go over the wearer's ears. Concepts' primary frame also includes two rear and side portions each having a projection or housing welded to them. |
| a pair of first magnetic members secured in said projections respectively, | Concepts' primary frames each have a pair of first magnetic members (in this case magnets) that are secured in the projections. |
| an auxiliary spectacle frame for supporting auxiliary lenses therein, said auxiliary spectacle frame including two side portions each having an arm extended therefrom for extending over and for engaging with said upper side portion of said primary spectacle frame, and | Concepts' products include an auxiliary spectacle frame for supporting auxiliary lenses. The auxiliary frame includes two side portions each having an arm. The arms reach over the upper side portion of the primary frame. The arms engage the upper side portion of the primary frame because the lower surfaces of the second magnetic members and the underside of the portions of the arms that secure the second magnetic members touch the upper surfaces of the first magnetic members and the projections. |
| a pair of second magnetic members secured to said arms respectively for engaging with said first magnetic members of said primary spectacle frame so as to secure said auxiliary spectacle frame to said primary spectacle frame, | Concepts' auxiliary frames each have a pair of second magnetic members secured to the arms. The second magnetic members engage the first magnetic members of the primary frames to secure the auxiliary frame to the primary frame. |
| said arms being engaged with and supported on said upper side portion of said primary spectacle frame so as to allow said auxiliary spectacle frame to be stably supported on said primary spectacle frame and so as to prevent said auxiliary spectacle frame from moving downward relative to said primary spectacle frame and so as to prevent said auxiliary spectacle frame from being disengaged from said | The arms of Concepts' auxiliary frames are engaged with and supported on the upper side portion of the primary frames because the lower surfaces of the second magnetic members and the underside of the portions of the arms that secure the second magnetic members touch the upper surfaces of the first magnetic members and the projections. This allows the auxiliary frame to be stably supported on the primary frame so |

| | |
|---|---|
| primary spectacle frame. | that the auxiliary frame will not easily move downward relative to the primary frame, and will not be easily disengaged from the primary frame when the user conducts jogging or jumping exercises. |

| Claim 17 | Concepts' Nino Bali® Eyewear |
|---|---|
| An eyeglass device comprising: | Concepts' products are eyeglass devices. |
| a primary spectacle frame having two side portion extensions, each of said extensions extending laterally away from one another and rearwardly of said frame, each of said extensions having a top side, a front side and a rear side with a first magnetic member secured to said rear side, and | Concepts' products include a primary spectacle frame. The primary frame has an end-piece or "extension" located on each side of each lens rim. The extensions extend laterally away from one another and rearwardly of the lens rim portions of the frame. Each extension has a front side, and a rear side. A first magnetic member is enclosed in a housing that is secured to the rear side of each extension. |
| an auxiliary spectacle frame including two side portions each having an arm extending from said front side over said top side, said arms containing corresponding second magnetic members, said arms and said first and second magnetic members supporting said auxiliary spectacle frame on said primary spectacle frame. | Concepts' products include an auxiliary spectacle frame. The auxiliary frame has two arms extending from the sides of the lens rims. The arms extend toward and beyond the rear sides of the extensions when the auxiliary frame is secured to the primary frame. Each arm of the auxiliary frame contains a second magnetic member. When the primary and auxiliary frames are connected together, the second magnetic members of the auxiliary frame magnetically attract and touch the first magnetic members of the primary frame. Also, the portions of the arms of the auxiliary frame enclosing the second magnetic members touch the upper surfaces of the housings for the first magnetic members. In this way, the arms of the auxiliary frame and the second magnetic members work together to stably support the auxiliary frame in position on the primary frame so that the auxiliary frame will be inhibited from falling or slipping during normal and expected use of the eyewear (such as jogging or jumping exercises). |

K.   **Equivalency Between Concepts' Products And The 545 Patent**

42.   As I understand it, Concepts are also arguing that its products are not "equivalent" to claims 1 and 17 for the following reasons: (a) unlike the preferred embodiment of the invention shown in the drawings, the projections of Concepts' products are not secured to the eye rims of the primary frame; (b) by locating the projections away from the lens rims, the block and screw assemblies of the Concepts' products can be mounted in the conventional position

between the extension and the lens rim; (c) unlike the preferred embodiment shown in the drawings, the auxiliary arms of Concepts' products do not rest on the extensions of the primary frame; (d) unlike the preferred embodiment of the invention, Concepts' magnetic members "touch"; and (e) unlike the 545 patent design, which limits relative motion between the frames only in the up and down directions, the Concepts' products limit relative motion between the primary and auxiliary frame in the up, down, forward, and side to side directions due to the presence of flanges on the mounting collars of the auxiliary frame. I disagree.

43. First, in my opinion, whether the projections are attached to just the rear surfaces of the extensions, as in Concepts' products, or to the rear surfaces of the extensions and the lens rims, as in the preferred embodiment shown in the patent drawings, the projections in Concepts' products would still perform substantially the same function, in substantially the same way, to achieve substantially the same result as the preferred embodiment of the invention.

44. The function of the projections in the preferred embodiment of the invention is to mount a first pair of magnetic members at either sides and behind the frontal surface of the primary spectacle frame. The way this is accomplished is by having a primary spectacle frame that includes two rear and side portions each having a projection secured thereto with a pair of first magnetic members secured in the projections. The result is that the first pair of magnetic members are mounted on the primary frame without excavating cavities which would greatly decrease the strength of the frame. In addition, the first pair of magnetic members are able to engage with a pair of second magnetic members secured to arms and extending from side portions of an auxiliary spectacle frame. The auxiliary frame arms are capable of extending over and engaging with upper side portions of the primary frame so that the arms are supported on the upper side portions.

