**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.: 09-61515-CIV-COOKE
MAGISTRATE JUDGE BANDSTRA**

ASPEX EYEWEAR, INC. AND
CONTOUR OPTIK, INC.

      Plaintiffs,

vs.

HARDY LIFE, LLC., MARCHON
EYEWEAR, INC., NIKE, INC.,
REVOLUTION EYEWEAR, INC.,
AND GARY MARTIN ZELMAN,
AN INDIVIDUAL,

      Defendants.

---

**MEMORANDUM OF LAW OF DEFENDANT REVOLUTION
EYEWEAR, INC. IN OPPOSITION TO PLAINTIFFS' MOTION
FOR PARTIAL SUMMARY JUDGMENT**

**I.  INTRODUCTION**

Plaintiffs' Motion for Partial Summary Judgment is completely lacking in merit and astonishingly lacking in candor.  Plaintiffs fail to tell the Court that they previously sued Revolution on the same '545 patent and the same products -- Revolution's bottom-mounting auxiliary "clip-on" frames – resulting in a final judgment (the "California Action").  Plaintiffs' counts II and V are therefore barred as a matter of law based on *res judicata/*claim preclusion. Plaintiffs fail to tell this Court that the court in the California Action ("California Court") construed the '545 patent and specific claim terms in such a way that Revolution's auxiliary frames cannot be deemed to infringe as a matter of law.  Plaintiffs' claims thus also fail based on issue preclusion.  Plaintiffs fail to tell this Court that the California Court granted summary judgment of non-infringement in favor of Revolution on two claims of the '545 patent based on its construction of claim terms relating to the auxiliary frame.  They fail to tell this Court that the California Court's claim construction and summary judgment rulings were upheld on appeal and that the Federal Circuit agreed with the California Court that the invention of the '545 patent is limited to top-mounting auxiliary frames.

These undisputed facts regarding the California Action alone mandate denial of plaintiffs' Motion, granting Defendants' motion for summary judgment, and awarding sanctions for

plaintiffs' remarkable lack of candor and their filing of baseless claims.

Plaintiffs' Motion must also be denied based on an independent claim construction and the undisputed facts regarding the accused auxiliary frames. The California Court described the relevant facts concerning claim construction of the '545 patent as follows: "the invention described is clearly for a top-mounting design: the written description only describes a top-mounting design, the drawings only show a top-mounting configuration and nothing in the prosecution history shows that the inventor envisioned anything other than a top-mounting design." (DE 112-4 p. 32 of 40.)  It is established law that the claims of a patent do not "enlarge what is patented beyond what the inventor described as the invention." *Netword LLC v. Centraal Corp.*, 242 F.3d 1347, 1349 (Fed. Cir. 2001). The inventor here described his invention as <u>requiring</u> top-mounting auxiliary frames. Only this configuration allows arms on the auxiliary frame "for extending over and for engaging with the upper portion of the primary spectacle frame" and magnets on the auxiliary frame "extended downward toward … the primary spectacle frame." ('545 patent Col. 1:55-58; Col. 2:5-7.)  Indeed, the inventor never even thought of bottom-mounting auxiliary frames until he saw Revolution's frames many years after he applied for and received a patent.

Accordingly, claim 23 must be construed to require a *downwardly facing* surface on the auxiliary frame magnets, arms that extend *across the top* of the primary frame, and vertical engagement of the auxiliary frames *from the top* of the primary frames. Any contrary constructions would render claims 23 and 35 invalid for failure to meet the written description requirement of 35 U.S.C. § 112(1), and would be contrary to the binding claim constructions in the California Action. It is undisputed that Revolution's auxiliary frames are <u>bottom-mounting</u>, **not** top-mounting; undisputed that the arms do **not** secure a magnetic member having a downwardly facing surface; undisputed that the arms are made to extend <u>underneath</u>, **not** across the top of, side portions of the primary frame; and undisputed that magnetic members of the auxiliary frame engage the magnetic members of the primary frame <u>from the bottom</u>, **not** from the top. (UMF Nos. 26 - 28).[1]

---

[1]  "UMF No. __" refers the undisputed material facts set forth in Defendants' Statement of Undisputed Material Facts (DE 113).



*Revolution Auxiliary Frame Showing Upwardly Facing (Silver) Magnet Surface*



*Revolution Auxiliary Frame Showing (Red) Epoxy Covering Bottom of Arm*



*Revolution Auxiliary Frame Mounted to Revolution Primary Frame From the Bottom*

Faced with these undisputed facts, proven by a simple visual inspection of the products, plaintiffs attempt to alter reality.  They argue that non-magnetic, non-metallic epoxy on the bottom of the arm is the surface of a magnetic member, that the auxiliary frames are "suitable for" top-mounting even though they are badly misaligned and readily fall off, and that they can establish infringement by misusing the products sold by Revolution on a primary frame that is not commercially sold and admittedly was created for the sole purpose of this litigation.  Even then, the auxiliary frames are not stably supported on the bogus primary frame and are easily disengaged, contrary to the requirements of the '545 patent.

Thus, the undisputed facts establish that Defendants are entitled to summary judgment based on claim preclusion, issue preclusion and non-infringement.  Disputed facts under plaintiffs' legally incorrect claim construction also require denial of plaintiffs' Motion.

## II.  UNDISPUTED AND DISPUTED FACTS

The undisputed facts established in Defendants' Motion for Summary Judgment (DE 111) and Statement of Undisputed Material Facts (DE 113) and supporting evidence are incorporated herein by reference.  Many of these facts are addressed below in conjunction with the corresponding legal analysis.  Disputed facts, which provide an additional basis for denial of plaintiffs' Motion, are set forth in the Response to Plaintiffs' Statement of Material Facts filed herewith, and further addressed below.

## III.  PLAINTIFFS' CLAIMS ARE BARRED BASED ON RES JUDICATA/CLAIM PRECLUSION

### A.    This Case Involves the Same Parties and the Same Claim as the California Action

Plaintiffs' claims are barred under the doctrines of claim preclusion and issue preclusion based on the rulings and judgment in a prior case involving the same parties and the same patent,

*Revolution Eyewear, Inc. v. Aspex Eyewear, Inc.*, Central District of California Case No. CV 02-1087 ("California Action").  (UMF Nos. 2-6, 11-23.)  Claim preclusion applies because the accused products in this action – Revolution's auxiliary frames -- are legally the same as the accused products in the California Action.  See *Roche Palo Alto LLC v. Apotex, Inc.*, 531 F.3d 1372, 1379-80 (Fed. Cir. 2008) (upholding summary judgment of claim preclusion).

