EXHIBIT 3

PART 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 09-61515-CIV-COOKE
MAGISTRATE JUDGE BANDSTRA

ASPEX EYEWEAR, INC. AND
CONTOUR OPTIK, INC.

      Plaintiffs,

vs.

HARDY LIFE, LLC., MARCHON
EYEWEAR, INC., NIKE, INC.,
REVOLUTION EYEWEAR, INC.,
AND GARY MARTIN ZELMAN,
AN INDIVIDUAL,

      Defendants.

## EXPERT REPORT OF JOEL SODANO

## I.      INTRODUCTION

1.      I have been retained by Revolution Eyewear, Inc. ("Revolution") and Marchon Eyewear, Inc. ("Marchon") to provide expert testimony in the above-referenced lawsuit on behalf of all defendants.

2.      I submit my report pursuant to Fed. R. Civ. P. 26(a)(2)(B).  I have formed the opinions expressed in this report through my independent evaluation and analysis.  If called upon to testify in this case, I can competently testify to the matters addressed in this Expert Report, the attachments thereto, and the materials I relied upon in rendering my opinions.  I may also rebut any testimony, reports, or opinions proffered by Plaintiffs' witnesses (expert or otherwise).

**A.**      **Qualifications**

3.      I am currently self-employed as a consultant specializing in the optical and sunglass industry.  From 1990 to 2008, I was employed by what is now known as Luxottica Retail, which owns and operates a number of optical and sunglass chains including LensCrafters, Sunglass Hut, Pearle Vision, Sears Optical, and Target Optical.  Luxottica Retail's brands have

the largest market share in optical and sunglass retailing in North America.  Combined, the Luxottica chains generate $4.0B in annual revenue with 5,000+ stores and 35,000 associates. From 2005 to 2008, I was Senior Vice President, Frames Management, Product Development, and Planning.  My earlier positions included:  Vice President, Frames Management and Development, from December 1998 to January, 2007; Assoc. Vice President, Frames Management and Development, from January 1996 to December, 1998; Senior Director, Frame Buying, from September 1994 to January, 1996; and Director of Frame Buying, from January, 1991 to September, 1994.

4.      Among my responsibilities from at least 1996 to 2008 were all aspects of product development for the Luxottica Retail chains, which included reviewing and analyzing technical drawings and other product illustrations, reviewing and analyzing prototypes, suggesting modifications to product designs, conceiving product configurations and overseeing production of prototypes according to those configurations, and interfacing with manufacturing personnel to implement product designs.  In connection with my frame buying and frame management responsibilities I was also responsible for being thoroughly familiar with the range of both optical and sunglass products in the market.  As described in more detail below, this included "clip-on" products where sunglass clip-ons attach to an optical frame, and further included magnetic clip-on products, where the clip-ons attach magnetically.

5.      As part of my duties, I also became aware of certain patents in the optical field. In some instances, I was involved in negotiations to potentially obtain rights under patents and/or to acquire companies with certain patent rights.  In some instances, I worked with Luxottica's legal department to understand any limitations on Luxottica's ability to make and sell certain potential products.  For example, I became aware of a patent owned by Sunreeve relating to front-mounting magnetic clip-ons, a patent application by Pentax for top-mounting magnetic clip-ons, one or more of Contour's patents relating to top-mounting magnetic clip-on eyewear and a Revolution Eyewear patent relating to bottom-mounting magnetic clip-on eyewear.

-2-

6.      A copy of my curriculum vitae, which includes my employment history and education in more detail, is attached to this Expert Report as Exhibit A.

7.      I have not previously testified as an expert witness; and I have not authored any publications within the preceding ten years.

8.      My compensation for my work in this matter is $250 per hour and is not contingent upon the outcome of this litigation.

**B.      Materials Considered and Reviewed**

9.      In forming the opinions expressed in this Expert Report, I considered and reviewed a number of documents and things, which are identified in a list attached as Exhibit B to this Expert Report.

**C.      Person of Ordinary Skill in the Art**

10.     I have been asked to examine the issue of what the relevant field of art is for U.S. Patent No. RE37,545 ("the '545 patent") and the level of skill in the art at the time of the invention.  The field of art is, generally, clip-on eyewear that attaches to optical eyeglass frames as part of a matching set.

11.     Based upon my experience in the field and review of the documents and related things in this case, one of ordinary skill in the art in this field would be a person with five or more years working in product design and development in the field of eyewear, including clip-on eyewear.  I believe that I am a person of at least ordinary skill in the art, and have been so from the mid 1990s to the present.

