UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 09-61515-CIV-COOKE/BANDSTRA

ASPEX EYEWEAR, INC. and
CONTOUR OPTIK, INC.,

    Plaintiffs,

vs.

HARDY LIFE, LLC, MARCHON
EYEWEAR, INC., NIKE, INC.,
REVOLUTION EYEWEAR, INC., and
GARY MARTIN ZELMAN, an
individual,

    Defendants.
_____/

**PLAINTIFFS' CLAIM CONSTRUCTION MEMORANDUM**

I.     **INTRODUCTION**

Plaintiffs Aspex Eyewear, Inc. ("Aspex") and Contour Optik, Inc. (collectively, "Plaintiffs") submit this memorandum of points and authorities in support of their proposed construction of the disputed elements of asserted Claims 23 and 35 of reexamined U.S. Patent RE 37, 545 ("'545 Patent"). For the reasons discussed in detail below, Plaintiffs respectfully submit that their proposed constructions of be adopted by the Court.

II.    **THE '545 PATENT AND DISPUTED ELEMENTS OF CLAIMS 23 AND 35**

On February 12, 2002, the U.S. Patent and Trademark Office issued U.S. Patent No. RE 37, 545, entitled "Auxiliary Lenses For Eyeglasses" (the "'545 Patent") (Exh. 1).[1] The '545 Patent is a "reissue" of U.S. Patent No. 5,568,207, which originally issued on October 22, 1996 (the "'207 Patent") (Exh. 2). As issued, the '545 Patent contained 34 claims directed generally to magnetic clip-on eyewear. Three embodiments of the invention are claimed: (1) a combination primary spectacle frame/auxiliary spectacle frame, in which the auxiliary frame is attached to the primary frame through the use of cooperating magnetic members; (2) the primary spectacle frame itself; and (3) the auxiliary spectacle frame itself.[2]

Plaintiffs are only asserting New Claims 23 and 35 of the '545 Patent against the Defendants. These claims are directed to the auxiliary spectacle frame embodiment of the invention. The text of New Claims 23 and 35 is reproduced in Exhibit 4. The proper

---

[1] Copies of all exhibits referenced in this memorandum are attached to the Declaration of Ericka Turk-Moore, filed contemporaneously herewith.

[2] Following a September 13, 2007 request for re-examination of certain claims of the '545 Patent, the Patent Office issued Reexamination Certificate No. RE 37,545 F1 on March 3, 2009, which reconfirmed the patentability of all original claims of the '545 Patent, and included New amended Claim 23, and New Claim 35 (Exh. 3). Plaintiffs are the original assignees of record of the '545 Patent, each owning a one-half undivided interest. Recently, Plaintiff Contour Optik, Inc. ("Contour") transferred its ownership interest to co-Plaintiff Aspex Eyewear, Inc. ("Aspex"). Aspex is now the sole owner of the '545 Patent.

constructions of the claim elements highlighted in Exhibit 5 are in dispute. Exhibit 6 to this memorandum is a claim chart summarizing the Plaintiffs' constructions of all terms recited in New Claims 23 and 35, including support for Plaintiffs' constructions from the intrinsic record of the '545 Patent, as well as appropriate extrinsic evidence.

## II.     PLAINTIFFS' PROPOSED CONSTRUCTIONS SHOULD BE ADOPTED

### A.     The Law Of Claim Construction

#### 1.     The Claims Define The Invention

Claim construction is a question of law for the Court. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370, 391 (1996). "'[T]he claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (*en banc*) (citation omitted); *accord Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). Claim terms are generally given the "ordinary and customary meaning" the terms would have "to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Phillips*, 415 F.3d at 1313.

#### 2.     Preamble Statements

The "preamble" of a patent claim consists of the words appearing before the recitation of elements in the body of the claim; and typically ends with a transitional term such as "comprising". In general, a preamble does not limit the scope of a patent claim. *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002). There are three situations in which the preamble may have a limiting effect: (1) when the limitations in the body of the claim rely upon and derive antecedent basis from the preamble; (2) when the preamble recites essential structure or steps or is necessary to give life, meaning and vitality to the claim; and (3) if there was clear reliance on the preamble during prosecution to distinguish the prior art.

