# EXHIBIT B





___ㄴ Priority
___ㄴ Send
_____ Clsd
___ㄴ Enter
_____ JS-5/JS-6
_____ JS-2/JS-3

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Revolution Eyewear, Inc., | CV 02-1087 LGB (CWx) |
| Plaintiff, | |
| v. | |
| | ORDER CONSTRUING CLAIMS OF U.S. PATENTS 6,343,858 AND RE 37,545 |
| Aspex Eyewear, Inc. et al., | |
| Defendants. | |

## I. INTRODUCTION

In the present action, plaintiff Revolution Eyewear, Inc. ("Plaintiff" or "Revolution") alleges that defendants Aspex Eyewear, Inc. ("Aspex"), Thierry Ifergan ("Ifergan"), Real Eyes Optical ("REO") and Scott Strenk ("Strenk")[1] infringe its U.S. Patent No. 6,343,858 (the "'858 Patent"). Defendant and counterclaimant Aspex contends that Plaintiff infringes U.S.

_____

[1] Aspex, Thierry, REO and Strenk are collectively referred to as "Defendants."

1

Patent No. RE 37,545E (the "'545 Patent") issued to Aspex, Manhattan Design Studio, Inc., Contour Optik, Inc. and Asahi Optical Co., Ltd. (collectively "Counterclaimants").

This matter is before the Court for the purpose of interpreting the disputed claims of the '858 and '545 patents.

## II.  FACTUAL AND PROCEDURAL HISTORY

For purposes of the instant motion, the Court finds the following facts to be relevant. The technology at issue in this case involves a spectacle frame that supports an auxiliary frame, enabling the user to securely fasten a second set of lenses (e.g., sunglass lenses) onto the primary frame (often holding prescription lenses). Plaintiff's '858 Patent, which issued on February 5, 2002, is directed to a method and apparatus for mounting auxiliary eyeglasses on conventional eyeglasses in which magnets are attached to appendages on the auxiliary eyeglasses mating with magnets mounted on the temple extensions of conventional eye-glasses.

Counterclaimants' '545 Patent, which issued on February 12, 2002, is directed to a spectacle frame that supports an auxiliary lens frame through an arrangement using magnetic members. The '545 is a reissue of Counterclaimants' original U.S. Patent No. 5,568,207 (the "'207 Patent"), which has now been surrendered.[2]

---

[2] This Court has previously found on summary judgement, in a related case, that Revolution does not infringe Aspex's original '207 patent issued to Chao. See Aspex Eyewear, Inc. v. Revolution Eyewear, Inc., CV 99-1623, Order Granting Defendant's Motion for Summary

1   For purposes of the Court's claim construction endeavor

2   here, it suffices to note that Plaintiff accuses Defendants of

3   infringing the '858 Patent and Counterclaimants accuse Plaintiff

4   of infringing the '545 Patent.  Pursuant to the Court's February

5   28, 2003 Minute Order, the parties, on March 12, 2003, submitted

6   two Joint Claim Construction Statements, one for the '858 Patent

7   ("JS-'858") and the second for the '545 Patent ("JS-'545").  On

8   March 19, 2003, Revolution and Counterclaimants filed their

9   respective Opening Claim Construction Briefs.  On March 26, 2003,

10  Counterclaimants filed their joint Responsive Brief to

11  Revolution's Opening Claim Construction Brief.  On March 27,

12  2003, Revolution filed its Responsive Brief to Counterclaimants'

13  Opening Claim Construction Brief.[3]  Also on March 27, 2003,

14

15  defendants REO and Strenk filed their joint Responsive Brief to

16  Revolution's Opening Claim Construction Brief.[4]  On April 2,

17  2003, Revolution and Counterclaimants filed their respective

18  Reply briefs.

19  ///

20  ///

21

22

23  Judgment on Plaintiff's Claim of Patent Infringement, June 4, 2001, Docket Entry No. 184. The
    Federal Circuit affirmed this Court's finding of non-infringement. See Case No. CV-1623,

24  Docket Entry No. 217.  In the instant case, Counterclaimants allege that Revolution infringes
    claims 6, 22 and 34 of the '207 Reissue Patent - the '545 Patent.

25

26  [3] Although Revolution's Responsive Brief was filed a day late, the Court deems it to have been
    timely filed.

27
    [4] Like Revolution's Responsive Brief, REO and Strenk's joint responsive Brief was filed a day
28  late; however, the court deems it to have been timely filed.

3

III. **LEGAL STANDARDS AND ANALYSIS**

  A.   **Legal Standards**

  In <u>Markman v. Westview Instruments, Inc.</u>, 517 U.S. 370 (1996), the Supreme Court held that the interpretation of a patent claim-the portion of the patent document that defines the scope of the patentee's rights-is a matter of law exclusively within the scope of the court and is not a factual question for the jury. <u>Id.</u> at 372. The <u>Markman</u> decision suggested that a trial court could consider various types of evidence when interpreting a patent, including expert testimony. <u>See id.</u> at 388-90. Shortly after the Supreme Court handed down <u>Markman</u>, the Federal Circuit, in <u>Vitronics Corp. v. Conceptronic, Inc.</u>, 90 F.3d 1576 (Fed. Cir. 1996), expanded on the Court's dicta concerning evidence available to a trial court in interpreting patent claims. <u>See id.</u> at 1581-83.  The Federal Circuit held that if intrinsic evidence can, by itself, resolve ambiguity in a patent term, then a court may not rely on extrinsic evidence, such as expert testimony, to construe the term. <u>See id.</u> at 1583.  A trial court may only use extrinsic evidence when intrinsic evidence fails to illuminate the meaning of the disputed claim. <u>Id.</u> Moreover, extrinsic evidence cannot broaden the reach of a claim or contradict explicit language.  <u>Id.</u> The policy rationale supporting this evidentiary limitation is that prospective patentees must have access to public records concerning the patent to "design around" a prior art. <u>Id.</u>  If expert testimony or other extrinsic evidence were permitted to alter the record,

then this public benefit would be frustrated. _Id._ Thus, a court can only examine extrinsic evidence if the evidence does not contradict the claim language, the specification, or the prosecution history but instead supplements it. _Id._ at 1584-85.

