# EXHIBIT F

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Reissue Application ) REISSUE PATENT APPLICATION

Inventor:    Richard Chao )

Reissue Application No.: 09/182,862 ) Art Unit: 2873

Filed:    10/21/98 ) Examiner:    Huy Mai

Patent No.:    5,568,207 )

Title:    AUXILIARY LENSES FOR
EYEGLASSES )

**CERTIFICATE OF MAILING UNDER 37 C.F.R. § 1.8**
I hereby certify that this correspondence is being deposited in the United States
Postal Service with sufficient postage as first class mail in an envelope addressed to Assistant
Commissioner for Patents, Washington, D.C. 20231, on January 14, 2000.

_____(Attorney Signature)
Peter P. Tong, Reg. No. 35,757
Signature Date: January 14, 2000

## RESPONSE TO OFFICE ACTION UNDER 37 C.F.R. § 1.111

Assistant Commissioner for Patents
Washington, D.C.  20231

Sir:

This RESPONSE  is in reply to the Office action mailed July 15, 1999.

In the Specification

On column 2, after line 30, please replace "FIG. 8 illustrates another embodiment of a

cross sectional view", with --FIG. 8 illustrates another embodiment of a part of a cross sectional

view--.

01/21/2000 SLUANG    00000055 09182862
01 FC:217                    435.00 OP

- 1 -

Attorney Docket No.: CONT1013REISRM/PPT
ppt/cont1013rei.009

<u>In the Drawings:</u>

A proposed drawing amendment to FIG. 8 is submitted to replace the original drawing sheet for FIG. 8.

<u>In the Claims:</u>

Please AMEND claims 6, 9, 12, 13, 22, 34, and 35, and ADD NEW claims 36–46 as follows:

6. **(Once Amended)**   An eyeglass device as recited in Claim 5 wherein the upper portion is an upper part of one of the side portions <u>of the primary frame</u>.

9. **(Once Amended)**   An eyeglass device as recited in Claim 8 wherein the upper portion is an upper part of one of the side portions <u>of the primary frame</u>.

12. **(Once Amended)**  An eyeglass device comprising:

a primary <u>spectacle</u> frame for supporting primary lenses therein<u>, with the lenses defining a vertical plane</u>;

the primary spectacle frame including two side portions;

each side portion having an extension extended therefrom for  pivotally coupling a leg thereto; and

the primary spectacle frame including two first magnets, each secured to one of the side portions of the primary frame; and

an auxiliary <u>spectacle</u> frame for supporting auxiliary lenses therein, and for disposing in front of the primary frame;

the auxiliary spectacle frame including two auxiliary side portions; and

Attorney Docket No.: CONT1013REISRM/PPT
ppt/cont1013rei.008

200.001:100197

the auxiliary spectacle frame including two second magnets, each secured to one of the auxiliary side portions, for engaging on a horizontal position with one of the first magnets so as to secure the auxiliary frame to the primary frame.

13. **(Once Amended)**  An eyeglass device as recited in Claim 12 wherein:

the primary spectacle frame includes a projection extending from each of its side portion;

each projection secures one of the first magnets;

the primary spectacle frame includes an upper portion;

each said auxiliary side portion has an arm extended therefrom;

at least one arm is configured to extend over the upper portion of the primary spectacle frame;

each arm secures one of the second magnets; and

the upper portion is an upper part of one of the side portions of the primary spectacle frame.

22. **(Once Amended)**  A primary eyeglass device adapted to stably support an auxiliary spectacle frame, the auxiliary spectacle frame for supporting auxiliary lenses therein, and for disposing in front of the primary frame, the auxiliary spectacle frame including two auxiliary side portions, each auxiliary side portion having an arm extended therefrom, and each arm securing a first magnet,

the primary eyeglass device comprising:

a primary spectacle frame for supporting primary lenses therein;

the primary spectacle frame including two side portions;

– 3 –

Attorney Docket No.: CONT1013REISRM/PPT
ppt/cont1013rei.009

200.001:100197

each of the two side portions having an extension extended therefrom for pivotally coupling a leg thereto;

the primary spectacle frame including a projection extending from each said side portion;

each projection securing a second magnet; and

when the primary frame is supporting the auxiliary frame,

each second magnet is coupled to, but not in contact with, one of the first magnets on a horizontal position so as to secure the auxiliary frame to the primary frame; and

the auxiliary frame is supported by at least an upper portion of the primary frame.

**34. (Once Amended)**  An eyeglass device comprising:

a primary frame for supporting primary lenses therein, with the lenses defining a vertical plane;

the primary spectacle frame including two side portions;

each side portion having an extension extended therefrom for pivotally coupling a leg thereto; and

the primary spectacle frame including two first magnets, each secured to one of the side portions of the primary frame; and

an auxiliary frame for supporting auxiliary lenses therein, and for disposing in front of the primary frame;

the auxiliary spectacle frame including two auxiliary side portions; and

- 4 -

Attorney Docket No.: CONT1013REISRM/PPT
ppt/cont1013rei.009

200.001:100197

the auxiliary frame including two second magnets, each secured to one of the auxiliary side portions, for coupling on a horizontal position with one of the first magnets so as to secure the auxiliary frame to the primary frame.

35. **(Once Amended)**  An eyeglass device comprising:

a <u>spectacle</u> primary frame for supporting primary lenses therein, <u>with the primary lenses defining a vertical plane</u>;

the primary spectacle frame including two side portions;

each side portion having an extension extended therefrom for  pivotally coupling a leg thereto; and

the primary spectacle frame including two first magnetic members, each secured to one of the side portions of the primary frame; and

an auxiliary <u>spectacle</u> frame for supporting auxiliary lenses therein, and for disposing in front of the primary frame;

the auxiliary spectacle frame including two auxiliary side portions;

[and]

the auxiliary frame including two second magnetic members, each secured to one of the auxiliary side portions, for coupling on a horizontal position, but not in contact, with one of the first [magnets] <u>magnetic members</u> so as to secure the auxiliary frame to the primary frame<u>; and</u>

<u>the auxiliary spectacle frame being supported by at least an upper portion of the primary spectacle frame</u>.

