# EXHIBIT G

# IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| In re Reissue Application | ) REISSUE PATENT APPLICATION |
| | ) |
| Inventor:     Richard Chao | ) |
| | ) |
| Reissue Application No.: 09/182,862 | )      Art Unit:       2873 |
| | ) |
| | )      Examiner:    Mai, H. |
| Filed:        10/21/98 | ) |
| | ) |
| Patent No.:   5,568,207 | ) |
| | ) |
| Title:        AUXILIARY LENSES FOR | ) |
|               EYEGLASSES | ) |

*(Stamp: OIPE — NOV 27 2000 — PATENT & TRADEMARK OFFICE)*

---

CERTIFICATE OF MAILING UNDER 37 C.F.R. § 1.8
I hereby certify that this correspondence is being deposited in the United States Postal Service with sufficient postage as first class mail in an envelope addressed to Box Missing Parts, Assistant Commissioner for Patents, Washington, D.C. 20231, on November 22, 2000.

_____ (Attorney Signature)
Brian I. Marcus, Reg. No. 34,511
Signature Date: November 22, 2000

## RESPONSE TO OFFICE ACTION UNDER 37 C.F.R. § 1.111

Assistant Commissioner of Patents
Washington, D.C.  20231

Sir:

This RESPONSE A is in reply to the Office Action mailed ~~July 15, 1999.~~

### Amendments

Please amend the above-identified application as follows:

*(Stamp: RECEIVED — DEC -4 2000 — TC 2800 MAIL ROOM)*

### In the Specification,

On column 2, after line 30, please replace "FIG. 8 illustrates another embodiment of a cross sectional view", with --FIG. 8 illustrates another embodiment of a part of a cross sectional view--.

- 1 -

At the top of Column 3, please insert:

As shown in Figs. 3-7, the engaging surfaces between magnetic members 14 in primary spectacle frame 10 and the magnetic members 22 in the auxiliary spectacle frame 20 lie in a plane that is substantially horizontal when the eyeglass device is worn.

In the Drawings:

A proposed drawing amendment to FIG. 8 is submitted to replace the original drawing sheet for FIG. 8.

In the Claims,

Please amend Claim 1.

Please add new Claims 3-66.

The claims have been reproduced in full for your convenience.

1. **(Once Amended)** An eyeglass device comprising:

a primary spectacle frame for supporting primary lenses therein, said primary spectacle frame including two side portions each having an extension extended therefrom for pivotally coupling a leg means thereto, said primary spectacle frame including two rear and side portions each having a projection secured thereto, said primary spectacle frame including an upper side portion,

a pair of first magnetic members secured in said projections respectively,

an auxiliary spectacle frame for supporting auxiliary lenses therein, said auxiliary spectacle frame including two side portions each

- 2 -

Attorney Docket No.: CONT-01013US1 SRM/BIM
bim/cont/1013us1.012.wpd

having an arm extended therefrom, with at least one arm for extending over [and for engaging with] said upper side portion of said primary spectacle frame, and

a pair of second magnetic members secured to said arms respectively for engaging with said first magnetic members of said primary spectacle frame so as to secure said auxiliary spectacle frame to said primary spectacle frame,

at least one of said arms being [engaged with and] supported on said upper side portion of said primary spectacle frame so as to allow said auxiliary spectacle frame to be stably supported on said primary spectacle frame and so as to prevent said auxiliary spectacle frame from moving downward relative to said primary spectacle frame and so as to prevent said auxiliary spectacle frame from being disengaged from said primary spectacle frame.

2.  An eyeglass device according to Claim 1, wherein said projections and said first magnetic members are arranged lower than said upper side portion of said primary spectacle frame, said second magnetic members are extended downward toward said projections for hooking on said primary spectacle frame so as to further secure said auxiliary spectacle frame to said primary spectacle frame.

3.  (New) An eyeglass device as recited in Claim 1 wherein the first and the second magnetic members are magnets.

- 3 -

Attorney Docket No.: CONT-01013US1 SRM/BIM
bim/cont/1013us1.012.wpd

4.    **(New)** An eyeglass device as recited in Claim 1 wherein:

the primary spectacle frame includes two upper side portions, each upper

side portion for supporting one of said arms.

5.    **(New)** An eyeglass device comprising:

a primary spectacle frame for supporting primary lenses therein;

the primary spectacle frame including two side portions;

each side portion having an extension extended therefrom

for pivotally coupling a leg thereto;

the primary spectacle frame including a projection

extending from each said side portion;

each projection securing a first magnetic member; and

the primary spectacle frame including an upper portion; and

an auxiliary spectacle frame for supporting auxiliary lenses

therein;

the auxiliary spectacle frame including two auxiliary side portions;

each said auxiliary side portion having an arm extended

therefrom;

with at least one arm being configured to extend over the

upper portion of the primary spectacle frame;

each arm securing a second magnetic member;

each second magnetic member configured to engage with one of

the first magnetic members of the primary spectacle frame; and

the upper portion supports at least one arm of the auxiliary frame.

- 4 -

6. **(New)** An eyeglass device as recited in Claim 5 wherein the upper portion is an upper part of one of the side portions of the primary frame.

7. **(New)** An eyeglass device as recited in Claim 5 wherein the first and the second magnetic members are magnets.

8. **(New)** An eyeglass device as recited in Claim 7 wherein the first magnetic members are not in contact with the second magnetic members.

9. **(New)** An eyeglass device as recited in Claim 8 wherein the upper portion is an upper part of one of the side portions of the primary frame.

10. **(New)** An eyeglass device comprising:

a primary spectacle frame for supporting primary lenses therein;

the primary spectacle frame including two side portions;

each side portion having an extension extended therefrom for pivotally coupling a leg thereto;

the primary spectacle frame including a projection extending from each said side portion;

each projection securing a first magnetic member; and

the primary spectacle frame including an upper means; and

an auxiliary spectacle frame for supporting auxiliary lenses therein;

- 5 -

Attorney Docket No.: CONT-01013US1 SRM/BIM
bim/cont/1013us1.012.wpd

the auxiliary spectacle frame including two auxiliary side portions;

each said auxiliary side portion having an arm extended therefrom;

with at least one arm being configured to extend over the upper means of the primary spectacle frame;

each arm securing a second magnetic member;

each second magnetic member configured to engage with one of the first magnetic members of the primary spectacle frame; and

the upper means supports at least one arm of the auxiliary frame.

11. **(New)** An eyeglass device as recited in Claim 10 wherein;

the first and the second magnetic members are magnets; and

the upper means is an upper part of one of the side portions.

12. **(New)** An eyeglass device comprising:

a primary spectacle frame for supporting primary lenses therein, with the lenses defining a vertical plane;

the primary spectacle frame including two side portions;

each side portion having an extension extended therefrom for pivotally coupling a leg thereto; and

the primary spectacle frame including two first magnets, each secured to one of the side portions of the primary frame; and

an auxiliary spectacle frame for supporting auxiliary lenses therein, and for disposing in front of the primary frame;

- 6 -

the auxiliary spectacle frame including two auxiliary side portions;
and

the auxiliary spectacle frame including two second magnets, each secured to one of the auxiliary side portions, for engaging on a horizontal position with one of the first magnets so as to secure the auxiliary frame to the primary frame.

13.    **(New)**  An eyeglass device as recited in Claim 12 wherein:

the primary spectacle frame includes a projection extending from each of its side portion;

each projection secures one of the first magnets;

the primary spectacle frame includes an upper portion;

each said auxiliary side portion has an arm extended therefrom;

at least one arm is configured to extend over the upper portion of the primary spectacle frame;

each arm secures one of the second magnets; and

the upper portion is an upper part of one of the side portions of the primary spectacle frame.

14.    **(New)**  A primary eyeglass device adapted to stably support an auxiliary spectacle frame, which includes two auxiliary side portions, each auxiliary side portion having an arm extended therefrom, and each arm securing a first magnetic member,

the primary eyeglass device comprising:

- 7 -

Attorney Docket No.: CONT-01013US1 SRM/BIM
bim/cont/1013us1.012 wpd

a primary spectacle frame for supporting primary lenses therein;

the primary spectacle frame including two primary side portions;

each side portion having an extension extended therefrom for pivotally coupling a leg thereto;

the primary spectacle frame including a projection extending from each said side portion;

each projection securing a second magnetic member;

the primary spectacle frame including an upper portion; and

when the primary frame is supporting the auxiliary frame,

each second magnetic member engages with one of the first magnetic members;

the upper portion being extended over by at least one arm of the auxiliary frame; and

the upper portion supports at least one arm of the auxiliary frame.

