movement . . . ," was expressed in means-plus-function terms governed by 35 U.S.C. § 112, ¶ 6, despite the fact that the term "means" was never used in the claim. In *AMP, Inc. v. Fujitsu Microelectronics, Inc.,* 853 F. Supp. 808, 820-21 (M.D. Pa. 1994), a district court held that the claim element, "bus solder tail means," in the patent at issue was not expressed in means-plus-function language even though the term "means" was used in the claim. Whether a claim element will be deemed expressed in means-plus-function language for the purposes of 35 U.S.C. § 112, ¶ 6 may not generally depend upon the use or non-use of the term "means" in the claim.

Regarding mechanical devices, the critical inquiry to determine whether a claim element is expressed in means-plus-function language may depend on whether that claim element is primarily described in terms of its function, and not its structure. *Haney,* 29 U.S.P.Q.2d at 1608 ("A functional claim element is an element that is described in terms of what it does, not by its structure."); *AMP,* 853 F. Supp. at 820 ("In those cases in which claim language is construed to be 'means plus function' language, the language refers to an indefinite structure, defining it only by what function it will perform."). If a functional element is interpreted literally, it might cover substantially every structure capable of performing the claimed function. The purpose of Section 112, ¶ 6 seems to prevent such coverage by limiting the functional element of the claim to cover only the structure described in the specification and equivalents thereof. See *Haney,* 29 U.S.P.Q.2d at 1608. Thus, a claim element might be subject to the limitations of Section 112, ¶ 6, if it is primarily described in terms of function.

For mechanical devices, whether a claim element is deemed expressed in means-plus-function language and therefore subject to the limitations of Section 112, ¶ 6 might not depend on whether the term "means" is used in the claim language. Instead, a claim element might be governed by Section 112, ¶ 6, if it includes primarily a functional claim limitation, as opposed to a structural limitation.

- 24 -

Thus, Section 112, ¶ 6 does not seem to forbid Applicant from claiming "means" without a function, or a function without using the word "means". Section 112, ¶ 6 governs the interpretation of means-plus-function claims. Nowhere in the laws, whether in Section 112, ¶ 6 or other statutes, is there any limitation restricting Applicant from claiming with the word "means".

## Rejections Based on § 102

### Rejections Under Nishioka

In the last paragraph on page 7, the Office Action rejected Claims 12 and 34 under 35 U.S.C. 102(e) as being anticipated under U.S. Patent No. 5,642,177 by Nishioka (the "Nishioka Patent").

In the Nishioka Patent, the magnets 3 in the auxiliary frame 1 engage vertically with the magnets 7 in the primary frame. The engagement surfaces are parallel to the plane of the lenses. In Claims 12 and 34, the amendment should have removed any possibility of ambiguity. The engagement is on a horizontal position, as opposed to the vertical plane defined by the lenses in the primary frame.

Under Section 102, a claim is anticipated only if each and every element as set forth in the claim is found in a single prior art reference. *Constant v. Advanced Micro-Devices Inc.*, 848 F.2d 1560, 1570 (Fed. Cir. 1988). In other words, every limitation of a claim must identically appear in a single prior art reference for it to anticipate the claim. *In re Bond*, 910 F.2d 831, 832 (Fed. Cir. 1990).

Since the Nishioka Patent at least has not disclosed the horizontal engagement position, the amended Claims 12 and 34 could not have been anticipated by Nishioka.

- 25 -

Rejections Under Twincome-Pentax

On page 8, Claims 1, 3-7, 10-21, 23, 24 and 34 were rejected under 35 U.S.C. 102(a) as being anticipated by Twincome-Pentax. The basis of the rejection depends on a number of documents. They include materials allegedly presented to the Le Coane Group on June 21, 1995; an enlarged photograph of a portion of a Pentax booth allegedly taken during an IOFT meeting on October 1995 with Information and Data Sheet; and a brochure entitled, "October 1995, IOFT -- Material for New Product Development (Q & A)" allegedly distributed to attendees who visited Pentax's October 1995 IOFT exhibition site.

The Le Coane Group meeting on June 21, 1995 was not public and was not a 35 102(a) event.

35 USC 102 provides in relevant part that:

A person shall be entitled to a patent unless --

(a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent ....

Nothing about the meeting of the Le Coane Group can constitute a 35 USC 102 (a) event.

The meeting of the Le Coane Group took place in Japan, not in the United States. Hence, the meeting of the Le Coane Group is not evidence that the claimed invention was "known or used by others in this county .... before the invention thereof by ... [Applicant]."

The meeting of the Le Coane Group was not a patenting of anything. Hence, the meeting of the Le Coane Group is not evidence that the claimed invention was "patented in this or a foreign country, before the invention thereof by ... [Applicant]."

That leaves the final possibility, which is that something about the meeting of the Le Coane Group meant that the claimed invention was "described in a printed publication in... a

- 26 -

Attorney Docket No.: CONT1013REISRM/PPT
ppt/cont1013rel.009

200.001:100197

foreign country, before the invention thereof by ... [Applicant]." However, the display of the prototype at the meeting was certainly not a printed publication of anything. That leaves the display of the technical drawings at the meeting being "printed publication[s]."

The leading opinion concerning what constitutes a "printed publication" under either 35 USC 102(a) or 35 USC 102(b) is In re Wyer, 655 F.2d 221, 210 USPQ 790 (CCPA 1981) (Rich, J). According to that opinion:

> the printed publication provision was designed to prevent withdrawal by an inventor, as the subject matter of a patent, of that which was already in the possession of the public. Thus, the question to be examined under § 102(b) is the accessibility to at least the pertinent part of the public, of a perceptible description of the invention, in whatever form it may have been recorded. Access involves such factual inquiries as classification and indexing. In other words, such a reference is a "printed publication" and a bar to patentability
>
> > ***upon a satisfactory showing that such document has been disseminated or otherwise made available to the extent that persons interested and ordinarily skilled in the subject matter or art, exercising reasonable diligence, can locate it and recognize and comprehend therefrom the essentials of the claimed invention without need of further research or experimentation.[1]

Applying that statement to the present situation, it is abundantly clear that the technical drawings which were displayed at the meeting of the Le Coane Group were not printed publications. Not only were they not classified or indexed, they were not "disseminated or otherwise made available

---

[1]655 F.2d at 226, 210 USPQ at 794.

- 27 -

to the extent that persons interested and ordinarily skilled in the subject matter or art, exercising reasonable diligence,... [could] locate...[them] and recognize and comprehend therefrom the essentials of the claimed invention without need of further research or experimentation."

Moreover, Applicant has not rested purely on the weakness of the Le Coane Group meeting evidence. Applicant is submitting concurrently herewith the declaration of Prof. Richard J, Samuels, a leading academic expert on Japanese business practices. The gist of his declaration is that the meeting of the Le Come Group was not public. Hence, even if the Examiner were to decide that the technical drawings displayed at the meeting of the Le Coane Group were printed, they were not printed publications because they were not made publicly available.

Regarding the enlarged photograph of a portion of a Pentax booth showing four models of Pentax's Magnetic Eyeglass Frame System and the "Information and Data Sheet" that identified certain models of the Pentax system and provided pricing and options for each, Applicant submits that:

      i.     The enlarged photograph does not clearly illustrate the type of frames that were on display.

      ii.     Even if the frames on display were magnetic frames, they might well have been showing the front-mounted frames, whose magnets have coupling surfaces that are substantially parallel to the front surfaces of the lenses.

      iii.     No magnets can be identified in the frames shown, let alone magnetic members positioned as claimed. Also, the exhibits do not show eyeglasses with a pair of frames-- auxiliary frame with primary frame. The exhibits only show eyeglasses with one frame.

      iv.     Thus, those documents cannot be anticipatory prior art against the claimed invention.

- 28 -

Attorney Docket No.: CONT1013REISRM/PPT
ppt/cont1013rei.009

200.001:100197

Regarding the brochure entitled, "October 1995, IOFT -- Material for New Product Development (Q & A)", Applicant submits that the New Development Q&A was not distributed and was not for distribution to convention attendees at the trade show.

About 30,000 people attended the IOFT meeting in 1995. It was one of the largest conventions held in Japan for the eye wear industry. Any company trying to promote an eye wear product in the largest eye wear trade show should have (a) prepared a different type of brochure, (b) prepared many more brochures than Pentax had, and (c) more widely distributed the brochure, instead of just providing the brochure to a very selected group of people (i.e., the members of the Le Coane Group) in a special meeting presumably arranged during the IOFT.

Twincome is an eye wear product, a fashion product. To promote such a product to the 30,000 eye wear retailers and wholesalers in the largest trade show, a company typically prepares attractive, eye-catching brochures with glossy pictures. Instead, Pentax only prepared a dull Q&A. The content of the Q&A includes discussion of Nd-Fe-B magnet ≈ 3,000 gauss, and potential health hazards. It is highly unlikely that a company would only prepare such type of brochure to promote an eye wear product to the general attendees in the largest eye wear trade show.

To promote an eye wear product in the largest trade show, a company typically prepares materials enough for 20% of the attendees. With IOFT typically having about 30,000 attendees, Pentax should have prepared 6,000 brochures.

Instead, Pentax (i) only distributed the brochures to 14 people, (ii) did not distribute the brochure to anyone else, and (iii) allegedly left another 56 copies on a table, which Pentax was unaware of their whereabout at the end of the conference. Seventy copies is just 0.25% of the 30,000 attendees--too few brochures for the biggest trade show, and the biggest opportunity for Pentax to promote the product.

- 29 -

Attorney Docket No.: CONT1013REISRM/PPT
ppt/cont1013rei.009

200.001:100197

The Q&A New Development Brochures is a very dull publication, with only a very limited number prepared. The only recorded distribution was to a small group of people. Regarding the remaining 56 copies, Pentax was unaware of their whereabout.

It is only logical that the brochures were prepared only for a special group of people during such a large trade show. The brochures were probably distributed to them at a special meeting, and were not for the general attendees of the IOFT. That would have explained the dullness of the brochure and the limited number prepared for so big a trade show.

The IOFT was not a 35 USC 102(a) event, and the Q&A is not a 35 USC 102(a) document, for much the same reasons that the meeting of the Le Coane Group was not a 35 USC 102(a) event and the technical drawings are not 35 USC 102(a) documents.

As for the IOFT, it was in Japan, and there was no evidence that it was attended by Americans or that any information concerning Pentax's display of its magnetic eye wear at the IOFT was transmitted to the United States prior to the critical date. Hence, there is no evidence that whatever Pentax disclosed at the IOFT was "known...by others in this country...before the invention... by...[Applicant]."

As for the Q&A, there is no evidence that it was classified or indexed anywhere in a fashion that made it "accsessib[le] to at least the pertinent part of the public..." or that it was "disseminated or otherwise made available to the extent that persons interested and ordinarily skilled in the subject matter or art, exercising reasonable diligence, c[ould] locate it...." Hence, it is not available as a reference under 35 USC 102(a). In re Wyer, 655 F.2d 221, 210 USPQ 790 (CCPA 1981).

A document distributed to a limited group, even if there is no requirement of secrecy, does not automatically make the document a publication. For example, an internal corporate memorandum is not a publication because, by its nature, it is an internal document, not intended

- 30 -

to be distributed and not in fact distributed beyond a single organization or company. In re Katz, 592 F.2d 1169, 201 USPQ 71 (CCPA 1979). It has even been held that limited distribution beyond a single organization may not constitute publication. For example, in Ex Parte Suozzi, 125 USPQ 445 (POBA 1959), twenty-five copies of a search report marked "unclassified," circulated to various individuals and agencies, was held not to be a publication. The Board of Appeals stated that, "[E]ven assuming that there was no prohibition against the author of the report or the named or other official recipients of copies thereof, in giving copies or imparting information contained in said report to others who would be classed as the public in general, this would be merely permissive and would not show unequivocally that there was in fact any publication of the report."

The concept of access has been taken by the courts to mean free access to the public. For example, in RCA Corp. v. Data General Corp., 701 F. Supp 456, 468, 8 USPQ 2d 1305, 1315 (D. Del. 1988), aff'd, 887 F.2d 1056, 12 USPQ 1499 (Fed.Cir. 1989), an infringer failed to show that a memorandum filed in a special patent library research institute constituted prior publication as of the relevant date because it was "unclear from the disputed testimony whether a member of the public would be permitted access to the memorandum even if he or she had specifically asked to see it."

The Q&A was not published within the meaning of the word "published" under the statute. The Q&A was distributed by Pentax to a special group of people. Any communications between Pentax and that special group are not by definition communications to the public at large. Information exchanged solely within this group is not information that is accessible by the public.

As far as the evidence shows, out of the 30,000 IOFT attendees, the Q&A was only given out to a special group of 14. There were also 56 copies of the Q&A left out on a table that were

- 31 -

gone at the end of the IOFT.  However, there is no evidence as to what happened to those copies.

They may well simply have been thrown away by a janitor at the end of the IOFT.

A reading of the Q & A confirms the intent of Pentax was not to provide information to

the public.  The document itself is in the nature of advance information or sales training literature

and not in the form of a document for general release to the public.  For example, the document

concerns such issues as product liability and potential health hazards of the product.  A sales

brochure released to the public in general would not include such information and would have

been disclosed to many more IFOT attendees.

The Q & A was circulated in small numbers to a single group.  And the Q & A, based on

its content, appears to be a communication intended to educate the recipients on working with

the public.  Thus, even if the Q&A is considered to be "printed" within the meaning of 35 USC

102(a), it was not a "publication" within the meaning of 35 USC 102(a) for the same reasons that

the technical drawings exhibited at the meeting of the Le Coane Group were not "publications"

within the meaning of 35 USC 102(a)--namely, they were not distributed publicly.


In the event that the Examiner, upon reexamination, determines that an action other than

an allowance is appropriate, the Examiner is requested and authorized to telephone Applicant's

attorney prior to taking such action, if the Examiner feels that such a telephone call will advance

the prosecution of the present application.

In view of the above Amendments and Remarks, reconsideration of Claims 1-35 is

requested and consideration of newly added Claims 36-46 is requested.

Enclosed is a PETITION FOR EXTENSION OF TIME UNDER 37 C.F.R. § 1.136 for

extending the time to respond up to and including January 15, 2000.

- 32 -

The Commissioner is authorized to charge any underpayment or credit any overpayment to Deposit Account No. 06-1325 for any matter in connection with this response, including any fee for extension of time, which may be required.

