arm extends downward toward one of the side portions of the primary spectacle frame for hooking on the primary spectacle frame such that the auxiliary spectacle frame can be further stably supported and secured to the primary spectacle frame.

31.    (New)  An eyeglass device as recited in Claim 25 wherein the first and the second magnetic members are magnets.

32.    (New)  An eyeglass device as recited in Claim 26 wherein the first and the second magnetic members are magnets.

33.    (New)  An eyeglass device as recited in Claim 27 wherein the first and the second magnetic members are magnets.

34.    (New)  An eyeglass device comprising:

a primary frame for supporting primary lenses therein, with the lenses defining a vertical plane;

the primary spectacle frame including two side portions;

each side portion having an extension extended therefrom for pivotally coupling a leg thereto; and

the primary spectacle frame including two first magnets, each secured to one of the side portions of the primary frame; and

an auxiliary frame for supporting auxiliary lenses therein, and for disposing in front of the primary frame;

- 13 -

the auxiliary spectacle frame including two auxiliary side portions;

and

the auxiliary frame including two second magnets, each secured to one of the auxiliary side portions, for coupling on a horizontal position with one of the first magnets so as to secure the auxiliary frame to the primary frame.

35.     (New)  An eyeglass device comprising:

a spectacle primary frame for supporting primary lenses therein, with the primary lenses defining a vertical plane;

the primary spectacle frame including two side portions;

each side portion having an extension extended therefrom for pivotally coupling a leg thereto; and

the primary spectacle frame including two first magnetic members, each secured to one of the side portions of the primary frame; and

an auxiliary spectacle frame for supporting auxiliary lenses therein, and for disposing in front of the primary frame;

the auxiliary spectacle frame including two auxiliary side portions;

the auxiliary frame including two second magnetic members, each secured to one of the auxiliary side portions, for coupling on a horizontal position, but not in contact, with one of the first magnetic members so as to secure the auxiliary frame to the primary frame; and

the auxiliary spectacle frame being supported by at least an upper portion of the primary spectacle frame.

- 14 -

Attorney Docket No.: CONT-01013US1 SRM/BIM
bim/cont/1013us1 010.wpd

36.    (New)  An eyeglass device comprising:

      a primary spectacle frame for supporting primary lenses therein;

      the primary spectacle frame including two side portions;

      each side portion having an extension extended therefrom for pivotally coupling a leg thereto; and

      the primary spectacle frame including two first magnetic members, each secured to one of the side portions of the primary frame; and

      an auxiliary spectacle frame for supporting auxiliary lenses therein, and for disposing in front of the primary frame;

      the auxiliary spectacle frame including two auxiliary side portions; and

      the auxiliary spectacle frame including two second magnetic members, each secured to one of the auxiliary side portions, for coupling on a horizontal position with one of the first magnetic members so as to secure the auxiliary frame to the primary frame, the horizontal position being substantially perpendicular to a front surface of the primary frame.

37.    (New)  An eyeglass device as recited in Claim 36 wherein the second magnetic members are magnets.

38.    (New)  An eyeglass device as recited in Claim 36 wherein the first magnetic members are magnets.

39.    (New)  An eyeglass device as recited in Claim 36 wherein the first and the second magnetic members are magnets.

- 15 -

Attorney Docket No.: CONT-01013US1 SRM/BIM
bim/cont/1013us1.010.wpd

40. **(New)** An eyeglass device as recited in Claim 36 wherein the first magnetic members are not in contact with the second magnetic members.

41. **(New)** An eyeglass device as recited in Claim 39 wherein the first magnetic members are not in contact with the second magnetic members.

42. **(New)** An eyeglass device as recited in Claim 36 further comprising at least one projection extending from said primary frame, said projection being configured to secure one of said first magnetic members.

43. **(New)** An eyeglass device comprising:

   a primary spectacle frame for supporting primary lenses therein;

   the primary spectacle frame including two side portions;

   each side portion having an extension extended therefrom for pivotally coupling a leg thereto;

   the primary spectacle frame including a projection extending from each said side portion;

   each projection securing a first magnetic member; and

   the primary spectacle frame including an upper portion; and

   an auxiliary spectacle frame for supporting auxiliary lenses therein;

   the auxiliary spectacle frame including two auxiliary side portions;

   each said auxiliary side portion having an arm extended therefrom;

- 16 -

with at least one arm being configured to extend over the upper portion of the primary spectacle frame;

each arm securing a second magnetic member;

each second magnetic member configured to couple with one of the first magnetic members of the primary spectacle frame; and

the upper portion supports at least one arm of the auxiliary frame.

44.    (New)  An auxiliary eyeglass device comprising;

an auxiliary spectacle frame for supporting auxiliary lenses therein;

the auxiliary spectacle frame including two auxiliary side portions;

each auxiliary side portion having an arm extended therefrom; and

each arm securing a first magnetic member;

the auxiliary spectacle frame being adapted to be stably supported on a primary spectacle frame, which includes two primary side portions, each side portion securing a second magnetic member, the primary spectacle frame also including an upper portion; and

when the auxiliary frame is supported by the primary frame,

each first magnetic member engages with one of the second magnetic members; and

at least one arm of the auxiliary frame extending over the upper portion.

Attorney Docket No.: CONT-01013US1 SRM/BIM
bim/cont/1013us1_010.wpd

08/30/2000 16:05 FAX 415 362 2028 FDM&L 023

**45.** **(New)** A primary eyeglass device for securing an auxiliary spectacle frame, which includes two auxiliary side portions, each auxiliary side portion securing to a first magnetic member, the primary eyeglass device comprising:

a primary spectacle frame for supporting primary lenses therein;

the primary spectacle frame including two side portions;

each side portion having an extension extended therefrom for pivotally coupling a leg thereto;

the primary spectacle frame including two first magnetic members, each secured to one of the side portions of the primary spectacle frame; and

when the auxiliary spectacle frame is secured to the primary spectacle frame, each second magnetic member couples on a horizontal position with one of the first magnetic members, the horizontal position being substantially perpendicular to a front surface of the primary frame.

**46.** **(New)** An auxiliary eyeglass device adapted to be secured to a primary spectacle frame, which includes two primary side portions, each said side portion securing a first magnetic member, the auxiliary eyeglass device comprising:

an auxiliary spectacle frame for supporting auxiliary lenses therein;

the auxiliary spectacle frame including two auxiliary side portions;

each auxiliary side portion configured to secure a second magnetic member; and

when the auxiliary frame is secured to the primary frame, each second magnetic member couples on a horizontal position with one of the first magnetic

- 18 -

Attorney Docket No. CONT-01013US1 SRM/BIM
bim/cont/1013us1.010.wpd

members of the primary spectacle frame, the horizontal position being substantially perpendicular to a front surface of the auxiliary frame.

47.    (New)  An eyeglass device, comprising:

a primary spectacle frame for supporting primary lenses therein;

a pair of spaced apart projections mounted to said primary spectacle frame and projecting toward a wearer when the eyeglass device is worn;

a first pair of magnetic members, each affixed to said pair of projections, said first pair of magnetic members each having a first engagement surface;

an auxiliary spectacle frame for supporting auxiliary lenses therein;

a pair of spaced apart arms mounted to said auxiliary spectacle frame and projecting toward the wearer when the eyeglass device is worn; and

a second pair of magnetic members, each affixed to said pair of arms, said second pair of magnetic members each having a second engagement surface, said auxiliary spectacle frame capable of being removably affixed to said primary spectacle frame by bringing said first engagement surfaces of said pair of first magnetic members into magnetic engagement with said second engagement surfaces of said pair of second magnetic members, engagement of said first and second engagement surfaces occurring in a substantially horizontal plane when the eyeglass device is worn by the wearer.

48.    (New)  An eyeglass device as recited in claim 47, wherein said second pair of magnetic members are removably affixed on top of said first pair of magnetic members.

- 19 -

Attorney Docket No.: CONT-01013US1 SRM/BJM
bjm/cont/1013us1.010.wpd

49. **(New)** An eyeglass device capable of being supported on a face of a wearer, the eyeglass device comprising:

a primary spectacle frame for supporting primary lenses therein, said primary spectacle frame including a pair of side portions, each at opposed sides of said primary spectacle frame;

a first pair of magnetic members, affixed respectively to said pair of side portions, said first pair of magnetic members each having a first engaging surface;

an auxiliary spectacle frame for supporting auxiliary lenses therein and for being removably supported by said primary spectacle frames; and

a second pair of magnetic members affixed to said auxiliary spectacle frame, said second pair of magnetic members each having a second engagement surface, said auxiliary spectacle frame capable of being removably supported by said primary spectacle frame by bringing said first engagement surfaces of said pair of first magnetic members into magnetic engagement with said second engagement surfaces of said pair of second magnetic members, engagement of said first and second engagement surfaces occurring in a substantially horizontal plane when the eyeglass device is worn by the wearer.

50. **(New)** An eyeglass device as recited in claim 49, wherein said second pair of magnetic members are removably supported on top of said first pair of magnetic members.

51. **(New)** An eyeglass device capable of being supported on a face of a wearer, the eyeglass device comprising:

- 20 -

Attorney Docket No.: CONT-01013US1 SRM/BIM
bim/cont/1013us1.010.wpd

a primary spectacle frame for supporting primary lenses therein, said primary spectacle frame including a pair of side portions, each at opposed sides of said primary spectacle frame;

a first pair of magnetic members, affixed respectively to said pair of side portions, said first pair of magnetic members each having a first, substantially horizontal engaging surface when said primary spectacle frame is worn by the wearer;

an auxiliary spectacle frame for supporting auxiliary lenses therein and for being removably supported by said primary spectacle frames; and

a second pair of magnetic members affixed to said auxiliary spectacle frame, said second pair of magnetic members each having a second, substantially horizontal engagement surface when said auxiliary frame is supported by said primary frame, said auxiliary spectacle frame capable of being removably supported by said primary spectacle frame by bringing said first engagement surfaces of said pair of first magnetic members into magnetic engagement with said second engagement surfaces of said pair of second magnetic members.

52.   (New)  An eyeglass device as recited in claim 51, wherein said second pair of magnetic members are removably supported on top of said first pair of magnetic members.

53.   (New)  An eyeglass device capable of being supported on a face of a wearer, the eyeglass device comprising:

a primary spectacle frame for supporting primary lenses therein;

- 21 -

at least one first magnetic member affixed to said primary spectacle frame, said at least one first magnetic member having a first engaging surface;

an auxiliary spectacle frame for supporting auxiliary lenses therein and for being removably supported by said primary spectacle frames; and

at least one second magnetic member affixed to said auxiliary spectacle frame, said at least one second magnetic member having a second engagement surface, said auxiliary spectacle frame capable of being removably supported by said primary spectacle frame by bringing said first engagement surface of said at least one first magnetic member into magnetic engagement with said second engagement surface of said at least one second magnetic member, engagement of said first and second engagement surfaces occurring in a substantially horizontal plane when the eyeglass device is worn by the wearer.

54.     (New) An eyeglass device as recited in claim 53, wherein said at least one second magnetic member is removably supported on top of said at least one first magnetic member.

55.     (New) An eyeglass device comprising:

a primary spectacle frame for supporting primary lenses generally in a lens reference plane, and for supporting a pair of legs in a leg reference plane substantially perpendicular to said lens reference plane;

at least one first magnetic member affixed to said primary spectacle frame, said at least one first magnetic member having a first engaging surface;

- 22 -

an auxiliary spectacle frame for supporting auxiliary lenses therein and for being removably supported by said primary spectacle frames; and

at least one second magnetic member affixed to said auxiliary spectacle frame, said at least one second magnetic member having a second engagement surface, said auxiliary spectacle frame capable of being removably supported by said primary spectacle frame by bringing said first engagement surface of said at least one first magnetic member into magnetic engagement with said second engagement surface of said at least one second magnetic member, engagement of said first and second engagement surfaces occurring in a plane substantially parallel to said leg reference plane.

56. **(New)** An eyeglass device as recited in claim 55, wherein said at least one second magnetic member is removably supported on top of said at least one first magnetic member.

57. **(New)** A primary spectacle frame for supporting primary lenses therein, the primary spectacle frames being capable of supporting an auxiliary spectacle frame, the auxiliary spectacle frame including a first pair of magnetic members, the first pair of magnetic members each including a first engagement surface, the primary spectacle frame comprising:

a pair of spaced apart projections projecting toward a wearer when the primary spectacle frame is worn; and

a second pair of magnetic members, affixed respectively to said pair of projections, said second pair of magnetic members each having a second

Attorney Docket No.: CONT-01013US1 SRM/BIM
bin/cont/101300).010.wpd

engagement surface capable of engaging one of the first engagement surfaces of the first pair of magnetic members in a substantially horizontal plane.

58.   **(New)**   An eyeglass device as recited in claim 57, wherein the first pair of magnetic members are removably supported on top of said second pair of magnetic members.

59.   **(New)**   An auxiliary spectacle frame for supporting auxiliary lenses therein, the auxiliary spectacle frame being supported on a primary spectacle frame, the primary spectacle frame including a pair of primary lenses therein, and a first pair of magnetic members, said first pair of magnetic members each having a first engagement surface, said auxiliary spectacle frame comprising:

a pair of spaced apart arms projecting toward the wearer when the eyeglass device is worn; and

a second pair of magnetic members, affixed respectively to said pair of arms, said second pair of magnetic members each having a second engagement surface capable of engaging one of the first engagement surfaces of the first pair of magnetic members in a substantially horizontal plane.

60.   **(New)**   An eyeglass device as recited in claim 59, wherein said second pair of magnetic members are removably supported on top of the first pair of magnetic members.

- 24 -

Attorney Docket No.: CONT-01013US1 SRM/BIM

**61.**  **(New)  An eyeglass device, comprising:**

a primary spectacle frame for supporting primary lenses therein;

a pair of spaced apart projections mounted to said primary spectacle frame and projecting toward a wearer when the eyeglass device is worn;

a first pair of magnetic members, each affixed to said pair of projections, said first pair of magnetic members each having a first surface;

an auxiliary spectacle frame for supporting auxiliary lenses therein;

a pair of spaced apart arms mounted to said auxiliary spectacle frame and projecting toward the wearer when the eyeglass device is worn;

a second pair of magnetic members, each affixed to said pair of arms, said second pair of magnetic members each having a second surface, said auxiliary spectacle frame capable of being supported on said primary spectacle frame by mounting said second pair of magnetic members over said first pair of magnetic members, said first and second surfaces being oppositely directed so that said surfaces are juxtaposed.

**62.**  **(New)  An eyeglass device comprising a primary spectacle frame for supporting primary lenses therein, a pair of side arms connected at spaced locations to said primary frame, and operable to retain said primary frame on a user,**

an auxiliary frame for supporting auxiliary lenses therein and adopted to be positioned over said primary lenses, a pair of portions secured at spaced locations to said auxiliary frame and projecting rearwardly therefrom so as to be juxtaposed with selected portions of said primary frame, each of said portions having a magnetic member thereon with said magnetic members cooperating with

- 25 -

08/30/2000  16:07 FAX 415 362 2928   EDN&L   028

said primary frame to hold juxtaposed surfaces of said primary frame and projections in abutment to inhibit relative movement therebetween.

63. **(New)** An eyeglass device according to claim 62 wherein said auxiliary frame includes an abutment surface for engagement with an oppositely directed surface on said primary frame to inhibit relative movement therebetween.

64. **(New)** An eyeglass device according to claim 63 wherein said abutment surface is provided on each of said portions on said auxiliary frame.

65. **(New)** An eyeglass device according to claim 62 wherein said portions are located adjacent respective ones of said arms.

66. **(New)** An eyeglass device according to claim 65 wherein said auxiliary frame includes an abutment surface for engagement with an oppositely directed surface on said primary frame to inhibit relative movement therebetween.

- 26 -

## REMARKS

Claims 3-46 were previously presented in a Response to Office action dated July 6, 2000.

Claims 47-66 are added with the present amendment. No new matter has been presented.

