Interference No. 104,051
Chao v. Iwamoto

    3.    Claim 2 depends from claim 1 and further specifies that the second pair of **magnetic members** secured to the arms of the auxiliary spectacle frame **are extended downward** toward projections in the rear and side portions of the primary spectacle frame.

    4.    Figure 7 of the Chao patent illustrates an embodiment of the invention in accordance with the feature added by claim 2.

    5.    Live testimony of Messrs. Richard and David Chao was taken by direct examination on February 24 and 25, 1999, in the presence of Judges McKelvey and Lee.

    6.    Richard Chao came up with the idea within the scope of claim 1 in September or October of 1994 while taking a shower. (Exhibit 1112, page 191, lines 14-21).

    7.    Richard Chao considered his invention as that of creating a "hook" type engagement between the primary spectacle frame and the auxiliary spectacle frame.  To Richard Chao, so long as the hook function is achieved, it did not matter to Richard Chao from what material the hook is made.  (Exhibit 1112, page 206, lines 14-16).

    8.    After having initially thought of the idea of a hooked arrangement between the primary and auxiliary spectacle frames, Richard Chao shared his idea with other persons in discussions about his invention.  The other persons included family members,

Interference No. 104,051
Chao v. Iwamoto

for example, David Chao, a brother of Richard Chao.  (Exhibit 1162, page 198, line 2 to page 199, line 22).

9.  David Chao, after hearing Richard Chao's idea and discussing the same with Richard Chao, drew in his 1994 Day Planner, as an entry for September 5, 1994, a figure to depict what he thought Richard Chao had invented and communicated to him.  (Exhibit 1105).

10.  David Chao also drew in his 1994 day Planner, in the entry for October 20, 1994, another figure to depict what he thought Richard Chao had invented and communicated to him. (Exhibit 1106).

11.  The drawings of David Chao on the September 5 and October 20, 1994, i.e., the entries of his Day Planner, illustrate a magnetic member extending downward from an auxiliary frame toward a projection on the primary spectacle frame holding a magnetic member, as does Figure 7 of the Chao patent. (Exhibits 1105 and 1106).

12.  During testimony of David Chao, the following question and answer exchange occurred between Judge McKelvey and witness David Chao (Exhibit 1112, page 293, line 19 through page 294, line 20):

JUDGE McKELVEY:  Mr. David Chao, do you have the Chao patent in front of you?

5

Interference No. 104,051
Chao v. Iwamoto

        THE WITNESS:   Yes, I do, Your Honor.

        JUDGE McKELVEY:  Would you look at figure 7, please.

        THE WITNESS:   Yes.

        JUDGE McKELVEY:  Do you understand what figure 7 is?

        THE WITNESS:  I understand.

        JUDGE McKELVEY:  Tell me what it is.

        THE WITNESS: It describes a mechanism that has, sort
of, like a stopper or a hook to further secure the
auxiliary lenses on to the primary frame.

        JUDGE McKELVEY:  Is the item shown in figure 7
your idea?

        THE WITNESS:  No.

        JUDGE McKELVEY: Whose idea do you think it is?

        THE WITNESS:  Richard Chao.

        JUDGE McKELVEY: Did you [he] tell you about this idea?

        THE WITNESS: Yes.

13.  David Chao recalls his understanding from discussions
with Richard Chao that there is a need to have something extended
downward from the auxiliary spectacle frame to form a hook.  He
does not remember if Richard Chao told him something else.
(Exhibit 1112, page 298, lines 15-21).

14.  Before the time he drew the figure in the September 5,
1994 entry in the Day Planner, David Chao does not remember

Interference No. 104,051
Chao v. Iwamoto

whether Richard. Chao told him that to form the hook there should
be magnetic members extended downwardly. (Exhibit 1112, page
298, last line to page 299, line 7).

15.  Richard Chao did not consider important the nature of
the material which extends downwardly from the auxiliary frame to
constitute a hook for engagement with the primary frame, so long
as there is a hook.  (Exhibit 1112, page 206, lines 10-16).

16.  Richard Chao does not remember whose idea it was to
extend the magnetic member in particular downwardly.  (Exhibit
1112, page 207, line 15 to page 208, line 2).  May be it was his
and may be it was someone else's.

17.  The following question and answer exchange occurred
between Richard Chao and counsel for Iwamoto (Exhibit 1112,
page 207, line 15 to page 208, line 2):

BY Mr. BERNSTEIN:

Q    Whose idea was that to extend the magnetic
downwardly?

A    It might have been my idea, and it might have
been some idea that came from our discussion.

Q    From whose discussion?

A    Well, the situation might have been, I
discussed this with David and then we told this idea to
the person who submitted the patent application for us.

7

Interference No. 104,051
Chao v. Iwamoto

## Discussion

Judges Lee presided over, and Judge McKelvey attended, the entire live testimony of Messrs. Richard and David Chao.  Thus, the panel has the benefit of Judge Mckelvey's and Judge Lee's evaluation of the credibility of the witnesses based on their observation of the witnesses' demeanor under interrogation.  It is their view that both witnesses are highly credible.  Based on their testimony and the transcript as a whole, the panel is inclined to accord their testimony considerable weight.  It is also Judge Mckelvey's and Judge Lee's impression that the bare written transcript of the testimony (Exhibit 1112) does not give the full flavor or true scope of the testimony given.  For instance, as will be explained later in context, when Richard Chao referred to "David's idea," he was merely referring by short-hand to the drawing made by David and contained in David's 1994 Day Planner and not making an admission that the idea originated from David.

The findings above reveal our view of the circumstances surrounding the inventorship issue in this case.  On the record presently before us, Richard Chao came up with the idea of having a hooked engagement between the auxiliary frame mounted on top of a primary frame and the primary frame.  Specifically, on this record, Richard Chao conceived of the idea of having arms

8

Interference No. 104,051
Chao v. Iwamoto

extending from the side portions of the auxiliary frame to engage
the upper side portion of the primary frame.  This hooked
engagement feature is an addition to the previously known idea
that a pair of magnetic members on the auxiliary frame engages a
pair of magnetic members on the primary frame.  To Richard Chao,
it was not important from what material the hook was made, so
long as the hooked arrangement was made.  The hook can be made
from an extension of the magnetic members on the auxiliary frame
or an extension of some other part of the auxiliary frame.

Richard Chao discussed his idea with David Chao and others
and subsequent to these discussions the application which matured
into the Chao patent was filed, including claim 2 which requires
the magnetic members on the auxiliary frame to extend downwardly
towards the primary frame for hooking onto the primary frame.
Figure 7 of the patent illustrates an embodiment of claim 2.

David Chao does not remember whether Richard Chao had told
him specifically that the magnetic members on the auxiliary frame
should extend downwardly.  Richard Chao also does not know for
certain whether that specific idea originated with him or with
David Chao.  The only thing certain was that there were
discussions between Richard and David about Richard's idea of a
hooked engagement and then the application for patent was filed
including claim 2.  Either one could have proposed the idea.

Interference No. 104,051
Chao v. Iwamoto

The inventorship as originally named on the Chao patent is presumptively correct. Iwamoto as the moving party bears the burden of proof to show that Richard Chao is not properly named as sole inventor. 37 CFR § 1.637(a). That burden is by a preponderance of the evidence. Bruning v. Hirose, 161 F.3d 681, 684-5, 48 USPQ2d 1934, 1938 (Fed. Cir. 1998). On the record before us, it might be possible to come up with a theory that the specific notion of extending the "magnetic member" downwardly from the auxiliary frame originated from David Chao and not Richard Chao. However, a contrary position is at least as plausible, particularly since David Chao disavows having made the invention of claim 2. Accordingly, it cannot be said, on this record, that Iwamoto's burden of proof by a preponderance of the evidence has been satisfied. In other words, we have not been persuaded that it is more likely true than not that the subject matter of claim 2 originated with David Chao. In our view, it is at least equally likely that claim 2 was an embodiment mentioned only briefly by Richard Chao in his discussions with David Chao.

Iwamoto points out that during the deposition of Richard Chao, "Richard testified that it was David Chao's idea to have the magnetic member extend downward" (Motion at 8). Specifically, on page 9 of preliminary motion 2, Iwamoto states:

10

Interference No. 104,051
Chao v. Iwamoto'

> After preparing these sketches (Exhibit 2066),
> Richard Chao pointed out his idea in contrast to
> David's idea:

> > THE WITNESS: This is my original idea.  This
> > is a stopper, and this is the magnetic
> > member. (Indicating).  This was stopper to
> > stop it. (Indicating).  This is David's idea.
> > He used magnetic member here. (Indicating).
> > Transcript pp. 204:20~205:3.

> However, Judges Mckelvey and Lee presided over the live
> testimony and understand the actual context in which the
> reference to David Chao's idea was made.  It is clear to both of
> them that Richard's reference to "David's idea" merely
> identifies, by short-hand or abbreviation, the drawings that were
> made by David Chao in the September 5, and October 20, 1994
> entries of David Chao's Day Planner.  In our view, consequently,
> Richard Chao's reference to "David's idea" was not an admission
> or an indication that David originally conceived of the idea to
> have the magnetic members on the auxiliary frame extend downward.
> While Richard Chao remembers that he first conceived of an
> embodiment using a non-magnetic stopper which extended
> downwardly, as we discussed earlier Richard Chao does not

11

Interference No. 104,051
Chao v. Iwamoto

remember how the idea of having the magnetic members extend

downwardly originated.

Iwamoto asserts that prior to the time that David Chao

purportedly made the drawings which are entries in the

September 5 and October 20, 1994 entries of his Day Planner,

Richard Chao had not told David Chao that magnetic members should

extend downward to form a hook.  In support of that assertion

Iwamoto quotes the following from David Chao's testimony (Exhibit

1162, page 296, line 16 to page 296, line 2):

    [David Chao testifying]

    Q    During that discussion [with Richard Chao],

         did he [Richard Chao] tell you what the hook

         should be made from?  What material the hook

         should be made from?

    A    No.

    Q    Did he tell you it should be a magnet?

    A    The hook should be a magnet?

    Q    Yes.

    A    No.

The above-quoted portion of David Chao's testimony does not

support Iwamoto's assertion.  First, the phrase "should be" in

this context is more reasonably understood as "must" or at least

"most preferably" and not simply as "can be."  The question that

12

Interference No. 104,051
Chao v. Iwamoto

should have been asked is whether Richard Chao told David Chao

that the hook "can be" made by extending the magnetic members

downwardly from the auxiliary frame.  David Chao's "No" answer is

consistent with Richard Chao's testimony that so long as the

function of a hook is achieved, it does not matter from what

material the hook is made.  Neither a magnetic hook nor a non-

magnetic hook is a must; either would be fine.

Finally, Iwamoto argues that the authenticity of the

drawings purportedly made by David Chao in the September 5 and

October 20, 1994 entries in his day Planner are highly suspect

and thus so is the credibility of David Chao.  However, Iwamoto

has not timely provided evidence to reasonably demonstrate that

those entries were made not in 1994 but in 1998 after the

declaration of this interference.  On April 16, 1999, we entered

a decision (Paper No. 143) denying as untimely Iwamoto's request

to have David Chao's 1994 Day Planner provided for purposes of

further ink-testing.  On this record, its the law of the case

that date on which the entries were made cannot be an issue.

13

Interference No. 104,051
Chao v. Iwamoto

<u>Conclusion</u>

For the foregoing reasons, Iwamoto has failed to sustain its burden to prove that inventorship of the Chao patent has been incorrectly named or that Richard Chao derived the subject matter of claim 2 from David Chao.  Furthermore, because we conclude that Iwamoto's preliminary motion 2 failed to establish a prima facie entitlement to relief, Chao's opposition has not been considered and is herein returned to Chao.  There is no need for Iwamoto to file a reply.  Iwamoto's preliminary motion 2 is **denied**.

*Fred McKelvey*
Fred E. McKelvey, Senior      )
Administrative Patent Judge)
                                                      )
                                                      )
                                                      )   BOARD OF PATENT
*Richard E. Schafer*                    )        APPEALS
Richard E. Schafer                    )           AND
Administrative Patent Judge)   INTERFERENCES
                                                      )
                                                      )
                                                      )
*Jameson Lee*                             )
Jameson Lee                              )
Administrative Patent Judge)

14

Interference No. 104,051
Chao v. Iwamoto

By Federal Express

Counsel for party Chao:

Sheldon R. Meyer
Fliesler, Dubb, Meyer & Lovejoy
Four Embarcadero Center, Suite 400
San Francisco, California 94111-4156

R. Danny Huntington, Esq.
Burns, Doane, Swecker & Mathis, L.L.P.
1737 King Street, Suite 500
Alexandria, Virginia 22314

Counsel for party Iwamoto:

Bruce Bernstein
Greenblum & Bernstein
1941 Roland Clarke Place
Reston, Va 20191

15

Interference No. 104,051
Chao v. Iwamoto

McKelvey, <u>senior Administrative Patent Judge</u>, concurring.

I fully agree with the principal opinion, join therein and
have signed it.  I write separately to add some personal
observations concerning the manner in which the issue before us
was developed and resolved.

## I.

There are certain cases where being able to observe live
testimony is helpful, if not essential.  Included are cases where
the following issues arise (1) derivation, (2) fraud and
inequitable conduct, (3) inventorship and (4) testimony given
through a translator because the witness speaks a foreign
language and not English.  There may be other issues where live
testimony can be helpful.  In this case, both inventorship and
testimony through a translator are involved.  Cases where a
witness does not speak English and must testify through a
translator present unique challenges.

## II.

In cases involving testimony given through a translator,
apart from the witness and the translator, the other actors
(attorneys and judges) can be:

    (1)   Individuals who are fluent only in English;

    (2)   Individuals who are fluent in English and the
           language in which testimony is being given
           (Mandarin Chinese in the case before us) and

- 16 -

Interference No. 104,051
Chao v. Iwamoto

> (3) Individuals who are fluent in English and another
>     language, but not the language in which testimony
>     is being given.

An individual in category (1) may have a hard time asking
questions in English which can in fact be translated into the
language spoken by the witness. An English-only individual will
not appreciate the fact that certain English-language questions
cannot be translated into the foreign language in question.
Likewise, the individual may not appreciate the fact that a
literal translation of an English-language question does not
necessarily mean the same thing in the foreign language.

An individual in category (2) will understand

> (a) what is being asked in English,
>
> (b) whether the translation into the foreign language
>     is correct,
>
> (c) the answer given in the foreign language by the
>     witness and
>
> (d) whether the answer given by the witness has been
>     correctly translated into English.

The individual will know when literal translations of certain
English-language questions (particularly those with legalese and
patentese) do not have the same significance in the foreign
language as they do in English. As applied to the facts of this
case, Judge Lee falls into category (2).

- 17 -

Interference No. 104,051
Chao v. Iwamoto

An individual in category (3) will have some appreciation as to whether the English-language question can be translated into the foreign language known by the individual.  A category (3) individual will also appreciate that literal translations of English may not have the same significance in a foreign language. Thus, a category (3) individual may have a suspicion that a translation is not possible.  I fall into category (3) being fluent in Spanish and having essentially no understanding of Chinese.

Compounding any language impairment, is the "American lawyer" way of asking questions.  American lawyers tend to use legalese and to think of questions and answers in terms of legalese.  In addition, patent attorneys tend to use patentese and to think of questions and answers in terms of patentese. But, witnesses, including witnesses with scientific credentials, do not normally think in legalese or in patentese.