45. The projections of Concept's products perform substantially the same function. They hold a first pair of magnetic members at either side and behind the frontal surface of the primary spectacle frame. The projections of the accused products perform this function in substantially the same way. The accused products have a primary spectacle frame that includes

projections secured to the rear and side portions of the extensions (which are part of the primary spectacle frame) with a pair of first magnetic members secured in the projections. The projections of Concepts' products also achieve substantially the same result. The first pair of magnetic members are mounted on the primary frame without excavating cavities that would greatly reduce the strength of the frame. In addition, the first pair of magnetic members are able to engage with a pair of second magnetic members secured to arms extending from side portions of an auxiliary frame. These arms extend over and engage with upper side portions of the Concept's primary frame so that the arms are supported on the upper side portions. In addition, securing the projections to just the extensions, rather than to the extensions and the lens rims, will have no substantial effect on: (a) the ability of the primary and auxiliary magnetic members to engage each other; (b) the ability of the engaged auxiliary and primary magnetic members to resist relative motion between the frames; (c) the ability of the auxiliary frame to be attached to the primary frame; and (d) the ability of the primary frame to stably support the auxiliary frame.

46. Second, in my opinion, whether the screw and barrel assembly is located in its "conventional" position between the extension and the lens rim, or whether it is located in a "non-conventional" position as in the preferred embodiment of the 545 patent, the primary and auxiliary frames would still perform substantially the same function, in substantially the same way, to achieve substantially the same result. In my opinion, Concepts' argument is another way of saying that there is a substantial difference between securing the projections to the extensions alone, and securing them to the extensions and lens rims. For the reasons discussed in paragraphs 43-45 above, I disagree. Among other reasons, it is my opinion that the relocation of the screw and block assembly to a non-conventional position on the primary frame will have no substantial effect on: (a) the ability of the primary and auxiliary magnetic members to engage each other; (b) the ability of the engaged auxiliary and primary magnetic members to resist relative motion between the frames; (c) the ability of the auxiliary frame to be attached to the primary frame; and (d) the ability of the primary frame to stably support the auxiliary frame.

47. It is my understanding that in Concepts' products the auxiliary frame is supported on the primary frame through surface-to-surface contact between the mounting collars and magnetic members. In my opinion, whether the arms of the auxiliary frame engage the upper side portions of the extensions, rather than the upper side portions of the primary frame mounting collars and magnetic members, the auxiliary arms will still perform substantially the same function, in substantially the same way, to achieve substantially the same result in that the auxiliary frame will be stably supported on the primary frame.

48. The functions of the arms in the preferred embodiment of the 545 patent are to support the auxiliary frame on the primary frame, and to secure it to the primary frame through magnetic attraction. The way the arms do this is by extending over and engaging with the upper side portions of the primary frame, and by holding the second magnetic members to engage with the first magnetic members of the primary frame. The result is that the auxiliary frames are not simply attached to the primary frames by magnetic attraction, but instead are additionally supported by its arms that are in turn secured to and stably supported on the primary frame. This stable support prevents the auxiliary spectacle frame from moving downward in relation to the primary spectacle frame, and prevents the auxiliary and primary frames from being disengaged.

49. The arms of Concept's products perform substantially the same function. They support the auxiliary frame on the primary frame and secure the auxiliary frame to the primary frame through magnetic attraction. The arms of the accused products perform this function in substantially the same way. The auxiliary arms of Concepts' products extend over the upper side portion of the primary frame and engage with and are supported on the projections and primary frame magnetic members, while the auxiliary arms simultaneously hold second magnetic members to engage with the first magnetic members of the primary frame. The arms of Concepts' products achieve substantially the same result. The auxiliary frames are not simply attached to the primary spectacle frame by magnetic attraction, but instead are additionally supported by the arms of the auxiliary frame that are in turn secured to and stably supported on

the primary frame. This stable support prevents the auxiliary frame from moving downward in relation to the primary frame, and prevents the auxiliary frame from being disengaged from the primary frame.

50. Finally, I disagree with Concepts' position that the 545 patent eyewear only limits relative motion between the primary and auxiliary frames in the up and down directions, while Concepts' products also limit relative motion in the front and side to side directions due to the presence of flanges on the auxiliary arm mounting collars. In my opinion, the engagement of the cooperating primary and auxiliary magnetic members in the 545 patent eyewear limits relative motion in the up and down directions, and also limits relative motion between the primary and auxiliary frames in the front, and side to side directions. The presence of the flanges on Concept's products does not change my opinion. The reason is that if the magnets were not present, the flanges themselves would be unable to resist relative motion between, or disengagement of, the primary and auxiliary frames. On the other hand, if the flanges were not present on Concepts' products, the attractive forces of the engaged primary and auxiliary magnets would still limit relative motion in all directions.

51. In my opinion, the structures of the projections, screw and block assemblies, and auxiliary arms of Concepts' products are interchangeable with the corresponding structures of the preferred embodiment of the invention illustrated and described in the 545 patent. There are no substantial differences between the 545 patent eyewear and the projections, auxiliary arms, and screw and block assembly of the Defendants' products.

52. It is my further opinion that Concepts' products are virtually identical copies of Plaintiff Aspex's Easyclip® magnetic clip-on eyewear protected by the 545 patent.

53. Under 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct. Executed in Ann Harbor, Michigan on April 25, 2003.

David Yinkai Chao