The doctrine of *res judicata*, or claim preclusion, bars the filing of claims which were raised or could have been raised in an earlier proceeding.  *Ragsdale v. Rubbermaid, Inc.*, 193 F.3d 1235, 1238 (11th Cir. 1999).  "A claim will be barred by prior litigation if the four following elements are present: (1) there is a final judgment on the merits; (2) the decision was rendered by a court of competent jurisdiction; (3) the parties, or those in privity with them, are identical in both suits; and (4) the same cause of action is involved in both cases." *Id*.  Each of those elements is present here:  (1) a final judgment; (2) by a competent court; (3) involving the same parties and/or their privies; and (4) on the same cause of action.  (UMF Nos. 21, 39.)

Under the rule against "claim-splitting," a party cannot avoid the effects of res judicata by splitting a cause of action into separate grounds of recovery and then raising the separate grounds in successive lawsuits.  See *Mars Inc. v. Nippon Conlux Kabushiki-Kaisha*, 58 F.3d 616, 619 (Fed. Cir. 1995).[2]  Nor can plaintiffs avoid the preclusion of res judicata by contending that reexamined claims 23 and 35 are "new claims."  This argument was soundly rejected in *Hoffman v. Wisner Classic Manufacturing Co.*, 927 F.Supp. 67, 73 (E.D.N.Y. 1996):

> [C]laims added or amended in a reexamination proceeding will necessarily be narrower because [35 U.S.C.] section 305 bars claims that enlarge the scope of original claims. Therefore, no device can infringe the narrower claims emerging from reexamination that would not have infringed the original claims as well. *See In re Freeman*, 30 F.3d 1459, 1464 (Fed. Cir. 1994). Because the '860 patent's claims were narrowed by the addition of claims 4-7, and because it has already been concluded that any prior action for infringement of the original patent has been adjudicated in favor of the defendant, Wisner cannot now be deemed guilty of infringing upon this new, narrower patent.

Similarly here, amended claim 23 and dependent claim 35 are no broader than claim 23

---

[2]  Asserting different claims of the same patent against the same products does not constitute a separate cause of action and is barred under the rule.  "It is … of no moment that [plaintiff] now accuses Defendants of infringement of [a different claim from the same patent], for the 'nucleus of facts' is identical in both suits."  *Hemphill v. Kimberly-Clark Corp.*, 530 F. Supp. 2d 108, 111 (D.D.C. 2008), aff'd 335 Fed. Appx. 964, 965 (Fed. Cir. 2008) ("In other words, it is required that a patentee sue an alleged infringer for infringement of all pertinent claims of her patent at one time regarding the same products, rather than attempting to litigate each claim separately.")

as it existed before the amendment.  Therefore, Revolution's auxiliary frames cannot infringe the claims emerging from reexamination unless they would have infringed original claim 23. Because it was already concluded in the California Action that Revolution's bottom-mounting auxiliary frames did not infringe the '545 patent, those frames cannot now be deemed to infringe these no-broader claims.  In other words, plaintiffs <u>could have asserted</u> the earlier, equivalent or broader version of claim 23 in the California Action, so their present cause of action for infringing the amended claim is barred under the doctrine of res judicata.  *Id.*

**B.      Plaintiffs' Cause Of Action For Infringement Of Claim 23 Is Also Barred Because It Was A Compulsory Counterclaim In The California Action**

Under Federal Circuit law, an action for a declaratory judgment of non-infringement of a patent makes any counterclaim for infringement of that patent compulsory.  *Polymer Indus. Products Co. v. Bridgestone/Firestone, Inc.*, 347 F.3d 935, 938 (Fed. Cir. 2003).  Compulsory counterclaims must include every claim of the patent at issue that the counterclaimant contends is infringed.  *Civix-DDI, LLC v. Expedia, Inc.*, 2005 U.S. Dist. LEXIS 9493 at *8-9 (N.D. Ill. May 2, 2005), citing *Polymer Indus.*, 347 F.3d at 938.  A party that does not raise an infringement claim as a compulsory counterclaim is "forever barred from asserting that claim in future litigation."  *Id.*

In the California Action, plaintiffs filed a counterclaim for infringement of multiple claims of the '545 patent, which it later specified as only claims 6, 22 and 34.  (UMF No. 2.)  In response, Revolution filed its own counterclaim alleging that it did not infringe <u>any</u> valid claim of the '545 patent.  (UMF No. 3.)  Under the law cited above, plaintiffs were required to file a counterclaim for infringement of any and all claims of the '545 patent they believed were infringed, but failed to do so with respect to claim 23.  (*Id.*)  Similarly, plaintiffs were required to claim infringement of the '545 patent with respect to any products then sold by Revolution. *Polymer Indus.*, 347 F.3d at 937-38.  However, plaintiffs never asserted that Revolution's auxiliary frames <u>alone</u> infringed the '545 patent.  (UMF No. 33.)  Plaintiffs are thus barred under Rule 13(a) from asserting claim 23 of the '545 patent in this case and barred from asserting that Revolution's auxiliary frames infringe any claim of the '545 patent, because they failed to assert these as compulsory counterclaims in the California Action.

**C.      The Accused Products Are Essentially The Same As The Accused Auxiliary Frames Device In The California Action**

Whether two claims for infringement constitute the "same claim" is an issue particular to patent law and thus Federal Circuit law applies.  *Roche*, 531 F.3d at 1379; *Acumed LLC v.*

*Stryker Corp.*, 525 F.3d 1319, 1323 (Fed. Cir. 2008); *Hallco Mfg. Co. v. Foster*, 256 F.3d 1290, 1294 (Fed. Cir. 2001).  Under the law of the Federal Circuit, an infringement claim in a second suit is the "same claim" as in an earlier infringement suit if the accused products in the two suits are "essentially the same."  *Roche*, 531 F.3d at 1379; *Foster v. Hallco Mfg. Co.*, 947 F.2d 469, 479-80 (Fed. Cir. 1991).  Accused products "are 'essentially the same' where the differences between them are merely 'colorable' or 'unrelated to the limitations in the claim of the patent.'" *Roche*, 531 F.3d at 1379; *Acumed*, 525 F.3d at 1324; *Foster*, 947 F.2d at 480.