## II.     THE '545 PATENT

**A.     Background**

12.     The '545 patent specification acknowledges two prior art patents that disclosed the use of magnets to attach an auxiliary frame and/or lens to a primary spectacle frame. Specifically, the '545 patent states that U.S. Pat. No. 4,070,103 to Meeker discloses a spectacle frame that includes magnetic material for facilitating attachment of a clip-on sunglass lens to the spectacle frame. The clip-on rim also includes a magnetic strip for engaging with the magnetic material of the spectacle frame.  ('545 patent col. 1, lines 14-20.)

13.     The '545 patent states that U.S. Pat. No. 5,416,537 to Sadler discloses another typical eyeglass frame that includes first magnetic members secured to the temporal portions of the frames and second magnetic members secured to the corresponding temporal portions auxiliary lenses.  Meeker and Sadler disclose what is sometimes referred to in the art as "front-mounting" clip-ons, where the magnets are on the *front* of the primary frame.  In the course of my duties at Luxottica, I became aware in the early 1990s of a magnetic clip-on design presented to me by Alain Mikli.  After reviewing the materials identified above, it appears this design may correspond to Japanese Patent No. 5-40493 to Sadanaga.  Also in the course of my duties at Luxottica, I became aware in the mid-1990s of front-mounting magnetic clip-on eyewear made by Sunreeve and known as Takumi.

14.     The '545 patent specification explains that the front-mounting magnetic auxiliary frames in the prior art "have no supporting members for preventing the auxiliary lenses from moving downward relative to the frames such that the auxiliary lenses may easily move downward relative to the frames and may be easily disengaged from the frames when the users conduct jogging or jumping exercises. ...  The present invention has arisen to mitigate and/or obviate the afore-described disadvantages of the conventional spectacle frames." (col. 1, lines 27-40.)

-4-

**B.     Description of the Invention**

15.     The '545 patent then includes a summary of the invention, which starts as follows: "The primary objective of the present invention is to provide auxiliary lenses which may be stably secured and supported on the frames." The summary goes on to explain how the auxiliary frames are stably secured and supported on the primary frames:

> the auxiliary spectacle frame including two side portions each having an arm extended therefrom for extending over and for engaging with the upper portion of the primary spectacle frame, and a pair of second magnetic members secured to the arms respectively for engaging with the first magnetic members of the primary spectacle frame so as to secure the auxiliary spectacle frame to the primary spectacle frame. The arms are engaged with and supported on the upper portion of the primary spectacle frame so as to allow the auxiliary spectacle frame to be stably supported on the primary spectacle frame and so as to prevent the auxiliary spectacle frame from moving downward relative to and so as to prevent the auxiliary spectacle frame from being disengaged from the primary spectacle frame.
>
> … the second magnetic members are extended downward toward the projections for hooking on the primary spectacle frame.  (col. 1, line 56 – col. 2, line 7.)

16.     I understand this to mean that the auxiliary frames of the invention of the '545 patent are "top-mounting", i.e., the auxiliary frames mount on top of the primary frames. "Top-mounted" or "top-mounting" is a term commonly used in the eyewear industry for this configuration and for many of the products sold by Aspex.[1] As described in the portion of the '545 patent quoted above, the end pieces or "arms" of the auxiliary frame extend over and rest on end pieces of the primary frame. The end pieces of the auxiliary frame house magnets. The bottom surface of those magnets attach or engage with the top surface of magnets on the end pieces of the primary frame. In the prior art front-mounting clip-ons described in the '545 patent, only the magnetic attraction between the auxiliary frame magnets and the primary frame magnets held the clip-on in place. In the '545 patent, the end piece of the auxiliary frame rests on top of the end piece of the primary frame to prevent the clip-on from slipping downwards.

---

[1]     From my experience in the industry and my review of Aspex products, most of Aspex' magnetic clip-on products appear to include a top-mounting auxiliary frame with a primary frame.

17.    The '545 patent then includes a brief description of the drawings and a detailed description of the preferred embodiment.  Below I include the figures and the relevant portions of the written description that refer to the drawings.



FIG. 1 and FIG. 3 are front and top views of a "primary" spectacle frame in accordance with the present invention.