*Id*. Otherwise, the preamble should be non-limiting. *American Medical Systems, Inc. v. Biolitec, Inc.*, 2010 WL 3564855, *4 (Fed. Cir. 2010).

### 3. The Claim Differentiation Doctrine

"Differences among claims can also be a useful guide in understanding the meaning of particular claim terms. For example, the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Phillips*, 415 F.3d at 1314-15; *see also Forrest Laboratories, Inc. v. Abbott Laboratories*, 239 F.3d 1305, 1310 (Fed. Cir. 2001) ("Where claims use different terms, those differences are presumed to reflect a difference in the scope of the claims.").

### 4. Claims Are Construed In Light Of The Intrinsic Record

#### i. The Patent Specification

The patent specification (all parts of the patent including the claims) is "the primary basis for construing the claims." *Phillips*, 415 F.3d at 1315. However, particular embodiments of the invention disclosed in the patent specification should not be ***imported*** into the claims where the claim language is broader than these embodiments. *Id.* at 1323. Thus, the Federal Circuit has repeatedly held that "the number of embodiments disclosed in the specification is not determinative of the meaning of disputed claim terms", even where only one embodiment of the invention is disclosed. *Teleflex, Inc. v. Ficosa North America Corp.,* 299 F.3d 1313, 1325-26 (Fed. Cir. 2002); *SRI Int'l v. Matsushita Electric Corp. of America*, 775 F.2d 1107, 1121 n. 14 (Fed. Cir. 1985) (*en banc*); *Phillips*, 415 F.3d at 1323.

Conversely, a claim construction which ***excludes a preferred embodiment*** of the invention disclosed in the patent specification should not be adopted, because such a narrowing construction is rarely, if ever, the correct one. *Primos, Inc. v. Hunter's Specialties, Inc.*, 451 F.3d 841, 848 (Fed. Cir. 2006) ("While we are mindful that we cannot import limitations from

3

the preferred embodiments into the claim, we also should not normally interpret a claim term to exclude a preferred embodiment."); *Modine Mfg. Co. v. United States Int'l Trade Comm'n*, 75 F.3d 1545, 1550 (Fed. Cir. 1996).

### ii. The Prosecution History

The prosecution history of a patent "consists of the complete record of the proceedings before the PTO and includes the prior art cited during the examination of the patent". *Phillips*, 415 F.3d at 1317. "Unless altering claim language to escape an examiner rejection, a patent applicant only limits claims during prosecution by clearly disavowing claim coverage." *York Products, Inc. v. Central Tractor Farm & Family Center*, 99 F.3d 1568, 1575 (Fed. Cir. 1996). Where statements made to the during prosecution are amenable to "multiple reasonable interpretations," they do not constitute a "clear and unmistakable" disclaimer of claim scope. *Cordis Corp. v. Medtronic Ave., Inc.*, 339 F.3d 1352, 1359 (Fed. Cir. 2003); *see also Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003 ("manifest exclusion or restriction" of scope is required to limit a claim term).[3]

### B. The Preamble Term "*An eyeglass device*" Is Not A Claim Limitation

| Plaintiffs' Construction | Defendants' Construction |
|---|---|
| "*An eyeglass device*" is preamble term; not a claim limitation | "*An eyeglass device*" includes a primary spectacle frame and an auxiliary spectacle frame |

---

[3] "Dictionaries or comparable sources are often useful to assist in understanding the commonly understood meaning of words and have been used both by [the Federal Circuit] and the Supreme Court in claim interpretation." *Phillips*, 415 F.3d at 1323. Dictionaries and technical treatises can be consulted by Courts "at any time in order to better understand the underlying technology and may also rely on dictionary definitions when construing claim terms, so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents." *Vitronics*, 90 F.3d at 1584, n. 6, 1585.