The Federal Circuit detailed a hierarchy of specific types of evidence that a court may consider. Thus, when interpreting a patent, a trial court must first look at the language of the claim itself. _See id._ at 1582. Courts should typically construe terms by their common, customary meaning, but a patentee is allowed to define her own terms in the specification section of the patent. _See id._ Therefore, courts must always review the specification, which, when setting forth an embodiment of the invention, frequently provides explicit definitions of the claim terms. _See id._ The language in the specification is dispositive, and "it is the single best guide to the meaning of the disputed term." _Id._ However, a patent's claims are not limited to the specification's best mode, preferred embodiment, specific objects, or illustrative examples, and it is erroneous to read limitations from the specification into the claims. _See Laitram Corp. v. Cambridge Wire Cloth Co._, 863 F.2d 855, 865 (Fed. Cir. 1988)("References to a preferred embodiment, such as those often present in a specification, are not claim limitations."); _Rolls-Royce Ltd. v. GTE Valeron Corp._, 800 F.2d 1101, 1108 (Fed. Cir. 1987)("Reference to an object does not constitute in itself a limitation in the claims."). In addition, a court may consider the prosecution history of the patent as

5

1   evidence of meaning. Id. This history contains the complete

2   record of all the filings and examinations before the Patent and

3   Trademark Office ("PTO"), including representations made by the

4   applicant regarding the significance of claims and terms. Id. The

5   history also limits the interpretation of terms by recording the

6   exclusion of any term definition disclaimed during the

7   prosecution. Id.

8   **B.   Analysis**

9        **1.   The claims in dispute**

10       Pursuant to the Joint Statement, the following claims of the

11  '858 and the '545 patents contain terms that are disputed by the

12  parties.[5]

13

14            **a.   Disputed claims in the '858 Patent**

15  **Claim 1:**

16  Apparatus for attaching auxiliary eyeglasses to conventional

17  eyeglasses comprising:

18       a **plurality of sockets** formed on temple extensions of

19  said conventional eyeglasses;

20       a plurality of **magnets** mounted in said sockets on said

21  conventional eyeglasses;

22       a **plurality of sockets** formed on appendages on said

23  auxiliary sunglasses, said appendages construed and arranged

24  to fit below said temple extensions;

25

26

27  _____

28  [5] The disputed terms are shown in bold.

1    a plurality of **magnets** mounted in said **plurality of**
2    **sockets** on said appendages;
3    said plurality of magnets mounted on said conventional
4    eyeglasses and said plurality of magnets mounted on said
5    auxiliary eyeglasses being oriented such that the maximum
6    magnetic attractive force between said magnets is oriented
7    approximately parallel to lenses in said conventional
8    eyeglasses;
9    a first pair of said **plurality of sockets** having said
10   plurality of **magnets** mounted **to form recesses** in said first
11   pair of sockets;
12   a second pair of said **plurality of sockets** having said
13   plurality of **magnets** mounted to extend out of said pair of
14   sockets, said **magnets constructed and arranged to fit into**
15   **said recesses** in said first pair of sockets;
16   **whereby said extended magnets in said second pair of**
17   **sockets engage said recesses to automatically align and**
18   **secure said auxiliary eyeglasses when mated with said**
19   **magnets forming said recesses in said first pair of sockets**
20   providing maximum resistance to downward movement of said
21   auxiliary eyeglasses thereby preventing detachment of said
22   auxiliary eyeglasses from said conventional eyeglasses.
23
24
25   Claim 2:
26   The apparatus according to claim 1 in which said first
27   pair of sockets having said **magnets** mounted to form a recess

7

are on said conventional eyeglass temple extensions; and

said second pair of sockets with **magnets** extended out

therefrom are mounted on said appendages on said auxiliary

eyeglasses.

**Claim 3:**

The apparatus according to claim 2 including a

**protective and decorative coating material** on exposed sides

of said plurality of **magnets**.

**Claim 4:**

The apparatus according to claim 3 in which said

protective and decorative coating material **matches** the

frames of said conventional and auxiliary eyeglasses.


        **b.    Disputed claims in the '545 Patent**

**Claim 6:**

An eyeglass device comprising:

a primary spectacle frame for supporting primary lenses

therein;

the primary spectacle frame including two side portion

extensions extended therefrom for pivotally coupling a leg

thereto; and

the primary spectacle frame including two first

magnetic members respectively having a **horizontal surface**

and being secured to one of the side portions extensions of

the primary spectacle frame; and

8

1        an auxiliary spectacle frame for supporting auxiliary

2    lenses therein, and for disposing in front of the primary

3    spectacle frame, the auxiliary spectacle frame including two

4    auxiliary side portions, wherein the auxiliary spectacle

5    frame further includes two second magnetic members each

6    secured to one of the auxiliary side portions and having a

7    **horizontal surface** for coupling a corresponding surface of

8    one of the first magnetic members so as to secure the

9    auxiliary spectacle frame to the primary spectacle frame.

10   **Claim 22:**

11      A primary spectacle frame for supporting primary lenses

12   therein and having two side portion extensions extending

13   rearwardly therefrom and having a front side, a rear side, a

14   top side, and a rear end, each of said rear ends pivotally

15   coupling a leg configured to conform to a user at a distal

16   end thereof, each of said extensions of said primary

17   spectacle frame further having a projection attached to each

18   of said rear sides, and a pair of first magnetic members

19   respectively **secured in said projections, said first**

20   **magnetic members capable of engaging second magnetic members**

21   **of an auxiliary spectacle frame** so that lenses of an

22   auxiliary spectacle are located in front of said primary

23   lenses.

24   **Claim 34:**

25      An eyeglass device comprising:

26

27

28

9

a primary spectacle frame having two side portion
extensions with a front side, a rear side and a first
magnetic member;

an auxiliary spectacle frame including two side
portions each having an arm extended therefrom, each of said
arms containing a second magnetic member, **said arms
extending across a respective extension** from said front side
to said rear side so that **said first and second magnetic
members engage one another** whereby said auxiliary spectacle
frame is supported by said primary spectacle frame.

### 2.    The disputed terms

The Court first considers the disputed claim terms in the
'858 Patent, followed by the disputed terms in the '545 Patent.

### a.    Disputed terms in the '858 Patent

The following terms or combination of terms are in
dispute:(1) "plurality of sockets," in claim 1 (2) "magnets" in
claims 1-3; (3) "being oriented such that the maximum magnetic
attractive force between said magnets is oriented approximately
parallel to lenses in said conventional eyeglasses" in claim 1;
(4) "mounted to form recesses in said first pair of sockets," in
claim 1; (5) "whereby said extended magnets in said second pair
of sockets engage said recesses to automatically align and secure
said auxiliary eyeglasses when mated with said magnets forming
said recesses in said first pair or sockets," in claim 1, (6)

1   "providing maximum resistance to a downward movement of said

2   auxiliary eyeglasses thereby preventing detachment of said

3   auxiliary eyeglasses from said conventional eyeglasses," in claim

4   1; **(7)** "a protective and decorative coating material on exposed

5   sides of said plurality of magnets," in claim 3; and **(8)**

6   "matches" in claim 4.

7

8           (1)   "plurality of sockets" (claim 1)

9       Plaintiff Revolution argues that the phrase "plurality of

10  sockets" in claim 1 of the '858 means "two or more openings or

11  recesses formed in the temple extensions." JS-'858, Exh. 1 at 1.