36. **(New)**  An eyeglass device comprising:

- 5 -

a primary spectacle frame for supporting primary lenses therein;

the primary spectacle frame including two side portions;

each side portion having an extension extended therefrom for  pivotally coupling a leg thereto; and

the primary spectacle frame including two first magnetic members, each secured to one of the side portions of the primary frame; and

an auxiliary spectacle frame for supporting auxiliary lenses therein, and for disposing in front of the primary frame;

the auxiliary spectacle frame including two auxiliary side portions; and

the auxiliary spectacle frame including two second magnetic members, each secured to one of the auxiliary side portions, for coupling on a horizontal position with one of the first magnetic members so as to secure the auxiliary frame to the primary frame, the horizontal position being substantially perpendicular to a front surface of the primary frame.

37. (New)  An eyeglass device as recited in claim 36 wherein the second magnetic members are magnets.

38. (New)  An eyeglass device as recited in claim 36 wherein the first magnetic members are magnets.

39. (New)  An eyeglass device as recited in claim 36 wherein the first and the second magnetic members are magnets.

- 6 -

40. **(New)** An eyeglass device as recited in Claim 36 wherein the first magnetic members are not in contact with the second magnetic members.

41. **(New)** An eyeglass device as recited in Claim 39 wherein the first magnetic members are not in contact with the second magnetic members.

42. **(New)** An eyeglass device as recited in Claim 36 further comprising at least one projection extending from said primary frame, said projection being configured to secure one of said first magnetic members.

43. **(New)** An eyeglass device comprising:

a primary spectacle frame for supporting primary lenses therein;

the primary spectacle frame including two side portions;

each side portion having an extension extended therefrom for pivotally coupling a leg thereto;

the primary spectacle frame including a projection extending from each said side portion;

each projection securing a first magnetic member; and

the primary spectacle frame including an upper portion; and

an auxiliary spectacle frame for supporting auxiliary lenses therein;

the auxiliary spectacle frame including two auxiliary side portions;

each said auxiliary side portion having an arm extended therefrom;

- 7 -

200.001:100197

with at least one arm being configured to extend over the upper portion of the primary spectacle frame;

each arm securing a second magnetic member;

each second magnetic member configured to couple with one of the first magnetic members of the primary spectacle frame; and

the upper portion supports at least one arm of the auxiliary frame.


44. **(New)**  An auxiliary eyeglass device comprising:

an auxiliary spectacle frame for supporting auxiliary lenses therein;

the auxiliary spectacle frame including two auxiliary side portions;

each auxiliary side portion having an arm extended therefrom; and

each arm securing a first magnetic member;

the auxiliary spectacle frame being adapted to be stably supported on a primary spectacle frame, which includes two primary side portions, each side portion securing a second magnetic member, the primary spectacle frame also including an upper portion; and

when the auxiliary frame is supported by the primary frame,

each first magnetic member engages with one of the second magnetic members; and

at least one arm of the auxiliary frame extending over the upper portion.

Attorney Docket No.: CONT1013REISRM/PPT
ppt/cont1013rei.009

200.001:100197

45. **(New)**  A primary eyeglass device for securing an auxiliary spectacle frame, which includes two auxiliary side portions, each auxiliary side portion securing to a first magnetic member, the primary eyeglass device comprising:

a primary spectacle frame for supporting primary lenses therein;

the primary spectacle frame including two side portions;

each side portion having an extension extended therefrom for  pivotally coupling a leg thereto;

the primary spectacle frame including two first magnetic members, each secured to one of the side portions of the primary spectacle frame; and

when the auxiliary spectacle frame is secured to the primary spectacle frame, each second magnetic member couples on a horizontal position with one of the first magnetic members, the horizontal position being substantially perpendicular to a front surface of the primary frame.


46.  **(New)**  An auxiliary eyeglass device adapted to be secured to a primary spectacle frame, which includes two primary side portions, each said side portion securing a first magnetic member, the auxiliary eyeglass device comprising:

an auxiliary spectacle frame for supporting auxiliary lenses therein;

the auxiliary spectacle frame including two auxiliary side portions;

each auxiliary side portion configured to secure a second magnetic member; and

when the auxiliary frame is secured to the primary frame, each second magnetic member couples on a horizontal position with one of the first magnetic

- 9 -

members of the primary spectacle frame, the horizontal position being substantially perpendicular to a front surface of the auxiliary frame.

## REMARKS

Applicant presented claims 1 through 35 for examination. In the above-identified Office Action, the Examiner has rejected all of the claims, and has disapproved the proposed drawing.

Applicant appreciates the Examiner's detailed and meticulous comments in his Office Action to the above-identified application. Because of the care that the Examiner has exhibited in his Office Action, Applicant has been able to fully appreciate and understand the Examiner's reasons and grounds for the rejections. For the reasons to be stated below, however, Applicant respectfully traverses the Examiner's rejections of the claims.

By this amendment, Applicant has added claims 36-46, enclosed a declaration of Professor Richard J. Samuels, and submitted a proposed drawing amendment to Figure 8. Subject to the approval of the Examiner, it is respectfully requested that the new drawing sheet be substituted for the originally filed drawing sheet for FIG. 8. Accordingly, claims 1-46 are now in the application. Applicant believes that no new matter has been introduced by the amendment and no additional fees are required for the application.