15.    **(New)** A primary eyeglass device as recited in Claim 14 wherein the upper portion is an upper part of one of the primary side portions.

- 8 -

16.     **(New)** An auxiliary eyeglass device comprising:

an auxiliary spectacle frame for supporting auxiliary lenses therein;

the auxiliary spectacle frame including two auxiliary side portions;

each auxiliary side portion having an arm extended therefrom; and

each arm securing a first magnet;

the auxiliary spectacle frame being adapted to be stably supported on a primary spectacle frame, which includes two primary side portions, each side portion securing a second magnetic member, the primary spectacle frame also including an upper portion; and

when the auxiliary frame is supported by the primary frame,

each first magnet engages with one of the second magnetic members; and

at least one arm of the auxiliary frame extending over the upper portion.

17.     **(New)** An auxiliary eyeglass device as recited in Claim 16 wherein when the auxiliary frame is supported by the primary frame, at least one arm of the auxiliary frame is supported by the upper portion of the primary frame, which is an upper part of one of the primary side portions.

18.     **(New)** An auxiliary eyeglass device adapted to be stably supported on a primary spectacle frame, which includes two primary side portions, each said side portion securing a first magnetic member, the primary spectacle

- 9 -

frame also including an upper portion, the auxiliary eyeglass device comprising:

an auxiliary spectacle frame for supporting auxiliary lenses therein;

the auxiliary spectacle frame including two auxiliary side portions;

each auxiliary side portion having an arm extended therefrom;

each arm securing a second magnet; and

when the auxiliary frame is supported by the primary frame,

each second magnet engages with one of the first magnetic members of the primary spectacle frame; and

at least one arm of the auxiliary frame extending over the upper portion.

19.   **(New)** An auxiliary eyeglass device as recited in Claim 18 wherein when the auxiliary frame is supported by the primary frame, at least one arm of the auxiliary frame is supported by the upper portion of the primary frame, which is an upper part of one of the primary side portions.

20.   **(New)** A primary eyeglass device comprising:

a primary spectacle frame for supporting primary lenses therein;

the primary spectacle frame including two primary side portions;

each side portion having an extension extended therefrom for pivotally coupling a leg thereto;

- 10 -

Attorney Docket No.: CONT-01013US1 SKM/BIM
bim/cont/1013us1.012.wpd

the primary spectacle frame including a projection extending from each said side portion;

each projection securing a first magnet; and

the primary spectacle frame including an upper portion;

the primary frame adapted to stably support an auxiliary spectacle frame, which includes two auxiliary side portions each securing a second magnetic member; and

when the primary spectacle frame is supporting the auxiliary spectacle frame,

the upper portion is extended over by at least one of the auxiliary side portions;

the upper portion supports at least one of the auxiliary side portions; and

each first magnet engages with one of the second magnetic members.

21.   (New) A primary eyeglass device as recited in Claim 20 wherein the upper portion is an upper part of one of the primary side portions.

22.   (New) A primary eyeglass device adapted to stably support an auxiliary spectacle frame, the auxiliary spectacle frame for supporting auxiliary lenses therein, and for disposing in front of the primary frame, the auxiliary spectacle frame including two auxiliary side portions, each

- 11 -

auxiliary side portion having an arm extended therefrom, and each arm

securing a first magnet,

the primary eyeglass device comprising:

a primary spectacle frame for supporting primary lenses therein;

the primary spectacle frame including two side portions;

each of the two side portions having an extension extended

therefrom for pivotally coupling a leg thereto;

the primary spectacle frame including a projection extending from

each said side portion;

each projection securing a second magnet; and

when the primary frame is supporting the auxiliary frame,

each second magnet is coupled to, but not in contact with, one of

the first magnets on a horizontal position so as to secure the auxiliary

frame to the primary frame; and

the auxiliary frame is supported by at least an upper portion of the

primary frame.


23.   **(New)** An eyeglass device as recited in Claim 4 wherein each upper side

portion is an upper part of one of the side portions of the primary

spectacle frame.


24.   **(New)** An eyeglass device as recited in Claim 23 wherein the magnetic

members are magnets.


- 12 -

25.  **(New)**  An eyeglass device as recited in Claim 1 wherein at least the end portion of one arm extends downward toward one of the projections for hooking on the primary spectacle frame so as to further stably support and secure the auxiliary spectacle frame to the primary spectacle frame.

26.  **(New)**  An eyeglass device as recited in Claim 5 wherein at least the end portion of one arm extends downward toward one of the projections for hooking on the primary spectacle frame such that the auxiliary spectacle frame is further stably supported and secured to the primary spectacle frame.

27.  **(New)**  An eyeglass device as recited in Claim 10 wherein at least the end portion of one arm extends downward toward one of the projections for hooking on the primary spectacle frame such that the auxiliary spectacle frame is further stably supported and secured to the primary spectacle frame.

28.  **(New)**  An eyeglass device as recited in Claim 12 wherein at least the end portion of one auxiliary side portion extends downward toward one of the side portions of the primary spectacle frame for hooking on the primary spectacle frame such that the auxiliary spectacle frame is further stably supported and secured to the primary spectacle frame.

- 13 -

Attorney Docket No.: CONT-01013US1 SRM/BIM
bim/cont/1013us1.012.wpd

29.     **(New)**  An auxiliary eyeglass device as recited in Claim 16 wherein when the auxiliary frame is supported by the primary frame, at least the end portion of one arm extends downward toward one of the side portions of the primary spectacle frame for hooking on the primary spectacle frame such that the auxiliary spectacle frame can be further stably supported and secured to the primary spectacle frame.

30.     **(New)**  An auxiliary eyeglass device as recited in Claim 18 wherein when the auxiliary frame is supported by the primary frame, at least the end portion of one arm extends downward toward one of the side portions of the primary spectacle frame for hooking on the primary spectacle frame such that the auxiliary spectacle frame can be further stably supported and secured to the primary spectacle frame.

31.     **(New)**  An eyeglass device as recited in Claim 25 wherein the first and the second magnetic members are magnets.

32.     **(New)**  An eyeglass device as recited in Claim 26 wherein the first and the second magnetic members are magnets.

33.     **(New)**  An eyeglass device as recited in Claim 27 wherein the first and the second magnetic members are magnets.

34.     **(New)**  An eyeglass device comprising:

- 14 -

a primary frame for supporting primary lenses therein, with the lenses defining a vertical plane;

the primary spectacle frame including two side portions;

each side portion having an extension extended therefrom for pivotally coupling a leg thereto; and

the primary spectacle frame including two first magnets, each secured to one of the side portions of the primary frame; and

an auxiliary frame for supporting auxiliary lenses therein, and for disposing in front of the primary frame;

the auxiliary spectacle frame including two auxiliary side portions; and

the auxiliary frame including two second magnets, each secured to one of the auxiliary side portions, for coupling on a horizontal position with one of the first magnets so as to secure the auxiliary frame to the primary frame.

35.   **(New)** An eyeglass device comprising:

a spectacle primary frame for supporting primary lenses therein, with the primary lenses defining a vertical plane;

the primary spectacle frame including two side portions;

each side portion having an extension extended therefrom for pivotally coupling a leg thereto; and

- 15 -

Attorney Docket No.: CONT-01013US1 SRM/BIM
bim/cont/1013us1.012.wpd

the primary spectacle frame including two first magnetic members, each secured to one of the side portions of the primary frame; and

an auxiliary spectacle frame for supporting auxiliary lenses therein, and for disposing in front of the primary frame;

the auxiliary spectacle frame including two auxiliary side portions;

the auxiliary frame including two second magnetic members, each secured to one of the auxiliary side portions, for coupling on a horizontal position but not in contact, with one of the first magnetic members so as to secure the auxiliary frame to the primary frame; and

the auxiliary spectacle frame being supported by at least an upper portion of the primary spectacle frame.