Respectfully submitted,

Date: January 14, 2000     By: _____
                               Peter P. Tong
                               Reg. No. 35,757
                               (408) 748-7300

FLIESLER, DUBB, MEYER & LOVEJOY LLP
Four Embarcadero Center, Suite 400
San Francisco, California 94111-4156
Telephone: (415) 362-3800

- 33 -





FIG. 8



## FIRST DECLARATION OF RICHARD J. SAMUELS



Table of Contents

I.      Qualifications . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     Materials Given to Review and Question Posed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III.    General Discussion of the Academic Literature Relating to Such Groups as the Le Coane Group . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

IV.     Application of the General Principles to the Le Coane Group . . . . . . . . . . . . . . . . . . . 7

V.      My Opinion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

VI.     Jurat . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

## I.   Qualifications

(1)     I am Ford International Professor at the Massachusetts Institute of Technology, where I am also Founding Director of the MIT Japan Program. I served as Head of the Department of Political Science between 1992 and 1997 and as vice-chairman of the Committee on Japan of the National Research Council from 1990 until 1996. In 1992 I was elected a member of the Council on Foreign Relations. In 1994 I became a member of the Abe Program Fellowship Committee of the Social Science Research Council. I am also an Associate in Research at the Reischauer Institute, Harvard University. From 1988 to 1993 I was a member of the Joint Committee on Japanese Studies of the American Council of Learned Societies and the Social Science Research Council. I have been awarded three Fulbright Fellowships and a National Science Foundation Research Grant to support four separate extended research trips to Japan, totaling six years in the field. In October 1998 I was awarded an Abe Fellowship for field research in Japan and Italy during 1999-2000.

(2)     I have written or edited six books, most recently "Rich Nation, Strong Army": National Security and the Technological Transformation of Japan, Cornell University Press (1994), which won the 1996 John Whitney Hall Prize of the Association of Asian Studies and the 1996 Arisawa Memorial Prize of the Association of American University Presses. My 1987 book, The Business of the Japanese State: Energy Markets in Comparative and Historical Perspective (Cornell University Press) received the Masayoshi Ohira Memorial Prize in 1988. In 1983, Princeton University Press published my Politics of Regional Policy in Japan. I have also contributed essays and articles to The Cambridge Encyclopedia of Japan, International Organization, International Security, Daedalus, The Sloan Management Review, The Journal of Modern Italian Studies, and other journals. I am also a regular columnist for the Mainichi

-1-

Shimbun. In these publications I have explored the relationships between firms and the state in Japan, and I have paid careful attention to the relationships among firms at different levels of the value-added chain: manufacturers/suppliers, producers/distributors, etc.

(3)     I read and speak Japanese with professional proficiency.

(4)     I received my Ph.D. from the Massachusetts Institute of Technology, Department of Political Science in 1980, my MA from Tufts University in 1974, and my AB from Colgate University, magna cum laude, in June 1973.

(5)     A copy of my CV is the party Chao's Exhibit 1030.

## II.     Materials Given to Review and Question Posed

(6)     Charles Gholz, counsel for the party Chao, gave me the following materials to review.

(a)     the declaration of Masahiro Sudo and every exhibit referred to therein;

(b)     the declaration of Yasuo Fukuwa and every exhibit referred to therein;

(c)     the supplementation declaration of Yasuo Fukuwa and every exhibit referred to therein;

(d)     a draft outline of cross-examination for Mr. Sudo;

(e)     a draft outline of cross-examination for Mr. Fukuwa;

(f)     transcripts of the depositions of Messrs. Sudo and Fukuwa; and

(g)     a copy of the organizational document, or *kisoku*, of the Le Coane Group and the party Iwamoto's translation thereof, which is the party Chao's Exhibit 1060.

-2-

(7)     Mr. Gholz asked for my opinion concerning the credibility of the assertions by Messrs. Sudo and Fukuwa that members of the Le Coane Group were under no obligation to keep matters discussed at group meetings confidential.  In addition, Mr. Gholz asked me to critique his proposed lines of questions for Messrs. Sudo and Fukuwa and to suggest additional lines of questions.  Although I have read the statements in the Sudo and Fukuwa declarations and in the transcripts of their depositions relating to the International Optical Fair in Tokyo, Mr. Gholz did not ask me for my opinion on those statements.

III.     **General Discussion of the Academic Literature Relating to Such Groups as the Le Coane Group**

(8)     "Groups" such as the Le Coane Group have been frequently discussed in the academic literature and are very familiar to me.  Such "vertical" business associations are quite common in Japanese commerce and industry.  Sometimes referred to as "industry groups" (*kōgyōkai*) or as  "supplier associations" (*kyōryokukai*, which is literally translated as "cooperation groups"), these associations usually cluster around a single manufacturer.  (Toyota's *kōgyōkai* is the most famous example).  Sometimes they are associations of manufacturers and suppliers, and sometimes they are associations of manufacturers and distributors, as in the case of the Le Coane Group.  Either way, they are not considered "open."  Membership is by invitation only, and while neither the suppliers nor the distributors are expected to be entirely monogamous vis-à-vis the manufacturer, the expectation is that what is discussed and learned in their meetings will be kept "in-house."

(9)     A great deal has been written about interfirm relationships in Japan.  There is a pervasive sense and general agreement that Japanese firms are embedded in particularly dense

-3-

networks in which there is rather greater information exchange and coordination than neo-classical theory would predict or find efficient.

(10)   For example, Imai[1] reports that "the dense, intricate, and overlapping interaction within the Japanese manufacturing and distribution system...creates advantages for Japanese suppliers in their speed and adaptability to continuous change in business environments..." (p. 179).   The Japanese system requires "speedy coordination between marketing, production, and R&D..." (p.183).

(11)   As noted above, these relationships are common among producers and distributors, as in the case of the Le Coane Group, as well as among producers and subcontractors.   According to Nishiguchi,[2] the formal institutional ties between assemblers and suppliers help considerably to facilitate problem solving.   He says that "Japanese subcontracting relations are characterized by an institutional design that aims at continuous quality improvement and cost reduction through problem solving-oriented commitments..." (p.181).   For Nishiguchi, both final assemblers and suppliers benefit from the same sort of institutional commitment to "bilateral problem solving" across the value added chain that appears to characterize the Le Coane Group.

---

[1]Imai, Kenichi, "Japanese Business Groups and the Structural Impediments Initiative," in K. Yamamura, ed. Japan's Economic Structure: Should it Change? Seattle: Society for Japanese Studies, 1990.  A copy of Imai is the party Chao's Exhibit 1035.

[2]Nishiguchi, Toshihiro, Strategic Industrial Sourcing: The Japanese Advantage. New York: Oxford University Press, 1994.  A copy of the title page, the copyright page, and chapter 6 of Nishiguchi is the party Chao's Exhibit 1034.

-4-

(12)     An excellent characterization of the generic form of "cooperation groups" or "supplier associations" (*kyōryokukai*) is offered by Mari Sako[3] of the London School of Economics.  She explains that such interfirm organizations are ubiquitous among Japanese automobile manufacturers and that their stability affords members the opportunity to share technological and marketing information among themselves:

> [The *kyōryokukai*] is generally a voluntary association with their [sic; its] own rules and regulations.  Its aim is generally to enhance member suppliers' cooperation with the assembler and with each other.  Most of the assemblers' associations have a name which signifies cooperation, friendship, or prosperity. Some supplier associations, just like Japanese companies, are described as a "community of fate" (*unmei kyōdōtai*).  [p.11.]

(13)     Gerlach's[4] is the most comprehensive English language analysis of "intercorporate alliances" in Japan.  Speaking primarily to the *keiretsu* alliances across market segments, Gerlach reports "a strong predilection for firms in Japan to cluster themselves into coherent groupings of affiliated companies..." (p. xiii).  Importantly, he acknowledges that the now famous term "*keiretsu*" is inconsistently applied to (and masks) the fact that a wide variety

---

[3]Sako, Mari, "Associations in the Japanese Automobile Industry:  Collective Action for Technology Diffusion," Paper presented to the 1995 Annual Sponsors Meeting, International Motor Vehicle program, Toronto.  A copy of Sako's paper is the party Chao's Exhibit 1037.

[4]Gerlach, Michael, Alliance Capitalism: The Social Organization of Japanese Business. Berkeley: University of California Press, 1992.  A copy of the title page, the copyright page, and Chapters I-III of Gerlach is the party Chao's Exhibit 1036.

of alliances exist in Japan. These alliances each display some degree of the following characteristics which combine to form "the social structure of markets" in Japan:

>  (a)  affiliational ties which are less binding than vertical integration but more binding than arm's length transactions;

>  (b)  long term relationships which are more diffuse than contractual ones;

>  (c)  multiplex relationships in which capital ties may be only one of several kinds of formal ties;

>  (d)  extended networks in which the parties formally associate can facilitate relationships to other related firms; and

>  (e)  symbolic ties which bind even in the absence of legal arrangements.

(14)  Gerlach points out that a great deal of Japanese business is transacted "outside" the formal confines of firms. Much has been delegated to interfirm institutions—"localized networks of long-term mutual obligation... [and] preferential trading." (p.66). Of particular relevance for the case at hand:

> the Japanese distribution system works largely through external networks. Within domestic markets, wholesalers (*ton'ya*) are organized into elaborate networks in which products may pass through three or four middle stages before reaching final users. [p. 63.]

(15)  Gerlach insists that Japanese business transactions "can be dimensionalized along a continuum from 'relational' to 'transactional' exchange." (p.70). He contrasts the one time transaction between anonymous parties to the differentiating feature of Japanese business

-6-

practice—the "relational" exchange in which "actors rely upon various forms of implicit assumptions and agreements to organize their relationships. (p.70).

(16)    Here Gerlach is echoing Ronald Dore's[5] seminal analysis of Japanese business relationships. Dore focuses upon "goodwill"-- "the sense of diffuse personal obligation which accrue between individuals engaged in recurring contractual economic exchange." (p.170). Dore asserts that this "sense of diffuse personal obligation" is the "primordial embodiment of basic social bonds" (p. 171) of Japanese capitalism.   Noting that "benevolence" was rejected as an economic motive by Adam Smith,  Dore argues that "goodwill" is a critical element in Japanese economic behavior.  Opportunism is reduced by the stability of relationships among economic actors, relationships that both sides recognize the obligation to maintain.  Thus, "relational contracting" (which he compares to a "marriage") is much more common in Japan than "spot contracting" (which he compares to a "one-night stand").  Thus firms persist in stable relationships—elsewhere compared to "extended family groupings"--and agree to share the costs of bad times and the gains of good times. The material gains are not insignificant for Dore:  trust and mutual dependency beget a more rapid flow of information and hence greater flexibility and nimbleness in the marketplace.

IV.    **Application of the General Principles to the Le Coane Group**

(17)    As I said at the outset, I read and speak Japanese proficiently, and I have read <u>all</u> of the Japanese language materials concerning the meeting of the Le Coane Group referred in the declarations of Messrs. Sudo and Fukuwa, not just the selected excerpts translated by the party

---

[5]Dore, Ronald, "Good Will and the Spirit of Market Capitalism," in <u>Taking Japan Seriously: A Confucian Perspective Leading Economic Issues</u>, Stanford: Stanford University Press, 1987. A copy of Dore is the party Chao's Exhibit 1033.

-7-

Iwamoto, and I have read the organizational document (or *kisoku*) of the Le Coane Group in the original Japanese. Having done so, it is my opinion that the Le Coane Group is a Pentax-sponsored forum for the exclusive interaction between Pentax and its distributors. While there is no evidence that Pentax has capital ties with these firms, the minutes (*gijiroku*) of the "Second Meeting of Sales Representatives of the Le Coane Group" suggest that the activities of this group were very collaborative. Sales and marketing representatives met "to continue sales cooperation while overcoming common problems each firm had with the price, design, and low brand recognition of the 'Le Coane Eman' line" of eye wear. Those representatives discussed market conditions and plans for sales promotions, and the Pentax representatives solicited suggestions for marketing the Le Coane Eman product line from the non-Pentax representatives. Representatives of Pentax and its distributors discussed a jointly administered questionnaire to determine the prospects for particular styles and products, and they renewed the tenure of the members of a "development committee."

(18)    That the Le Coane Group's name is the same as the product line being promoted by Pentax suggests that this is more than a merely voluntary association of firms that might come and go. It suggests that this is a close-knit group of firms dedicated to the collaborative promotion, marketing, and sales of a particular product line. According to the minutes, representatives of Pentax and its distributors work together to identify common problems and their solutions. The "Le Coane Group" (*kai*) is a problem-identifying and problem-solving group comprising distributor firms and Pentax. That it is also referred to in the minutes as the "Le Coane Company" (*sha*) suggests an even closer association than is customary with such groups.

(19)    Incidentally, the party Iwamoto's translation of the organizational document (or

-8-

*kisoku*) for the Le Coane Group contains two major errors.

(20) The first major error in the translation of the *kisoku* is that the translator called the Le Coane Group the Le Coane Company throughout the translation. However, in the Japanese, only the word "*kai*" (group) is used. The word "*sha*" (company) never appears.

(21) The second mistake in the translation is more significant . In the Japanese, the non-Pentax members of the Le Coane Group are called "regular members," and they pay 10,000 yen (approximately $85.00) per month to belong to the Le Coane Group. Pentax, on the other hand, is the only "special member" of the Le Coane Group, and it pays 100,000 yen (approximately $850.00) per month to belong to the Le Coane Group. The translation has it backwards, making it look as if the distributors are bearing the bulk of the burden of the costs of running the Le Coane Group. To the contrary: Pentax pays for most of the costs, and it is the site of the secretariat to boot. Moreover, it is Pentax employees who prepare the minutes, arrange the meetings, set the agenda, etc. Pentax is clearly in charge here.

(22) I read with great interest Mr. Fukuwa's statement that the designation Le Coane *sha* is reserved for the French company. Having read that I went back and re-read the minutes. In that document, the word "*sha*" appears only once, in the untranslated paragraph 9. It seemed clear to me on my initial reading (and it still seems clear to me upon re-reading that paragraph with Mr. Fukuwa's testimony in mind) that that paragraph refers to the Pentax-sponsored *kyōryokukai* and not to any French company! Thus, my earlier impression that the interchangeable use of the two terms "*kai*" and "*sha*" implies a close "in-house-relationship" between Pentax and the *kyōryokukai* is reinforced.

(23) I thought particularly telling Mr. Sudo's reaction to Mr. Gholz's question about whether he would feel free to disclose to a foreign competitor a Pentax disclosure to the Le

-9-

Coane Group that Pentax was going to introduce a new product to the next meeting of the IOFT. As Mr. Sudo said, so doing would be dishonorable. Thus, even Mr. Sudo recognized and admitted that the information conveyed to the members of the Le Coane Group by Pentax was subject to important "strings" of confidentiality.