The Examiner's prompt attention to this matter is greatly appreciated. Should further questions remain, the Examiner is invited to contact the undersigned attorney by telephone.

The Commissioner is authorized to charge any underpayment or credit any overpayment to Deposit Account No. 06-1325 for any matter in connection with this response, including any fee for extension of time, which may be required.

Respectfully submitted,

Date: __August 30, 2000__

By: _____
Brian L. Marcus
Reg. No. 34,511

FLIESLER, DUBB, MEYER & LOVEJOY LLP
Four Embarcadero Center, Suite 400
San Francisco, California 94111-4156
Telephone: (415) 362-3800

- 27 -

3

As shown in Figs. 3-7, the engaging surfaces between magnetic members 14 in primary spectacle frame 10 and the magnetic members 22 in the auxiliary spectacle frame 20 lie in a plane that is substantially horizontal when the eyeglass device is worn.

Referring next to FIGS 7 and 8, it is preferable that the projec-

tions 13 and the magnetic members 14 are located slightly lower than the upper portion of the primary spectacle frame 10; and the end portions of the arms 21 and/or the magnetic members 22 are slightly extended downward toward the projections 13 such that the arms 21 and the magnetic members 22 may hook on the primary spectacle frame 10 and such that the auxiliary spectacle frame 20 may further be stably supported and secured to the primary spectacle frame 10.

10

In one embodiment, as shown in FIG. 7, magnetic members 14 and 22 are not in contact with each other; magnetic members 14 and 22 are engaged with, but not supported on, each other. Instead, the arm 21 securing the magnetic member 22 is supported on an upper side portion of the primary spectacle frame 10. As shown in FIG 7, the upper side portion can be an upper part of the side portion securing the projection 13.

# FLIESLER
# DUBB
# MEYER &
# LOVEJOY LLP

FOUR EMBARCADERO CENTER, FOURTH FLOOR
SAN FRANCISCO, CALIFORNIA 94111-4156
TELEPHONE 415.362.3800
FACSIMILE 415.362.2928

# C O N F I D E N T I A L

**TO:**   Examiner Huy Mai

**FAX NO.:**   703.308.7722

**FROM:**   Brian I. Marcus, Esq.

**RE:**   Reissue Application No. 09/182,862; Our File: CONT-01013US1

**DATE:**   August 30, 2000        Total Pages :   31

Original will follow by mail:   No

If you do not receive all of the pages, please call   Lissette Miller   at 415.362.3800.

MESSAGE (if any):

FAX COPY RECEIVED

AUG 3 0 2000

TECHNOLOGY CENTER 2800

**NOTICE: This facsimile is *confidential and may be attorney-client privileged, work product, and/or otherwise exempt from disclosure* under applicable law.**

This facsimile is intended only for the addressee and those authorized by the addressee to receive it. Any use, dissemination, distribution or copying of this facsimile by any others is prohibited. Any others receiving this facsimile are requested to notify FLIESLER DUBB MEYER & LOVEJOY LLP immediately by telephone or fax and to return the original facsimile to FLIESLER DUBB MEYER & LOVEJOY LLP.

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| In re Reissue Application ) | REISSUE PATENT APPLICATION |
| ) | |
| Inventor: Richard Chao ) | |
| ) | Art Unit: 2873 |
| Reissue Application No.: 09/182,862 ) | |
| ) | Examiner: Mai, H. |
| Filed: 10/21/98 ) | |
| ) | |
| Patent No.: 5,568,207 ) | |
| ) | |
| Title: AUXILIARY LENSES FOR ) | |
| EYEGLASSES ) | |

**CERTIFICATE OF TRANSMISSION UNDER 37 C.F.R. § 1.8**

I hereby certify that this correspondence is being facsimile transmitted to the Patent and Trademark Office on August 30, 2000.

Brian L Marcus, Reg. No. 34,511
Signature Date: August 30, 2000

### TRANSMITTAL LETTER

FAX COPY RECEIVED
AUG 3 0 2000
TECHNOLOGY CENTER 2800

Assistant Commissioner for Patents
Washington, D.C. 20231

Sir:

Transmitted with this communication in connection with the above-identified application are the following:

**X**   A Supplemental Amendment.

**X**   Substitute Sheet.

**X**   A fee (of $531) for the addition of claims was sent with the Supplementary Amendment mailed on August 23, 2000.

- 1 -

08/30/2000 18:01 FAX 415 362-3828        FDM&L        ☐003

    __X__    The Commissioner is hereby authorized to charge underpayment of any fees associated with this communication to Deposit Account No. 06-1325. A duplicate copy of this authorization is enclosed.

Respectfully submitted,

Date: __August 30, 2000__       By: _____

                                   Brian I. Marcus
                                   Reg. No. 34,511

FLIESLER, DUBB, MEYER & LOVEJOY LLP
Four Embarcadero Center, Suite 400
San Francisco, California 94111-4156
Telephone: (415) 362-3800

- 2 -

Attorney Docket No.: CONT-01013US1 SRM/BIM
bim/cont/1013us1.011.wpd

UNITED STATES DEPARTMENT OF COMMERCE
**Patent and Trademark Office**
Address: COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

| APPLICATION NUMBER | FILING DATE | FIRST NAMED APPLICANT | ATTORNEY DOCKET NO. |
|---|---|---|---|
| | | | |

| EXAMINER |
|---|
| |

| ART UNIT | PAPER NUMBER |
|---|---|
| | 12 |

DATE MAILED:

## INTERVIEW SUMMARY

All participants (applicant, applicant's representative, PTO personnel):

(1) Huy Mai                              (3) _____

(2) Brian T. Marcus                      (4) _____

Date of Interview  9/7/00

Type: ☑ Telephonic  ☐ Personal (copy is given to ☐ applicant ☐ applicant's representative).

Exhibit shown or demonstration conducted: ☐ Yes  ☐ No  If yes, brief description: _____

Agreement ☐ was reached. ☑ was not reached.

Discussion:
Claims discussed: Claim 1, the reissue declaration, the newly added Fig. 8.

Identification of prior art discussed: _____

Description of the general nature of what was agreed to if an agreement was reached, or any other comments: Neither the attorney of record nor the examiner agree on any issue of the discussion. The examiner informed the attorney that the letter of non-responsive amendment mailed on June 6, 2000 does not address the non-entry of the informal amendments paper #'s 7 & 10 filed on 1/19/2000 and 7/10/2000.

(A fuller description, if necessary, and a copy of the amendments, if available, which the examiner agreed would render the claims allowable must be attached. Also, where no copy of the amendments which would render the claims allowable is available, a summary thereof must be attached.)

1. ☑ It is not necessary for applicant to provide a separate record of the substance of the interview.

Unless the paragraph above has been checked to indicate to the contrary, A FORMAL WRITTEN RESPONSE TO THE LAST OFFICE ACTION IS NOT WAIVED AND MUST INCLUDE THE SUBSTANCE OF THE INTERVIEW. (See MPEP Section 713.04). If a response to the last Office action has are ready been filed, APPLICANT IS GIVEN ONE MONTH FROM THIS INTERVIEW DATE TO FILE A STATEMENT OF THE SUBSTANCE OF THE INTERVIEW.

2. ☐ Since the Examiner's interview summary above (including any attachments) reflects a complete response to each of the objections, rejections and requirements that may be present in the last Office action, and since the claims are now allowable, this completed form is considered to fulfill the response requirements of the last Office action. Applicant is not relieved from providing a separate record of the interview unless box 1 above is also checked.

Examiner Note: You must sign this form unless it is an attachment to another form.

FORM PTOL-413 (REV. 1-98)

Huy Mai
**Primary Examiner**



**UNITED STATES DEPARTMENT OF COMMERCE**
**Patent and Trademark Office**
Address:   COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | | ATTORNEY DOCKET NO. |
|---|---|---|---|---|
| 09/182.862 | 10/21/98 | CHAO | R | CONT1013SRM/ |

| | EXAMINER |
|---|---|
| MMC1/1012 | MAI, H |

SHELDON R MEYER
FLIESLER DUBB MEYER AND LOVEJOY
FOUR EMBARCADERO CENTER
SUITE 400
SAN FRANCISCO CA 94111-4156

| ART UNIT | PAPER NUMBER |
|---|---|
| 2873 | 13 |

DATE MAILED:
10/12/00

Please find below and/or attached an Office communication concerning this application or proceeding.

Commissioner of Patents and Trademarks

( See the attached letter )

Attachment:
PTOL- 413 Telephone Interview Summary

1- File Copy

Application/Control Number: 09/182,862                         Page 2

Art Unit: 2873

### *Non-Responsive Amendment*

1.    The replies filed on January 19 and July 10, 2000 are not fully responsive to the prior Office action because of the following omission(s) or matter(s): The Applicant does not follow the rules 37 CFR 1.121 (see the amendments in reissue application). Accordingly, the amendments filed on Jan. 19 and Jul. 10, 2000 are not been entered because of these amendments being considered as informal amendments. However, the faxed supplemental amendment filed on Aug. 30, 2000 will be forwarded to the LIE for entering after mailing this letter. (NOTE: In response to this letter, the Applicant is advised to fully respond to the previous Office action, paper #5, mailed on July 15, 1999 as discussed on the telephone interview on Sept. 7, 2000.)  See 37 CFR 1.111.  Since the above-mentioned replies appear to be *bona fide*, applicant is given **ONE (1) MONTH or THIRTY (30) DAYS** from the mailing date of this notice, whichever is longer, within which to supply the omission or correction in order to avoid abandonment.  EXTENSIONS OF THIS TIME PERIOD MAY BE GRANTED UNDER 37 CFR 1.136(a).

2.    Any inquiry concerning this communication or earlier communications from the examiner should be directed to Huy K. Mai whose telephone number is (703) 308-4874. The fax phone number for the organization where this application or proceeding is assigned is (703) 308-7722 (or 7724).

Any inquiry of a general nature or relating to the status of this application or proceeding should be directed to the receptionist whose telephone number is (703) 308-0956.

HM/

September 22, 2000

Huy Mai
Primary Examiner

# Paper No. 14
# Returned to Sender

**UNITED STATES PATENT AND TRADEMARK OFFICE**

COMMISSIONER FOR PATENTS
UNITED STATES PATENT AND TRADEMARK OFFICE
WASHINGTON, D.C. 20231
www.uspto.gov

Paper No. 15

R. Joseph Trojan                          Protestor
TROJAN LAW OFFICES
9250 Wilshire Blvd., Suite 325
Beverly Hills, CA 90212                   **MAILED**

Sheldon R. Meyer                          Applicant       **FEB 0 5 2001**
FLIESLER DUBB MEYER AND LOVEJOY
Four Embarcadero Center                                   OFFICE OF DIRECTOR
Suite 400                                                 GROUP
San Francisco , CA 94111-4156

In re Application of:                           :
    Richard Chao                  :
Application No. 09/182,862                      :      DECISION RETURNING PAPERS
Filed: October 21, 1998                         :      FILED UNDER 37 C.F.R. § 1.291(a)
Title: Auxiliary Lenses for Eyeglasses          :

The protest filed on October 5, 2000, under 37 C.F.R. § 1.291(a) is before the Group Director for consideration.

The protest is **RETURNED**.

## BACKGROUND

On July 15, 2000, the examiner issued a first Office action.
On January 19, 2000, an extension of time (3 months) and an Amendment A was filed.
On June 6, 2000, a notice of a Non-Responsive Amendment was mailed.
On July 10, 2000, an Amendment B was filed.
On August 30, 2000, a supplemental Amendment C was filed.
On October 5, 2000, R. Joseph Trojan filed this protest.

REGULATIONS AND PRACTICE

    37 C.F.R. § 1.291 provides:

    (a)    Protests by a member of the public against pending applications will be referred

to the examiner having charge of the subject matter involved. A protest specifically identifying the application to which the protest is directed will be entered in the application file if:

      (1)   The protest is submitted prior to the mailing of a notice of allowance under 1.311; and

      (2)   The protest is either served upon the applicant in accordance with 1.248, or filed with the Office in duplicate in the event service is not possible.

(b)   Protests raising fraud or other inequitable conduct issues will be entered in the application file, generally without comment on those issues. Protests which do not adequately identify a pending patent application will be returned to the protestor and will not be further considered by the Office. A protest submitted in accordance with the second sentence of paragraph (a) of this section will be considered by the Office if the application is still pending when the protest and application file are brought before the examiner and it includes:

      (1)   A listing of the patents, publications, or other information relied upon;

      (2)   A concise explanation of the relevance of each listed item;

      (3)   A copy of each listed patent or publication or other item of information in written form or at least the pertinent portions thereof; and

      (4)   An English language translation of all the necessary and pertinent parts of any non-English language patent, publication, or other item of information in written form relied upon.

(c)   A member of the public filing a protest in an application under paragraph (a) of this section will not receive any communications from the Office relating to the protest, other than the return of a self-addressed postcard which the member of the public may include with the protest in order to receive an acknowledgment by the Office that the protest has been received. In the absence of a request by the Office, an applicant has no duty to, and need not, reply to a protest. The limited involvement of the member of the public filing a protest pursuant to paragraph (a) of this section ends with the filing of the protest, and no further submission on behalf of the protestor will be considered, except for additional prior art, or unless such submission raises new issues which could not have been earlier presented.

M.P.E.P. § 1901.03 provides in pertinent part:

... new protests which also argue Office actions or replies or any matter beyond the new issue should not be accepted. Improper protests will be returned by the Examining Group Director. While improper protests will be returned, a new protest by an earlier protestor will be proper and can be entered if it is clearly limited to new issues which could not have been earlier presented, and thereby constitutes a new protest.

Application No. 09/182,862                                                    Page -3-
Decision Returning Papers Filed Under 37 C.F.R. § 1.291(a)

## OPINION

Although a Reissue application file is open to the public, participation in the prosecution by a third party is prohibited by 37 C.F.R. § 1.291 (c). This protest includes comments directed to the response to the Office action filed January 19, 2000, and suggestions on how the response should be treated and addressed by the examiner. As such, it is hereby concluded that the comments in the protest are improper attempts to participate in the prosecution of the instant application.

Accordingly, pursuant to the M.P.E.P. § 1901.03, the protest will not be considered by the examiner and is being returned herewith.

Also, it is noted that the address at which the protest was served on the patent applicant is incorrect, a copy of the protest is being enclosed for the patent applicant.

A copy of this decision is being retained in the file record.

Inquiries regarding this decision should be directed to Clayton E. LaBalle at (703) 308-0519.

_Janice A. Falcone_

Janice A. Falcone, Director
Technology Center 2800
Semiconductors, Electrical and Optical
       Systems and Components

JAF/cel

Enclosures: protest filed October 5, 2000 to Protestor
           and copy of protest to Applicant

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| In re Reissue Application | ) **REISSUE PATENT APPLICATION** |
| | ) |
| Inventor:    Richard Chao | ) |
| | )   **Art Unit:**   2873 |
| Reissue Application No.: 09/182,862 | ) |
| | )   **Examiner:**   Mai, H. |
| Filed:    10/21/98 | ) |
| | ) |
| Patent No.:  5,568,207 | )   **Customer No.: 23910** |
| | ) |
| Title:    AUXILIARY LENSES FOR | ) |
|           EYEGLASSES | ) |

**CERTIFICATE OF MAILING UNDER 37 C.F.R. § 1.8**

I hereby certify that this correspondence is being deposited in the United States Postal Service with sufficient postage as first class mail in an envelope addressed to Commissioner for Patents, Washington, DC 20231, on November 22, 2000.

_____ (Attorney Signature)

Brian I. Marcus, Reg. No. 34,511
Signature Date: November 22, 2000

## PETITION FOR EXTENSION OF TIME UNDER 37 C.F.R. §1.136

Commissioner for Patents
Washington, D.C. 20231

Sir:

    In the Office Action dated October 12, 2000 , a shortened period for response was set to expire on November 12, 2000.