There has been some recent experience at the board in cases where testimony has been through a translator.  There came a time when I had an opportunity to preside over a cross-examination deposition in which an individual was testifying through a Japanese translator.  At the outset, I was struck by the highly "technical" nature of the questions.  Apart from being very long, the questions being asked by the American attorney included legalese such as "depositions," "interrogatories," etc.  There was plenty of patentese too!  Basically, the American attorney

- 18 -

Interference No. 104,051
Chao v. Iwamoto

used words which probably would not have meant anything to the
witness even if an assumption is made that those words can be
translated.  Perhaps more to the point, there came a time during
the examination that I felt some of the answers to a series of
questions were not consistent and were not particularly making
sense.  So, I asked the witness three questions, each worded
differently in English.  In my opinion, the three questions in
English were essentially asking the same question,  In an
English-only context, the three questions should have resulted in
essentially the same answer.  However, by the time a translation
of the questions had been made into Japanese and the answers in
Japanese were translated back into English, the answers were
basically "yes", "no" and "possibly."  The reason I knew to ask
the questions was because the attorney's line of questions could
not readily be translated into Spanish.  As a result, I suspected
that a literal translation Japanese might change the significance
of the question and therefore the meaning of the question to the
witness in Japanese might not have the same English-language
meaning which the attorney had intended.  I asked the witness
what the difference was between question 1 and question 2 and it
became clear that translations of what I thought were essentially
the same English questions ended up being different questions in
Japanese.  The bottom line is that counsel tread on very thin ice
if they do not have assistance at counsel table of an individual

Interference No. 104,051
Chao v. Iwamoto

who is fluent in the foreign language involved and perhaps as
well with the case in general.

## III.

## A.

Richard Chao testified in Chinese.

Judge Lee is fluent in Chinese. The transcript of
proceedings will show that Judge Lee on more than one occasion
advised counsel for Iwamoto that the question needed to be re-
asked (see, e.g., Ex. 1112, page 200, lines 11-12; page 203, line
19).

I am not fluent in Chinese. Nevertheless, even I knew that
some questions being propounded by counsel for Iwamoto probably
could not be translated into Chinese all the while maintaining
the same meaning (see, e.g., Ex. 1112, page 108, lines 12-15;
page 197, lines 13-14 and page 277, lines 4-11).

There came a time during the evidentiary hearing when
Richard Chao testified as follows (Ex. 1112, page 205, line 12
through page 208, line 15):

> Mr. BERNSTEIN: So then David's idea was to extend the
> magnet downwardly as the hook; is that correct?
>
> A (Richard Chao): I don't know about David's idea.
>
> Q    But your original idea was to extend the flange
> downwardly, but not the magnet; is that correct?
>
> A    Yes, when I first told David about my idea, it was
> so.
>
> Q    I want to show you figure 7 of your patent.  Item
> reference number 22, do you know what that is in figure 7?

- 20 -

Interference No. 104,051
Chao v. Iwamoto

A    Magnetic member.

Q    Is that a magnet extending downwardly?

A    Yes.

Q    Was that your original idea?

A    Here, it was the -- the idea of the hook was the reflected in the drawing. That was my original idea.

Q    Right. But that's not my question, sir. My question is: The extension of magnet 22 downwardly, was that your original idea?

A    As long as it reflects the idea of the hook, it's not important what material is used.

Q    Again, that wasn't my question. My specific question is: Was the idea of extending the magnet downwardly, as magnet 22 is extended downwardly --

JUDGE McKELVEY:  Mr. Bernstein, ask him if the magnet is extended downwardly.

Mr. BERNSTEIN:  I'm sorry.

JUDGE McKELVEY:  Let's try it that way.

Mr. BERNSTEIN:  Does magnet 22 extend downwardly in figure 7 of the patent?

A    When I first thought about this invention, I didn't think about having the magnetic member protruding downward.

JUDGE McKELVEY:  The question is:  Does the member 22 of figure 7 protrude downward?

THE WITNESS:  Yes.

Mr. BERNSTEIN:  Whose idea was that to extend the magnetic downwardly?

A    It might have been my idea, and it might have been some idea that came from our discussion.

Q    From whose discussion?

- 21 -

Interference No. 104,051
Chao v. Iwamoto

    A    Well, the situation might have been, I discussed this with David and then we told this idea to the person who submitted the patent application for us.

    Q    So are you saying you don't remember whose idea it was to extend the magnet downwardly?

    A    The drawing was produced by the person who submitted the application.

    Q    Who was that person?

    A    A Mr. Chen.

    Q    Who is Mr. Chen?

    A    He helped us write the patent application in Taiwan.

## B.

What is the significance of Richard Chao's testimony? To answer the question, you had to be at the evidentiary hearing.

Iwamoto says that because Richard Chao talked with others before the patent application was filed the "idea" of a downward projecting magnet (claim 2) must have come from someone else, probably David Chao. Iwamoto says so because Richard Chao has testified that "[i]t might have been my idea, and it might have been some idea that came from our discussion." The problem is that counsel for Iwamoto did not ask the right questions. If I have an idea and I show it to Mr. A, then Mr. A might say "well how are you going to make your idea?" I then have to come up with means to put my idea into practice and I remain sole inventor. Or, Mr. A might say "how are you going to commercialize your idea given element B of your proposed lens?"

- 22 -

Interference No. 104,051
Chao v. Iwamoto

I then make changes to overcome Mr. A's commercialization
observation and I remain sole inventor.  On the other hand, Mr. A
might say, "Gee, good idea, but let me make a suggestion that you
use a magnet?"  If the suggestion is a good one and I decide to
include it in my application and claim it, then I maybe I am a
joint inventor with Mr. A, at least to the embodiment with a
magnet.  The problem with Iwamoto's examination is that it does
not reasonably rule out the possibility that Richard Chao came up
with the magnet idea after discussing his idea with others.  The
mere fact that an inventor talks with others after having an idea
does not mean that the inventor did not make the invention
described and claimed in a patent.

IV.

     In this case, Iwamoto would have us draw one of two
plausible conclusions from the evidence.  But, there is a
presumption that Richard Chao is properly named as inventor of
the invention claimed in the Chao patent.  Compare Brown v.
Edeler, 110 F.2d 858, 861, 45 USPQ 181, 184 (CCPA 1940) (an
application made by two or more persons claiming to be joint
inventors is prima facie evidence of joint inventorship; see also
Hamer v. White, 143 F.2d 987, 991, 62 USPQ 285, 288 (CCPA 1944).
Iwamoto was under a burden to establish by a preponderance of the
evidence that Richard Chao is not properly named as sole
inventor.

- 23 -

Interference No. 104,051
Chao v. Iwamoto

Arguably for purpose of discussion, Iwamoto might make out a case based on the words of the transcript that Richard and David Chao should be named as joint inventors. But, it is equally, if not more, plausible that Iwamoto has failed to sustain its burden. Based on observation of the demeanor of the Chao's, there is little doubt in my mind that Iwamoto failed to sustain its burden. To the extent one might conclude there is a "tie," then the "tie" goes to Richard Chao. Compare Yamaha Int'l Corp. v. Hoshino Gakki Co., 840 F.2d 1572, 1580 n.11, 6 USPQ2d 1001, 1008 n.11 (Fed. Cir. 1988) (the ultimate burden of persuasion [in a case where a party is under a burden to establish a fact by a preponderance of the evidence] is only critical in the situation where the evidence is so evenly balanced that no preponderance emerges. In that event, the party having the burden of persuasion necessarily loses).

_Fred McKelvey_
FRED E. MCKELVEY,
Senior Administrative Patent Judge

23 April 1999
Arlington, VA

- 24 -

Interference No. 104,051
Chao v. Iwamoto

cc (via Federal Express):

Attorneys for Chao:

      Sheldon R. Meyer, Esq.
      FLIESLER, DUBB, MEYER & LOVEJOY
      Four Embarcadero Center
      Suite 400
      San Francisco, CA  94111-4156

      R. Danny Huntington, Esq.
      BURNS, DOANE, SWECKER & MATHIS, LLP
      1737 King Street
      Suite 500
      Alexandria, VA  22314

Attorneys for Iwamoto:

      Bruce Bernstein, Esq.
      GREENBLUM & BERNSTEIN
      1941 Roland Clarke Place
      Reston, VA  20191

- 25 -

0914828962 .0707070101

# EXHIBIT 4

THIS OPINION WAS NOT WRITTEN FOR PUBLICATION

The opinion in support of the decision being entered today (1) was not written
for publication in a law journal and (2) is not binding precedent of the Board.

Paper No. 185

Filed by:    Trial Section Motions Panel
             Box Interference
             Washington, D.C. 20231
             Tel:   703-308-9797
             Fax:   703-305-0942

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE BOARD OF PATENT APPEALS
AND INTERFERENCES
(Judge Jameson Lee)

**FAXED**

RICHARD CHAO

Junior Party,
(Patent No. 5,568,207)

v.

TOSHIKAZU IWAMOTO

Senior Party.
(Application 08/655,828)

APR 7 - 2000

PAT. & T.M. OFFICE
BOARD OF PATENT APPEALS
AND INTERFERENCES

Patent Interference No. 104,051

Before: McKELVEY, Senior Administrative Patent Judge, and SCHAFER
and LEE, Administrative Patent Judges.

LEE, Administrative Patent Judge.

ORDER
Dismissing Motions, Authorizing
Disclosure of Test Results, and
for Entry of Adverse Judgment in 5 Months

     In Paper No. 163, dated May 24, 1999, the Board authorized

the parties to have certain sketches ink-tested by an independent

expert provided that the results of the ink-testing not be

1

disclosed to either party until either (1) after judgment has been entered in this interference, or (2) authorization for disclosure is expressly given by the Board.

On April 6, 2000, at approximately 9:30 AM, a telephone conference was conducted between administrative patent judge Lee, Mr. Danny Huntington representing junior party Chao, and Messrs. Michael J. Fink and Bruce H. Bernstein representing party Iwamoto.  The administrative patent judge was informed that the parties have in fact signed a settlement agreement which will result, in no more than 4 months, in a request by one of the parties for entry of adverse judgment and that all pending motions would either be moot or withdrawn.  Counsel for the parties indicated that precisely which party will prevail depends on the results of the ink-testing that was performed previously in this interference by an independent expert, which results are now under seal by order of the Board, and on a series of procedures to be carried out by the parties once they find out the results of the ink-testing.

Pursuant to discussions during the telephone conference, the parties, through counsel, agreed that if the administrative patent judge now authorizes disclosure of the results of the ink-testing to the parties, cancels the hearing for preliminary motions scheduled later this month, and withholds from issuing a decision on pending motions, then adverse judgment may be entered by the Board against both parties on or after September

6, 2000, unless prior to that date, either party has filed a request for entry of adverse judgment.

Accordingly, based on the foregoing, it is

ORDERED that the results of the ink-testing referred to in Paper No. 163 may be unsealed and disclosed to the parties;

FURTHER ORDERED that on or after September 6, 2000, adverse judgment will be entered by the Board against both parties, unless either party has requested entry of adverse judgment against itself;

FURTHER ORDERED that the hearing on preliminary motions is canceled and no decision on preliminary motions will be rendered prior to September 6, 2000; and

FURTHER ORDERED that all pending preliminary and/or miscellaneous motions of both parties are dismissed, with prejudice.


_McK_
_____
Fred E. McKelvey, Senior )
Administrative Patent Judge)
                           )
                           )
                           )
_Rchl E Schp_            ) BOARD OF PATENT
_____   )    APPEALS
Richard E. Schafer        )      AND
Administrative Patent Judge) INTERFERENCES
                           )
                           )
                           )
_Jameson Lee_             )
_____   )
Jameson Lee               )
(Administrative Patent Judge)

3

☎703 603 3541                        APP & INT              04/07/00 13:13   P.005

Counsel for Party Chao:

(By Facsimile)
415-362-2928
Sheldon R. Meyer
Fliesler, Dubb, Meyer & Lovejoy
Four Embarcadero Center, Suite 400
San Francisco, California 94111-4156

(By Facsimile)
703-836-2021
R. Danny Huntington
Burns, Doane, Swecker & Mathis
1737 King Street, Suite 500
Alexandria, Va 22314

Counsel for Party Iwamoto

(By Facsimile)
703-716-1180
Bruce Bernstein
Greenblum & Bernstein
1941 Roland Clarke Place
Reston, Va 20191

4

091828962.070401

# EXHIBIT 5

Paper No. _____

Filed on behalf of:    Party Iwamoto
By:                  Bruce H. Bernstein, Esq.
                      Michael J. Fink, Esq.
                      Greenblum & Bernstein, P.L.C.
                      1941 Roland Clarke Place
                      Reston, VA 20191
                      Tel:   703-716-1191
                      Fax:   703-716-1180

                      Party Chao
                      R. Danny Huntington, Esq.
                      Burns, Doane, Swecker & Mathis, L.L.P.
                      P.O. Box 1404
                      Alexandria, VA 22313-1404
                      Tel:   703-836-6620
                      Fax:   703-836-2021

## UNITED STATES PATENT AND TRADEMARK OFFICE

## BEFORE THE BOARD OF PATENT APPEALS AND INTERFERENCES
(Administrative Patent Judge Jameson Lee)

### RICHARD CHAO

**Junior Party,**
(Patent No. 5,568,207)

v.

### TOSHIKAZU IWAMOTO

**Senior Party.**
(Application No. 08/655,828)

Patent Interference No. 104,051

## JOINT REQUEST FOR ENTRY OF ADVERSE JUDGMENT PURSUANT TO 37 C.F.R. § 1.662

Senior Party IWAMOTO and Junior Party CHAO hereby jointly request, and expressly agree to, an entry of adverse judgment against Senior Party IWAMOTO with respect to the counts of the above-identified interference, in accordance with 37 C.F.R. § 1.662(a). Accordingly, the parties respectfully request the Board of Patent Appeals and Interferences to issue an order entering adverse judgment against IWAMOTO in accordance with 37 C.F.R. § 1.662(a).

If the Administrative Patent Judge has any questions regarding this Request, he is invited to contact the undersigned counsel at the below-listed telephone numbers.

Respectfully submitted,

IWAMOTO, Senior Party

/ MAY 26, 2000
Date

Bruce H. Bernstein, Esq., Reg. No. 29,027
Michael J. Fink, Esq., Reg. No. 31,827
GREENBLUM & BERNSTEIN, P.L.C.
1941 Roland Clarke Place
Reston, VA 20191
Telephone: 703-716-1191

CHAO, Junior Party

May 25, 2000
Date

R. Danny Huntington, Esq., Reg. No. 27,903
BURNS, DOANE, SWECKER & MATHIS, L.L.P.
P.O. Box 1404
Alexandria, VA 22313-1404
Telephone: 703-836-6620

(J121204P.104)

1

## CERTIFICATE OF SERVICE

I hereby declare that a true copy of the foregoing JOINT REQUEST FOR ENTRY OF ADVERSE JUDGMENT PURSUANT TO 37 C.F.R. § 1.662, was served on Party CHAO this 26th day of May, 2000 by sending a copy of this paper via overnight courier service to the following address:

R. Danny Huntington, Esq.
BURNS, DOANE, SWECKER & MATHIS, L.L.P.
1737 King Street, Suite 500
Alexandria, VA 22314

_May 26, 2000_
Date

Michael J. Fink, Esq.
Reg. No. 31,827
Counsel for Senior Party IWAMOTO

0918282862 . 0704D1

# EXHIBIT 6

**THIS OPINION WAS NOT WRITTEN FOR PUBLICATION**

The opinion in support of the decision being entered today (1) was not written for publication in a law journal and (2) is not binding precedent of the Board.

Paper No. 189

Filed by: Trial Section Merits Panel
Box Interference
Washington, D.C.  20231
Tel:  703-308-9797
Fax:  703-305-0942

## UNITED STATES PATENT AND TRADEMARK OFFICE

### BEFORE THE BOARD OF PATENT APPEALS AND INTERFERENCES

**MAILED**

RICHARD CHAO,

**MAY 3 0 2000**

Junior Party
(Patent No. 5,568,207)[1]

PAT. & T.M. OFFICE
BOARD OF PATENT APPEALS
AND INTERFERENCES

v.

TOSHIKAZU IWAMOTO

Senior Party
(Application 08/655,828)[2]

Patent Interference No. 104,051

Before SCHAFER, BARRETT and LEE, Administrative Patent Judges.

LEE, Administrative Patent Judge.