In *Roche*, the defendant seeking to avoid the application of res judicata established a number of minor differences between the accused drug formulation in the second action (ANDA-2 formulation) and the accused drug formulation in the first action (ANDA-1).  The district court nevertheless granted the plaintiff's motion for summary judgment, finding that the two formulations were essentially the same because the differences were unrelated to the claims of the patent.  The Federal Circuit agreed and affirmed the district court's summary judgment that the defendants' counterclaims were barred by claim preclusion.  *Roche*, 531 F.3d at 1379.

Similarly here, the accused auxiliary frames in the California Action and the Accused Products in this case are "essentially the same" because any alleged differences among the products are unrelated to the claims of the patent being asserted.  Plaintiffs argue that there are slight differences in the size of the magnets and arms – without any changes to their orientation - - of the various models of Revolution's accused auxiliary frames.[3]  Thus, these slight differences are not new – they have existed all along among the various models accused in the California Action and in this action.  (UMF No. 29.)  Further, the question is not whether the Accused Products are identical to the previously accused products, but rather whether they are essentially the same in relation to the claims at issue.  *Roche*, 531 F.3d at 1379.  As admitted by plaintiffs, patent claims 23 and 35 have no limitations regarding the size of the magnets or the arms.  (See *Id.* at 1379-80; UMF Nos. 30-31.)  In other words, the accused auxiliary frames in the California Action and the Accused Products in this case are identical with respect to the limitations in claims 23 and 35.  (UMF No. 30.)[4]

---

[3]  The "Accused Products" are the auxiliary frames of 41 models sold by Revolution, which are identified in Plaintiffs' second supplemental response to Interrogatory No. 1.  (DE 111, Ex. B, pp. 3-4.)

[4]  Indeed, plaintiffs concede that the accused auxiliary frames in the California Action and the Accused Products in this case are "essentially the same" under the Federal Circuit standard by contending that both sets of products meet all the limitations of claim 23, regardless of any

Thus, none of these differences give rise to a claim that plaintiffs did not previously have in the California Action. Plaintiffs <u>could have asserted</u> patent claim 23 in the California Action regardless of any such variability in arm or magnet size. Thus, plaintiffs' claims for infringement of claims 23 and 35 in this case are barred based on the final judgment in the California Action and the doctrine of claim preclusion. *Roche*, 531 F.3d at 1379-80.

### IV.   THE ACCUSED PRODUCTS DO NOT CONTAIN KEY ELEMENTS OF THE ASSERTED CLAIMS AS A MATTER OF LAW

**A.   The Claim Construction In The California Action Is Binding On Plaintiffs**

A patent infringement analysis requires two steps. The first step, the interpretation of the claims of the patent, is a matter of law exclusively for the Court to determine. *Markman v.Westview Inst. Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (*en banc*), aff'd, 517 U.S. 370 (1996). In the present case, the California Court's claim construction is binding and should be followed by this Court. The second step, comparing the construed claims of a patent to the accused device, is an issue of fact. *See Id.* at 976. There are no genuinely disputed material issues here with respect to non-infringement.

The California Court made the following claim construction rulings: (1) "the invention disclosed in the '545 patent is limited to a top-mounting design" (UMF No. 6); (2) "magnetic members … having a horizontal surface" in the auxiliary frame means "having a downwardly facing surface that lies in a plane substantially perpendicular to the plane of the lenses of the auxiliary spectacle frame" (UMF No. 11); (3) "said arms [of the auxiliary frame] extending across a respective extension [of the primary frame]" means that "at least some portion of each arm <u>reaches across the top</u> of the corresponding extension" (UMF No. 13). Plaintiffs did not challenge these claim construction rulings on appeal. (UMF No. 22; *Revolution Eyewear, Inc. v. Aspex Eyewear, Inc.*, 563 F.3d 1358, 1365 (Fed. Cir. 2009).) [5]

Based on the doctrine of issue preclusion and fundamental claim construction law, the identical and nearly identical language of claim 23 must be construed consistently to require that the arms and <u>downwardly</u> facing magnetic members of the auxiliary frame are adapted to reach <u>across the top</u> of the corresponding extension of the primary frame. *Del Mar Avionics, Inc. v. Quinton Instrument Co.*, 836 F.2d 1320, 1323 ("The prior determination of certain issues,

---

alleged differences in the size or angle of the auxiliary frame arms. (Compare claim 23 of '545 patent with DE 112-9 (Aspex Depo.) pp. 6-11, 58.)

[5] Plaintiffs even admit that they are bound by the California court's claim construction. (UMF No. 22.)

including the issues of claim construction and of infringement … bars judicial redetermination of those issues as between the parties to the prior actions.")  Unless the patent otherwise provides, a claim term cannot be given a different meaning in the various claims of the same patent.  See, e.g., *Georgia-Pacific Corp. v. U.S. Gypsum Co.*, 195 F.3d 1322, 1331 (Fed. Cir. 1999).  Thus, the corresponding limitations of claim 23 should be construed as set forth in section IV.E. below.

**B.     The Claims Must Be Construed In Light of the Specification to Require Top Mounting**

The California Court's constructions are fully supported, indeed mandated, by the Federal Circuit's claim construction methodology.  See *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005).  The *Phillips* court held:  "the specification 'is always highly relevant to the claim construction analysis.  Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'"  *Id.* at 1315 (citations omitted).  The *Phillips* court noted that the importance of the specification derives from the statutory requirement that the specification describe the invention in "full, clear, concise, and exact terms."  *Id.* at 1316, quoting 35 U.S.C. § 112(1).

This has become known as the written description requirement, under which the written description must "clearly allow persons of ordinary skill in the art to recognize that [the inventor] invented what is claimed."  *Ariad Pharmaceuticals, Inc. v. Eli Lilly and Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010), quoting *Vas-Cath Inc. v. Mahurkar*, 935 F.2d 1555, 1563 (Fed. Cir. 1991); *In re Gosteli*, 872 F.2d 1008, 1012 (Fed. Cir. 1989).  In other words, the test for sufficiency is whether the disclosure reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date.  *Ariad*, 598 F.3d at 1351; *Ralston Purina Co. v. Far-Mar-Co, Inc.*, 772 F.2d 1570, 1575 (Fed. Cir. 1985); see also *In re Kaslow*, 707 F.2d 1366, 1375 (Fed. Cir. 1983).