"Referring to the drawings, and initially to FIGS. 1 to 4, an eyeglass device in accordance with the present invention comprises a primary spectacle frame 10 for supporting primary lenses therein.  The primary spectacle frame 10 includes two side portions each having an extension 11 extended rearward therefrom for pivotally coupling leg 12 thereto. The primary spectacle frame 10 includes two projections 13 secured to the rear and side portions thereof for supporting magnetic members 14 therein." (Col. 2, lines 30-38.)





FIG. 2 and FIG. 4 are front and top views of an auxiliary frame in accordance with the present invention



FIG. 5 and FIG. 6 are front and top views of the spectacle frame and the auxiliary lenses combination;

"An auxiliary spectacle frame 20 is provided for supporting the auxiliary lenses therein and includes two side portions each having an arm 21 extended rearward therefrom for extending over and for engaging with the upper portion of the primary spectacle frame 10 (FIGS. 5 and 6). The auxiliary spectacle frame 20 also includes two magnetic members 22 secured to the arms 21 therefor for engaging with the magnetic members 14 of the primary spectacle frame 10 such that the auxiliary spectacle frame 20 may be stably supported on the primary spectacle frame 10, best shown in FIGS. 5 and 6.

It is to be noted that the arms 21 are engaged with and are supported on the upper portion of the primary spectacle frame 10 such that the auxiliary spectacle frame 20 may be stably supported and secured to the primary spectacle frame 10. The auxiliary spectacle frame 20 will not move downward relative to the primary spectacle frame and will not be easily disengaged from the primary spectacle frame when the users conduct jogging or jumping exercises." (Col. 2, lines 38-55.0

"As shown in FIGS. 3-7, the engaging surfaces between magnetic members 14 in primary spectacle frame 10 and the magnetic members 22 in the auxiliary spectacle frame 20 lie in a plane that is substantially horizontal when the eyeglass device is worn." (Col. 2, lines 64-68.)



# F I G . 7

FIG. 7 is a cross sectional view taken along lines 7--7 of FIG. 6,

"Referring next to FIG. 7, it is preferable that the projections 13 and the magnetic members 14 are located slightly lower than the upper portion of the primary spectacle frame 10; and the end portions of the arms 21 and/or the magnetic members 22 are slightly extended downward toward the projections 13 such that the arms 21 and the magnetic members 22 may hook on the primary spectacle frame 10 and such that the auxiliary spectacle frame 20 may further be stably supported and secured to the primary spectacle frame 10.

In one embodiment, as shown in FIG. 7, magnetic members 14 and 22 are not in contact with each other; magnetic members 14 and 22 are engaged with, but not supported on, each other. Instead, the arm 21 securing the magnetic member 22 is supported on an upper side portion of the primary spectacle frame 10. As shown in FIG. 7, the upper side portion can be an upper part of the side portion securing the projection 13." (Col. 3, lines 1-17.)

18.     The specification sums up the "present invention" as follows:

"Accordingly, the eyeglass device in accordance with the present invention includes an auxiliary spectacle frame that may be stably secured to the primary spectacle frame and will not move downward relative to the primary spectacle frame and will not be easily disengaged from the primary spectacle frame when the users conduct jogging or jumping exercises."

19.     Thus, the "present invention" is consistently described as top-mounting, and all aspects of the invention require a top-mounting auxiliary frame to achieve the "primary objective" of the invention:  "to provide auxiliary lenses which may be stably secured and supported on the frames."  The physical configuration of the invention requires that the end pieces of the auxiliary frame extend over and rest on end pieces of the primary frame to support the auxiliary frame and prevent downward movement of the auxiliary frame.  The only way to achieve this is with a top-mounted design.  Further, the hooking function described at col. 2, lines 3-10 and col. 3, lines 1-10 requires top-mounting, the end-pieces of the auxiliary frame must extend over the end pieces of the primary frame and the magnet or housing must extend downwards towards the primary frame.  The hooking function would not work in any configuration other than top-mounting.  For example, if the auxiliary frames were bottom-mounting, they would simply fall downward if the magnets became disengaged, and the "hook" would offer no further securing of the auxiliary spectacle frame to the primary spectacle frame.  Further, the gap between the magnets described at col. 3, lines 11-17, require top mounting:  "In one embodiment, as shown in FIG. 7, magnetic members 14 and 22 are not in contact with each other ... .  Instead, the arm 21 securing the magnetic member 22 is supported on an upper side portion of the primary spectacle frame 10."  If one were to attempt to achieve this in a bottom-mounting configuration, there would be nothing but magnetic attraction to prevent the downward movement of the auxiliary frames, just as in the prior art, and the magnetic attraction would be weakened because of the gap and be more susceptible to the force of gravity.