4

Here, the preamble the "*An eyeglass device*" is merely a descriptive statement of intended use of the invention recited in Claims 23 and 35, and does not fall within any of the three general situations in which preamble language may have a limiting effect.  First, there are no limitations in the body of Claims 23 and 35 that rely upon and derive antecedent basis from the preamble. Second, the preamble does not recite any essential steps, and it is not necessary to give life, meaning, and vitality to the claims.  To the contrary, the bodies of Claims 23 and 35 recite structurally complete inventions without the preamble language. Finally, the inventor never relied upon the preamble language to distinguish prior art during prosecution of the '545 Patent. *See American Medical Systems*, 2010 WL 3564855, *4; *Catalina*, 289 F. 3d at 808.  As a result, the preamble of Claims 23 and 35 is not a claim limitation, and need not be construed.

Defendants' contend that the preamble is a claim limitation, and construe it to mean "*a primary spectacle frame and an auxiliary spectacle frame*".  Defendants' position should be rejected, because it implies that Claims 23 and 35 are directed to a combination primary frame/auxiliary frame.  However, the plain wording of Claims 23 and 35 demonstrates that they are directed to the structure and functionality of the auxiliary frame *only*.  When the inventor wanted to claim a combination primary frame/auxiliary frame, he did so.  *See* Exh. 1: '545 Patent, *e.g.*, Claims 1, 12, 14, and 16, which recite "a primary spectacle frame" in combination with "an auxiliary spectacle frame".  *See also Revolution Eyewear, Inc. v. Aspex Eyewear, Inc.,* 563 F.3d 1358, 1365 (Fed. Cir. 2009) ("*Revolution I*"), where Revolution conceded that Claim 22 of the '545 Patent, which also includes the preamble "*An eyeglass device*", is directed to the primary spectacle frame only, not a combination primary frame/auxiliary frame -- thus

5

conceding that the preamble is non-limiting. 563 F.3d at 1365 ("In fact, Revolution concedes in its brief that 'new claim 22[is] directed to a primary frame alone instead of the combination.'").[4]

C. *"each of said arms having a rearwardly directed free end for securing a magnetic member having a horizontal surface"*

| Plaintiffs' Construction | Defendants' Construction |
|---|---|
| "*rearwardly directed free end*" means – the end of the arm that extends substantially rearward of the lenses and is not attached to the side portions of the auxiliary spectacle frame.<br><br>"*for securing*" means – for connecting in a manner such that the connection is not likely to fail or give way.<br><br>"*magnetic member*" means – a permanent magnet or a ferromagnetic member, but at least one magnetic member in each pair of corresponding auxiliary frame/primary frame magnetic members must be a permanent magnet.<br><br>"*horizontal surface*" means – a surface in a substantially horizontal plane when the frame is worn (i.e., in a plane substantially perpendicular to the plane of the lenses of the auxiliary spectacle frame). | "*rearwardly directed free end*" and "*for securing*" to be given their ordinary and customary meaning.<br><br>"*magnetic member*" means -- "a member having the properties of a magnet, i.e., attracting iron and producing a magnetic field external to itself".<br><br>"*magnetic member having a horizontal surface*" means -- "a magnetic member of the auxiliary frame having a downwardly facing horizontal surface (exterior face)" |

Plaintiffs' constructions of the above claim terms are fully supported by the intrinsic record of the '545 Patent, as well as the ordinary meaning of the words. First, consistent with Plaintiffs' construction of "*rearwardly directed free end*", Figure 4 of the '545 Patent illustrates a top view of an exemplary auxiliary spectacle frame 20 that has two arms 21, each arm

---

[4] In any event, if the preamble term "*An eyeglass device*" were to be construed, it should be construed consistent with its ordinary meaning to mean an "eyepiece" (Exh. 7: *merriam-webster.com* definition of the word "eyeglass").

including a free end extending rearwardly of the corresponding lens and is not attached to the corresponding side portion of the frame. Figure 4 is reproduced below:



Second, consistent with the Plaintiffs' construction of the term "*for securing*": (1) the ordinary dictionary meaning of the word "secure" is "not likely to fail or give way" (*Webster's II New College Dictionary* (1st Ed. 1999) at page 150 (Exh. 8)); and (3) this Court in *Aspex Eyewear, et al v. Concepts In Optics, Inc.* 00-7067-CIV Moreno/Dube (S.D. Fla. 2005) (the "*Concepts*" case), construed the word "secured" used in '545 Patent claims to mean "not likely to fail or give way" (D.E. # 590 at page 17) (Exh. 9). There is no basis in the claim language or the intrinsic record for this Court to construe the term "*for securing*" any differently.