12  Conversely, Counterclaimants[6] argue that the instant phrase

13  should be construed to mean "two or more housings or openings

14  into which inserted parts are designed to fit." JS-'858, Exh. 2

15  at 1.

16      Preliminarily, the Court notes that Revolution's

17  construction is counter-productive because it defines the word

18  "sockets" as "recesses"; and the word "recesses" is a separate

19  element of claim 1. See Declaration of Michael A. Nicodema

20  Submitting Documents and Exhibits in Support of

21  Defendants'/Counterclaimants' Responsive Claim Construction Brief

22  for U.S. Patent No. 6,343,858 ("Nicodema Decl. I"), Exh. 1, '858

23  Patent, Col. 8, ll. 38-40. Additionally, and contrary to

---

[6] REO and Strenk's arguments in their joint claim construction brief are identical to those made by Counterclaimants. Therefore, and for the sake of brevity, only Counterclaimants' briefs will be cited to in this Order.

1  Counterclaimants' proposed construction, the word "housing" is

2  not used by the inventor to define "sockets."  <u>See</u>

3  Counterclaimants' Responsive Brief Re. '858 patent at 8:14-17

4  (citing the '858 Patent at Col. 7, ll. 19-21).

5       The '858 patent specification and prosecution history do not

6  define the word "socket"; they simply use the word.  There is no

7  special meaning of "socket" set out in the intrinsic record which

8  would warrant a construction that departs from the ordinary and

9  customary definition of the word.  Accordingly, the dictionary

10 definition should control.  <u>See Texas Digital Systems, Inc. v.</u>

11 <u>Telegenix, Inc.</u>, 308 F.3d 1193, 1203 (Fed. Cir. 2002) (stating

12 that dictionaries, encyclopedias and treatises "may be the most

13 meaningful sources of information to aid judges in better

14 understanding both the technology and the terminology used by

15 those skilled in the art to describe the technology.").  The

16 dictionary definition of "socket" is "[a]n opening into which an

17 inserted part is designed to fit."  <u>Webster's II New College</u>

18 <u>Dictionary</u> ("Webster's"), Nicodema Decl. I, Exh. 3 at 43.

19      Based on the foregoing the Court construes the phrase

20 "plurality of sockets" to mean two or more openings into which an

21 inserted part is designed to fit.

22

23

24          (2)  "magnets" (claims 1-3)

25      Plaintiffs argue that the term "magnets" in claims 1-3 of

26 the '858 Patent means "a permanent magnet, or ferromagnetic

1   material capable of acting as a magnet, or equivalents." JS-
2   '858, Exh. 1 at 3.  Conversely, Counterclaimants argue that the
3   instant phrase means "permanent magnets."  JS-'858, Exh. 2 at 3.
4        In its proposed construction of "magnets," Revolution relies
5   upon this Court's construction of the phrase "magnetic members"
6   in the case of Aspex Eyewear, Inc. v. Miracle Optics, Inc., CV
7   01-10396, Order Construing Claims of U.S. Patents RE 37,545 and
8   6,109,747, February 14, 2003, attached to the Declaration of
9   Michael Nicodema Submitting Documents and Exhibits in Support of
10  Claim Construction Analysis of the '545 Patent ("Nicodema Decl.
11  II"), Exh. 8 (hereinafter "Miracle Claim Construction Order").
12  In that case, the Court was construing the claims of
13  Counterclaimants' '545 and '747 patents, not the claims of
14  Revolution's '858 Patent.  Contrary to Revolution's assertion,
15  the Court's claim construction order in the Miracle case does not
16  "estop" Counterclaimants from asserting that the ordinary meaning
17  of the word "magnet," as used in the '858 Patent, does not
18  include ferromagnetic materials.  The words used in the claims of
19  the '858 and the '545 patents are different; as are their
20  intrinsic records.  Nowhere in the Miracle Claim Construction
21  Order did the Court state or suggest that it was construing the
22  noun "magnet"; let alone any element of the '858 Patent claims.
23       In the claims at issue in the '858 Patent, the operative
24  word is the noun "magnet," not the adjective "magnetic."  The
25  only word used in the '858 Patent specification to describe the
26  magnets of the asserted claims is "magnet"; not "magnetic

13

1  members," "magnetic material," or "ferromagnetic material." The

2  '858 patent specification and prosecution history do not define

3  the word "magnet"; they simply use the word. The ordinary

4  meaning of the word "magnet" is: "1. A body that attracts certain

5  materials, as iron, by virtue of a surrounding field of force

6  created by the motion of its atomic electrons and the alignment

7  of its atoms.  2. An electromagnet. 3. One that attracts."

8  Webster's, Nicodema Decl. I, Exh. 3 at 34.  Thus, the ordinary

9  meaning of "magnet" is essentially a permanent magnet; it cannot

10 be  ferromagnetic material because it needs to have the ability

11 to attract certain material like iron.[7]

12

13      The Court also notes that various portions of the '858

14 patent specification support the position that the word "magnet"

15 should be given its ordinary dictionary definition - i.e., a

16 permanent magnet.  See Nicodema Decl. I, Exh. 1, '858 Patent at

17 Col. 7, ll. 47-49, stating that "the key feature here is the

18 orientation of magnets 26 and 30 so that the maximum magnetic

19 attractive force along their axis (i.e. poles) 34 is vertically

20 oriented or parallel with conventional eyeglass frame 20"; and

21 Col. 3, ll. 22-27, stating that "[c]omplementary mating magnets

22 ... are also oriented with the plane of the magnets horizontal

23 and their axis (i.e. poles) vertical or approximately parallel to

24 the plane of the conventional eyeglasses."

25

26

27 _____

[7] A ferromagnetic material is a material that is attracted by a permanent magnet, *e.g.*, iron, nickel

28 and cobalt.  See Miracle Claim Construction Order at 19 n. 9.

14

1    Revolution argues that its construction is supported by the

2    fact that "a review of the entire file history of the '858 Patent

3    demonstrates that no rejection can be found based upon the type

4    of magnetic material used."  Revolution's Opening Brief at 7:2-4.

5    This argument by Revolution is at best irrelevant to the instant

6    issue.  The mere fact that the patent examiner did not issue a

7    rejection based on the type of magnetic material used has no

8    bearing on the interpretation of the term "magnets."  The patent

9    applicant in this case used the term "magnets" in his

10   application; and the most logical assumption is that the patent

11   examiner simply considered "magnets" to mean permanent magnets,

12   and thus would have had no reason to consider other

13   interpretations of that term.