Reissue Declaration

At Least One Error Has Been Identified

On page 2, the Rejection stated that the reissue declaration was defective because it failed to identify at least an error in the declaration. Applicant respectfully disagrees because Applicant has stated at least one error in the declaration.

- 10 -

"A reissue applicant must acknowledge the existence of an error in the specification, drawings, or claims, which error causes the original patent to be defective.... See MPEP § 1402 for a discussion of grounds for filing a reissue that may constitute the 'error' required by 35 U.S.C. 251.... Applicant need only specify in the reissue oath/declaration one of the errors upon which reissue is based. Where applicant specifies <u>one</u> such error, this requirement of a reissue oath/declaration is satisfied." MPEP § 1414, with emphasis added.

MPEP § 1402 states, with emphasis added, that: "In accordance with 35 U.S.C. 251, the error upon which a reissue is based must be one which causes the patent to be 'deemed wholly or partly inoperative or invalid ... by reason of the patentee claiming more or less than he had a right to claim in the patent.' .... The most common bases for filing a reissue applications are: (A) <u>the claims are too narrow or too broad</u> .... <u>An attorney's failure to appreciate the full scope of the invention was held to be an error</u> correctable through reissue ...."

As stated in the MPEP, (1) Claims being too broad or too narrow is one of the most common bases for filing a reissue; (2) An attorney's failure to appreciate the full scope of the invention was held to be an error; and (3) Applicant only needs to specify one error in the declaration.

The Federal Circuit has applied even more liberal standards than an attorney's failure to appreciate the full scope, as shown in the following decision:

"Similarly, in In re Wesseler, the CCPA stated that error is established where there is no evidence that the appellant intentionally omitted or abandoned the claimed subject matter. Thus, the CCPA has construed the term error under section 251 broadly. The Ninth Circuit employed a more rigid standard in *Riley v. Broadway-Hale Stores, Inc*.... We decline to adopt the rigid standard applied in *Riley*, in favor of the more liberal approach

- 11 -

taken by the CCPA." *Ball v. United States* 729 F.2d 1429, 1435, 221 USPQ 289, 294 (Fed. Cir. 1984).

In the declaration, Applicant states the following:

11.     Based on further investigation, I was advised that my Taiwan patent counsel failed to appreciate the full scope and breadth of the invention. I should both broaden and narrow my claims.

As discussed in the above paragraph 11, Applicant has identified at least one error, which is its Taiwan patent counsel's failure to appreciate the full scope and breadth of the invention. Such an error is correctable through reissue.

MPEP 1414 further explains with emphasis added, that: "If the initial reissue oath/declaration 'states at least one error' in the original patent, and, *in addition*, recites the specific corrective action taken in the reissue application, the oath/declaration would be considered acceptable, <u>even though the corrective action statement is not required</u>."

Following MPEP 1414's suggestion, Applicant further includes a number of corrective actions in the declaration. They are, for example, as follows:

12.     I was advised, for example, that (1) I should include as dependent claims magnetic members being magnets; (2) I should include as dependent claims two upper side portions, and the gap between the first magnetic members and the second magnetic members; (3) I should claim magnetic members engaging on a horizontal position; (4) I should claim primary spectacle frames without auxiliary frames; (5) I should claim auxiliary frames without primary spectacle frames; (6) I should include as dependent claims the end portion of an arm extending downward for hooking on the primary spectacle frame; and (7) I should broaden the issued Claim 1.

Attorney Docket No.: CONT1013REISRM/PPT
ppt/cont1013rei.009                                    200.001:100197

Thus, Applicant not only has stated at least one error, but also a number of planned corrective actions to be taken in the reissue application, though the corrective action statement is not required.

### Declaration Did Refer To The Reissue Specification and Claims

The office action further stated that the declaration was defective because of its paragraph 3, which states, "I have reviewed and understand the contents of the above-identified specification, including claims." The office action's argument was that in view of paragraph 3, the declaration referred only to the patent specification and patent claims, and not to the reissue specification and reissue claims. Applicant respectfully disagrees. Paragraph 17 of the declaration describes changes made in both the specification and the claims in the reissue. Paragraph 18 then states the following:

> As a result of these corrections, the amended claims, the new claims and the amended specification more closely represent my invention.... My invention is better represented by the amended specification, the amended claim and the new claims for reissue.

Thus, Applicant, in the declaration, refers specifically to changes made in the reissue--Both in the reissue specification and the reissue claims. Not only has Applicant reviewed and understood the content of the reissue application, Applicant has reproduced the changes submitted in the reissue application in the declaration. The declaration that the amended claim, the new claims and the amended specification more closely represent his invention, indicates that Applicant has reviewed and understood the reissue specification and the reissue claims.

However, if the Examiner insists on Applicant submitting a supplemental reissue declaration on this issue, please so indicate.

- 13 -

New Matter Rejection

### Magnetic Members Coupled and Not in Contact Is Not New Matter

The Office Action rejected Claims 8, 9, 22 and 35 based on the argument that nowhere in the original specification provided support for magnetic members being coupled, but not in contact, with each other. See the third paragraph on page 3 of the Office Action. Applicant respectfully disagrees.

As clearly shown in FIG. 7 of the '207 patent, the two magnetic members, 14 and 22, are in proximity of, coupled to, but not in contact with each other. Magnets are coupled to each other when they are in proximity of each other. The introduction of the phrase magnetic members coupled to each other cannot be considered new matter. Another reason why magnetic members coupling cannot be new matter is because there are numerous recitations of the magnetic members engaging with each other in the specification.