36.   **(New)** An eyeglass device comprising:

a primary spectacle frame for supporting primary lenses therein;

the primary spectacle frame including two side portions;

each side portion having an extension extended therefrom for pivotally coupling a leg thereto; and

the primary spectacle frame including two first magnetic members, each secured to one of the side portions of the primary frame; and

an auxiliary spectacle frame for supporting auxiliary lenses therein, and for disposing in front of the primary frame;

- 16 -

Attorney Docket No.: CONT-01013US1 SRM/BIM
bim/cont/1013us1.012.wpd

the auxiliary spectacle frame including two auxiliary side portions; and

the auxiliary spectacle frame including two second magnetic members, each secured to one of the auxiliary side portions, for coupling on a horizontal position with one of the first magnetic members so as to secure the auxiliary frame to the primary frame, the horizontal position being substantially perpendicular to a front surface of the primary frame.

37. **(New)** An eyeglass device as recited in Claim 36 wherein the second magnetic members are magnets.

38. **(New)** An eyeglass device as recited in Claim 36 wherein the first magnetic members are magnets.

39. **(New)** An eyeglass device as recited in Claim 36 wherein the first and the second magnetic members are magnets.

40. **(New)** An eyeglass device as recited in Claim 36 wherein the first magnetic members are not in contact with the second magnetic members.

41. **(New)** An eyeglass device as recited in Claim 39 wherein the first magnetic members are not in contact with the second magnetic members.

- 17 -

Attorney Docket No.: CONT-01013US1 SRM/BJM
bim/cont/1013us1.012.wpd

42. **(New)** An eyeglass device as recited in Claim 36 further comprising at least one projection extending from said primary frame, said projection being configured to secure one of said first magnetic members.

43. **(New)** An eyeglass device comprising:

a primary spectacle frame for supporting primary lenses therein;

the primary spectacle frame including two side portions;

each side portion having an extension extended therefrom for pivotally coupling a leg thereto;

the primary spectacle frame including a projection extending from each said side portion;

each projection securing a first magnetic member; and

the primary spectacle frame including an upper portion; and

an auxiliary spectacle frame for supporting auxiliary lenses therein;

the auxiliary spectacle frame including two auxiliary side portions;

each said auxiliary side portion having an arm extended therefrom;

with at least one arm being configured to extend over the upper portion of the primary spectacle frame;

each arm securing a second magnetic member;

each second magnetic member configured to couple with one of the first magnetic members of the primary spectacle frame; and

the upper portion supports at least one arm of the auxiliary frame.

- 18 -

44. **(New)** An auxiliary eyeglass device comprising:

an auxiliary spectacle frame for supporting auxiliary lenses therein;

the auxiliary spectacle frame including two auxiliary side portions;

each auxiliary side portion having an arm extended therefrom; and

each arm securing a first magnetic member;

the auxiliary spectacle frame being adapted to be stably supported on a primary spectacle frame, which includes two primary side portions, each side portion securing a second magnetic member, the primary spectacle frame also including an upper portion; and

when the auxiliary frame is supported by the primary frame,

each first magnetic member engages with one of the second magnetic members; and

at least one arm of the auxiliary frame extending over the upper portion.

45. **(New)** A primary eyeglass device for securing an auxiliary spectacle frame, which includes two auxiliary side portions, each auxiliary side portion securing to a first magnetic member, the primary eyeglass device comprising:

a primary spectacle frame for supporting primary lenses therein;

the primary spectacle frame including two side portions;

each side portion having an extension extended therefrom for pivotally coupling a leg thereto;

- 19 -

the primary spectacle frame including two first magnetic members, each secured to one of the side portions of the primary spectacle frame; and

when the auxiliary spectacle frame is secured to the primary spectacle frame, each second magnetic member couples on a horizontal position with one of the first magnetic members, the horizontal position being substantially perpendicular to a front surface of the primary frame.

46.    (New)  An auxiliary eyeglass device adapted to be secured to a primary spectacle frame, which includes two primary side portions, each said side portion securing a first magnetic member, the auxiliary eyeglass device comprising:

an auxiliary spectacle frame for supporting auxiliary lenses therein;

the auxiliary spectacle frame including two auxiliary side portions;

each auxiliary side portion configured to secure a second magnetic member; and

when the auxiliary frame is secured to the primary frame, each second magnetic member couples on a horizontal position with one of the first magnetic members of the primary spectacle frame, the horizontal position being substantially perpendicular to a front surface of the auxiliary frame.

47.    (New)  An eyeglass device, comprising:

- 20 -

Attorney Docket No.: CONT-01013US1 SRM/BIM
bim/cont/1013us1.012.wpd

a primary spectacle frame for supporting primary lenses therein;

a pair of spaced apart projections mounted to said primary spectacle frame and projecting toward a wearer when the eyeglass device is worn;

a first pair of magnetic members, each affixed to said pair of projections, said first pair of magnetic members each having a first engagement surface;

an auxiliary spectacle frame for supporting auxiliary lenses therein;

a pair of spaced apart arms mounted to said auxiliary spectacle frame and projecting toward the wearer when the eyeglass device is worn; and

a second pair of magnetic members, each affixed to said pair of arms, said second pair of magnetic members each having a second engagement surface, said auxiliary spectacle frame capable of being removably affixed to said primary spectacle frame by bringing said first engagement surfaces of said pair of first magnetic members into magnetic engagement with said second engagement surfaces of said pair of second magnetic members, engagement of said first and second engagement surfaces occurring in a substantially horizontal plane when the eyeglass device is worn by the wearer.

- 21 -

48.　**(New)**  An eyeglass device as recited in claim 47, wherein said second

pair of magnetic members are removably affixed on top of said first pair

of magnetic members.


49.　**(New)**  An eyeglass device capable of being supported on a face of a

wearer, the eyeglass device comprising:

　　　a primary spectacle frame for supporting primary lenses therein,

said primary spectacle frame including a pair of side portions, each at

opposed sides of said primary spectacle frame;

　　　a first pair of magnetic members, affixed respectively to said pair

of side portions, said first pair of magnetic members each having a first

engaging surface; .

　　　an auxiliary spectacle frame for supporting auxiliary lenses therein

and for being removably supported by said primary spectacle frames; and

　　　a second pair of magnetic members affixed to said auxiliary

spectacle frame, said second pair of magnetic members each having a

second engagement surface, said auxiliary spectacle frame capable of

being removably supported by said primary spectacle frame by bringing

said first engagement surfaces of said pair of first magnetic members into

magnetic engagement with said second engagement surfaces of said pair

of second magnetic members, engagement of said first and second

engagement surfaces occurring in a substantially horizontal plane when

the eyeglass device is worn by the wearer.

- 22 -

Attorney Docket No.: CONT-01013US1 SRM/BIM
bim/cont/1013us1.012.wpd

50.   **(New)**  An eyeglass device as recited in claim 49, wherein said second pair of magnetic members are removably supported on top of said first pair of magnetic members.

51.   **(New)**  An eyeglass device capable of being supported on a face of a wearer, the eyeglass device comprising:

a primary spectacle frame for supporting primary lenses therein, said primary spectacle frame including a pair of side portions, each at opposed sides of said primary spectacle frame;

a first pair of magnetic members, affixed respectively to said pair of side portions, said first pair of magnetic members each having a first, substantially horizontal engaging surface when said primary spectacle frame is worn by the wearer;

an auxiliary spectacle frame for supporting auxiliary lenses therein and for being removably supported by said primary spectacle frames; and

a second pair of magnetic members affixed to said auxiliary spectacle frame, said second pair of magnetic members each having a second, substantially horizontal engagement surface when said auxiliary frame is supported by said primary frame, said auxiliary spectacle frame capable of being removably supported by said primary spectacle frame by bringing said first engagement surfaces of said pair of first magnetic members into magnetic engagement with said second engagement surfaces of said pair of second magnetic members.

- 23 -

Attorney Docket No.: CONT-01013US1 SRM/BIM
bim/cont/1013us1.012.wpd

52.   **(New)**  An eyeglass device as recited in claim 51, wherein said second pair of magnetic members are removably supported on top of said first pair of magnetic members.