(24)   As for Mr. Fukuwa's testimony, his professed confusion over the two meanings of the word *kyōryoku* (strong or powerful and a cooperative association) was startling -- and unbelievable. It is true that "*kyōryoku*" means "strong" when written with a different first character. However, when it is written that way, it is not combined with "*kai*" to refer to a group. Moreover, the word *kyōryokukai* is a familiar Japanese business term. In my opinion, it is totally unbelievable that Mr. Fukuwa did not know what Mr. Gholz was asking about.

(25)   I also think that Mr. Fukuwa's admission that there are no public announcements of the meetings of the Le Coane Group supports my opinion that the Le Coane Group is a closed group. (Of course, that answer was exactly what I expected. That is how *kyōryokukai* work.)

(26)   With respect to the exchange on page 60 of the transcript of Mr. Fukuwa's deposition, I wonder whether Mr. Fukuwa understood the question. I find it hard to believe that the Le Coane Group is the only *kyōryokukai* organized and run by Pentax. As is well known, Pentax is a large company with many products -- cameras being perhaps the best known in this country. I would expect that Pentax sponsors other *kyōryokukai*. It is a common (if not the modal) form of interaction among vertically related firms in Japan, some with a company and its sub-contractors and others with a company and its distributors

(27)   Finally, Mr. Fukuwa's claim (on page 71 of the transcript of his deposition) that the non-Pentax members of the Le Coane Group never tell Pentax anything confidential seems disingenuous to me. The non-Pentax members of the Le Coane Group are in that group to build

-10-

trust between themselves and Pentax, and sharing confidential information is a tried and true way to do that -- in Japan as in the United States.

## V.    My Opinion

(28)    In my opinion, the statements by Messrs. Sudo and Fukuwa that the members of the Le Coane Group were under no obligation to keep matters discussed at group meetings confidential is, at the very least, misleading. It may well be that there was no written contract, articles of incorporation, or the like which contained an express obligation of secrecy. However, given the customs and traditions of Japanese business, no such express written contract or the like was necessary or expected. There was probably no express written contract, articles of incorporation, or the like that required the representatives of the distributors to wear clothes when they attended meetings of the Le Coane Group. However, just as it was clearly understood that the members of the Le Coane Group would wear clothes when they came to meetings, it was clearly understood that they would maintain in confidence anything that they learned at those meetings about Pentax's business plans, new products, and the like. Any non-Pentax company member of the Le Coane Group who "leaked" any such business-sensitive information could expect to be promptly "cut" from the group, and any individual representative of any member of the Le Coane Group (i.e., either any representative of Pentax or any representative of any non-Pentax member of the Le Coane Group) who "leaked" any such business-sensitive information could expect to be severely reprimanded by his or her company (presuming, of course, that the "leak" was not authorized). As has been written many, many times, many things that have to be expressed in contractual form in the United States do not have to be "put in writing" in Japan. That, however, does not mean that such things are not clearly understood by all.

-11-

## VI.   Jurat

(29)    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Date: __23 January 1999__

Richard J. Samuels

-12-

**UNITED STATES DEPARTMENT OF COMMERCE**
Patent and Trademark Office
Address:   COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | | ATTORNEY DOCKET NO. |
|---|---|---|---|---|
| 09/182,862 | 10/21/98 | CHAO | R | CONT1013SRM/ |

MM92/0606

SHELDON R MEYER
FLIESLER DUBB MEYER AND LOVEJOY
FOUR EMBARCADERO CENTER
SUITE 400
SAN FRANCISCO CA 94111-4156

| EXAMINER |  |
|---|---|
| MAI,H | |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2873 | 8 |

DATE MAILED:   06/06/00

Please find below and/or attached an Office communication concerning this application or
proceeding.

Commissioner of Patents and Trademarks

(See the attached letter)

1- File Copy

Application/Control Number: 09/182,862          Page 2

Art Unit: 2873

### *None-Responsive Amendment*

1.    The reply filed on January 19, 2000 is not fully responsive to the prior Office action because of the following omission(s) or matter(s): The Applicant does not follow the rules 37 CFR 1.121. (See the amendments in reissue application) . <u>See</u> 37 CFR 1.111. Since the above-mentioned reply appears to be *bona fide*, applicant is given **ONE (1) MONTH or THIRTY (30) DAYS** from the mailing date of this notice, whichever is longer, within which to supply the omission or correction in order to avoid abandonment. EXTENSIONS OF THIS TIME PERIOD MAY BE GRANTED UNDER 37 CFR 1.136(a).

2.    Any inquiry concerning this communication or earlier communications from the examiner should be directed to Huy K. Mai whose telephone number is (703) 308-4874. The fax phone number for the organization where this application or proceeding is assigned is (703) 308-7722 (or 7724).

     Any inquiry of a general nature or relating to the status of this application or proceeding should be directed to the receptionist whose telephone number is (703) 308-0956.

HM/
June 5, 2000

Huy Mai
Primary Examiner

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | |
|---|---|---|
| In re Reissue Application | ) | **REISSUE PATENT APPLICATION** |
| | ) | |
| Inventor:   Richard Chao | ) | |
| | ) | Art Unit:   2833 |
| Reissue Application No.: 09/182,862 | ) | |
| | ) | Examiner:   Unknown |
| Filed:       10/21/98 | ) | |
| | ) | |
| Patent No.: 5,568,207 | ) | |
| | ) | |
| Title:      **AUXILIARY LENSES FOR** | ) | |
|             **EYEGLASSES** | ) | |

### CERTIFICATE OF MAILING UNDER 37 C.F.R. § 1.8

I hereby certify that this correspondence is being deposited in the United States Postal Service with sufficient postage as first class mail in an envelope addressed to **Assistant Commissioner for Patents**, Washington, D.C. 20231, on ___/ 8___ , 1999.

_____ (Attorney Signature)
Peter P. Tong, Reg. No. 35,757
Signature Date: __1/ 8___ , 1999.

### REQUEST FOR CORRECTION OF FILING RECEIPT

Assistant Commissioner for Patents
Washington, D.C.  20231

Sir:

In the Filing Receipt received by Applicant in the above-identified patent application, the U.S. Patent and Trademark Office erroneously listed the number of drawings as 2 pages, when there are actually 3 pages of figures.  Please correct the Filing Receipt to reflect 3 pages of drawings.

A copy of the Filing Receipt is attached, with the correction marked thereon.

- 1 -

Attorney Docket No.: CONT1013REI1 SRM/PPT
ppt/cont1013rei.008

There is no fee due with this correction.

Respectfully submitted,

Date: _____ 1/8/99 _____     By: _____ Peter Tong _____

Peter P. Tong
Reg. No. 35,757

FLIESLER, DUBB, MEYER & LOVEJOY LLP
Four Embarcadero Center, Suite 400
San Francisco, California 94111-4156
Telephone: (415) 362-3800

- 2 -

PTO-103X
(Rev. 8-95)

**RECEIVED**

NOV 30 1998

**FILING RECEIPT**

FLIESLER DUBB,
MEYER & LOVEJOY



UNITED STATES DEPARTMENT OF COMMERCE
Patent and Trademark Office
ASSISTANT SECRETARY AND COMMISSIONER
OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

| APPLICATION NUMBER | FILING DATE | GRP ART UNIT | FIL FEE REC'D | ATTORNEY DOCKET NO. | DRWGS | TOT CL | IND CL |
|---|---|---|---|---|---|---|---|
| 09/182,862 | 10/21/98 | 2833 | $970.00 | CONT1013SRM/ | ✗ 3 | 35 | 11 |

SHELDON R MEYER
FLIESLER DUBB MEYER AND LOVEJOY
FOUR EMBARCADERO CENTER
SUITE 400
SAN FRANCISCO CA 94111-4156

*OIPE*
*JAN 1 2 1999*
*PATENT & TRADEMARK OFFICE*

Receipt is acknowledged of this nonprovisional Patent Application. It will be considered in its order and you will be notified as to the results of the examination. Be sure to provide the U.S. APPLICATION NUMBER, FILING DATE, NAME OF APPLICANT, and TITLE OF INVENTION when inquiring about this application. Fees transmitted by check or draft are subject to collection. Please verify the accuracy of the data presented on this receipt. If an error is noted on this Filing Receipt, please write to the Application Processing Division's Customer Correction Branch within 10 days of receipt. Please provide a copy of the Filing Receipt with the changes noted thereon.

Applicant(s)

RICHARD CHAO, TAWAIN, TAIWAN.

CONTINUING DATA AS CLAIMED BY APPLICANT-
THIS APPLN IS A RE OF     08/554,854 11/07/95     PAT 5,568,207 ✓

\* SMALL ENTITY \*

TITLE
AUXILIARY LENSES FOR EYEGLASSES

PRELIMINARY CLASS: 351

**RECEIVED**
JUN -8 2000
TC 2800 MAIL ROOM

*CONT 1013 REI 1*
*Application Pub'd*
*November 21, 1998*
*November 21, 1998*
*SRM/PPT*
*prev. dkted.*
*no pa*

(see reverse)

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| In re Reissue Application | ) REISSUE PATENT APPLICATION |
| | ) |
| Inventor: Richard Chao | ) |
| | ) |
| Reissue Application No.: 09/182,86? | ) Art Unit: 2873 |
| | ) |
| Filed: 10/21/98 | ) Examiner: Mai, H. |
| | ) |
| Patent No.: 5,568,207 | ) |
| | ) |
| Title: AUXILIARY LENSES FOR | ) |
| EYEGLASSES | ) |
| | ) |

**RECEIVED**

AUG – 3 2000

TECHNOLOGY CENTER 2800

**CERTIFICATE OF MAILING UNDER 37 C.F.R. § 1.8**

I hereby certify that this correspondence is being deposited in the United States Postal Service with sufficient postage as first class mail in an envelope addressed to Assistant Commissioner for Patents, Washington, D.C. 20231, on July 6, 2000.

_____ (Attorney Signature)
Brian I. Marcus, Reg. No. 34,511
Signature Date: July 6, 2000

<u>RESPONSE TO OFFICE ACTION UNDER 37 C.F.R. § 1.111</u>

Assistant Commissioner for Patents
Washington, D.C. 20231

**RECEIVED**

AUG 1 0 2000

OFFICE OF PETITIONS

Sir:

This RESPONSE is in reply to the Office action mailed June 6, 2000.

<u>In the Claims</u>

Please amend Claim 1.

Please add new Claims 3-46.

The claims have been reproduced in full for your convenience.

1.      **(Once Amended)** An eyeglass device comprising:

a primary spectacle frame for supporting primary lenses therein, said

primary spectacle frame including two side portions each having an extension

extended therefrom for pivotally coupling a leg means thereto, said primary

- 1 -

spectacle frame including two rear and side portions each having a projection secured thereto, said primary spectacle frame including an upper side portion,

a pair of first magnetic members secured in said projections respectively,

an auxiliary spectacle frame for supporting auxiliary lenses therein, said auxiliary spectacle frame including two side portions each having an arm extended therefrom, with at least one arm for extending over [and for engaging with] said upper side portion of said primary spectacle frame, and

a pair of second magnetic members secured to said arms respectively for engaging with said first magnetic members of said primary spectacle frame so as to secure said auxiliary spectacle frame to said primary spectacle frame,

at least one of said arms being [engaged with and] supported on said upper side portion of said primary spectacle frame so as to allow said auxiliary spectacle frame to be stably supported on said primary spectacle frame and so as to prevent said auxiliary spectacle frame from moving downward relative to said primary spectacle frame and so as to prevent said auxiliary spectacle frame from being disengaged from said primary spectacle frame.

2.      An eyeglass device according to Claim 1, wherein said projections and said first magnetic members are arranged lower than said upper side portion of said primary spectacle frame, said second magnetic members are extended downward toward said projections for hooking on said primary spectacle frame so as to further secure said auxiliary spectacle frame to said primary spectacle frame.

- 2 -

Attorney Docket No.. CONT-01013US1 SKM/BIM
bim/cont/1013us1.003

3.     **(New)** An eyeglass device as recited in Claim 1 wherein the first and the second magnetic members are magnets.

4.     **(New)** An eyeglass device as recited in Claim 1 wherein:

the primary spectacle frame includes two upper side portions, each upper side portion for supporting one of said arms.

5.     **(New)** An eyeglass device comprising:

a primary spectacle frame for supporting primary lenses therein;

the primary spectacle frame including two side portions;

each side portion having an extension extended therefrom for pivotally coupling a leg thereto;

the primary spectacle frame including a projection extending from each said side portion;

each projection securing a first magnetic member; and

the primary spectacle frame including an upper portion; and

an auxiliary spectacle frame for supporting auxiliary lenses therein;

the auxiliary spectacle frame including two auxiliary side portions;

each said auxiliary side portion having an arm extended therefrom;

with at least one arm being configured to extend over the upper portion of the primary spectacle frame;

each arm securing a second magnetic member;

- 3 -

Attorney Docket No . CONT-01013US1 SRM/BIM
bim/cont/1013us1.003

each second magnetic member configured to engage with one of the first magnetic members of the primary spectacle frame; and

the upper portion supports at least one arm of the auxiliary frame.

6.     **(New)** An eyeglass device as recited in Claim 5 wherein the upper portion is an upper part of one of the side portions of the primary frame.

7.     **(New)** An eyeglass device as recited in Claim 5 wherein the first and the second magnetic members are magnets.

8.     **(New)** An eyeglass device as recited in Claim 7 wherein the first magnetic members are not in contact with the second magnetic members.

9.     **(New)** An eyeglass device as recited in Claim 8 wherein the upper portion is an upper part of one of the side portions of the primary frame.

10.    **(New)** An eyeglass device comprising:

a primary spectacle frame for supporting primary lenses therein;

the primary spectacle frame including two side portions;

each side portion having an extension extended therefrom for pivotally coupling a leg thereto;

the primary spectacle frame including a projection extending from each said side portion;

each projection securing a first magnetic member; and

- 4 -

Attorney Docket No.: CONT-01013US1 SRM/BIM
bim/cont/1013us1.003

the primary spectacle frame including an upper means; and

an auxiliary spectacle frame for supporting auxiliary lenses therein;

the auxiliary spectacle frame including two auxiliary side portions;

each said auxiliary side portion having an arm extended therefrom;

with at least one arm being configured to extend over the upper means of the primary spectacle frame;

each arm securing a second magnetic member;

each second magnetic member configured to engage with one of the first magnetic members of the primary spectacle frame; and

the upper means supports at least one arm of the auxiliary frame.

11.   **(New)** An eyeglass device as recited in Claim 10 wherein:

the first and the second magnetic members are magnets; and

the upper means is an upper part of one of the side portions.