    Pursuant to 37 C.F.R. §1.136(a), Applicant(s) hereby petition(s) the Commissioner for an extension of time for responding to the Office Action up to and including December 12, 2000.

11/30/2000 RHARIS1  00000016 061325  09182862
01 FC:215       55.00 CH

- 1 -

Attorney Docket No.: CONT-01013US1 SRM/BJM
bim/cont/1013us1.014.wpd

The amount of the petition fee set by 37 C.F.R. §1.17 is determined as follows:

| Fee (Large Entity/Small Entity) | | Extended Month |
|---|---|---|
| X | $110.00/$55.00 | First |
| ___ | $390.00/$195.00 | Second |
| ___ | $890.00/$445.00 | Third |
| ___ | $1,390.00/$695.00 | Fourth |
| ___ | $1,890.00/$945.00 | Fifth |

TOTAL PETITION FEE $____55.00____

The TOTAL PETITION FEE is included with the payment of other papers filed together with this petition.

The Commissioner is authorized to charge any underpayment or credit any overpayment associated with this communication to Deposit Account No. 06-1325. A duplicate copy of this authorization is enclosed.

The other papers enclosed or associated with this communication include:

_____    A reply to the Office action was previously filed on _____.

__X___    A reply to the Office action is filed herewith.

Respectfully submitted,

Date:  November 22, 2000          By: _____
                                       Brian I. Marcus
                                       Reg. No. 34,511

FLIESLER, DUBB, MEYER & LOVEJOY LLP
Four Embarcadero Center, Suite 400
San Francisco, California 94111-4156
Telephone: (415) 362-3800

- 2 -

Attorney Docket No.: CONT-01013US1 SRM/BIM
bim/cont/1013us1.014.wpd



# IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| In re Reissue Application | ) REISSUE PATENT APPLICATION |
| | ) |
| Inventor:    Richard Chao | ) |
| | )        Art Unit:    2873 |
| Reissue Application No.: 09/182,862 | ) |
| | )        Examiner:    Mai, H. |
| Filed:    10/21/98 | ) |
| | ) |
| Patent No.:    5,568,207 | )        **Customer No.: 23910** |
| | ) |
| Title:    AUXILIARY LENSES FOR | ) |
| EYEGLASSES | ) |
| | ) |

**CERTIFICATE OF MAILING UNDER 37 C.F.R. § 1.8**

I hereby certify that this correspondence is being deposited in the United States Postal Service with sufficient postage as first class mail in an envelope addressed to Commissioner for Patents, Washington, DC 20231, on November 22, 2000.

_____ (Attorney Signature)

Brian I. Marcus, Reg. No. 34,511
Signature Date: November 22, 2000

## TRANSMITTAL LETTER

Assistant Commissioner for Patents
Washington, D.C.  20231

Sir:

Transmitted with this communication in connection with the above-identified application are the following:

 X    A Response under 37 C.F.R. §1.111 to the Office Action dated October 12, 2000.

 _    A Response under 37 C.F.R. §1.116 to the Office Action dated ___.

 X    A Petition for an Extension of Time under 37 C.F.R. §1.136.

 X    First Declaration of Richard J. Samuels.

 X    A Letter to Official Draftsperson including amended Fig. 8.

- 1 -

The fee associated with this communication has been calculated as shown below:

\_\_\_  No fee is required with this communication.

\_\_\_  Small entity status of this application under 37 C.F.R. §1.9 and §1.27 has been established.

 X   A fee for extension of time for response under 37 C.F.R. §1.136 filed within  one  month(s) after the original time for response of $ 55.00  is due.

\_\_\_  A fee of $240.00 is due for the submission of the accompanying Information Disclosure Statement.

\_\_\_  A fee for addition of claims under 37 C.F.R. §1.16 is due as follows:

| Claims Remaining After Amendment | Highest Previously Paid For | Number Extra | Rate Small Entity/ Other Than Small Entity | |
|---|---|---|---|---|
| Total Claims  66  - | 66  = | 0 * X | $ 9.00 $18.00 = | $ -0- |
| Independent Claims  25  - | 25  = | 0 * X | $40.00 $80.00 = | $ -0- |
| First Presentation of Multiple Dependent Claim(s) \_\_\_ | | | $135.00 $270.00= | $ |

*If the difference is less than zero, enter "0".

Additional Fee=     $    -0-

The total fee required with this communication is $ 55.00  and is to be paid as follows:

 X   Please charge Deposit Account No. 06-1325 in the amount of $ 55.00  .  A duplicate copy of this authorization is enclosed.

\_\_\_  A check in the amount of $\_\_\_ is enclosed.

- 2 -

__X__   The Commissioner is hereby authorized to charge underpayment of any fees, including the following fees, associated with this communication or credit any overpayment to Deposit Account No. 06-1325. A duplicate copy of this authorization is enclosed.

    __X__   Any filing fees under 37 C.F.R. §1.16 for the presentation of additional claims.

    __X__   Any patent application processing fees under 37 C.F.R. §1.17 including any applicable fee for extension of time.

Respectfully submitted,

Date: __November 22, 2000__      By: _____

                               Brian I. Marcus
                               Reg. No. 34,511

FLIESLER, DUBB, MEYER & LOVEJOY LLP
Four Embarcadero Center, Suite 400
San Francisco, California 94111-4156
Telephone: (415) 362-3800

Attorney Docket No.: CONT-01013US1 SRM/BIM
bim/cont/1013us1.013.wpd

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Reissue Application )

Inventor:    Richard Chao )

Reissue Application No.: 09/182,862 )

Filed:        10/21/98 )

Patent No.:  5,568,207 )

Title:        AUXILIARY LENSES FOR
              EYEGLASSES )

) REISSUE PATENT APPLICATION

Art Unit:    2873

Examiner:   Mai, H.

---

CERTIFICATE OF MAILING UNDER 37 C.F.R. § 1.8

I hereby certify that this correspondence is being deposited in the United States Postal Service with sufficient postage as first class mail in an envelope addressed to Box Missing Parts, Assistant Commissioner for Patents, Washington, D.C. 20231, on November 22, 2000.

_____ (Attorney Signature)

Brian I. Marcus, Reg. No. 34,511
Signature Date: November 22, 2000

## RESPONSE TO OFFICE ACTION UNDER 37 C.F.R. § 1.111

Assistant Commissioner of Patents
Washington, D.C.  20231

Sir:

This RESPONSE A is in reply to the Office Action mailed ~~July 15, 1999.~~

### Amendments

Please amend the above-identified application as follows:

### In the Specification,

On column 2, after line 30, please replace "FIG. 8 illustrates another embodiment of a cross sectional view", with --FIG. 8 illustrates another embodiment of a part of a cross sectional view--.

- 1 -

At the top of Column 3, please insert:

As shown in Figs. 3-7, the engaging surfaces between magnetic members 14 in primary spectacle frame 10 and the magnetic members 22 in the auxiliary spectacle frame 20 lie in a plane that is substantially horizontal when the eyeglass device is worn.

In the Drawings:

A proposed drawing amendment to FIG. 8 is submitted to replace the original drawing sheet for FIG. 8.

In the Claims,

Please amend Claim 1.

Please add new Claims 3-66.

The claims have been reproduced in full for your convenience.

1.      **(Once Amended) An eyeglass device comprising:**

a primary spectacle frame for supporting primary lenses therein, said primary spectacle frame including two side portions each having an extension extended therefrom for pivotally coupling a leg means thereto, said primary spectacle frame including two rear and side portions each having a projection secured thereto, said primary spectacle frame including an upper side portion,

a pair of first magnetic members secured in said projections respectively,

an auxiliary spectacle frame for supporting auxiliary lenses therein, said auxiliary spectacle frame including two side portions each

- 2 -

having an arm extended therefrom, with at least one arm for extending over [and for engaging with] said upper side portion of said primary spectacle frame, and

a pair of second magnetic members secured to said arms respectively for engaging with said first magnetic members of said primary spectacle frame so as to secure said auxiliary spectacle frame to said primary spectacle frame,

at least one of said arms being [engaged with and] supported on said upper side portion of said primary spectacle frame so as to allow said auxiliary spectacle frame to be stably supported on said primary spectacle frame and so as to prevent said auxiliary spectacle frame from moving downward relative to said primary spectacle frame and so as to prevent said auxiliary spectacle frame from being disengaged from said primary spectacle frame.

2.   An eyeglass device according to Claim 1, wherein said projections and said first magnetic members are arranged lower than said upper side portion of said primary spectacle frame, said second magnetic members are extended downward toward said projections for hooking on said primary spectacle frame so as to further secure said auxiliary spectacle frame to said primary spectacle frame.

3.   (New) An eyeglass device as recited in Claim 1 wherein the first and the second magnetic members are magnets.

- 3 -

Attorney Docket No.: CONT-01013US1 SRM/BIM
bim/cont/1013us1.012.wpd

4. **(New)** An eyeglass device as recited in Claim 1 wherein:

the primary spectacle frame includes two upper side portions, each upper side portion for supporting one of said arms.

5. **(New)** An eyeglass device comprising:

a primary spectacle frame for supporting primary lenses therein;

the primary spectacle frame including two side portions;

each side portion having an extension extended therefrom for pivotally coupling a leg thereto;

the primary spectacle frame including a projection extending from each said side portion;

each projection securing a first magnetic member; and

the primary spectacle frame including an upper portion; and

an auxiliary spectacle frame for supporting auxiliary lenses therein;

the auxiliary spectacle frame including two auxiliary side portions;

each said auxiliary side portion having an arm extended therefrom;

with at least one arm being configured to extend over the upper portion of the primary spectacle frame;

each arm securing a second magnetic member;

each second magnetic member configured to engage with one of the first magnetic members of the primary spectacle frame; and

the upper portion supports at least one arm of the auxiliary frame.

- 4 -

Attorney Docket No.: CONT-01013US1 SRM/BIM
bim/cont/1013us1.012.wpd

6. **(New)** An eyeglass device as recited in Claim 5 wherein the upper portion is an upper part of one of the side portions of the primary frame.

7. **(New)** An eyeglass device as recited in Claim 5 wherein the first and the second magnetic members are magnets.

8. **(New)** An eyeglass device as recited in Claim 7 wherein the first magnetic members are not in contact with the second magnetic members.

9. **(New)** An eyeglass device as recited in Claim 8 wherein the upper portion is an upper part of one of the side portions of the primary frame.

10. **(New)** An eyeglass device comprising:

a primary spectacle frame for supporting primary lenses therein;

the primary spectacle frame including two side portions;

each side portion having an extension extended therefrom for pivotally coupling a leg thereto;

the primary spectacle frame including a projection extending from each said side portion;

each projection securing a first magnetic member; and

the primary spectacle frame including an upper means; and

an auxiliary spectacle frame for supporting auxiliary lenses therein;

- 5 -

the auxiliary spectacle frame including two auxiliary side portions;

each said auxiliary side portion having an arm extended therefrom;

with at least one arm being configured to extend over the upper means of the primary spectacle frame;

each arm securing a second magnetic member;

each second magnetic member configured to engage with one of the first magnetic members of the primary spectacle frame; and

the upper means supports at least one arm of the auxiliary frame.

11.  (New) An eyeglass device as recited in Claim 10 wherein;

the first and the second magnetic members are magnets; and

the upper means is an upper part of one of the side portions.

12.  (New) An eyeglass device comprising:

a primary spectacle frame for supporting primary lenses therein, with the lenses defining a vertical plane;

the primary spectacle frame including two side portions;

each side portion having an extension extended therefrom for pivotally coupling a leg thereto; and

the primary spectacle frame including two first magnets, each secured to one of the side portions of the primary frame; and

an auxiliary spectacle frame for supporting auxiliary lenses therein, and for disposing in front of the primary frame;

- 6 -

Attorney Docket No.: CONT-01013US1 SRM/BIM
bim/cont/1013us1.012.wpd

the auxiliary spectacle frame including two auxiliary side portions;
and

the auxiliary spectacle frame including two second magnets, each secured to one of the auxiliary side portions, for engaging on a horizontal position with one of the first magnets so as to secure the auxiliary frame to the primary frame.

13.    **(New)** An eyeglass device as recited in Claim 12 wherein:

the primary spectacle frame includes a projection extending from each of its side portion;

each projection secures one of the first magnets;

the primary spectacle frame includes an upper portion;

each said auxiliary side portion has an arm extended therefrom;

at least one arm is configured to extend over the upper portion of the primary spectacle frame;

each arm secures one of the second magnets; and

the upper portion is an upper part of one of the side portions of the primary spectacle frame.

14.    **(New)** A primary eyeglass device adapted to stably support an auxiliary spectacle frame, which includes two auxiliary side portions, each auxiliary side portion having an arm extended therefrom, and each arm securing a first magnetic member,

the primary eyeglass device comprising:

- 7 -

a primary spectacle frame for supporting primary lenses therein;

the primary spectacle frame including two primary side portions;

each side portion having an extension extended therefrom for pivotally coupling a leg thereto;

the primary spectacle frame including a projection extending from each said side portion;

each projection securing a second magnetic member;

the primary spectacle frame including an upper portion; and

when the primary frame is supporting the auxiliary frame,

each second magnetic member engages with one of the first magnetic members;

the upper portion being extended over by at least one arm of the auxiliary frame; and

the upper portion supports at least one arm of the auxiliary frame.

15.   **(New)** A primary eyeglass device as recited in Claim 14 wherein the upper portion is an upper part of one of the primary side portions.

- 8 -

16.   **(New)**  An auxiliary eyeglass device comprising:

an auxiliary spectacle frame for supporting auxiliary lenses therein;

the auxiliary spectacle frame including two auxiliary side portions;

each auxiliary side portion having an arm extended therefrom; and

each arm securing a first magnet;

the auxiliary spectacle frame being adapted to be stably supported on a primary spectacle frame, which includes two primary side portions, each side portion securing a second magnetic member, the primary spectacle frame also including an upper portion; and

when the auxiliary frame is supported by the primary frame,

each first magnet engages with one of the second magnetic members; and

at least one arm of the auxiliary frame extending over the upper portion.

17.   **(New)**  An auxiliary eyeglass device as recited in Claim 16 wherein when the auxiliary frame is supported by the primary frame, at least one arm of the auxiliary frame is supported by the upper portion of the primary frame, which is an upper part of one of the primary side portions.

18.   **(New)**  An auxiliary eyeglass device adapted to be stably supported on a primary spectacle frame, which includes two primary side portions, each said side portion securing a first magnetic member, the primary spectacle

- 9 -

frame also including an upper portion, the auxiliary eyeglass device comprising:

an auxiliary spectacle frame for supporting auxiliary lenses therein;

the auxiliary spectacle frame including two auxiliary side portions;

each auxiliary side portion having an arm extended therefrom;

each arm securing a second magnet; and

when the auxiliary frame is supported by the primary frame,

each second magnet engages with one of the first magnetic members of the primary spectacle frame; and

at least one arm of the auxiliary frame extending over the upper portion.

19.   **(New)** An auxiliary eyeglass device as recited in Claim 18 wherein when the auxiliary frame is supported by the primary frame, at least one arm of the auxiliary frame is supported by the upper portion of the primary frame, which is an upper part of one of the primary side portions.

20.   **(New)** A primary eyeglass device comprising:

a primary spectacle frame for supporting primary lenses therein;

the primary spectacle frame including two primary side portions;

each side portion having an extension extended therefrom for pivotally coupling a leg thereto;

- 10 -

the primary spectacle frame including a projection extending from each said side portion;

each projection securing a first magnet; and

the primary spectacle frame including an upper portion;

the primary frame adapted to stably support an auxiliary spectacle frame, which includes two auxiliary side portions each securing a second magnetic member; and

when the primary spectacle frame is supporting the auxiliary spectacle frame,

the upper portion is extended over by at least one of the auxiliary side portions;

the upper portion supports at least one of the auxiliary side portions; and

each first magnet engages with one of the second magnetic members.

21.   (New) A primary eyeglass device as recited in Claim 20 wherein the upper portion is an upper part of one of the primary side portions.