### JUDGMENT

---

[1]   Based on application 08/554,854, filed November 7, 1995. The real party in interest is Contour Optik, Inc.

[2]   Filed May 31, 1996. Accorded the benefit of Japanese application 07-156,856, filed May 31, 1995, and Japanese application 08-153,172, filed May 24, 1996. The real party in interest is Asahi Kogaku Kogyo Kabushiki Kaisha. See Paper 129.

Interference No. 104,051
Chao v. Iwamoto

The parties have filed a joint request for entry of adverse judgment, pursuant to 37 CFR § 1.662, against senior party Iwamoto.  (Paper No. 187).  The parties have also filed a settlement agreement and a joint request under 37 CFR § 1.666(b) to keep the settlement agreement separate from the file of the interference.  (Paper No. 188).

The joint request to keep the settlement agreement separate from the file of the interference pursuant to 37 CFR § 1.666(b) is <u>granted</u>.

The joint request for entry of adverse judgment against senior party Iwamoto is <u>granted</u>.[3]

It is

**ORDERED** that judgment as to the subject matter of both counts 1 and 2 is herein entered against the senior party TOSHIKAZU IWAMOTO;

**FURTHER ORDERED** that the senior party TOSHIKAZU IWAMOTO is not entitled to its application claims 1, 3, 4, 14, 21, 22 and 27-29 which correspond to count 1; and

**FURTHER ORDERED** that the senior party TOSHIKAZU IWAMOTO is not entitled to its application claims 7-9, 15-18, 23-26, 30 and 31-47 which correspond to count 2.

---

[3]   An order dated April 7, 2000, dismissed all then pending motions of both parties.

2

Interference No. 104,051
Chao v. Iwamoto


_Richard E. Schafer_
Richard E. Schafer        )
Administrative Patent Judge)
                          )
                          )
                          )
_Lee E. Barrett_          )        BOARD OF PATENT
                          )        APPEALS
Lee E. Barrett            )        AND
Administrative Patent Judge)       INTERFERENCES
                          )
                          )
                          )
_Jameson Lee_             )
                          )
Jameson Lee               )
Administrative Patent Judge)

3

Interference No. 104,051
Chao v. Iwamoto


By Facsimile and Federal Express
Counsel for Party Chao:

703-836-2021
R. Danny Huntington
Burns, Doane, Swecker & Mathis, L.L.P.
P.O. Box 1404
Alexandria, Virginia 22313-1404

Counsel for Party Iwamoto:

703-716-1180
Bruce Bernstein
Greenblum & Bernstein
1941 Roland Clarke Place
Reston, Va 20191*

4

C41802062.070401

# EXHIBIT 7

Our Docket No. 4216-4000

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Reissue of                              :

  **Letters Patent 5,568,207**          :

Richard CHAO                              :  Examiner: H. Mai

Serial No.:    09/182,862                  :  Group Art Unit: 2873

Filed:   October 21, 1998                  :

For: AUXILIARY LENSES FOR EYEGLASSES  :

Commissioner for Patents
Washington, D.C. 20231

## DECLARATION OF DAVID Y. CHAO PURSUANT TO 37 CFR § 1.131

SIR:

      I David Y. Chao hereby declare that:

1.    I have a Bachelor of Science degree in Finance from the University of Maryland.

2.    I am currently the Director of International Sales of Contour Optik, Inc., and have been

the Director since 1996.  I was the Sales Manager of Contour Optik Inc. between 1993 to

1996.  My business address is 6 Industrial Fifth Rd., Tau-Chiauo Industrial Park, Chiayi

Taiwan.

1 of 5

23727 v1



Declaration of David Y. Chao
Serial No. 09/182,862

3.    Contour Optik, Inc. manufactures and sells optical products. Contour Optik, Inc. is the assignee of 50% of the entire right, title and interest in and to U.S. Patent No. 5,568,207 ("the '207 patent"), which issued on October 22, 1996 to my brother, Richard Chao.

4.    I am the same David Chao who testified under oath in Interference No. 104,051, involving the '207 patent, before Judges Lee and McKelvey in February 1999.

5.    I understand that a reissue of the '207 patent is being sought, and I am familiar with at least claim 1 of the '207 patent and the reissue application.

6.    Prior to May 31, 1995, while I was working in Taiwan I made a first drawing entry into my Day Planner. The drawing entry illustrates a figure that depicts what I thought my brother Richard Chao had invented and communicated to me in Taiwan. (Chao Interference Exhibits 1105). (Exhibits 8)

7.    I routinely take my Day Planner with me when I travel for business in my capacity as Director of International Sales. I also routinely took my Day Planner with me when I traveled for business in my capacity as Sales Manager for Contour Optik, Inc.

8.    Prior to May 31, 1995, but after I sketched the drawing (the figure of Exhibit 8) referred to in ¶6 above, I traveled to the United States (the "US")(hereinafter the "first trip"). A copy of business records verifying that I was in the US prior to May 31, 1995 are attached as Exhibit 10. The business records include a copy of my American Express

2 of 5

Declaration of David Y. Chao
Serial No. 09/182,862
Docket No. 4216-4000

Bill. The copy of my American Express Bill attached as Exhibit 10 has a closing date prior to May 31, 1995, and identifies the charges I made in California and Pennsylvania prior to May 31, 1995. A copy of charge receipts that I signed and received while I was in the US prior to May 31, 1995, and identified on my American Express Bill, are also attached as part of Exhibit 10. The Credit Card Number and dates have been redacted from these business records.

9.  As is my customary practice, I had my Day Planner referred to in ¶ 6 above with me during my first trip to the US prior to May 31, 1995, which Day Planner included the illustration identified in ¶ 6 supra.

10. Prior to May 31, 1995, but after I returned from my first trip to the US discussed in ¶ 8 above, and while working in Taiwan, I made a second drawing entry into my Day Planner which illustrates a figure which depicts what I thought my brother Richard Chao had invented and communicated to me while in Taiwan. (Chao Interference Exhibits 1106). (Exhibit 9). The second drawing entry into my Day Planner made prior to May 31, 1995, but after the first drawing entry into my Day Planner, illustrates, inter-alia, a magnetic member extending downward from an auxiliary frame toward a projection on the primary spectacle frame holding a magnetic member, as does Figure 7 of the Chao '207 patent.

11. Prior to May 31, 1995, but after I sketched the drawing figure of Exhibit 9, referred to in ¶ 10 above, I again traveled to the US (hereinafter the "second trip"). A copy a business

3 of 5

record verifying that I was again in the US prior to May 31, 1995 is attached as Exhibit 11, and includes a copy of my American Express Bill. The copy of my American Express Bill attached as Exhibit 11 has a closing date prior to May 31, 1995, and identifies charges I made in California and Virginia prior to May 31, 1995. The Credit Card Number and dates have been redacted from these business records.

12. As is my customary practice, I had my Day Planner with me during my second trip to the US prior to May 31, 1995, which Day Planner included the illustration identified in ¶ 10 supra.

13. Prior to May 31, 1995, I brought at least one prototype of a spectacle device having the "hook" type engagement between the primary spectacle frame and the auxiliary spectacle frame and in which a magnetic member extended downward from the auxiliary frame toward a projection on the primary spectacle with me when I traveled to the US.

14. That shortly before March 25, 1995, active exercise began and continued in a diligent effort toward reducing the inventive concepts illustrated in my Day Planner to practice in the US.

15. I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18

4 of 5



of the United States Code and that such willful false statements may jeopardize the

validity of the application or any patent issued thereon.

DATE: _APRIL 19, 2001_                    _____
                                          David Y. Chao

23727 v1

# EXHIBIT 8

CHAO EXHIBIT 1105
CHAO V TWAMTO
INTERFERENCE 104,051

091828062 - 070401

Chao EXHIBIT 1105
Chao v. Iwamoto
Interference 104,051

9 September

Week 37

REDACTED

# EXHIBIT 9

09182862-0704401

CHAO EXHIBIT 1106
CHAO V IWAMTO
INTERFERENCE 104,051

REDACTED

Week 43

**10 October**

| 17 Monday 星期一 | 18 Tuesday 星期二 | 19 Wednesday 星期三 |
| --- | --- | --- |
| REDACTED | REDACTED | REDACTED |
| REDACTED | REDACTED | REDACTED |

| 20 Thursday 星期四 | 21 Friday 星期五 | 22 Saturday 星期六 | 23 Sunday 星期日 |
| --- | --- | --- | --- |
| REDACTED | REDACTED | REDACTED | REDACTED |

Masaki Jipoh

Chao EXHIBIT 1106
Chao v. Iwamoto
Interference 104,051

01/28/1999 12:04   8139947821   JOHN CHERNG   PAGE 03

# EXHIBIT 10



# The Gold Card Summary of Account


Please retain this portion for your files.

EXHIBIT 10



| Card Member Name | Account Number | Closing Date |
|---|---|---|
| DAVID YINKAI CHAO | | |

Page 1 of 2

| Previous Balance | Credits/Payments | New Charges | New Balance |
|---|---|---|---|
| $.00 | $.00 | $652.81 | $652.81 |

| Amex Rel. No. | Item No. | Listing of Charges and Credits | Charges | Credits |
|---|---|---|---|---|
| 034266-1 | 001 | THRIFTY CAR RENTAL LOS ANGELES CA<br>INV#384806 | 116.53 ✓ | |
| 098281-1 | 002 | DOLLAR RAC OF SO CAL LOS ANGELES CA<br>INV#477258 | 183.75 ✓ | |
| 033283-1 | 003 | B/W MONTEREY PARK INN MONTEREY PARK CA<br>INV#159032 | 50.40 ✓ | |
| 501263-1 | 004 | ALAMO RENT-A-CAR INC CHANTILLY    VA<br>232836519 ALAMO RENT-A-CAR INC | 253.72 ✓ | |
| 501266-1 | 005 | HOUSE OF SHANGHAI   LANCASTER     PA<br>265211838 FOOD-BEV | 22.30 ✓ | |
| 501268-1 | 006 | BLOOMINGDALES        TYSONS CORNER  VA<br>142058725 MENS WOVEN SHIRTS | 26.11 | |
| | | ACCOUNT TOTAL | $652.81 | $.00 |

**The Gold Card**

| Card Member Name | Account Number | Closing Date | Page 2 of 2 | FRBF12033 |
|---|---|---|---|---|
| DAVID YINKAI CHAO | | | S3 | 4593 |

---

**ITEM 001**    THRIFTY CAR RENTAL LOS ANGELES CA    $116.53



```
  05/94 THRU 06/97    88   AX
  DAVID YINKAI CHAO         6000
  ...EST CA
              #91684
  LOS ANGELES
  5043917319 ... CA
                                    TT41676 2
  Vink Chao              TOTAL    116.53
  00 384806                American Express Cards
```

**ITEM 002**    DOLLAR RAC OF SO CAL LOS ANGELES CA    $183.75



```
  05/94 THRU 06/97   88   AX
  DAVID YINKAI CHAO        6000
  DOLLAR
  00 034767397
  1304000670            092894
  5043917319  CA
                        1.70-3
  VINK CHAO     TOTAL  $183.75
  00 477258               American Express Cards
```

---

**ITEM 003**    B/W MONTEREY PARK INN MONTEREY PARK CA    $50.40



```
  05/94 THRU 06/97   88   AX
  DAVID YINKAI CHAO        6000
  BST WSTRN MTRY PK
  INN5040549875MTP
  6011023040002674CA      092999
  095 18 1820 994
  VINK CHAO      TOTAL   $50.40
  00 159032              American Express Cards
```

**ITEM 004**    ALAMO RENT-A-CAR INC CHANTILLY    VA    $253.72

| Cardmember Account No | Date of Charge | Reference Code | Approval Code |
|---|---|---|---|
| | | 091994 | |

Service Establishment and Location
ALAMO RENT-A-CAR INC CHANTILLY    VA

Record of Charge

| LOCATION | DATE/TIME | |
|---|---|---|
| RENTAL CHANTILLY | VA 00/00/00 | AGREEMENT 732836519 |
| RETURN | | TR# 263515 |

S/E #  4453900561    **TOTAL CHARGE AMOUNT**    $253.72

---

**ITEM 005**    HOUSE OF SHANGHAI   LANCASTER    PA    $22.30

| Cardmember Account No | Date of Charge | Reference Code | Approval Code |
|---|---|---|---|
| | | 205211838 | 29 |

Service Establishment and Location
HOUSE OF SHANGHAI   LANCASTER    PA

Record of Charge

| FOOD BEV | $19.30 |
|---|---|
| TIP | $3.00 |

S/E #  2371048703    **TOTAL CHARGE AMOUNT**    $22.30

**ITEM 006**    BLOOMINGDALES    TYSONS CORNER    VA    $26.11

| Cardmember Account No | Date of Charge | Reference Code | Approval Code |
|---|---|---|---|
| | | 142058725 | 00 |

Service Establishment and Location
BLOOMINGDALES    TYSONS CORNER    VA

Record of Charge

MENS WOVEN SHIRTS

ROC NUMBER 1402058725    TAX    $1.12

S/E #  4455700683    **TOTAL CHARGE AMOUNT**    $26.11

Case 0:09-cv-61515-MGC   Document 184-15   Entered on FLSD Docket 10/19/2010   Page 52 of 100

# EXHIBIT 11

# The Gold Card Summary of Account

Please retain this portion for your files

EXHIBIT 11

| Card Member Name | Account Number | Closing Date |
|---|---|---|

DAVID YINKAI CHAO

Page 1 of 2

| Previous Balance | Credits/Payments | New Charges | New Balance |
|---|---|---|---|
| $.00 | $.00 | $355.75 | $355.75 |

| Amex Ref. No. | Item No | Listing of Charges and Credits | | Charges | Credits |
|---|---|---|---|---|---|
| 501087-1 | 001 | ROSS DRESS FOR LESS ESCONDIDO<br>00001498  CLOTHING | CA | 70.60 | |
| 495094-1 | 002 | AVIS RENT-A-CAR        CHANTILLY<br>R/A# 700105114 AVIS RENT-A-CAR | VA | 205.15 | |
| 501097-1 | 003 | DFS WEST610 LA AIRPTLOS ANGELES<br>15030215  GIFTS/SUNDRIES | CA | 80.00 | |
| | | ACCOUNT TOTAL | | $355.75 | $.00 |

TOh0h04 07

Payments or credits received after closing date above will appear on next month's statement

001 OZ.

Please see reverse side for important information regarding certain types of charges

Our Docket No. 4216-4000

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Reissue of                                    :

Letters Patent 5,568,207                            :

Richard CHAO                                        :          Examiner: H. Mai

Serial No.:        09/182,862                       :          Group Art Unit: 2873

Filed:        October 21, 1998                      :

For: *AUXILIARY LENSES FOR EYEGLASSES*              :

COMMISSIONER FOR PATENTS
Washington, D.C. 20231

### INFORMATION DISCLOSURE STATEMENT

Sir:

Pursuant to Rules 97 and 98, the applicant(s) hereby call(s) the attention of the Patent Office to the references listed on the attached Form PTO 1449. Copies of these references are enclosed. This statement does not constitute an admission that any of the references are prior art.

☐ This document is being filed within three months of the filing of the application;

☒ Please charge the $180.00 fee to Deposit Account No. 13-4500.

☐ This document is being concurrently filed with the above-identified application;

☐ This document is being filed prior to a first Office Action;

☐ An Office Action has been issued and the appropriate Certification is enclosed. No fee is necessary.

☐ This document is being filed after a Final Office Action or Notice of Allowance, a Petition and fee and appropriate Certification is enclosed;

☒ Please charge any fees necessary to effect the consideration of this document to

☒ Deposit Account No.13-4500, Order No. 4216-4000.

☒ A DUPLICATE COPY OF THIS SHEET IS ATTACHED.