Furthermore, the Federal Circuit has repeatedly recognized that it is more than appropriate to construe claims with limitations found in the specification when the specification requires the limitations or assigns significance to those limitations.  *Bell Atlantic Network Servs., Inc. v. Covad Communs. Group, Inc.*, 262 F.3d 1258, 1271 (Fed. Cir. 2001) (finding a claim term defined by "implication" where the specification used the term consistently throughout)[6]; *Kraft*

---

[6]  This case is closely comparable to *Bell Atlantic*.  The district court construed the term "mode" to be limited to the modes described in the written description, and the Federal Circuit affirmed. 262 F.3d at 1271.  The Federal Circuit rejected the contention that this construction improperly imported a limitation from the specification into the claims.  *Id.* at 1270.  The court noted that the Summary of the Invention, the Detailed Description of the Preferred Embodiments, and every

*Foods Inc. v. Int'l Trading Co.*, 203 F.3d 1362, 1367-69 (Fed. Cir. 2000) (finding that the claim term "protecting back panel" was limited to a "relatively stiff" panel because the specification described the back panel as being "constructed of a relatively stiff material"); *Toro Co. v. White Consol. Indus.*, 199 F.3d 1295, 1300-02 (Fed. Cir. 1999) (construing the claim term "including" to mean "permanently attached" because the patent's drawings and the specification established that the claimed vacuum/blower's flow restriction ring was attached to the invention's air inlet cover); *Wang Labs., Inc. v. America Online, Inc.*, 197 F.3d 1377, 1382-83 (Fed. Cir. 1999) (noting that the claims were limited to a character-based protocol because of the express teachings of such a protocol in both the patent's specification and the drawings.) [7]

1.    The Written Description – Background of the Invention

Here, the '545 patent specification acknowledges two prior art patents that disclosed the use of magnets to attach an auxiliary frame and/or lens to a primary spectacle frame, U.S. Pat. No. 4,070,103 to Meeker and U.S. Pat. No. 5,416,537 to Sadler.  ('545 patent Col. 1:14-25.) Meeker and Sadler disclose what is sometimes referred to in the art as "front-mounting" clip-ons, where the magnets are on the *front* of the primary frame.  (Sodano Report ¶¶ 12-13.)[8]

The '545 patent specification explains that the front-mounting magnetic auxiliary frames in the prior art "have no supporting members for preventing the auxiliary lenses from moving downward relative to the frames such that the auxiliary lenses may easily move downward relative to the frames and may be easily disengaged from the frames when the users conduct jogging or jumping exercises.…   The present invention has arisen to mitigate and/or obviate the afore-described disadvantages of the conventional spectacle frames."  (Col. 1:27-40.)

2.    The Written Description – Summary and Description of the Invention

The '545 patent then includes a summary of the invention, which starts as follows:  "The primary objective of the present invention is to provide auxiliary lenses which may be stably secured and supported on the frames."  The summary goes on to explain how the auxiliary frames are stably secured and supported on the primary frames:

the auxiliary spectacle frame including two side portions each having an arm

---

other reference to the term "mode" in the written description supported the district court's construction.  *Id.* at 1270-73.

[7]  Plaintiff's reliance on *Electro Med. Sys., S.A. v. Cooper Life Sciences, Inc.*, 34 F.3d 1048, 1054 (Fed. Cir. 1994) (MSJ p. 7) is misplaced.  Unlike here, no significance was attached to the disputed claim term in the specification.

[8]  The Expert Report of Joel Sodano is filed herewith.

extended therefrom for extending over and for engaging with the upper portion of the primary spectacle frame, and a pair of second magnetic members secured to the arms respectively for engaging with the first magnetic members of the primary spectacle frame so as to secure the auxiliary spectacle frame to the primary spectacle frame. The arms are engaged with and supported on the upper portion of the primary spectacle frame so as to allow the auxiliary spectacle frame to be stably supported on the primary spectacle frame and so as to prevent the auxiliary spectacle frame from moving downward relative to and so as to prevent the auxiliary spectacle frame from being disengaged from the primary spectacle frame.

… the second magnetic members are extended downward toward the projections for hooking on the primary spectacle frame.  (Col. 1:56 –2:7.)

This means that the auxiliary frames of the invention of the '545 patent are "top-mounting", i.e., the auxiliary frames mount on top of the primary frames.  As described in the portion of the '545 patent quoted above, the end pieces or "arms" of the auxiliary frame extend over and rest on end pieces of the primary frame.  The end pieces of the auxiliary frame house magnets.  The bottom surface of those magnets attach or engage with the top surface of magnets on the end pieces of the primary frame.  In the prior art front-mounting clip-ons described in the '545 patent, only the magnetic attraction between the auxiliary frame magnets and the primary frame magnets held the clip-on in place.  In the '545 patent, the end piece of the auxiliary frame rests on top of the end piece of the primary frame to prevent the clip-on from slipping downwards.  (Sodano Report ¶ 16.)

The '545 patent then includes a brief description of the drawings and a detailed description of the preferred embodiment.  Below are the figures and the relevant portions of the written description that refer to the drawings.



FIG. 1 and FIG. 3 are front and top views of a "primary" spectacle frame in accordance with the present invention.

Referring to the drawings, and initially to FIGS. 1 to 4, an eyeglass device in accordance with the present invention comprises a primary spectacle frame 10 for supporting primary lenses therein.  The primary spectacle frame 10 includes two side portions each having an extension 11 extended rearward therefrom for pivotally coupling leg 12

thereto. The primary spectacle frame 10 includes two projections 13 secured to the rear and side portions thereof for supporting magnetic members 14 therein.  (Col. 2:30-38.)



FIG. 2 and FIG. 4 are front and top views of an auxiliary frame in accordance with the present invention



FIG. 5 and FIG. 6 are front and top views of the spectacle frame and the auxiliary lenses combination;

"An auxiliary spectacle frame 20 is provided for supporting the auxiliary lenses therein and includes two side portions each having an arm 21 extended rearward therefrom for extending over and for engaging with the upper portion of the primary spectacle frame 10 (FIGS. 5 and 6). The auxiliary spectacle frame 20 also includes two magnetic members 22 secured to the arms 21 therefor for engaging with the magnetic members 14 of the primary spectacle frame 10 such that the auxiliary spectacle frame 20 may be stably supported on the primary spectacle frame 10, best shown in FIGS. 5 and 6.

It is to be noted that the arms 21 are engaged with and are supported on the upper portion of the primary spectacle frame 10 such that the auxiliary spectacle frame 20 may be stably supported and secured to the primary spectacle frame 10. The auxiliary spectacle frame 20 will not move downward relative to the primary spectacle frame and will not be easily disengaged from the primary spectacle frame when the users conduct jogging or jumping exercises."  (Col. 2:38-55.)