20.     In sum, the '545 patent only teaches a top-mounted configuration to achieve the objectives of the invention – supporting the auxiliary frame and preventing downward movement of the auxiliary frame during activity.  This configuration requires an end piece on the auxiliary frame that extends over the top of the primary frame.  In other words, the only structure in the

patent that provides support and resistance to downward movement, other than the magnets disclosed in the prior art, is the end pieces of the auxiliary frame extended over the top of the primary frame.  The '545 patent does not teach a bottom-mounting or any other configuration which achieves the stated objectives.

### III.    INTERPRETATION OF CERTAIN CLAIM TERMS

21.    I understand that the only two claims of the '545 patent that have been asserted against defendants are claims 23 and 35, which provide as follows:

Claim 23

An eyeglass device comprising:

an auxiliary spectacle frame for supporting auxiliary lenses therein, said frame including a front side, a rear side, and oppositely positioned side portions, each of said side portions having an arm extended therefrom, each of said arms having a rearwardly directed free end for securing a magnetic member having a horizontal surface, and a pair of magnetic members respectively secured in the free ends of said arms

said arms and said pair of magnetic members adapted to extend across respective side portions of a primary spectacle frame so that said pair of magnetic members having a horizontal surface can vertically engage corresponding magnetic member surfaces on a primary spectacle frame

Claim 35

The eyeglass device according to claim 23,

wherein said magnetic members of said auxiliary spectacle frame are magnets.

22.    I also understand based on plaintiffs' counsel's representations and Mr. Zaro's deposition testimony that plaintiffs are only making a claim for literal infringement against defendants' accused products.  I also understand that plaintiffs are not making any claims under the doctrine of equivalents, but reserve the right to express opinions on that subject if plaintiffs attempt to do so.

-10-

23.     I am told that literal infringement requires every limitation recited in the claim to be present in the accused product; as opposed to the doctrine of equivalents, where one can allege that a missing element can be met by an equivalent that performs substantially the same function in substantially the same way to achieve substantially the same result.

24.     I am told that an infringement analysis is a two-step process where in the first step the claims must be construed or interpreted.  The second step being to compare the construed claim language to the accused product.

25.     It is my understanding that the law requires claim terms to be construed in light of the specification, that is the written description and the drawings of the invention.  I am told that the patent itself may be the best guide to determining the meaning of any disputed claim term.

26.     I believe that there are at least three terms of claim 23 that require interpretation. I note that Mr. Zaro did not construe any claim terms and, should he attempt to construe terms at a later time, I may wish to offer further opinions.  The three terms are:  (1) "a magnetic member having a horizontal surface", (2) "said arms and said pair of magnetic members adapted to extend across respective side portions", and (3) " so that said pair of magnetic members having a horizontal surface can vertically engage corresponding magnetic member surfaces".  As for the remaining terms of the claims, I believe they should be given their plain and ordinary meaning. Again, I reserve the right to discuss this further should plaintiffs offer additional positions.

27.     As stated above, the written description and the drawings in the '545 patent require the auxiliary frame to be top-mounting.  In construing the claims of the '545 patent, the California Court in Revolution Eyewear, Inc. v. Aspex Eyewear, Inc. et al., Case No. 02-1087 (C.D. Ca.) (the "California Action") held that "the invention disclosed in the '545 patent is limited to a top-mounting design."  (May 6, 2003 Claim Construction Order, p. 32.)  The California Court observed that "the invention described is clearly for a top-mounting design: the written description only describes a top mounting design, the drawings only show a top-mounting configuration and nothing in the prosecution history shows that the inventor

-11-

envisioned anything other than a top-mounting design." (May 6, 2003 Claim Construction Order, p. 31.)