Third, consistent with Plaintiffs' construction of the term "*magnetic members*": (1) under the claim differentiation doctrine, because dependent Claim 35 limits the term "magnetic member" to a "magnet", the term "magnetic member" cannot be limited to permanent magnet; (2) the ordinary dictionary meaning of the word "magnetic" is "having the properties of a magnet", and "capable of being magnetized or of being attracted by a magnet" (thus being broader than just a "magnet") (*Webster's II New College Dictionary* (1st Ed. 1999) at page 140 (Exh. 10); (3) prior art U.S. Patent No. 5,416,357 to Sadler, which was considered during prosecution of the '545 Patent (Exh. 11), discloses at col. 3, lines 21-25 that the first and second magnetic members are made of a permanent magnetic material or a ferromagnetic material, but "[a]t least the one of the first and second magnetic members must be of a permanent magnetic

material for a magnetic attraction to exist";[5] and (4) the *Concepts* Court construed the term "magnetic member" consistent with the Plaintiffs' construction here (Exh. 9 at 9-10).

Defendants' position that the "ordinary meaning" of the terms "*rearwardly directed free end*" and "*for securing*" should apply is meritless, because Defendants do not propose ordinary meanings for these terms. Thus, Defendants' position is entirely unhelpful to the trier of fact in this case, who must apply the properly construed claim terms to Defendants' accused products to determine infringement. Because the only constructions of the terms "*rearwardly directed free end*" and "*for securing*" offered to the Court are those constructions proposed by the Plaintiff's, and Plaintiffs' constructions of these terms are fully consistent with the intrinsic record of the '545 Patent and ordinary parlance, Plaintiffs' constructions should be adopted.[6]

Defendants' construction of the term "*magnetic member*" should also be rejected because: (1) Defendants' construction incorrectly implies that the term is limited to permanent magnets; and (2) the construction fails to take into account the fact that, as discussed above, all of the cooperating magnetic members of the claimed auxiliary frame, and the primary frame to which it is adapted to attach, cannot be ferromagnetic magnetic materials (*i.e.*, there must be at least one permanent magnet in each cooperating pair for magnetic engagement to occur).

Finally, consistent with Plaintiffs' construction of the term "*horizontal surface*" is the illustrative embodiment shown in Figures 4 and 7 of the '545 Patent, reproduced below:

---

[5] Prior art considered during prosecution of a patent is relevant to the proper construction of claim language. *Kumar v. Ovonic Battery Co., Inc.*, 351 F.3d 1364, 1368 (Fed. Cir. 2003).

[6] Because the constructions of "*rearwardly directed free end*" and "*for securing*" are in dispute, the Court must construe these terms, and cannot simply conclude that they should be construed in accordance with some unidentified ordinary meaning. *O2 Micro Intern., Ltd. v. Beyond Innovation Technology Co.*, Ltd., 521 F.3d 1351, 1361-63 (Fed. Cir. 2008).



FIG.4  FIG.7

Figures 4 and 7 of the '545 Patent illustrate top and side views, respectively, of an auxiliary spectacle frame 20 that has two arms 21, each arm including a free end for securing a magnetic member 22. Each magnetic member 22 has a surface located in a substantially horizontal plane when the auxiliary frame is worn (*i.e.*, in a plane substantially perpendicular to the plane of the lenses of the auxiliary spectacle frame). The '545 Patent describes Figure 7 as showing "engaging surfaces" for magnetic members 14 and 22 that "lie in a substantially horizontal plane when the eyeglass device is worn" (Col. 2, lines 63-67).