14   

15        In its Reply Brief, Revolution states:

16        The Webster's definition of magnet is '1 ... a body having

17        the property of attracting iron and producing a magnetic

18        field external to itself; *specif*: a mass of iron, steel, or

19        alloy that has this property artificially imparted 2:

20        something that attracts.'  <u>Webster's New Collegiate</u>

21        <u>Dictionary</u>, 1980 Edition.... Under the dictionary

22        definition, a magnet includes a metal having an external

23        magnetic field to be artificially imparted.  For the

24        magnetic field to be artificially imparted to the metal, it

25        is a necessary and logical precondition that the particular

26        metal be capable of being magnetized.  Therefore, the

27        Court's prior definition in the <u>Miracle Optics</u> case is

15

equally applicable here: magnet means a permanent magnet or any ferromagnetic material capable of acting as a magnet.[8] Revolution's Reply Brief at 2:14-28. Revolution's argument misses the mark. The operative phrase in the dictionary definition is that a magnet has the property of <u>attracting iron</u> <u>and producing a magnetic field external to itself</u>. A ferromagnetic material, such as iron, "is a material that is <u>attracted by</u> a permanent magnet," it does not attract other material. <u>See Miracle</u> Claim Construction Order at 19 n. 9 (emphasis added).

Based on the foregoing, the Court construes the word "magnets" in claims 1-3 of the '858 Patent to mean permanent magnets.

> (3) "being oriented such that the maximum magnetic
> attractive force between said magnets is oriented
> approximately parallel to lenses in said
> conventional eyeglasses" (claim 1).

Revolution contends that the phrase "bring oriented such that the maximum magnetic attractive force between said magnets is oriented approximately parallel to lenses in said conventional eyeglasses" in claim 1 of the '858 Patent means "contained on the respective conventional frame and auxiliary frame parallel to the

---

[8] Incidentally, this Court construed "magnetic member" in <u>Miracle</u> to mean "a permanent magnet or a ferromagnetic member, but at least either the first or second magnetic members must be a permanent magnet." <u>Miracle</u> Claim Construction Order at 20:5-8.

1    plane of the lenses, which is the orientation that results in the

2    maximum orientation." JS-'858, Exh. 1 at 7-8. Conversely,

3    Counterclaimants argue that the phrase in question means that

4    "when the auxiliary eyeglasses are attached to the conventional

5    eyeglasses, the permanent magnets mounted on the conventional

6    eyeglasses are positioned relative to the magnets mounted on the

7    auxiliary eyeglasses such that the greatest possible amount of

8    magnetic attractive force between the magnets attainable will be

9    in the plane approximately parallel to the plane of the lenses of

10   the conventional eyeglasses." JS-'858, Exh. 2 at 7.

11

12       In its Reply Brief, Revolution states:

13       The parties may be closer on this issue than first imagined.

14       . . .

15       Revolution's concern is that the defendants are attempting

16       to add language requiring the magnets have maximum magnetic

17       force in order to argue later that the strongest possible

18       magnets must be used.... Given that the parties appear to

19       agree that the orientation causes the maximum magnetic

20       attraction, Revolution's proposed claim construction is most

21       appropriate because it does not open up any inappropriate

22       issues concerning the gauss strength of the magnets.

23   Revolution's Reply Brief at 3:17-4:19. It is clear to the Court

24   from reviewing the parties' briefs that Counterclaimants do not

25   seek to add language requiring that the magnets have a particular

26   gauss strength. Instead, Counterclaimants' construction, like

27   Revolution's, seek to construe the instant phrase to mean that

28

17

1  the primary and auxiliary frame magnets are oriented in such a

2  way as to achieve maximum magnetic attraction.[9]

3  <u>See</u> Counterclaimant's Responsive Brief at 12:13-22.

4       Therefore, the Court construes the instant phrase to mean

5  that when the auxiliary eyeglasses are attached to the

6  conventional eyeglasses, the permanent magnets mounted on the

7  conventional eyeglasses are positioned relative to the magnets

8  mounted on the auxiliary eyeglasses such that the greatest

9  possible amount of magnetic force attainable between the magnets

10 will be in a plane approximately parallel to the plane of the

11 lenses of the conventional eyeglasses.  <u>See</u> Webster's, Nicodema

12 Decl. I, Exh. 3 at 36, defining "maximum" as "the greatest

13 possible, quantity, degree, or number."

14

15            (4)  "mounted to form recesses in said first pair of

16                      sockets" ( claim 1)

17

18      Revolution contends that the phrase "mounted to form

19 recesses in said first pair of sockets" in claim 1 of the '858

20 Patent means "mounted in a first pair of sockets so that the

21 socket still contains a recess."  JS-'858, Exh. 1 at 10.

22

23 ────────────────────────────

24 [9] This, of course, begs the question of why the parties could not
   have simply resolved this issue during their meet-and-confer
25 session on claim construction, which was specifically ordered by
   the Court in its February 28, 2003 Minute Order.  The Court also
26 reminds the parties of their obligation under Local Rule 7-3 "to
   discuss thoroughly...the substance of the contemplated motion and
27 any potential resolution" before filing such motion with the
28 Court.

                              18

1  Counterclaimants argue that the instant phrase means "positioned
2  sufficiently below the outer peripheral edges of the sockets so
3  as to define an opening between the mating surfaces and the outer
4  peripheral edges." JS-'858, Exh. 2 at 9.

5     In its Reply Brief, Revolution states:
6     Defendants' definition of this term improperly includes the
7     term 'mating surfaces.' 'Mating surfaces' does not appear
8     in the claim, and it is unnecessary to the understanding of
9     the claim. No reason has been given for borrowing this term
10    from the specification. For this reason alone, the
11    defendants' interpretation of the claim is improper. <u>If</u>
12    <u>'mating surfaces' were deleted from the defendants'</u>
13    <u>definition of the term, then Revolution would agree to the</u>
14    <u>definition.</u>
15
16 Revolution's Reply Brief at 4:21-28 (emphasis added).
17 Preliminarily, the Court notes that, in their Responsive Claim
18 Construction Brief, Counterclaimants place no emphasis at all on
19 the use of the term "mating surfaces" in their construction of
20 the instant phrase. <u>See</u> Counterclaimants' Responsive Brief at
21 13:5-15. The Court agrees with Revolution that the term "mating
22 surfaces" is not necessary to construe the instant phrase. Thus,
23 the Court adopts Counterclaimants' construction without the term
24 "mating surfaces." Therefore the Court construes the instant
25 phrase to mean positioned sufficiently below the outer peripheral
26 edges of the sockets so as to define an opening between the
27 magnets and the outer peripheral edges.
28

19

1    (5)    "whereby said extended magnets in said second pair
2           of sockets engage said recesses to automatically
3           align and secure said auxiliary eyeglasses when
4           mated with said magnets forming said recesses in
5           said first pair of sockets" (claim 1)

6    Plaintiffs contend that the phrase "whereby said extended
7    magnets in said second pair of sockets engage said recesses to
8    automatically align and secure said auxiliary eyeglasses when
9    mated with said magnets forming said recesses inn said first pair
10   of sockets" in claim 1 of the '858 Patent means that "when
11   extended magnet clicks into place in the recess, the user
12   automatically knows that the auxiliary eyeglasses have been
13   properly positioned for use."  JS-'858, Exh. 1 at 13.