### End Portion Of An Arm Extended Downward Is Not New Matter

In the fourth paragraph on page 3 of the Office Action, Claims 25-33 were rejected based on the argument that the original specification failed to disclose the "subject matter of the end portion of the arm of the auxiliary frame extended downward toward the projection for hooking on the primary spectacle frame".

Applicant respectfully disagrees. Lines 4-7, column 3 of the original specification states:

[T]he end portions of the arms 21 ... are slightly extended downward toward the projections 13 such that the arms 21 ... may hook on the primary spectacle frame 10.

Thus, the original specification provides support for the subject matter of the end portion of the arm of the auxiliary frame extended downward toward the projection for hooking on the primary spectacle frame.

- 14 -

<u>Phrases Added In Pages 2 and 3 Are Not New Matter</u>

In the second half of the fourth paragraph on page 3 of the Office Action, phrases added in pages 2 and 3 of the original specification were considered new matter. Applicant again respectfully disagrees.

On page 2, Applicant has added the following paragraph:

FIG. 8 illustrates another embodiment of a <u>part of a</u> cross sectional view taken along lines 7-7 of FIG. 6.

As to be explained below, the original FIG. 8 cannot be considered new matter. FIG. 8 has been amended to further eliminate any possibility of introducing any new matter. With FIG. 8 not being new matter, the added paragraph on page 2 cannot be new matter.

On page 3, Applicant added the following paragraph:

In one embodiment, as shown in FIG. 7, magnetic members 14 and 22 are not in contact with each other; magnetic members 14 and 22 are engaged with, but not supported on, each other. Instead, the arm 21 securing the magnetic member 22 is supported on an upper side portion of the primary spectacle frame 10. As shown in FIG. 7, the upper side portion can be an upper part of the side portion securing the projection 13.

The above paragraph cannot be considered new matter because at least it is supported by FIG. 7 of the original specification. To more clearly show that no new matter has been introduced, Applicant has separated the above paragraph into the following sections.

(1)     Magnetic members 14 and 22 are not in contact with each other; magnetic members 14 and 22 are engaged with, but not supported on, each other.

- 15 -

(2)     Instead, the arm 21 securing the magnetic member 22 is supported on an upper

side portion of the primary spectacle frame 10.

(3)     As shown in FIG. 7, the upper side portion can be an upper part of the side portion

securing the projection 13.

In one embodiment, each of the above sections is identified in FIG. 7 as shown in the following

drawing:



# F I G. 7

Thus, the original FIG. 7 clearly supports all three sections.   Regarding section 2, it is also

supported by the original claim 1.

### Securing Magnetic Members To The Side Portions Is Not New Matter

In the fifth paragraph on page 3 of the Office Action, the subject matter of securing the

magnetic members to the side portions of the primary spectacle frame and of the auxiliary

spectacle frame was considered not supported.  Applicant respectfully disagrees.

For example, as shown in FIG. 3, each magnetic member is secured to a portion at each

side of the primary frame.  In other words, the subject matter of securing magnetic members to

side portions of the primary frame is shown in FIG. 3.  Similarly in FIG. 4, each magnetic member

is secured to a portion at each side of the auxiliary frame.  Again, the subject matter of securing

magnetic members to side portions of the auxiliary frame is shown in FIG. 4.

Attorney Docket No.: CONT1013REISRM/PPT
ppt/cont1013rei.009

200.001:100197

Drawings Rejection

FIG. 8 was rejected as being new matter, based on the argument that the original disclosure did not support "the showing of the end portions, but not the magnetic member 22, of the arm extends downward toward the projection for hook on the primary spectacle frame."

The specification has recited the embodiment of the end portions of the arm extending downward toward the projection for hooking on the primary spectacle frame. This is shown, for example, in the following:

"[T]he end portions of the arms 21 ... extended downward toward the projections 13 such that the arms 21 ... may hook on the primary spectacle frame 10..." See Col. 3, lines 4-7 of the specification.

The rejection stated that, "the magnetic member 22, of the arm extends downward toward the projection for hook on the primary spectacle frame." The rejection may be somehow related to the magnetic member 22 in the figure. To expedite the prosecution of this reissue application, Applicant has amended FIG. 8 so that it does not show the magnetic members. Upon the Examiner's acceptance of the amendment, Applicant will submit the formal drawing for Figure 8.

Rejections Based on § 112

Claims 8, 9, 22 and 23 on Coupling and No Contact

In the first paragraph on page 5 of the Office Action, Claims 8, 9, 22, 35 were rejected based on the argument that (1) "the original specification fails to disclose and/or discuss the reasons why the first magnetic member being coupled, but not in contact, with the second magnetic member;" and (2) The structure "renders how the auxiliary spectacle frame being stably supported on the primary frame as now claimed."

- 17 -

35 USC 112 states that:

The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

The laws, the rules, and the teachings in the MPEP do not require the discussion of reasons behind an embodiment before one can claim the embodiment. Whether or not the reasons behind the embodiment are discussed in the specification is immaterial.

Regarding the second argument, Applicant does not fully understand the rejection. At least in one embodiment, the structure does not require the magnetic members to be in contact in order to have the auxiliary frame stably supported by the primary frame. To expedite the prosecution, Applicant has amended Claims 22 and 35 to include the limitation of the auxiliary frame being supported by at least an upper portion of the primary frame.

<u>End Portion Extended Downward as in Claims 25-33</u>

In the second paragraph on page 5 of the Office Action, Claims 25-33 were rejected based on the argument that the original specification failed "to disclose the subject matter of the end portion of the arm of the auxiliary frame extended downward toward the projection for hooking on the primary spectacle frame". Applicant respectfully disagrees. As explained above in the New Matter Rejection section, the end portion of the arm extended downward has been fully disclosed in the specification.