53.   **(New)**  An eyeglass device capable of being supported on a face of a wearer, the eyeglass device comprising:

   a primary spectacle frame for supporting primary lenses therein;

   at least one first magnetic member affixed to said primary spectacle frame, said at least one first magnetic member having a first engaging surface;

   an auxiliary spectacle frame for supporting auxiliary lenses therein and for being removably supported by said primary spectacle frames; and

   at least one second magnetic member affixed to said auxiliary spectacle frame, said at least one second magnetic member having a second engagement surface, said auxiliary spectacle frame capable of being removably supported by said primary spectacle frame by bringing said first engagement surface of said at least one first magnetic member into magnetic engagement with said second engagement surface of said at least one second magnetic member, engagement of said first and second engagement surfaces occurring in a substantially horizontal plane when the eyeglass device is worn by the wearer.

- 24 -

Attorney Docket No.: CONT-01013US1 SRM/BIM
bim/cont/1013us1.012.wpd

54.    **(New)**  An eyeglass device as recited in claim 53, wherein said at least one second magnetic member is removably supported on top of said at least one first magnetic member.

55.    **(New)**  An eyeglass device comprising:

a primary spectacle frame for supporting primary lenses generally in a lens reference plane, and for supporting a pair of legs in a leg reference plane substantially perpendicular to said lens reference plane;

at least one first magnetic member affixed to said primary spectacle frame, said at least one first magnetic member having a first engaging surface;

an auxiliary spectacle frame for supporting auxiliary lenses therein and for being removably supported by said primary spectacle frames; and

at least one second magnetic member affixed to said auxiliary spectacle frame, said at least one second magnetic member having a second engagement surface, said auxiliary spectacle frame capable of being removably supported by said primary spectacle frame by bringing said first engagement surface of said at least one first magnetic member into magnetic engagement with said second engagement surface of said at least one second magnetic member, engagement of said first and second engagement surfaces occurring in a plane substantially parallel to said leg reference plane.

- 25 -

Attorney Docket No.: CONT-01013US1 SRM/BIM
bim/cont/1013us1.012.wpd

56.　(New) An eyeglass device as recited in claim 55, wherein said at least one second magnetic member is removably supported on top of said at least one first magnetic member.

57.　(New) A primary spectacle frame for supporting primary lenses therein, the primary spectacle frames being capable of supporting an auxiliary spectacle frame, the auxiliary spectacle frame including a first pair of magnetic members, the first pair of magnetic members each including a first engagement surface, the primary spectacle frame comprising:

a pair of spaced apart projections projecting toward a wearer when the primary spectacle frame is worn; and

a second pair of magnetic members, affixed respectively to said pair of projections, said second pair of magnetic members each having a second engagement surface capable of engaging one of the first engagement surfaces of the first pair of magnetic members in a substantially horizontal plane.

58.　(New) An eyeglass device as recited in claim 57, wherein the first pair of magnetic members are removably supported on top of said second pair of magnetic members.

59.　(New) An auxiliary spectacle frame for supporting auxiliary lenses therein, the auxiliary spectacle frame being supported on a primary spectacle frame, the primary spectacle frame including a pair of primary

- 26 -

Attorney Docket No.: CONT-01013US1 SRM/BIM
bim/cont/1013us1.012.wpd

lenses therein, and a first pair of magnetic members, said first pair of magnetic members each having a first engagement surface, said auxiliary spectacle frame comprising:

a pair of spaced apart arms projecting toward the wearer when the eyeglass device is worn; and

a second pair of magnetic members, affixed respectively to said pair of arms, said second pair of magnetic members each having a second engagement surface capable of engaging one of the first engagement surfaces of the first pair of magnetic members in a substantially horizontal plane.

60. **(New)** An eyeglass device as recited in claim 59, wherein said second pair of magnetic members are removably supported on top of the first pair of magnetic members.

- 27 -

61.   (New)  An eyeglass device, comprising:

a primary spectacle frame for supporting primary lenses therein;

a pair of spaced apart projections mounted to said primary spectacle frame and projecting toward a wearer when the eyeglass device is worn;

a first pair of magnetic members, each affixed to said pair of projections, said first pair of magnetic members each having a first surface;

an auxiliary spectacle frame for supporting auxiliary lenses therein;

a pair of spaced apart arms mounted to said auxiliary spectacle frame and projecting toward the wearer when the eyeglass device is worn;

a second pair of magnetic members, each affixed to said pair of arms, said second pair of magnetic members each having a second surface, said auxiliary spectacle frame capable of being supported on said primary spectacle frame by mounting said second pair of magnetic members over said first pair of magnetic members, said first and second surfaces being oppositely directed so that said surfaces are juxtaposed.

62.   (New)  An eyeglass device comprising a primary spectacle frame for supporting primary lenses therein, a pair of side arms connected at spaced locations to said primary frame, and operable to retain said primary frame on a user,

- 28 -

an auxiliary frame for supporting auxiliary lenses therein and adopted to be positioned over said primary lenses, a pair of portions secured at spaced locations to said auxiliary frame and projecting rearwardly therefrom so as to be juxtaposed with selected portions of said primary frame, each of said portions having a magnetic member thereon with said magnetic members cooperating with said primary frame to hold juxtaposed surfaces of said primary frame and projections in abutment to inhibit relative movement therebetween.

63.   **(New)** An eyeglass device according to claim 62 wherein said auxiliary frame includes an abutment surface for engagement with an oppositely directed surface on said primary frame to inhibit relative movement therebetween.

64.   **(New)** An eyeglass device according to claim 63 wherein said abutment surface is provided on each of said portions on said auxiliary frame.

65.   **(New)** An eyeglass device according to claim 62 wherein said portions are located adjacent respective ones of said arms.

66.   **(New)** An eyeglass device according to claim 65 wherein said auxiliary frame includes an abutment surface for engagement with an oppositely directed surface on said primary frame to inhibit relative movement therebetween.

- 29 -

Attorney Docket No.: CONT-01013US1 SRM/BIM
bim/cont/1013us1.012.wpd

## REMARKS

This Supplemental Response is filed in response to Paper No. 13. On September 7, 2000, the undersigned attorney had a telephonic interview with the Examiner. During that interview, the Examiner indicated that the reissue declaration filed in the application was defective for failure to state an error on which the reissue application is based. I indicated that this issue had been addressed in the January 14, 2000 response by Peter Tong. The Examiner indicated that the January 14, 2000 Response had not been entered into the Patent Office record. Despite over seven months having passed, this was the first time the Examiner indicated that the January 14, 2000 response had not been entered.

Regarding the assertion that the declaration fails to state an error, it was pointed out by the undersigned attorney that where an attorney fails to appreciate the full scope of an invention, the courts have held that this is a proper "error" on which filing a reissue may be based. Despite the judicial support, the Examiner nevertheless disagreed with this point.

The Examiner also indicated in the telephonic interview that the reissue application added new matter.

This Supplemental response is being filed so that the remarks presented in the January 14, 2000 response, and the claims added during the prosecution of the reissue application, may be considered.

In the Office Action dated July 15, 1999 (the last substantive Office Action issued in this application, referred to herein as "the Office Action"), the Examiner had rejected all of the claims, and has disapproved the proposed drawing.

- 30 -

Applicant appreciates the Examiner's detailed and meticulous comments in his Office Action to the above-identified application. For the reasons to be stated below, however, Applicant respectfully traverses the Examiner's rejections of the claims.

By this amendment, Applicant has added claims 3-66, enclosed a declaration of Professor Richard J. Samuels, and submitted a proposed drawing amendment to Figure 8. Subject to the approval of the Examiner, it is respectfully requested that the new drawing sheet be substituted for the originally filed drawing sheet for FIG. 8. Accordingly, claims 1-66 are now in the application. Applicant believes that no new matter has been introduced by the amendment.

## Reissue Declaration

### At Least One Error Has Been Identified

On page 2, the Office Action stated that the reissue declaration was defective because it failed to identify at least an error in the declaration. Applicant respectfully disagrees because Applicant has stated at least one error in the declaration.

"A reissue applicant must acknowledge the existence of an error in the specification, drawings, or claims, which error causes the original patent to be defective.... See MPEP § 1402 for a discussion of grounds for filing a reissue that may constitute the 'error' required by 35 U.S.C. 251.... Applicant need only specify in the reissue oath/declaration one of the errors upon which reissue is based. Where applicant specifies one such error, this requirement of a reissue oath/declaration is satisfied." MPEP § 1414, with emphasis added.