12.   **(New)** An eyeglass device comprising:

a primary spectacle frame for supporting primary lenses therein, with the lenses defining a vertical plane;

the primary spectacle frame including two side portions;

each side portion having an extension extended therefrom for pivotally coupling a leg thereto; and

the primary spectacle frame including two first magnets, each secured to one of the side portions of the primary frame; and

- 5 -

an auxiliary spectacle frame for supporting auxiliary lenses therein, and for disposing in front of the primary frame;

the auxiliary spectacle frame including two auxiliary side portions; and

the auxiliary spectacle frame including two second magnets, each secured to one of the auxiliary side portions, for engaging on a horizontal position with one of the first magnets so as to secure the auxiliary frame to the primary frame.

13.    **(New)** An eyeglass device as recited in Claim 12 wherein:

the primary spectacle frame includes a projection extending from each of its side portion;

each projection secures one of the first magnets;

the primary spectacle frame includes an upper portion;

each said auxiliary side portion has an arm extended therefrom;

at least one arm is configured to extend over the upper portion of the primary spectacle frame;

each arm secures one of the second magnets; and

the upper portion is an upper part of one of the side portions of the primary spectacle frame.

14.    **(New)** A primary eyeglass device adapted to stably support an auxiliary spectacle frame, which includes two auxiliary side portions, each auxiliary side portion having an arm extended therefrom, and each arm securing a first magnetic member,

the primary eyeglass device comprising:

- 6 -

a primary spectacle frame for supporting primary lenses therein;

the primary spectacle frame including two primary side portions;

each side portion having an extension extended therefrom for pivotally coupling a leg thereto;

the primary spectacle frame including a projection extending from each said side portion;

each projection securing a second magnetic member;

the primary spectacle frame including an upper portion; and

when the primary frame is supporting the auxiliary frame,

each second magnetic member engages with one of the first magnetic members;

the upper portion being extended over by at least one arm of the auxiliary frame; and

the upper portion supports at least one arm of the auxiliary frame.

15.    **(New)** A primary eyeglass device as recited in Claim 14 wherein the upper portion is an upper part of one of the primary side portions.

16.    **(New)** An auxiliary eyeglass device comprising:

an auxiliary spectacle frame for supporting auxiliary lenses therein;

the auxiliary spectacle frame including two auxiliary side portions;

each auxiliary side portion having an arm extended therefrom; and

each arm securing a first magnet;

- 7 -

the auxiliary spectacle frame being adapted to be stably supported on a primary spectacle frame, which includes two primary side portions, each side portion securing a second magnetic member, the primary spectacle frame also including an upper portion; and

when the auxiliary frame is supported by the primary frame,

each first magnet engages with one of the second magnetic members; and

at least one arm of the auxiliary frame extending over the upper portion.

17.   (New) An auxiliary eyeglass device as recited in Claim 16 wherein when the auxiliary frame is supported by the primary frame, at least one arm of the auxiliary frame is supported by the upper portion of the primary frame, which is an upper part of one of the primary side portions.

18.   (New) An auxiliary eyeglass device adapted to be stably supported on a primary spectacle frame, which includes two primary side portions, each said side portion securing a first magnetic member, the primary spectacle frame also including an upper portion, the auxiliary eyeglass device comprising:

an auxiliary spectacle frame for supporting auxiliary lenses therein;

the auxiliary spectacle frame including two auxiliary side portions;

each auxiliary side portion having an arm extended therefrom;

each arm securing a second magnet; and

when the auxiliary frame is supported by the primary frame,

- 8 -

each second magnet engages with one of the first magnetic

members of the primary spectacle frame; and

at least one arm of the auxiliary frame extending over the upper

portion.

19.    **(New)** An auxiliary eyeglass device as recited in Claim 18 wherein when the

auxiliary frame is supported by the primary frame, at least one arm of the

auxiliary frame is supported by the upper portion of the primary frame, which is

an upper part of one of the primary side portions.

20.    **(New)** A primary eyeglass device comprising:

a primary spectacle frame for supporting primary lenses therein;

the primary spectacle frame including two primary side portions;

each side portion having an extension extended therefrom for pivotally

coupling a leg thereto;

the primary spectacle frame including a projection extending from

each said side portion;

each projection securing a first magnet; and

the primary spectacle frame including an upper portion;

the primary frame adapted to stably support an auxiliary spectacle frame,

which includes two auxiliary side portions each securing a second magnetic

member; and

when the primary spectacle frame is supporting the auxiliary spectacle

frame,

- 9 -

the upper portion is extended over by at least one of the auxiliary side portions;

the upper portion supports at least one of the auxiliary side portions; and

each first magnet engages with one of the second magnetic members.

21.     **(New)** A primary eyeglass device as recited in Claim 20 wherein the upper portion is an upper part of one of the primary side portions.

22.     **(New)** A primary eyeglass device adapted to stably support an auxiliary spectacle frame, the auxiliary spectacle frame for supporting auxiliary lenses therein, and for disposing in front of the primary frame, the auxiliary spectacle frame including two auxiliary side portions, each auxiliary side portion having an arm extended therefrom, and each arm securing a first magnet,

the primary eyeglass device comprising:

a primary spectacle frame for supporting primary lenses therein;

the primary spectacle frame including two side portions;

each of the two side portions having an extension extended therefrom for pivotally coupling a leg thereto;

the primary spectacle frame including a projection extending from each said side portion;

each projection securing a second magnet; and

when the primary frame is supporting the auxiliary frame,

- 10 -

Attorney Docket No.: CONT-01013US1 SRM/BIM
bim/cont/1013us1.003

each second magnet is coupled to, but not in contact with, one of the first

magnets on a horizontal position so as to secure the auxiliary frame to the primary

frame; and

the auxiliary frame is supported by at least an upper portion of the primary

frame.

23.     **(New)**  An eyeglass device as recited in Claim 4 wherein each upper side portion

is an upper part of one of the side portions of the primary spectacle frame.

24.     **(New)**  An eyeglass device as recited in Claim 23 wherein the magnetic members

are magnets.

25.     **(New)**  An eyeglass device as recited in Claim 1 wherein at least the end portion

of one arm extends downward toward one of the projections for hooking on the

primary spectacle frame so as to further stably support and secure the auxiliary

spectacle frame to the primary spectacle frame.

26.     **(New)**  An eyeglass device as recited in Claim 5 wherein at least the end portion

of one arm extends downward toward one of the projections for hooking on the

primary spectacle frame such that the auxiliary spectacle frame is further stably

supported and secured to the primary spectacle frame.

27.     **(New)**  An eyeglass device as recited in Claim 10 wherein at least the end portion

of one arm extends downward toward one of the projections for hooking on the

- 11 -

primary spectacle frame such that the auxiliary spectacle frame is further stably

supported and secured to the primary spectacle frame.

28.  **(New)**  An eyeglass device as recited in Claim 12 wherein at least the end portion

of one auxiliary side portion extends downward toward one of the side portions

of the primary spectacle frame for hooking on the primary spectacle frame such

that the auxiliary spectacle frame is further stably supported and secured to the

primary spectacle frame.

29.  **(New)**  An auxiliary eyeglass device as recited in Claim 16 wherein when the

auxiliary frame is supported by the primary frame, at least the end portion of one

arm extends downward toward one of the side portions of the primary spectacle

frame for hooking on the primary spectacle frame such that the auxiliary spectacle

frame can be further stably supported and secured to the primary spectacle frame.

30.  **(New)**  An auxiliary eyeglass device as recited in Claim 18 wherein when the

auxiliary frame is supported by the primary frame, at least the end portion of one

arm extends downward toward one of the side portions of the primary spectacle

frame for hooking on the primary spectacle frame such that the auxiliary spectacle

frame can be further stably supported and secured to the primary spectacle frame.

31.  **(New)**  An eyeglass device as recited in Claim 25 wherein the first and the second

magnetic members are magnets.

- 12 -

32.    **(New)** An eyeglass device as recited in Claim 26 wherein the first and the second magnetic members are magnets.

33.    **(New)** An eyeglass device as recited in Claim 27 wherein the first and the second magnetic members are magnets.

34.    **(New)** An eyeglass device comprising:

a primary frame for supporting primary lenses therein, with the lenses defining a vertical plane;

the primary spectacle frame including two side portions;

each side portion having an extension extended therefrom for pivotally coupling a leg thereto; and

the primary spectacle frame including two first magnets, each secured to one of the side portions of the primary frame; and

an auxiliary frame for supporting auxiliary lenses therein, and for disposing in front of the primary frame;

the auxiliary spectacle frame including two auxiliary side portions; and

the auxiliary frame including two second magnets, each secured to one of the auxiliary side portions, for coupling on a horizontal position with one of the first magnets so as to secure the auxiliary frame to the primary frame.

- 13 -

35.    (New)  An eyeglass device comprising:

a spectacle primary frame for supporting primary lenses therein, with the primary lenses defining a vertical plane;

the primary spectacle frame including two side portions;

each side portion having an extension extended therefrom for pivotally coupling a leg thereto; and

the primary spectacle frame including two first magnetic members, each secured to one of the side portions of the primary frame; and

an auxiliary spectacle frame for supporting auxiliary lenses therein, and for disposing in front of the primary frame;

the auxiliary spectacle frame including two auxiliary side portions;

the auxiliary frame including two second magnetic members, each secured to one of the auxiliary side portions, for coupling on a horizontal position, but not in contact, with one of the first magnetic members so as to secure the auxiliary frame to the primary frame; and

the auxiliary spectacle frame being supported by at least an upper portion of the primary spectacle frame.


36.    (New)  An eyeglass device comprising:

a primary spectacle frame for supporting primary lenses therein;

the primary spectacle frame including two side portions;

each side portion having an extension extended therefrom for pivotally coupling a leg thereto; and

- 14 -

the primary spectacle frame including two first magnetic members, each secured to one of the side portions of the primary frame; and

an auxiliary spectacle frame for supporting auxiliary lenses therein, and for disposing in front of the primary frame;

the auxiliary spectacle frame including two auxiliary side portions; and

the auxiliary spectacle frame including two second magnetic members, each secured to one of the auxiliary side portions, for coupling on a horizontal position with one of the first magnetic members so as to secure the auxiliary frame to the primary frame, the horizontal position being substantially perpendicular to a front surface of the primary frame.

37.    **(New)** An eyeglass device as recited in Claim 36 wherein the second magnetic members are magnets.

38.    **(New)** An eyeglass device as recited in Claim 36 wherein the first magnetic members are magnets.

39.    **(New)** An eyeglass device as recited in Claim 36 wherein the first and the second magnetic members are magnets.

40.    **(New)** An eyeglass device as recited in Claim 36 wherein the first magnetic members are not in contact with the second magnetic members.

- 15 -

41.     **(New)** An eyeglass device as recited in Claim 39 wherein the first magnetic members are not in contact with the second magnetic members.

42.     **(New)** An eyeglass device as recited in Claim 36 further comprising at least one projection extending from said primary frame, said projection being configured to secure one of said first magnetic members.

43.     **(New)** An eyeglass device comprising:

a primary spectacle frame for supporting primary lenses therein;

the primary spectacle frame including two side portions;

each side portion having an extension extended therefrom for pivotally coupling a leg thereto;

the primary spectacle frame including a projection extending from each said side portion;

each projection securing a first magnetic member; and

the primary spectacle frame including an upper portion; and

an auxiliary spectacle frame for supporting auxiliary lenses therein;

the auxiliary spectacle frame including two auxiliary side portions;

each said auxiliary side portion having an arm extended therefrom;

with at least one arm being configured to extend over the upper portion of the primary spectacle frame;

each arm securing a second magnetic member;

- 16 -

each second magnetic member configured to couple with one of the first

magnetic members of the primary spectacle frame; and

the upper portion supports at least one arm of the auxiliary frame.

44.   (New) An auxiliary eyeglass device comprising:

an auxiliary spectacle frame for supporting auxiliary lenses therein;

the auxiliary spectacle frame including two auxiliary side portions;

each auxiliary side portion having an arm extended therefrom; and

each arm securing a first magnetic member;

the auxiliary spectacle frame being adapted to be stably supported on a

primary spectacle frame, which includes two primary side portions, each side

portion securing a second magnetic member, the primary spectacle frame also

including an upper portion; and

when the auxiliary frame is supported by the primary frame,

each first magnetic member engages with one of the second

magnetic members; and

at least one arm of the auxiliary frame extending over the upper

portion.

45.   (New)   A primary eyeglass device for securing an auxiliary spectacle frame,

which includes two auxiliary side portions, each auxiliary side portion securing

to a first magnetic member, the primary eyeglass device comprising:

a primary spectacle frame for supporting primary lenses therein;

the primary spectacle frame including two side portions;

- 17 -

each side portion having an extension extended therefrom for pivotally coupling a leg thereto;

the primary spectacle frame including two first magnetic members, each secured to one of the side portions of the primary spectacle frame; and

when the auxiliary spectacle frame is secured to the primary spectacle frame, each second magnetic member couples on a horizontal position with one of the first magnetic members, the horizontal position being substantially perpendicular to a front surface of the primary frame.

46.    **(New)** An auxiliary eyeglass device adapted to be secured to a primary spectacle frame, which includes two primary side portions, each said side portion securing a first magnetic member, the auxiliary eyeglass device comprising:

an auxiliary spectacle frame for supporting auxiliary lenses therein;

the auxiliary spectacle frame including two auxiliary side portions;

each auxiliary side portion configured to secure a second magnetic member; and

when the auxiliary frame is secured to the primary frame, each second magnetic member couples on a horizontal position with one of the first magnetic members of the primary spectacle frame, the horizontal position being substantially perpendicular to a front surface of the auxiliary frame.

- 18 -

## REMARKS

The Examiner rejected the reply filed on January 19, 2000 as not fully responsive to the prior Office action because the applicant did not follow the rules as set forth in 37 C.F.R. §1.121.

Applicant has amended the claims to follow the rules as set forth in 37 C.F.R. §1.121, and it is respectfully requested that the objection to the reply be withdrawn.

The Examiner's prompt attention to this matter is greatly appreciated.  Should further questions remain, the Examiner is invited to contact the undersigned attorney by telephone.

The Commissioner is authorized to charge any underpayment or credit any overpayment to Deposit Account No. 06-1325 for any matter in connection with this response, including any fee for extension of time, which may be required.

Respectfully submitted,

Date:  July 6, 2000                    By:                              

Brian I. Marcus
Reg. No. 34,511

FLIESLER, DUBB, MEYER & LOVEJOY LLP
Four Embarcadero Center, Suite 400
San Francisco, California 94111-4156
Telephone: (415) 362-3800

- 19 -

Attorney Docket No.: CONT-01013US1 SRM/BIM
bim/cont/1013us1.003

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| In re Reissue Application | ) REISSUE PATENT APPLICATION |
| | ) |
| Inventor:     Richard Chao | ) |
| | ) Art Unit:        2873 |
| Reissue Application No.: 09/182,862 | ) |
| | ) Examiner:     Mai, H. |
| Filed:       10/21/98 | ) |
| | ) RECEIVED |
| Patent No.:   5,568,207 | ) |
| | ) AUG - 3 2000 |
| Title:       AUXILIARY LENSES FOR | ) |
|              EYEGLASSES | ) TECHNOLOGY CENTER 2800 |

---

CERTIFICATE OF MAILING UNDER 37 C.F.R. § 1.8

I hereby certify that this correspondence is being deposited in the United States Postal Service with sufficient postage as first class mail in an envelope addressed to Assistant Commissioner for Patents, Washington, D.C. 20231, on July 6, 2000.