22.   (New) A primary eyeglass device adapted to stably support an auxiliary spectacle frame, the auxiliary spectacle frame for supporting auxiliary lenses therein, and for disposing in front of the primary frame, the auxiliary spectacle frame including two auxiliary side portions, each

- 11 -

auxiliary side portion having an arm extended therefrom, and each arm securing a first magnet,

the primary eyeglass device comprising:

a primary spectacle frame for supporting primary lenses therein;

the primary spectacle frame including two side portions;

each of the two side portions having an extension extended therefrom for pivotally coupling a leg thereto;

the primary spectacle frame including a projection extending from each said side portion;

each projection securing a second magnet; and

when the primary frame is supporting the auxiliary frame,

each second magnet is coupled to, but not in contact with, one of the first magnets on a horizontal position so as to secure the auxiliary frame to the primary frame; and

the auxiliary frame is supported by at least an upper portion of the primary frame.

23.  (New) An eyeglass device as recited in Claim 4 wherein each upper side portion is an upper part of one of the side portions of the primary spectacle frame.

24.  (New) An eyeglass device as recited in Claim 23 wherein the magnetic members are magnets.

- 12 -

25.   **(New)**  An eyeglass device as recited in Claim 1 wherein at least the end portion of one arm extends downward toward one of the projections for hooking on the primary spectacle frame so as to further stably support and secure the auxiliary spectacle frame to the primary spectacle frame.

26.   **(New)**  An eyeglass device as recited in Claim 5 wherein at least the end portion of one arm extends downward toward one of the projections for hooking on the primary spectacle frame such that the auxiliary spectacle frame is further stably supported and secured to the primary spectacle frame.

27.   **(New)**  An eyeglass device as recited in Claim 10 wherein at least the end portion of one arm extends downward toward one of the projections for hooking on the primary spectacle frame such that the auxiliary spectacle frame is further stably supported and secured to the primary spectacle frame.

28.   **(New)**  An eyeglass device as recited in Claim 12 wherein at least the end portion of one auxiliary side portion extends downward toward one of the side portions of the primary spectacle frame for hooking on the primary spectacle frame such that the auxiliary spectacle frame is further stably supported and secured to the primary spectacle frame.

- 13 -

Attorney Docket No.: CONT-01013US1 SRM/BIM
bim/cont/1013us1.012.wpd

29.   **(New)**  An auxiliary eyeglass device as recited in Claim 16 wherein when the auxiliary frame is supported by the primary frame, at least the end portion of one arm extends downward toward one of the side portions of the primary spectacle frame for hooking on the primary spectacle frame such that the auxiliary spectacle frame can be further stably supported and secured to the primary spectacle frame.

30.   **(New)**  An auxiliary eyeglass device as recited in Claim 18 wherein when the auxiliary frame is supported by the primary frame, at least the end portion of one arm extends downward toward one of the side portions of the primary spectacle frame for hooking on the primary spectacle frame such that the auxiliary spectacle frame can be further stably supported and secured to the primary spectacle frame.

31.   **(New)**  An eyeglass device as recited in Claim 25 wherein the first and the second magnetic members are magnets.

32.   **(New)**  An eyeglass device as recited in Claim 26 wherein the first and the second magnetic members are magnets.

33.   **(New)**  An eyeglass device as recited in Claim 27 wherein the first and the second magnetic members are magnets.

34.   **(New)**  An eyeglass device comprising:

- 14 -

a primary frame for supporting primary lenses therein, with the lenses defining a vertical plane;

the primary spectacle frame including two side portions;

each side portion having an extension extended therefrom for pivotally coupling a leg thereto; and

the primary spectacle frame including two first magnets, each secured to one of the side portions of the primary frame; and

an auxiliary frame for supporting auxiliary lenses therein, and for disposing in front of the primary frame;

the auxiliary spectacle frame including two auxiliary side portions; and

the auxiliary frame including two second magnets, each secured to one of the auxiliary side portions, for coupling on a horizontal position with one of the first magnets so as to secure the auxiliary frame to the primary frame.

35.   (New) An eyeglass device comprising:

a spectacle primary frame for supporting primary lenses therein, with the primary lenses defining a vertical plane;

the primary spectacle frame including two side portions;

each side portion having an extension extended therefrom for pivotally coupling a leg thereto; and

- 15 -

the primary spectacle frame including two first magnetic members, each secured to one of the side portions of the primary frame; and

an auxiliary spectacle frame for supporting auxiliary lenses therein, and for disposing in front of the primary frame;

the auxiliary spectacle frame including two auxiliary side portions;

the auxiliary frame including two second magnetic members, each secured to one of the auxiliary side portions, for coupling on a horizontal position but not in contact, with one of the first magnetic members so as to secure the auxiliary frame to the primary frame; and

the auxiliary spectacle frame being supported by at least an upper portion of the primary spectacle frame.

36. **(New)** An eyeglass device comprising:

a primary spectacle frame for supporting primary lenses therein;

the primary spectacle frame including two side portions;

each side portion having an extension extended therefrom for pivotally coupling a leg thereto; and

the primary spectacle frame including two first magnetic members, each secured to one of the side portions of the primary frame; and

an auxiliary spectacle frame for supporting auxiliary lenses therein, and for disposing in front of the primary frame;

- 16 -

the auxiliary spectacle frame including two auxiliary side portions; and

the auxiliary spectacle frame including two second magnetic members, each secured to one of the auxiliary side portions, for coupling on a horizontal position with one of the first magnetic members so as to secure the auxiliary frame to the primary frame, the horizontal position being substantially perpendicular to a front surface of the primary frame.

37.  **(New)** An eyeglass device as recited in Claim 36 wherein the second magnetic members are magnets.

38.  **(New)** An eyeglass device as recited in Claim 36 wherein the first magnetic members are magnets.

39.  **(New)** An eyeglass device as recited in Claim 36 wherein the first and the second magnetic members are magnets.

40.  **(New)** An eyeglass device as recited in Claim 36 wherein the first magnetic members are not in contact with the second magnetic members.

41.  **(New)** An eyeglass device as recited in Claim 39 wherein the first magnetic members are not in contact with the second magnetic members.

- 17 -

Attorney Docket No.: CONT-01013US1 SRM/BJM
bjm/cont/1013us1.012.wpd

42. **(New)** An eyeglass device as recited in Claim 36 further comprising at least one projection extending from said primary frame, said projection being configured to secure one of said first magnetic members.

43. **(New)** An eyeglass device comprising:

a primary spectacle frame for supporting primary lenses therein;

the primary spectacle frame including two side portions;

each side portion having an extension extended therefrom for pivotally coupling a leg thereto;

the primary spectacle frame including a projection extending from each said side portion;

each projection securing a first magnetic member; and

the primary spectacle frame including an upper portion; and

an auxiliary spectacle frame for supporting auxiliary lenses therein;

the auxiliary spectacle frame including two auxiliary side portions;

each said auxiliary side portion having an arm extended therefrom;

with at least one arm being configured to extend over the upper portion of the primary spectacle frame;

each arm securing a second magnetic member;

each second magnetic member configured to couple with one of the first magnetic members of the primary spectacle frame; and

the upper portion supports at least one arm of the auxiliary frame.

- 18 -

44.     **(New)** An auxiliary eyeglass device comprising:

an auxiliary spectacle frame for supporting auxiliary lenses therein;

the auxiliary spectacle frame including two auxiliary side portions;

each auxiliary side portion having an arm extended therefrom; and

each arm securing a first magnetic member;

the auxiliary spectacle frame being adapted to be stably supported on a primary spectacle frame, which includes two primary side portions, each side portion securing a second magnetic member, the primary spectacle frame also including an upper portion; and

when the auxiliary frame is supported by the primary frame,

each first magnetic member engages with one of the second magnetic members; and

at least one arm of the auxiliary frame extending over the upper portion.

45.     **(New)**  A primary eyeglass device for securing an auxiliary spectacle frame, which includes two auxiliary side portions, each auxiliary side portion securing to a first magnetic member, the primary eyeglass device comprising:

a primary spectacle frame for supporting primary lenses therein;

the primary spectacle frame including two side portions;

each side portion having an extension extended therefrom for pivotally coupling a leg thereto;

- 19 -

Attorney Docket No.: CONT-01013US1 SRM/BIM
bim/cont/1013us1.012.wpd

the primary spectacle frame including two first magnetic members, each secured to one of the side portions of the primary spectacle frame; and

when the auxiliary spectacle frame is secured to the primary spectacle frame, each second magnetic member couples on a horizontal position with one of the first magnetic members, the horizontal position being substantially perpendicular to a front surface of the primary frame.

46.   **(New)** An auxiliary eyeglass device adapted to be secured to a primary spectacle frame, which includes two primary side portions, each said side portion securing a first magnetic member, the auxiliary eyeglass device comprising:

an auxiliary spectacle frame for supporting auxiliary lenses therein;

the auxiliary spectacle frame including two auxiliary side portions;

each auxiliary side portion configured to secure a second magnetic member; and

when the auxiliary frame is secured to the primary frame, each second magnetic member couples on a horizontal position with one of the first magnetic members of the primary spectacle frame, the horizontal position being substantially perpendicular to a front surface of the auxiliary frame.

47.   **(New)** An eyeglass device, comprising:

- 20 -

Attorney Docket No.: CONT-01013US1 SRM/BIM
bim/cont/1013us1.012.wpd

a primary spectacle frame for supporting primary lenses therein;

a pair of spaced apart projections mounted to said primary spectacle frame and projecting toward a wearer when the eyeglass device is worn;

a first pair of magnetic members, each affixed to said pair of projections, said first pair of magnetic members each having a first engagement surface;

an auxiliary spectacle frame for supporting auxiliary lenses therein;

a pair of spaced apart arms mounted to said auxiliary spectacle frame and projecting toward the wearer when the eyeglass device is worn; and

a second pair of magnetic members, each affixed to said pair of arms, said second pair of magnetic members each having a second engagement surface, said auxiliary spectacle frame capable of being removably affixed to said primary spectacle frame by bringing said first engagement surfaces of said pair of first magnetic members into magnetic engagement with said second engagement surfaces of said pair of second magnetic members, engagement of said first and second engagement surfaces occurring in a substantially horizontal plane when the eyeglass device is worn by the wearer.

Attorney Docket No.: CON1-01013US1 SRM/BIM
bim/cont/1013us1.012.wpd

48.   **(New)**  An eyeglass device as recited in claim 47, wherein said second pair of magnetic members are removably affixed on top of said first pair of magnetic members.

49.   **(New)**  An eyeglass device capable of being supported on a face of a wearer, the eyeglass device comprising:

a primary spectacle frame for supporting primary lenses therein, said primary spectacle frame including a pair of side portions, each at opposed sides of said primary spectacle frame;

a first pair of magnetic members, affixed respectively to said pair of side portions, said first pair of magnetic members each having a first engaging surface;

an auxiliary spectacle frame for supporting auxiliary lenses therein and for being removably supported by said primary spectacle frames; and

a second pair of magnetic members affixed to said auxiliary spectacle frame, said second pair of magnetic members each having a second engagement surface, said auxiliary spectacle frame capable of being removably supported by said primary spectacle frame by bringing said first engagement surfaces of said pair of first magnetic members into magnetic engagement with said second engagement surfaces of said pair of second magnetic members, engagement of said first and second engagement surfaces occurring in a substantially horizontal plane when the eyeglass device is worn by the wearer.

- 22 -

50.　　**(New)**  An eyeglass device as recited in claim 49, wherein said second pair of magnetic members are removably supported on top of said first pair of magnetic members.

51.　　**(New)**  An eyeglass device capable of being supported on a face of a wearer, the eyeglass device comprising:

　　　　a primary spectacle frame for supporting primary lenses therein, said primary spectacle frame including a pair of side portions, each at opposed sides of said primary spectacle frame;

　　　　a first pair of magnetic members, affixed respectively to said pair of side portions, said first pair of magnetic members each having a first, substantially horizontal engaging surface when said primary spectacle frame is worn by the wearer;

　　　　an auxiliary spectacle frame for supporting auxiliary lenses therein and for being removably supported by said primary spectacle frames; and

　　　　a second pair of magnetic members affixed to said auxiliary spectacle frame, said second pair of magnetic members each having a second, substantially horizontal engagement surface when said auxiliary frame is supported by said primary frame, said auxiliary spectacle frame capable of being removably supported by said primary spectacle frame by bringing said first engagement surfaces of said pair of first magnetic members into magnetic engagement with said second engagement surfaces of said pair of second magnetic members.

- 23 -

Attorney Docket No.: CONT-01013US1 SRM/BJM
bim/cont/1013us1.012.wpd

52. **(New)** An eyeglass device as recited in claim 51, wherein said second pair of magnetic members are removably supported on top of said first pair of magnetic members.

53. **(New)** An eyeglass device capable of being supported on a face of a wearer, the eyeglass device comprising:

a primary spectacle frame for supporting primary lenses therein;

at least one first magnetic member affixed to said primary spectacle frame, said at least one first magnetic member having a first engaging surface;

an auxiliary spectacle frame for supporting auxiliary lenses therein and for being removably supported by said primary spectacle frames; and

at least one second magnetic member affixed to said auxiliary spectacle frame, said at least one second magnetic member having a second engagement surface, said auxiliary spectacle frame capable of being removably supported by said primary spectacle frame by bringing said first engagement surface of said at least one first magnetic member into magnetic engagement with said second engagement surface of said at least one second magnetic member, engagement of said first and second engagement surfaces occurring in a substantially horizontal plane when the eyeglass device is worn by the wearer.

- 24 -

Attorney Docket No.: CONT-01013US1 SRM/BIM
bim/cont/1013us1.012.wpd

54.　**(New)**  An eyeglass device as recited in claim 53, wherein said at least one second magnetic member is removably supported on top of said at least one first magnetic member.

55.　**(New)**  An eyeglass device comprising:

a primary spectacle frame for supporting primary lenses generally in a lens reference plane, and for supporting a pair of legs in a leg reference plane substantially perpendicular to said lens reference plane;

at least one first magnetic member affixed to said primary spectacle frame, said at least one first magnetic member having a first engaging surface;

an auxiliary spectacle frame for supporting auxiliary lenses therein and for being removably supported by said primary spectacle frames; and

at least one second magnetic member affixed to said auxiliary spectacle frame, said at least one second magnetic member having a second engagement surface, said auxiliary spectacle frame capable of being removably supported by said primary spectacle frame by bringing said first engagement surface of said at least one first magnetic member into magnetic engagement with said second engagement surface of said at least one second magnetic member, engagement of said first and second engagement surfaces occurring in a plane substantially parallel to said leg reference plane.

- 25 -

Attorney Docket No.: CONT-01013US1 SRM/BIM
bim/cont/1013us1.012 wpd

56.    **(New)** An eyeglass device as recited in claim 55, wherein said at least one second magnetic member is removably supported on top of said at least one first magnetic member.

57.    **(New)** A primary spectacle frame for supporting primary lenses therein, the primary spectacle frames being capable of supporting an auxiliary spectacle frame, the auxiliary spectacle frame including a first pair of magnetic members, the first pair of magnetic members each including a first engagement surface, the primary spectacle frame comprising:

    a pair of spaced apart projections projecting toward a wearer when the primary spectacle frame is worn; and

    a second pair of magnetic members, affixed respectively to said pair of projections, said second pair of magnetic members each having a second engagement surface capable of engaging one of the first engagement surfaces of the first pair of magnetic members in a substantially horizontal plane.

58.    **(New)** An eyeglass device as recited in claim 57, wherein the first pair of magnetic members are removably supported on top of said second pair of magnetic members.

59.    **(New)** An auxiliary spectacle frame for supporting auxiliary lenses therein, the auxiliary spectacle frame being supported on a primary spectacle frame, the primary spectacle frame including a pair of primary

- 26 -

lenses therein, and a first pair of magnetic members, said first pair of magnetic members each having a first engagement surface, said auxiliary spectacle frame comprising:

a pair of spaced apart arms projecting toward the wearer when the eyeglass device is worn; and

a second pair of magnetic members, affixed respectively to said pair of arms, said second pair of magnetic members each having a second engagement surface capable of engaging one of the first engagement surfaces of the first pair of magnetic members in a substantially horizontal plane.