Respectfully submitted,

Date: _____April 12, 2001_____          By: _____

                                             Michael S. Marcus
                                             Registration No. 31,727
                                             (202) 857-7887 Telephone
                                             (202) 857-7929 Telecopier

CORRESPONDENCE ADDRESS:
MORGAN & FINNEGAN, L.L.P.
345 Park Avenue
22nd Floor, 23 Floor
New York, New York 10154-0053
(212) 758-4800 Telephone
(212) 751-6849 Facsimile

1

23414 v1

| FORM PTO-1449 | Attorney Docket: 4216-4000 | Serial No.: 09/182,862 |
| --- | --- | --- |
| **INFORMATION DISCLOSURE CITATION** | Applicant: Richard CHAO | Examiner: H. MAI |
| | Filing Date: October 21, 1998 | Group Art Unit: 2873 |



### U.S. PATENT DOCUMENTS

| Examiner Initial | Document Number | Date | Name | Class | Sub-Class | Filing Date |
| --- | --- | --- | --- | --- | --- | --- |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

### FOREIGN PATENT DOCUMENTS

| | Document Number | Date | Country | Class | Sub-Class | Translation Yes/No |
| --- | --- | --- | --- | --- | --- | --- |
| Jm | CN 107096 | 04-07-1985 | China | | | YES |
| Jm | WO 96/23241 | 08-01-1996 | WIPO | | | YES |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

### OTHER DOCUMENTS (Including Author, Title, Date, etc.)

| | | |
| --- | --- | --- |
| | | |
| | | |
| | | |
| | | |
| | | |

| Examiner  Mai | Date Considered  5/17/01 |
| --- | --- |

| Examiner: | Initial if reference considered, whether or not citation is in conformance with MPEP §609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to Applicant. |
| --- | --- |

23416 v1



**UNITED STATES DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**
Address:   COMMISSIONER OF PATENTS AND TRADEMARKS
           Washington, D.C. 20231

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. |
|---|---|---|---|
| 09/182,862 | 10/21/98 | CHAO | CONT1013SRM/ |

MM92/0522

MICHAEL S. MARCUS.
MORGAN & FINNEGAN, L.L.P.
345 PARK AVENUE
NEW YORK NY 10154-0053

| EXAMINER |
|---|
| MAI.H |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2873 | |

DATE MAILED:   05/22/01

**Please find below and/or attached an Office communication concerning this application or proceeding.**

Commissioner of Patents and Trademarks

1- File Copy

| *Office Action Summary* | Application No. | Applicant(s) |
|---|---|---|
| | 09/182,862 | CHAO, RICHARD |
| | Examiner | Art Unit | |
| | Huy K. Mai | 2873 | |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE <u>3</u> MONTH(S) FROM
THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136 (a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If the period for reply specified above is less than thirty (30) days, a reply within the statutory minimum of thirty (30) days will be considered timely.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133).
- Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

**Status**

1)☒ Responsive to communication(s) filed on <u>20 April 2001</u> .

2a)☒ This action is FINAL.    2b)☐ This action is non-final.

3)☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims**

4)☒ Claim(s) <u>1-3,8,12,36-41 and 67-89</u> is/are pending in the application.

☐ 4a) Of the above claim(s) _____ is/are withdrawn from consideration.

5)☒ Claim(s) <u>1-3, 12,28,67-72 and 74-89</u> is/are allowed.

6)☒ Claim(s) <u>36-41</u> is/are rejected.

7)☒ Claim(s) <u>73</u> is/are objected to.

8)☐ Claims _____ are subject to restriction and/or election requirement.

**Application Papers**

9)☐ The specification is objected to by the Examiner.

10)☐ The drawing(s) filed on _____ is/are objected to by the Examiner.

11)☐ The proposed drawing correction filed on _____ is: a)☐ approved b)☐ disapproved.

12)☒ The oath or declaration is objected to by the Examiner.

**Priority under 35 U.S.C. § 119**

13)☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

a)☐ All b)☐ Some * c)☐ None of:

1.☐ Certified copies of the priority documents have been received.

2.☐ Certified copies of the priority documents have been received in Application No. _____ .

3.☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).

* See the attached detailed Office action for a list of the certified copies not received.

14)☐ Acknowledgement is made of a claim for domestic priority under 35 U.S.C. § 119(e).

**Attachment(s)**

15)☐ Notice of References Cited (PTO-892)        18)☐ Interview Summary (PTO-413) Paper No(s). _____ .

16)☐ Notice of Draftsperson's Patent Drawing Review (PTO-948)    19)☐ Notice of Informal Patent Application (PTO-152)

17)☒ Information Disclosure Statement(s) (PTO-1449) Paper No(s) <u>19, 24</u>    20)☐ Other:

Application/Control Number: 09/182,862                                   Page 2
Art Unit: 2873

## DETAILED ACTION

### *Information Disclosure Statement*

1.     The Information Disclosure Statements filed on Dec. 1st, 2000 and April 2 & 12, 2001 are

acknowledged.

### *Oath/Declaration*

2.     The supplemental reissue declaration filed on March 29, 2001 is objected because of

containing the language of Fig. 8 (paragraph VI) and "at least one arm for extending over said

upper side portion" (paragraph VIII). Since the cancellation of Fig. 8 and the remove the

language "at least one arm for extending over said upper side portion" from claims as amended

*above-mentioned*

in the amendment filed on April 20, 2001, the language in the paragraphs VI & VII of the

supplemental declaration is inappropriate and should be removed.

       The examiner agreed that the supplemental declaration is in complete compliance with

the reissue rules as argued. Therefore, the observations/rejections set forth paragraphs #2 and 3

of the July 1999 Office action (hereinafter the 1999 Office action) have been withdrawn.

3.     Regarding the first declaration of RICHARD J. SAMUELS filed on November 27, 2000

in considering the meetings of the Le Coane Group to determine whether the Twin-Come

documents is available as a prior art.

(I) The R. J. Samuels declaration does not prevail the prior art "Twin-Come" documents which

are printed publication and were public accessible (as discussed in the 1999 action) in view of

*Garret Corp. v. United States*, 422 F.2d 874, 878, 164 USPQ 521, 524 (Ct. Cl.1970) ("While

distribution to government agencies and personnel alone may not constitute publication …

distribution to commercial companies without restriction on use clearly does.")

Application/Control Number: 09/182,862                                          Page 3
Art Unit: 2873

Mr. Samuels states in paragraph (8) that "Sometimes they (Groups) are associations of manufacturers and suppliers, and *sometimes they are associations of manufacturers and distributors, as in the case of the Le Coane Group*" and in paragraph (27) that "I have read all of the Japanese language materials concerning the meeting of the Le Coane Group referred in the declarations of Messrs ... and I have read the organizational document (or *kisoku*) of the Le Coane Group in the original Japanese ... it is my opinion that *the Le Coane Group is a Pentax-sponsored forum for the exclusive interaction between Pentax and its distributors.*" Neither the Samuels' declaration nor the meetings of the Le Coane Group indicate a restriction on use the Twin-Come products. Thus, it is clear that the distribution of the Twin-Come products to its distributors without restriction on use constitute publication. See *Garret Corp. v. United States,* 422 F.2d 874, 878, 164 USPQ 521, 524 (Ct. Cl.1970).

(II) Further, in consideration of the Twin-Come documents and the R. J. Samuels declaration, they do not constitute a confidential from public accessible instead of the Le Coane Group meetings were confidential from a foreign competitor as stated by Mr. Samuels in his declaration.

Mr. Samuels states in paragraph (23) that "I thought particularly telling Mr. Sudo's reaction to Mr. Gholz's question about whether he would feel free to disclose to a foreign competitor a Pentax disclosure to the Le Coane Group that Pentax was going to introduce a new product to the next meeting of the IOFT. As Mr. Sudo said, so doing would be dishonorable". Then, Mr. Samuels concludes "the information conveys to the members of the Le Coane Group by Pentax was subject important "strings" of confidential." And based on the claim on page 71 of the transcription of Mr. Fukuwa's deposition, Mr. Samuels states in paragraph (27) that "the non-

Application/Control Number: 09/182,862                                    Page 4
Art Unit: 2873

Pentax members of the Le Coane Group are in that group to build trust between themselves and

Pentax and sharing confidential information is a tried and true way to do that – in Japan as in the

United States." It appears to the examiner that the subject important "strings" of confidential and

confidential information of the Le Coane Group in the R. J. Samuels declaration were

confidential from the foreign competitor but not from the public accessible because of the

evidence in the Twin-come documents as discussed in the 1999 Office action. The evidence from

the Twin-come documents show that the meeting (of the Le Coane Group) was conducted at

IOFT at the same time as while the Twin-Come products of Pentax was displayed and sold at

IOFT in October 1995. The evidence also show that the Twin-Come products, at least models, of

Pentax were delivered to the individuals as well as the large retailers about October 1995. It is

clear to the examiner that the Twin-come documents including the products and/or the meetings

of the Le Coane Group were not restricted from use, display and sale. In another word, the Twin-

come documents were public accessible.

Therefore, the R. J. Samuels declaration does not prevail the prior art "Twin-Come" documents

in view of *Garret Corp. v. United States*, 422 F.2d 874, 878, 164 USPQ 521, 524 (Ct. Cl.1970)

for the reasons as discussed above.

### *Drawings*

4.      The cancellation of the newly added Fig. 8 is acknowledged.

### *Claim Objections*

5.      Claim 73 is objected to because of the following informalities: The phrase "said auxiliary

spectacle" (claim 73, line 7) should read --said spectacle frame--; otherwise, the phrase "said

auxiliary spectacle" has no antecedent basis.  Appropriate correction is required.

Application/Control Number: 09/182,862                                                Page 5
Art Unit: 2873

### *Claim Rejections - 35 USC § 112*

6.      The following is a quotation of the second paragraph of 35 U.S.C. 112:

> The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.

7.      Claims 40,41 are rejected under 35 U.S.C. 112, second paragraph, as being indefinite for failing to particularly point out and distinctly claim the subject matter which applicant regards as the invention.

The limitations "the first magnetic members are not in contact with the second magnetic members" in dependent claims 40,41 take into with the limitations in claims 36,39, where claims 40,41 depend from, render claims 40,41 unclear as how the first magnetic members are not in contact with the second magnetic members? There is no means to support for the first magnetic members are coupled to, but not in contact with, the second magnetic members.

### *Claim Rejections - 35 USC § 102*

8.      The following is a quotation of the appropriate paragraphs of 35 U.S.C. 102 that form the basis for the rejections under this section made in this Office action:

> A person shall be entitled to a patent unless –
>
> (b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of application for patent in the United States.

9.      Claims 36-41 are rejected under 35 U.S.C. 102(b) as being clearly anticipated by Nishioka (5,642,177).

Nishioka discloses in Figs. 1-3, column 2, lines 8-59, an eyeglass device comprising a primary spectacle frame (5a) including two first magnetic members (7) and an auxiliary spectacle frame (1a) including two second magnetic members (3) each secured to one of the auxiliary side

portions for coupling on a horizontal position with one of the first magnetic members (7), the

horizontal position being substantially perpendicular to a front surface of the primary spectacle

frame (5a) (NOTE: the horizontal position is where the first magnetic member coupled to the

second magnetic member along the line from the center of the first magnetic member (7) to the

center of the second magnetic member (3). The line and/or the horizontal position being

substantially perpendicular to a front surface of the primary spectacle frame (5a)).

Regarding claims 40,41, due to lacking the clarity of how are the first magnetic members not in

contact with the second magnetic members, as discussed above, the limitations in claims 40,41

are inherently included in the Nishioka's device.

### *Allowable Subject Matter*

10.     Claims 1-3,12,28,67-72,74-89 are allowed.

11.     Claim 73 would be allowable if overcome the objection of minor informality.

### *Response to Amendment*

12.     The declaration/affidavit of David Chao under 37 CFR 1.131 (see exhibit #4) filed on

April 20, 2001 with the evidence (see exhibits #8-10) and the facts fount in the interference

104,051, papers #149,185 are sufficient to overcome the Twin-come documents reference.

### *Conclusion*

13.     Applicant's amendment necessitated the new ground(s) of rejection presented in this

Office action. Accordingly, **THIS ACTION IS MADE FINAL**. See MPEP § 706.07(a).

Applicant is reminded of the extension of time policy as set forth in 37 CFR 1.136(a).

    A shortened statutory period for reply to this final action is set to expire THREE

MONTHS from the mailing date of this action. In the event a first reply is filed within TWO

Application/Control Number: 09/182,862                                      Page 7
Art Unit: 2873

MONTHS of the mailing date of this final action and the advisory action is not mailed until after

the end of the THREE-MONTH shortened statutory period, then the shortened statutory period

will expire on the date the advisory action is mailed, and any extension fee pursuant to 37

CFR 1.136(a) will be calculated from the mailing date of the advisory action.   In no event,

however, will the statutory period for reply expire later than SIX MONTHS from the date of this

final action.


          Any  inquiry  concerning  this  communication  or  earlier  communications  from  the

examiner should be directed to Huy K. Mai whose telephone number is (703) 308-4874.   The

examiner can normally be reached on M-F (8:00-4:30).

          If  attempts  to  reach  the  examiner  by  telephone  are  unsuccessful,  the  examiner's

supervisor, Georgia Y. Epps can be reached on (703) 308-4883.   The fax phone numbers for the

organization where this application or proceeding is assigned are (703) 308-7722 for regular

communications and (703) 308-7724 for After Final communications.

          Any inquiry of a general nature or relating to the status of this application or proceeding

should be directed to the receptionist whose telephone number is (703) 308-0956.


HKM/
May 17, 2001

Huy . Mai
Primary Examiner

| **Interview Summary** | Application No. | Applicant(s) |
|---|---|---|
| | 09/182,862 | CHAO, RICHARD |
| | Examiner | Art Unit |
| | Huy K. Mai | 2873 |

All participants (applicant, applicant's representative, PTO personnel):

(1) *Huy K. Mai*.                                      (3)_____.

(2) *Michael S. Marcus*.                               (4)_____.

Date of Interview: *18 June 2001* .

Type:  a)☐ Telephonic   b)☐ Video Conference
       c)☒ Personal [copy given to: 1)☐ applicant   2)☒ applicant's representative]

Exhibit shown or demonstration conducted:  d)☐ Yes   e)☒ No.
If Yes, brief description:          .

Claim(s) discussed: *1,12,36,40,41,68,71,73,75,78,86 and 89* .

Identification of prior art discussed: *Nishioka* .

Agreement with respect to the claims f)☒ was reached.  g)☐ was not reached.  h)☐ N/A.

Substance of Interview including description of the general nature of what was agreed to if an agreement was reached, or any other comments: *The examiner and the attorney of record agreed that the proposed amendment would avoid the 112 problem and overcome the Nishioka reference. The objection to the declaration has been withdrawn. The proposed claims 1,12,36,40,41,6,71,73,75,78,86 and 89 would be allaowable. Such a proposed amendment would be entered* .

(A fuller description, if necessary, and a copy of the amendments which the examiner agreed would render the claims allowable, if available, must be attached. Also, where no copy of the amendments that would render the claims allowable is available, a summary thereof must be attached.)

i)☒ It is not necessary for applicant to provide a separate record of the substance of the interview(if box is checked).

Unless the paragraph above has been checked, THE FORMAL WRITTEN REPLY TO THE LAST OFFICE ACTION MUST INCLUDE THE SUBSTANCE OF THE INTERVIEW. (See MPEP Section 713.04). If a reply to the last Office action has already been filed, APPLICANT IS GIVEN ONE MONTH FROM THIS INTERVIEW DATE TO FILE A STATEMENT OF THE SUBSTANCE OF THE INTERVIEW. See Summary of Record of Interview requirements on reverse side or on attached sheet.

**Huy  Mai**
**Primary Examiner**

Examiner Note: You must sign this form unless it is an Attachment to a signed Office action.

Examiner's signature, if required

## Summary of Record of Interview Requirements

**Manual of Patent Examining Procedure (MPEP), Section 713.04, Substance of Interview Must be Made of Record**
A complete written statement as to the substance of any face-to-face, video conference, or telephone interview with regard to an application must be made of record in the application whether or not an agreement with the examiner was reached at the interview.