"As shown in FIGS. 3-7, the engaging surfaces between magnetic members 14 in primary spectacle frame 10 and the magnetic members 22 in the auxiliary spectacle frame 20 lie in a plane that is substantially horizontal when the eyeglass device is worn."  (Col. 2:64-68.)



# F I G. 7

FIG. 7 is a cross sectional view taken along lines 7--7 of FIG. 6

"Referring next to FIG. 7, it is preferable that the projections 13 and the magnetic members 14 are located slightly lower than the upper portion of the primary spectacle frame 10; and the end portions of the arms 21 and/or the magnetic members 22 are slightly extended downward toward the projections 13 such that the arms 21 and the magnetic members 22 may hook on the primary spectacle frame 10 and such that the auxiliary spectacle frame 20 may further be stably supported and secured to the primary spectacle frame 10.

In one embodiment, as shown in FIG. 7, magnetic members 14 and 22 are not in contact with each other; magnetic members 14 and 22 are engaged with, but not supported on, each other. Instead, the arm 21 securing the magnetic member 22 is supported on an upper side portion of the primary spectacle frame 10. As shown in FIG. 7, the upper side portion can be an upper part of the side portion securing the projection 13."  (Col. 3:1-17.)

The specification sums up the "present invention" as follows:

"Accordingly, the eyeglass device in accordance with the present invention includes an auxiliary spectacle frame that may be stably secured to the primary spectacle frame and will not move downward relative to the primary spectacle frame and will not be easily disengaged from the primary spectacle frame when the users conduct jogging or jumping exercises."  (Col. 3:18-26.)

Thus, the "present invention" is consistently described as top-mounting, and all aspects of the invention require a top-mounting auxiliary frame to achieve the "primary objective" of the invention: "to provide auxiliary lenses which may be stably secured and supported on the frames."  The invention requires that the end pieces of the auxiliary frame extend over and rest on end pieces of the primary frame to support the auxiliary frame and prevent downward movement of the auxiliary frame.  The only way to achieve this is with a top-mounted design. (Sodano Report ¶ 19.)  Further, the hooking function described at col. 2, lines 3-10 and col. 3, lines 1-10 requires top-mounting, the end-pieces of the auxiliary frame must extend over the end pieces of the primary frame and the magnet or housing must extend downwards towards the primary frame.  The hooking function would not work in any configuration other than top-mounting.  For example, if the auxiliary frames were bottom-mounting, they would simply fall downward if the magnets became disengaged, and the "hook" would offer no further securing of the auxiliary spectacle frame to the primary spectacle frame.  (Sodano Report ¶ 19.)  Further, the gap between the magnets described at col. 3, lines 11-17, require top mounting:  "In one embodiment, as shown in FIG. 7, magnetic members 14 and 22 are not in contact with each other …. Instead, the arm 21 securing the magnetic member 22 is supported on an upper side portion

of the primary spectacle frame 10." If one were to attempt to achieve this in a bottom-mounting configuration, there would be nothing but magnetic attraction to prevent the downward movement of the auxiliary frames, just as in the prior art, and the magnetic attraction would be weakened because of the gap and be more susceptible to the force of gravity. (Sodano Report ¶ 19.)

In sum, the '545 patent only teaches a top-mounted configuration to achieve the objectives of the invention – supporting the auxiliary frame and preventing downward movement of the auxiliary frame during activity. The only structure in the patent that provides support and resistance to downward movement, other than the magnets disclosed in the prior art, is the end pieces of the auxiliary frame extended over the top of the primary frame. The '545 patent does not teach a bottom-mounting or any other configuration which achieves the stated objectives. (Sodano Report ¶ 20.)

**C.     The Scope of the Claims May Not Exceed the Description of the Invention**

The Federal Circuit, *en banc*, recently reconfirmed the importance of the written description in curtailing claims that are broader than the written description of the invention. *Ariad*, 598 F.3d at 1352 (Fed. Cir. 2010) ("requiring a written description of the invention plays a vital role in curtailing claims … that have not been invented, and thus cannot be described.") Here, it is undisputed that the inventor of the '545 patent, Richard Chao, did not invent bottom mounting auxiliary frames. He testified that his invention was for a top-mounting auxiliary frame, and that he never even thought of a bottom-mounting auxiliary frame until he saw Revolution's bottom-mounting auxiliary frame many years later. (UMF No. 10.) Because he did not invent bottom-mounting auxiliary frames, it is not surprising that the written description of the '545 patent does not describe or even hint at bottom-mounting auxiliary frames.

*Ariad* reconfirmed that, under these circumstances, the claims of the '545 patent <u>cannot</u> be construed to cover a bottom mounting auxiliary frame. See *Ariad*, 598 F.3d at 1358 citing *LizardTech, Inc. v. Earth Res. Mapping, Inc*., 424 F.3d 1336, 1345 (Fed. Cir. 2005) (holding that "[a]fter reading the patent, a person of skill in the art would **not** understand" the patentee to have invented a generic method where the patent only disclosed one embodiment of it); *Reiffin v. Microsoft Corp.,* 214 F.3d 1342, 1345-46 (Fed. Cir. 2000) (noting that the "scope of the right to exclude" must **not** "overreach the scope of the inventor's contribution to the field of art as described in the patent specification"); *Carnegie Mellon Univ. v. Hoffmann-La Roche Inc*., 541 F.3d 1115, 1126 (Fed. Cir. 2008) (holding that the narrow description of a gene from a particular

bacteria did **not** adequately support a broad claim to the gene from any bacterial source); *see also Neteword*, 242 F.3d at 1349 (Fed. Cir. 2001) (the claims of a patent do **not** "enlarge what is patented beyond what the inventor described as the invention").  Thus, while the Federal Circuit has cautioned against reading limitations from the specification into the claims, it has consistently upheld the rule that the claims must be construed in light of the specification and cannot be broader than what the written description describes as the invention.

Here, it is beyond dispute that the written description does **not** describe bottom-mounting auxiliary frames.  In fact, the written description teaches away from bottom-mounting auxiliary frames because they lack the very feature that distinguished the invention from the prior art, i.e., an arm supporting the auxiliary frame and preventing the auxiliary frames from moving downward relative to the primary frames.  (See Col. 1:27-31; Col. 1:55 –2:2; Col. 2:49-56.)  This is only accomplished in a top-mounting configuration.  An arm extending underneath the primary frame would simply fall down if the magnets disengage, just as the '545 patent described the prior art.  (Sodano Report ¶¶ 19-20.)