28.    Given the position taken by plaintiffs, I was surprised to learn when reviewing inventor Richard Chao's deposition transcript in this case that he never thought of a bottom-mount magnetic clip-on until he saw a Revolution bottom-mount magnetic clip-on at some point in the last five years -- a decade or more after he filed the patent application underlying the '545 patent in 1995:

```
11     Q. What I want to know now about is
12     bottom-mounted. When is the first time you thought
13     about a bottom-mounted magnetic clip-on?
14     A. I never thought of it.
15     Q. So is today --
16     A. Well, until I find a product from
17     Revolution.
18     Q. When was that?
19     A. I don't know.
20     Q. So you never thought of a bottom-mounted
21     magnetic clip-on until you saw Revolution's
22     products, correct?
23     A. Yes.
24     Q. And give me your best estimate of when
25     that occurred.

2      A. I cannot remember.
3      Q. I want your best estimate. Was it within
4      the last year?
5      A. No.
6      Q. Was it within the last five years?
7      A. Maybe. Yeah.
8      Q. Can you say for sure it was within the
9      last 10 years?
10     A. Probably less than that.
11     Q. Okay. So your best estimate would be
12     sometime in the last five years?
13     A. Yes.
```

(Richard Chao Dep. at 141-142.)

I find it hard to believe that the '545 patent specification could describe or that the '545 patent could cover a configuration the inventor never even thought of.

29.     Therefore, I disagree with Mr. Zaro's opinion that "one skilled in the art at the time would have understood that the vertical engagement was capable of occurring between the upwardly facing horizontal surface of the auxiliary spectacle frame and downwardly facing horizontal surface of the primary frame."  In fact, Richard Chao also testified that the available magnets at that time were not strong enough to hold an auxiliary frame to the bottom of a primary frame:

```
3   Q. And the problem solved by your invention
4   in 1994 was to make the magnetic attachment of the
5   auxillary clip-ons more stable, correct?
6   A. Yes.
7   Q. Do bottom-mounting magnetic clip-ons solve
8   that problem?
9   A. If, in these days, the magnets, because
10  the magnets is much stronger than the day in 1994.
11  So if you ask my opinion in 1994, I would definitely
12  say no. But right now, it is hard to say.
```

(Richard Chao Dep. at 65) (emphasis added).

```
11  Just to follow up on the last question, in
12  1995, bottom-mounting auxillary clip-ons wouldn't
13  work because the magnets weren't strong enough,
14  correct?
15  MR. SCHINDLER: Objection, asked and
16  answered.
17  MR. HANLE: That was 1994. Now I'm asking
18  1995.
19  MR. SCHINDLER: Okay.
20  THE WITNESS: I believe so.
```

(Richard Chao Dep. at 66.)

A.     **"a magnetic member *having a horizontal surface*"**

30.     Here, the written description and the drawings require the horizontal surface of the magnetic members on the auxiliary frame to be downwardly facing so that this horizontal surface can engage corresponding upwardly facing horizontal surfaces on the primary frame.  As

-13-

set forth above, this is the only way the features and advantages of the invention of the '545 patent can be achieved.

31.     A person of ordinary skill in the art reading the specification and claims of the '545 patent would understand the term "a magnetic member having a horizontal surface" as used in claim 23 to mean *a magnet having a downwardly facing surface.*

32.     In the California Action, the term "having a horizontal surface" as used in claim 6 was interpreted to mean "having a downwardly facing surface that lies in a plane substantially perpendicular to the plane of the lenses of the auxiliary spectacle frame." (Depo. Ex. 69 p. 32.) Thus, the California court's interpretation of "having a horizontal surface" is consistent with my own. After the California court's interpretation, plaintiffs added the phrase "having a horizontal surface" to claim 23 of the '545 patent in 2008 (effective March 2009) (see Reexamination Certificate). Thus, plaintiffs added this term with full knowledge that it had been construed by the California court to mean "having a downward facing surface."

**B.     "said arms and said pair of magnetic members *adapted to extend across* respective side portions of a primary spectacle frame"**

33.     The specification, including the drawings and the written description, requires that the arms and magnetic members of the auxiliary frame extend across the top of end pieces of the primary spectacle frame. As set forth above, this is the only way the features and advantages of the '545 patent invention can be achieved.

34.     A person of ordinary skill in the art reading the specification and claims of the '545 patent would understand that the term " *said arms and said pair of magnetic members adapted to extend across respective side portions of a primary spectacle frame*" to mean that the arms and magnetic members of the auxiliary frame are made to extend across the top of the corresponding side portions or extensions of the primary frame.