Defendants seek to construe the term "*horizontal surface*" to mean a "***downwardly facing** horizontal surface **(exterior face)***", but no such limitations are required by the clear and unambiguous language of Claims 23 and 35, the patent specification, or the prosecution history. Notably, Defendants' requirement that the "*horizontal surface*" be the "exterior surface" of the magnetic member would mean, if adopted, that the magnetic engaging surfaces of the auxiliary spectacle frame magnetic members could not include any protective or aesthetic coatings. There is absolutely nothing in Claims 23 and 35 or the intrinsic record to support such a narrow construction. Defendants' construction should therefore be rejected.[7]

---

[7] Defendants seek to support their claim construction of "*horizontal surface*" and others based on the *Revolution I* District Court's construction of an entirely different set of claims containing somewhat overlapping language to the claims at issue here. As Plaintiffs set out in their opposition to Revolution's motion for summary judgment of non-infringement, a prior Court's claim construction is not considered binding even when involves the exact same set of claims (*see* D.E. # 124 at page 14).

9

**D.** "*said arms and said pair of magnetic members adapted to extend across respective side portions of a primary spectacle frame*"

| Plaintiffs' Construction | Defendants' Construction |
|---|---|
| "*adapted to extend across respective side portions of a primary spectacle frame*" means -- the magnetic members and at least some portion of the auxiliary spectacle frame arms are suitable for reaching across the top or bottom of the corresponding side portion of a primary spectacle frame | "*adapted to extend across respective side portions of a primary spectacle frame*" means -- "said arms and said pair of magnetic members are made to extend across the top of respective side portions or extensions of the primary spectacle frame" |

Plaintiffs' construction of the term "*adapted to extend across respective side portions of a primary spectacle frame*" is consistent with ordinary meaning of the word "adapted". *See, e.g.*, *www.merriam-webster.com*: defining the term "adapted" to mean "to make fit (as for a specific or new use or situation) often by modification"; synonyms include, e.g., adjust, accommodate, and conform (Exh. 12); *www.thefreedictionary.com*: defining the term "adapted" to mean "[t]o make suitable to or fit for a specific use or situation (Exh. 13); and *www.macmillandictionary.com*: defining the term "adapted" to mean "especially suitable for someone or something"; synonyms include, e.g., fitting, apt, and possible (Exh. 14).

Figures 6-7 of the '545 Patent illustrate one embodiment of the claim element "*adapted to extend across respective side portions of a primary spectacle frame*":



Figures 6-7 illustrate auxiliary spectacle frame 20 that has two arms 21, each arm securing a magnetic member 22. The arms 21 and magnetic members 22 extend across the top

10

of side portions (e.g. extensions 11) of a primary spectacle frame 10. The plain language of the element "*adapted to extend across respective side portions of a primary spectacle frame*" does not require arms/magnetic members to extend across the top of a primary frame.

Defendants engage in some slight of hand in their construction by construing the term "*adapted to*" to mean "made to", and changing the claim term "*a* primary spectacle frame" to "*the* primary spectacle frame". However, as shown above, the ordinary meaning of the word "adapted" is not so narrow as to be restricted to an auxiliary frame "made to" extend across the side portion of a particular primary frame (as the Defendants' construction requires), and there is nothing in the clear and unambiguous claim language, the patent specification, or the prosecution history of the '545 Patent to support such a narrow construction of Claims 23 and 35.

The motivation underlying the Defendants' construction is clear. Defendants argued in their summary judgment briefing that the arms and magnetic members of their auxiliary spectacle frames are not "*adapted to extend across respective side portions of a primary spectacle frame*" because when Defendants' auxiliary frames are magnetically engaged to the top of *Defendants'* commercially sold primary frames, the primary/auxiliary lenses are not aligned, and the auxiliary frames are not stably supported on *Defendants'* primary frames. However, Claims 23 and 35 do not require that the auxiliary frame arms/magnetic members be adapted to extend across the top of, or be magnetically engaged with, any *particular* primary spectacle frame. Rather, Claims 23 and 35 simply require that the auxiliary spectacle frame arms/magnetic members be adapted to perform the claimed functions in connection with "*a* primary spectacle frame"; which means *any* primary frame. Here, as in *Revolution I*, Defendants' attempt to read limitations into Claims 23 and 35 that are simply not there should be rejected.