14   Counterclaimants construe the instant claim element to mean
15   that "when the magnets forming the recesses and the extended
16   magnets contact each other and join together through magnetic
17   attractive forces, the extended magnets will also contact
18   interior surfaces of the recesses, and this contact between the
19   extended magnets and the recesses, in combination with the mating
20   contact of the extended magnets and the magnets forming the
21   recesses, causes the auxiliary eyeglasses to be firmly attached
22   to the conventional eyeglasses, and the lenses of the auxiliary
23   eyeglasses to align with the lenses of the conventional
24   eyeglasses without any independent assistance of the wearer."
25   JS-'858, Exh. 2 at 12-13.

28

20

1    Revolution's construction seeks to reduce the functionality
2    of this elements to the "click[ing]" of the extended magnet into
3    the recess, even though the patent does not use any form of the
4    word "click."[10]  Revolution also fails to construe the following
5    elements of claim 1: 1) that the extended magnets "engage said
6    recesses"; 2) that the extended magnets be "mated" with the
7    magnets forming the recesses; and 3) that the alignment of the
8    frames be "automatic."  Revolution cites to <u>Texas Instruments,</u>
9    <u>Inc. v. U.S. Int'l Trade Commn.</u>, 988 F.2d 1165, 1772 (Fed. Cir.
10   1993) to argue that "functional statements, [like the 'whereby'
11   element here], which merely state the result of the limitation
12   are not to be construed as limitations themselves."  Revolution's
13   Opening Brief Re '858 Patent at 9:23-10:4.  Contrary to
14   Revolution's argument, the instant claim element contains
15   additional structural features not present in any other part of
16   the claim - features that are necessary to describe how the
17   conventional and auxiliary eyeglasses interconnect – i.e., the
18   extended magnets "engage said recesses", and the extended magnets
19   are "mated" with the magnets forming the recesses.  These
20   structural features are necessary to show how the other recited
21   elements cooperate to secure the auxiliary sunglasses to the
22   conventional eyeglasses; and thus, are necessary to complete the
23   invention claimed.  Indeed, the inventor emphasized in the
24   patents specification that these features constituted a "unique

_____

28   [10] The Court also finds the term "click" to be ambiguous as applied to the instant invention.

21

1 and important improvement" to ensure "secure attachment and
2 alignment of auxiliary eyeglass frames 10 with conventional
3 eyeglass frame 12." Nicodema Decl. I, Exh. 1, '858 Patent, Col.
4 7, 11. 15-27.

5    The decision in <u>Texas Instruments</u> is completely
6 distinguishable. There, the Federal Circuit held that the
7 "whereby/to preclude" clauses were not claim elements because the
8 clauses "[did] not contain any limitations not inherent to the
9 process found in" the claims. <u>Texas Instruments</u>, 988 F.2d at
10 1172. Here, in contrast, the requirements that the extended
11 magnets "engage the recesses," and that the extended magnets be
12 "mated" with the magnets forming the recesses only appear in the
13 "whereby" clause, and are not inherent parts of the eyeglass
14 structure recited in other portions of the claim.

16    In this case, the part of the specification relevant to the
17 phrase being construed states:

18    One can easily see the auxiliary eyeglasses approaching the
19    conventional eyeglasses with the appendages on the auxiliary
20    eyeglasses below the temple of the conventional eyeglass
21    frame. Then with a very slight upward movement the magnets
22    attract and the auxiliary eyeglass frame is firmly attached.
23    This can be done simply and easily with one hand without any
24    feeling or fumbling that previous arrangements required.
25    The orientation is nearly automatic and doesn't require the

22

1    more careful alignment that is required of other

2    magnetically fastened auxiliary eyeglasses.[11]

3  Nicodema Decl., Exh. 1, '858 Patent, Col. 3, ll. 42-51.  Based on

4  the foregoing, the Court construes the instant phrase to mean

5  that when the magnets forming the recesses and the extended

6  magnets contact each other, this contact between the extended

7  magnets and the recesses causes the auxiliary eyeglasses to align

8  and secure to the conventional eyeglasses with little assistance

9  from the wearer.

10

11

12    (6)  "providing maximum resistance to downward movement

13          of said auxiliary eyeglasses thereby preventing

14          detachment of said auxiliary eyeglasses from said

15          conventional eyeglasses" (claim 1)

16  Plaintiff argues that the phrase "providing maximum

17  resistance to downward movement of said auxiliary eyeglasses

18  thereby preventing detachment of said auxiliary eyeglasses from

19  said conventional eyeglasses" in claim 1 of the '858 Patent means

20  that "the orientation of the magnetic forces recited earlier in

21  the claim will result in maximum resistance to downward movement

22  of the auxiliary eyeglasses."  JS-'858, Exh. 1 at 14-15.

23

---

24  [11] In the "Background of the Invention" section of the '858 Patent, the inventor describes the

25  "problem" with some of the prior art as requiring "that the auxiliary eyeglass extensions ... be
     carefully placed above the temple hinge connections, [which] makes it [a] little more difficult to

26  attach the auxiliary frames to be sure that the extensions are placed carefully above the hinge

27  connections of the conventional eyeglass.  In most cases a wearer has to remove his conventional
     eyeglasses to attach the auxiliary lenses."  Nicodema Decl. I, Exh. 1, '858 Patent, Col. 2, ll. 12-

28  19.

23

1   Conversely, Counterclaimants argue that the instant phrase means

2   that "the mated magnets provide the greatest possible amount of

3   resistance to downward movement of the auxiliary eyeglasses so as

4   to keep the auxiliary eyeglasses from separating from the

5   conventional eyeglasses." JS-'858, Exh. 2 at 14.

6        The Court notes that Revolution's proposed construction

7   merely repeats the claim element in question, and fails to

8   construe its terms. Revolution again relies on <u>Texas</u>

9   <u>Instruments</u> to argue that the instant claim term is merely a

10  functional statement and not a claim limitation.

11  <u>See</u> Revolution's Opening brief for the '858 Patent at 9:11-10:4.