<u>Newly Added Phrases in Pages 2 and 3</u>

- 18 -

Also in the second paragraph on page 5 of the Office Action, Claims 25-33 were rejected based on the argument that the added phrases in pages 2 and 3 were new matter. As explained above in the New Matter Rejection section, the paragraphs introduced in pages 2 and 3 have full support in the original specification.

<u>Securing Magnetic Members to the Side Portions as in Claims 12, 16, 18, 20, 34 and 35</u>

In the third paragraph on page 5 of the Office Action, Claims 12, 16, 18, 20, 34 and 35 were rejected based on the argument that the original specification failed to disclose the subject matter of securing the magnetic members to the side portions of the primary spectacle frame and of the auxiliary frame. Again, as explained above in the New Matter Rejection section, such disclosures have full support in the original specification.

<u>Claims 1, 5, 10, 12, 14, 16, 18, 20, 22, 34 and 35: At Least One Arm and Engaged With</u>

In the paragraph bridging page 5 and 6, together with the first paragraph in page 6 of the Office Action, Claims 1, 5, 10, 12, 14, 16, 18, 20, 22, 34 and 35 were rejected based on the following argument: "[A]dding the phrase 'at least one of' before the phrase 'said arms' and deleting the function 'engaged with' of the arms ... render the invention, as a whole, as claimed become inoperative." The reasons cited in the office action are that (a)"[T]he 'at least one arms' may be supported on along the upper side portion of the lens rim of the primary spectacle frame"; and (b) "The above-mentioned adding and deleting also render whether or not all the functions 'so as to allow ... and so as to prevent ... and so as to prevent ...' (claim 1, lines 23-29) are existed."

Applicant does not understand how the amendments would have rendered the invention inoperative.

- 19 -

Attorney Docket No.: CONT1013REISRM/PPT
ppt/cont1013rei.009

200.001:100197

Before the amendment, Claim 1 recited the following limitations:

said auxiliary frame including two side portions each having an arm extended therefrom for extending over and for engaging with said upper side portion of said primary spectacle frame, ... said arms being engaged with and supported on said upper side portion of said primary spectacle frame ...

Claim 1, before amendment, includes the limitation of two side portions of the auxiliary frame, each having an arm extending over, engaging with and supported on the upper side portion of the primary frame. Applicant amends the claim to state that "at least one arm" is supported on the upper side portion.

The Office Action seems to argue such an amendment is defective because, "the 'at least one of said arms' may be supported on along the upper side portion of the lens rim of the primary spectacle frame." Applicant does not understand how such a modification would render the invention inoperative. Applicant respectfully requests the Examiner to clarify the rationale behind the rejection so as to help Applicant respond to the rejection.

Second, the removal of the words, "engaged with", also would not render the invention inoperative. As shown in FIG. 6, one embodiment of the invention depicts an arm extending over a side portion. Applicant does not understand the reason why removing the words, "engaging with", but leaving the term, "extending over" in the claim would render the invention inoperative. Also, according to the second edition of Random House Unabridged Dictionary, the word "engage" can have the following meanings:

2. to secure for aid, employment, use, etc...

3. to attract and hold fast ...

4. to attract or please ...

- 20 -

5. to attach or secure...

In one embodiment, the word, engaging, can be interpreted to mean "attaching". One embodiment of the invention, as shown in FIG. 7, depicts an arm being supported by an upper side portion. Again, Applicant does not understand why removing the words, "engaged with", but leaving the terms, "supported on", in the claim would render the invention inoperative.

The Office Action further stated that the modification also rendered "whether or not all the functions 'so as to allow ... and so as to prevent ... and so as to prevent ...' (claim 1, lines 23-29) are existed". Applicant does not fully understand the argument. The Office Actions referred to the following three functions:

a.    Allow said auxiliary spectacle frame to be stably supported on said primary spectacle frame;

b.    Prevent said auxiliary spectacle frame from moving downward relative to said primary spectacle frame; and

c.    Prevent said auxiliary spectacle frame from being disengaged from said primary spectacle frame.

Though the amendments should not have affected these functions, Applicant respectfully requests the Examiner to clarify the rejection so as to help Applicant respond.


Claims 5 and 10: The Term Configured to Engage

In the last paragraph on page 6, Claims 5 and 10 were rejected because "the limitation 'configured to engage' (claim 5, line 17 and claim 10, line 16) is unclear." In one embodiment, the sentence, "X is configured to engage with Y", in a mechanical setting typically denotes that X includes a structural configuration to engage with Y. The meaning of the limitation "configured

- 21 -

to engage" should be quite clear.  Applicant again requests the Examiner to clarify the rejection so that Applicant can better respond.

### Claims 8 and 22: Coupled, But Not in Contact

In the last paragraph on page 6, Claims 8 and 22 were rejected because "it is unclear how the second magnetic member coupled, but not in contact, with the first magnetic member in order to the auxiliary frame stably supported by the primary frame as claimed in claim 8 and 22."  It seems the argument is that the auxiliary frame cannot be stably supported by the primary frame if the second magnetic member is coupled to, but not in contact, with the first magnetic member.

This issue has previously been addressed above in the New Matter Rejection section.

### Claims 6, 9 and 13: The Side Portions of The Primary Frame

Claims 6, 9 and 13 were rejected in view of possible ambiguity in the claims.  Applicant has followed the Examiner's suggestion, and has amended those claims accordingly, with the "side portions" replaced by the "side portions of the primary frame."

### Claim 22: Each Of The Two Side Portions

In the last paragraph on page 6, the feature "each side portion" has been replaced by "each of the two side portions" to clarify any ambiguity in the claim.