MPEP § 1402 states, with emphasis added, that: "In accordance with 35 U.S.C. 251, the error upon which a reissue is based must be one which causes the patent to be 'deemed wholly or partly inoperative or invalid ... by reason of the patentee claiming more or less than he had a right to claim in the patent.' .... The most common bases for filing a reissue applications are: (A)

- 31 -

the claims are too narrow or too broad .... <u>An attorney's failure to appreciate the full scope of the invention was held to be an error</u> correctable through reissue ...."

As stated in the MPEP, (1) Claims being too broad or too narrow is one of the most common bases for filing a reissue; (2) An attorney's failure to appreciate the full scope of the invention was held to be an error; and (3) Applicant only needs to specify one error in the declaration.

The Federal Circuit has applied even more liberal standards than an attorney's failure to appreciate the full scope, as shown in the following decision:

> "Similarly, in In re Wesseler, the CCPA stated that error is established where there is no evidence that the appellant intentionally omitted or abandoned the claimed subject matter. Thus, the CCPA has construed the term error under section 251 broadly. The Ninth Circuit employed a more rigid standard in *Riley v. Broadway-Hale Stores, Inc.*... We decline to adopt the rigid standard applied in *Riley*, in favor of the more liberal approach taken by the CCPA." *Ball v. United States* 729 F.2d 1429, 1435, 221 USPQ 289, 294 (Fed. Cir. 1984).

In the declaration, Applicant states the following:

11.     Based on further investigation, I was advised that my Taiwan patent counsel failed to appreciate the full scope and breadth of the invention. I should both broaden and narrow my claims.

As discussed in the above paragraph 11, Applicant has identified at least one error, which is its Taiwan patent counsel's failure to appreciate the full scope and breadth of the invention. Such an error is correctable through reissue.

MPEP 1414 further explains with emphasis added, that: "If the initial reissue oath/declaration 'states at least one error' in the original patent, and, *in addition*, recites the specific corrective action taken in the reissue application, the oath/declaration would be considered acceptable, <u>even though the corrective action statement is not required</u>."

- 32 -

Attorney Docket No.: CONT-01013US1 SRM/BIM
bim/cont/1013us1.012.wpd

Following MPEP 1414's suggestion, Applicant further includes a number of corrective actions in the declaration. They are, for example, as follows:

12.    I was advised, for example, that (1) I should include as dependent claims magnetic members being magnets; (2) I should include as dependent claims two upper side portions, and the gap between the first magnetic members and the second magnetic members; (3) I should claim magnetic members engaging on a horizontal position; (4) I should claim primary spectacle frames without auxiliary frames; (5) I should claim auxiliary frames without primary spectacle frames; (6) I should include as dependent claims the end portion of an arm extending downward for hooking on the primary spectacle frame; and (7) I should broaden the issued Claim 1.

Thus, Applicant not only has stated at least one error, but also a number of planned corrective actions to be taken in the reissue application, though the corrective action statement is not required.

### Declaration Did Refer To The Reissue Specification and Claims

The Office Action further stated that the declaration was defective because of its paragraph 3, which states, "I have reviewed and understand the contents of the above-identified specification, including claims." The Office Action's argument was that in view of paragraph 3, the declaration referred only to the patent specification and patent claims, and not to the reissue specification and reissue claims. Applicant respectfully disagrees. Paragraph 17 of the declaration describes changes made in both the specification and the claims in the reissue. Paragraph 18 then states the following:

Attorney Docket No.: CONT-01013US1 SRM/BIM
bim/cont/1013us1.012.wpd

As a result of these corrections, the amended claims, the new claims and the amended

specification more closely represent my invention.... My invention is better represented

by the amended specification, the amended claim and the new claims for reissue.

Thus, Applicant, in the declaration, refers specifically to changes made in the reissue--Both in

the reissue specification and the reissue claims. Not only has Applicant reviewed and understood

the content of the reissue application, Applicant has reproduced the changes submitted in the

reissue application in the declaration. The declaration that the amended claim, the new claims

and the amended specification more closely represent his invention, indicates that Applicant has

reviewed and understood the reissue specification and the reissue claims.

However, if the Examiner insists on Applicant submitting a supplemental reissue

declaration on this issue, please so indicate.

New Matter Rejection

Magnetic Members Coupled and Not in Contact Is Not New Matter

The Office Action rejected Claims 8, 9, 22 and 35 based on the argument that nowhere

in the original specification provided support for magnetic members being coupled, but not in

contact, with each other. See the third paragraph on page 3 of the Office Action. Applicant

respectfully disagrees.

As clearly shown in FIG. 7 of the '207 patent, the two magnetic members, 14 and 22, are

in proximity of, coupled to, but not in contact with each other. Magnets are coupled to each other

when they are in proximity of each other. The introduction of the phrase magnetic members

coupled to each other cannot be considered new matter. Another reason why magnetic members

coupling cannot be new matter is because there are numerous recitations of the magnetic

members engaging with each other in the specification.

- 34 -

<u>End Portion Of An Arm Extended Downward Is Not New Matter</u>

In the fourth paragraph on page 3 of the Office Action, Claims 25-33 were rejected based on the argument that the original specification failed to disclose the "subject matter of the end portion of the arm of the auxiliary frame extended downward toward the projection for hooking on the primary spectacle frame".

Applicant respectfully disagrees. Lines 4-7, column 3 of the original specification state:

> [T]he end portions of the arms 21 ... are slightly extended downward toward the projections 13 such that the arms 21 ... may hook on the primary spectacle frame 10.

Thus, the original specification provides support for the subject matter of the end portion of the arm of the auxiliary frame extended downward toward the projection for hooking on the primary spectacle frame.

<u>Phrases Added In Pages 2 and 3 Are Not New Matter</u>

In the second half of the fourth paragraph on page 3 of the Office Action, phrases added in pages 2 and 3 of the original specification were considered new matter. Applicant again respectfully disagrees.

On page 2, Applicant has added the following paragraph:

> FIG. 8 illustrates another embodiment of a part of a cross sectional view taken along lines 7-7 of FIG. 6.

As to be explained below, the original FIG. 8 cannot be considered new matter. FIG. 8 has been amended to further eliminate any possibility of introducing any new matter. With FIG. 8 not being new matter, the added paragraph on page 2 cannot be new matter.

- 35 -

On page 3, Applicant added the following paragraph:

> In one embodiment, as shown in FIG. 7, magnetic members 14 and 22 are not in contact with each other; magnetic members 14 and 22 are engaged with, but not supported on, each other. Instead, the arm 21 securing the magnetic member 22 is supported on an upper side portion of the primary spectacle frame 10. As shown in FIG. 7, the upper side portion can be an upper part of the side portion securing the projection 13.

The above paragraph cannot be considered new matter because at least it is supported by FIG. 7 of the original specification. To more clearly show that no new matter has been introduced, Applicant has separated the above paragraph into the following sections.

(1)     Magnetic members 14 and 22 are not in contact with each other; magnetic members 14 and 22 are engaged with, but not supported on, each other.

(2)     Instead, the arm 21 securing the magnetic member 22 is supported on an upper side portion of the primary spectacle frame 10.

(3)     As shown in FIG. 7, the upper side portion can be an upper part of the side portion securing the projection 13.

In one embodiment, each of the above sections is identified in FIG. 7 as shown in the following drawing:



# F I G. 7

Thus, the original FIG. 7 clearly supports all three sections. Regarding section 2, it is also supported by the original claim 1.

Attorney Docket No.: CONT-01013US1 SRM/BIM
bim/cont/1013us1.012.wpd

<u>Securing Magnetic Members To The Side Portions Is Not New Matter</u>

In the fifth paragraph on page 3 of the Office Action, the subject matter of securing the magnetic members to the side portions of the primary spectacle frame and of the auxiliary spectacle frame was considered not supported. Applicant respectfully disagrees.

For example, as shown in FIG. 3, each magnetic member is secured to a portion at each side of the primary frame. In other words, the subject matter of securing magnetic members to side portions of the primary frame is shown in FIG. 3. Similarly in FIG. 4, each magnetic member is secured to a portion at each side of the auxiliary frame. Again, the subject matter of securing magnetic members to side portions of the auxiliary frame is shown in FIG. 4.

<u>Drawings Rejection</u>

FIG. 8 was rejected as being new matter, based on the argument that the original disclosure did not support "the showing of the end portions, but not the magnetic member 22, of the arm extends downward toward the projection for hook on the primary spectacle frame."