_____ (Attorney Signature)

Brian N Marcus, Reg. No. 34,511
Signature Date: July 6, 2000

RESPONSE TRANSMITTAL LETTER

RECEIVED

AUG 1 0 2000

OFFICE OF PETITIONS

Assistant Commissioner for Patents
Washington, D.C.  20231

Sir:

Transmitted with this communication in connection with the above-identified application are the following:

__X__   A Response under 37 C.F.R. §1.111 to the Office Action dated June 6, 2000 .

___   A Response under 37 C.F.R. §1.116 to the Office Action dated ___.

___   A Petition for an Extension of Time under 37 C.F.R. §1.136.

___   A Statement pursuant to 37 C.F.R. §1.27 to establish small entity status under 37 C.F.R. §1.9(f).

___   An Information Disclosure Statement pursuant to 37 C.F.R. §1.56.

RECEIVED AUG 17 2000 TC2800 MAIL ROOM

RECEIVED JUL 11 2000 TC 2800 MAIL ROOM

- 1 -

The fee associated with this communication has been calculated as shown below:

__X__    No fee is required with this communication.

___    Small entity status of this application under 37 C.F.R. §1.9 and §1.27 has been established.

___    A fee for extension of time for response under 37 C.F.R. §1.136 filed within __ month(s) after the original time for response of $___ is due.

___    A fee of $240.00 is due for the submission of the accompanying Information Disclosure Statement.

___    A fee for addition of claims under 37 C.F.R. §1.16 is due as follows:

| Claims Remaining After Amendment | Highest Previously Paid For | | Number Extra | | Rate Small Entity/ Other Than Small Entity | | |
|---|---|---|---|---|---|---|---|
| Total Claims __46__ - | __46__ | = | __0__ * X | | $ 9.00 $18.00 | = | $-0- |
| Independent Claims __16__ - | __16__ | = | __0__ * X | | $39.00 $78.00 | = | $-0- |
| First Presentation of Multiple Dependent Claim(s) __ | | | | | $130.00 $260.00 | = | $ |

*If the difference is less than zero, enter "0".

Additional Fee=    $___-0-___

The total fee required with this communication is $__-0-__ and is to be paid as follows:

___    Please charge Deposit Account No. 06-1325 in the amount of $___.  A duplicate copy of this authorization is enclosed.

___    A check in the amount of $___ is enclosed.

- 2 -

X    The Commissioner is hereby authorized to charge underpayment of any fees, including the following fees, associated with this communication or credit any overpayment to Deposit Account No. 06-1325. A duplicate copy of this authorization is enclosed.

    X    Any filing fees under 37 C.F.R. §1.16 for the presentation of additional claims.

    X    Any patent application processing fees under 37 C.F.R. §1.17 including any applicable fee for extension of time.

Respectfully submitted,

Date: _July 6, 2000_

By: _____

Brian I. Marcus
Reg. No. 34,511

FLIESLER, DUBB, MEYER & LOVEJOY LLP
Four Embarcadero Center, Suite 400
San Francisco, California 94111-4156
Telephone: (415) 362-3800

RECEIVED

AUG - 4 2000

TECHNOLOGY CENTER 2800

RECEIVED
JUL 11 2000
TC 2800 MAIL ROOM

RECEIVED
AUG 17 2000
TC 2800 MAIL ROOM

- 3 -

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| In re Reissue Application | ) REISSUE PATENT APPLICATION |
| | ) |
| Inventor:     Richard Chao | ) |
| | ) |
| Reissue Application No.: 09/182,862 | ) Art Unit:      2873 |
| | ) |
| Filed:        10/21/98 | ) Examiner:    Mai, H. |
| | ) |
| Patent No.:   5,568,207 | ) |
| | ) |
| Title:        AUXILIARY LENSES FOR | ) |
|               EYEGLASSES | ) |

*OIPE  JUL 1 0 2000  PATENT & TRADEMARK OFFICE*

*Ok to Enter*

*RECEIVED AUG 17 2000 TC 2800 MAIL ROOM*

**CERTIFICATE OF MAILING UNDER 37 C.F.R. § 1.8**

I hereby certify that this correspondence is being deposited in the United States Postal Service with sufficient postage as first class mail in an envelope addressed to Assistant Commissioner for Patents, Washington, D.C. 20231, on July 6, 2000.

_____ (Attorney Signature)

Brian D Marcus, Reg. No. 34,511
Signature Date: July 6, 2000

**RECEIVED**

AUG - 3 2000

TECHNOLOGY CENTER 2800

### RESPONSE TRANSMITTAL LETTER

Assistant Commissioner for Patents
Washington, D.C.  20231

Sir:

Transmitted with this communication in connection with the above-identified application are the following:

__X__    A Response under 37 C.F.R. §1.111 to the Office Action dated June 6, 2000 .

___    A Response under 37 C.F.R. §1.116 to the Office Action dated ___.

___    A Petition for an Extension of Time under 37 C.F.R. §1.136.

___    A Statement pursuant to 37 C.F.R. §1.27 to establish small entity status under 37 C.F.R. §1.9(f).

___    An Information Disclosure Statement pursuant to 37 C.F.R. §1.56.

**RECEIVED**

AUG 1 0 2000

OFFICE OF PETITIONS

*RECEIVED JUL 1 0 2000 TC 2800 MAIL ROOM*

Attorney Docket No.. CONT-01013US1 SRM/BIM
bim/cont/1013us1.005

The fee associated with this communication has been calculated as shown below:

__X__  No fee is required with this communication.

__  Small entity status of this application under 37 C.F.R. §1.9 and §1.27 has been established.

__  A fee for extension of time for response under 37 C.F.R. §1.136 filed within __ month(s) after the original time for response of $___ is due.

__  A fee of $240.00 is due for the submission of the accompanying Information Disclosure Statement.

__  A fee for addition of claims under 37 C.F.R. §1.16 is due as follows:

| Claims Remaining After Amendment | Highest Previously Paid For | | Number Extra | | Rate Small Entity/ Other Than Small Entity | | |
|---|---|---|---|---|---|---|---|
| Total Claims __46__ - | __46__ | = | __0__ * | X | $ 9.00 $18.00 | = | $-0- |
| Independent Claims __16__ - | __16__ | = | __0__ * | X | $39.00 $78.00 | = | $-0- |
| First Presentation of Multiple Dependent Claim(s) __ | | | | | $130.00 $260.00 | = | $ |

*If the difference is less than zero, enter "0".

Additional Fee=     $___-0-___

The total fee required with this communication is $_-0-_ and is to be paid as follows:

__  Please charge Deposit Account No. 06-1325 in the amount of $__. A duplicate copy of this authorization is enclosed.

__  A check in the amount of $___ is enclosed.

- 2 -

__X__   The Commissioner is hereby authorized to charge underpayment of any fees, including the following fees, associated with this communication or credit any overpayment to Deposit Account No. 06-1325. A duplicate copy of this authorization is enclosed.

    __X__   Any filing fees under 37 C.F.R. §1.16 for the presentation of additional claims.

    __X__   Any patent application processing fees under 37 C.F.R. §1.17 including any applicable fee for extension of time.

Respectfully submitted,

Date:  July 6, 2000

By: _____
     Brian I. Marcus
     Reg. No. 34,511

FLIESLER, DUBB, MEYER & LOVEJOY LLP
Four Embarcadero Center, Suite 400
San Francisco, California 94111-4156
Telephone: (415) 362-3800

**RECEIVED**
AUG - 3 2000
TECHNOLOGY CENTER 2800

**RECEIVED**
AUG 17 2000
TC 2800 MAIL ROOM

**RECEIVED**
JUL 11 2000
TC 2800 MAIL ROOM

- 3 -

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| In re Reissue Application | ) | REISSUE PATENT APPLICATION |
| | ) | |
| Inventor:    Richard Chao | ) | |
| | ) | Art Unit:    2873 |
| Reissue Application No.: 09/182,862 | ) | |
| | ) | Examiner:    Mai, H. |
| Filed:    10/21/98 | ) | |
| | ) | |
| Patent No.:    5,568,207 | ) | |
| | ) | |
| Title:    AUXILIARY LENSES FOR | ) | |
| EYEGLASSES | ) | |
| | ) | |

CERTIFICATE OF MAILING UNDER 37 C.F.R. § 1.8

I hereby certify that this correspondence is being deposited in the United States Postal Service with sufficient postage as first class mail in an envelope addressed to *Assistant Commissioner for Patents*, Washington, D.C. 20231, on August 23, 2000

_____ (Attorney Signature)

Brian I. Marcus, Reg. No 34,511
Signature Date: August 23, 2000

## SUPPLEMENTAL AMENDMENT

Assistant Commissioner for Patents
Washington, D.C.  20231

Sir:

Please amend the above-identified application as follows:

In the Specification,

At the top of Column 3, please insert:

-- As shown in Figs. 3-7, the engaging surfaces between magnetic members 14 in primary spectacle frame 10 and the magnetic members 22 in the auxiliary spectacle frame 20 lie in a plane that is substantially horizontal when the eyeglass device is worn. --

A substitute sheet is enclosed.

09/07/2000 SSITHIB1 00000013 09182862
01 FC:203                                       180.00 OP
02 FC:202                                       351.00 OP

- 1 -

Attorney Docket No.: CONT-01013US1 SRM/BIM
bim/cont/1013us1.007.wpd

<u>In the Claims,</u>

Please amend Claim 1.

Please add new Claims 3-66.

The claims have been reproduced in full for your convenience.

1.     **(Once Amended)** An eyeglass device comprising:

a primary spectacle frame for supporting primary lenses therein, said primary spectacle frame including two side portions each having an extension extended therefrom for pivotally coupling a leg means thereto, said primary spectacle frame including two rear and side portions each having a projection secured thereto, said primary spectacle frame including an upper side portion,

a pair of first magnetic members secured in said projections respectively,

an auxiliary spectacle frame for supporting auxiliary lenses therein, said auxiliary spectacle frame including two side portions each having an arm extended therefrom, <u>with at least one arm</u> for extending over [and for engaging with] said upper side portion of said primary spectacle frame, and

a pair of second magnetic members secured to said arms respectively for engaging with said first magnetic members of said primary spectacle frame so as to secure said auxiliary spectacle frame to said primary spectacle frame,

<u>at least one of</u> said arms being [engaged with and] supported on said upper side portion of said primary spectacle frame so as to allow said auxiliary spectacle frame to be stably supported on said primary spectacle frame and so as to prevent said auxiliary spectacle frame from moving downward relative to said primary spectacle frame and so as to prevent said auxiliary spectacle frame from being disengaged from said primary spectacle frame.

- 2 -

Attorney Docket No.: CONT-01013US1 SRM/BIM
bim/cont/1013us1.007.wpd

2.    An eyeglass device according to Claim 1, wherein said projections and said first magnetic members are arranged lower than said upper side portion of said primary spectacle frame, said second magnetic members are extended downward toward said projections for hooking on said primary spectacle frame so as to further secure said auxiliary spectacle frame to said primary spectacle frame.

3.    (New)  An eyeglass device as recited in Claim 1 wherein the first and the second magnetic members are magnets.

4.    (New)  An eyeglass device as recited in Claim 1 wherein:

the primary spectacle frame includes two upper side portions, each upper side portion for supporting one of said arms.

5.    (New)  An eyeglass device comprising:

a primary spectacle frame for supporting primary lenses therein;

the primary spectacle frame including two side portions;

each side portion having an extension extended therefrom for pivotally coupling a leg thereto;

the primary spectacle frame including a projection extending from each said side portion;

each projection securing a first magnetic member; and

the primary spectacle frame including an upper portion; and

an auxiliary spectacle frame for supporting auxiliary lenses therein;

the auxiliary spectacle frame including two auxiliary side portions;

- 3 -

Attorney Docket No.: CONT-01013US1 SRM/BIM
bim/cont/1013us1.007 wpd

each said auxiliary side portion having an arm extended therefrom;

with at least one arm being configured to extend over the upper portion of the primary spectacle frame;

each arm securing a second magnetic member;

each second magnetic member configured to engage with one of the first magnetic members of the primary spectacle frame; and

the upper portion supports at least one arm of the auxiliary frame.

6.    **(New)**  An eyeglass device as recited in Claim 5 wherein the upper portion is an upper part of one of the side portions of the primary frame.

7.    **(New)**  An eyeglass device as recited in Claim 5 wherein the first and the second magnetic members are magnets.

8.    **(New)**  An eyeglass device as recited in Claim 7 wherein the first magnetic members are not in contact with the second magnetic members.

9.    **(New)**  An eyeglass device as recited in Claim 8 wherein the upper portion is an upper part of one of the side portions of the primary frame.

10.   **(New)**  An eyeglass device comprising:

a primary spectacle frame for supporting primary lenses therein;

the primary spectacle frame including two side portions;

- 4 -

Attorney Docket No.: CONT-01013US1 SRM/BIM
bim/cont/1013us1.007.wpd

each side portion having an extension extended therefrom for pivotally coupling a leg thereto;

the primary spectacle frame including a projection extending from each said side portion;

each projection securing a first magnetic member; and

the primary spectacle frame including an upper means; and

an auxiliary spectacle frame for supporting auxiliary lenses therein;

the auxiliary spectacle frame including two auxiliary side portions;

each said auxiliary side portion having an arm extended therefrom;

with at least one arm being configured to extend over the upper means of the primary spectacle frame;

each arm securing a second magnetic member;

each second magnetic member configured to engage with one of the first magnetic members of the primary spectacle frame; and

the upper means supports at least one arm of the auxiliary frame.

11.     **(New)** An eyeglass device as recited in Claim 10 wherein:

the first and the second magnetic members are magnets; and

the upper means is an upper part of one of the side portions.

12.     **(New)** An eyeglass device comprising:

a primary spectacle frame for supporting primary lenses therein, with the lenses defining a vertical plane;

the primary spectacle frame including two side portions;

- 5 -

each side portion having an extension extended therefrom for pivotally coupling a leg thereto; and

the primary spectacle frame including two first magnets, each secured to one of the side portions of the primary frame; and

an auxiliary spectacle frame for supporting auxiliary lenses therein, and for disposing in front of the primary frame;

the auxiliary spectacle frame including two auxiliary side portions; and

the auxiliary spectacle frame including two second magnets, each secured to one of the auxiliary side portions, for engaging on a horizontal position with one of the first magnets so as to secure the auxiliary frame to the primary frame.