60.   **(New)** An eyeglass device as recited in claim 59, wherein said second pair of magnetic members are removably supported on top of the first pair of magnetic members.

- 27 -

61. **(New)** An eyeglass device comprising:

a primary spectacle frame for supporting primary lenses therein;

a pair of spaced apart projections mounted to said primary spectacle frame and projecting toward a wearer when the eyeglass device is worn;

a first pair of magnetic members, each affixed to said pair of projections, said first pair of magnetic members each having a first surface;

an auxiliary spectacle frame for supporting auxiliary lenses therein;

a pair of spaced apart arms mounted to said auxiliary spectacle frame and projecting toward the wearer when the eyeglass device is worn;

a second pair of magnetic members, each affixed to said pair of arms, said second pair of magnetic members each having a second surface, said auxiliary spectacle frame capable of being supported on said primary spectacle frame by mounting said second pair of magnetic members over said first pair of magnetic members, said first and second surfaces being oppositely directed so that said surfaces are juxtaposed.

62. **(New)** An eyeglass device comprising a primary spectacle frame for supporting primary lenses therein, a pair of side arms connected at spaced locations to said primary frame, and operable to retain said primary frame on a user,

- 28 -

an auxiliary frame for supporting auxiliary lenses therein and adopted to be positioned over said primary lenses, a pair of portions secured at spaced locations to said auxiliary frame and projecting rearwardly therefrom so as to be juxtaposed with selected portions of said primary frame, each of said portions having a magnetic member thereon with said magnetic members cooperating with said primary frame to hold juxtaposed surfaces of said primary frame and projections in abutment to inhibit relative movement therebetween.

63.   **(New)**  An eyeglass device according to claim 62 wherein said auxiliary frame includes an abutment surface for engagement with an oppositely directed surface on said primary frame to inhibit relative movement therebetween.

64.   **(New)**  An eyeglass device according to claim 63 wherein said abutment surface is provided on each of said portions on said auxiliary frame.

65.   **(New)**  An eyeglass device according to claim 62 wherein said portions are located adjacent respective ones of said arms.

66.   **(New)**  An eyeglass device according to claim 65 wherein said auxiliary frame includes an abutment surface for engagement with an oppositely directed surface on said primary frame to inhibit relative movement therebetween.

- 29 -

## REMARKS

This Supplemental Response is filed in response to Paper No. 13. On September 7, 2000, the undersigned attorney had a telephonic interview with the Examiner. During that interview, the Examiner indicated that the reissue declaration filed in the application was defective for failure to state an error on which the reissue application is based. I indicated that this issue had been addressed in the January 14, 2000 response by Peter Tong. The Examiner indicated that the January 14, 2000 Response had not been entered into the Patent Office record. Despite over seven months having passed, this was the first time the Examiner indicated that the January 14, 2000 response had not been entered.

Regarding the assertion that the declaration fails to state an error, it was pointed out by the undersigned attorney that where an attorney fails to appreciate the full scope of an invention, the courts have held that this is a proper "error" on which filing a reissue may be based. Despite the judicial support, the Examiner nevertheless disagreed with this point.

The Examiner also indicated in the telephonic interview that the reissue application added new matter.

This Supplemental response is being filed so that the remarks presented in the January 14, 2000 response, and the claims added during the prosecution of the reissue application, may be considered.

In the Office Action dated July 15, 1999 (the last substantive Office Action issued in this application, referred to herein as "the Office Action"), the Examiner had rejected all of the claims, and has disapproved the proposed drawing.

- 30 -

Applicant appreciates the Examiner's detailed and meticulous comments in his Office Action to the above-identified application. For the reasons to be stated below, however, Applicant respectfully traverses the Examiner's rejections of the claims.

By this amendment, Applicant has added claims 3-66, enclosed a declaration of Professor Richard J. Samuels, and submitted a proposed drawing amendment to Figure 8. Subject to the approval of the Examiner, it is respectfully requested that the new drawing sheet be substituted for the originally filed drawing sheet for FIG. 8. Accordingly, claims 1-66 are now in the application. Applicant believes that no new matter has been introduced by the amendment.

## Reissue Declaration

### At Least One Error Has Been Identified

On page 2, the Office Action stated that the reissue declaration was defective because it failed to identify at least an error in the declaration. Applicant respectfully disagrees because Applicant has stated at least one error in the declaration.

"A reissue applicant must acknowledge the existence of an error in the specification, drawings, or claims, which error causes the original patent to be defective.... See MPEP § 1402 for a discussion of grounds for filing a reissue that may constitute the 'error' required by 35 U.S.C. 251.... Applicant need only specify in the reissue oath/declaration one of the errors upon which reissue is based. Where applicant specifies <u>one</u> such error, this requirement of a reissue oath/declaration is satisfied." MPEP § 1414, with emphasis added.

MPEP § 1402 states, with emphasis added, that: "In accordance with 35 U.S.C. 251, the error upon which a reissue is based must be one which causes the patent to be 'deemed wholly or partly inoperative or invalid ... by reason of the patentee claiming more or less than he had a right to claim in the patent.' .... The most common bases for filing a reissue applications are: (A)

- 31 -

the claims are too narrow or too broad .... <u>An attorney's failure to appreciate the full scope of the invention was held to be an error</u> correctable through reissue ...."

As stated in the MPEP, (1) Claims being too broad or too narrow is one of the most common bases for filing a reissue; (2) An attorney's failure to appreciate the full scope of the invention was held to be an error; and (3) Applicant only needs to specify one error in the declaration.

The Federal Circuit has applied even more liberal standards than an attorney's failure to appreciate the full scope, as shown in the following decision:

> "Similarly, in In re Wesseler, the CCPA stated that error is established where there is no evidence that the appellant intentionally omitted or abandoned the claimed subject matter. Thus, the CCPA has construed the term error under section 251 broadly. The Ninth Circuit employed a more rigid standard in *Riley v. Broadway-Hale Stores, Inc.*.... We decline to adopt the rigid standard applied in *Riley*, in favor of the more liberal approach taken by the CCPA." *Ball v. United States* 729 F.2d 1429, 1435, 221 USPQ 289, 294 (Fed. Cir. 1984).

In the declaration, Applicant states the following:

11.    Based on further investigation, I was advised that my Taiwan patent counsel failed to appreciate the full scope and breadth of the invention. I should both broaden and narrow my claims.

As discussed in the above paragraph 11, Applicant has identified at least one error, which is its Taiwan patent counsel's failure to appreciate the full scope and breadth of the invention. Such an error is correctable through reissue.

MPEP 1414 further explains with emphasis added, that: "If the initial reissue oath/declaration 'states at least one error' in the original patent, and, *in addition*, recites the specific corrective action taken in the reissue application, the oath/declaration would be considered acceptable, <u>even though the corrective action statement is not required</u>."

- 32 -

Following MPEP 1414's suggestion, Applicant further includes a number of corrective actions in the declaration. They are, for example, as follows:

12.     I was advised, for example, that (1) I should include as dependent claims magnetic members being magnets; (2) I should include as dependent claims two upper side portions, and the gap between the first magnetic members and the second magnetic members; (3) I should claim magnetic members engaging on a horizontal position; (4) I should claim primary spectacle frames without auxiliary frames; (5) I should claim auxiliary frames without primary spectacle frames;  (6) I should include as dependent claims the end portion of an arm extending downward for hooking on the primary spectacle frame; and (7) I should broaden the issued Claim 1.

Thus, Applicant not only has stated at least one error, but also a number of planned corrective actions to be taken in the reissue application, though the corrective action statement is not required.


Declaration Did Refer To The Reissue Specification and Claims

The Office Action further stated that the declaration was defective because of its paragraph 3, which states, "I have reviewed and understand the contents of the above-identified specification, including claims." The Office Action's argument was that in view of paragraph 3, the declaration referred only to the patent specification and patent claims, and not to the reissue specification and reissue claims. Applicant respectfully disagrees. Paragraph 17 of the declaration describes changes made in both the specification and the claims in the reissue. Paragraph 18 then states the following:

- 33 -

Attorney Docket No.: CONT-01013US1 SRM/BIM
bim/cont/1013us1.012.wpd

As a result of these corrections, the amended claims, the new claims and the amended specification more closely represent my invention.... My invention is better represented by the amended specification, the amended claim and the new claims for reissue.

Thus, Applicant, in the declaration, refers specifically to changes made in the reissue--Both in the reissue specification and the reissue claims. Not only has Applicant reviewed and understood the content of the reissue application, Applicant has reproduced the changes submitted in the reissue application in the declaration. The declaration that the amended claim, the new claims and the amended specification more closely represent his invention, indicates that Applicant has reviewed and understood the reissue specification and the reissue claims.

However, if the Examiner insists on Applicant submitting a supplemental reissue declaration on this issue, please so indicate.

New Matter Rejection

Magnetic Members Coupled and Not in Contact Is Not New Matter

The Office Action rejected Claims 8, 9, 22 and 35 based on the argument that nowhere in the original specification provided support for magnetic members being coupled, but not in contact, with each other. See the third paragraph on page 3 of the Office Action. Applicant respectfully disagrees.

As clearly shown in FIG. 7 of the '207 patent, the two magnetic members, 14 and 22, are in proximity of, coupled to, but not in contact with each other. Magnets are coupled to each other when they are in proximity of each other. The introduction of the phrase magnetic members coupled to each other cannot be considered new matter. Another reason why magnetic members coupling cannot be new matter is because there are numerous recitations of the magnetic members engaging with each other in the specification.

- 34 -

Attorney Docket No.: CONT-01013US1 SRM/BIM
bin/cont/1013us1.012.wpd

<u>End Portion Of An Arm Extended Downward Is Not New Matter</u>

In the fourth paragraph on page 3 of the Office Action, Claims 25-33 were rejected based on the argument that the original specification failed to disclose the "subject matter of the end portion of the arm of the auxiliary frame extended downward toward the projection for hooking on the primary spectacle frame".

Applicant respectfully disagrees. Lines 4-7, column 3 of the original specification state:

> [T]he end portions of the arms 21 ... are slightly extended downward toward the projections 13 such that the arms 21 ... may hook on the primary spectacle frame 10.

Thus, the original specification provides support for the subject matter of the end portion of the arm of the auxiliary frame extended downward toward the projection for hooking on the primary spectacle frame.

<u>Phrases Added In Pages 2 and 3 Are Not New Matter</u>

In the second half of the fourth paragraph on page 3 of the Office Action, phrases added in pages 2 and 3 of the original specification were considered new matter. Applicant again respectfully disagrees.

On page 2, Applicant has added the following paragraph:

> FIG. 8 illustrates another embodiment of a part of a cross sectional view taken along lines 7-7 of FIG. 6.

As to be explained below, the original FIG. 8 cannot be considered new matter. FIG. 8 has been amended to further eliminate any possibility of introducing any new matter. With FIG. 8 not being new matter, the added paragraph on page 2 cannot be new matter.

- 35 -

Attorney Docket No.: CONT-01013US1 SRM/BIM
bim/cont/1013us1.012.wpd

On page 3, Applicant added the following paragraph:

> In one embodiment, as shown in FIG. 7, magnetic members 14 and 22 are not in contact with each other; magnetic members 14 and 22 are engaged with, but not supported on, each other. Instead, the arm 21 securing the magnetic member 22 is supported on an upper side portion of the primary spectacle frame 10. As shown in FIG. 7, the upper side portion can be an upper part of the side portion securing the projection 13.

The above paragraph cannot be considered new matter because at least it is supported by FIG. 7 of the original specification. To more clearly show that no new matter has been introduced, Applicant has separated the above paragraph into the following sections.

(1)     Magnetic members 14 and 22 are not in contact with each other; magnetic members 14 and 22 are engaged with, but not supported on, each other.

(2)     Instead, the arm 21 securing the magnetic member 22 is supported on an upper side portion of the primary spectacle frame 10.

(3)     As shown in FIG. 7, the upper side portion can be an upper part of the side portion securing the projection 13.

In one embodiment, each of the above sections is identified in FIG. 7 as shown in the following drawing:



F I G. 7

Thus, the original FIG. 7 clearly supports all three sections. Regarding section 2, it is also supported by the original claim 1.

Attorney Docket No.: CONT-01013US1 SRM/BIM
bim/cont/1013us1.012.wpd

Securing Magnetic Members To The Side Portions Is Not New Matter

In the fifth paragraph on page 3 of the Office Action, the subject matter of securing the magnetic members to the side portions of the primary spectacle frame and of the auxiliary spectacle frame was considered not supported. Applicant respectfully disagrees.

For example, as shown in FIG. 3, each magnetic member is secured to a portion at each side of the primary frame. In other words, the subject matter of securing magnetic members to side portions of the primary frame is shown in FIG. 3. Similarly in FIG. 4, each magnetic member is secured to a portion at each side of the auxiliary frame. Again, the subject matter of securing magnetic members to side portions of the auxiliary frame is shown in FIG. 4.

Drawings Rejection

FIG. 8 was rejected as being new matter, based on the argument that the original disclosure did not support "the showing of the end portions, but not the magnetic member 22, of the arm extends downward toward the projection for hook on the primary spectacle frame."

The specification has recited the embodiment of the end portions of the arm extending downward toward the projection for hooking on the primary spectacle frame. This is shown, for example, in the following:

> "[T]he end portions of the arms 21 ... extended downward toward the projections 13 such that the arms 21 ... may hook on the primary spectacle frame 10..." See Col. 3, lines 4-7 of the specification.

The rejection stated that, "the magnetic member 22, of the arm extends downward toward the projection for hook on the primary spectacle frame." The rejection may be somehow related to the magnetic member 22 in the figure. To expedite the prosecution of this reissue application,

- 37 -

Attorney Docket No.: CONT-01013US1 SRM/BIM
bim/cont/1013us1.012.wpd

Applicant has amended FIG. 8 so that it does not show the magnetic members.  Upon the Examiner's acceptance of the amendment, Applicant will submit the formal drawing for Figure 8.

Rejections Based on § 112

### Claims 8, 9, 22 and 23 on Coupling and No Contact

In the first paragraph on page 5 of the Office Action, Claims 8, 9, 22, 35 were rejected based on the argument that (1) "the original specification fails to disclose and/or discuss the reasons why the first magnetic member being coupled, but not in contact, with the second magnetic member;" and (2) The structure "renders how the auxiliary spectacle frame being stably supported on the primary frame as now claimed." ·

35 USC 112 states that:

> The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

The applicable statutes, and the teachings in the MPEP, do not require the discussion of reasons behind an embodiment before one can claim the embodiment.  Whether or not the reasons behind the embodiment are discussed in the specification is immaterial.

Regarding the second argument, Applicant does not fully understand the rejection.  At least in one embodiment, the structure does not require the magnetic members to be in contact in order to have the auxiliary frame stably supported by the primary frame.  To expedite the prosecution, Applicant has amended Claims 22 and 35 to include the limitation of the auxiliary frame being supported by at least an upper portion of the primary frame.

- 38 -

Attorney Docket No.: CONT-01013US1 SRM/BIM
bim/cont/1013us1.012.wpd

### End Portion Extended Downward as in Claims 25-33

In the second paragraph on page 5 of the Office Action, Claims 25-33 were rejected based on the argument that the original specification failed "to disclose the subject matter of the end portion of the arm of the auxiliary frame extended downward toward the projection for hooking on the primary spectacle frame". Applicant respectfully disagrees. As explained above in the New Matter Rejection section, the end portion of the arm extended downward has been fully disclosed in the specification.

### Newly Added Phrases in Pages 2 and 3

Also in the second paragraph on page 5 of the Office Action, Claims 25-33 were rejected based on the argument that the added phrases in pages 2 and 3 were new matter. As explained above in the New Matter Rejection section, the paragraphs introduced in pages 2 and 3 have full support in the original specification.