### Title 37 Code of Federal Regulations (CFR) § 1.133 Interviews
#### Paragraph (b)
In every instance where reconsideration is requested in view of an interview with an examiner, a complete written statement of the reasons presented at the interview as warranting favorable action must be filed by the applicant. An interview does not remove the necessity for reply to Office action as specified in §§ 1.111, 1.135. (35 U.S.C. 132)

### 37 CFR §1.2 Business to be transacted in writing.
All business with the Patent or Trademark Office should be transacted in writing  The personal attendance of applicants or their attorneys or agents at the Patent and Trademark Office is unnecessary. The action of the Patent and Trademark Office will be based exclusively on the written record in the Office. No attention will be paid to any alleged oral promise, stipulation, or understanding in relation to which there is disagreement or doubt.

The action of the Patent and Trademark Office cannot be based exclusively on the written record in the Office if that record is itself incomplete through the failure to record the substance of interviews.

It is the responsibility of the applicant or the attorney or agent to make the substance of an interview of record in the application file, unless the examiner indicates he or she will do so. It is the examiner's responsibility to see that such a record is made and to correct material inaccuracies which bear directly on the question of patentability.

Examiners must complete an Interview Summary Form for each interview held where a matter of substance has been discussed during the interview by checking the appropriate boxes and filling in the blanks. Discussions regarding only procedural matters, directed solely to restriction requirements for which interview recordation is otherwise provided for in Section 812.01 of the Manual of Patent Examining Procedure, or pointing out typographical errors or unreadable script in Office actions or the like, are excluded from the interview recordation procedures below. Where the substance of an interview is completely recorded in an Examiners Amendment, no separate Interview Summary Record is required.

The Interview Summary Form shall be given an appropriate Paper No., placed in the right hand portion of the file, and listed on the "Contents" section of the file wrapper. In a personal interview, a duplicate of the Form is given to the applicant (or attorney or agent) at the conclusion of the interview. In the case of a telephone or video-conference interview, the copy is mailed to the applicant's correspondence address either with or prior to the next official communication. If additional correspondence from the examiner is not likely before an allowance or if other circumstances dictate, the Form should be mailed promptly after the interview rather than with the next official communication.

The Form provides for recordation of the following information:
- – Application Number (Series Code and Serial Number)
- – Name of applicant
- – Name of examiner
- – Date of interview
- – Type of interview (telephonic, video-conference, or personal)
- – Name of participant(s) (applicant, attorney or agent, examiner, other PTO personnel, etc.)
- – An indication whether or not an exhibit was shown or a demonstration conducted
- – An identification of the specific prior art discussed
- – An indication whether an agreement was reached and if so, a description of the general nature of the agreement (may be by attachment of a copy of amendments or claims agreed as being allowable).  Note: Agreement as to allowability is tentative and does not restrict further action by the examiner to the contrary.
- – The signature of the examiner who conducted the interview (if Form is not an attachment to a signed Office action)

It is desirable that the examiner orally remind the applicant of his or her obligation to record the substance of the interview of each case unless both applicant and examiner agree that the examiner will record same. Where the examiner agrees to record the substance of the interview, or when it is adequately recorded on the Form or in an attachment to the Form, the examiner should check the appropriate box at the bottom of the Form which informs the applicant that the submission of a separate record of the substance of the interview as a supplement to the Form is not required.

It should be noted, however, that the Interview Summary Form will not normally be considered a complete and proper recordation of the interview unless it includes, or is supplemented by the applicant or the examiner to include, all of the applicable items required below concerning the substance of the interview.

A complete and proper recordation of the substance of any interview should include at least the following applicable items:
1) A brief description of the nature of any exhibit shown or any demonstration conducted,
2) an identification of the claims discussed,
3) an identification of the specific prior art discussed,
4) an identification of the principal proposed amendments of a substantive nature discussed, unless these are already described on the Interview Summary Form completed by the Examiner,
5) a brief identification of the general thrust of the principal arguments presented to the examiner,
   (The identification of arguments need not be lengthy or elaborate. A verbatim or highly detailed description of the arguments is not required. The identification of the arguments is sufficient if the general nature or thrust of the principal arguments made to the examiner can be understood in the context of the application file. Of course, the applicant may desire to emphasize and fully describe those arguments which he or she feels were or might be persuasive to the examiner.)
6) a general indication of any other pertinent matters discussed, and
7) if appropriate, the general results or outcome of the interview unless already described in the Interview Summary Form completed by the examiner.

Examiners are expected to carefully review the applicant's record of the substance of an interview. If the record is not complete and accurate, the examiner will give the applicant an extendable one month time period to correct the record.

### Examiner to Check for Accuracy

If the claims are allowable for other reasons of record, the examiner should send a letter setting forth the examiner's version of the statement attributed to him or her. If the record is complete and accurate, the examiner should place the indication, "Interview Record OK" on the paper recording the substance of the interview along with the date and the examiner's initials.

2

SN 09/182,862

## PROPOSED AMENDMENT CHANGES FOR 2ND INTERVIEW

The following claims are not shown in "reissue format" but instead show the present claims with material deleted with brackets and material in bold italics.

The changes to claims 36, 40, 41 and 73 conform with your suggestions.

The change to claim 1 is to return it to its original "pre-reissue" form.

The changes to the remaining claims is to use more compact language, "side portion extensions" instead of "side portions, each side portion having an extension."

1. **(Five Times Amended)**       An eyeglass device comprising:

a primary spectacle frame for supporting primary lenses therein, said primary spectacle frame including two side portions each having an extension extended therefrom for pivotally coupling a leg means thereto, said primary spectacle frame including two rear and side portions each having a projection secured thereto, said primary spectacle frame including an upper side portion,

a pair of first magnetic members secured in said projections respectively,

1

25254 v1

an auxiliary spectacle frame for supporting auxiliary lenses therein, said

auxiliary spectacle frame including two side portions each having an arm extended

therefrom for extending over [and for engaging with] said upper side portion of

said primary spectacle frame, and

a pair of second magnetic members secured to said arms respectively for

engaging with said first magnetic members of said primary spectacle frame so as to

secure said auxiliary spectacle frame to said primary spectacle frame,

said arms being [engaged with and] supported on said upper side portion of

said primary spectacle frame so as to allow said auxiliary spectacle frame to be

stably supported on said primary spectacle frame and so as to prevent said

auxiliary spectacle frame from moving downward relative to said primary

spectacle frame and so as to prevent said auxiliary spectacle frame from being

disengaged from said primary spectacle frame.

36. **(Twice Amended)**    An eyeglass device comprising:

a primary spectacle frame for supporting primary lenses therein;

the primary spectacle frame including two side portion[s, each side portion

having an] extensions extended therefrom for pivotally coupling a leg thereto; and

S/N 09/182,862

the primary spectacle frame including two first magnetic members *respectively having a horizontal surface* and being secured to one of the side portions *extensions* of the primary spectacle frame; and

an auxiliary spectacle frame for supporting auxiliary lenses therein, and for disposing in front of the primary spectacle frame, the auxiliary spectacle frame including two auxiliary side portions, wherein the auxiliary spectacle frame further includes two second magnetic members each secured to one of the auxiliary side portions *and having a horizontal surface* for coupling *a corresponding horizontal surface* [on a horizontal position] of one of the first magnetic members so as to secure the auxiliary spectacle frame to the primary spectacle frame.

40. (Once Amended)      An eyeglass device as recited in Claim 36 wherein *the auxiliary side portions are respectively supported on a corresponding extension* and the first magnetic members are not in contact with the second magnetic members.

41. (Once Amended)      An eyeglass device as recited in Claim 39 wherein *the auxiliary side portions are respectively supported on a corresponding*

25254 v1

S/N 09/182,862

*extension* and the first magnetic members are not in contact with the second

magnetic members.


73. (Once Amended)      An eyeglass device comprising:

a primary spectacle frame for supporting primary lenses therein having two

side portion[s, said side portions each having an] extension*s* [with] *having* a top

side and a rear side with a first magnetic member secured to said rear side, and

an auxiliary spectacle frame including two arms for extending over and

engaging a corresponding top side of said extensions, said arms respectively

containing downwardly extended second magnetic members for hooking said

auxiliary spectacle *frame* to said primary spectacle frame, said arms and said first

and second magnetic members cooperating to support said auxiliary spectacle

frame on said primary spectacle frame.


We are also contemplating some changes to the claims you have allowed,  The
changes are for the purpose of using consistent claim language and are show
below.  The new phraseology used in the following claims was deemed is clearly
found in the allowed claims.


12. (**Twice Amended**)    An eyeglass device comprising:

a primary spectacle frame for supporting primary lenses therein with the

lenses defining a vertical plane, the primary spectacle frame including two side

25254 v1

portion[s, each of the side portions having an] extension*s* extended therefrom for pivotally coupling a leg thereto and a first magnet having a horizontal surface and secured to [a rear side of each of the side portions] *said side portion extensions* of the primary spectacle frame, and

an auxiliary spectacle frame for supporting auxiliary lenses therein, and for disposing in front of the primary spectacle frame, the auxiliary spectacle frame including two auxiliary side portions, the auxiliary spectacle frame including two second magnets, each secured to one of the auxiliary side portions for respectively engaging the horizontal surface of one of the first magnets so as to secure the auxiliary spectacle frame to the primary spectacle frame.

68. (Once Amended)      An eyeglass device comprising:

a primary spectacle frame for supporting primary lenses therein, said primary spectacle frame including two side portion[s each having an] extension*s* extended therefrom for pivotally coupling a leg, each of said extensions also including an outer side, an inner side, and a top side with a projection secured to said inner side, each of said projections respectively securing a first magnetic member, and

an auxiliary spectacle frame for supporting auxiliary lenses therein, said auxiliary spectacle frame including two side portions each having an arm extended therefrom, said auxiliary spectacle frame further including a pair of second

5

S/N 09/182,862

magnetic members secured to said arms respectively for engaging said first

magnetic members of said primary spectacle, each of said arms adapted to extend

over one of said top sides.


71. (Once Amended)       An eyeglass device comprising:

a primary spectacle frame having two side portions[, said side portions each

having an] extensions extending rearwardly therefrom having a top side and a rear

side with a first magnetic member secured thereto, and

an auxiliary spectacle frame including two arms for extending over a

corresponding top side of said extensions, said arms respectively containing second

magnetic members for cooperation with said first magnetic members and

downwardly extended end portions for hooking said auxiliary spectacle frame to

said primary spectacle frame, said arms and said first and second magnetic

members supporting said auxiliary spectacle frame on said primary spectacle

frame.


75. (Once Amended)       An eyeglass device comprising:

a primary spectacle frame for supporting primary lenses therein and having

two side portion[s, an] extensions extending rearwardly *there*from [each of said

25254 v1

S/N 09/182,862

~~side portions~~] and having a front side, a rear side, a top side, and a rear end, each of said rear ends pivotally coupling a leg configured to conform to a user at a distal end thereof, each of said extensions of said primary spectacle frame further having a projection attached to each of said rear sides, and a pair of first magnetic members respectively secured in said projections, said first magnetic members capable of engaging second magnetic members of an auxiliary spectacle frame.

78. (Once Amended)     An eyeglass device comprising:

a primary spectacle frame having two side portion[s each having an] extension*s* extending therefrom and adapted to pivotally couple a leg thereto, said extensions each having a front side, a rear side, a top side and a projection extending from said rear side, each of said projections securing a first magnetic member, and

an auxiliary spectacle frame including two side portions each having an arm extended therefrom for extending over said top side, said arms containing corresponding second magnetic members, said arms with said second magnetic members engaging said first magnetic members thereby securing said auxiliary frame to said primary spectacle frame to prevent said auxiliary spectacle frame from moving downward relative to and/or disengaging from said primary spectacle frame.

7

25254 v1

S/N 09/182,862

86. (NEW)  An eyeglass device comprising:

a primary spectacle frame having two side portion[s, said side portions each having an] extensions extending rearwardly therefrom with a top side and a rear side with a first magnetic member secured thereto, and

an auxiliary spectacle frame including two arms for extending over a corresponding top side of said extensions, said arms respectively containing second magnetic members for cooperation with said first magnetic members and downwardly extended end portions for hooking said auxiliary spectacle frame to said primary spectacle frame, said arms and said first and second magnetic members supporting said auxiliary spectacle frame on said primary spectacle frame, wherein at least one of said first magnetic members and said second magnetic members are magnets.

89. (Once Amended)      An eyeglass device comprising:

a primary spectacle frame having two side portion[s, each of said portions having an] extensions with a front side, a rear side and a first magnetic member [secured to said rear side],

an auxiliary spectacle frame including two side portions each having an arm extended therefrom, each of said arms containing a second magnetic member, said arms extending across a respective extension from said front side to said rear side

8

25254 v1

S/N 09/182,862

so that said first and second magnetic members engage one another whereby said

auxiliary spectacle frame is supported by said primary spectacle frame.--

09182862.070401

9

(d)  The oath or declaration required by paragraph (a) of this section may be submitted under the provisions of § 1.53(f).

The reissue oath/declaration is an essential part of a reissue application and must be filed with the application, or within the time period set under 37 CFR 1.53(f) along with the required surcharge as set forth in 37 CFR 1.16(e) in order to avoid abandonment.

The question of the sufficiency of the reissue oath/declaration filed under 37 CFR 1.175 must in each case be reviewed and decided personally by the primary examiner.

Reissue oaths or declarations must contain the following:

(A) A statement that the applicant believes the original patent to be wholly or partly inoperative or invalid—

(1) by reason of a defective specification or drawing, or

(2) by reason of the patentee claiming more or less than patentee had the right to claim in the patent;

(B) A statement of at least one error which is relied upon to support the reissue application, *i.e.*, as the basis for the reissue;

(C) A statement that all errors which are being corrected in the reissue application up to the time of filing of the oath/declaration arose without any deceptive intention on the part of the applicant; and

(D) The information required by 37 CFR 1.63.

These elements will now be discussed:

**I.  A STATEMENT THAT THE APPLICANT BELIEVES THE ORIGINAL PATENT TO BE WHOLLY OR PARTLY INOPERATIVE OR INVALID BY REASON OF A DEFECTIVE SPECIFICATION OR DRAWING, OR BY REASON OF THE PATENTEE CLAIMING MORE OR LESS THAN PATENTEE HAD THE RIGHT TO CLAIM IN THE PATENT.**

In order to satisfy this requirement, a declaration can state:

"Applicant believes the original patent to be partly inoperative or invalid by reason of a defective specification or drawing."

Alternatively, a declaration can state:

"Applicant believes the original patent to be partly inoperative or invalid by reason of the patentee claiming more or less than patentee had the right to claim in the patent."

Where the specification or drawing is defective and patentee claimed more or less than patentee had the right to claim in the patent, then *both* statements should be included in the reissue oath/declaration. See MPEP § 1412.04 for an exemplary declaration statement when the error being corrected is an error in inventorship.

The above examples will be sufficient to satisfy this requirement without any further statement.

Form paragraph 14.01 may be used where the reissue oath/declaration does not provide the required statement as to applicant's belief that the original patent is wholly or partly inoperative or invalid.

*¶ 14.01 Defective Reissue Oath/Declaration, 37 CFR 1.175(a)(1) - No Statement of Defect in the Patent*

The reissue oath/declaration filed with this application is defective because it fails to contain the statement required under 37 CFR 1.175(a)(1) as to applicant's belief that the original patent is wholly or partly inoperative or invalid. See 37 CFR 1.175(a)(1) and see MPEP § 1414. [1]

**Examiner Note:**

1.  Use this form paragraph when applicant (a) fails to allege that the original patent is inoperative or invalid and/or (b) fails to state the reason of a defective specification or drawing, or of patentee claiming more or less than patentee had the right to claim in the patent. In bracket 1, point out the specific defect to applicant by using the language of (a) and/or (b), as it is appropriate.