## D.      "Adapted To" Does Not Mean "Suitable For"

Plaintiffs' construction of the term "adapted to" as "suitable for" is inconsistent with the plain meaning of the term, inconsistent with the written description and has been rejected by the courts.  (See MSJ pp. 13-14 and Turk-Moore Decl. Ex. 3 p. 10.)  In *Boston Sci. Corp. v. Cordis Corp.*, 2006 U.S. Dist. LEXIS 94329 (N.D. Cal. Dec. 20, 2006), the court rejected the exact argument presented by plaintiffs here.  As here, the patent used the term "capable of" in one of the patent claims and the term "adapted to" in another.  (*Id.* at *6; compare '545 patent claim 22 ("capable of engaging") with claim 23 ("adapted to extend across").)  The defendant nevertheless argued that "adapted to" should be construed as "suitable for."  The court first observed that "adapted to" necessarily meant something different than "capable of" based on the doctrine of claim differentiation.  *Id.* at *5-6.  The court then observed:

> [C]apable of is a broader term than "adapted to."
>      The definition asserted by Defendant Cordis, namely "suitable for" is similar to "capable of." That is, a device could be suitable for multiply folding upon itself, without being intentionally and specifically made in a way that would cause it to multiply fold.  Moreover, Defendant's proposed definition of "suitable for" does not follow from a plain dictionary definition of the word "adapt." Widely accepted dictionary definitions of "adapt" are "to make fit (as for a specific new use or situation)," (Merriam-Webster's Collegiate Dictionary 13 (10th ed. 1998)), and "to make suitable to a specific use or situation." American Heritage College Dictionary

15 (3d ed. 1993). No dictionary that Defendant has cited defines "adapt to" to mean "suitable for."

On the other hand, Plaintiffs' proposed definition of "configured to" embraces the concept of a device intentionally and specifically made to act in a certain way. A widely accepted dictionary definition of the word "configure" means "[t]o design, arrange, set up, or shape with a view to specific applications or uses." American Heritage Dictionary 386 (4th ed. 2000). The written description of the '498 patent supports the definition of "configured to" because it discloses embodiments in which specific types of materials and wire dimensions are used to make coils that act in certain ways.

*Id.* at *6-7. The court thus construed "adapted to" to mean "configured to." *Id.* at *7; see also *Agilent Techs., Inc. v. Affymetrix, Inc*., 567 F.3d 1366, 1378 (Fed. Cir. 2009) (**rejecting** district court's claim construction that "a closed chamber . . . adapted to retain a quantity of fluid" means "an enclosed cavity … which is capable of being sealed or set apart from its surroundings to retain a quantity of fluid.")[9]; *Sta-Rite Indus., LLC v. ITT Corp*., 2010 U.S. Dist. LEXIS 10790 at *30-32 (E.D. Tex., Jan. 19, 2010) (construing "adapted to" as "designed or configured to" and rejecting construction as "having the capacity to").[10]

Here, the written description describes that the arms are specifically "for extending over and for engaging with the upper portion of the primary spectacle frame."  (Col. 1:57-59; Col. 2:40-43.)  The figures also show that the arms are configured to extend across the top of the extensions of the primary frame.  Note that the lenses of the primary and auxiliary frame are aligned when the auxiliary frames are top-mounted as shown in Figs. 5 and 6, and would be misaligned if the same auxiliary frames were mounted so that the arms extended underneath the extensions on the primary frame.

Thus, the plain language, the specification and the applicable law all agree that "adapted to" does **not** mean merely "suitable for" and should be construed as "configured to."

**E.     Defendants' Claim Constructions**

For the foregoing reasons, the following terms of claim 23 should be construed as

---

[9]  The Federal Circuit instead construed the term to mean "an enclosed cavity defined by the inner surfaces of the first and second substrates, from which there is no egress of fluid."  Thus, "adapted to retain" did not mean merely "capable of retaining", it meant that the chamber was specifically configured to prevent the egress of fluid.  *Id.*

[10]  Plaintiffs purport to rely on the same Webster's definition quoted in the *Boston Scientific* case (MSJ p. 13), yet "suitable for" omits a substantial part of that definition:  "to *make* fit (*as for a* **_specific_** *or new use or situation*) *often by modification*"  (http://www.merriam-webster.com/dictionary/adapted (emphasis added).)

follows:

- "a magnetic member having a horizontal surface" means "a magnetic member having a downwardly facing surface". Because the magnetic members are "secured in the free ends of said arms" pursuant to claim 23, they are not the arms themselves.

- "said arms and said pair of magnetic members adapted to extend across respective side portions of a primary spectacle frame" means that the arms and magnetic members of the auxiliary frame are configured to extend <u>across the top</u> of the corresponding side portions or extensions of the primary frame.

- "said pair of magnetic members having a horizontal surface can *vertically engage* corresponding magnetic member surfaces on a primary spectacle frame" means that the magnetic members of the auxiliary frame having a downwardly facing surface can *engage from the top* upwardly facing magnetic member surfaces on a primary spectacle frame.

**F.      The Accused Products Do Not Infringe Under The Claim Construction Required By The California Court's Ruling**

| Claims 23 and 35 Language | Construction Required by Construction in California Action and Further Support | Why The Accused Products Do Not Infringe |
|---|---|---|
| "magnetic member having a horizontal surface" | A magnetic member having a downwardly facing surface. The magnetic member is not the arm itself.<br><br>Support<br><br>1. Claim construction in California Action;<br><br>2. Written description including figures of '545 patent requiring top-mounting; (See Sodano Report ¶¶ 30-32.)<br><br>3. Claim language that | The magnets on Revolution's auxiliary frames have an upwardly facing surface **not** a downwardly facing surface. (UMF No. 26.) The downwardly facing surfaces on the arm are the bottom of the arm itself covered by epoxy. (Trusso Decl. Ex. A (Zelman Depo.) p. 63.) Thus, since the magnetic members are not the arms themselves, the bottom surface of the arm and the epoxy adhered to the bottom of the arm are not "magnetic members having a downwardly facing surface". (Sodano Report, p. 19.) |