35.     Because a top-mounting configuration is <u>required</u> by the specification of the '545 patent, persons of skill in the art would <u>not</u> understand "*adapted to extend across respective side*

*portions*" to mean that the arms and magnetic members are <u>merely</u> <u>capable</u> of extending across or <u>adaptable</u> to extend across the top of side portions or extensions of the primary frame. The '545 patent does not disclose the arms and magnetic members in any configuration other than extending across the top of the primary spectacle frame and does not teach how one could use any other configuration to achieve the objectives of the invention. A person of skill in the art would understand that an auxiliary frame designed for bottom mounting was not made to be top-mounted because the auxiliary frame would not be stable and there would be misalignment between the auxiliary frame and the primary frame, including the bridges of the respective frames and the lenses.

36.     In looking at how this term or similar terms have been interpreted in the past, I learned that Claim 34 of the '545 patent has the following limitation: *"said arms [of the auxiliary frame] extending across a respective extension [of the primary frame]"*. This language is quite similar to the "adapted to extend across" language of claim 23. The Court in the California Action interpreted the Claim 34 language to mean that at least some portion of each arm <u>reaches across the top</u> of the corresponding extension of the primary frame. (Depo. Ex. 69. p 35.) Thus, the California court's interpretation is again consistent with my own.

**C.      "said pair of magnetic members *having a horizontal surface* can *vertically engage corresponding magnetic member surfaces* on a primary spectacle frame"**

37.     The '545 patent specification, including the drawings and the written description, requires the magnetic members of the auxiliary frame to engage the magnetic member surfaces on the primary spectacle frame from the top. As set forth above, this is the only way the features and advantages of the invention can be achieved. If the magnetic members of the auxiliary frame engaged the magnetic members of the primary frame from the bottom, there would be nothing but magnetic attraction to secure the clip-ons, just as the magnetic clip-ons found in the prior art, including the Sadler and Meeker patents discussed in the '545 patent.

-15-

38.     A person of ordinary skill in the art reading the specification and claims of the '545 patent would understand that the term "said pair of magnetic members having a horizontal surface can *vertically engage* corresponding magnetic member surfaces on a primary spectacle frame " as used in claim 23 to mean that the magnetic members of the auxiliary frame having a downwardly facing surface *engage from the top* upwardly facing magnetic member surfaces on a primary spectacle frame.

**D.     Comments On Mr. Zaro's Report**

39.     I have been asked to review and comment on the Expert Report of Lee Zaro dated May 7, 2010 ("Zaro Report"). Despite his criticisms of what defendants allege regarding claim construction, the law requires claim terms to be construed in light of the specification. Nevertheless, the Zaro Report contains no analysis of the specification. Further, I attended Mr. Zaro's deposition on June 2, and Mr. Zaro stated that he did not even consider the court's claim construction in the California Action.

40.     The Zaro Report states that: "The claim [23] does not require the 'horizontal surface' [of the magnetic members] to be downwardly facing." The Zaro Report provides no support for this statement and I strongly disagree. The '545 patent teaches that the arm of the auxiliary frame <u>must</u> extend over a side portion of the primary frame to support the auxiliary frame and prevent downward movement. Without this configuration, there would be nothing but magnetic attraction to secure the clip-ons, just as in the prior art. Since the arms are on top and the magnetic members are secured in the arms, the magnetic member surfaces of the auxiliary frame that engage the corresponding magnetic member surfaces on a primary frame <u>must</u> be downwardly facing. The '545 patent does not teach how the auxiliary frame arms securing the magnets can be on top and the magnet surfaces can be upwardly facing, yet still engage the magnet surfaces on the primary frame. Further, in order to achieve the hooking function described in the '545 patent, the arms and/or the magnetic members of the auxiliary frame must extend downward toward the projections on the primary (see col. 3, lines 1-10), that is, the

-16-

magnetic member surfaces of the auxiliary frame must be downwardly facing. The court in the California Action reached the same conclusion, but Mr. Zaro did not consider the court's ruling.

41.     The Zaro Report assumes that claim 23 allows the arms and magnetic members of the auxiliary frame to extend underneath the end pieces of the primary frame. I disagree. The '545 patent teaches that the arm of the auxiliary frame must extend over a side portion of the primary frame to support the auxiliary frame and prevent downward movement. Without this configuration, there would be nothing but the magnetic attraction to secure the clip-ons, just as in the prior art. Mr. Zaro also apparently contends that *adapted to extend across respective side portions of a primary spectacle frame* may refer to the eye wires on the side of the primary frame. This is not described in the '545 patent, nor would persons of skill in the art understand the '545 patent to describe such a structure. Arms that extend next to the eye wire would not achieve the objective of the invention – supporting the auxiliary frame and preventing downward movement – that is achieved by the arm extending over a side portion of the primary frame. Nor would such a structure necessarily allow vertical engagement as provided in claim 23 – that is vertical engagement could be achieved regardless of whether the arms extend next to the eye wire. For example, the arms could extend outwardly from the auxiliary frames, without crossing the eye wire, yet still have a magnetic member with a horizontal surface that engages a corresponding magnetic member surface on a primary frame. The Court in the California Action reached the same conclusion I did, that the arm of the auxiliary frame extends across the top of a side portion of the primary frame.