Defendants' argument here is not a new one for the parties; and was squarely before the

Federal Circuit in *Revolution I*. That case involved Claim 22 of the '545 Patent, which is directed to the primary spectacle frame of the invention. The dispute was over the claim language "said first magnet members [of a primary frame] capable of engaging second magnetic members of ***an*** auxiliary spectacle frame." In *Revolution I*, as here, Revolution argued that there was "no infringement because Revolution's primary frame is not capable of being top-mounted with its counterpart auxiliary frame or any commercially sold auxiliary frame." 563 F.3d at 1369. The Federal Circuit rejected Revolution's argument based on the clear claim language (*i.e.*, Claim 22 recited "***an*** auxiliary spectacle frame"), stating: "It is irrelevant that Revolution's auxiliary frames, or any other commercially available auxiliary frames, are not actually used in a top-mounting configuration or cannot be so used." *Id.* at 1369-70.[8]

C.      **"*primary spectacle frame*" and "*side portions*" [of the primary frame]**

| Plaintiffs' Construction | Defendants' Construction |
|---|---|
| "***primary spectacle frame***" means -- the main frame and includes at least a nose bridge, legs which extend back over the wearer's ears, lens rims (if provided), partial rims (if provided), structures that support lenses in rimless frames (if provided), extensions, and primary frame magnetic members. | "***primary spectacle frame***" -- "includes two side portions each having an extension extended rearward therefrom for pivotally coupling a leg thereto, and two projections secured to the rear and side portions thereof for supporting magnetic members therein (i.e., the magnetic members are not embedded in the frame)." |
| "***side portions***" means – those portions of the primary spectacle frame adjacent the lenses or lens rims (if provided) or other lens supporting structure, and which extend outwardly to connect to the legs that fit over the wearer's ears. | "***side portions***" means -- those portions of the primary spectacle frame extending from the sides of the lens rims |

Plaintiffs' construction of the term "*primary spectacle frame*" is fully supported by the

---

[8] The term "adapted to" is analyzed similarly to the term "capable of". In *R.A.C.C. Indus., Inc. v. Stun-Tech, Inc.*, 1998 WL 834329 (Fed. Cir. 1998).

intrinsic record of the '545 Patent (Exh. 1). Defendants' construction limits the primary spectacle frame to one that has "non-embedded" magnetic members. However, since the invention of Claims 23 and 35 is directed to the structure and functionality of the *auxiliary spectacle frame only*, it does not matter whether the primary frame has embedded or non-embedded magnetic members. For those claims of the '545 Patent directed to the primary frame only (Claim 22), and those claims directed to a combination primary frame/auxiliary frame, the inventor included language to indicate that the primary frame magnetic members were non-embedded. *See, e.g.*, Claim 22 ("a pair of first magnetic members respectively secured in said projections"; Claim 12 ("a first magnetic member secured to said rear side [of the primary frame extensions]). There is nothing in the clear and unambiguous language of Claims 23 and 35 that would require the "*primary spectacle frame*" to have non-embedded magnetic members.

Plaintiffs' construction of the term "*side portions*" is fully supported by the intrinsic record of the '545 Patent. For example, Figure 3 of the '545 Patent shows a top view of an exemplary primary spectacle frame 10 which includes "side portions" that are structurally consistent with (although not limiting of) Plaintiffs' proposed construction:



Defendants' construction of "*side portions*" to mean "those portions of the primary spectacle frame extending from the sides of the lens rims" is vague and unspecific, and requires the primary spectacle frame to include lens rims. However, there is no requirement of "lens rims" in the clear and unambiguous language of Claims 23 and 35, the patent specification, or

13

the prosecution history. Moreover, Defendants' construction of "*side portions*" contradicts their construction of the term "*primary spectacle frame*", which does not require lens rims.