12  The Court disagrees.  An important part of this invention, as

13  expressed in the patent itself, is that the alignment of the

14  magnets provides maximum resistance to the downward detachment of

15  the auxiliary frame from the conventional frame.  <u>See</u> Nicodema

16  Decl. I, Exh. 1, '858 Patent, Col. 7, ll. 15-24.  Thus, the

17  present claim language dealing with the resistance to downward

18  movement, language not present anywhere else in the claim, is

19  part of the claim limitation.  The Court finds that

20  Counterclaimant's construction is consistent with the patent

21  documents and the ordinary meaning of the words.  Therefore, the

22  Court adopts Counterclaimants' construction and construes the

23  instant phrase to mean providing the greatest possible amount of

24  resistance to downward movement of the auxiliary eyeglasses so as

25

26

27

28

1 to keep the auxiliary eyeglasses from separating from the

2 conventional eyeglasses.[12]

3

4           (7) "a protective and decorative coating material

5           on exposed sides of said plurality of magnets"

6           (claim 3)

7     Revolution construes the phrase "a protective and decorative

8 coating material on exposed sides" in claim 3 of the '858 Patent

9 to mean that "the exposed surfaces of magnets or ferromagnetic

10 [sic] are substantially covered with a coating." JS-'858, Exh. 1

11 at 16. Counterclaimants, conversely, construe the instant phrase

12 to mean that "all visible sides of the magnets that are not

13 enclosed by the sockets formed on the temple extensions and the

14 appendages are covered with a layer of material that enhances the

15 aesthetic appearance of the magnets and provides protection from

16 normal wear and tear." JS-'858, Exh. 2 at 16.

17     Preliminarily, the Court notes that, contrary to

18 Counterclaimants' assertion, it is not necessary to construe the

19 terms "decorative" and "protective." The Court also notes that

20 Revolution's proposed construction improperly seeks to inject

21 into the claim element an apparent broadening requirement of

22

23

24

25

26 _____

27 [12] As previously discussed, see supra section "III B 2 a (3)," the interpretation of the terms
"maximum resistance" to mean "greatest possible amount of resistance" does not infer that a

28 magnet with a particular gauss strength must be used.

1   "substantial[ity]" that is usupported by the patent documents.[13]

2   The relevant dictionary definitions of the terms in dispute are:

3   1) coat: "a layer of covering material: coating"; Webster's,

4   Nicodema Decl. I, Exh. 3 at 29; and 2) expose: "to make visible."

5   Id. at 33.  Based on the foregoing the Court construes the

6   instant phrase to mean a layer of protective and decorative

7   covering material on the visible sides of said plurality of

8   magnets.

9

10

11                    (8)  "matches" (claim 4)

12      Revolution contends that the term "matches" in dependent

13   claim 4 means "is aesthetically consistent with the color"  JS-

14   '858, Exh. 1 at 17.  Conversely, Counterclaimants contend that

15   the instant term means "is the exact color."  JS-'858, Exh. 2 at

16   18.

17      The only reference in the specification that is relevant to

18   the instant term describes one of the preferred embodiments by

19   stating:

20          This embodiment improves the appearance of the magnets in

21          the conventional eyeglass frame 12' by covering the exposed

22          surface with a protective and decorative coating of material

23          72 configured to match the color and appearance of the

24          conventional eyeglass frames 12'.

25

26

27   _____

[13] It is not clear if Revolution acquiesced to the proposed construction by Counterclaimants as

28   Revolution did not address the construction of the instant phrase in its Reply Brief.

Nicodema Decl. I, Exh. 1, '858 Patent Col. 7, ll. 5-9. The dictionary definition of the verb "to match" is "1. a. to be exactly like: correspond precisely. b. to be like with respect to specified qualities. 2. To resemble or harmonize with <The lipstick *matches* the nail polish.>." Nicodema Decl. I, Webster's, Exh. 3 at 35. The dispute between the parties boils down to whether the court should adopt the first definition in Webster's, *i.e.*, "to be exactly like," or the second definition, *i.e.*, "to resemble or harmonize." The Court finds that the first definition, which is sought by Counterclaimants, is unnecessarily restrictive. There is no requirement in the patent documents that the color of the coating material on the magnets be exactly like the color of the frames; instead, a harmonization of the colors is encompassed by the claimed invention. Therefore, the Court adopts the second definition in Webster's and construes "matches" to mean resembles or harmonizes with.

### b. Disputed terms in the '545

The following terms and combination of terms in claims 6, 22 and 34 of the '545 patent are disputed: **(1)** "having a horizontal surface" (claim 6); **(2)** "secured in said projections" (claim 22); **(3)** "said first magnetic members capable of engaging second magnetic members of an auxiliary spectacle frame" (claim 22); **(4)** "said arms extending across a respective extension" (claim 34), and **(5)** "said first and second magnetic members engage one

another" (claim 34). The Court now addresses each of these disputed terms.

(1) "having a horizontal surface" (claim 6)

Claim 6 of the '545 Patent uses the phrase "having a horizontal surface" in two contexts. First, the claim refers to the first magnetic members of the primary spectacle frame as "having a horizontal surface." Nicodema Decl. II, Exh. 1, '545 Patent, Col. 4, ll. 35-36. Second, the claim refers to the second magnetic members of the auxiliary frame as "having a horizontal surface." Id. at Col. 4, ll. The Court will address separately each use of the instant phrase.

(a) "having a horizontal surface" - first magnetic members in the primary frame

Counterclaimants construe the phrase "having a horizontal surface" as used with the magnetic members of the primary frame to mean "ha[ving] a surface that lies in a plane substantially perpendicular to the plane of the lenses of the primary spectacle frame." JS-'545, Exh. 1 at 5. Conversely, Revolution contends that the instant phrase means that "the first magnetic members each have an upperwardly [sic][14] facing surface that lies in a plane that is substantially perpendicular to the plane of

_____

[14] Presumably, Revolution meant to say "upwardly."

28

1  the lenses of the primary spectacle frame."  JS-'545, Exh. 2 at
2  26 (emphasis added).

3       The crux of the dispute between the parties is whether or
4  not the invention claimed in the '545 Patent is limited to a top-
5  mounting design.[15]  Counterclaimants contend that the '545 Patent
6  covers both a top and bottom-mounted designs; conversely,
7  Revolution argues that only a top-mounting design is covered by
8  the invention.

9       In this case, the specification of the '545 Patent describes
10  the attachment of the auxiliary frame in terms of top-mounting as
11  shown by the following:
12

13       The arms are engaged with and supported on the <u>upper portion</u>
14       of the primary spectacle frame so as to allow the auxiliary
15       spectacle frame to be stably supported on the primary
16       spectacle frame and so as to prevent the auxiliary spectacle
17       frame from moving downward....

18  '545 Patent, Nicodema Decl. II, Exh. 1, '545 Patent, Col 1, ll.
19  62-67 (emphasis added)

20       It is to be noted that the arms 21 are engaged with and are
21       supported on the <u>upper portion</u> of the primary spectacle
22       frame 10 such that the auxiliary spectacle frame 20 may be
23       stable supported and secured to the primary spectacle frame
24       10.
25

26  <u>Id.</u>, Col. 2, ll. 49-56 (emphasis added).