### Claims 12, 13 and 35: Primary and Auxiliary Spectacle Frame

In the last paragraph on page 6, claims 12, 13 and 35 were rejected because the terms primary and auxiliary spectacle frames lacked antecedent basis.  Applicant has amended the claims accordingly.

- 22 -

<u>Claims 12, 34 and 35: Engaging/Coupling On A Horizontal Position</u>

In the last paragraph on page 6, Claims 12, 34 and 35 were rejected because "of 'engaging on a horizontal position' and of 'coupling on a horizontal position, but not in contact with...'. The structure of the eyeglass device in claims 12, 34 and 35 does not draw such a horizontal position."

Applicant does not fully understand the rejection, but believes that the rejection may be on the issue of the term horizontal being relative. To prevent any possibility of ambiguity, Applicant has amended Claims 12, 34 and 35 to include the limitation of the lenses in the primary frame defining a vertical plane, as opposed to horizontal coupling or engagement as specified. Such structural limitations should be sufficient to clarify any indefiniteness, if there were one.

<u>Means Limitation</u>

In the first paragraph on page 7, the Office Action rejected claim 10 based on the argument that Applicant is attempting to use "a 'means' clause to recite a claim element as a means for performing a specific function. However, since no function being specified by the word preceding 'means.' It is impossible to determine the equivalent of the claim element, as set forth by 35 U.S.C. 112, sixth paragraph."

The Office Action might have misinterpreted 35 U.S.C. § 112, ¶ 6, regarding means-plus-function claim.

While there is a widespread convention of using the term "means" to express a claim element in means-plus-function language, the absence or presence of the word "means" in the claim does not seem to be dispositive on the issue whether the language is means-plus-function language. In *Haney v. Timesavers, Inc.*, 29 U.S.P.Q.2d 1605, 1607-09 (D. Or. 1993), a district court held that a claim element, "a double-drive mechanism . . . where the double-drive mechanism imparts at least one translational orbital movement superimposed on another

- 23 -

Attorney Docket No.: CONT1013REISRM/PPT
ppt/cont1013rel.009                                                          200.001:100197

movement . . . ," was expressed in means-plus-function terms governed by 35 U.S.C. § 112, ¶ 6, despite the fact that the term "means" was never used in the claim.  In *AMP, Inc. v. Fujitsu Microelectronics, Inc.*, 853 F. Supp. 808, 820-21 (M.D. Pa. 1994), a district court held that the claim element, "bus solder tail means," in the patent at issue was not expressed in means-plus-function language even though the term "means" was used in the claim.  Whether a claim element will be deemed expressed in means-plus-function language for the purposes of 35 U.S.C. § 112, ¶ 6 may not generally depend upon the use or non-use of the term "means" in the claim.

Regarding mechanical devices, the critical inquiry to determine whether a claim element is expressed in means-plus-function language may depend on whether that claim element is primarily described in terms of its function, and not its structure.  *Haney*, 29 U.S.P.Q.2d at 1608 ("A functional claim element is an element that is described in terms of what it does, not by its structure."); *AMP*, 853 F. Supp. at 820 ("In those cases in which claim language is construed to be 'means plus function' language, the language refers to an indefinite structure, defining it only by what function it will perform.").  If a functional element is interpreted literally, it might cover substantially every structure capable of performing the claimed function.  The purpose of Section 112, ¶ 6 seems to prevent such coverage by limiting the functional element of the claim to cover only the structure described in the specification and equivalents thereof.  See *Haney*, 29 U.S.P.Q.2d at 1608.  Thus, a claim element might be subject to the limitations of Section 112, ¶ 6, if it is primarily described in terms of function.

For mechanical devices, whether a claim element is deemed expressed in means-plus-function language and therefore subject to the limitations of Section 112, ¶ 6 might not depend on whether the term "means" is used in the claim language.  Instead, a claim element might be governed by Section 112, ¶ 6, if it includes primarily a functional claim limitation, as opposed to a structural limitation.

- 24 -

Thus, Section 112, ¶ 6 does not seem to forbid Applicant from claiming "means" without a function, or a function without using the word "means". Section 112, ¶ 6 governs the interpretation of means-plus-function claims. Nowhere in the laws, whether in Section 112, ¶ 6 or other statutes, is there any limitation restricting Applicant from claiming with the word "means".

## Rejections Based on § 102

### Rejections Under Nishioka

In the last paragraph on page 7, the Office Action rejected Claims 12 and 34 under 35 U.S.C. 102(e) as being anticipated under U.S. Patent No. 5,642,177 by Nishioka (the "Nishioka Patent").

In the Nishioka Patent, the magnets 3 in the auxiliary frame 1 engage vertically with the magnets 7 in the primary frame. The engagement surfaces are parallel to the plane of the lenses. In Claims 12 and 34, the amendment should have removed any possibility of ambiguity. The engagement is on a horizontal position, as opposed to the vertical plane defined by the lenses in the primary frame.

Under Section 102, a claim is anticipated only if each and every element as set forth in the claim is found in a single prior art reference. *Constant v. Advanced Micro-Devices Inc.*, 848 F.2d 1560, 1570 (Fed. Cir. 1988). In other words, every limitation of a claim must identically appear in a single prior art reference for it to anticipate the claim. *In re Bond*, 910 F.2d 831, 832 (Fed. Cir. 1990).

Since the Nishioka Patent at least has not disclosed the horizontal engagement position, the amended Claims 12 and 34 could not have been anticipated by Nishioka.