The specification has recited the embodiment of the end portions of the arm extending downward toward the projection for hooking on the primary spectacle frame. This is shown, for example, in the following:

> "[T]he end portions of the arms 21 ... extended downward toward the projections 13 such that the arms 21 ... may hook on the primary spectacle frame 10..." See Col. 3, lines 4-7 of the specification.

The rejection stated that, "the magnetic member 22, of the arm extends downward toward the projection for hook on the primary spectacle frame." The rejection may be somehow related to the magnetic member 22 in the figure. To expedite the prosecution of this reissue application,

- 37 -

Applicant has amended FIG. 8 so that it does not show the magnetic members. Upon the Examiner's acceptance of the amendment, Applicant will submit the formal drawing for Figure 8.

Rejections Based on § 112

Claims 8, 9, 22 and 23 on Coupling and No Contact

In the first paragraph on page 5 of the Office Action, Claims 8, 9, 22, 35 were rejected based on the argument that (1) "the original specification fails to disclose and/or discuss the reasons why the first magnetic member being coupled, but not in contact, with the second magnetic member;" and (2) The structure "renders how the auxiliary spectacle frame being stably supported on the primary frame as now claimed." ·

35 USC 112 states that:

> The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

The applicable statutes, and the teachings in the MPEP, do not require the discussion of reasons behind an embodiment before one can claim the embodiment. Whether or not the reasons behind the embodiment are discussed in the specification is immaterial.

Regarding the second argument, Applicant does not fully understand the rejection. At least in one embodiment, the structure does not require the magnetic members to be in contact in order to have the auxiliary frame stably supported by the primary frame. To expedite the prosecution, Applicant has amended Claims 22 and 35 to include the limitation of the auxiliary frame being supported by at least an upper portion of the primary frame.

- 38 -

### End Portion Extended Downward as in Claims 25-33

In the second paragraph on page 5 of the Office Action, Claims 25-33 were rejected based on the argument that the original specification failed "to disclose the subject matter of the end portion of the arm of the auxiliary frame extended downward toward the projection for hooking on the primary spectacle frame". Applicant respectfully disagrees. As explained above in the New Matter Rejection section, the end portion of the arm extended downward has been fully disclosed in the specification.

### Newly Added Phrases in Pages 2 and 3

Also in the second paragraph on page 5 of the Office Action, Claims 25-33 were rejected based on the argument that the added phrases in pages 2 and 3 were new matter. As explained above in the New Matter Rejection section, the paragraphs introduced in pages 2 and 3 have full support in the original specification.

### Securing Magnetic Members to the Side Portions as in Claims 12, 16, 18, 20, 34 and 35

In the third paragraph on page 5 of the Office Action, Claims 12, 16, 18, 20, 34 and 35 were rejected based on the argument that the original specification failed to disclose the subject matter of securing the magnetic members to the side portions of the primary spectacle frame and of the auxiliary frame. Again, as explained above in the New Matter Rejection section, such disclosures have full support in the original specification.

### Claims 1, 5, 10, 12, 14, 16, 18, 20, 22, 34 and 35: At Least One Arm and Engaged With

In the paragraph bridging page 5 and 6, together with the first paragraph in page 6 of the Office Action, Claims 1, 5, 10, 12, 14, 16, 18, 20, 22, 34 and 35 were rejected based on the

- 39 -

following argument: "[A]dding the phrase 'at least one of' before the phrase 'said arms' and

deleting the function 'engaged with' of the arms ... render the invention, as a whole, as claimed

become inoperative." The reasons cited in the Office Action are that (a)"[T]he 'at least one arms'

may be supported on along the upper side portion of the lens rim of the primary spectacle frame";

and (b) "The above-mentioned adding and deleting also render whether or not all the functions

'so as to allow ... and so as to prevent ... and so as to prevent ...' (claim 1, lines 23-29) are

existed."

Applicant does not understand how the amendments would have rendered the invention

inoperative.

Before the amendment, Claim 1 recited the following limitations:

> said auxiliary frame including two side portions each having an
> arm extended therefrom for extending over and for engaging with
> said upper side portion of said primary spectacle frame, ... said
> arms being engaged with and supported on said upper side portion
> of said primary spectacle frame ...

Claim 1, before amendment, includes the limitation of two side portions of the auxiliary

frame, each having an arm extending over, engaging with and supported on the upper side

portion of the primary frame. Applicant amends the claim to state that "at least one arm" is

supported on the upper side portion.

The Office Action seems to argue such an amendment is defective because, "the 'at least

one of said arms' may be supported on along the upper side portion of the lens rim of the primary

spectacle frame." Applicant does not understand how such a modification would render the

invention inoperative. Applicant respectfully requests the Examiner to clarify the rationale

behind the rejection so as to help Applicant respond to the rejection.

Second, the removal of the words, "engaged with", also would not render the invention

inoperative. As shown in FIG. 6, one embodiment of the invention depicts an arm extending

- 40 -

over a side portion.  Applicant does not understand the reason why removing the words, "engaging with", but leaving the term, "extending over" in the claim would render the invention inoperative.  Also, according to the second edition of Random House Unabridged Dictionary, the word "engage" can have the following meanings:

2. to secure for aid, employment, use, etc...

3. to attract and hold fast ...

4. to attract or please ...

5. to attach or secure...

In one embodiment, the word, engaging, can be interpreted to mean "attaching".  One embodiment of the invention, as shown in FIG. 7, depicts an arm being supported by an upper side portion.  Again, Applicant does not understand why removing the words, "engaged with", but leaving the terms, "supported on", in the claim would render the invention inoperative.

The Office Action further stated that the modification also rendered "whether or not all the functions 'so as to allow ... and so as to prevent ... and so as to prevent ...' (claim 1, lines 23-29) are existed".  Applicant does not fully understand the argument.  The Office Action referred to the following three functions:

a.      Allow said auxiliary spectacle frame to be stably supported on said primary spectacle frame;

b.      Prevent said auxiliary spectacle frame from moving downward relative to said primary spectacle frame; and

c.      Prevent said auxiliary spectacle frame from being disengaged from said primary spectacle frame.

Though the amendments should not have affected these functions, Applicant respectfully requests the Examiner to clarify the rejection so as to help Applicant respond.

- 41 -

<u>Claims 5 and 10: The Term Configured to Engage</u>

In the last paragraph on page 6, Claims 5 and 10 were rejected because "the limitation 'configured to engage' (claim 5, line 17 and claim 10, line 16) is unclear." In one embodiment, the sentence, "X is configured to engage with Y", in a mechanical setting typically denotes that X includes a structural configuration to engage with Y. The meaning of the limitation "configured to engage" should be quite clear. Applicant again requests the Examiner to clarify the rejection so that Applicant can better respond.

<u>Claims 8 and 22: Coupled, But Not in Contact</u>

In the last paragraph on page 6, Claims 8 and 22 were rejected because "it is unclear how the second magnetic member coupled, but not in contact, with the first magnetic member in order to the auxiliary frame stably supported by the primary frame as claimed in claim 8 and 22." It seems the argument is that the auxiliary frame cannot be stably supported by the primary frame if the second magnetic member is coupled to, but not in contact, with the first magnetic member. This issue has previously been addressed above in the New Matter Rejection section.

<u>Claims 6, 9 and 13: The Side Portions of The Primary Frame</u>

Claims 6, 9 and 13 were rejected in view of possible ambiguity in the claims. Applicant has followed the Examiner's suggestion, and has amended those claims accordingly, with the "side portions" replaced by the "side portions of the primary frame."

<u>Claim 22: Each Of The Two Side Portions</u>

In the last paragraph on page 6, the feature "each side portion" has been replaced by "each of the two side portions" to clarify any ambiguity in the claim.

- 42 -

<u>Claims 12, 13 and 35: Primary and Auxiliary Spectacle Frame</u>

In the last paragraph on page 6, claims 12, 13 and 35 were rejected because the terms primary and auxiliary spectacle frames lacked antecedent basis. Applicant has amended the claims accordingly.

<u>Claims 12, 34 and 35: Engaging/Coupling On A Horizontal Position</u>

In the last paragraph on page 6, Claims 12, 34 and 35 were rejected because "of 'engaging on a horizontal position' and of 'coupling on a horizontal position, but not in contact with...'. The structure of the eyeglass device in claims 12, 34 and 35 does not draw such a horizontal position."