13.     **(New)** An eyeglass device as recited in Claim 12 wherein:

the primary spectacle frame includes a projection extending from each of its side portion;

each projection secures one of the first magnets;

the primary spectacle frame includes an upper portion;

each said auxiliary side portion has an arm extended therefrom;

at least one arm is configured to extend over the upper portion of the primary spectacle frame;

each arm secures one of the second magnets; and

the upper portion is an upper part of one of the side portions of the primary spectacle frame.

- 6 -

14.    **(New)**  A primary eyeglass device adapted to stably support an auxiliary spectacle frame, which includes two auxiliary side portions, each auxiliary side portion having an arm extended therefrom, and each arm securing a first magnetic member,

the primary eyeglass device comprising:

a primary spectacle frame for supporting primary lenses therein;

the primary spectacle frame including two primary side portions;

each side portion having an extension extended therefrom for pivotally coupling a leg thereto;

the primary spectacle frame including a projection extending from each said side portion;

each projection securing a second magnetic member;

the primary spectacle frame including an upper portion; and

when the primary frame is supporting the auxiliary frame,

each second magnetic member engages with one of the first magnetic members;

the upper portion being extended over by at least one arm of the auxiliary frame; and

the upper portion supports at least one arm of the auxiliary frame.

15.    **(New)**  A primary eyeglass device as recited in Claim 14 wherein the upper portion is an upper part of one of the primary side portions.

- 7 -

16.     **(New)** An auxiliary eyeglass device comprising:

an auxiliary spectacle frame for supporting auxiliary lenses therein;

the auxiliary spectacle frame including two auxiliary side portions;

each auxiliary side portion having an arm extended therefrom; and

each arm securing a first magnet;

the auxiliary spectacle frame being adapted to be stably supported on a primary spectacle frame, which includes two primary side portions, each side portion securing a second magnetic member, the primary spectacle frame also including an upper portion; and

when the auxiliary frame is supported by the primary frame,

each first magnet engages with one of the second magnetic members; and

at least one arm of the auxiliary frame extending over the upper portion.

17.     **(New)** An auxiliary eyeglass device as recited in Claim 16 wherein when the auxiliary frame is supported by the primary frame, at least one arm of the auxiliary frame is supported by the upper portion of the primary frame, which is an upper part of one of the primary side portions.

18.     **(New)** An auxiliary eyeglass device adapted to be stably supported on a primary spectacle frame, which includes two primary side portions, each said side portion securing a first magnetic member, the primary spectacle frame also including an upper portion, the auxiliary eyeglass device comprising:

- 8 -

an auxiliary spectacle frame for supporting auxiliary lenses therein;

the auxiliary spectacle frame including two auxiliary side portions;

each auxiliary side portion having an arm extended therefrom;

each arm securing a second magnet; and

when the auxiliary frame is supported by the primary frame,

each second magnet engages with one of the first magnetic members of the primary spectacle frame; and

at least one arm of the auxiliary frame extending over the upper portion.

19.   **(New)** An auxiliary eyeglass device as recited in Claim 18 wherein when the auxiliary frame is supported by the primary frame, at least one arm of the auxiliary frame is supported by the upper portion of the primary frame, which is an upper part of one of the primary side portions.

20.   **(New)** A primary eyeglass device comprising:

a primary spectacle frame for supporting primary lenses therein;

the primary spectacle frame including two primary side portions;

each side portion having an extension extended therefrom for pivotally coupling a leg thereto;

the primary spectacle frame including a projection extending from each said side portion;

each projection securing a first magnet; and

the primary spectacle frame including an upper portion;

- 9 -

Attorney Docket No.: CONT-01013US1 SRM/BIM
bim/cont/1013us1.007.wpd

the primary frame adapted to stably support an auxiliary spectacle frame, which includes two auxiliary side portions each securing a second magnetic member; and

when the primary spectacle frame is supporting the auxiliary spectacle frame,

the upper portion is extended over by at least one of the auxiliary side portions;

the upper portion supports at least one of the auxiliary side portions; and

each first magnet engages with one of the second magnetic members.

21.    **(New)** A primary eyeglass device as recited in Claim 20 wherein the upper portion is an upper part of one of the primary side portions.

22.    **(New)** A primary eyeglass device adapted to stably support an auxiliary spectacle frame, the auxiliary spectacle frame for supporting auxiliary lenses therein, and for disposing in front of the primary frame, the auxiliary spectacle frame including two auxiliary side portions, each auxiliary side portion having an arm extended therefrom, and each arm securing a first magnet,

the primary eyeglass device comprising:

a primary spectacle frame for supporting primary lenses therein;

the primary spectacle frame including two side portions;

- 10 -

Attorney Docket No.: CONT-01013US1 SRM/BIM
bim/cont/1013us1.007.wpd

each of the two side portions having an extension extended therefrom for pivotally coupling a leg thereto;

the primary spectacle frame including a projection extending from each said side portion;

each projection securing a second magnet; and

when the primary frame is supporting the auxiliary frame,

each second magnet is coupled to, but not in contact with, one of the first magnets on a horizontal position so as to secure the auxiliary frame to the primary frame; and

the auxiliary frame is supported by at least an upper portion of the primary frame.

23.   **(New)** An eyeglass device as recited in Claim 4 wherein each upper side portion is an upper part of one of the side portions of the primary spectacle frame.

24.   **(New)** An eyeglass device as recited in Claim 23 wherein the magnetic members are magnets.

25.   **(New)** An eyeglass device as recited in Claim 1 wherein at least the end portion of one arm extends downward toward one of the projections for hooking on the primary spectacle frame so as to further stably support and secure the auxiliary spectacle frame to the primary spectacle frame.

- 11 -

26.   **(New)** An eyeglass device as recited in Claim 5 wherein at least the end portion of one arm extends downward toward one of the projections for hooking on the primary spectacle frame such that the auxiliary spectacle frame is further stably supported and secured to the primary spectacle frame.

27.   **(New)** An eyeglass device as recited in Claim 10 wherein at least the end portion of one arm extends downward toward one of the projections for hooking on the primary spectacle frame such that the auxiliary spectacle frame is further stably supported and secured to the primary spectacle frame.

28.   **(New)** An eyeglass device as recited in Claim 12 wherein at least the end portion of one auxiliary side portion extends downward toward one of the side portions of the primary spectacle frame for hooking on the primary spectacle frame such that the auxiliary spectacle frame is further stably supported and secured to the primary spectacle frame.

29.   **(New)** An auxiliary eyeglass device as recited in Claim 16 wherein when the auxiliary frame is supported by the primary frame, at least the end portion of one arm extends downward toward one of the side portions of the primary spectacle frame for hooking on the primary spectacle frame such that the auxiliary spectacle frame can be further stably supported and secured to the primary spectacle frame.

30.   **(New)** An auxiliary eyeglass device as recited in Claim 18 wherein when the auxiliary frame is supported by the primary frame, at least the end portion of one

- 12 -

Attorney Docket No · CONT-01013US1 SRM/BJM
bim/cont/1013us1.007 wpd

arm extends downward toward one of the side portions of the primary spectacle frame for hooking on the primary spectacle frame such that the auxiliary spectacle frame can be further stably supported and secured to the primary spectacle frame.

31.     (New)  An eyeglass device as recited in Claim 25 wherein the first and the second magnetic members are magnets.

32.     (New)  An eyeglass device as recited in Claim 26 wherein the first and the second magnetic members are magnets.

33.     (New)  An eyeglass device as recited in Claim 27 wherein the first and the second magnetic members are magnets.

34.     (New)  An eyeglass device comprising:

a primary frame for supporting primary lenses therein, with the lenses defining a vertical plane;

the primary spectacle frame including two side portions;

each side portion having an extension extended therefrom for pivotally coupling a leg thereto; and

the primary spectacle frame including two first magnets, each secured to one of the side portions of the primary frame; and

an auxiliary frame for supporting auxiliary lenses therein, and for disposing in front of the primary frame;

- 13 -

the auxiliary spectacle frame including two auxiliary side portions; and

the auxiliary frame including two second magnets, each secured to one of the auxiliary side portions, for coupling on a horizontal position with one of the first magnets so as to secure the auxiliary frame to the primary frame.

35.   (New) An eyeglass device comprising:

a spectacle primary frame for supporting primary lenses therein, with the primary lenses defining a vertical plane;

the primary spectacle frame including two side portions;

each side portion having an extension extended therefrom for pivotally coupling a leg thereto; and

the primary spectacle frame including two first magnetic members, each secured to one of the side portions of the primary frame; and

an auxiliary spectacle frame for supporting auxiliary lenses therein, and for disposing in front of the primary frame;

the auxiliary spectacle frame including two auxiliary side portions;

the auxiliary frame including two second magnetic members, each secured to one of the auxiliary side portions, for coupling on a horizontal position, but not in contact, with one of the first magnetic members so as to secure the auxiliary frame to the primary frame; and

the auxiliary spectacle frame being supported by at least an upper portion of the primary spectacle frame.

- 14 -

36.     **(New)**  An eyeglass device comprising:

a primary spectacle frame for supporting primary lenses therein;

the primary spectacle frame including two side portions;

each side portion having an extension extended therefrom for  pivotally coupling a leg thereto; and

the primary spectacle frame including two first magnetic members, each secured to one of the side portions of the primary frame; and

an auxiliary spectacle frame for supporting auxiliary lenses therein, and for disposing in front of the primary frame;

the auxiliary spectacle frame including two auxiliary side portions; and

the auxiliary spectacle frame including two second magnetic members, each secured to one of the auxiliary side portions, for coupling on a horizontal position with one of the first magnetic members so as to secure the auxiliary frame to the primary frame, the horizontal position being substantially perpendicular to a front surface of the primary frame.

37.     **(New)**  An eyeglass device as recited in Claim 36 wherein the second magnetic members are magnets.

38.     **(New)**  An eyeglass device as recited in Claim 36 wherein the first magnetic members are magnets.

39.     **(New)**  An eyeglass device as recited in Claim 36 wherein the first and the second magnetic members are magnets.

- 15 -

Attorney Docket No.: CONT-01013US1 SRM/BIM
bim/cont/1013us1.007.wpd

40.   **(New)** An eyeglass device as recited in Claim 36 wherein the first magnetic members are not in contact with the second magnetic members.

41.   **(New)** An eyeglass device as recited in Claim 39 wherein the first magnetic members are not in contact with the second magnetic members.

42.   **(New)** An eyeglass device as recited in Claim 36 further comprising at least one projection extending from said primary frame, said projection being configured to secure one of said first magnetic members.

43.   **(New)** An eyeglass device comprising:

a primary spectacle frame for supporting primary lenses therein;

the primary spectacle frame including two side portions;

each side portion having an extension extended therefrom for pivotally coupling a leg thereto;

the primary spectacle frame including a projection extending from each said side portion;

each projection securing a first magnetic member; and

the primary spectacle frame including an upper portion; and

an auxiliary spectacle frame for supporting auxiliary lenses therein;

the auxiliary spectacle frame including two auxiliary side portions;

each said auxiliary side portion having an arm extended therefrom;

- 16 -

with at least one arm being configured to extend over the upper portion of the primary spectacle frame;

each arm securing a second magnetic member;

each second magnetic member configured to couple with one of the first magnetic members of the primary spectacle frame; and

the upper portion supports at least one arm of the auxiliary frame.

44.    **(New)** An auxiliary eyeglass device comprising:

an auxiliary spectacle frame for supporting auxiliary lenses therein;

the auxiliary spectacle frame including two auxiliary side portions;

each auxiliary side portion having an arm extended therefrom; and

each arm securing a first magnetic member;

the auxiliary spectacle frame being adapted to be stably supported on a primary spectacle frame, which includes two primary side portions, each side portion securing a second magnetic member, the primary spectacle frame also including an upper portion; and

when the auxiliary frame is supported by the primary frame,

each first magnetic member engages with one of the second magnetic members; and

at least one arm of the auxiliary frame extending over the upper portion.

- 17 -

45.  **(New)**  A primary eyeglass device for securing an auxiliary spectacle frame, which includes two auxiliary side portions, each auxiliary side portion securing to a first magnetic member, the primary eyeglass device comprising:

   a primary spectacle frame for supporting primary lenses therein;

   the primary spectacle frame including two side portions;

   each side portion having an extension extended therefrom for  pivotally coupling a leg thereto;

   the primary spectacle frame including two first magnetic members, each secured to one of the side portions of the primary spectacle frame; and

   when the auxiliary spectacle frame is secured to the primary spectacle frame, each second magnetic member couples on a horizontal position with one of the first magnetic members, the horizontal position being substantially perpendicular to a front surface of the primary frame.

46.  **(New)**  An auxiliary eyeglass device adapted to be secured to a primary spectacle frame, which includes two primary side portions, each said side portion securing a first magnetic member, the auxiliary eyeglass device comprising:

   an auxiliary spectacle frame for supporting auxiliary lenses therein;

   the auxiliary spectacle frame including two auxiliary side portions;

   each auxiliary side portion configured to secure a second magnetic member; and

   when the auxiliary frame is secured to the primary frame, each second magnetic member couples on a horizontal position with one of the first magnetic

- 18 -

Attorney Docket No.: CONT-01013US1 SRM/BIM
bim/cont/1013us1 007 wpd

members of the primary spectacle frame, the horizontal position being substantially perpendicular to a front surface of the auxiliary frame.

47.　(New)　An eyeglass device, comprising:

a primary spectacle frame for supporting primary lenses therein;

a pair of spaced apart projections mounted to said primary spectacle frame and projecting toward a wearer when the eyeglass device is worn;

a first pair of magnetic members, each affixed to said pair of projections, said first pair of magnetic members each having a first engagement surface;

an auxiliary spectacle frame for supporting auxiliary lenses therein;

a pair of spaced apart arms mounted to said auxiliary spectacle frame and projecting toward the wearer when the eyeglass device is worn; and

a second pair of magnetic members, each affixed to said pair of arms, said second pair of magnetic members each having a second engagement surface, said auxiliary spectacle frame capable of being removably affixed to said primary spectacle frame by bringing said first engagement surfaces of said pair of first magnetic members into magnetic engagement with said second engagement surfaces of said pair of second magnetic members, engagement of said first and second engagement surfaces occurring in a substantially horizontal plane when the eyeglass device is worn by the wearer.

48.　(New)　An eyeglass device as recited in claim 47, wherein said second pair of magnetic members are removably affixed on top of said first pair of magnetic members.