### Securing Magnetic Members to the Side Portions as in Claims 12, 16, 18, 20, 34 and 35

In the third paragraph on page 5 of the Office Action, Claims 12, 16, 18, 20, 34 and 35 were rejected based on the argument that the original specification failed to disclose the subject matter of securing the magnetic members to the side portions of the primary spectacle frame and of the auxiliary frame. Again, as explained above in the New Matter Rejection section, such disclosures have full support in the original specification.

### Claims 1, 5, 10, 12, 14, 16, 18, 20, 22, 34 and 35: At Least One Arm and Engaged With

In the paragraph bridging page 5 and 6, together with the first paragraph in page 6 of the Office Action, Claims 1, 5, 10, 12, 14, 16, 18, 20, 22, 34 and 35 were rejected based on the

- 39 -

following argument: "[A]dding the phrase 'at least one of' before the phrase 'said arms' and deleting the function 'engaged with' of the arms ... render the invention, as a whole, as claimed become inoperative." The reasons cited in the Office Action are that (a)"[T]he 'at least one arms' may be supported on along the upper side portion of the lens rim of the primary spectacle frame"; and (b) "The above-mentioned adding and deleting also render whether or not all the functions 'so as to allow ... and so as to prevent ... and so as to prevent ...' (claim 1, lines 23-29) are existed."

Applicant does not understand how the amendments would have rendered the invention inoperative.

Before the amendment, Claim 1 recited the following limitations:

> said auxiliary frame including two side portions each having an arm extended therefrom for extending over and for engaging with said upper side portion of said primary spectacle frame, ... said arms being engaged with and supported on said upper side portion of said primary spectacle frame ...

Claim 1, before amendment, includes the limitation of two side portions of the auxiliary frame, each having an arm extending over, engaging with and supported on the upper side portion of the primary frame. Applicant amends the claim to state that "at least one arm" is supported on the upper side portion.

The Office Action seems to argue such an amendment is defective because, "the 'at least one of said arms' may be supported on along the upper side portion of the lens rim of the primary spectacle frame." Applicant does not understand how such a modification would render the invention inoperative. Applicant respectfully requests the Examiner to clarify the rationale behind the rejection so as to help Applicant respond to the rejection.

Second, the removal of the words, "engaged with", also would not render the invention inoperative. As shown in FIG. 6, one embodiment of the invention depicts an arm extending

- 40 -

over a side portion. Applicant does not understand the reason why removing the words, "engaging with", but leaving the term, "extending over" in the claim would render the invention inoperative. Also, according to the second edition of Random House Unabridged Dictionary, the word "engage" can have the following meanings:

    2. to secure for aid, employment, use, etc...

    3. to attract and hold fast ...

    4. to attract or please ...

    5. to attach or secure...

In one embodiment, the word, engaging, can be interpreted to mean "attaching". One embodiment of the invention, as shown in FIG. 7, depicts an arm being supported by an upper side portion. Again, Applicant does not understand why removing the words, "engaged with", but leaving the terms, "supported on", in the claim would render the invention inoperative.

The Office Action further stated that the modification also rendered "whether or not all the functions 'so as to allow ... and so as to prevent ... and so as to prevent ...' (claim 1, lines 23-29) are existed". Applicant does not fully understand the argument. The Office Action referred to the following three functions:

    a.    Allow said auxiliary spectacle frame to be stably supported on said primary spectacle frame;

    b.    Prevent said auxiliary spectacle frame from moving downward relative to said primary spectacle frame; and

    c.    Prevent said auxiliary spectacle frame from being disengaged from said primary spectacle frame.

Though the amendments should not have affected these functions, Applicant respectfully requests the Examiner to clarify the rejection so as to help Applicant respond.

- 41 -

<u>Claims 5 and 10: The Term Configured to Engage</u>

In the last paragraph on page 6, Claims 5 and 10 were rejected because "the limitation 'configured to engage' (claim 5, line 17 and claim 10, line 16) is unclear." In one embodiment, the sentence, "X is configured to engage with Y", in a mechanical setting typically denotes that X includes a structural configuration to engage with Y. The meaning of the limitation "configured to engage" should be quite clear. Applicant again requests the Examiner to clarify the rejection so that Applicant can better respond.

<u>Claims 8 and 22: Coupled, But Not in Contact</u>

In the last paragraph on page 6, Claims 8 and 22 were rejected because "it is unclear how the second magnetic member coupled, but not in contact, with the first magnetic member in order to the auxiliary frame stably supported by the primary frame as claimed in claim 8 and 22." It seems the argument is that the auxiliary frame cannot be stably supported by the primary frame if the second magnetic member is coupled to, but not in contact, with the first magnetic member. This issue has previously been addressed above in the New Matter Rejection section.

<u>Claims 6, 9 and 13: The Side Portions of The Primary Frame</u>

Claims 6, 9 and 13 were rejected in view of possible ambiguity in the claims. Applicant has followed the Examiner's suggestion, and has amended those claims accordingly, with the "side portions" replaced by the "side portions of the primary frame."

<u>Claim 22: Each Of The Two Side Portions</u>

In the last paragraph on page 6, the feature "each side portion" has been replaced by "each of the two side portions" to clarify any ambiguity in the claim.

- 42 -

<u>Claims 12, 13 and 35: Primary and Auxiliary Spectacle Frame</u>

In the last paragraph on page 6, claims 12, 13 and 35 were rejected because the terms primary and auxiliary spectacle frames lacked antecedent basis. Applicant has amended the claims accordingly.

<u>Claims 12, 34 and 35: Engaging/Coupling On A Horizontal Position</u>

In the last paragraph on page 6, Claims 12, 34 and 35 were rejected because "of 'engaging on a horizontal position' and of 'coupling on a horizontal position, but not in contact with...'. The structure of the eyeglass device in claims 12, 34 and 35 does not draw such a horizontal position."

Applicant does not fully understand the rejection, but believes that the rejection may be on the issue of the term horizontal being relative. To prevent any possibility of ambiguity, Applicant has amended Claims 12, 34 and 35 to include the limitation of the lenses in the primary frame defining a vertical plane, as opposed to horizontal coupling or engagement as specified. Such structural limitations should be sufficient to clarify any indefiniteness, if there were one.

<u>Means Limitation</u>

In the first paragraph on page 7, the Office Action rejected claim 10 based on the argument that Applicant is attempting to use "a 'means' clause to recite a claim element as a means for performing a specific function. However, since no function was specified by the word preceding 'means' it is impossible to determine the equivalent of the claim element, as set forth by 35 U.S.C. 112, sixth paragraph."

- 43 -

Attorney Docket No.: CONT-01013US1 SRM/BIM
bim/cont/1013us1.012.wpd

The Office Action might have misinterpreted 35 U.S.C. § 112, ¶ 6, regarding means-plus-function claim.

While there is a widespread convention of using the term "means" to express a claim element in means-plus-function language, the absence or presence of the word "means" in the claim does not seem to be dispositive on the issue whether the language is means-plus-function language. In *Haney v. Timesavers, Inc.*, 29 U.S.P.Q.2d 1605, 1607-09 (D. Or. 1993), a district court held that a claim element, "a double-drive mechanism . . . where the double-drive mechanism imparts at least one translational orbital movement superimposed on another movement . . . ," was expressed in means-plus-function terms governed by 35 U.S.C. § 112, ¶ 6, despite the fact that the term "means" was never used in the claim. In *AMP, Inc. v. Fujitsu Microelectronics, Inc.*, 853 F. Supp. 808, 820-21 (M.D. Pa. 1994), a district court held that the claim element, "bus solder tail means," in the patent at issue was not expressed in means-plus-function language even though the term "means" was used in the claim. Whether a claim element will be deemed expressed in means-plus-function language for the purposes of 35 U.S.C. § 112, ¶ 6 may not generally depend upon the use or non-use of the term "means" in the claim.

Regarding mechanical devices, the critical inquiry to determine whether a claim element is expressed in means-plus-function language may depend on whether that claim element is primarily described in terms of its function, and not its structure. *Haney*, 29 U.S.P.Q.2d at 1608 ("A functional claim element is an element that is described in terms of what it does, not by its structure."); *AMP*, 853 F. Supp. at 820 ("In those cases in which claim language is construed to be 'means plus function' language, the language refers to an indefinite structure, defining it only by what function it will perform."). If a functional element is interpreted literally, it might cover substantially every structure capable of performing the claimed function. The purpose of Section 112, ¶ 6 seems to prevent such coverage by limiting the functional element of the claim to cover

- 44 -

only the structure described in the specification and equivalents thereof. See *Haney*, 29 U.S.P.Q.2d at 1608. Thus, a claim element might be subject to the limitations of Section 112, ¶ 6, if it is primarily described in terms of function.

For mechanical devices, whether a claim element is deemed expressed in means-plus-function language and therefore subject to the limitations of Section 112, ¶ 6 might not depend on whether the term "means" is used in the claim language. Instead, a claim element might be governed by Section 112, ¶ 6, if it includes primarily a functional claim limitation, as opposed to a structural limitation.

Thus, Section 112, ¶ 6 does not seem to forbid Applicant from claiming "means" without a function, or a function without using the word "means". Section 112, ¶ 6 governs the interpretation of means-plus-function claims. Nowhere in the laws, whether in Section 112, ¶ 6 or other statutes, is there any limitation restricting Applicant from claiming with the word "means".

## Rejections Based on § 102

### Rejections Under Nishioka

In the last paragraph on page 7, the Office Action rejected Claims 12 and 34 under 35 U.S.C. 102(e) as being anticipated under U.S. Patent No. 5,642,177 by Nishioka (the "Nishioka Patent").

In the Nishioka Patent, the magnets 3 in the auxiliary frame 1 engage vertically with the magnets 7 in the primary frame. The engagement surfaces are parallel to the plane of the lenses. In Claims 12 and 34, the amendment should have removed any possibility of ambiguity. The engagement is on a horizontal position, as opposed to the vertical plane defined by the lenses in the primary frame.

- 45 -

Under Section 102, a claim is anticipated only if each and every element as set forth in the claim is found in a single prior art reference. *Constant v. Advanced Micro-Devices Inc.*, 848 F.2d 1560, 1570 (Fed. Cir. 1988). In other words, every limitation of a claim must identically appear in a single prior art reference for it to anticipate the claim. *In re Bond*, 910 F.2d 831, 832 (Fed. Cir. 1990).

Since the Nishioka Patent at least has not disclosed the horizontal engagement position, the amended Claims 12 and 34 could not have been anticipated by Nishioka.

### Rejections Under Twincome-Pentax

On page 8, Claims 1, 3-7, 10-21, 23, 24 and 34 were rejected under 35 U.S.C. 102(a) as being anticipated by Twincome-Pentax. The basis of the rejection depends on a number of documents. They include materials allegedly presented to the Le Coane Group on June 21, 1995; an enlarged photograph of a portion of a Pentax booth allegedly taken during an IOFT meeting on October 1995 with Information and Data Sheet; and a brochure entitled, "October 1995, IOFT -- Material for New Product Development (Q & A)" allegedly distributed to attendees who visited Pentax's October 1995 IOFT exhibition site.

Initially, Applicant notes that the Interference Proceeding No. 104,051 between Pentax and Applicant based in part on Applicant's present invention has ended with Applicant prevailing.

The Le Coane Group meeting on June 21, 1995 was not public and was not a 35 102(a) event.

35 USC 102 provides in relevant part that:

- 46 -

A person shall be entitled to a patent unless --

(a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent ....

Nothing about the meeting of the Le Coane Group can constitute a 35 USC 102 (a) event.

The meeting of the Le Coane Group took place in Japan, not in the United States. Hence, the meeting of the Le Coane Group is not evidence that the claimed invention was "known or used by others in this county ... before the invention thereof by ... [Applicant]."

The meeting of the Le Coane Group was not a patenting of anything. Hence, the meeting of the Le Coane Group is not evidence that the claimed invention was "patented in this or a foreign country, before the invention thereof by ... [Applicant]."

That leaves the final possibility, which is that something about the meeting of the Le Coane Group meant that the claimed invention was "described in a printed publication in... a foreign country, before the invention thereof by ... [Applicant]." However, the display of the prototype at the meeting was certainly not a printed publication of anything. That leaves the display of the technical drawings at the meeting being "printed publication[s]."

The leading opinion concerning what constitutes a "printed publication" under either 35 USC 102(a) or 35 USC 102(b) is In re Wyer, 655 F.2d 221, 210 USPQ 790 (CCPA 1981) (Rich, J). According to that opinion:

the printed publication provision was designed to prevent withdrawal by an inventor, as the subject matter of a patent, of that which was already in the possession of the public. Thus, the question to be examined under § 102(b) is the accessibility to at least the pertinent part of the public, of a perceptible description of the invention, in whatever form it may have been recorded. Access involves such factual inquiries as classification and indexing. In other words, such a reference is a "printed publication" and a bar to patentability

- 47 -

Attorney Docket No. CONT-01013US1 SRM/BJM
bjm/cont/1013us1.012.wpd

...upon a satisfactory showing that such document has been disseminated or otherwise made available to the extent that persons interested and ordinarily skilled in the subject matter or art, exercising reasonable diligence, can locate it and recognize and comprehend therefrom the essentials of the claimed invention without need of further research or experimentation.[1]

Applying that statement to the present situation, it is abundantly clear that the technical drawings which were displayed at the meeting of the Le Coane Group were not printed publications. Not only were they not classified or indexed, they were not "disseminated or otherwise made available to the extent that persons interested and ordinarily skilled in the subject matter or art, exercising reasonable diligence,... [could] locate...[them] and recognize and comprehend therefrom the essentials of the claimed invention without need of further research or experimentation."

Moreover, Applicant has not rested purely on the weakness of the Le Coane Group meeting evidence. Applicant is submitting concurrently herewith the declaration of Prof. Richard J, Samuels, a leading academic expert on Japanese business practices. The gist of his declaration is that the meeting of the Le Come Group was not public. Hence, even if the Examiner were to decide that the technical drawings displayed at the meeting of the Le Coane Group were printed, they were not printed publications because they were not made publicly available.

Regarding the enlarged photograph of a portion of a Pentax booth showing four models of Pentax's Magnetic Eyeglass Frame System and the "Information and Data Sheet" that identified certain models of the Pentax system and provided pricing and options for each, Applicant submits that:

    i.    The enlarged photograph does not clearly illustrate the type of frames that were on display.

---

[1]655 F.2d at 226, 210 USPQ at 794.

Attorney Docket No.: CONT-01013US1 SRM/BIM
bim/cont/1013us1.012.wpd

ii.     Even if the frames on display were magnetic frames, they might well have been showing the front-mounted frames, whose magnets have coupling surfaces that are substantially parallel to the front surfaces of the lenses.

iii.     No magnets can be identified in the frames shown, let alone magnetic members positioned as claimed. Also, the exhibits do not show eyeglasses with a pair of frames--auxiliary frame with primary frame. The exhibits only show eyeglasses with one frame.

iv.     Thus, those documents cannot be anticipatory prior art against the claimed invention.

Regarding the brochure entitled, "October 1995, IOFT -- Material for New Product Development (Q & A)", Applicant submits that the New Development Q&A was not distributed and was not for distribution to convention attendees at the trade show.

About 30,000 people attended the IOFT meeting in 1995. It was one of the largest conventions held in Japan for the eye wear industry. Any company trying to promote an eye wear product in the largest eye wear trade show should have (a) prepared a different type of brochure, (b) prepared many more brochures than Pentax had, and (c) more widely distributed the brochure, instead of just providing the brochure to a very selected group of people (i.e., the members of the Le Coane Group) in a special meeting presumably arranged during the IOFT.