2.  Form paragraph 14.14 must follow this form paragraph.

**II.  A STATEMENT OF AT LEAST ONE ERROR WHICH IS RELIED UPON TO SUPPORT THE REISSUE APPLICATION (I.E., THE BASIS FOR THE REISSUE).**

A reissue applicant must acknowledge the existence of an error in the specification, drawings, or claims, which error causes the original patent to be defective. *In re Wilder*, 736 F.2d 1516, 222 USPQ 369 (Fed. Cir. 1984). A change or departure from the original specification or claims represents an "error" in the original patent under 35 U.S.C. 251. See MPEP § 1402 for a discussion of grounds for filing a reissue that may constitute the "error" required by 35 U.S.C. 251. Not all changes with respect to the patent constitute the "error" required by 35 U.S.C. 251.

Applicant need only specify in the reissue oath/declaration one of the errors upon which reissue is based. Where applicant specifies one such error, this requirement of a reissue oath/declaration is satisfied. Applicant may specify more than one error.

Where more than one error is specified in the oath/declaration and some of the designated "errors" are found to not be "errors" under 35 U.S.C. 251, any remaining error which is an error under 35 U.S.C. 251 will still support the reissue.

The "at least one error" which is relied upon to support the reissue application must be set forth in the oath/declaration. It is not necessary, however, to point out how (or when) the error arose or occurred. Further, it is not necessary to point out how (or when) the error was discovered. If an applicant chooses to point out these matters, the statements directed to these matters will not be reviewed by the examiner, and the applicant should be so informed in the

(d) The oath or declaration required by paragraph (a) of this section may be submitted under the provisions of § 1.53(f).

The reissue oath/declaration is an essential part of a reissue application and must be filed with the application, or within the time period set under 37 CFR 1.53(f) along with the required surcharge as set forth in 37 CFR 1.16(e) in order to avoid abandonment.

The question of the sufficiency of the reissue oath/declaration filed under 37 CFR 1.175 must in each case be reviewed and decided personally by the primary examiner.

Reissue oaths or declarations must contain the following:

(A) A statement that the applicant believes the original patent to be wholly or partly inoperative or invalid—

(1) by reason of a defective specification or drawing, or

(2) by reason of the patentee claiming more or less than patentee had the right to claim in the patent;

(B) A statement of at least one error which is relied upon to support the reissue application, *i.e.*, as the basis for the reissue;

(C) A statement that all errors which are being corrected in the reissue application up to the time of filing of the oath/declaration arose without any deceptive intention on the part of the applicant; and

(D) The information required by 37 CFR 1.63.

These elements will now be discussed:

I.    **A STATEMENT THAT THE APPLICANT BELIEVES THE ORIGINAL PATENT TO BE WHOLLY OR PARTLY INOPERATIVE OR INVALID BY REASON OF A DEFECTIVE SPECIFICATION OR DRAWING, OR BY REASON OF THE PATENTEE CLAIMING MORE OR LESS THAN PATENTEE HAD THE RIGHT TO CLAIM IN THE PATENT.**

In order to satisfy this requirement, a declaration can state:

"Applicant believes the original patent to be partly inoperative or invalid by reason of a defective specification or drawing."

Alternatively, a declaration can state:

"Applicant believes the original patent to be partly inoperative or invalid by reason of the patentee claiming more or less than patentee had the right to claim in the patent."

Where the specification or drawing is defective and patentee claimed more or less than patentee had the right to claim in the patent, then *both* statements should be included in the reissue oath/declaration. See MPEP § 1412.04 for an exemplary declaration statement when the error being corrected is an error in inventorship.

The above examples will be sufficient to satisfy this requirement without any further statement.

Form paragraph 14.01 may be used where the reissue oath/declaration does not provide the required statement as to applicant's belief that the original patent is wholly or partly inoperative or invalid.

*¶ 14.01 Defective Reissue Oath/Declaration, 37 CFR 1.175(a)(1) - No Statement of Defect in the Patent*

The reissue oath/declaration filed with this application is defective because it fails to contain the statement required under 37 CFR 1.175(a)(1) as to applicant's belief that the original patent is wholly or partly inoperative or invalid. See 37 CFR 1.175(a)(1) and see MPEP § 1414. [1]

Examiner Note:

1.   Use this form paragraph when applicant: (a) fails to allege that the original patent is inoperative or invalid and/or (b) fails to state the reason of a defective specification or drawing, or of patentee claiming more or less than patentee had the right to claim in the patent . In bracket 1, point out the specific defect to applicant by using the language of (a) and/or (b), as it is appropriate.

2.   Form paragraph 14.14 must follow this form paragraph.

II.    **A STATEMENT OF AT LEAST ONE ERROR WHICH IS RELIED UPON TO SUPPORT THE REISSUE APPLICATION (I.E., THE BASIS FOR THE REISSUE).**

A reissue applicant must acknowledge the existence of an error in the specification, drawings, or claims, which error causes the original patent to be defective. *In re Wilder*, 736 F.2d 1516, 222 USPQ 369 (Fed. Cir. 1984). A change or departure from the original specification or claims represents an "error" in the original patent under 35 U.S.C. 251. See MPEP § 1402 for a discussion of grounds for filing a reissue that may constitute the "error" required by 35 U.S.C. 251. Not all changes with respect to the patent constitute the "error" required by 35 U.S.C. 251.

Applicant need only specify in the reissue oath/declaration one of the errors upon which reissue is based. Where applicant specifies one such error, this requirement of a reissue oath/declaration is satisfied. Applicant may specify more than one error.

Where more than one error is specified in the oath/declaration and some of the designated "errors" are found to not be "errors" under 35 U.S.C. 251, any remaining error which is an error under 35 U.S.C. 251 will still support the reissue.

The "at least one error" which is relied upon to support the reissue application must be set forth in the oath/declaration. It is not necessary, however, to point out how (or when) the error arose or occurred. Further, it is not necessary to point out how (or when) the error was discovered. If an applicant chooses to point out these matters, the statements directed to these matters will not be reviewed by the examiner, and the applicant should be so informed in the

JUN 11 '01  07:07PM ASPEX EYEWEAR                          BROBECK                   P.4/41
08/05/2001 17:39 FAX 415 442 1010          BROBECK SF                                 ☑002

ENTERED
CLERK, U.S. DISTRICT COURT

JUN 15 2001

CENTRAL DISTRICT OF CALIFORNIA
BY

FILED
CLERK, U.S. DISTRICT COURT

JUN - 4 2001

CENTRAL DISTRICT OF CALIFORNIA
BY            DEPUTY

X  Priority
X  Send
___ Clsd
X  Enter
___ JS-5/JS-8
___ JS-2/JS-3

THIS CONSTITUTES NOTICE OF ENTRY
AS REQUIRED BY FRCP, RULE 77(d).

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ASPEX EYEWEAR, INC.<br><br>        Plaintiff,<br><br>    v.<br><br>REVOLUTION EYEWEAR, INC.<br><br>        Defendant. | CV 99-1623 LGB (BQRx)<br><br>ORDER GRANTING PLAINTIFF'S<br>MOTION FOR PARTIAL SUMMARY<br>JUDGMENT ON DEFENDANT'S<br>COUNTERCLAIM AND<br>AFFIRMATIVE DEFENSE OF<br>PATENT INVALIDITY |

I.   INTRODUCTION

This action arises out of Plaintiff Aspex Eyewear, Inc.'s allegation that Defendant Revolution Eyewear, Inc. is infringing upon its patent for magnetic eyewear. By the instant motion, Plaintiff seeks partial summary judgment on Defendant Revolution Eyewear Inc.'s counter-claim and affirmative defense of patent invalidity.

//

//

✓ Docketed
✓ Copies / NTC Sent
✓ JS - 5 / JS - 6
___ JS - 2 / JS - 3
___ CLSD

JUN 05 2001

183

JUN 11 '01   07:07PM ASPEX EYEWEAR
06/05/2001 17:40 FAX 415 442 1010         BRUBECK SF                              P. 3/4
                                                                                @003

1  II.  FACTUAL BACKGROUND

2      Plaintiff purportedly has rights in U.S. Patent No. 5,568,207

3  (the "'207 Patent") for a particular type of magnetic "clip-on"

4  eyeglasses. See Def.'s Ex. 7 ('207 Patent). The patent was issued on

5  October 22, 1996, and identifies the inventor of the device disclosed

6  therein as a person by the name of Richard Chao ("Chao"). See id. at

7  1.

8      A.  DESCRIPTION OF THE PATENTED DEVICE

9          The '207 Patent relates to an eyeglass device comprising a

10  primary spectacle frame for supporting primary lenses therein, and an

11  auxiliary frame (colloquially known as the "clip-on" frame) for

12  supporting auxiliary lenses. ('207 Patent, Abstract). The '207 Patent

13  specifies an arrangement whereby the auxiliary frame is engaged to the

14  primary spectacle frame using "magnetic members." See id. The two

15  magnetic members of the primary frame are secured within "projections"

16  that are in turn secured to the "rear and side portions" of the

17  primary spectacle frame. ('207 Patent, col. 1, lns. 50-52 & Fig. 3).

18  The two magnetic members of the auxiliary frame are secured to the

19  "arms," which are in turn secured to the two "side portions" of the

20  auxiliary frame. (Id. at col. 1, lns. 54-55 & Fig. 4). The arms of the

21  auxiliary frame extend over, and engage with, the upper portion of the

22  primary spectacle frame, such that the magnetic members of the two

23  frames engage with each other. (Id. at lns. 55-58 & Fig. 6). The

24  arrangement prevents the auxiliary frame from moving downward relative

25  to the primary spectacle frame, thereby enabling the auxiliary frame

26  to be stably supported. (Id. at col. 1, ln.62 - col.2, ln. 2).

27

28

- 2 -

1      B.     DEFENDANT'S INVALIDITY COUNTERCLAIM

2           On February 17, 1999, Plaintiff filed suit against Defendant, on

3      the grounds that its magnetic eyewear infringed upon the '207 Patent.

4      See Pl.'s Compl. On March 11, 1999, Defendant filed a counterclaim

5      seeking a declaration that the '207 Patent is invalid, and an

6      affirmative defense of invalidity. See Def.'s Counterclaim & Answer.

7           Defendant bases its invalidity claim on the contention that an

8      inventor by the name of Julie Madison ("Madison") is the first true

9      inventor of the device claimed in the '207 Patent. Madison is the

10     holder of U.S. Patent No. 6,149,269 (the "'269 Patent") for

11     "Eyeglasses Having Magnetically Held Auxiliary Lenses." See Def.'s Ex.

12     1 ('269 Patent). Madison applied for the patent on April 18, 1997, and

13     the '269 Patent was issued on November 21, 2000. See id. The '269

14     Patent describes itself as an improvement over prior art because of

15     its "uniblock" design:

16          Eyeglasses and clip-ons are improved by providing
            housings for magnets for securing the clip-ons in a
17          uniblock also incorporating one or more of the
            following: parts of closing block, an end piece, and
18          part of a hinge. The structure is more compact, neater
            in appearance, and of improved quality as compared to
19          eyeglasses incorporating conventional structures . . .

20     See '269 Patent, Abstract. See also id. at col. 1, lns. 36-42

21     ("In eyeglasses constructed in accordance with the prior art, the

22     piecemeal assembly of closing block, end piece, magnet housing

23     and temple-piece hinge produces a structure that is unduly strung

24     out or elongate, and the housing for the magnet is bulky and

25     unsightly.") Significantly, the '269 Patent identifies the device

26     disclosed in the '207 Patent as a prior art reference. See id. at

27     1 (References Cited); id. at col. 1, lns. 13-25 ("Eyeglasses

28

                                   - 3 -

JUN 11 '01  07:06PM ASPEX EYEWEAR          BROBECK                              P.174
06/05/2001 17:41 FAX 415 442 1010          BROBECK SF                           ☒004

1  equipped with one or more magnets adapted to secure an auxiliary

2  lens in superimposed relation to a primary lens are known and

3  disclosed for example in Chao U.S. Pat. No. 5,586,207.")

4      Madison purportedly began designing eyewear in or around

5  1978. See Madison Depo., Vol. 1 at 6. Madison asserts that, in

6  the summer of 1994, she conceived of a variety of embodiments for

7  eyeglasses that utilize a magnet to attach an auxiliary frame to

8  a primary frame, in a uniblock (also known as a "monoblock")

9  configuration.[1] See id. at 16:5-19:7; Madison Depo., Vol. 2 at

10  189-190. Madison claims that she conceived of a number of

11  orientations for the magnets during the summer of 1994, including

12  "magnets mounted on the front, magnets mounted on the top, and .

13  . . magnets mounted . . . vertically and horizontally." Id. at

14  24:16-23. Madison also purportedly conceived of a design whereby

15  the arms of the auxiliary frame would "go directly over" the

16  front portion of the primary frame. See id. at 25-27. Madison

17  apparently committed her ideas and designs to paper during 1994.

18  See id. at 27-28.[2]

19

20  _____

21      [1] As described by Madison, a monoblock configuration is one where
    "all the parts, the rimlock, the hinge, and in this case the magnet, the

22  end piece, are constructed from a single piece of metal." Madison Depo.,
    Vol. 1 at 45.

23
        [2] "Q: Now, did you prepare any notes or writing that related to
24  this conception?
            A: Yes.
25      Q: And in what format did you maintain those notes?
        A: Some are in notebooks, some are on -- depends on where I was.
26          Some were on box tops. Depending what I was doing at that
27          time. Some were on random pieces of paper."

28  See Madison Depo., Vol. 1 at 27-28.

                            - 4 -

1       Also in the summer of 1994, Madison allegedly met with a

2   person by the name of Mr. Kimura, who worked for a company called

3   Sunreeve. See id. at 30; Madison Depo., Vol. 2 at 177. At their

4   meeting in Norwood, New Jersey, Kimura purportedly showed Madison

5   a sample of magnetic eyewear wherein the magnets were placed in a

6   front-mounted configuration. See Madison Depo., Vol.1 at 32:21-

7   33:24. As they discussed the sample, Madison asserts that she

8   disclosed certain aspects of the invention she had conceived.

9   See id. at 34. Specifically, Madison purportedly discussed her

10  idea for magnetic eyewear with back-mounted magnets. See id.; see

11  also id. at 47 (Madison's testimony that she disclosed "the

12  substance of" her U.S. Patent application to Kimura). However,

13  Madison did not disclose any of her previously-made notes and

14  drawings to Kimura. See Madison Depo., Vol. 2 at 207-208.

15  Instead, Madison and Kimura purportedly made drawings during the

16  course of their meeting, incorporating Madison's uniblock design.

17  See id. In addition, Madison asked Mr. Kimura and Sunreeve to

18  create an eyeglass sample with top-mounted magnets and a

19  monoblock configuration. See id. at 177, 190. While Madison did

20  not enter into any formal confidentiality agreement with Kimura

21  or Sunreeve (see Madison Depo., Vol. 1 at 44:12-45:2), Madison

22  testified that she did expect Kimura to refrain from disclosing

23  her ideas and drawings to other people within the industry.

24  See Madison Depo., Vol. 2 at 210-211.[3]

25  _____

26      [3] "Q: Would it be fair to say . . . that your discussions with Mr.
    Kimura that day in Anaheim when you went over these drawings were not

27  meant to be disclosed to anyone else in the industry?
        A: I had expected that he would go back to his office and discuss

28      it with his technical people 'cause he's not a technical - although

- 5 -

Jun 11 01 06:03p     Thierry's Desk         (954)432-3840        p.15
     06/11/01  14:47    ☎213 239 1300      BROBECK                      ☐026
   05/05/2001 17:42 FAX 415 442 1010     BROBECK SF                     ☐008

1   At a subsequent meeting in Anaheim, California in October of
2   1994, Kimura informed Madison that Sunreeve could not produce a
3   sample of a top-mounted monoblock design, because of the
4   technical difficulties it posed. See Madison Depo., Vol. 2 at
5   177-178; 190-192; 205:9-18. Thereafter, in April 18, 1997,
6   Madison applied for, and subsequently received, the '269 Patent.