| | | |
|---|---|---|
| | the magnetic members are members "secured in the free ends of said arms" (and thus are not the arms themselves)<br><br>4. Plaintiffs' claim construction: "***arm*** means the portion of the auxiliary spectacle frame that <u>secures</u> one of the auxiliary frame magnetic members". (Turk Moore Decl. Ex. 3, p. 7) |  <br>*Revolution Auxiliary Frame Showing Upwardly Facing (Silver) Magnet Surface*   *Revolution Auxiliary Frame Showing (Red) Epoxy Covering Bottom of Arm* |
| "said arms and said pair of magnetic members adapted to extend across respective side portions of a primary spectacle frame" | said arms and said pair of magnetic members are configured to extend across the top of respective side portions or extensions of the primary spectacle frame<br><br><u>Support</u><br><br>1. Claim construction in California Action;<br><br>2. Written description including figures of '545 patent; (See Sodano Report ¶¶ 33-36.)<br><br>3. See section IV.D. above re "adapted to" vs. "suitable for" | The arms and magnetic members of Revolution's auxiliary frames are configured such that the entire arms extend <u>underneath</u> the respective side portions of the primary spectacle frame, and <u>no part</u> of the arms or magnetic members are configured to <u>extend across the top</u> of the primary spectacle frame. (Sodano Report, p. 20; UMF Nos. 27-28.)<br><br><br>*Revolution Product with Arms and Magnets of Auxiliary Frame Extending Underneath Side Portions of Primary Frame* |
| so that said pair of magnetic members having a horizontal surface can vertically engage corresponding magnetic member surfaces on a primary spectacle frame | so that said pair of magnetic members having a downwardly facing surface can *engage from the top* upwardly facing magnetic member surfaces on a primary spectacle frame. | The <u>upwardly facing</u> surfaces of the magnetic members of Revolution's auxiliary frames engage <u>from the bottom</u> the corresponding <u>downwardly facing</u> magnetic member surfaces on the primary spectacle frame. (UMF No. 28) The magnetic members of the auxiliary frame do **not** engage the magnetic members of the primary frame from the top. (Sodano |

| | Support | Report, p. 21.) |
|---|---|---|
| | 1. Claim construction in California Action that invention is limited to top-mounting design;<br><br>2. Written description including figures of '545 patent. (See Sodano Report ¶¶ 36-38.) | 

*Auxiliary Frame*     *Bottom of Primary Frame*

*Revolution Frames Showing The Magnets of the Auxiliary Frame Engaging the <u>Bottom</u> of the Primary Frame.* [11] |

To literally infringe a claim, every limitation recited in the claim must read exactly on the accused device. *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1330 (Fed. Cir. 2001). The third column in the table shows that at least three limitations of claim 23 do not read on Revolution's Accused Products under the claim constructions binding on plaintiffs as a result of the California Court's claim constructions. The product and the pictures do not lie. The Accused Products do not infringe claim 23 and dependent claim 35 as a matter of law.

**G. Revolution's Auxiliary Frames Are Not Adapted To Extend Across Side Portions Of A Primary Frame**

Plaintiffs contend "that the Accused Products are adapted to engage the top of a primary

---

[11] Note that the surfaces of the endpiece on top of the primary frame are **not** "corresponding magnetic member surfaces". The '545 patent <u>requires</u> that the magnetic members in the primary frame be "secured in the projections" attached to the primary frame, and not embedded in the frame. (Col. 1:53-55; *Revolution Eyewear, Inc.*, 563 F.3d at 1368 ("We agree with the district court that, in pointing out the two deficiencies in the prior art, [inventor] <u>Chao disclaimed … a primary frame that has embedded magnetic members</u>").) In any event, the "corresponding magnetic member surfaces" are on the <u>bottom</u> of the primary frame, **not** the top.

spectacle frame" (MSJ p. 16), relying on a photograph of a Marchon auxiliary frame incorrectly mounted on top of a primary frame.  Plaintiffs fail to advise the Court that the primary frame in the photograph was not made or sold by Marchon, and that neither Marchon nor Revolution make such a primary frame.  Rather, the primary frame shown was made by plaintiff Aspex in a misguided attempt to argue that Defendants' auxiliary frames made for bottom-mounting – which even plaintiffs do not dispute –are suitable for top-mounting.  Plaintiffs are incorrect as a matter of fact and a matter of law.

As already determined by the court in the California Action, Revolution's bottom-mounting auxiliary frames are **not** "reasonably capable" of top-mounting.  *Aspex Eyewear, Inc. v. Revolution Eyewear, Inc*., 2001 U.S. Dist. LEXIS 25831, at *23-24, 26 (C.D. Cal. June 4, 2001.)  The California court based its conclusion on an analysis of the factors identified by the Federal Circuit in *High Tech Med. Instrumentation, Inc. v. New Image Indus.,* 49 F.3d 1551, 1555-56 (Fed. Cir. 1995) ("The question is not what [a device] might have been made to do, but what it was intended to do and did do.")  Application of those factors here confirms the conclusion of the California Court:

- The auxiliary frame of Revolution's magnetic clip-on eyewear are not made or configured or intended to mount and are not suitable for mounting to the top of Revolution's primary frame or any primary frame sold by anyone else.  (Zelman Decl. ¶ 4.)[12]

- Revolution has never anticipated or intended that the consumers of its magnetic clip-on eyewear would modify the auxiliary frame of Revolution's magnetic clip-on eyewear so that the auxiliary frame would be mounted on top of a primary frame, and is not aware of any instance where a consumer has made such a modification.  (*Id.* ¶ 5.)

- There is no evidence of a single instance where a consumer has worn Revolution's magnetic clip-on eyewear with the auxiliary frame mounted to the top of a primary frame.

---

[12]  Even with changes to the primary frames, Revolution's auxiliary frames are not "reasonably capable" of top-mounting.  First, the magnetic members of the auxiliary frame do not have a downwardly facing surface; rather, the downwardly facing surface of the auxiliary frame arms is epoxy.  Second, the accused auxiliary frames do not "engage" the magnetic surfaces of the specially made primary frames in the way "engagement" is described in the patent.  The attraction is weak, and the auxiliary frames detach easily.  The '545 patent specifically describes auxiliary frames which are stably supported on and will not be easily disengaged from the primary spectacle frame when the users conduct exercises.  (Sodano Report ¶ 55.)

(*Id.* ¶ 6.)[13]

- Revolution has not designed its magnetic clip-on eyewear so that the auxiliary frame can be altered or assembled to be mounted on top of Revolution's primary frame or any primary frame.  (Zelman Decl. ¶ 7.)