## IV.     COMPARISON OF THE CLAIMS AND THE ACCUSED PRODUCTS

42.     I understand that the products of Revolution Eyewear accused of infringing claims 23 and 35 of the '545 patent are those listed in Exhibit C, and the products of Marchon Eyewear accused of infringing Claims 23 and 35 are those highlighted in Exhibit D. My opinions herein relate only to these accused products. I reserve the right to supplement my analysis and opinions if additional products are accused.

-17-

43.     I have reviewed representative samples of the Revolution and Marchon products at issue in this case.  Despite certain minor difference, I understand that all the products are bottom mounted and any differences between the products are not material to any of the claim limitations of claims 23 and 35.  Thus, my opinions regarding non-infringement apply to all accused products.

44.     I am told that for there to be literal infringement, the only assertion made by plaintiffs, each and every element of claim 23 or each and every element of claim 35 must be found in the accused products.  As set forth below, the following elements are not present in any of the accused products.  I understand that claim 35 depends from claim 23, and that the elements of claim 23 are incorporated into claim 35.  Thus, if elements of claim 23 are not present in the accused products, those same elements will not be present with respect to claim 35. Accordingly, the Revolution and Marchon products at issue do not infringe claims 23 or 35 of the '545 patent.

45.     The chart below provides a comparison of the claims of the '545 patent, as they would be interpreted by persons of skill in the art, with Revolution's and Marchon's accused products, showing the absence of these claim elements in all of the accused products.[2]

---

[2]     The photographs below of the Revolution product are of model REV 546, which is representative of all Revolution accused products.  The photographs below of the Marchon product are of model FLEXON 885-MAG, which is representative of all Marchon (Flexon, Nike and Calvin Klein) accused products.

-18-

| Claim 23 Language | My Interpretation of the Claim Term | Comparison of The Accused Products with My Interpretation |
|---|---|---|
| "a magnetic member having a horizontal surface" | a magnetic member having a downwardly facing surface | The magnets on Revolution's and Marchon's auxiliary frames have an upwardly facing surface **not** a downwardly facing surface.  *Revolution Auxiliary Frame Showing Upwardly Facing(Silver) Magnet Surface*  *Marchon Auxiliary Frame Showing Upwardly Facing (Silver) Magnet Surface*  *Revolution Auxiliary Frame Showing (Red) Epoxy Surface Covering Bottom of Arm*  *Marchon Auxiliary Frame Showing (Gray) Epoxy Surface Covering Bottom of Arm* |

-19-

| "said arms and said pair of magnetic members adapted to extend across respective side portions of a primary spectacle frame" | said arms and said pair of magnetic members are made to extend across the top of respective side portions or extensions of the primary spectacle frame | The arms and magnetic members of Revolution's and Marchon's auxiliary frames are made to extend underneath the respective side portions of the primary spectacle frame, and not to extend across the top of the primary spectacle frame. |
| --- | --- | --- |
| | |  |
| | | *Marchon Product with Arms and Magnets of Auxiliary Frame Extending Underneath Side Portions of Primary Frame* |
| | |  |
| | | *Revolution Product with Arms and Magnets of Auxiliary Frame Extending Underneath Side Portions of Primary Frame* |

-20-

| "so that said pair of magnetic members having a horizontal surface can vertically engage corresponding magnetic member surfaces on a primary spectacle frame" | so that said pair of magnetic members having a downwardly facing surface can engage from the top upwardly facing magnetic member surfaces on a primary spectacle frame. | The magnetic members of Revolution's and Marchon's auxiliary frames are upwardly facing and engage the downwardly facing magnetic member surfaces on a primary spectacle frame from the bottom, not from the top |
|---|---|---|
| | |     <br> *Revolution Auxiliary Showing Upwardly Facing (Silver) Magnet Surface*    *Bottom of Revolution Primary Frame Showing Downwardly Facing (Silver) Magnet Surface*    *Revolution Auxiliary Frame with Upwardly Facing Magnet Surfaces Engaging Downwardly Facing Magnet Surface on Primary Frame from the Bottom* |
| | |  <br> *Marchon Auxiliary Frame Showing Upwardly Facing (Silver)Magnet Surface*    *Bottom of Marchon Primary Frame Showing Downwardly Facing (Silver) Magnet Surface*    *Marchon Auxiliary Frame With Upwardly Facing Magnet Surface Engaging Downwardly Facing Magnet Surface of Primary Frame From the Bottom* |
| | | Note that the "corresponding magnetic member surfaces" are on the bottom of the primary frame, not the top, which does not have a "magnetic member surface." |