E.   *"so that said pair of magnetic members having a horizontal surface can vertically engage corresponding magnetic member surfaces on a primary spectacle frame"*

| Plaintiffs' Construction | Defendants' Construction |
|---|---|
| "*horizontal surface*" means – a surface in a substantially horizontal plane when the frame is worn (i.e., in a plane substantially perpendicular to the plane of the lenses of the auxiliary spectacle frame).<br><br>"*vertically engage*" means -- that the horizontal surfaces of the auxiliary spectacle frame magnetic members engage corresponding magnetic member surfaces on a primary spectacle frame through actual contact, or through magnetic attraction without actual contact, in a plane that is substantially parallel to the plane of the lenses of the primary spectacle frame. | "*so that said pair of magnetic members having a horizontal surface can vertically engage corresponding magnetic member surfaces on a primary spectacle frame*" means -- "so that said pair of magnetic members having a downwardly facing horizontal surface can be stably supported and secured on top of the upwardly facing non-embedded magnetic member surfaces on a primary spectacle frame." |

Consistent with Plaintiffs' construction, Figures 5 and 7 of the '545 Patent illustrate one embodiment of the invention in which the auxiliary frame magnetic members 22 vertically engage corresponding magnetic members 14 on a primary frame 10 in a plane substantially parallel to the plane of the primary frame lenses, and without actual contact.



FIG. 5     FIG. 7

Claims 10-11 require that the engaged magnetic members are "not in contact". Thus, under the doctrine of claim differentiation, the term "engage" must therefore include magnetic

14

attraction with or without actual contact. Consistent with Plaintiffs' construction, the *Concepts* Court construed the magnetic engagement of the '545 Patent as encompassing magnetic attraction with and without actual contact (Exh. 8 at 11-14). The portion of Defendants' construction requiring that the auxiliary frame magnetic members be supported "on top of" the primary frame magnetic members implies that the primary/auxiliary magnetic members must touch one another. There is no such requirement in Claims 23 and 35.[9]

## IV.   CONCLUSION

For all the above reasons, we respectfully submit that the Plaintiffs' constructions of the disputed elements of Claims 23 and 35 of the '545 Patent be adopted in their entirety.

Dated:   October 19, 2010

Respectfully submitted,

By: _____
Michael A. Nicodema (*pro hoc vice*)
*nicodemab@gtlaw.com*
Jacqueline Becerra
*becerraj@gtlaw.com*
GREENBERG TRAURIG, P.A.
1221 Brickell Avenue
Miami, Florida 33131
Telephone:  (305) 579-0500
Facsimile:  (305) 579-0717

*Attorneys for Plaintiffs*

---

[9] Defendants' construction further attempts to read into the claims the terms "upwardly facing" and "downwardly facing" with respect to the primary spectacle frame and auxiliary spectacle frame magnetic members, so as to limit Claims 23 and 35 to top-mounting configurations in which the auxiliary frame is magnetically engaged to the top of the primary frame. However, the clear and unambiguous claim language, the patent specification, and the prosecution history impose no such limitations on Claims 23 and 35. Finally, Defendants' construction attempts to limit the primary spectacle frame to one that has "non-embedded" magnetic members. As discussed above, nothing in the plain language of Claims 23 and 35 or the intrinsic record requires such a limitation.

## CERTIFICATE OF SERVICE

      I hereby certify that on this 19th day of October, 2010, I filed the foregoing document with the Clerk of the Court Under Seal.  I also certify that the foregoing document is being served Via Overnight Courier on this day on all counsel of record identified on the attached Service List.

                                                                                                                                                                    _____

                                                                                                                                                                     Ericka Turk-Moore

**SERVICE LIST**

**W. Barry Blum**
bblum@gjb-law.com
**Martin J. Keane**
mkeane@gjb-law.com
Genovese Joblove & Battista, P.A.
100 S.E. 2nd Street, Suite 4400
Miami, Florida 33131
Telephone: 305-349-2300
Facsimile: 305-349-2310

**Edgar H. Haug**, Admitted Pro Hac Vice
ehaug@flhlaw.com
**Brian S. Goncalves**, Admitted Pro Hac Vice
bgoncalves@flhlaw.com
**David Herman**, Admitted Pro Hac Vice
dherman@flhlaw.com
Frommer Lawrence & Haug LLP
745 Fifth Avenue
New York, NY 10151
Telephone: 212-588-0888
Facsimile: 212-588-0500

*Attorneys for Defendants*
*Marchon Eyewear, Inc. and Nike, Inc.*