27  ---
28  [15] A "top-mounting design" is one where the magnetic members of the auxiliary frame mount on top of the magnetic members of the primary frame.

29

[T]he arm 21 securing the magnetic member 22 is supported on an <u>upper side</u> portion of the primary spectacle frame 10. As shown in FIG. 7, the upper side portion can be an upper part of the side portion securing the projection 13.

<u>Id.</u>, Col. 3, ll. 14-18. (emphasis added).

While it is true, as Counterclaimants argue, that the claims are generally not limited by the disclosed embodiments in the patent, <u>see Electro Med. Sys., S.A. v. Cooper Life Sciences, Inc.</u>, 34 F.3d 1048, 1054 (Fed. Cir. 1994), it does not, however, follow that the patentee has a monopoly over the entire universe of embodiments that may be created - whether or not such embodiments are encompassed by the disclosed invention. <u>See Netword LLC v. Centraal Corp.</u>, 242 F.3d 1347, 1352 (Fed. Cir. 2001) ("Although the specification need not present every embodiment or permutation of the invention and the claims are not limited to the preferred embodiment of the invention, neither do the claims enlarge what is patented beyond what the inventor has described as the invention.") (internal citations omitted); <u>see also Slimfold Mfg. Co. v. Kinkead Indus., Inc.</u>, 810 F.2d 1113, 1116 (Fed. Cir. 1987) ("Claims are not interpreted in a vacuum, but are part and are read in light of the specification."). Indeed, the specification may limit the scope that a patent claim is accorded in circumstances where no broader scope of the claim is described or enabled by the embodiments disclosed therein. <u>See e.g</u>, <u>Kraft Foods, Inc. v. Int'l Trading Co.</u>, 203 F.3d 1362, 1367-69 (Fed. Cir. 2000) (limiting "back panel" to the "rigid"

30

1    back panel described in every embodiment in the specification and

2    excluding the "flexible back panel of the accused device").[16]

3    Here, the invention described is clearly for a top-mounting

4    design: the written description only describes a top-mounting

5    design, the drawings only show a top-mounting configuration and

6    nothing in the prosecution history shows that the inventor

7    envisioned anything other than a top-mounting design.[17]

8

9       Based on the foregoing, the Court adopts the construction

10   proposed by Revolution and construes the instant phrase to mean

11   that the first magnetic members each have an upwardly facing

12   surface that lies in a plane that is substantially perpendicular

13   to the plane of the lenses of the primary spectacle frame.[18]

14

_____

15   [16] At Oral Argument, on May 2, 2003, Counterclaimants' counsel argued that Texas Digital

16   Systems, Inc. v. Telegenix, Inc., 308 F.3d 1193, 1201-03 (Fed. Cir. 2002), instructs that the
focus of claim construction should be on the claims themselves. See also Mem. of P's & A's in

17   Support of Counterclaimants' Opening Brief at 3:22-27 (citing Texas Digital Systems, Inc., 308
F.3d at 1202). The Court notes that the argument proffered by Counterclaimants as to claim

18   construction is quite unremarkable. Indeed, this Court, in its Miracle Claim Construction Order,

19   stated with regard to the steps involved in construing claims: "First a court must look to the
words of the claims themselves, both asserted and non-asserted, to define the scope of the

20   patented invention." Miracle Claim Construction Order at 16:1-3. In the instant case, the Court

21   is not deviating from well-established Federal Circuit precedent requiring that "[i]n construing
claims, the focus ... begin and remain centered on the language of the claims themselves." Texas

22   Digital, Inc., 308 F.3d at 1201. Instead, the Court is also incorporating into its analysis Federal

23   Circuit precedent that instructs that the claims, although they are the focus of claim construction,
are not to be construed in a vacuum, i.e., without regard to what the inventor disclosed as his

24   invention. See Slimfold Mfg. Co., 810 F.2d at 1116.

25   [17] Incidentally, in the Miracle Claim Construction Order, this Court also limited claims 12 and 16
to a top-mounting design. See Miracle Claim Construction Order at 27-28.

26

27   [18] The Court need not reach the other arguments raised by Revolution in support of its proposed
construction, including the arguments regarding the interference proceedings of the '207 Patent

28   and the prosecution history of the '858 Patent.

(b)    "having a horizontal surface" - second

magnetic members in the auxiliary frame

Counterclaimants construe the phrase "having a horizontal surface" as used with the magnetic members in the auxiliary frame to mean "ha[ving] a surface that lies in a plane substantially perpendicular to the plane of the lenses of the auxiliary spectacle frame." JS-'545 Patent, Exh. 1 at 5. Conversely, Revolution construes the instant phrase to mean "ha[ving] a downwardly facing surface that lies in a plane substantially perpendicular to the plane of the lenses of the auxiliary spectacle frame." JS-'545 Patent, Exh. 2 at 6 (emphasis added).

Here again, the dispute between the parties centers on whether the disclosed invention is limited to a top-mounting design. As the Court already held above, see supra section "III B 2 b(1)(a)," the invention disclosed in the '545 Patent is limited to a top-mounting design. Therefore, the Court adopts Revolution's proposed construction and construes the instant phrase to mean having a downwardly facing surface that lies in a plane substantially perpendicular to the plane of the lenses of the auxiliary spectacle frame.

(2)    "secured in said projections" (claim 22)

Counterclaimants contend that the phrase "secured in said projections" in claim 22 of the '545 Patent means that "each first magnetic member is inserted into and firmly connected to a

32

corresponding projection in a manner such that the connection is not likely to fail or give way." JS-'545, Exh. 1 at 11. Revolution, on the other hand, construes the instant phrase to mean that "each first magnetic member is inserted into and firmly connected to a corresponding projection in a manner that permits it attract [sic] a second magnetic member when placed <u>above</u> the first magnetic member." JS-'545, Exh. 2 at 12 (emphasis added).

Again, the parties' dispute centers on whether the invention is limited to a top-mounting design. However, this particular element of claim 22 need not address the issue of top-mounting as it only deals with the connection of the first magnetic members to the projections of the primary spectacle frame. Instead, the top-mounting limitation is more appropriately addressed in the element of claim 22 dealing with the auxiliary spectacle frame, which the court addresses next.

Consistent with the Court's <u>Miracle</u> Claim Construction Order, the Court adopts Counterclaimants' construction of "secured" to mean not likely to fail or give away. <u>See Miracle</u> Claim Construction Order at 22:3-9. Therefore, the Court construes the instant phrase to mean that each first magnetic member is inserted into and firmly connected to a corresponding projection in a manner such that the connection is not likely to fail or give.