- 25 -

Rejections Under Twincome-Pentax

On page 8, Claims 1, 3-7, 10-21, 23, 24 and 34 were rejected under 35 U.S.C. 102(a) as being anticipated by Twincome-Pentax. The basis of the rejection depends on a number of documents. They include materials allegedly presented to the Le Coane Group on June 21, 1995; an enlarged photograph of a portion of a Pentax booth allegedly taken during an IOFT meeting on October 1995 with Information and Data Sheet; and a brochure entitled, "October 1995, IOFT -- Material for New Product Development (Q & A)" allegedly distributed to attendees who visited Pentax's October 1995 IOFT exhibition site.

The Le Coane Group meeting on June 21, 1995 was not public and was not a 35 102(a) event.

35 USC 102 provides in relevant part that:

A person shall be entitled to a patent unless --

(a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent ....

Nothing about the meeting of the Le Coane Group can constitute a 35 USC 102 (a) event.

The meeting of the Le Coane Group took place in Japan, not in the United States. Hence, the meeting of the Le Coane Group is not evidence that the claimed invention was "known or used by others in this county .... before the invention thereof by ... [Applicant]."

The meeting of the Le Coane Group was not a patenting of anything. Hence, the meeting of the Le Coane Group is not evidence that the claimed invention was "patented in this or a foreign country, before the invention thereof by ... [Applicant]."

That leaves the final possibility, which is that something about the meeting of the Le Coane Group meant that the claimed invention was "described in a printed publication in... a

- 26 -

foreign country, before the invention thereof by ... [Applicant]." However, the display of the prototype at the meeting was certainly not a printed publication of anything. That leaves the display of the technical drawings at the meeting being "printed publication[s]."

The leading opinion concerning what constitutes a "printed publication" under either 35 USC 102(a) or 35 USC 102(b) is In re Wyer, 655 F.2d 221, 210 USPQ 790 (CCPA 1981) (Rich, J). According to that opinion:

> the printed publication provision was designed to prevent withdrawal by an inventor, as the subject matter of a patent, of that which was already in the possession of the public. Thus, the question to be examined under § 102(b) is the accessibility to at least the pertinent part of the public, of a perceptible description of the invention, in whatever form it may have been recorded. Access involves such factual inquiries as classification and indexing. In other words, such a reference is a "printed publication" and a bar to patentability
>
> > ***upon a satisfactory showing that such document has been disseminated or otherwise made available to the extent that persons interested and ordinarily skilled in the subject matter or art, exercising reasonable diligence, can locate it and recognize and comprehend therefrom the essentials of the claimed invention without need of further research or experimentation.[1]

Applying that statement to the present situation, it is abundantly clear that the technical drawings which were displayed at the meeting of the Le Coane Group were not printed publications. Not only were they not classified or indexed, they were not "disseminated or otherwise made available

---

[1] 655 F.2d at 226, 210 USPQ at 794.

Attorney Docket No.: CONT1013REISRM/PPT
ppt/cont1013rei.008

200.001:100197

to the extent that persons interested and ordinarily skilled in the subject matter or art, exercising reasonable diligence,... [could] locate...[them] and recognize and comprehend therefrom the essentials of the claimed invention without need of further research or experimentation."

Moreover, Applicant has not rested purely on the weakness of the Le Coane Group meeting evidence. Applicant is submitting concurrently herewith the declaration of Prof. Richard J, Samuels, a leading academic expert on Japanese business practices. The gist of his declaration is that the meeting of the Le Come Group was not public. Hence, even if the Examiner were to decide that the technical drawings displayed at the meeting of the Le Coane Group were printed, they were not printed publications because they were not made publicly available.

Regarding the enlarged photograph of a portion of a Pentax booth showing four models of Pentax's Magnetic Eyeglass Frame System and the "Information and Data Sheet" that identified certain models of the Pentax system and provided pricing and options for each, Applicant submits that:

    i.    The enlarged photograph does not clearly illustrate the type of frames that were on display.

    ii.    Even if the frames on display were magnetic frames, they might well have been showing the front-mounted frames, whose magnets have coupling surfaces that are substantially parallel to the front surfaces of the lenses.

    iii.    No magnets can be identified in the frames shown, let alone magnetic members positioned as claimed. Also, the exhibits do not show eyeglasses with a pair of frames-- auxiliary frame with primary frame. The exhibits only show eyeglasses with one frame.

    iv.    Thus, those documents cannot be anticipatory prior art against the claimed invention.

- 28 -

Regarding the brochure entitled, "October 1995, IOFT -- Material for New Product Development (Q & A)", Applicant submits that the New Development Q&A was not distributed and was not for distribution to convention attendees at the trade show.

About 30,000 people attended the IOFT meeting in 1995. It was one of the largest conventions held in Japan for the eye wear industry. Any company trying to promote an eye wear product in the largest eye wear trade show should have (a) prepared a different type of brochure, (b) prepared many more brochures than Pentax had, and (c) more widely distributed the brochure, instead of just providing the brochure to a very selected group of people (i.e., the members of the Le Coane Group) in a special meeting presumably arranged during the IOFT.

Twincome is an eye wear product, a fashion product. To promote such a product to the 30,000 eye wear retailers and wholesalers in the largest trade show, a company typically prepares attractive, eye-catching brochures with glossy pictures. Instead, Pentax only prepared a dull Q&A. The content of the Q&A includes discussion of Nd-Fe-B magnet ≠ 3,000 gauss, and potential health hazards. It is highly unlikely that a company would only prepare such type of brochure to promote an eye wear product to the general attendees in the largest eye wear trade show.

To promote an eye wear product in the largest trade show, a company typically prepares materials enough for 20% of the attendees. With IOFT typically having about 30,000 attendees, Pentax should have prepared 6,000 brochures.

Instead, Pentax (i) only distributed the brochures to 14 people, (ii) did not distribute the brochure to anyone else, and (iii) allegedly left another 56 copies on a table, which Pentax was unaware of their whereabout at the end of the conference. Seventy copies is just 0.25% of the 30,000 attendees--too few brochures for the biggest trade show, and the biggest opportunity for Pentax to promote the product.