Applicant does not fully understand the rejection, but believes that the rejection may be on the issue of the term horizontal being relative. To prevent any possibility of ambiguity, Applicant has amended Claims 12, 34 and 35 to include the limitation of the lenses in the primary frame defining a vertical plane, as opposed to horizontal coupling or engagement as specified. Such structural limitations should be sufficient to clarify any indefiniteness, if there were one.

<u>Means Limitation</u>

In the first paragraph on page 7, the Office Action rejected claim 10 based on the argument that Applicant is attempting to use "a 'means' clause to recite a claim element as a means for performing a specific function. However, since no function was specified by the word preceding 'means' it is impossible to determine the equivalent of the claim element, as set forth by 35 U.S.C. 112, sixth paragraph."

- 43 -

The Office Action might have misinterpreted 35 U.S.C. § 112, ¶ 6, regarding means-plus-function claim.

While there is a widespread convention of using the term "means" to express a claim element in means-plus-function language, the absence or presence of the word "means" in the claim does not seem to be dispositive on the issue whether the language is means-plus-function language. In *Haney v. Timesavers, Inc.*, 29 U.S.P.Q.2d 1605, 1607-09 (D. Or. 1993), a district court held that a claim element, "a double-drive mechanism . . . where the double-drive mechanism imparts at least one translational orbital movement superimposed on another movement . . . ," was expressed in means-plus-function terms governed by 35 U.S.C. § 112, ¶ 6, despite the fact that the term "means" was never used in the claim. In *AMP, Inc. v. Fujitsu Microelectronics, Inc.*, 853 F. Supp. 808, 820-21 (M.D. Pa. 1994), a district court held that the claim element, "bus solder tail means," in the patent at issue was not expressed in means-plus-function language even though the term "means" was used in the claim. Whether a claim element will be deemed expressed in means-plus-function language for the purposes of 35 U.S.C. § 112, ¶ 6 may not generally depend upon the use or non-use of the term "means" in the claim.

Regarding mechanical devices, the critical inquiry to determine whether a claim element is expressed in means-plus-function language may depend on whether that claim element is primarily described in terms of its function, and not its structure. *Haney*, 29 U.S.P.Q.2d at 1608 ("A functional claim element is an element that is described in terms of what it does, not by its structure."); *AMP*, 853 F. Supp. at 820 ("In those cases in which claim language is construed to be 'means plus function' language, the language refers to an indefinite structure, defining it only by what function it will perform."). If a functional element is interpreted literally, it might cover substantially every structure capable of performing the claimed function. The purpose of Section 112, ¶ 6 seems to prevent such coverage by limiting the functional element of the claim to cover

Attorney Docket No.: CON1-01013US1 SRM/BIM
bim/cont/1013us1.012.wpd

only the structure described in the specification and equivalents thereof.  See *Haney*, 29 U.S.P.Q.2d at 1608.  Thus, a claim element might be subject to the limitations of Section 112, ¶ 6, if it is primarily described in terms of function.

For mechanical devices, whether a claim element is deemed expressed in means-plus-function language and therefore subject to the limitations of Section 112, ¶ 6 might not depend on whether the term "means" is used in the claim language.  Instead, a claim element might be governed by Section 112, ¶ 6, if it includes primarily a functional claim limitation, as opposed to a structural limitation.

Thus, Section 112, ¶ 6 does not seem to forbid Applicant from claiming "means" without a function, or a function without using the word "means".  Section 112, ¶ 6 governs the interpretation of means-plus-function claims.  Nowhere in the laws, whether in Section 112, ¶ 6 or other statutes, is there any limitation restricting Applicant from claiming with the word "means".

## Rejections Based on § 102

### Rejections Under Nishioka

In the last paragraph on page 7, the Office Action rejected Claims 12 and 34 under 35 U.S.C. 102(e) as being anticipated under U.S. Patent No. 5,642,177 by Nishioka (the "Nishioka Patent").

In the Nishioka Patent, the magnets 3 in the auxiliary frame 1 engage vertically with the magnets 7 in the primary frame.  The engagement surfaces are parallel to the plane of the lenses.  In Claims 12 and 34, the amendment should have removed any possibility of ambiguity.  The engagement is on a horizontal position, as opposed to the vertical plane defined by the lenses in the primary frame.

- 45 -

Under Section 102, a claim is anticipated only if each and every element as set forth in the claim is found in a single prior art reference. *Constant v. Advanced Micro-Devices Inc.*, 848 F.2d 1560, 1570 (Fed. Cir. 1988). In other words, every limitation of a claim must identically appear in a single prior art reference for it to anticipate the claim. *In re Bond*, 910 F.2d 831, 832 (Fed. Cir. 1990).

Since the Nishioka Patent at least has not disclosed the horizontal engagement position, the amended Claims 12 and 34 could not have been anticipated by Nishioka.

### Rejections Under Twincome-Pentax

On page 8, Claims 1, 3-7, 10-21, 23, 24 and 34 were rejected under 35 U.S.C. 102(a) as being anticipated by Twincome-Pentax. The basis of the rejection depends on a number of documents. They include materials allegedly presented to the Le Coane Group on June 21, 1995; an enlarged photograph of a portion of a Pentax booth allegedly taken during an IOFT meeting on October 1995 with Information and Data Sheet; and a brochure entitled, "October 1995, IOFT -- Material for New Product Development (Q & A)" allegedly distributed to attendees who visited Pentax's October 1995 IOFT exhibition site.

Initially, Applicant notes that the Interference Proceeding No. 104,051 between Pentax and Applicant based in part on Applicant's present invention has ended with Applicant prevailing.

The Le Coane Group meeting on June 21, 1995 was not public and was not a 35 102(a) event.

35 USC 102 provides in relevant part that:

- 46 -

A person shall be entitled to a patent unless --

(a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent ....

Nothing about the meeting of the Le Coane Group can constitute a 35 USC 102 (a) event.

The meeting of the Le Coane Group took place in Japan, not in the United States. Hence, the meeting of the Le Coane Group is not evidence that the claimed invention was "known or used by others in this county ... before the invention thereof by ... [Applicant]."

The meeting of the Le Coane Group was not a patenting of anything. Hence, the meeting of the Le Coane Group is not evidence that the claimed invention was "patented in this or a foreign country, before the invention thereof by ... [Applicant]."

That leaves the final possibility, which is that something about the meeting of the Le Coane Group meant that the claimed invention was "described in a printed publication in... a foreign country, before the invention thereof by ... [Applicant]." However, the display of the prototype at the meeting was certainly not a printed publication of anything. That leaves the display of the technical drawings at the meeting being "printed publication[s]."

The leading opinion concerning what constitutes a "printed publication" under either 35 USC 102(a) or 35 USC 102(b) is In re Wyer, 655 F.2d 221, 210 USPQ 790 (CCPA 1981) (Rich, J). According to that opinion:

the printed publication provision was designed to prevent withdrawal by an inventor, as the subject matter of a patent, of that which was already in the possession of the public. Thus, the question to be examined under § 102(b) is the accessibility to at least the pertinent part of the public, of a perceptible description of the invention, in whatever form it may have been recorded. Access involves such factual inquiries as classification and indexing. In other words, such a reference is a "printed publication" and a bar to patentability

- 47 -

> ...upon a satisfactory showing that such document has been
> disseminated or otherwise made available to the extent that
> persons interested and ordinarily skilled in the subject matter or
> art, exercising reasonable diligence, can locate it and recognize
> and comprehend therefrom the essentials of the claimed invention
> without need of further research or experimentation.[1]

Applying that statement to the present situation, it is abundantly clear that the technical drawings which were displayed at the meeting of the Le Coane Group were not printed publications. Not only were they not classified or indexed, they were not "disseminated or otherwise made available to the extent that persons interested and ordinarily skilled in the subject matter or art, exercising reasonable diligence,... [could] locate...[them] and recognize and comprehend therefrom the essentials of the claimed invention without need of further research or experimentation."

Moreover, Applicant has not rested purely on the weakness of the Le Coane Group meeting evidence. Applicant is submitting concurrently herewith the declaration of Prof. Richard J, Samuels, a leading academic expert on Japanese business practices. The gist of his declaration is that the meeting of the Le Come Group was not public. Hence, even if the Examiner were to decide that the technical drawings displayed at the meeting of the Le Coane Group were printed, they were not printed publications because they were not made publicly available.