- 19 -

49.     (New) An eyeglass device capable of being supported on a face of a wearer, the eyeglass device comprising:

a primary spectacle frame for supporting primary lenses therein, said primary spectacle frame including a pair of side portions, each at opposed sides of said primary spectacle frame;

a first pair of magnetic members, affixed respectively to said pair of side portions, said first pair of magnetic members each having a first engaging surface;

an auxiliary spectacle frame for supporting auxiliary lenses therein and for being removably supported by said primary spectacle frames; and

a second pair of magnetic members affixed to said auxiliary spectacle frame, said second pair of magnetic members each having a second engagement surface, said auxiliary spectacle frame capable of being removably supported by said primary spectacle frame by bringing said first engagement surfaces of said pair of first magnetic members into magnetic engagement with said second engagement surfaces of said pair of second magnetic members, engagement of said first and second engagement surfaces occurring in a substantially horizontal plane when the eyeglass device is worn by the wearer.

50.     (New)  An eyeglass device as recited in claim 49, wherein said second pair of magnetic members are removably supported on top of said first pair of magnetic members.

51.     (New) An eyeglass device capable of being supported on a face of a wearer, the eyeglass device comprising:

- 20 -

a primary spectacle frame for supporting primary lenses therein, said primary spectacle frame including a pair of side portions, each at opposed sides of said primary spectacle frame;

a first pair of magnetic members, affixed respectively to said pair of side portions, said first pair of magnetic members each having a first, substantially horizontal engaging surface when said primary spectacle frame is worn by the wearer;

an auxiliary spectacle frame for supporting auxiliary lenses therein and for being removably supported by said primary spectacle frames; and

a second pair of magnetic members affixed to said auxiliary spectacle frame, said second pair of magnetic members each having a second, substantially horizontal engagement surface when said auxiliary frame is supported by said primary frame, said auxiliary spectacle frame capable of being removably supported by said primary spectacle frame by bringing said first engagement surfaces of said pair of first magnetic members into magnetic engagement with said second engagement surfaces of said pair of second magnetic members.

52.   **(New)**  An eyeglass device as recited in claim 51, wherein said second pair of magnetic members are removably supported on top of said first pair of magnetic members.

53.   **(New)**  An eyeglass device capable of being supported on a face of a wearer, the eyeglass device comprising:

a primary spectacle frame for supporting primary lenses therein;

- 21 -

Attorney Docket No.  CONT-01013US1 SRM/BJM
bjm/cont/1013us1.007.wpd

at least one first magnetic member affixed to said primary spectacle frame, said at least one first magnetic member having a first engaging surface;

an auxiliary spectacle frame for supporting auxiliary lenses therein and for being removably supported by said primary spectacle frames; and

at least one second magnetic member affixed to said auxiliary spectacle frame, said at least one second magnetic member having a second engagement surface, said auxiliary spectacle frame capable of being removably supported by said primary spectacle frame by bringing said first engagement surface of said at least one first magnetic member into magnetic engagement with said second engagement surface of said at least one second magnetic member, engagement of said first and second engagement surfaces occurring in a substantially horizontal plane when the eyeglass device is worn by the wearer.

54.   **(New)** An eyeglass device as recited in claim 53, wherein said at least one second magnetic member is removably supported on top of said at least one first magnetic member.

55.   **(New)** An eyeglass device comprising:

a primary spectacle frame for supporting primary lenses generally in a lens reference plane, and for supporting a pair of legs in a leg reference plane substantially perpendicular to said lens reference plane;

at least one first magnetic member affixed to said primary spectacle frame, said at least one first magnetic member having a first engaging surface;

- 22 -

Attorney Docket No.: CONT-01013US1 SRM/BIM
bim/cont/1013us1.007.wpd

an auxiliary spectacle frame for supporting auxiliary lenses therein and for being removably supported by said primary spectacle frames; and

at least one second magnetic member affixed to said auxiliary spectacle frame, said at least one second magnetic member having a second engagement surface, said auxiliary spectacle frame capable of being removably supported by said primary spectacle frame by bringing said first engagement surface of said at least one first magnetic member into magnetic engagement with said second engagement surface of said at least one second magnetic member, engagement of said first and second engagement surfaces occurring in a plane substantially parallel to said leg reference plane.

56.    (New) An eyeglass device as recited in claim 55, wherein said at least one second magnetic member is removably supported on top of said at least one first magnetic member.

57.    (New)  A primary spectacle frame for supporting primary lenses therein, the primary spectacle frames being capable of supporting an auxiliary spectacle frame, the auxiliary spectacle frame including a first pair of magnetic members, the first pair of magnetic members each including a first engagement surface, the primary spectacle frame comprising:

a pair of spaced apart projections projecting toward a wearer when the primary spectacle frame is worn; and

a second pair of magnetic members, affixed respectively to said pair of projections, said second pair of magnetic members each having a second

- 23 -

engagement surface capable of engaging one of the first engagement surfaces of the first pair of magnetic members in a substantially horizontal plane.

58.    **(New)**  An eyeglass device as recited in claim 57, wherein the first pair of magnetic members are removably supported on top of said second pair of magnetic members.

59.    **(New)**  An auxiliary spectacle frame for supporting auxiliary lenses therein, the auxiliary spectacle frame being supported on a primary spectacle frame, the primary spectacle frame including a pair of primary lenses therein, and a first pair of magnetic members, said first pair of magnetic members each having a first engagement surface, said auxiliary spectacle frame comprising:

a pair of spaced apart arms projecting toward the wearer when the eyeglass device is worn; and

a second pair of magnetic members, affixed respectively to said pair of arms, said second pair of magnetic members each having a second engagement surface capable of engaging one of the first engagement surfaces of the first pair of magnetic members in a substantially horizontal plane.

60.    **(New)**  An eyeglass device as recited in claim 59, wherein said second pair of magnetic members are removably supported on top of the first pair of magnetic members.

- 24 -

61.     **(New)**  An eyeglass device, comprising:

a primary spectacle frame for supporting primary lenses therein;

a pair of spaced apart projections mounted to said primary spectacle frame and projecting toward a wearer when the eyeglass device is worn;

a first pair of magnetic members, each affixed to said pair of projections, said first pair of magnetic members each having a first surface;

an auxiliary spectacle frame for supporting auxiliary lenses therein;

a pair of spaced apart arms mounted to said auxiliary spectacle frame and projecting toward the wearer when the eyeglass device is worn;

a second pair of magnetic members, each affixed to said pair of arms, said second pair of magnetic members each having a second surface, said auxiliary spectacle frame capable of being supported on said primary spectacle frame by mounting said second pair of magnetic members over said first pair of magnetic members, said first and second surfaces being oppositely directed so that said surfaces are juxtaposed.

62.     **(New)**  An eyeglass device comprising a primary spectacle frame for supporting primary lenses therein, a pair of side arms connected at spaced locations to said primary frame, and operable to retain said primary frame on a user,

an auxiliary frame for supporting auxiliary lenses therein and adopted to be positioned over said primary lenses, a pair of portions secured at spaced locations to said auxiliary frame and projecting rearwardly therefrom so as to be juxtaposed with selected portions of said primary frame, each of said portions having a magnetic member thereon with said magnetic members cooperating with

- 25 -

Attorney Docket No.: CONT-01013US1 SRM/BIM
bim/cont/1013us1.007.wpd

said primary frame to hold juxtaposed surfaces of said primary frame and projections in abutment to inhibit relative movement therebetween.

63.   **(New)** An eyeglass device according to claim 62 wherein said auxiliary frame includes an abutment surface for engagement with an oppositely directed surface on said primary frame to inhibit relative movement therebetween.

64.   **(New)** An eyeglass device according to claim 63 wherein said abutment surface is provided on each of said portions on said auxiliary frame.

65.   **(New)**  An eyeglass device according to claim 62 wherein said portions are located adjacent respective ones of said arms.

66.   **(New)** An eyeglass device according to claim 65 wherein said auxiliary frame includes an abutment surface for engagement with an oppositely directed surface on said primary frame to inhibit relative movement therebetween.

- 26 -

## REMARKS

Claims 3-46 were previously presented in a Response to Office action dated July 6, 2000.

Claims 47-66 are added with the present amendment. No new matter has been presented.

The Examiner's prompt attention to this matter is greatly appreciated. Should further questions remain, the Examiner is invited to contact the undersigned attorney by telephone.

The Commissioner is authorized to charge any underpayment or credit any overpayment to Deposit Account No. 06-1325 for any matter in connection with this response, including any fee for extension of time, which may be required.

Respectfully submitted,

Date:  August 23, 2000                    By:  _____

Brian I. Marcus
Reg. No. 34,511

FLIESLER, DUBB, MEYER & LOVEJOY LLP
Four Embarcadero Center, Suite 400
San Francisco, California 94111-4156
Telephone: (415) 362-3800

- 27 -

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| In re Reissue Application | ) REISSUE PATENT APPLICATION |
| | ) |
| Inventor:     Richard Chao | ) |
| | )     Art Unit:      2873 |
| Reissue Application No.: 09/182,862 | ) |
| | )     Examiner:    Mai, H. |
| Filed:        10/21/98 | ) |
| | ) |
| Patent No.:   5,568,207 | ) |
| | ) |
| Title:        AUXILIARY LENSES FOR | ) |
|               EYEGLASSES | ) |
| | ) |

**CERTIFICATE OF MAILING UNDER 37 C.F.R. § 1.8**

I hereby certify that this correspondence is being deposited in the United States Postal Service with sufficient postage as first class mail in an envelope addressed to Assistant Commissioner for Patents, Washington, D.C. 20231, on August 23, 2000

_____ (Attorney Signature)

Brian I. Marcus, Reg. No. 34,511
Signature Date: August 23, 2000

## TRANSMITTAL LETTER

Assistant Commissioner for Patents
Washington, D.C.  20231

Sir:

Transmitted with this communication in connection with the above-identified application are the following:

__X__     A Supplemental Amendment.

___     A Response under 37 C.F.R. §1.116 to the Office Action dated ___.

___     A Petition for an Extension of Time under 37 C.F.R. §1.136.

___     A Statement pursuant to 37 C.F.R. §1.27 to establish small entity status under 37 C.F.R. §1.9(f).

___     An Information Disclosure Statement pursuant to 37 C.F.R. §1.56.

- 1 -

Attorney Docket No  CONT-01013US1 SRM/BIM
bim/cont/1013us1.008.wpd

The fee associated with this communication has been calculated as shown below:

___   No fee is required with this communication.

___   Small entity status of this application under 37 C.F.R. §1.9 and §1.27 has been established.

___   A fee for extension of time for response under 37 C.F.R. §1.136 filed within ___ month(s) after the original time for response of $___ is due.

___   A fee of $240.00 is due for the submission of the accompanying Information Disclosure Statement.

__X__   A fee for addition of claims under 37 C.F.R. §1.16 is due as follows:

| Claims Remaining After Amendment | Highest Previously Paid For | | Number Extra | | Rate Small Entity/ Other Than Small Entity | | |
|---|---|---|---|---|---|---|---|
| Total Claims  66  - |  46  | = |  20  * | X | $ 9.00 $18.00 | = | $180.00 |
| Independent Claims  25  - |  16  | = |  9  * | X | $39.00 $78.00 | = | $351.00 |
| First Presentation of Multiple Dependent Claim(s) __ | | | | | $130.00 $260.00 | = | $ |

*If the difference is less than zero, enter "0".

Additional Fee   =   $ 531.00

The total fee required with this communication is $ 531.00  and is to be paid as follows:

___   Please charge Deposit Account No. 06-1325 in the amount of $__. A duplicate copy of this authorization is enclosed.

__X__   A check in the amount of $ 531.00  is enclosed.

- 2 -

___X___    The Commissioner is hereby authorized to charge underpayment of any fees, including the following fees, associated with this communication or credit any overpayment to Deposit Account No. 06-1325. A duplicate copy of this authorization is enclosed.

      ___X___    Any filing fees under 37 C.F.R. §1.16 for the presentation of additional claims.

      ___X___    Any patent application processing fees under 37 C.F.R. §1.17 including any applicable fee for extension of time.

Respectfully submitted,

Date: __August 23, 2000__        By: _____

                                     Brian I. Marcus
                                     Reg. No. 34,511

FLIESLER, DUBB, MEYER & LOVEJOY LLP
Four Embarcadero Center, Suite 400
San Francisco, California 94111-4156
Telephone: (415) 362-3800

- 3 -

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| In re Reissue Application | ) REISSUE PATENT APPLICATION |
| | ) |
| Inventor:      Richard Chao | ) |
| | )   Art Unit:      2873 |
| Reissue Application No.: 09/182,862 | ) |
| | )   Examiner:     Mai, H. |
| Filed:          10/21/98 | ) |
| | ) |
| Patent No.:    5,568,207 | ) |
| | ) |
| Title:          AUXILIARY LENSES FOR | ) |
| EYEGLASSES | ) |
| | ) |

**CERTIFICATE OF MAILING UNDER 37 C.F.R. § 1.8**
I hereby certify that this correspondence is being deposited in the United States Postal Service with sufficient postage as first class mail in an envelope addressed to Assistant Commissioner for Patents, Washington, D.C. 20231, on August 23, 2000

_____ (Attorney Signature)

Brian I. Marcus, Reg. No 34,511
Signature Date:  August 23, 2000

## TRANSMITTAL LETTER

Assistant Commissioner for Patents
Washington, D.C.  20231

Sir:

　　　Transmitted with this communication in connection with the above-identified application are the following:

__X__    A Supplemental Amendment.

___    A Response under 37 C.F.R. §1.116 to the Office Action dated ___.

___    A Petition for an Extension of Time under 37 C.F.R. §1.136.

___    A Statement pursuant to 37 C.F.R. §1.27 to establish small entity status under 37 C.F.R. §1.9(f).

___    An Information Disclosure Statement pursuant to 37 C.F.R. §1.56.

- 1 -

The fee associated with this communication has been calculated as shown below:

_____ No fee is required with this communication.

_____ Small entity status of this application under 37 C.F.R. §1.9 and §1.27 has been established.

_____ A fee for extension of time for response under 37 C.F.R. §1.136 filed within __ month(s) after the original time for response of S___ is due.

_____ A fee of $240.00 is due for the submission of the accompanying Information Disclosure Statement.

__X__ A fee for addition of claims under 37 C.F.R. §1.16 is due as follows:

| Claims Remaining After Amendment | Highest Previously Paid For | Number Extra | Rate Small Entity/ Other Than Small Entity | | |
|---|---|---|---|---|---|
| Total Claims  66  -  46  = | | 20 * X | $ 9.00 $18.00 | = | $180.00 |
| Independent Claims  25  -  16  = | | 9 * X | $39.00 $78.00 | = | $351.00 |
| First Presentation of Multiple Dependent Claim(s) __ | | | $130.00 $260.00 | = | $ |

If the difference is less than zero, enter "0".