Twincome is an eye wear product, a fashion product. To promote such a product to the 30,000 eye wear retailers and wholesalers in the largest trade show, a company typically prepares attractive, eye-catching brochures with glossy pictures. Instead, Pentax only prepared a dull Q&A. The content of the Q&A includes discussion of Nd-Fe-B magnet ≠ 3,000 gauss, and potential health hazards. It is highly unlikely that a company would only prepare such type of brochure to promote an eye wear product to the general attendees in the largest eye wear trade show.

- 49 -

Attorney Docket No.: CONT-01013US1 SRM/BIM
bim/cont/1013us1.012.wpd

To promote an eye wear product in the largest trade show, a company typically prepares materials enough for 20% of the attendees. With IOFT typically having about 30,000 attendees, Pentax should have prepared 6,000 brochures.

Instead, Pentax (i) only distributed the brochures to 14 people, (ii) did not distribute the brochure to anyone else, and (iii) allegedly left another 56 copies on a table, which Pentax was unaware of their whereabout at the end of the conference. Seventy copies is just 0.25% of the 30,000 attendees--too few brochures for the biggest trade show, and the biggest opportunity for Pentax to promote the product.

The Q&A New Development Brochures is a very dull publication, with only a very limited number prepared. The only recorded distribution was to a small group of people. Regarding the remaining 56 copies, Pentax was unaware of their whereabout.

It is only logical that the brochures were prepared only for a special group of people during such a large trade show. The brochures were probably distributed to them at a special meeting, and were not for the general attendees of the IOFT. That would have explained the dullness of the brochure and the limited number prepared for so big a trade show.

The IOFT was not a 35 USC 102(a) event, and the Q&A is not a 35 USC 102(a) document, for much the same reasons that the meeting of the Le Coane Group was not a 35 USC 102(a) event and the technical drawings are not 35 USC 102(a) documents.

As for the IOFT, it was in Japan, and there was no evidence that it was attended by Americans or that any information concerning Pentax's display of its magnetic eye wear at the IOFT was transmitted to the United States prior to the critical date. Hence, there is no evidence that whatever Pentax disclosed at the IOFT was "known...by others in this country...before the invention... by...[Applicant]."

Attorney Docket No.: CONT-01013US1 SRM/BIM
bim/cont/1013us1.012.wpd

As for the Q&A, there is no evidence that it was classified or indexed <u>anywhere</u> in a fashion that made it "accsessib[le] to at least the pertinent part of the public..." or that it was "disseminated or otherwise made available to the extent that persons interested and ordinarily skilled in the subject matter or art, exercising reasonable diligence, c[ould] locate it...." Hence, it is not available as a reference under 35 USC 102(a). <u>In re Wyer</u>, 655 F.2d 221, 210 USPQ 790 (CCPA 1981).

A document distributed to a limited group, even if there is no requirement of secrecy, does not automatically make the document a publication. For example, an internal corporate memorandum is not a publication because, by its nature, it is an internal document, not intended to be distributed and not in fact distributed beyond a single organization or company. In re <u>Katz,</u> 592 F.2d 1169, 201 USPQ 71 (CCPA 1979). It has even been held that limited distribution beyond a single organization may not constitute publication. For example, in <u>Ex Parte Suozzi,</u> 125 USPQ 445 (POBA 1959), twenty-five copies of a search report marked "unclassified," circulated to various individuals and agencies, was held not to be a publication. The Board of Appeals stated that, "[E]ven assuming that there was no prohibition against the author of the report or the named or other official recipients of copies thereof, in giving copies or imparting information contained in said report to others who would be classed as the public in general, this would be merely permissive and would not show unequivocally that there was in fact any publication of the report."

The concept of access has been taken by the courts to mean free access to the public. For example, in <u>RCA Corp.</u> v. <u>Data General Corp.</u>, 701 F. Supp 456, 468, 8 USPQ 2d 1305, 1315 (D. Del. 1988), <i>aff'd</i>, 887 F.2d 1056, 12 USPQ 1499 (Fed.Cir. 1989), an infringer failed to show that a memorandum filed in a special patent library research institute constituted prior publication as of the relevant date because it was "unclear from the disputed testimony whether a member

- 51 -

of the public would be permitted access to the memorandum even if he or she had specifically asked to see it."

The Q&A was not published within the meaning of the word "published" under the statute. The Q&A was distributed by Pentax to a special group of people. Any communications between Pentax and that special group are not by definition communications to the public at large. Information exchanged solely within this group is not information that is accessible by the public. As far as the evidence shows, out of the 30,000 IOFT attendees, the Q&A was only given out to a special group of 14. There were also 56 copies of the Q&A left out on a table that were gone at the end of the IOFT. However, there is no evidence as to what happened to those copies. They may well simply have been thrown away by a janitor at the end of the IOFT.

A reading of the Q & A confirms the intent of Pentax was not to provide information to the public. The document itself is in the nature of advance information or sales training literature and not in the form of a document for general release to the public. For example, the document concerns such issues as product liability and potential health hazards of the product. A sales brochure released to the public in general would not include such information and would have been disclosed to many more IFOT attendees.

The Q & A was circulated in small numbers to a single group. And the Q & A, based on its content, appears to be a communication intended to educate the recipients on working with the public. Thus, even if the Q&A is considered to be "printed" within the meaning of 35 USC 102(a), it was not a "publication" within the meaning of 35 USC 102(a) for the same reasons that the technical drawings exhibited at the meeting of the Le Coane Group were not "publications" within the meaning of 35 USC 102(a)--namely, they were not distributed publicly.

- 52 -

In the event that the Examiner, upon reexamination, determines that an action other than an allowance is appropriate, the Examiner is requested and authorized to telephone Applicant's attorney prior to taking such action, if the Examiner feels that such a telephone call will advance the prosecution of the present application.

Should further questions remain, the Examiner is invited to contact the undersigned attorney by telephone.

Enclosed is a PETITION FOR EXTENSION OF TIME UNDER 37 C.F.R. § 1.136 for extending the time to respond up to and including November 22, 2000.

The Commissioner is authorized to charge any underpayment or credit any overpayment to Deposit Account No. 06-1325 for any matter in connection with this response, including any fee for extension of time, which may be required.

Respectfully submitted,

Date: __November 22, 2000__          By: _____

Brian I. Marcus
Reg. No. 34,511

FLIESLER, DUBB, MEYER & LOVEJOY LLP
Four Embarcadero Center, Suite 400
San Francisco, California 94111-4156
Telephone: (415) 362-3800

- 53 -

Attorney Docket No.: CONT-01013US1 SRM/BIM
bim/cont/1013us1.012.wpd

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| In re Reissue Application | ) **REISSUE PATENT APPLICATION** |
| | ) |
| Inventor:     Richard Chao | ) |
| | )     Art Unit:      2873 |
| Reissue Application No.: 09/182,862 | ) |
| | )     Examiner:    Mai, H. |
| Filed:         10/21/98 | ) |
| | ) |
| Patent No.:   5,568,207 | )   **Customer No.: 23910** |
| | ) |
| Title:        AUXILIARY LENSES FOR | ) |
|               EYEGLASSES | ) |
| | ) |

RECEIVED
TECHNOLOGY CENTER 2800
DEC -1 2000

### VIA HAND DELIVERY

### INFORMATION DISCLOSURE STATEMENT UNDER 37 C.F.R. §1,56

Assistant Commissioner for Patents
Washington, D.C.  20231

Sir:

     It is requested that the information identified in this statement be considered by the Examiner and made of record in the above-identified application. This statement is not intended to represent that a search has been made or that the information cited in the statement is, or is considered to be, material to patentability as defined in 37 C.F.R. §1.56.

*Enclosed with this statement are the following:*

  **X**    Form PTO-1449. The Examiner is requested to initial the form and return it to the undersigned in accordance with M.P.E.P. §609.

  **X**    A copy of each cited document as required by 37 C.F.R. §1.98. Copies are not submitted of U.S. applications, 37 C.F.R. §1.98(a)(2)(iii), and copies are not submitted of documents already cited or submitted in a parent application from which benefit under 35 U.S.C. §120 is claimed, 37 C.F.R. §1.98(d). If any of the cited/submitted documents is in a foreign language, a concise explanation of relevancy is provided pursuant to 37 C.F.R. §1.98(a)(3). For foreign language documents cited in a search report by a foreign patent office, the requirement for a concise explanation of relevance is satisfied by the submission herewith of an English language version of the search report.  57 F.R. 2021 (1/17/92). If a written English-language translation of a non-English language document, or portion thereof, is within the possession, custody or control of, or is readily available to any individual designated in §1.56(c), a copy of the translation accompanies this statement. 37 C.F.R. §1.98(c). *This statement should be considered because:*

- 1 -

___ This statement qualifies under 37 C.F.R. §1.97, <u>subsection (b)</u> because:

    (1)  It is being filed within 3 months of the application filing date;
        -- OR --

    (2)  It is being filed within 3 months of entry of a national stage;
        -- OR --

    (3)  It is being filed before the mailing date of the first Office action on the merits, whichever occurs last.

**X**  Although it may not qualify under subsection (b), this statement qualifies under 37 C.F.R. §1.97, <u>subsection (c)</u> because:

    (1)  It is being filed before the mailing date of a FINAL Office Action and before a Notice of Allowance (whichever occurs first)

        -- AND *(check at least one of the following)* --

    **X**  (1)  It is accompanied by the $240 fee set forth in 37 C.F.R. §1.17(p)
              -- OR --

    ___  (2)  It is accompanied by a STATEMENT as set forth in 37 C.F.R. §1.97(e)

___ Although it may not qualify under subsection (b) or (c), this statement qualifies under 37 C.F.R. §1.97, <u>subsection (d)</u> because:

    (1)  It is accompanied by a STATEMENT as set forth in 37 C.F.R. §1.97(e);
        -- AND --

    (2)  It is accompanied by a PETITION TO ACCEPT INFORMATION DISCLOSURE STATEMENT UNDER 37 C.F.R. §1.97(d);
        -- AND --

    (3)  It is accompanied by the $130 fee set forth in 37 C.F.R. §1.17(i)(1);
        -- AND --

    (4)  The Issue Fee has not yet been paid.

**X**  *Fee Authorization.*  The Commissioner is hereby authorized to charge underpayment of any additional fees or credit any overpayment associated with this communication to Deposit Account No. 06-1325. A duplicate copy of this authorization is enclosed.

Respectfully submitted,

FLIESLER, DUBB, MEYER & LOVEJOY LLP

Date:   November 29, 2000      By: _____

                                 Brian I. Marcus
                                 Reg. No. 34,511

Attorney Docket No.: CONT1013SRM/BIM
bim/cont/1013us1.018.wpd

104.001:120197
11/29/0-17:21

| Form PTO-1449 *(Substitute)* | U.S. DEPARTMENT OF COMMERCE PATENT AND TRADEMARK OFFICE | Attorney Docket Number CONT1013us1SRM/BIM | Serial/Patent Number 09/182,862 |
|---|---|---|---|
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** *(Use several sheets if necessary)* | | Applicant/Patent Owner David Chao | |
| | | Filing/Issue Date August 21, 1998 | Group Art Unit 2873 |

## U.S. PATENT DOCUMENTS

| Examiner Initial | | Document Number | Date | Name | Class | Subclass | Filing Date |
|---|---|---|---|---|---|---|---|
| | | 2,737,847 | 3/13/56 | Tesauro | 351/ | 41 | 3/13/56 |
| | | 2,770,168 | 11/13/56 | Tesauro | 351/ | 41 | 10/5/53 |
| | | 3,498,701 | 3/3/70 | Miller | 351/ | 57 | 1/11/68 |
| | | 3,531,188 | 9/29/70 | LeBlanc, et al. | 351/ | 48 | 5/31/68 |
| | | 3,565,517 | 2/23/71 | Gitlin, et al. | 351/ | 106 | |
| | | 3,582,192 | 6/1/71 | Gitlin, et al. | 351/ | 52 | 9/29/69 |
| | | 3,838,914 | 10/1/74 | Fernandez | 351/ | 106 | 6/8/73 |
| | | 4,196,981 | 4/8/80 | Waldrop | 351/ | 59 | 1/21/78 |
| | | 4,547,909 | 10/22/85 | Bell | 2/ | 431 | 11/17/83 |
| | | 4,988,181 | 1/29/91 | Riach | 351/ | 52 | 4/16/90 |
| | | 5,181,051 | 1/19/93 | Townsend, et al. | 351/ | 52 | 1/17/91 |
| | | 5,243,366 | 9/7/93 | Blevins | 351/ | 57 | 1/13/92 |
| | | 5,321,442 | 6/14/94 | Albanese | 351/ | 44 | 2/25/92 |
| | | 5,389,981 | 2/14/95 | Riach | 351/ | 158 | 6/22/93 |
| | | 5,410,763 | 5/2/95 | Bolle | 2/ | 436 | 2/11/93 |
| | | 5,416,537 | 5/16/95 | Sadler | 351/ | 57 | 5/22/94 |

## FOREIGN PATENT DOCUMENTS

| Examiner Initial | | Document Number | Date | Country | Class | Subclass | Trans- lation Yes \| No |
|---|---|---|---|---|---|---|---|
| | | 1117593 | 2/29/96 | China | | | X |
| | | 0,469,699 | 2/5/92 | E.P.O. | | | |
| | | 0,743,545 | 11/20/96 | E.P.O. | | | |
| | | 2,657,436 | 7/26/91 | France | | | X |
| | | 1266652 | 12/4/81 | France | | | |

- 3 -

Sheet ___ of _3_

## FOREIGN PATENT DOCUMENTS

| Examiner Initial | | Document Number | Date | Country | Class | Subclass | Translation Yes | No |
|---|---|---|---|---|---|---|---|---|
| | | 1037755 | 9/22/53 | France | | | X | |
| | | 915,421 | 11/6/46 | France | | | X | |
| | | 2,483,632 | 4/12/81 | France | | | X | |
| | | 43 16 698 | 11/17/94 | Germany | | | X | |
| | | 1797366 | 1/28/71 | Germany | | | X | |
| | | 3921987 | 1/17/91 | Germany | | | X | |
| | | 3920879 | 1/3/91 | Germany | | | X | |
| | | 3919489 | 12/20/90 | Germany | | | X | |
| | | 39333310 | 1/31/91 | Germany | | | X | |
| | | 9216919 | 2/18/93 | Germany | | | X | |
| | | 3905041 | 8/23/90 | Germany | | | X | |
| | | 5-40493 | 10/14/93 | Japan | | | X | |
| | | 1-136114 | 5/29/89 | Japan | | | X | |
| | | 57-184910 | 11/24/82 | Japan | | | X | |
| | | 55-50217 | 4/11/80 | Japan | | | X | |
| | | 54-111842 | 9/1/79 | Japan | | | X | |
| | | 612621 | 1/9/86 | Japan | | | X | |
| | | 44-15392 | 7/3/69 | Japan | | | X | |
| | | 5-157997 | 6/25/93 | Japan | | | X | |
| | | 56-29209 | 3/24/81 | Japan | | | X | |
| | | 54-111841 | 9/1/79 | Japan | | | X | |
| | | 220885 | 6/28/68 | Russia | | | X | |
| | | 572,222 | 1/30/76 | Switzerland | | | X | |
| | | 274588 | 4/21/96 | Taiwan | | | X | |
| | | 846,425 | 8/31/60 | United Kingdom | | | | |
| | | 855,268 | 11/30/60 | United Kingdom | | | | |

## OTHER DOCUMENTS (Include Author, Title, Date, Pertinent pages, etc. )

| | |
|---|---|
| 1. | English language abstract of Japanese Publication No. 55-50217. |
| 2. | English language abstract of Japanese Publication No. 54-111842. |

- 4 -

104.001:120197
11/29/0-17:21

## OTHER DOCUMENTS (Include Author, Title, Date, Pertinent pages, etc. )

| | | |
|---|---|---|
| | 3. | English language abstract of Japanese Publication No.54-111841. |
| | 4. | English language abstract of Japanese Publication No.1-136114. |
| | 5. | English language abstract of Japanese Publication No.56-29209. |
| | 6. | English language abstract of Japanese Publication No.44-15392. |
| | 7. | English language abstract of Japanese Publication No.5-157997. |
| | 8. | English language abstract of Japanese Publication No. 612621. |
| | 9. | English language abstract of Japanese Publication No. 5-40493 |
| | 10 | English language abstract of German Publication No. 9216919. |
| | 11 | English language abstract of German Publication No.1797366. |
| | 12 | English language abstract of German Publication No.43 16 698. |
| | 13 | English language abstract of German Publication No.39333310. |
| | 14 | English language abstract of German Publication No.3921987. |
| | 15 | English language abstract of German Publication No.3920879. |
| | 16 | English language abstract of German Publication No.3919489. |
| | 17 | English language abstract of German Publication No.3905041. |
| | 18 | English language abstract of French Publication No.1266652. |
| | 19 | English language abstract of French Publication No.1037755. |
| | 20 | English language abstract of French Publication No.2,657,436. |
| | 21 | English language abstract of French Publication No.2,483,632. |
| | 22 | English language abstract of French Publication No.915,421. |
| | 23 | English language abstract of Switzerland Publication No.572,222. |
| | 24 | English language abstract of Russian Publication No.220885. |
| | 25 | English language abstract of Taiwan Publication No.274588. |
| | 26 | English language abstract of Chinese Publication No.1117593. |

| Examiner | Date Considered |
|---|---|
| | |

*EXAMINER: Initial if citation considered, whether or not citation is in conformance with MPEP 609.  Draw line through citation if not in conformance and not considered.  Include copy of this form with next communication to applicant.