7

8   III. PROCEDURAL BACKGROUND

9       Plaintiff filed the instant patent infringement action
10  against Defendant on February 17, 1999. Defendant filed an Answer
11  on March 11, 1999. Defendant also filed two counterclaims. The
12  first counterclaim seeks a declaration that its frames do not
13  infringe the '207 Patent, and the second counterclaim seeks a
14  declaration that the '207 Patent is invalid.
15      On June 2, 1999, Defendant filed a motion to stay this
16  action pending the conclusion of an interference proceeding by
17  the PTO to determine who, as between Richard Chao and inventor
18  Toshikazu Iwamoto, was the first to invent the device claimed in
19  the '207 Patent. On September 10, 1999, the Court ordered a stay
20

21      he's very bright, he's not the technical guy.
22      Q: Now, you expected him to talk to people within Sunreeve?
        A: Right.
23      Q: Right. But you didn't expect him to go to talk to other people
        within the industry?
24      . . .
25      A: Correct.
        . . .
26      Q: Did you want him to keep the information a secret?
        . . .
27      A: That would be yes."

28  See Madison Depo., Vol. 2 at 210-212.

- 6 -

06/05/2001 TUE 16:19  [TX/RX NO 6808] ☐007

06/05/2001 TUE 17:38  [TX/RX NO 6285] ☐008

Jun 11 01 06:01p       Thierry's Desk       (954)432-3840       p.14

06/11/01   14:47   ☎213 239 1300       BROBECK       ☒027

06/05/2001 17:42 FAX 415 442 1010       BROBECK SF       ☒009

1   of the action. On or about May 30, 2000, Richard Chao prevailed

2   in the interference proceeding, and the Court thereafter vacated

3   the stay on July 25, 2000.

4       On April 12, 2001, Plaintiff filed the instant motion for

5   partial summary judgment on Defendant's invalidity counterclaim

6   and affirmative defense. Defendant filed an opposition on April

7   23, 2001, to which Plaintiff replied on April 30, 2001.[4]

8

9   IV.   SUMMARY JUDGMENT STANDARD

10      Rule 56 of the Federal Rules of Civil Procedure provides

11  that a court shall grant a motion for summary judgment if "the

12  pleadings, depositions, answers to interrogatories, and

13  admissions on file, together with the affidavits, if any, show

14  that there is no genuine issue as to any material fact and that

15  the moving party is entitled to judgment as a matter of law."

16  Fed. R. Civ. P. 56(c). Material facts are those that may affect

17  the outcome of the case. See Anderson v. Liberty Lobby, Inc.,

18  477 U.S. 242, 248 (1986). A dispute as to a material fact is

19  genuine if there is sufficient evidence for a reasonable jury to

20  return a verdict for the nonmoving party. See id.

21      The party moving for summary judgment bears the initial

22  burden of informing the district court of the basis of the

23  summary judgment motion, and of demonstrating the absence of a

24  _____

25  [4] In its motion, Plaintiff also represents that Defendant agreed to
    dismiss its fifth affirmative defense of statute of limitations, and its
26  ninth affirmative defense of laches. See Totino Decl. ¶2 & Ex. A.
    Defendant's opposition does not indicate whether it agrees with this
27  representation. As these affirmative defenses are not made a part of
    Plaintiff's motion for summary judgment, the Court will not dismiss such
28  defenses in the absence of a stipulation between the parties.

- 7 -

1  genuine issue of material fact for trial.  See Celotex Corp. v.

2  Garrett, 477 U.S. 317, 323 (1986); Katz v. Children's Hosp. of

3  Orange County, 28 F 3d 1520, 1534 (9th Cir. 1994). On an issue

4  for which the nonmoving party has the burden of proof at trial,

5  the moving party need only point out "that there is an absence of

6  evidence to support the nonmoving party's case." Celotex, 477

7  U.S. at 325. Once this initial burden is satisfied, the non-

8  moving party is required to "go beyond the pleadings and by her

9  own affidavits, or by the depositions, answers to

10 interrogatories, and admissions on file, designate 'specific

11 facts' showing that there is a genuine issue for trial." Celotex,

12 477 U.S. at 324 (internal quotations omitted). See also Nilsson,

13 Robbins, Dalgarn, Berliner, Carson & Wurst v. Louisiana Hydrolec,

14 854 F. 2d 1538, 1544 (9th Cir. 1988). Where the standard of proof

15 at trial is preponderance of the evidence, the non-moving party's

16 evidence must be such that a "fair-minded jury could return a

17 verdict for the [non-moving party] on the evidence presented."

18 Anderson, 477 U.S. at 252.

19

20 V.  ANALYSIS

21    A.  LEGAL STANDARD FOR PATENT INVALIDITY

22    Patents enjoy a statutory presumption of validity. See 35

23 U.S.C. § 282 (1994). The party seeking to establish a patent's

24 invalidity must do so by clear and convincing evidence. Id.; Eli

25 Lilly & Co. v. Barr Laboratories, Inc., 222 F.3d 973, 980 (Fed.

26 Cir. 2000). "If the evidence requires the fact finder to draw

27 extensive inferences, the evidence does not satisfy the clear and

28 convincing proof requirement." Hay & Forage Industries v. New

- 8 -

Jun 11 01 05:58p        Thierry's Desk              (954)432-3840           p.12
       06/11/01   14:48   ☎213 239 1300        BROBECK                              ☎029
  06/03/2001 17:43 FAX 415 442 1010          BROBECK SF
                                                                                    ☎011

1   Holland North America, Inc., 60 F.Supp.2d 1099, 1119 (D.Kan.

2   1998).

3        "[A] moving party seeking to have a patent held not invalid

4   at summary judgment must show that the nonmoving party, who bears

5   the burden of proof at trial, failed to produce clear and

6   convincing evidence on an essential element of a defense upon

7   which a reasonable jury could invalidate the patent." Id.

8        A patent may be rendered invalid if it is anticipated by

9   prior art. Invalidity based on anticipation is described in 35

10  U.S.C. § 102(a):

     A person shall be entitled to a patent unless -
     (a) the invention was known or used by others in this
     country, or patented or described in a printed
     publication in this or a foreign country, before
     invention thereof by the applicant for the patent.

15  See 35 U.S.C. §102(a). In essence, this statutory provision

     requires an invention to be "new" in order to be patentable.

     See 1 Chisum, Chisum on Patents, §3.01 at 3-3 (2000).

     Here, Defendant argues that the Madison drawings disclosed

     to Kimura constitute prior art that anticipates and invalidates

20  the '207 Patent. To withstand Plaintiff's motion for summary

21  judgment, Defendant must produce sufficient evidence to permit a

22  reasonable finder of fact to find patent invalidity on this basis

23  by clear and convincing evidence. See Anderson v. Liberty Lobby,

24  Inc., 477 U.S. at 254.[5]

_____

25        [5] As a preliminary matter, Plaintiff argues that Defendant is

26  precluded from arguing anticipation because Madison's own patent refers

27  to the Chao invention as a prior art reference. See '269 Patent at 1
    (References Cited); id. at col. 1, lns. 13-25. "A statement in a patent

28  that something is in the prior art is binding on the applicant and
    patentee for determinations of anticipation and obviousness." Constant

                              - 9 -

                    05/05/2001 TUE 16:19  [TX/RX NO 6806] ☎010
                    06/05/2001 TUE 17:38  [TX/RX NO 8285] ☎011

06/11/01   14:48    213 239 1300          BROBECK                              030

06/05/2001 17:43 FAX 415 442 1010        BROBECK SF                           012

**B.    APPLICATION**

1

2      "A patent is invalid for anticipation when the same device

3    or method, having all of the elements and limitations contained

4    in the claims, is described in a single prior art reference." ATD

5    Corporation v. Lydall, Inc., 159 F.3d 534, 545 (Fed. Cir. 1998).

6       In order to invalidate a patent based on anticipation, the

7    Court must undertake a three-step analysis. First, the Court must

8    determine whether the purportedly anticipating invention is

9    indeed a prior art reference. See Purdue Pharma L.P. v.

10   Boehringer Ingelheim, GMBH, 237 F.3d 1359, 1365 (Fed. Cir. 2001).

11   In other words, does the reference pre-date the invention of the

12   patent-in-suit? Second, the Court must compare the claims of the

13   patent-in-suit to the prior art, to determine whether the prior

14   art reference discloses each and every limitation of the

15   invention claimed in the patent-in-suit. See Heliflix Limited v.

16   Blok-Lok Limited, 208 F.3d 1339, 1346 (Fed. Cir. 2000). See also

17   Hybritech, Inc. v. Monoclonal Antibodies, Inc., 802 F.2d 1367

18   (Fed. Cir. 1986)("It is axiomatic that for prior art to

19   anticipate under §102 it has to meet every element of the claimed

20   invention . . ."). Third, the Court must determine whether the

21   prior art reference was either "known or used by others in this

22   _____

23   v. Advanced Micro Devices, Inc., 848 F.2d 1560, 1570 (Fed. Cir. 1988).
     Thus, Madison's description of the '207 Patent as a prior art reference
24   constitutes an admission of this fact as to Madison. However, Plaintiff
     identifies no cases, and the Court has found none, indicating that the
25   scope of the admission extends to third parties seeking to raise an
     invalidity defense. Thus, the Court is hesitant to rest upon this
26   admission alone in assessing the viability of Defendant's counterclaim.
     Nevertheless, it is significant that Defendant places virtually
27   exclusive reliance upon Madison's deposition testimony to prove a
     contention that Madison herself is barred from making.
28

                              - 10 -

Jun 11 01 05:55p     Thierry's Desk          (954)432-3840        p.10

06/11/01  14:48  ☎213 239 1300        BROBECK                        ☑031

06/05/2001 17:43 FAX 413 442 1010        BROBECK SF                  ☑053

1  country", or "described in a printed publication in this or a

2  foreign country." 35 U.S.C. §102(a). Anticipation is a question

3  of fact that is subject to review under the clearly erroneous

4  standard. See In re King, 801 F.2d 1324, 1326 (Fed. Cir. 1986).

5          1.    WHETHER THE MADISON INVENTION IS A PRIOR ART
                 REFERENCE
6

7          A reference constitutes prior art only if it

8  predates the date of invention of the device claimed in the

9  patent-in-suit. See 35 U.S.C. §102(a). The presumptive date of

10  invention for any device is the date upon which a complete patent

11  application is filed in the Patent and Trademark Office ("PTO").

12  See Cooper v. Goldfarb, 154 F.3d 1321, 1327 (Fed.Cir. 1998);

13  Bates v. Coe, 98 U.S. 31, 34 (1978). A patentee may establish an

14  earlier date of invention, however, by showing either (1) "an

15  earlier reduction to practice." (Purdue, 237 F.3d at 1365); or

16  (2) "an earlier conception followed by a diligent reduction to

17  practice." Id. "Conception and reduction to practice are

18  questions of law, based on subsidiary findings of fact." Id.

19          Here, the presumptive date of invention of Chao's eyeglass

20  device is November 7, 1995 -- the date Chao filed his patent

21  application with the PTO. See Pl.'s Ex. 7. The presumptive date

22  of invention of Madison's eyeglass device is seventeen months

23  later, on April 18, 1997 -- the date upon which Madison filed her

24  patent application. See Pl.'s Ex. 1. Thus, in order for Defendant

25  to establish that Madison's invention is a prior art reference,

26  it must raise a genuine issue of material fact that Madison

27  either reduced her invention to practice before November 7, 1995,

28  or conceived of her invention and diligently worked to reduce it

- 11 -

Jun 11 01 05:54p      Thierry's Desk           (954) 432-3840         P.9
     06/11/01   14:49   ☎213 239 1300      BROBECK
  06/05/2001 17:43 FAX 415 442 1010      BROBECK SF                        ☑014

1  to practice before November 7, 1995.

2              (a) Actual Reduction to Practice

3              To prove actual reduction to practice, "an
4  inventor must establish that he actually prepared the composition
5  and knew it would work." Estee Lauder Inc. v. L'Oreal, S.A., 129
6  F.3d 588, 592 (Fed.Cir.1997); Markman v. Lehman, 987 F.Supp. 25,
7  30 (1997) ("Proof of actual reduction to practice requires a
8  showing that the apparatus actually existed and that it worked
9  for its intended purpose.") "To establish an actual reduction to
10 practice, an inventor must provide independent corroborating
11 evidence in addition to his or her own statements and documents,
12 such as testimony of a witness other than the inventor or
13 evidence of surrounding facts and circumstances independent of
14 information received from the inventor." Markman, 987 F.Supp. at
15 30. "The purpose of this rule is to prevent fraud." Id.

16      Here, Defendant does not attempt to provide any evidence
17 that Madison actually reduced her eyeglass device to practice
18 prior to the filing of the Chao patent application on November 7,
19 1995. Indeed, the only evidence in the record is the
20 uncorroborated testimony of Madison that the first specimen
21 embodying her patented invention was produced in 1996. See
22 Madison Depo., Vol. 2 at 228-229.  Thus, Madison cannot establish
23 priority on this basis.

24              (b)  Conception and Diligent Reduction to
25                   Practice

26              Defendant seeks to establish priority on the
27 alternative basis that Madison conceived of her invention, and
28 diligently worked to reduce it practice, prior to November 7,

                          - 12 -

Jun 11 01 05:53p   Thierry's Desk   (954)432-3840   p.8
06/11/01  14:49  213 239 1300   BROBECK   033
05/05/2001 17:44 FAX 415 442 2010   BROBECK SF   015

1    1995. Conception "requires proof that the inventor formed in his
2    mind 'a definite and permanent idea of the complete and operative
3    invention, as it is hereafter to be applied in practice,' and
4    that the idea be 'so clearly defined in the inventor's mind that
5    only ordinary skill would be necessary to reduce the invention to
6    practice, without extensive research or experimentation.'" Id.
7    (quoting Burroughs Wellcome Co. v. Barr Labs., Inc., 40 F.3d
8    1223, 1228 (Fed.Cir. 1994). Where a party seeks to show
9    conception though oral testimony of an inventor, it must produce
10   independent evidence corroborating that testimony. See Purdue,
11   237 F.3d at 1365. Indeed, "[p]roof of an alleged inventor's
12   conception and reduction to practice is a heavy one and requires
13   full corroboration by other than the inventor's own self-serving
14   testimony or records." Porter Instrument Co., Inc. v. Odec
15   Computer Systems, Inc., 370 F.Supp. 198, 206 (D.R.I. 1974)
16   (quoting Eastman Kodak Co. v. E. I. DuPont de Nemours & Co., 298
17   F.Supp. 718, 728 (E.D.Tenn. 1969)).
18        In order to show due diligence in the inventor's reduction
19   to practice, "the patentee must account for the entire critical
20   period between the date of conception and the date of reduction
21   to practice by showing either activity aimed at reduction to
22   practice or legally adequate excuses for inactivity." American
23   Standard, Inc. v. Pfizer, Inc., 722 F.Supp. 86, 109 (D.Del. 1989)
24   (citing 3 D. Chisum, Patents § 10.07 (1987)). "In addition, the
25   law requires corroboration of diligence during the critical
26
27
28

                              - 13 -

Jun 11 01 05:52p      Thierry's Desk           (954)432-3840        P.7
         06/11/01   14:49   ☎213 239 1300      BROBECK                        ☑034
         06/03/2001 17:44 FAX 415 442 1010     BROBECK SF                     ☑016

1   period." *American Standard*, 722 F.Supp. at 109.[6]

2       Relying on Madison's deposition testimony, Defendant

3   contends that Madison conceived of her magnetic eyewear in the

4   summer of 1994. *See* Madison Depo., Vol. 1 at 16:5-19:7; Madison

5   Depo., Vol. 2 at 189-190. The only purportedly corroborating

6   evidence provided by Defendant are declarations of Kimura and

7   Takahiro Nishioka (Deputy General Manager of Sunreeve) that were

8   allegedly submitted to the PTO in the prosecution of Madison's

9   patent. *See* Def.'s Opp'n. at 2; Def.'s Exs. 5 & 6. However,

10  Plaintiff properly objects to the admission of the declarations

11  because they are improperly authenticated. "In order for a

12  document to be considered by a court in ruling on a motion for

13  summary judgment, the document must be authenticated by and

14  attached to an affidavit that meets the requirements of

15  Fed.R.Rule.P. 56(e). . . ." *See* Countryside Oil Co., Inc. v.

16  *Travelers Insurance Co.*, 928 F.Supp. 474, 482 (D.NJ. 1995).