- Revolution's promotional and advertising materials have never shown Revolution's magnetic clip-on eyewear in a top-mounted configuration.  (Zelman Decl. ¶ 8.)

- If the auxiliary frames were mounted to the top they would serve no functional purpose in this modified configuration.  (Zelman Decl. ¶ 9.)

The California Court relied on several cases instructive here.  In *Telemac*, 247 F.3d at 1330, the Federal Circuit held that a mobile telephone system was not reasonably capable of infringing due to a restriction built into the software program stored in the telephone's memory, which prevented consumers from operating the system in an infringing manner.  Similarly here, there are several features on Revolution's auxiliary frames which prevent consumers from top-mounting, including the rounded epoxy coating, which prevents a stable and secure engagement, and the placement of the arms, which causes misalignment of the lenses when one attempts to mount the auxiliary frames on top (Sodano Report ¶ 55; Trusso Decl. ¶ 4.).  In *Stryker Corp. v. Davol, Inc.,* 10 F. Supp. 2d 841, 844-45 (W.D. Mich. 1998), the court found that a surgical device was not infringing where it could perform as required by the patent claims only if attached to a probe that was **not** commercially available.  Thus, plaintiffs cannot establish infringement by attempting to attach Revolution's auxiliary frames to Aspex' specially made primary frames that are not commercially available.  (See Trusso Decl. Ex. B (Zaro Depo.) pp. 38-39, 311-312, 331-332.)  This case is also analogous to *Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1310-11 (Fed. Cir. 2005), where even though the accused device itself was not modified, the Federal Circuit held that a third party's misuse of the accused device could not be used to meet a claim limitation.  Here, plaintiffs cannot establish infringement by misusing the accused auxiliary frames by attempting to mount them on top of a primary frame.

---

[13]  Aspex admitted in the first California case that he had never seen or heard of a user actually wearing Revolution's eyeglasses in a top-mounted configuration.  *Aspex*, 2001 U.S. Dist. LEXIS 25831 at *19.

## V.     CONCLUSION

The undisputed facts establish that Defendants are entitled to summary judgment based on claim preclusion, issue preclusion and non-infringement.  Disputed facts under plaintiffs' legally incorrect claim constructions also require denial of plaintiffs' Motion for partial summary judgment.

Respectfully submitted,

s/ Steven M. Hanle


Steven M. Hanle, Admitted Pro Hac Vice
shanle@sheppardmullin.com
Jennifer A. Trusso, Admitted Pro Hac Vice
jtrusso@sheppardmullin.com
Aaron M. Fennimore, Admitted Pro Hac Vice
afennimore@sheppardmullin.com
SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
650 Town Center Drive, 4th Floor
Costa Mesa, California  92626-1993
Telephone:     714.513.5100
Telecopy:      714.513.5130

and

s/ Janet T. Munn
Janet T. Munn
jmunn@rascoklock.com
Florida Bar No. 501281
Rasco, Klock, Reininger, Perez, Esquenazi, Vigil & Nieto, P.L.
283 Catalonia Avenue
Suite 200
Coral Gables, FL  33134
Telephone: 305.476.7100
Telecopy: 305.476.7102

*Attorneys for Defendants Revolution Eyewear, Inc., Hardy Way, LLC and Gary Martin Zelman*

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that on June 14, 2010, I electronically filed the foregoing with the Clerk of the Court using the CM/EFC system.  I also certify that the foregoing document is being served this day on all counsel of record identified on the attached Service List in the manner specified on the Notice of Electronic Filing generated by CM/ECF.

By: <u>s/ Janet T. Munn              </u>
　　Janet T. Munn

W02-WEST:3JAT1\402703661.1

## SERVICE LIST

*Attorney for Plaintiffs Aspex Eyewear, Inc., and Contour Optik, Inc.*
Jacqueline Becerra, Esquire
email: becerraj@gtlaw.com
Ericka Yolanda Turk, Esquire
email: turkmooree@gtlaw.com
**GREENBERG TRAURIG**
1221 Brickell Avenue
Miami, Florida 33131
Telephone: 305.379.0534
Telecopy: 305.579.0717

*Attorney for Plaintiffs Aspex Eyewear, Inc., and Contour Optik, Inc.*
Michael Nicodema, Esquire
email: nicodemam@gtlaw.com
Barry J. Schindler, Admitted Pro Hac Vice
email: schindlerb@gtlaw.com
MetLife Building
**GREENBERG TRAURIG**
200 Park Avenue
New York, New York 10166-1400
Telephone: 212.801.9200
Telecopy: 212.801.6400

Todd Schleifstein, Admitted Pro Hac Vice
**GREENBERG TRAURIG**
200 Park Avenue
Florham Park, NJ  07932
email: schleifsteint@gtlaw.com
Telephone: 973.360.7900
Telecopy: 973.301.8410

*Attorney for Defendants Marchon Eyewear, Inc., and Nike, Inc.*
W. Barry Blum, Esquire
email: bblum@gjb-law.com
Martin J. Keane, Esquire
email: mkeane@gjb-law.com
**GENOVESE JOBLOVE & BATTISTA, P.A.**
100 S.E. 2nd Street, Suite 4400
Miami, Florida 33131
Telephone: 305.349.2300
Telecopy: 305.349.2310

Scott W. Hansen, Admitted Pro Hac Vice
email: shansen@reinhartlaw.com
**REINHART BOERNER VAN DEUREN**
1000 N. Water Street
PO Box 2965
Milwaukee, WI  53201-2965
Telephone: 414.298.8123
Telecopy: 414.298.8097

*Attorney for Defendants Marchon Eyewear, Inc., and Nike, Inc.*
Edgar H. Haug, Admitted Pro Hac Vice
email: ehaug@flhlaw.com
Brian S. Goncalves, Admitted Pro Hac Vice
email: bgoncalves@flhlaw.com
David Herman, Admitted Pro Hac Vice
email: dherman@flhlaw.com
Porter F. Fleming, Admitted Pro Hac Vice
email: pfleming@flhlaw.com
**FROMMER LAWRENCE & HAUG LLP**
745 Fifth Ave.
New York, New York 10151
Telephone: 212.588.0800
Telecopy: 212.588.0500

Mark P. Walters, Admitted Pro Hac Vice
email: mwalters@flhlaw.com
**FROMMER LAWRENCE & HAUG LLP**
1191 2nd Avenue, Suite 2000
Seattle, WA  98101
Telephone: 206.336.5690
Telecopy: 212.588.0500

W02-WEST:3JAT1\402703661.1