-21-

46.     The Zaro Reports states that "the Accused Products have a 'downwardly facing surface that lies in a plane substantially perpendicular to the plane of the lenses of the auxiliary spectacle frame' [as] the exemplary products illustrate." Mr. Zaro is incorrect. Claim 23 refers to "a magnetic member having a horizontal surface", not merely that "the Accused Products have a downwardly facing surface." The downwardly facing surface must be the surface of a magnetic member. The auxiliary frame magnetic members in the accused products do <u>not</u> have a downwardly facing surface; rather, they have an upwardly facing surface. The downwardly facing surface on the arms of the accused products is an epoxy surface, not the surface of a magnetic member. Persons of skill in the art would never consider an epoxy surface to be the surface of a magnetic member.

47.     The Zaro Report further states that:

> The only difference between the upwardly facing surface of the magnets (which are shown in just prior photos) and the downwardly facing surface is an epoxy coating on the downwardly facing surface of the magnet. … The epoxy coating does not impede the magnetic properties of the downwardly facing surface of the magnets in the auxiliary spectacle frame.

48.     These statements are also incorrect. First, the downwardly facing epoxy surfaces are slightly rounded, while the upwardly facing magnet surfaces are flat, and protrude upwardly from the arm to allow them to protrude into pockets in the primary frame. The flat upwardly facing magnet surfaces of the auxiliary frame allow more surface area contact with the downwardly facing surfaces of the primary frame, which allows for a more secure hold. Second, at least with respect to the accused products made by Revolution, the bottom of the arm housing the magnet is closed such that there is both epoxy and additional material covering the magnet. Thus, the downwardly facing surface on the arms of the accused products is not a magnetic member surface.

49.     Further, the epoxy coating on the bottom of the arms of the accused products certainly impedes the magnetic properties of the magnets by increasing the distance between the magnets of the auxiliary frame and the magnets on the primary frame. As even someone not

-22-

skilled in the art can observe, the strength of magnetic attraction decreases as one increases the distance between magnetic materials. Mr. Zaro admitted at his deposition that the strength of magnetic attraction decreases as the thickness of the epoxy increases.

50.     The Zaro Report states that "The Accused Products have arms with a pair of magnetic members adapted to extend across the respective side portions of a primary spectacle frame." I disagree. The arms and magnetic members of the accused products are specifically made to extend underneath side portions of the primary frames, and not across the top of side portions of the primary frame for several reasons. First, when one mounts the accused auxiliary spectacle frames on the bottom of their matching primary frame such that the arms extend underneath the primary frame, the lenses align; when one attempts to mount the auxiliary frames on top such that the arms extends over the primary frame, the lenses are misaligned, i.e., the auxiliary lenses are significantly higher than the primary lenses.

51.     Second, when one mounts the accused auxiliary spectacle frames on the bottom of their matching primary frame, the magnets of the auxiliary frame protrude securely into mating pockets on the bottom of the primary frame; when one attempts to mount the auxiliary frames on top, the rounded epoxy rests on top of the flat primary frame surface, creating instability.

52.     Third, when one mounts the accused auxiliary spectacle frames on the bottom of their matching primary frame, the auxiliary frames are securely attached to the primary frames; when one attempts to mount the auxiliary frames on top, the auxiliary frames are not securely attached and easily fall off. In fact, Mr. Zaro could not shake the auxiliary lenses off the primary frame when mounted on the bottom, but they easily fell off when he attempted to mount them on top, even when he merely turned the primary frames upside down. Thus, the arms and magnetic members of the auxiliary frame are not adapted to extend across the top of side portions of the auxiliary frame.

53.     Under Mr. Zaro's contention that "said arms and said pair of magnetic members adapted to extend across respective side portions" may include extending "across" the side of the