(3)   "said first magnetic members capable of
         engaging second magnetic members of an
         auxiliary spectacle frame" (claim 22)

Counterclaimants construe the phrase "said magnetic members
capable of engaging second magnetic members of an auxiliary
spectacle frame" in claim 22 of the '545 Patent to mean that "the
first magnetic members have the ability to magnetically attract
corresponding magnetic members of an auxiliary spectacle frame,
with or without actual contact." JS-'545, Exh.1 at 12-13.
Conversely, Revolution argues that the instant phrase means that
"the first magnetic members have the ability to magnetically
attract the corresponding second magnetic members of an auxiliary
spectacle frame when placed <u>above</u> the first magnetic member, with
or without actual contact." JS-'545, Exh. 2 at 14 (emphasis
added).

Again, the dispute between the parties hinges on whether the
claimed invention is limited to a top-mounting design. For the
reasons stated above, see supra section "III B 2 b(1)(a)," the
Court adopts Revolution's construction and interprets the instant
phrase to mean the first magnetic members have the ability to
magnetically attract the corresponding second magnetic members of
an auxiliary spectacle frame when placed above the first magnetic
member, with or without actual contact.

(4)   "said arms extending across a respective extension" (claim 34)

Counterclaimants construe the phrase "said arms extending across a respective extension" in claim 34 of the '545 Patent to mean that "at least some portion of each arm reaches across the corresponding extension." JS-'545, Exh. 1 at 17. Revolution contends that the instant phrase means that "at least some portion of each arm reaches across the <u>top</u> of the corresponding extension." JS-'545, Exh. 2 at 18 (emphasis added).

Here again, the dispute between the parties hinges on whether the claimed invention describes a top-mounting design. For the reasons set forth above, <u>see</u> <u>supra</u> section "III B 2 b(1)(a)," the Court adopts Revolution's construction and construes the instant phrase to mean that at least some portion of each arm reaches across the top of the corresponding extension.

(5)   "said first and second magnetic members engage one another" (claim 34)

Counterclaimants construe the phrase "said first and second magnetic members engage one another" in claim 34 fo the '545 Patent to mean that the "first and second magnetic members magnetically attract one another, with or without actual contact." JS-'545, Exh. 1 at 20. Revolution, however, construes the instant phrase to mean that "the first and second magnetic

35

1   members are magnetically attracted to each other when the second

2   magnetic member is placed in proximity <u>above</u> the first magnet

3   [sic].[19]"   JS-'545, Exh. 2 at 20.

4       The crux of the parties dispute is again whether the design

5   disclosed by the invention is top-mounting.  For the reasons set

6   forth above, <u>see</u> <u>supra</u> section "III B 2 b(1)(a)," the Court

7   adopts Revolution's construction and construes the instant phrase

8   to mean that the first and second magnetic members are

9

10  magnetically attracted to each other when the second magnetic

11  member is placed in proximity above the first magnetic member.

12  **IV.   CONCLUSION**

13

14      Based on the foregoing, the Court concludes that:

15  1.    "plurality of sockets" in claim 1 of the '858 Patent

16        means two or more openings into which an inserted part

17        is designed to fit;

18  2.    "magnets" in claims 1-3 of the '858 Patent means

19        permanent magnets;

20

21  3.    "being oriented such that the maximum magnetic

22        attractive force between said magnets is oriented

23        approximately parallel to lenses in said conventional

24        eyeglasses" in claim 1 of the '858 Patent means that

25        when the auxiliary eyeglasses are attached to the

26        conventional eyeglasses, the permanent magnets mounted

27  _____

28  [19] Presumably, Revolution meant to say "magnetic member."

on the conventional eyeglasses are positioned relative
to the magnets mounted on the auxiliary eyeglasses such
that the greatest possible amount of magnetic force
attainable between the magnets will be in a plane
approximately parallel to the plane of the lenses of
the conventional eyeglasses;

4.    "mounted to form recesses in said first pair of
sockets" in claim 1 of the '858 Patent means positioned
sufficiently below the outer peripheral edges of the
sockets so as to define an opening between the magnets
and the outer peripheral edges;

5.    "whereby said extended magnets in said second pair of
sockets engage said recesses to automatically align and
secure said auxiliary eyeglasses when mated with said
magnets forming said recesses in said first pair of
sockets" in claim 1 of the '858 Patent means that when
the magnets forming the recesses and the extended
magnets contact each other, this contact between the
extended magnets and the recesses causes the auxiliary
eyeglasses to align and secure to the conventional
eyeglasses with little assistance from the wearer;

6.    "providing maximum resistance to a downward movement of
said auxiliary eyeglasses thereby preventing detachment
of said auxiliary eyeglasses from said conventional
eyeglasses" in claim 1 of the '858 Patent means

37

providing the greatest possible amount of resistance to downward movement of the auxiliary eyeglasses so as to keep the auxiliary eyeglasses from separating from the conventional eyeglasses;

7.  "a protective and decorative coating material on exposed sides of said plurality of magnets" in claim 3 of the '858 Patent means a layer of protective and decorative covering material on the visible sides of said plurality of magnets;

8.  "matches" in claim 4 of the '858 Patent means resembles or harmonizes with;

9.  "having a horizontal surface" as used with the first magnetic members in the primary frame in claim 6 of the '545 Patent means that the first magnetic members each have an upwardly facing surface that lies in a plane that is substantially perpendicular to the plane of the lenses of the primary spectacle frame;

10. "having a horizontal surface" as used with the second magnetic members of the auxiliary frame in claim 6 of the '545 patent means having a downwardly facing surface that lies in a plane substantially perpendicular to the plane of the lenses of the auxiliary spectacle frame;

11. "secured in said projections" in claim 22 of the '545 Patent means that each first magnetic member is

38

1    inserted into and firmly connected to a corresponding

2    projection in a manner such that the connection is not

3    likely to fail or give;

4

5    12.   "said first magnetic members capable of engaging second

6          magnetic members of an auxiliary spectacle frame" in

7          claim 22 of the '545 Patent means the first magnetic

8          members have the ability to magnetically attract the

9          corresponding second magnetic members of an auxiliary

10         spectacle frame when placed above the first magnetic

11         member, with or without actual contact;

12   13.   "said arms extending across a respective extension" in

13         claim 34 of the '545 Patent means that at least some

14         portion of each arm reaches across the top of the

15         corresponding extension; and

16

17   14.   "said first and second magnetic members engage one

18         another" in claim 34 of the '545 Patent means that the

19         first and second magnetic members are magnetically

20         attracted to each other when the second magnetic member

21         is placed in proximity above the first magnetic member.

22   **IT IS SO ORDERED.**

23   Dated:  *May 5, 2003*

24

25

26                        **LOURDES G. BAIRD**

27                        **United States District Judge**

28