- 29 -

Attorney Docket No.: CONT1013REISRM/PPT .
ppt/cont1013rei.009

200.001:100197

The Q&A New Development Brochures is a very dull publication, with only a very limited number prepared. The only recorded distribution was to a small group of people. Regarding the remaining 56 copies, Pentax was unaware of their whereabout.

It is only logical that the brochures were prepared only for a special group of people during such a large trade show. The brochures were probably distributed to them at a special meeting, and were not for the general attendees of the IOFT. That would have explained the dullness of the brochure and the limited number prepared for so big a trade show.

The IOFT was not a 35 USC 102(a) event, and the Q&A is not a 35 USC 102(a) document, for much the same reasons that the meeting of the Le Coane Group was not a 35 USC 102(a) event and the technical drawings are not 35 USC 102(a) documents.

As for the IOFT, it was in Japan, and there was no evidence that it was attended by Americans or that any information concerning Pentax's display of its magnetic eye wear at the IOFT was transmitted to the United States prior to the critical date. Hence, there is no evidence that whatever Pentax disclosed at the IOFT was "known...by others in this country...before the invention... by...[Applicant]."

As for the Q&A, there is no evidence that it was classified or indexed anywhere in a fashion that made it "accsessib[le] to at least the pertinent part of the public..." or that it was "disseminated or otherwise made available to the extent that persons interested and ordinarily skilled in the subject matter or art, exercising reasonable diligence, c[ould] locate it...." Hence, it is not available as a reference under 35 USC 102(a). In re Wyer, 655 F.2d 221, 210 USPQ 790 (CCPA 1981).

A document distributed to a limited group, even if there is no requirement of secrecy, does not automatically make the document a publication. For example, an internal corporate memorandum is not a publication because, by its nature, it is an internal document, not intended

- 30 -

to be distributed and not in fact distributed beyond a single organization or company. In re Katz, 592 F.2d 1169, 201 USPQ 71 (CCPA 1979). It has even been held that limited distribution beyond a single organization may not constitute publication. For example, in Ex Parte Suozzi, 125 USPQ 445 (POBA 1959), twenty-five copies of a search report marked "unclassified," circulated to various individuals and agencies, was held not to be a publication. The Board of Appeals stated that, "[E]ven assuming that there was no prohibition against the author of the report or the named or other official recipients of copies thereof, in giving copies or imparting information contained in said report to others who would be classed as the public in general, this would be merely permissive and would not show unequivocally that there was in fact any publication of the report."

The concept of access has been taken by the courts to mean free access to the public. For example, in RCA Corp. v. Data General Corp., 701 F. Supp 456, 468, 8 USPQ 2d 1305, 1315 (D. Del. 1988), aff'd, 887 F.2d 1056, 12 USPQ 1499 (Fed.Cir. 1989), an infringer failed to show that a memorandum filed in a special patent library research institute constituted prior publication as of the relevant date because it was "unclear from the disputed testimony whether a member of the public would be permitted access to the memorandum even if he or she had specifically asked to see it."

The Q&A was not published within the meaning of the word "published" under the statute. The Q&A was distributed by Pentax to a special group of people. Any communications between Pentax and that special group are not by definition communications to the public at large. Information exchanged solely within this group is not information that is accessible by the public.

As far as the evidence shows, out of the 30,000 IOFT attendees, the Q&A was only given out to a special group of 14. There were also 56 copies of the Q&A left out on a table that were

- 31 -

Attorney Docket No.: CONT1013REISRM/PPT
ppt/cont1013rei.009

200.001:100197

gone at the end of the IOFT.  However, there is no evidence as to what happened to those copies.  They may well simply have been thrown away by a janitor at the end of the IOFT.

A reading of the Q & A confirms the intent of Pentax was not to provide information to the public.  The document itself is in the nature of advance information or sales training literature and not in the form of a document for general release to the public.  For example, the document concerns such issues as product liability and potential health hazards of the product.  A sales brochure released to the public in general would not include such information and would have been disclosed to many more IFOT attendees.

The Q & A was circulated in small numbers to a single group.  And the Q & A, based on its content, appears to be a communication intended to educate the recipients on working with the public.  Thus, even if the Q&A is considered to be "printed" within the meaning of 35 USC 102(a), it was not a "publication" within the meaning of 35 USC 102(a) for the same reasons that the technical drawings exhibited at the meeting of the Le Coane Group were not "publications" within the meaning of 35 USC 102(a)--namely, they were not distributed publicly.

In the event that the Examiner, upon reexamination, determines that an action other than an allowance is appropriate, the Examiner is requested and authorized to telephone Applicant's attorney prior to taking such action, if the Examiner feels that such a telephone call will advance the prosecution of the present application.

In view of the above Amendments and Remarks, reconsideration of Claims 1-35 is requested and consideration of newly added Claims 36-46 is requested.

Enclosed is a PETITION FOR EXTENSION OF TIME UNDER 37 C.F.R. § 1.136 for extending the time to respond up to and including January 15, 2000.

- 32 -

The Commissioner is authorized to charge any underpayment or credit any overpayment to Deposit Account No. 06-1325 for any matter in connection with this response, including any fee for extension of time, which may be required.

Respectfully submitted,

Date: January 14, 2000     By: _____
                               Peter P. Tong
                               Reg. No. 35,757
                               (408) 748-7300

FLIESLER, DUBB, MEYER & LOVEJOY LLP
Four Embarcadero Center, Suite 400
San Francisco, California 94111-4156
Telephone: (415) 362-3800

- 33 -