Regarding the enlarged photograph of a portion of a Pentax booth showing four models of Pentax's Magnetic Eyeglass Frame System and the "Information and Data Sheet" that identified certain models of the Pentax system and provided pricing and options for each, Applicant submits that:

    i.    The enlarged photograph does not clearly illustrate the type of frames that were on display.

---

[1] 655 F.2d at 226, 210 USPQ at 794.

Attorney Docket No.: CONT-01013US1 SRM/BIM
bim/cont/1013us1.012.wpd

ii.     Even if the frames on display were magnetic frames, they might well have been showing the front-mounted frames, whose magnets have coupling surfaces that are substantially parallel to the front surfaces of the lenses.

iii.     No magnets can be identified in the frames shown, let alone magnetic members positioned as claimed. Also, the exhibits do not show eyeglasses with a pair of frames--auxiliary frame with primary frame. The exhibits only show eyeglasses with one frame.

iv.     Thus, those documents cannot be anticipatory prior art against the claimed invention.

Regarding the brochure entitled, "October 1995, IOFT -- Material for New Product Development (Q & A)", Applicant submits that the New Development Q&A was not distributed and was not for distribution to convention attendees at the trade show.

About 30,000 people attended the IOFT meeting in 1995. It was one of the largest conventions held in Japan for the eye wear industry. Any company trying to promote an eye wear product in the largest eye wear trade show should have (a) prepared a different type of brochure, (b) prepared many more brochures than Pentax had, and (c) more widely distributed the brochure, instead of just providing the brochure to a very selected group of people (i.e., the members of the Le Coane Group) in a special meeting presumably arranged during the IOFT.

Twincome is an eye wear product, a fashion product. To promote such a product to the 30,000 eye wear retailers and wholesalers in the largest trade show, a company typically prepares attractive, eye-catching brochures with glossy pictures. Instead, Pentax only prepared a dull Q&A. The content of the Q&A includes discussion of Nd-Fe-B magnet $\neq$ 3,000 gauss, and potential health hazards. It is highly unlikely that a company would only prepare such type of brochure to promote an eye wear product to the general attendees in the largest eye wear trade show.

- 49 -

To promote an eye wear product in the largest trade show, a company typically prepares materials enough for 20% of the attendees. With IOFT typically having about 30,000 attendees, Pentax should have prepared 6,000 brochures.

Instead, Pentax (i) only distributed the brochures to 14 people, (ii) did not distribute the brochure to anyone else, and (iii) allegedly left another 56 copies on a table, which Pentax was unaware of their whereabout at the end of the conference. Seventy copies is just 0.25% of the 30,000 attendees--too few brochures for the biggest trade show, and the biggest opportunity for Pentax to promote the product.

The Q&A New Development Brochures is a very dull publication, with only a very limited number prepared. The only recorded distribution was to a small group of people. Regarding the remaining 56 copies, Pentax was unaware of their whereabout.

It is only logical that the brochures were prepared only for a special group of people during such a large trade show. The brochures were probably distributed to them at a special meeting, and were not for the general attendees of the IOFT. That would have explained the dullness of the brochure and the limited number prepared for so big a trade show.

The IOFT was not a 35 USC 102(a) event, and the Q&A is not a 35 USC 102(a) document, for much the same reasons that the meeting of the Le Coane Group was not a 35 USC 102(a) event and the technical drawings are not 35 USC 102(a) documents.

As for the IOFT, it was in Japan, and there was no evidence that it was attended by Americans or that any information concerning Pentax's display of its magnetic eye wear at the IOFT was transmitted to the United States prior to the critical date. Hence, there is no evidence that whatever Pentax disclosed at the IOFT was "known...by others in this country...before the invention... by...[Applicant]."

- 50 -

As for the Q&A, there is no evidence that it was classified or indexed <u>anywhere</u> in a fashion that made it "accsessib[le] to at least the pertinent part of the public..." or that it was "disseminated or otherwise made available to the extent that persons interested and ordinarily skilled in the subject matter or art, exercising reasonable diligence, c[ould] locate it...." Hence, it is not available as a reference under 35 USC 102(a). <u>In re Wyer</u>, 655 F.2d 221, 210 USPQ 790 (CCPA 1981).

A document distributed to a limited group, even if there is no requirement of secrecy, does not automatically make the document a publication. For example, an internal corporate memorandum is not a publication because, by its nature, it is an internal document, not intended to be distributed and not in fact distributed beyond a single organization or company. In re <u>Katz,</u> 592 F.2d 1169, 201 USPQ 71 (CCPA 1979). It has even been held that limited distribution beyond a single organization may not constitute publication. For example, in <u>Ex Parte Suozzi,</u> 125 USPQ 445 (POBA 1959), twenty-five copies of a search report marked "unclassified," circulated to various individuals and agencies, was held not to be a publication. The Board of Appeals stated that, "[E]ven assuming that there was no prohibition against the author of the report or the named or other official recipients of copies thereof, in giving copies or imparting information contained in said report to others who would be classed as the public in general, this would be merely permissive and would not show unequivocally that there was in fact any publication of the report."

The concept of access has been taken by the courts to mean free access to the public. For example, in <u>RCA Corp.</u> v. <u>Data General Corp.</u>, 701 F. Supp 456, 468, 8 USPQ 2d 1305, 1315 (D. Del. 1988), *aff'd*, 887 F.2d 1056, 12 USPQ 1499 (Fed.Cir. 1989), an infringer failed to show that a memorandum filed in a special patent library research institute constituted prior publication as of the relevant date because it was "unclear from the disputed testimony whether a member

- 51 -

of the public would be permitted access to the memorandum even if he or she had specifically asked to see it."

The Q&A was not published within the meaning of the word "published" under the statute. The Q&A was distributed by Pentax to a special group of people. Any communications between Pentax and that special group are not by definition communications to the public at large. Information exchanged solely within this group is not information that is accessible by the public. As far as the evidence shows, out of the 30,000 IOFT attendees, the Q&A was only given out to a special group of 14. There were also 56 copies of the Q&A left out on a table that were gone at the end of the IOFT. However, there is no evidence as to what happened to those copies. They may well simply have been thrown away by a janitor at the end of the IOFT.

A reading of the Q & A confirms the intent of Pentax was not to provide information to the public. The document itself is in the nature of advance information or sales training literature and not in the form of a document for general release to the public. For example, the document concerns such issues as product liability and potential health hazards of the product. A sales brochure released to the public in general would not include such information and would have been disclosed to many more IFOT attendees.

The Q & A was circulated in small numbers to a single group. And the Q & A, based on its content, appears to be a communication intended to educate the recipients on working with the public. Thus, even if the Q&A is considered to be "printed" within the meaning of 35 USC 102(a), it was not a "publication" within the meaning of 35 USC 102(a) for the same reasons that the technical drawings exhibited at the meeting of the Le Coane Group were not "publications" within the meaning of 35 USC 102(a)--namely, they were not distributed publicly.

Attorney Docket No.: CONT-01013US1 SRM/BIM
bim/cont/1013us1.012 wpd

In the event that the Examiner, upon reexamination, determines that an action other than an allowance is appropriate, the Examiner is requested and authorized to telephone Applicant's attorney prior to taking such action, if the Examiner feels that such a telephone call will advance the prosecution of the present application.

Should further questions remain, the Examiner is invited to contact the undersigned attorney by telephone.

Enclosed is a PETITION FOR EXTENSION OF TIME UNDER 37 C.F.R. § 1.136 for extending the time to respond up to and including November 22, 2000.

The Commissioner is authorized to charge any underpayment or credit any overpayment to Deposit Account No. 06-1325 for any matter in connection with this response, including any fee for extension of time, which may be required.

Respectfully submitted,

Date: __November 22, 2000__          By: _____
                                          Brian I. Marcus
                                          Reg. No. 34,511

FLIESLER, DUBB, MEYER & LOVEJOY LLP
Four Embarcadero Center, Suite 400
San Francisco, California 94111-4156
Telephone: (415) 362-3800

Attorney Docket No.: CONT-01013US1 SRM/BIM
bim/cont/1013us1.012.wpd