Additional Fee   =   $ 531.00

The total fee required with this communication is $ 531.00  and is to be paid as follows:

_____ Please charge Deposit Account No. 06-1325 in the amount of $___. A duplicate copy of this authorization is enclosed.

__X__ A check in the amount of $ 531.00  is enclosed.

- 2 -

__X__ The Commissioner is hereby authorized to charge underpayment of any fees, including the following fees, associated with this communication or credit any overpayment to Deposit Account No. 06-1325. A duplicate copy of this authorization is enclosed.

 __X__ Any filing fees under 37 C.F.R. §1.16 for the presentation of additional claims.

 __X__ Any patent application processing fees under 37 C.F.R. §1.17 including any applicable fee for extension of time.

Respectfully submitted,

Date: __August 23, 2000__   By: _____

            Brian I. Marcus
            Reg. No. 34,511

FLIESLER, DUBB, MEYER & LOVEJOY LLP
Four Embarcadero Center, Suite 400
San Francisco, California 94111-4156
Telephone: (415) 362-3800

- 3 -

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| In re Reissue Application | ) REISSUE PATENT APPLICATION |
| Inventor: Richard Chao | ) |
| | ) Art Unit: 2873 |
| Reissue Application No.: 09/182,862 | ) |
| | ) Examiner: Mai, H. |
| Filed: 10/21/98 | ) |
| Patent No.: 5,568,207 | ) |
| Title: AUXILIARY LENSES FOR EYEGLASSES | ) |

#11/C
9-2-00
Payon

OK
please
enter
#M
9/8/00

CERTIFICATE OF TRANSMISSION UNDER 37 C.F.R. § 1.8

I hereby certify that this correspondence is being facsimile transmitted to the Patent and Trademark Office on August 30, 2000.

Brian I. Marcus, Reg. No. 34,511
Signature Date: August 30, 2000

### SUPPLEMENTAL AMENDMENT

Assistant Commissioner for Patents
Washington, D.C. 20231

Sir:

Please amend the above-identified application as follows:

In the Specification.

At the top of Column 3, please insert:

-- As shown in Figs. 3-7, the engaging surfaces between magnetic members 14 in primary spectacle frame 10 and the magnetic members 22 in the auxiliary spectacle frame 20 lie in a plane that is substantially horizontal when the eyeglass device is worn. --

A substitute sheet is enclosed.

- 1 -

Attorney Docket No.: CONT-01013US1 SRM/BiM
bin/cont/1013us1.010.wpd

In the Claims,

Please amend Claim 1.

Please add new Claims 3-66.

The claims have been reproduced in full for your convenience.

1.    **(Once Amended)** An eyeglass device comprising:

a primary spectacle frame for supporting primary lenses therein, said primary spectacle frame including two side portions each having an extension extended therefrom for pivotally coupling a leg means thereto, said primary spectacle frame including two rear and side portions each having a projection secured thereto, said primary spectacle frame including an upper side portion,

a pair of first magnetic members secured in said projections respectively,

an auxiliary spectacle frame for supporting auxiliary lenses therein, said auxiliary spectacle frame including two side portions each having an arm extended therefrom, with at least one arm for extending over [and for engaging with] said upper side portion of said primary spectacle frame, and

a pair of second magnetic members secured to said arms respectively for engaging with said first magnetic members of said primary spectacle frame so as to secure said auxiliary spectacle frame to said primary spectacle frame,

at least one of said arms being [engaged with and] supported on said upper side portion of said primary spectacle frame so as to allow said auxiliary spectacle frame to be stably supported on said primary spectacle frame and so as to prevent said auxiliary spectacle frame from moving downward relative to said primary spectacle frame and so as to prevent said auxiliary spectacle frame from being disengaged from said primary spectacle frame.

- 2 -

Attorney Docket No.: CONT-01013US1 SRM/BIM
bim/cont/1013us1.010.wpd

2. An eyeglass device according to Claim 1, wherein said projections and said first magnetic members are arranged lower than said upper side portion of said primary spectacle frame, said second magnetic members are extended downward toward said projections for hooking on said primary spectacle frame so as to further secure said auxiliary spectacle frame to said primary spectacle frame.

3. (New) An eyeglass device as recited in Claim 1 wherein the first and the second magnetic members are magnets.

4. (New) An eyeglass device as recited in Claim 1 wherein:
the primary spectacle frame includes two upper side portions, each upper side portion for supporting one of said arms.

5. (New) An eyeglass device comprising:
a primary spectacle frame for supporting primary lenses therein;
the primary spectacle frame including two side portions;
each side portion having an extension extended therefrom for pivotally coupling a leg thereto;
the primary spectacle frame including a projection extending from each said side portion;
each projection securing a first magnetic member; and
the primary spectacle frame including an upper portion; and
an auxiliary spectacle frame for supporting auxiliary lenses therein;
the auxiliary spectacle frame including two auxiliary side portions;

- 3 -

Attorney Docket No.: CONT-01013US1 SRM/BIM
bim/cont/1013us1.010.wpd

each said auxiliary side portion having an arm extended therefrom;

with at least one arm being configured to extend over the upper portion of the primary spectacle frame;

each arm securing a second magnetic member;

each second magnetic member configured to engage with one of the first magnetic members of the primary spectacle frame; and

the upper portion supports at least one arm of the auxiliary frame.

6.      (New)  An eyeglass device as recited in Claim 5 wherein the upper portion is an upper part of one of the side portions of the primary frame.

7.      (New)  An eyeglass device as recited in Claim 5 wherein the first and the second magnetic members are magnets.

8.      (New)  An eyeglass device as recited in Claim 7 wherein the first magnetic members are not in contact with the second magnetic members.

9.      (New)  An eyeglass device as recited in Claim 8 wherein the upper portion is an upper part of one of the side portions of the primary frame.

10.     (New)  An eyeglass device comprising:

a primary spectacle frame for supporting primary lenses therein;

the primary spectacle frame including two side portions;

- 4 -

Attorney Docket No.: CONT-01013US1 SRM/BIM
bim/cont/1013us1.010.wpd

each side portion having an extension extended therefrom for pivotally coupling a leg thereto;

the primary spectacle frame including a projection extending from each said side portion;

each projection securing a first magnetic member; and

the primary spectacle frame including an upper means; and

an auxiliary spectacle frame for supporting auxiliary lenses therein;

the auxiliary spectacle frame including two auxiliary side portions;

each said auxiliary side portion having an arm extended therefrom;

with at least one arm being configured to extend over the upper means of the primary spectacle frame;

each arm securing a second magnetic member;

each second magnetic member configured to engage with one of the first magnetic members of the primary spectacle frame; and

the upper means supports at least one arm of the auxiliary frame.

11.    (New) An eyeglass device as recited in Claim 10 wherein:

the first and the second magnetic members are magnets; and

the upper means is an upper part of one of the side portions.

12.    (New) An eyeglass device comprising:

a primary spectacle frame for supporting primary lenses therein, with the lenses defining a vertical plane;

the primary spectacle frame including two side portions;

- 5 -

Attorney Docket No.: CONT-01013US1 SRM/BIM
bin/cont/1013us1.010.wpd



each side portion having an extension extended therefrom for pivotally coupling a leg thereto; and

the primary spectacle frame including two first magnets, each secured to one of the side portions of the primary frame; and

an auxiliary spectacle frame for supporting auxiliary lenses therein, and for disposing in front of the primary frame;

the auxiliary spectacle frame including two auxiliary side portions; and

the auxiliary spectacle frame including two second magnets, each secured to one of the auxiliary side portions, for engaging on a horizontal position with one of the first magnets so as to secure the auxiliary frame to the primary frame.

13.     (New) An eyeglass device as recited in Claim 12 wherein:

the primary spectacle frame includes a projection extending from each of its side portion;

each projection secures one of the first magnets;

the primary spectacle frame includes an upper portion;

each said auxiliary side portion has an arm extended therefrom;

at least one arm is configured to extend over the upper portion of the primary spectacle frame;

each arm secures one of the second magnets; and

the upper portion is an upper part of one of the side portions of the primary spectacle frame.

- 6 -

14.    (New) A primary eyeglass device adapted to stably support an auxiliary spectacle frame, which includes two auxiliary side portions, each auxiliary side portion having an arm extended therefrom, and each arm securing a first magnetic member.

the primary eyeglass device comprising:

a primary spectacle frame for supporting primary lenses therein;

the primary spectacle frame including two primary side portions;

each side portion having an extension extended therefrom for pivotally coupling a leg thereto;

the primary spectacle frame including a projection extending from each said side portion;

each projection securing a second magnetic member;

the primary spectacle frame including an upper portion; and

when the primary frame is supporting the auxiliary frame,

each second magnetic member engages with one of the first magnetic members;

the upper portion being extended over by at least one arm of the auxiliary frame; and

the upper portion supports at least one arm of the auxiliary frame.

15.    (New) A primary eyeglass device as recited in Claim 14 wherein the upper portion is an upper part of one of the primary side portions.

- 7 -

Attorney Docket No.: CONT-01013US1 SRM/BIM
bim/cont/1013ms1.010.wpd

16.     (New) An auxiliary eyeglass device comprising:

an auxiliary spectacle frame for supporting auxiliary lenses therein:

the auxiliary spectacle frame including two auxiliary side portions:

each auxiliary side portion having an arm extended therefrom: and

each arm securing a first magnet:

the auxiliary spectacle frame being adapted to be stably supported on a primary spectacle frame, which includes two primary side portions, each side portion securing a second magnetic member, the primary spectacle frame also including an upper portion: and

when the auxiliary frame is supported by the primary frame,

each first magnet engages with one of the second magnetic members: and

at least one arm of the auxiliary frame extending over the upper portion.

17.     (New) An auxiliary eyeglass device as recited in Claim 16 wherein when the auxiliary frame is supported by the primary frame, at least one arm of the auxiliary frame is supported by the upper portion of the primary frame, which is an upper part of one of the primary side portions.

18.     (New) An auxiliary eyeglass device adapted to be stably supported on a primary spectacle frame, which includes two primary side portions, each said side portion securing a first magnetic member, the primary spectacle frame also including an upper portion, the auxiliary eyeglass device comprising:

- 8 -

an auxiliary spectacle frame for supporting auxiliary lenses therein;

the auxiliary spectacle frame including two auxiliary side portions;

each auxiliary side portion having an arm extended therefrom;

each arm securing a second magnet; and

when the auxiliary frame is supported by the primary frame,

    each second magnet engages with one of the first magnetic members of the primary spectacle frame; and

    at least one arm of the auxiliary frame extending over the upper portion.

19.     (New) An auxiliary eyeglass device as recited in Claim 18 wherein when the auxiliary frame is supported by the primary frame, at least one arm of the auxiliary frame is supported by the upper portion of the primary frame, which is an upper part of one of the primary side portions.

20.     (New) A primary eyeglass device comprising:

    a primary spectacle frame for supporting primary lenses therein;

    the primary spectacle frame including two primary side portions;

    each side portion having an extension extended therefrom for pivotally coupling a leg thereto;

    the primary spectacle frame including a projection extending from each said side portion;

    each projection securing a first magnet; and

    the primary spectacle frame including an upper portion;

- 9 -

Attorney Docket No.: CONT-01013US1 SRM/BIM
bim/cont/1013us1.010.wpd

the primary frame adapted to stably support an auxiliary spectacle frame, which includes two auxiliary side portions each securing a second magnetic member; and

when the primary spectacle frame is supporting the auxiliary spectacle frame,

the upper portion is extended over by at least one of the auxiliary side portions;

the upper portion supports at least one of the auxiliary side portions; and

each first magnet engages with one of the second magnetic members.

21.   (New) A primary eyeglass device as recited in Claim 20 wherein the upper portion is an upper part of one of the primary side portions.

22.   (New) A primary eyeglass device adapted to stably support an auxiliary spectacle frame, the auxiliary spectacle frame for supporting auxiliary lenses therein, and for disposing in front of the primary frame, the auxiliary spectacle frame including two auxiliary side portions, each auxiliary side portion having an arm extended therefrom, and each arm securing a first magnet,

the primary eyeglass device comprising:

a primary spectacle frame for supporting primary lenses therein;

the primary spectacle frame including two side portions;

- 10 -

Attorney Docket No.: CONT-01013US1 SRM/BIM
bim/cont/1013us1.010.wpd

each of the two side portions having an extension extended therefrom for pivotally coupling a leg thereto;

the primary spectacle frame including a projection extending from each said side portion;

each projection securing a second magnet; and

when the primary frame is supporting the auxiliary frame,

each second magnet is coupled to, but not in contact with, one of the first magnets on a horizontal position so as to secure the auxiliary frame to the primary frame; and

the auxiliary frame is supported by at least an upper portion of the primary frame.

23.  (New)  An eyeglass device as recited in Claim 4 wherein each upper side portion is an upper part of one of the side portions of the primary spectacle frame.

24.  (New)  An eyeglass device as recited in Claim 23 wherein the magnetic members are magnets.

25.  (New)  An eyeglass device as recited in Claim 1 wherein at least the end portion of one arm extends downward toward one of the projections for hooking on the primary spectacle frame so as to further stably support and secure the auxiliary spectacle frame to the primary spectacle frame.

- 11 -

Attorney Docket No.: CONT-01013US1 SRM/BIM
bim/cont/1013us1.010.wpd

26. **(New)** An eyeglass device as recited in Claim 5 wherein at least the end portion of one arm extends downward toward one of the projections for hooking on the primary spectacle frame such that the auxiliary spectacle frame is further stably supported and secured to the primary spectacle frame.

27. **(New)** An eyeglass device as recited in Claim 10 wherein at least the end portion of one arm extends downward toward one of the projections for hooking on the primary spectacle frame such that the auxiliary spectacle frame is further stably supported and secured to the primary spectacle frame.

28. **(New)** An eyeglass device as recited in Claim 12 wherein at least the end portion of one auxiliary side portion extends downward toward one of the side portions of the primary spectacle frame for hooking on the primary spectacle frame such that the auxiliary spectacle frame is further stably supported and secured to the primary spectacle frame.

29. **(New)** An auxiliary eyeglass device as recited in Claim 16 wherein when the auxiliary frame is supported by the primary frame, at least the end portion of one arm extends downward toward one of the side portions of the primary spectacle frame for hooking on the primary spectacle frame such that the auxiliary spectacle frame can be further stably supported and secured to the primary spectacle frame.

30. **(New)** An auxiliary eyeglass device as recited in Claim 18 wherein when the auxiliary frame is supported by the primary frame, at least the end portion of one

- 12 -

Attorney Docket No.: CONT-01013US1 SRM/BIM
bim/cont/1013us1 010.wpd