*1 = Copy not submitted because it was submitted in prior application SN __/_____, filed _____, 19___.
*2 = Copy not submitted because it was submitted in prior application SN ___/ _____, filed _____, 19___.

- 5 -

# FLIESLER
# DUBB
# MEYER &
# LOVEJOY LLP

RECEIVED

DEC - 1 2000

TECHNOLOGY CENTER 2800

MARTIN C. FLIESLER
SHELDON R. MEYER
MARK E. MILLER
WARREN S. WOLFELD
LARRY E. VIERRA
GIDEON GIMLAN
KIRK J. DENIRO
BRIAN I. MARCUS
BURT MAGEN
THOMAS A. WARD
SARAH BARONE SCHWARTZ

SLADE E. SMITH
D. BENJAMIN BORSON, PH.D.
WILLIAM J. HARMON, III
BRENT A. FOLSOM
LORI L. BEHUN

PATENT AGENTS
KARL F. KENNA
LARRY T. HARRIS

COUNSEL
DAVID E. LOVEJOY

INTELLECTUAL PROPERTY LAW
SAN FRANCISCO • SANTA CLARA

BRIAN I. MARCUS
bim@fdml.com

November 29, 2000

**VIA FEDERAL EXPRESS**

Mr. David Goldstein
GIC Intellectual Property
2503 Columbia Pike, Suite 308
Arlington, VA 22204.000

Re:   Information Disclosure Statement

File:  U.S. Patent Re-Issue Application entitled
"Auxiliary Lenses For Eyeglasses"
Inventors:   Richard Chao
Serial No.:   09/182,862
Filed:   October 21, 1998
Our File No.:   CONT-01013US1 SRM/BIM

Dear David:

Enclosed in connection with the above-identified patent application is an information disclosure statement. Please hand deliver the IDS to Examiner H. Mai in Group Art Unit 2873.

Please do not hesitate to contact me should you have any questions.

Very truly yours,

Brian I. Marcus

BIM:lpm
Enclosures
bim/cont/1013us1.017.wpd


OIPE JC105
NOV 27 2000
PATENT & TRADEMARK OFFICE

## FIRST DECLARATION OF RICHARD J. SAMUELS

Table of Contents

I.      Qualifications . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     Materials Given to Review and Question Posed  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III.    General Discussion of the Academic Literature Relating to Such Groups as the Le
        Coane Group  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

IV.     Application of the General Principles to the Le Coane Group  . . . . . . . . . . . . . . . . . . . 7

V.      My Opinion  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

VI.     Jurat  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

## I.   Qualifications

(1)     I am Ford International Professor at the Massachusetts Institute of Technology, where I am also Founding Director of the MIT Japan Program. I served as Head of the Department of Political Science between 1992 and 1997 and as vice-chairman of the Committee on Japan of the National Research Council from 1990 until 1996. In 1992 I was elected a member of the Council on Foreign Relations. In 1994 I became a member of the Abe Program Fellowship Committee of the Social Science Research Council. I am also an Associate in Research at the Reischauer Institute, Harvard University. From 1988 to 1993 I was a member of the Joint Committee on Japanese Studies of the American Council of Learned Societies and the Social Science Research Council. I have been awarded three Fulbright Fellowships and a National Science Foundation Research Grant to support four separate extended research trips to Japan, totaling six years in the field. In October 1998 I was awarded an Abe Fellowship for field research in Japan and Italy during 1999-2000.

(2)     I have written or edited six books, most recently "Rich Nation, Strong Army": National Security and the Technological Transformation of Japan, Cornell University Press (1994), which won the 1996 John Whitney Hall Prize of the Association of Asian Studies and the 1996 Arisawa Memorial Prize of the Association of American University Presses. My 1987 book, The Business of the Japanese State: Energy Markets in Comparative and Historical Perspective (Cornell University Press) received the Masayoshi Ohira Memorial Prize in 1988. In 1983, Princeton University Press published my Politics of Regional Policy in Japan. I have also contributed essays and articles to The Cambridge Encyclopedia of Japan, International Organization, International Security, Daedalus, The Sloan Management Review, The Journal of Modern Italian Studies, and other journals. I am also a regular columnist for the Mainichi

-1-

Shimbun. In these publications I have explored the relationships between firms and the state in Japan, and I have paid careful attention to the relationships among firms at different levels of the value-added chain: manufacturers/suppliers, producers/distributors, etc.

(3)    I read and speak Japanese with professional proficiency.

(4)    I received my Ph.D. from the Massachusetts Institute of Technology, Department of Political Science in 1980, my MA from Tufts University in 1974, and my AB from Colgate University, magna cum laude, in June 1973.

(5)    A copy of my CV is the party Chao's Exhibit 1030.

## II.    Materials Given to Review and Question Posed

(6)    Charles Gholz, counsel for the party Chao, gave me the following materials to review.

(a)    the declaration of Masahiro Sudo and every exhibit referred to therein;

(b)    the declaration of Yasuo Fukuwa and every exhibit referred to therein;

(c)    the supplementation declaration of Yasuo Fukuwa and every exhibit referred to therein;

(d)    a draft outline of cross-examination for Mr. Sudo;

(e)    a draft outline of cross-examination for Mr. Fukuwa;

(f)    transcripts of the depositions of Messrs. Sudo and Fukuwa; and

(g)    a copy of the organizational document, or *kisoku*, of the Le Coane Group and the party Iwamoto's translation thereof, which is the party Chao's Exhibit 1060.

-2-

(7)     Mr. Gholz asked for my opinion concerning the credibility of the assertions by Messrs. Sudo and Fukuwa that members of the Le Coane Group were under no obligation to keep matters discussed at group meetings confidential.  In addition, Mr. Gholz asked me to critique his proposed lines of questions for Messrs. Sudo and Fukuwa and to suggest additional lines of questions.  Although I have read the statements in the Sudo and Fukuwa declarations and in the transcripts of their depositions relating to the International Optical Fair in Tokyo, Mr. Gholz did not ask me for my opinion on those statements.

III.    **General Discussion of the Academic Literature Relating to Such Groups as the Le Coane Group**

(8)     "Groups" such as the Le Coane Group have been frequently discussed in the académic literature and are very familiar to me.  Such "vertical" business associations are quite common in Japanese commerce and industry.  Sometimes referred to as "industry groups" (*kōgyōkai*) or as "supplier associations" (*kyōryokukai*, which is literally translated as "cooperation groups"), these associations usually cluster around a single manufacturer.  (Toyota's *kōgyōkai* is the most famous example).  Sometimes they are associations of manufacturers and suppliers, and sometimes they are associations of manufacturers and distributors, as in the case of the Le Coane Group.  Either way, they are not considered "open."  Membership is by invitation only, and while neither the suppliers nor the distributors are expected to be entirely monogamous vis-à-vis the manufacturer, the expectation is that what is discussed and learned in their meetings will be kept "in-house."

(9)     A great deal has been written about interfirm relationships in Japan.  There is a pervasive sense and general agreement that Japanese firms are embedded in particularly dense

-3-

networks in which there is rather greater information exchange and coordination than neo-classical theory would predict or find efficient.

(10)     For example, Imai[1] reports that "the dense, intricate, and overlapping interaction within the Japanese manufacturing and distribution system...creates advantages for Japanese suppliers in their speed and adaptability to continuous change in business environments..." (p. 179).  The Japanese system requires "speedy coordination between marketing, production, and R&D..." (p.183).

(11)     As noted above, these relationships are common among producers and distributors, as in the case of the Le Coane Group, as well as among producers and subcontractors.  According to Nishiguchi,[2] the formal institutional ties between assemblers and suppliers help considerably to facilitate problem solving.   He says that "Japanese subcontracting relations are characterized by an institutional design that aims at continuous quality improvement and cost reduction through problem solving-oriented commitments..." (p.181).  For Nishiguchi, both final assemblers and suppliers benefit from the same sort of institutional commitment to "bilateral problem solving" across the value added chain that appears to characterize the Le Coane Group.

---

[1]Imai, Kenichi, "Japanese Business Groups and the Structural Impediments Initiative," in K. Yamamura, ed. Japan's Economic Structure: Should it Change? Seattle: Society for Japanese Studies, 1990.  A copy of Imai is the party Chao's Exhibit 1035.

[2]Nishiguchi, Toshihiro, Strategic Industrial Sourcing: The Japanese Advantage. New York: Oxford University Press, 1994.  A copy of the title page, the copyright page, and chapter 6 of Nishiguchi is the party Chao's Exhibit 1034.

-4-

(12)   An excellent characterization of the generic form of "cooperation groups" or "supplier associations" (*kyōryokukai*) is offered by Mari Sako[3] of the London School of Economics. She explains that such interfirm organizations are ubiquitous among Japanese automobile manufacturers and that their stability affords members the opportunity to share technological and marketing information among themselves:

> [The *kyōryokukai*] is generally a voluntary association with their [sic; its] own rules and regulations. Its aim is generally to enhance member suppliers' cooperation with the assembler and with each other. Most of the assemblers' associations have a name which signifies cooperation, friendship, or prosperity. Some supplier associations, just like Japanese companies, are described as a "community of fate" (*unmei kyōdōtai*). [p.11.]

(13)   Gerlach's[4] is the most comprehensive English language analysis of "intercorporate alliances" in Japan. Speaking primarily to the *keiretsu* alliances across market segments, Gerlach reports "a strong predilection for firms in Japan to cluster themselves into coherent groupings of affiliated companies..." (p. xiii). Importantly, he acknowledges that the now famous term "*keiretsu*" is inconsistently applied to (and masks) the fact that a wide variety

---

[3]Sako, Mari, "Associations in the Japanese Automobile Industry: Collective Action for Technology Diffusion," Paper presented to the 1995 Annual Sponsors Meeting, International Motor Vehicle program, Toronto. A copy of Sako's paper is the party Chao's Exhibit 1037.

[4]Gerlach, Michael, Alliance Capitalism: The Social Organization of Japanese Business. Berkeley: University of California Press, 1992. A copy of the title page, the copyright page, and Chapters I-III of Gerlach is the party Chao's Exhibit 1036.

of alliances exist in Japan. These alliances each display some degree of the following characteristics which combine to form "the social structure of markets" in Japan:

      (a)    affiliational ties which are less binding than vertical integration but more binding than arm's length transactions;

      (b)    long term relationships which are more diffuse than contractual ones;

      (c)    multiplex relationships in which capital ties may be only one of several kinds of formal ties;

      (d)    extended networks in which the parties formally associate can facilitate relationships to other related firms; and

      (e)    symbolic ties which bind even in the absence of legal arrangements.

      (14)    Gerlach points out that a great deal of Japanese business is transacted "outside" the formal confines of firms. Much has been delegated to interfirm institutions—"localized networks of long-term mutual obligation... [and] preferential trading." (p.66). Of particular relevance for the case at hand:

    the Japanese distribution system works largely through external networks. Within domestic markets, wholesalers (*ton'ya*) are organized into elaborate networks in which products may pass through three or four middle stages before reaching final users. [p. 63.]

      (15)    Gerlach insists that Japanese business transactions "can be dimensionalized along a continuum from 'relational' to 'transactional' exchange." (p.70). He contrasts the one time transaction between anonymous parties to the differentiating feature of Japanese business

-6-

practice—the "relational" exchange in which "actors rely upon various forms of implicit assumptions and agreements to organize their relationships. (p.70).

(16)    Here Gerlach is echoing Ronald Dore's[5] seminal analysis of Japanese business relationships. Dore focuses upon "goodwill"-- "the sense of diffuse personal obligation which accrue between individuals engaged in recurring contractual economic exchange." (p.170). Dore asserts that this "sense of diffuse personal obligation" is the "primordial embodiment of basic social bonds" (p. 171) of Japanese capitalism.   Noting that "benevolence" was rejected as an economic motive by Adam Smith,  Dore argues that "goodwill" is a critical element in Japanese economic behavior.  Opportunism is reduced by the stability of relationships among economic actors, relationships that both sides recognize the obligation to maintain.  Thus, "relational contracting" (which he compares to a "marriage") is much more common in Japan than "spot contracting" (which he compares to a "one-night stand").   Thus firms persist in stable relationships—elsewhere compared to "extended family groupings"--and agree to share the costs of bad times and the gains of good times.  The material gains are not insignificant for Dore:  trust and mutual dependency beget a more rapid flow of information and hence greater flexibility and nimbleness in the marketplace.

IV.    **Application of the General Principles to the Le Coane Group**

(17)    As I said at the outset, I read and speak Japanese proficiently, and I have read all of the Japanese language materials concerning the meeting of the Le Coane Group referred in the declarations of Messrs. Sudo and Fukuwa, not just the selected excerpts translated by the party

——————————

[5]Dore, Ronald, "Good Will and the Spirit of Market Capitalism," in <u>Taking Japan Seriously: A Confucian Perspective Leading Economic Issues</u>, Stanford: Stanford University Press, 1987. A copy of Dore is the party Chao's Exhibit 1033.

-7-

Iwamoto, and I have read the organizational document (or *kisoku*) of the Le Coane Group in the original Japanese. Having done so, it is my opinion that the Le Coane Group is a Pentax-sponsored forum for the exclusive interaction between Pentax and its distributors. While there is no evidence that Pentax has capital ties with these firms, the minutes (*gijiroku*) of the "Second Meeting of Sales Representatives of the Le Coane Group" suggest that the activities of this group were very collaborative. Sales and marketing representatives met "to continue sales cooperation while overcoming common problems each firm had with the price, design, and low brand recognition of the 'Le Coane Eman' line" of eye wear. Those representatives discussed market conditions and plans for sales promotions, and the Pentax representatives solicited suggestions for marketing the Le Coane Eman product line from the non-Pentax representatives. Representatives of Pentax and its distributors discussed a jointly administered questionnaire to determine the prospects for particular styles and products, and they renewed the tenure of the members of a "development committee."

(18)    That the Le Coane Group's name is the same as the product line being promoted by Pentax suggests that this is more than a merely voluntary association of firms that might come and go. It suggests that this is a close-knit group of firms dedicated to the collaborative promotion, marketing, and sales of a particular product line. According to the minutes, representatives of Pentax and its distributors work together to identify common problems and their solutions. The "Le Coane Group" (*kai*) is a problem-identifying and problem-solving group comprising distributor firms and Pentax. That it is also referred to in the minutes as the "Le Coane Company" (*sha*) suggests an even closer association than is customary with such groups.

(19)    Incidentally, the party Iwamoto's translation of the organizational document (or

-8-