17  "Hence, before evidence may be admitted, a foundation must be

18  laid 'by evidence sufficient to support a finding that the matter

19  in question is what its proponent claims.'" *Id.* (quoting Fed. R.

20  Evid. 901(a)).

21      Here, the supporting affidavit by defense counsel Crucillo

22  does not state that the declarations are "true and correct"

23  copies of what they purport to be. *See* Crucillo Decl. ¶¶ 6-7.

24  Indeed, the file history for Madison's '269 Patent nowhere

25

26  _____

27      [6] The "critical period" of diligence is "from the time just before
    the entry of a second inventor into the field until a reduction to
    practice." *American Standard*, 722 F.Supp. at 114, n.21; *Driscoll v.*

28  *Cebalo*, 5 U.S.P.Q.2d 1477, 1481 n. 6 (P.T.O. 1982) (diligence is required
    only "from a time prior to the conception of another").

- 14 -

1  includes the foregoing declarations, and Defendant provides no

2  other evidence that the declarations were ever used in the patent

3  prosecution. See Totino Decl., Ex. A. Thus, the Court sustains

4  Plaintiff's objection to the admissibility of the declarations.

5      Even if the Court were to assume that conception occurred in

6  the summer of 1994, the record is devoid of evidence concerning

7  Plaintiff's diligent reduction to practice. Again, Defendant

8  relies on Madison's own deposition testimony, which is

9  insufficient as a matter of law because it is uncorroborated. See

10 American Standard, 722 F.Supp. at 109 ("the law requires

11 corroboration of diligence during the critical period.") Even if

12 the inadmissible declarations of Kimura and Nishioka are

13 considered, they are entirely silent as to Madison's attempts, if

14 any, to reduce her invention to practice. In fact, Nishioka's

15 declaration provides the opposite inference when it states: "I

16 replied to Ms. Julie Madison through Mr. Kaoru Kimura that her

17 ideas would not be realized if we used such new construction for

18 magnetic eyewear." See Def.'s Ex. 5, Nishioka Decl. at ¶3.

19     Thus, Defendant's evidence falls far short of raising a

20 genuine issue of material fact that Madison's ideas and drawings

21 constitute a prior art reference, especially in light of the

22 governing clear and convincing burden of proof. Conspicuously

23 absent from the record are the drawings themselves, upon which

24 the entirety of Defendant's counterclaim is premised. When

25 stripped to its essence, the evidence is nothing more than

26 testimony by the inventor herself, corroborated only by ambiguous

27 and inadmissible declarations. For this reason alone, partial

28 summary judgment in favor of Plaintiff is appropriate.

- 15 -

2.   WHETHER THE MADISON INVENTION WAS KNOWN OR USED BY OTHERS OR DESCRIBED IN A PRINTED PUBLICATION

Another crucial element of an anticipation defense is proving that the prior art reference was known or used by others, or described in a printed publication, prior to the invention of the device disclosed in the patent-in-suit. See 35 U.S.C. §102(a).

(1) Description in a Printed Publication

Anticipation by a prior publication occurs where the work adequately describes the invention in question and the work qualifies as a printed publication. See 1 Chisum, Chisum on Patents, §3.04 at 3-40. In order for a description to be "adequate", it must enable a person with ordinary skill in the art to not only comprehend the invention, but also to make it. See Beckman Instruments, Inc. v. LKB Produkter AB, 892 F.2d 1547, 1550 (Fed.Cir. 1989)(a prior art reference "must provide a description sufficient to teach a person of ordinary skill in the art how to make and use the apparatus or process"); Seymour v. Osborn, 78 U.S. 516 (1870).

In order for the prior art reference to qualify as a "printed publication" under 35 U.S.C. §102(a), it must have been "sufficiently accessible to those skilled in the art." In re Cronyn, 890 F.2d 1158, 1160 (Fed.Cir. 1989). This is because "dissemination and public accessibility are the keys to a legal determination whether a prior art reference was 'published'." Id. See also Deep Welding, Inc. v. Sciaky Bros., Inc., 417 F.2d 1227, 1235 (7th Cir. 1969) (distribution of paper at various technological conferences sufficed to constitute publication);

- 16 -

1   compare Preemption Devices, Inc. v. Minnesota Mining & Mfg. Co.,

2   732 F.2d 903 (Fed. Cir. 1984)("the dissemination of six copies to

3   an individual was not a 'publication' . . .").

4        Here, Defendant's evidence fails to raise a genuine issue of

5   material fact that the Madison drawings qualify as a "printed

6   publication". The evidence does not indicate that the Madison

7   drawings, assuming that they exist, were made accessible to

8   members of the public. Rather, Madison testified that she did not

9   disclose any drawings in her notebook to Kimura, and that Kimura

10  saw only those drawings that were created in the course of the

11  parties' 1994 meeting in New Jersey. See See Madison Depo., Vol.

12  2 at 207-208. Moreover, there is no evidence that persons other

13  than Kimura ever saw Madison's drawings, including other

14  employees of Sunreeve. Finally, Madison testified that, while

15  there was no confidentiality agreement with Kimura, she expected

16  Kimura to refrain from disclosing her ideas and drawings to other

17  persons in the optical industry. See Madison Depo., Vol. 1 at

18  44:12-45:2; Madison Depo., Vol. 2 at 210-211.

19       Defendant's evidence also fails to raise a genuine issue of

20  material fact that the Madison drawings were sufficiently

21  detailed to enable a person with ordinary skill in the art to

22  both comprehend the invention and to make it. Indeed, the only

23  evidence submitted suggests that the Madison drawings disclosed

24  to Kimura were not sufficient to enable him to create the sample

25  requested by Madison. See Madison Depo., Vol. 2 at 190-192;

26  209:9-18; 177-178.[7]

27  _____

28       [7] "Q: And after you gave [Kimura] specifications [of the top-mounted
    monoblock design), he later came back to you and said that it could not

                              - 17 -

(2)   Public Knowledge or Use

1
2                  Anticipation by prior knowledge requires that
3    a complete and adequate description of the prior art reference
4    must have been available to the public. See Rosemount, Inc. v.
5    Beckman Instruments, Inc., 218 U.S.P.Q. 881 (C.D. Cal. 1983),
6    aff'd 727 F.2d 1540 (Fed. Cir. 1984)("the knowledge or use by
7    others required by section 102(a) is public knowledge of a
8    complete and operative device."). In addition, "the knowledge
9    required by § 102(a) involves some type of public disclosure and
10   *is not satisfied by knowledge of a single person, or a few*
11   *persons working together.*" Nat'l Tractor Pullers Ass'n v.
12   Watkins, 205 U.S.P.Q. 892, 912 (N.D. Ill. 1980)(emphasis added).
13   Again, the inventor's testimony of prior knowledge or use must be
14   corroborated by other evidence. See 1 Chisum, Chisum on Patents,
15   §3.05[2] at 3-73.
16        In its opposition, Defendant argues that Madison provided
17   her drawings "to Sunreeve via Kimura." See Def.'s Opp'n. at 14.
18   However, Madison's testimony nowhere suggests that she disclosed
19   her drawings to any Sunreeve employees other than Kimura. The
20
21   be done; is that correct?
         A: Not right away. He said that they were talking about it, that
22       they were discussing it with technical people.
         Q: Right. But the ultimate conclusion was that it was not
23       feasible.?
         A: At that time, yes.
24       Q: So it was at that point in time the manufacturer said it could
         not be reduced practice; would that be correct?
25       A: At that moment they had failed to come up with what I considered
         to be a workable alternative, or a workable or viable expression of
26       the invention.
         Q: And that was in 1994?
27       A: Yes."
28
     See Madison, Vol. 2 at 177-178.

                            - 18 -

Jun 11 01 05:49p       Thierry's Desk          (954)432-3840          p.2
06/11/01   14:51   ☎213 239 1300        BROBECK                      ✇039
09/05/2001 17:46 FAX 415 442 1010      DROBECK SF                    ✇021

1  inadmissible declaration of Nishioka, Deputy General Manager of

2  Sunreeve, itself suggests that he was only verbally informed of

3  Madison's ideas by Kimura, and does not indicate that Nishioka

4  ever viewed the drawings in question. See Nishioka Decl. at ¶2

5  (Kimura "reported to me that Ms. Julie Madison disclosed to him

6  her ideas regarding the new construction of end-piece parts for

7  magnetic eyewear, when he met with her prior to December 9, 1994

8  at the Anaheim Hilton Hotel in California, U.S.A."). Thus,

9  Defendant's evidence shows, at best, that Madison's drawings were

10  disclosed only to Kimura, which is insufficient as a matter of

11  law to constitute public knowledge. See Nat'l Tractor Pullers

12  Ass'n v. Watkins, 205 U.S.P.Q. at 912.

13      Having examined all of the evidence, the Court concludes

14  that Defendant has failed to raise a genuine issue of material

15  fact as to patent invalidity. Defendant has failed to submit the

16  Madison drawings, forcing the Court to rely on uncorroborated

17  inventor testimony that her invention constitutes a prior art

18  reference. In addition, there is no evidence that the Madison

19  drawings, even assuming that they qualify as a prior art

20  reference, were disclosed to the public in a manner constituting

21  a "printed publication," or that sufficient public knowledge or

22  use of such drawings occurred. As such, the Court need not reach

23  the third element of patent invalidity -- whether Madison's

24  drawings disclose each and every limitation of the invention

25  claimed in the the '207 Patent.

26  //

27  //

28  //

- 19 -

06/05/2001 TUE 18:19   [TX/RX NO 8606] ✇020
06/05/2001 TUE 17:38   [TX/RX NO 8263] ✇021

Jun 11 01 05:49p    Thierry's Desk            (954)432-3840          P.1
   06/11/01   14:51   ☎213 239 1300       BROBECK                       ✉040
   06/05/2001 17:48 FAX 415 442 1010       BROBECK SF                    ✉022

**VI.   CONCLUSION**

For the foregoing reasons, the Court GRANTS Plaintiff's motion for partial summary judgment on Defendant's counterclaim and affirmative defense of patent invalidity.

IT IS SO ORDERED.

DATED: *June 4, 2001*

_____
LOURDES G. BAIRD
United States District Judge

- 20 -

Our Docket No. 4216-4000

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Reissue of ：

   **Letters Patent 5,568,207** ：

Richard **CHAO** ：    Examiner: H. Mai

Serial No.: 09/182,862 ：    Group Art Unit: 2873

Filed: October 21, 1998 ：

For: AUXILIARY LENSES FOR EYEGLASSES ：

**BOX AF**
Commissioner of Patents
Washington, D.C. 20231

### AMENDMENT PURSUANT TO 37 C.F.R. § 1.116

SIR:

   Kindly amend the above-identified application in response to the May 22, 2001 Office Action and the June 18, 2001 Interview as follows:

### IN THE CLAIMS:

   1. **(Five Times Amended)**   An eyeglass device comprising:

   a primary spectacle frame for supporting primary lenses therein, said primary spectacle frame including two side portions each having an extension extended therefrom for pivotally coupling a leg means thereto, said primary spectacle frame including two rear and side portions each having a projection secured thereto, said primary spectacle frame including an upper side portion,

   a pair of first magnetic members secured in said projections respectively,

   an auxiliary spectacle frame for supporting auxiliary lenses therein, said auxiliary spectacle frame including two side portions each having an arm extended therefrom for

-1-

25429 v1

Amendment Pursuant to 37 CFR § 1.116
Serial No. 09/182,862

Docket No. 4216-4000

extending over and for engaging with said upper side portion of said primary spectacle frame, and

a pair of second magnetic members secured to said arms respectively for engaging with said first magnetic members of said primary spectacle frame so as to secure said auxiliary spectacle frame to said primary spectacle frame,

said arms being engaged with and supported on said upper side portion of said primary spectacle frame so as to allow said auxiliary spectacle frame to be stably supported on said primary spectacle frame and so as to prevent said auxiliary spectacle frame from moving downward relative to said primary spectacle frame and so as to prevent said auxiliary spectacle frame from being disengaged from said primary spectacle frame.

12. (Twice Amended)      An eyeglass device comprising:

a primary spectacle frame for supporting primary lenses therein with the lenses defining a vertical plane, the primary spectacle frame including two side portion extensions extended therefrom for pivotally coupling a leg thereto and a first magnet having a horizontal surface and secured to said side portion extensions of the primary spectacle frame, and

an auxiliary spectacle frame for supporting auxiliary lenses therein, and for disposing in front of the primary spectacle frame, the auxiliary spectacle frame including two auxiliary side portions, the auxiliary spectacle frame including two second magnets, each secured to one of the auxiliary side portions for respectively engaging the horizontal surface of one of the first magnets so as to secure the auxiliary spectacle frame to the primary spectacle frame.

36. (Twice Amended)      An eyeglass device comprising:

a primary spectacle frame for supporting primary lenses therein;

-2-

Amendment Pursuant to 37 CFR § 1.116
Serial No. 09/182,862

Docket No. 4216-4000

the primary spectacle frame including two side portion extensions extended therefrom for pivotally coupling a leg thereto; and

the primary spectacle frame including two first magnetic members respectively having a horizontal surface and being secured to one of the side portions extensions of the primary spectacle frame; and

an auxiliary spectacle frame for supporting auxiliary lenses therein, and for disposing in front of the primary spectacle frame, the auxiliary spectacle frame including two auxiliary side portions, wherein the auxiliary spectacle frame further includes two second magnetic members each secured to one of the auxiliary side portions and having a horizontal surface for coupling a corresponding horizontal surface of one of the first magnetic members so as to secure the auxiliary spectacle frame to the primary spectacle frame.

40. (Once Amended) An eyeglass device as recited in Claim 36 wherein the auxiliary side portions are respectively supported on a corresponding extension and the first magnetic members are not in contact with the second magnetic members.



41. (Once Amended) An eyeglass device as recited in Claim 39 wherein the auxiliary side portions are respectively supported on a corresponding extension and the first magnetic members are not in contact with the second magnetic members.

68. (Once Amended) An eyeglass device comprising:

-3-

25429 v1

Amendment Pursuant to 37 CFR § 1.116
Serial No. 09/182,862

Docket No. 4216-4000

a primary spectacle frame for supporting primary lenses therein, said primary spectacle frame including two side portion extensions extended therefrom for pivotally coupling a leg, each of said extensions also including an outer side, an inner side, and a top side with a projection secured to said inner side, each of said projections respectively securing a first magnetic member, and

an auxiliary spectacle frame for supporting auxiliary lenses therein, said auxiliary spectacle frame including two side portions each having an arm extended therefrom, said auxiliary spectacle frame further including a pair of second magnetic members secured to said arms respectively for engaging said first magnetic members of said primary spectacle, each of said arms adapted to extend over one of said top sides.

71. (Once Amended) An eyeglass device comprising:

a primary spectacle frame having two side portion extensions extending rearwardly therefrom having a top side and a rear side with a first magnetic member secured thereto, and

an auxiliary spectacle frame including two arms for extending over a corresponding top side of said extensions, said arms respectively containing second magnetic members for cooperation with said first magnetic members and downwardly extended end portions for hooking said auxiliary spectacle frame to said primary spectacle frame, said arms and said first and second magnetic members supporting said auxiliary spectacle frame on said primary spectacle frame.

73. (Once Amended) An eyeglass device comprising:

a primary spectacle frame for supporting primary lenses therein having two side portion

-4-

25429 v1