# EXHIBIT B



FILED
CLERK, U.S. DISTRICT COURT

MAY - 6 2003

DISTRICT OF CALIFORNIA
DEPUTY

✓ Priority
✓ Send
___ Clsd
✓ Enter
___ JS-5/JS-6
___ JS-2/JS-3

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Revolution Eyewear, Inc., | CV 02-1087 LGB (CWx) |
| Plaintiff, | |
| v. | ORDER CONSTRUING CLAIMS OF U.S. PATENTS 6,343,858 AND RE 37,545 |
| Aspex Eyewear, Inc. et al., | |
| Defendants. | |

I.   INTRODUCTION

In the present action, plaintiff Revolution Eyewear, Inc. ("Plaintiff" or "Revolution") alleges that defendants Aspex Eyewear, Inc. ("Aspex"), Thierry Ifergan ("Ifergan"), Real Eyes Optical ("REO") and Scott Strenk ("Strenk")[1] infringe its U.S. Patent No. 6,343,858 (the "'858 Patent"). Defendant and counterclaimant Aspex contends that Plaintiff infringes U.S.

[1] Aspex, Thierry, REO and Strenk are collectively referred to as "Defendants."

1



DEPOSITION
EXHIBIT
CHAO
69

(145)

REV 00001

REV 00843

1   Patent No. RE 37,545E (the "'545 Patent") issued to Aspex,
2   Manhattan Design Studio, Inc., Contour Optik, Inc. and Asahi
3   Optical Co., Ltd. (collectively "Counterclaimants").
4   This matter is before the Court for the purpose of interpreting
5   the disputed claims of the '858 and '545 patents.
6
7
8   **II.  FACTUAL AND PROCEDURAL HISTORY**
9        For purposes of the instant motion, the Court finds the
10  following facts to be relevant.  The technology at issue in this
11  case involves a spectacle frame that supports an auxiliary frame,
12  enabling the user to securely fasten a second set of lenses
13  (e.g., sunglass lenses) onto the primary frame (often holding
14  prescription lenses).  Plaintiff's '858 Patent, which issued on
15  February 5, 2002, is directed to a method and apparatus for
16  mounting auxiliary eyeglasses on conventional eyeglasses in which
17  magnets are attached to appendages on the auxiliary eyeglasses
18  mating with magnets mounted on the temple extensions of
19  conventional eye-glasses.
20       Counterclaimants' '545 Patent, which issued on February 12,
21  2002, is directed to a spectacle frame that supports an auxiliary
22  lens frame through an arrangement using magnetic members.  The
23  '545 is a reissue of Counterclaimants' original U.S. Patent No.
24  5,568,207 (the "'207 Patent"), which has now been surrendered.[2]
25
26  ────────────────────────────
27  [2] This Court has previously found on summary judgement, in a related case, that Revolution does
    not infringe Aspex's original '207 patent issued to Chao.  See Aspex Eyewear, Inc. v.
28  Revolution Eyewear, Inc., CV 99-1623, Order Granting Defendant's Motion for Summary

                                    2

REV 00002

REV 00844

1        For purposes of the Court's claim construction endeavor
2   here, it suffices to note that Plaintiff accuses Defendants of
3   infringing the '858 Patent and Counterclaimants accuse Plaintiff
4   of infringing the '545 Patent.  Pursuant to the Court's February
5   28, 2003 Minute Order, the parties, on March 12, 2003, submitted
6   two Joint Claim Construction Statements, one for the '858 Patent
7   ("JS-'858") and the second for the '545 Patent ("JS-'545").  On
8   March 19, 2003, Revolution and Counterclaimants filed their
9   respective Opening Claim Construction Briefs.  On March 26, 2003,
10  Counterclaimants filed their joint Responsive Brief to
11  Revolution's Opening Claim Construction Brief.  On March 27,
12  2003, Revolution filed its Responsive Brief to Counterclaimants'
13  Opening Claim Construction Brief.³  Also on March 27, 2003,
14  defendants REO and Strenk filed their joint Responsive Brief to
15  Revolution's Opening Claim Construction Brief.⁴  On April 2,
16  2003, Revolution and Counterclaimants filed their respective
17  Reply briefs.
18  ///
19  ///
20
21
22  _____
23  Judgment on Plaintiff's Claim of Patent Infringement, June 4, 2001, Docket Entry No. 184.  The
    Federal Circuit affirmed this Court's finding of non-infringement.  See Case No. CV-1623,
24  Docket Entry No. 217.  In the instant case, Counterclaimants allege that Revolution infringes
    claims 6, 22 and 34 of the '207 Reissue Patent - the '545 Patent.
25
26  ³ Although Revolution's Responsive Brief was filed a day late, the Court deems it to have been
    timely filed.
27
28  ⁴ Like Revolution's Responsive Brief, REO and Strenk's joint responsive Brief was filed a day
    late; however, the court deems it to have been timely filed.

3

REV 00003

REV 00845

## III. LEGAL STANDARDS AND ANALYSIS

### A.   Legal Standards

In Markman v. Westview Instruments, Inc., 517 U.S. 370 (1996), the Supreme Court held that the interpretation of a patent claim—the portion of the patent document that defines the scope of the patentee's rights—is a matter of law exclusively within the scope of the court and is not a factual question for the jury. Id. at 372. The Markman decision suggested that a trial court could consider various types of evidence when interpreting a patent, including expert testimony.  See id. at 388-90. Shortly after the Supreme Court handed down Markman, the Federal Circuit, in Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576 (Fed. Cir. 1996), expanded on the Court's dicta concerning evidence available to a trial court in interpreting patent claims.  See id. at 1581-83.  The Federal Circuit held that if intrinsic evidence can, by itself, resolve ambiguity in a patent term, then a court may not rely on extrinsic evidence, such as expert testimony, to construe the term.  See id. at 1583.  A trial court may only use extrinsic evidence when intrinsic evidence fails to illuminate the meaning of the disputed claim. Id. Moreover, extrinsic evidence cannot broaden the reach of a claim or contradict explicit language.  Id. The policy rationale supporting this evidentiary limitation is that prospective patentees must have access to public records concerning the patent to "design around" a prior art. Id.  If expert testimony or other extrinsic evidence were permitted to alter the record,

4

REV 00004

REV 00846

1  then this public benefit would be frustrated. Id. Thus, a court

2  can only examine extrinsic evidence if the evidence does not

3  contradict the claim language, the specification, or the

4  prosecution history but instead supplements it. Id. at 1584-85.

5      The Federal Circuit detailed a hierarchy of specific types

6  of evidence that a court may consider. Thus, when interpreting a

7  patent, a trial court must first look at the language of the

8  claim itself. See id. at 1582.  Courts should typically construe

9  terms by their common, customary meaning, but a patentee is

10  allowed to define her own terms in the specification section of

11  the patent.  See id. Therefore, courts must always review the

12  specification, which, when setting forth an embodiment of the

13  invention, frequently provides explicit definitions of the claim

14  terms.  See id.  The language in the specification is

15  dispositive, and "it is the single best guide to the meaning of

16  the disputed term."  Id.  However, a patent's claims are not

17  limited to the specification's best mode, preferred embodiment,

18  specific objects, or illustrative examples, and it is erroneous

19  to read limitations from the specification into the claims. See

20  Laitram Corp. v. Cambridge Wire Cloth Co., 863 F.2d 855, 865

21  (Fed. Cir. 1988)("References to a preferred embodiment, such as

22  those often present in a specification, are not claim

23  limitations."); Rolls-Royce Ltd. v. GTE Valeron Corp., 800 F.2d

24  1101, 1108 (Fed. Cir. 1987)("Reference to an object does not

25  constitute in itself a limitation in the claims."). In addition,

26  a court may consider the prosecution history of the patent as

5

REV 00005

REV 00847

1   evidence of meaning. Id. This history contains the complete

2   record of all the filings and examinations before the Patent and

3   Trademark Office ("PTO"), including representations made by the

4   applicant regarding the significance of claims and terms. Id. The

5   history also limits the interpretation of terms by recording the

6   exclusion of any term definition disclaimed during the

7   prosecution. Id.

8       B.   Analysis

9           1.   The claims in dispute

10      Pursuant to the Joint Statement, the following claims of the

11  '858 and the '545 patents contain terms that are disputed by the

12  '858 and the '545 patents contain terms that are disputed by the

13  parties.[5]

14          a.   Disputed claims in the '858 Patent

15      Claim 1:

16      Apparatus for attaching auxiliary eyeglasses to conventional

17      eyeglasses comprising:

18          a plurality of sockets formed on temple extensions of

19      said conventional eyeglasses;

20          a plurality of magnets mounted in said sockets on said

21      conventional eyeglasses;

22          a plurality of sockets formed on appendages on said

23      auxiliary sunglasses, said appendages construed and arranged

24      to fit below said temple extensions;

25

26

27   ———————————

28   [5] The disputed terms are shown in bold.

6

1   a plurality of magnets mounted in said plurality of

2   sockets on said appendages;

3   said plurality of magnets mounted on said conventional

4   eyeglasses and said plurality of magnets mounted on said

5   auxiliary eyeglasses being oriented such that the maximum

6   magnetic attractive force between said magnets is oriented

7   approximately parallel to lenses in said conventional

8   eyeglasses;

9

10   a first pair of said plurality of sockets having said

11   plurality of magnets mounted to form recesses in said first

12   pair of sockets;

13   a second pair of said plurality of sockets having said

14   plurality of magnets mounted to extend out of said pair of

15   sockets, said magnets constructed and arranged to fit into

16   said recesses in said first pair of sockets;

17   whereby said extended magnets in said second pair of

18   sockets engage said recesses to automatically align and

19   secure said auxiliary eyeglasses when mated with said

20   magnets forming said recesses in said first pair of sockets

21   providing maximum resistance to downward movement of said

22   auxiliary eyeglasses thereby preventing detachment of said

23   auxiliary eyeglasses from said conventional eyeglasses.

24

25

26   Claim 2:

27   The apparatus according to claim 1 in which said first

28   pair of sockets having said magnets mounted to form a recess

7

1  are on said conventional eyeglass temple extensions; and

2  said second pair of sockets with magnets extended out

3  therefrom are mounted on said appendages on said auxiliary

4  eyeglasses.

5  Claim 3:

6      The apparatus according to claim 2 including a

7  protective and decorative coating material on exposed sides

8  of said plurality of magnets.

9  Claim 4:

10      The apparatus according to claim 3 in which said

11  protective and decorative coating material matches the

12  frames of said conventional and auxiliary eyeglasses.

13

14

15          b.    Disputed claims in the '545 Patent

16  Claim 6:

17  An eyeglass device comprising:

18      a primary spectacle frame for supporting primary lenses

19  therein;

20      the primary spectacle frame including two side portion

21  extensions extended therefrom for pivotally coupling a leg

22  thereto; and

23      the primary spectacle frame including two first

24  magnetic members respectively having a horizontal surface

25  and being secured to one of the side portions extensions of

26  the primary spectacle frame; and

27

28

8

REV 00008

REV 00850

1      an auxiliary spectacle frame for supporting auxiliary

2  lenses therein, and for disposing in front of the primary

3  spectacle frame, the auxiliary spectacle frame including two

4  auxiliary side portions, wherein the auxiliary spectacle

5  frame further includes two second magnetic members each

6  secured to one of the auxiliary side portions and having a

7  horizontal surface for coupling a corresponding surface of

8  one of the first magnetic members so as to secure the

9  auxiliary spectacle frame to the primary spectacle frame.

10 Claim 22:

11

12     A primary spectacle frame for supporting primary lenses

13 therein and having two side portion extensions extending

14 rearwardly therefrom and having a front side, a rear side, a

15 top side, and a rear end, each of said rear ends pivotally

16 coupling a leg configured to conform to a user at a distal

17 end thereof, each of said extensions of said primary

18 spectacle frame further having a projection attached to each

19 of said rear sides, and a pair of first magnetic members

20 respectively secured in said projections, said first

21 magnetic members capable of engaging second magnetic members

22 of an auxiliary spectacle frame so that lenses of an

23 auxiliary spectacle are located in front of said primary

24 lenses.

25

26 Claim 34:

27     An eyeglass device comprising:

28

REV 00009

REV 00851

1    a primary spectacle frame having two side portion

2    extensions with a front side, a rear side and a first

3    magnetic member;

4         an auxiliary spectacle frame including two side

5    portions each having an arm extended therefrom, each of said

6    arms containing a second magnetic member, said arms

7    extending across a respective extension from said front side

8    to said rear side so that said first and second magnetic

9    members engage one another whereby said auxiliary spectacle

10   frame is supported by said primary spectacle frame.

11

12

13        **2.   The disputed terms**

14   The Court first considers the disputed claim terms in the

15   '858 Patent, followed by the disputed terms in the '545 Patent.

16

17        **a.   Disputed terms in the '858 Patent**

18   The following terms or combination of terms are in

19   dispute:(1) "plurality of sockets," in claim 1 (2) "magnets" in

20   claims 1-3; (3) "being oriented such that the maximum magnetic

21   attractive force between said magnets is oriented approximately

22   parallel to lenses in said conventional eyeglasses" in claim 1;

23   (4) "mounted to form recesses in said first pair of sockets," in

24   claim 1; (5) "whereby said extended magnets in said second pair

25   of sockets engage said recesses to automatically align and secure

26   said auxiliary eyeglasses when mated with said magnets forming

27   said recesses in said first pair or sockets," in claim 1, (6)

10

REV 00010

REV 00852

1  "providing maximum resistance to a downward movement of said

2  auxiliary eyeglasses thereby preventing detachment of said

3  auxiliary eyeglasses from said conventional eyeglasses," in claim

4  1; (7) "a protective and decorative coating material on exposed

5  sides of said plurality of magnets," in claim 3; and (8)

6  "matches" in claim 4.

7

8        (1)  "plurality of sockets" (claim 1)

9

10      Plaintiff Revolution argues that the phrase "plurality of

11 sockets" in claim 1 of the '858 means "two or more openings or

12 recesses formed in the temple extensions." JS-'858, Exh. 1 at 1.

13 Conversely, Counterclaimants' argue that the instant phrase

14 should be construed to mean "two or more housings or openings

15 into which inserted parts are designed to fit." JS-'858, Exh. 2

16 at 1.

17      Preliminarily, the Court notes that Revolution's

18 construction is counter-productive because it defines the word

19 "sockets" as "recesses"; and the word "recesses" is a separate

20 element of claim 1. See Declaration of Michael A. Nicodema

21 Submitting Documents and Exhibits in Support of

22 Defendants'/Counterclaimants' Responsive Claim Construction Brief

23 for U.S. Patent No. 6,343,858 ("Nicodema Decl. I"), Exh. 1, '858

24 Patent, Col. 8, ll. 38-40.  Additionally, and contrary to

25

26 ───────────────────────

27 * REO and Strenk's arguments in their joint claim construction brief are identical to those made
   by Counterclaimants.  Therefore, and for the sake of brevity, only Counterclaimants' briefs will
28 be cited to in this Order.

11

1  Counterclaimants' proposed construction, the word "housing" is
2  not used by the inventor to define "sockets." See
3  Counterclaimants' Responsive Brief Re. '858 patent at 8:14-17
4  (citing the '858 Patent at Col. 7, ll. 19-21).

5      The '858 patent specification and prosecution history do not
6  define the word "socket"; they simply use the word. There is no
7  special meaning of "socket" set out in the intrinsic record which
8  would warrant a construction that departs from the ordinary and
9  customary definition of the word. Accordingly, the dictionary
10 definition should control. See Texas Digital Systems, Inc. v.
11 Telegenix, Inc., 308 F.3d 1193, 1203 (Fed. Cir. 2002) (stating
12 that dictionaries, encyclopedias and treatises "may be the most
13 meaningful sources of information to aid judges in better
14 understanding both the technology and the terminology used by
15 those skilled in the art to describe the technology."). The
16 dictionary definition of "socket" is "[a]n opening into which an
17 inserted part is designed to fit." Webster's II New College
18 Dictionary ("Webster's"), Nicodema Decl. I, Exh. 3 at 43.

19     Based on the foregoing the Court construes the phrase
20 "plurality of sockets" to mean two or more openings into which an
21 inserted part is designed to fit.

22
23
24
25     (2)  "magnets" (claims 1-3)
26     Plaintiffs argue that the term "magnets" in claims 1-3 of
27 the '858 Patent means "a permanent magnet, or ferromagnetic
28

REV 00012

REV 00854

1  material capable of acting as a magnet, or equivalents." JS-
2  '858, Exh. 1 at 3.  Conversely, Counterclaimants argue that the
3  instant phrase means "permanent magnets." JS-'858, Exh. 2 at 3.
4      In its proposed construction of "magnets," Revolution relies
5  upon this Court's construction of the phrase "magnetic members"
6  in the case of Aspex Eyewear, Inc. v. Miracle Optics, Inc., CV
7  01-10396, Order Construing Claims of U.S. Patents RE 37,545 and
8  6,109,747, February 14, 2003, attached to the Declaration of
9  Michael Nicodema Submitting Documents and Exhibits in Support of
10 Claim Construction Analysis of the '545 Patent ("Nicodema Decl.
11 II"), Exh. 8 (hereinafter "Miracle Claim Construction Order").
12 In that case, the Court was construing the claims of
13 Counterclaimants' '545 and '747 patents, not the claims of
14 Revolution's '858 Patent.  Contrary to Revolution's assertion,
15 the Court's claim construction order in the Miracle case does not
16 "estop" Counterclaimants from asserting that the ordinary meaning
17 of the word "magnet," as used in the '858 Patent, does not
18 include ferromagnetic materials.  The words used in the claims of
19 the '858 and the '545 patents are different; as are their
20 intrinsic records.  Nowhere in the Miracle Claim Construction
21 Order did the Court state or suggest that it was construing the
22 noun "magnet"; let alone any element of the '858 Patent claims.
23     In the claims at issue in the '858 Patent, the operative
24 word is the noun "magnet," not the adjective "magnetic."  The
25 only word used in the '858 Patent specification to describe the
26 magnets of the asserted claims is "magnet"; not "magnetic

REV 00013

REV 00855

1    members," "magnetic material," or "ferromagnetic material." The

2    '858 patent specification and prosecution history do not define

3    the word "magnet"; they simply use the word. The ordinary

4    meaning of the word "magnet" is: "1. A body that attracts certain

5    materials, as iron, by virtue of a surrounding field of force

6    created by the motion of its atomic electrons and the alignment

7    of its atoms. 2. An electromagnet. 3. One that attracts."

8    Webster's, Nicodema Decl. I, Exh. 3 at 34. Thus, the ordinary

9    meaning of "magnet" is essentially a permanent magnet; it cannot

10   be  ferromagnetic material because it needs to have the ability

11   to attract certain material like iron.[7]

12

13        The Court also notes that various portions of the '858

14   patent specification support the position that the word "magnet"

15   should be given its ordinary dictionary definition - i.e., a

16   permanent magnet. See Nicodema Decl. I, Exh. 1, '858 Patent at

17   Col. 7, 11. 47-49, stating that "the key feature here is the

18   orientation of magnets 26 and 30 so that the maximum magnetic

19   attractive force along their axis (i.e. poles) 34 is vertically

20   oriented or parallel with conventional eyeglass frame 20"; and

21   Col. 3, 11. 22-27, stating that "[c]omplementary mating magnets

22   ... are also oriented with the plane of the magnets horizontal

23   and their axis (i.e. poles) vertical or approximately parallel to

24   the plane of the conventional eyeglasses."

25

26

27   _____

[7] A ferromagnetic material is a material that is attracted by a permanent magnet, e.g., iron, nickel

28   and cobalt. See Miracle Claim Construction Order at 19 n. 9.

REV 00014

REV 00856

1   Revolution argues that its construction is supported by the
2   fact that "a review of the entire file history of the '858 Patent
3   demonstrates that no rejection can be found based upon the type
4   of magnetic material used."  Revolution's Opening Brief at 7:2-4.
5   This argument by Revolution is at best irrelevant to the instant
6   issue.  The mere fact that the patent examiner did not issue a
7   rejection based on the type of magnetic material used has no
8   bearing on the interpretation of the term "magnets."  The patent
9   applicant in this case used the term "magnets" in his
10  application; and the most logical assumption is that the patent
11  examiner simply considered "magnets" to mean permanent magnets,
12  and thus would have had no reason to consider other
13  interpretations of that term.

14      In its Reply Brief, Revolution states:

15      The Webster's definition of magnet is '1 ... a body having
16      the property of attracting iron and producing a magnetic
17      field external to itself; *specif*: a mass of iron, steel, or
18      alloy that has this property artificially imparted 2:
19      something that attracts.' Webster's New Collegiate
20      Dictionary, 1980 Edition.... Under the dictionary
21      definition, a magnet includes a metal having an external
22      magnetic field to be artificially imparted.  For the
23      magnetic field to be artificially imparted to the metal, it
24      is a necessary and logical precondition that the particular
25      metal be capable of being magnetized.  Therefore, the
26      Court's prior definition in the Miracle Optics case is

15

REV 00015

REV 00857

1    equally applicable here: magnet means a permanent magnet or

2    any ferromagnetic material capable of acting as a magnet.'

3    Revolution's Reply Brief at 2:14-28.  Revolution's argument

4    misses the mark.  The operative phrase in the dictionary

5    definition is that a magnet has the property of attracting iron

6    and producing a magnetic field external to itself. A

7    ferromagnetic material, such as iron, "is a material that is

8    attracted by a permanent magnet," it does not attract other

9    material.  See Miracle Claim Construction Order at 19 n. 9

10   (emphasis added).

11   Based on the foregoing, the Court construes the word

12   "magnets" in claims 1-3 of the '858 Patent to mean permanent

13   magnets.

14

15

16              (3)  "being oriented such that the maximum magnetic

17                    attractive force between said magnets is oriented

18                    approximately parallel to lenses in said

19                    conventional eyeglasses" (claim 1).

20   Revolution contends that the phrase "bring oriented such

21   that the maximum magnetic attractive force between said magnets

22   is oriented approximately parallel to lenses in said conventional

23   eyeglasses" in claim 1 of the '858 Patent means "contained on the

24   respective conventional frame and auxiliary frame parallel to the

25

26   _____

27   ' Incidentally, this Court construed "magnetic member" in Miracle to mean "a permanent magnet
     or a ferromagnetic member, but at least either the first or second magnetic members must be a

28   permanent magnet." Miracle Claim Construction Order at 20:5-8.

16

REV 00016

REV 00858

1  plane of the lenses, which is the orientation that results in the
2  maximum orientation."  JS-'858, Exh. 1 at 7-8.  Conversely,
3  Counterclaimants argue that the phrase in question means that
4  "when the auxiliary eyeglasses are attached to the conventional
5  eyeglasses, the permanent magnets mounted on the conventional
6  eyeglasses are positioned relative to the magnets mounted on the
7  auxiliary eyeglasses such that the greatest possible amount of
8  magnetic attractive force between the magnets attainable will be
9  in the plane approximately parallel to the plane of the lenses of
10 the conventional eyeglasses."  JS-'858, Exh. 2 at 7.
11
12      In its Reply Brief, Revolution states:
13      The parties may be closer on this issue than first imagined.
14      ...
15      Revolution's concern is that the defendants are attempting
16      to add language requiring the magnets have maximum magnetic
17      force in order to argue later that the strongest possible
18      magnets must be used.... Given that the parties appear to
19      agree that the orientation causes the maximum magnetic
20      attraction, Revolution's proposed claim construction is most
21      appropriate because it does not open up any inappropriate
22      issues concerning the gauss strength of the magnets.
23 Revolution's Reply Brief at 3:17-4:19.  It is clear to the Court
24 from reviewing the parties' briefs that Counterclaimants do not
25 seek to add language requiring that the magnets have a particular
26 gauss strength.  Instead, Counterclaimants' construction, like
27 Revolution's, seek to construe the instant phrase to mean that
28

17

REV 00017

REV 00859

1   the primary and auxiliary frame magnets are oriented in such a

2   way as to achieve maximum magnetic attraction.'

3   See Counterclaimant's Responsive Brief at 12:13-22.

4      Therefore, the Court construes the instant phrase to mean

5   that when the auxiliary eyeglasses are attached to the

6   conventional eyeglasses, the permanent magnets mounted on the

7   conventional eyeglasses are positioned relative to the magnets

8   mounted on the auxiliary eyeglasses such that the greatest

9   possible amount of magnetic force attainable between the magnets

10   will be in a plane approximately parallel to the plane of the

11   lenses of the conventional eyeglasses.  See Webster's, Nicodema

12   Decl. I, Exh. 3 at 36, defining "maximum" as "the greatest

13   possible, quantity, degree, or number."

14

15

16      (4)  "mounted to form recesses in said first pair of

17          sockets" ( claim 1)

18      Revolution contends that the phrase "mounted to form

19   recesses in said first pair of sockets" in claim 1 of the '858

20   Patent means "mounted in a first pair of sockets so that the

21   socket still contains a recess." JS-'858, Exh. 1 at 10.

22

23    ———————————

24   'This, of course, begs the question of why the parties could not
have simply resolved this issue during their meet-and-confer

25   session on claim construction, which was specifically ordered by
the Court in its February 28, 2003 Minute Order.  The Court also

26   reminds the parties of their obligation under Local Rule 7-3 "to
discuss thoroughly...the substance of the contemplated motion and

27   any potential resolution" before filing such motion with the

28   Court.

REV 00018

REV 00860

1  Counterclaimants argue that the instant phrase means "positioned
2  sufficiently below the outer peripheral edges of the sockets so
3  as to define an opening between the mating surfaces and the outer
4  peripheral edges." JS-'858, Exh. 2 at 9.
5       In its Reply Brief, Revolution states:
6       Defendants' definition of this term improperly includes the
7       term 'mating surfaces.' 'Mating surfaces' does not appear
8       in the claim, and it is unnecessary to the understanding of
9       the claim. No reason has been given for borrowing this term
10      from the specification. For this reason alone, the
11      defendants' interpretation of the claim is improper. If
12      'mating surfaces' were deleted from the defendants'
13      definition of the term, then Revolution would agree to the
14      definition.
15
16  Revolution's Reply Brief at 4:21-28 (emphasis added).
17  Preliminarily, the Court notes that, in their Responsive Claim
18  Construction Brief, Counterclaimants place no emphasis at all on
19  the use of the term "mating surfaces" in their construction of
20  the instant phrase. See Counterclaimants' Responsive Brief at
21  13:5-15. The Court agrees with Revolution that the term "mating
22  surfaces" is not necessary to construe the instant phrase. Thus,
23  the Court adopts Counterclaimants' construction without the term
24  "mating surfaces." Therefore the Court construes the instant
25  phrase to mean positioned sufficiently below the outer peripheral
26  edges of the sockets so as to define an opening between the
27  magnets and the outer peripheral edges.
28

19

REV 00019

REV 00861

1         (5)   "whereby said extended magnets in said second pair

2               of sockets engage said recesses to automatically

3               align and secure said auxiliary eyeglasses when

4               mated with said magnets forming said recesses in

5               said first pair of sockets" (claim 1)

6       Plaintiffs contend that the phrase "whereby said extended

7   magnets in said second pair of sockets engage said recesses to

8   automatically align and secure said auxiliary eyeglasses when

9   mated with said magnets forming said recesses inn said first pair

10   of sockets" in claim 1 of the '858 Patent means that "when

11   extended magnet clicks into place in the recess, the user

12   automatically knows that the auxiliary eyeglasses have been

13   properly positioned for use." JS-'858, Exh. 1 at 13.

14

15       Counterclaimants construe the instant claim element to mean

16   that "when the magnets forming the recesses and the extended

17   magnets contact each other and join together through magnetic

18   attractive forces, the extended magnets will also contact

19   interior surfaces of the recesses, and this contact between the

20   extended magnets and the recesses, in combination with the mating

21   contact of the extended magnets and the magnets forming the

22   recesses, causes the auxiliary eyeglasses to be firmly attached

23   to the conventional eyeglasses, and the lenses of the auxiliary

24   eyeglasses to align with the lenses of the conventional

25   eyeglasses without any independent assistance of the wearer."

26   JS-'858, Exh. 2 at 12-13.

27

28

REV 00020

REV 00862

1   Revolution's construction seeks to reduce the functionality

2  of this elements to the "click[ing]" of the extended magnet into

3  the recess, even though the patent does not use any form of the

4  word "click."[18]  Revolution also fails to construe the following

5  elements of claim 1: 1) that the extended magnets "engage said

6  recesses"; 2) that the extended magnets be "mated" with the

7  magnets forming the recesses; and 3) that the alignment of the

8  frames be "automatic."  Revolution cites to Texas Instruments,

9  Inc. v. U.S. Int'l Trade Commn., 988 F.2d 1165, 1772 (Fed. Cir.

10  1993) to argue that "functional statements, [like the 'whereby'

11  element here], which merely state the result of the limitation

12  are not to be construed as limitations themselves."  Revolution's

13  Opening Brief Re '858 Patent at 9:23-10:4.  Contrary to

14  Revolution's argument, the instant claim element contains

15  additional structural features not present in any other part of

16  the claim - features that are necessary to describe how the

17  conventional and auxiliary eyeglasses interconnect - i.e., the

18  extended magnets "engage said recesses", and the extended magnets

19  are "mated" with the magnets forming the recesses.  These

20  structural features are necessary to show how the other recited

21  elements cooperate to secure the auxiliary sunglasses to the

22  conventional eyeglasses; and thus, are necessary to complete the

23  invention claimed.  Indeed, the inventor emphasized in the

24  patents specification that these features constituted a "unique

25

26

27

28  [18] The Court also finds the term "click" to be ambiguous as applied to the instant invention.

21

1  and important improvement" to ensure "secure attachment and

2  alignment of auxiliary eyeglass frames 10 with conventional

3  eyeglass frame 12." Nicodema Decl. I, Exh. 1, '858 Patent, Col.

4  7, 11. 15-27.

5      The decision in Texas Instruments is completely

6  distinguishable.  There, the Federal Circuit held that the

7  "whereby/to preclude" clauses were not claim elements because the

8  clauses "[did] not contain any limitations not inherent to the

9  process found in" the claims.  Texas Instruments, 988 F.2d at

10 1172.  Here, in contrast, the requirements that the extended

11 magnets "engage the recesses," and that the extended magnets be

12 "mated" with the magnets forming the recesses only appear in the

13 "whereby" clause, and are not inherent parts of the eyeglass

14 structure recited in other portions of the claim.

15     In this case, the part of the specification relevant to the

16 phrase being construed states:

17

18     One can easily see the auxiliary eyeglasses approaching the

19     conventional eyeglasses with the appendages on the auxiliary

20     eyeglasses below the temple of the conventional eyeglass

21     frame.  Then with a very slight upward movement the magnets

22     attract and the auxiliary eyeglass frame is firmly attached.

23     This can be done simply and easily with one hand without any

24     feeling or fumbling that previous arrangements required.

25     The orientation is nearly automatic and doesn't require the

26

27

28

22

REV 00022

REV 00864

1   more careful alignment that is required of other

2   magnetically fastened auxiliary eyeglasses.[11]

3   Nicodema Decl., Exh. 1, '858 Patent, Col. 3, ll. 42-51.  Based on

4   the foregoing, the Court construes the instant phrase to mean

5   that when the magnets forming the recesses and the extended

6   magnets contact each other, this contact between the extended

7   magnets and the recesses causes the auxiliary eyeglasses to align

8   and secure to the conventional eyeglasses with little assistance

9   from the wearer.

10

11         (6)  "providing maximum resistance to downward movement

12              of said auxiliary eyeglasses thereby preventing

13              detachment of said auxiliary eyeglasses from said

14

15              conventional eyeglasses" (claim 1)

16       Plaintiff argues that the phrase "providing maximum

17   resistance to downward movement of said auxiliary eyeglasses

18   thereby preventing detachment of said auxiliary eyeglasses from

19   said conventional eyeglasses" in claim 1 of the '858 Patent means

20   that "the orientation of the magnetic forces recited earlier in

21   the claim will result in maximum resistance to downward movement

22   of the auxiliary eyeglasses."  JS-'858, Exh. 1 at 14-15.

23

24   [11] In the "Background of the Invention" section of the '858 Patent, the inventor describes the

25   "problem" with some of the prior art as requiring "that the auxiliary eyeglass extensions ... be
carefully placed above the temple hinge connections, [which] makes it [a] little more difficult to

26   attach the auxiliary frames to be sure that the extensions are placed carefully above the hinge
connections of the conventional eyeglass.  In most cases a wearer has to remove his conventional

27   eyeglasses to attach the auxiliary lenses." Nicodema Decl. I, Exh. 1, '858 Patent, Col. 2, ll. 12-

28   19.

REV 00023

REV 00865

1  Conversely, Counterclaimants argue that the instant phrase means

2  that "the mated magnets provide the greatest possible amount of

3  resistance to downward movement of the auxiliary eyeglasses so as

4  to keep the auxiliary eyeglasses from separating from the

5  conventional eyeglasses." JS-'858, Exh. 2 at 14.

6      The Court notes that Revolution's proposed construction

7  merely repeats the claim element in question, and fails to

8  construe its terms. Revolution again relies on Texas

9  Instruments to argue that the instant claim term is merely a

10  functional statement and not a claim limitation.

11  See Revolution's Opening brief for the '858 Patent at 9:11-10:4.

12  The Court disagrees.  An important part of this invention, as

13  expressed in the patent itself, is that the alignment of the

14  magnets provides maximum resistance to the downward detachment of

15  the auxiliary frame from the conventional frame. See Nicodema

16  Decl. I, Exh. 1, '858 Patent, Col. 7, ll. 15-24.  Thus, the

17  present claim language dealing with the resistance to downward

18  movement, language not present anywhere else in the claim, is

19  part of the claim limitation.  The Court finds that

20  Counterclaimant's construction is consistent with the patent

21  documents and the ordinary meaning of the words.  Therefore, the

22  Court adopts Counterclaimants' construction and construes the

23  instant phrase to mean providing the greatest possible amount of

24  resistance to downward movement of the auxiliary eyeglasses so as

25

26

27

28

24

REV 00024

REV 00866

1   to keep the auxiliary eyeglasses from separating from the

2   conventional eyeglasses.[12]

3

4                    (7) "a protective and decorative coating material

5                    on exposed sides of said plurality of magnets"

6                    (claim 3)

7       Revolution construes the phrase "a protective and decorative

8   coating material on exposed sides" in claim 3 of the '858 Patent

9   to mean that "the exposed surfaces of magnets or ferromagnetic

10  [sic] are substantially covered with a coating."  JS-'858, Exh. 1

11  at 16.  Counterclaimants, conversely, construe the instant phrase

12  to mean that "all visible sides of the magnets that are not

13  enclosed by the sockets formed on the temple extensions and the

14  appendages are covered with a layer of material that enhances the

15  aesthetic appearance of the magnets and provides protection from

16  normal wear and tear."  JS-'858, Exh. 2 at 16.

17      Preliminarily, the Court notes that, contrary to

18  Counterclaimants' assertion, it is not necessary to construe the

19  terms "decorative" and "protective."  The Court also notes that

20  Revolution's proposed construction improperly seeks to inject

21  into the claim element an apparent broadening requirement of

22

23

24

25

26

27  ---------------

28  [12] As previously discussed, see supra section "III B 2 a (3)," the interpretation of the terms "maximum resistance" to mean "greatest possible amount of resistance" does not infer that a magnet with a particular gauss strength must be used.

REV 00025

REV 00867

1   "substantial[ity]" that is usupported by the patent documents.[13]

2   The relevant dictionary definitions of the terms in dispute are:

3   1) coat: "a layer of covering material: coating"; Webster's,

4   Nicodema Decl. I, Exh. 3 at 29; and 2) expose: "to make visible."

5   Id. at 33.  Based on the foregoing the Court construes the

6   instant phrase to mean a layer of protective and decorative

7   covering material on the visible sides of said plurality of

8   magnets.

9

10

11                (8)   "matches" (claim 4)

12        Revolution contends that the term "matches" in dependent

13   claim 4 means "is aesthetically consistent with the color"  JS-

14   '858, Exh. 1 at 17.   Conversely, Counterclaimants contend that

15   the instant term means "is the exact color."  JS-'858, Exh. 2 at

16   18.

17        The only reference in the specification that is relevant to

18   the instant term describes one of the preferred embodiments by

19   stating:

20        This embodiment improves the appearance of the magnets in

21        the conventional eyeglass frame 12' by covering the exposed

22        surface with a protective and decorative coating of material

23        72 configured to match the color and appearance of the

24        conventional eyeglass frames 12'.

25

26

_____

27   [13] It is not clear if Revolution acquiesced to the proposed construction by Counterclaimants as

28   Revolution did not address the construction of the instant phrase in its Reply Brief.

26

REV 00026

REV 00868

1   Nicodema Decl. I, Exh. 1, '858 Patent Col. 7, ll. 5-9.  The

2   dictionary definition of the verb "to match" is "1. a. to be

3   exactly like; correspond precisely. b. to be like with respect to

4   specified qualities.  2. To resemble or harmonize with <The

5   lipstick *matches* the nail polish.>."  Nicodema Decl. I,

6   Webster's, Exh. 3 at 35.  The dispute between the parties boils

7   down to whether the court should adopt the first definition in

8   Webster's, i.e., "to be exactly like," or the second definition,

9   i.e., "to resemble or harmonize."  The Court finds that the first

10  definition, which is sought by Counterclaimants, is unnecessarily

11  restrictive.  There is no requirement in the patent documents

12  that the color of the coating material on the magnets be exactly

13  like the color of the frames; instead, a harmonization of the

14  colors is encompassed by the claimed invention.  Therefore, the

15  Court adopts the second definition in Webster's and construes

16  "matches" to mean resembles or harmonizes with.

17

18

19          **b.   Disputed terms in the '545**

20          The following terms and combination of terms in claims 6, 22

21  and 34 of the '545 patent are disputed: (1) "having a horizontal

22  surface" (claim 6); (2) "secured in said projections" (claim 22);

23  (3) "said first magnetic members capable of engaging second

24  magnetic members of an auxiliary spectacle frame" (claim 22);

25  (4) "said arms extending across a respective extension" (claim

26  34), and (5) "said first and second magnetic members engage one

27

28

REV 00027

REV 00869

1  another" (claim 34).  The Court now addresses each of these

2  disputed terms.

3

4              (1)  "having a horizontal surface"  (claim 6)

5      Claim 6 of the '545 Patent uses the phrase "having a

6  horizontal surface" in two contexts.  First, the claim refers to

7  the first magnetic members of the primary spectacle frame as

8  "having a horizontal surface."  Nicodema Decl. II, Exh. 1, '545

9  Patent, Col. 4, 11. 35-36.  Second, the claim refers to the

10  second magnetic members of the auxiliary frame as "having a

11  horizontal surface."  Id. at Col. 4, 11.  The Court will address

12  separately each use of the instant phrase.

13

14

15              (a)  "having a horizontal surface" - first

16                   magnetic members in the primary frame

17      Counterclaimants construe the phrase "having a horizontal

18  surface" as used with the magnetic members of the primary frame

19  to mean "ha[ving] a surface that lies in a plane substantially

20  perpendicular to the plane of the lenses of the primary

21  spectacle frame."  JS-'545, Exh. 1 at 5.  Conversely, Revolution

22  contends that the instant phrase means that "the first magnetic

23  members each have an upperwardly [sic][14] facing surface that lies

24  in a plane that is substantially perpendicular to the plane of

25

26

27  _____

28  [14] Presumably, Revolution meant to say "upwardly."

                              28

REV 00028

REV 00870

1   the lenses of the primary spectacle frame." JS-'545, Exh. 2 at

2   26 (emphasis added).

3       The crux of the dispute between the parties is whether or

4   not the invention claimed in the '545 Patent is limited to a top-

5   mounting design.[15] Counterclaimants contend that the '545 Patent

6   covers both a top and bottom-mounted designs; conversely,

7   Revolution argues that only a top-mounting design is covered by

8   the invention.

9       In this case, the specification of the '545 Patent describes

10   the attachment of the auxiliary frame in terms of top-mounting as

11   shown by the following:

12       

13       The arms are engaged with and supported on the <u>upper portion</u>

14       of the primary spectacle frame so as to allow the auxiliary

15       spectacle frame to be stably supported on the primary

16       spectacle frame and so as to prevent the auxiliary spectacle

17       frame from moving downward....

18   '545 Patent, Nicodema Decl. II, Exh. 1, '545 Patent, Col 1, ll.

19   62-67 (emphasis added)

20       It is to be noted that the arms 21 are engaged with and are

21       supported on the <u>upper portion</u> of the primary spectacle

22       frame 10 such that the auxiliary spectacle frame 20 may be

23       stable supported and secured to the primary spectacle frame

24       10.

25

26   <u>Id.</u>, Col. 2, ll. 49-56 (emphasis added).

27   ───────────────

28   [15] A "top-mounting design" is one where the magnetic members of the auxiliary frame mount on
     top of the magnetic members of the primary frame.

29

REV 00029

REV 00871

1   [T]he arm 21 securing the magnetic member 22 is supported on

2   an underline upper side underline portion of the primary spectacle frame 10.  As

3   shown in FIG. 7, the upper side portion can be an upper part

4   of the side portion securing the projection 13.

5   Id., Col. 3, ll. 14-18. (emphasis added).

6       While it is true, as Counterclaimants argue, that the claims

7   are generally not limited by the disclosed embodiments in the

8   patent, see Electro Med. Sys., S.A. v. Cooper Life Sciences,

9   Inc., 34 F.3d 1048, 1054 (Fed. Cir. 1994), it does not, however,

10   follow that the patentee has a monopoly over the entire universe

11   of embodiments that may be created - whether or not such

12   embodiments are encompassed by the disclosed invention.

13   See Netword LLC v. Centraal Corp., 242 F.3d 1347, 1352 (Fed. Cir.

14

15   2001) ("Although the specification need not present every

16   embodiment or permutation of the invention and the claims are not

17   limited to the preferred embodiment of the invention, neither do

18   the claims enlarge what is patented beyond what the inventor has

19   described as the invention.") (internal citations omitted); see

20   also Slimfold Mfg. Co. v. Kinkead Indus., Inc., 810 F.2d 1113,

21

22   1116 (Fed. Cir. 1987) ("Claims are not interpreted in a vacuum,

23   but are part and are read in light of the specification.").

24   Indeed, the specification may limit the scope that a patent claim

25   is accorded in circumstances where no broader scope of the claim

26   is described or enabled by the embodiments disclosed therein.

27   See e.g. Kraft Foods, Inc. v. Int'l Trading Co., 203 F.3d 1362,

28   1367-69 (Fed. Cir. 2000) (limiting "back panel" to the "rigid"

30

REV 00030

REV 00872

1  back panel described in every embodiment in the specification and
2  excluding the "flexible back panel of the accused device").[16]
3  Here, the invention described is clearly for a top-mounting
4  design: the written description only describes a top-mounting
5  design, the drawings only show a top-mounting configuration and
6  nothing in the prosecution history shows that the inventor
7  envisioned anything other than a top-mounting design.[17]

8
9      Based on the foregoing, the Court adopts the construction
10 proposed by Revolution and construes the instant phrase to mean
11 that the first magnetic members each have an upwardly facing
12 surface that lies in a plane that is substantially perpendicular
13 to the plane of the lenses of the primary spectacle frame.[18]

14

---

15 [16] At Oral Argument, on May 2, 2003, Counterclaimants' counsel argued that Texas Digital
16 Systems, Inc. v. Telegenix, Inc., 308 F.3d 1193, 1201-03 (Fed. Cir. 2002), instructs that the
   focus of claim construction should be on the claims themselves. See also Mem. of P's & A's in
17 Support of Counterclaimants' Opening Brief at 3:22-27 (citing Texas Digital Systems, Inc., 308
   F.3d at 1202). The Court notes that the argument proffered by Counterclaimants as to claim
18 construction is quite unremarkable. Indeed, this Court, in its Miracle Claim Construction Order,
19 stated with regard to the steps involved in construing claims: "First a court must look to the
   words of the claims themselves, both asserted and non-asserted, to define the scope of the
20 patented invention." Miracle Claim Construction Order at 16:1-3. In the instant case, the Court
   is not deviating from well-established Federal Circuit precedent requiring that "[i]n construing
21 claims, the focus ... begin and remain centered on the language of the claims themselves." Texas
22 Digital, Inc., 308 F.3d at 1201. Instead, the Court is also incorporating into its analysis Federal
   Circuit precedent that instructs that the claims, although they are the focus of claim construction,
23 are not to be construed in a vacuum, i.e., without regard to what the inventor disclosed as his
24 invention. See Slimfold Mfg. Co., 810 F.2d at 1116.

25 [17] Incidentally, in the Miracle Claim Construction Order, this Court also limited claims 12 and 16
   to a top-mounting design. See Miracle Claim Construction Order at 27-28.
26
27 [18] The Court need not reach the other arguments raised by Revolution in support of its proposed
   construction, including the arguments regarding the interference proceedings of the '207 Patent
28 and the prosecution history of the '858 Patent.

31

REV 00031

REV 00873

1               (b)   "having a horizontal surface" - second

2                   magnetic members in the auxiliary frame

3     Counterclaimants construe the phrase "having a horizontal

4 surface" as used with the magnetic members in the auxiliary frame

5 to mean "ha[ving] a surface that lies in a plane substantially

6 perpendicular to the plane of the lenses of the auxiliary

7 spectacle frame." JS-'545 Patent, Exh. 1 at 5.   Conversely,

8 Revolution construes the instant phrase to mean "ha[ving] a

9 <u>downwardly</u> facing surface that lies in a plane substantially

10 perpendicular to the plane of the lenses of the auxiliary

11 spectacle frame." JS-'545 Patent, Exh. 2 at 6 (emphasis added).

12 

13     Here again, the dispute between the parties centers on

14 whether the disclosed invention is limited to a top-mounting

15 design.   As the Court already held above, <u>see</u> <u>supra</u> section "III

16 B 2 b(1)(a)," the invention disclosed in the '545 Patent is

17 limited to a top-mounting design.   Therefore, the Court adopts

18 Revolution's proposed construction and construes the instant

19 phrase to mean having a downwardly facing surface that lies in a

20 plane substantially perpendicular to the plane of the lenses of

21 the auxiliary spectacle frame.

22 

23 

24               (2)   "secured in said projections" (claim 22)

25     Counterclaimants contend that the phrase "secured in said

26 

27 projections" in claim 22 of the '545 Patent means that "each

28 first magnetic member is inserted into and firmly connected to a

32

REV 00032

REV 00874

1  corresponding projection in a manner such that the connection is

2  not likely to fail or give way." JS-'545, Exh. 1 at 11.

3  Revolution, on the other hand, construes the instant phrase to

4  mean that "each first magnetic member is inserted into and firmly

5  connected to a corresponding projection in a manner that permits

6  it attract [sic] a second magnetic member when placed <u>above</u> the

7  first magnetic member." JS-'545, Exh. 2 at 12 (emphasis added).

8      Again, the parties' dispute centers on whether the invention

9  is limited to a top-mounting design. However, this particular

10  element of claim 22 need not address the issue of top-mounting as

11  it only deals with the connection of the first magnetic members

12  to the projections of the primary spectacle frame. Instead, the

13  top-mounting limitation is more appropriately addressed in the

14  element of claim 22 dealing with the auxiliary spectacle frame,

15  which the court addresses next.

16      Consistent with the Court's <u>Miracle</u> Claim Construction

17  Order, the Court adopts Counterclaimants' construction of

18  "secured" to mean not likely to fail or give away. <u>See</u> <u>Miracle</u>

19  Claim Construction Order at 22:3-9. Therefore, the Court

20  construes the instant phrase to mean that each first magnetic

21  member is inserted into and firmly connected to a corresponding

22  projection in a manner such that the connection is not likely to

23  fail or give.

24

25

26

27

28

REV 00033

REV 00875

1            (3)   "said first magnetic members capable of

2                  engaging second magnetic members of an

3                  auxiliary spectacle frame" (claim 22)

4

5      Counterclaimants construe the phrase "said magnetic members

6 capable of engaging second magnetic members of an auxiliary

7 spectacle frame" in claim 22 of the '545 Patent to mean that "the

8 first magnetic members have the ability to magnetically attract

9 corresponding magnetic members of an auxiliary spectacle frame,

10 with or without actual contact." JS-'545, Exh.1 at 12-13.

11 Conversely, Revolution argues that the instant phrase means that

12 "the first magnetic members have the ability to magnetically

13 attract the corresponding second magnetic members of an auxiliary

14 spectacle frame when placed <u>above</u> the first magnetic member, with

15 or without actual contact." JS-'545, Exh. 2 at 14 (emphasis

16 added).

17

18      Again, the dispute between the parties hinges on whether the

19 claimed invention is limited to a top-mounting design. For the

20 reasons stated above, <u>see supra</u> section "III B 2 b(1)(a)," the

21 Court adopts Revolution's construction and interprets the instant

22 phrase to mean the first magnetic members have the ability to

23 magnetically attract the corresponding second magnetic members of

24 an auxiliary spectacle frame when placed above the first magnetic

25 member, with or without actual contact.

26

27

28

34

REV 00034

REV 00876

(4)   "said arms extending across a respective extension" (claim 34)

Counterclaimants construe the phrase "said arms extending across a respective extension" in claim 34 of the '545 Patent to mean that "at least some portion of each arm reaches across the corresponding extension." JS-'545, Exh. 1 at 17.  Revolution contends that the instant phrase means that "at least some portion of each arm reaches across the top of the corresponding extension." JS-'545, Exh. 2 at 18 (emphasis added).

Here again, the dispute between the parties hinges on whether the claimed invention describes a top-mounting design. For the reasons set forth above, see supra section "III B 2 b(1)(a)," the Court adopts Revolution's construction and construes the instant phrase to mean that at least some portion of each arm reaches across the top of the corresponding extension.

(5)   "said first and second magnetic members engage one another" (claim 34)

Counterclaimants construe the phrase "said first and second magnetic members engage one another" in claim 34 fo the '545 Patent to mean that the "first and second magnetic members magnetically attract one another, with or without actual contact." JS-'545, Exh. 1 at 20.  Revolution, however, construes the instant phrase to mean that "the first and second magnetic

35

REV 00035

REV 00877

1   members are magnetically attracted to each other when the second

2   magnetic member is placed in proximity above the first magnet

3   [sic].[19]"  JS-'545, Exh. 2 at 20.

4
5       The crux of the parties dispute is again whether the design
6   disclosed by the invention is top-mounting.  For the reasons set
7   forth above, see supra section "III B 2 b(1)(a)," the Court
8   adopts Revolution's construction and construes the instant phrase
9   to mean that the first and second magnetic members are
10  magnetically attracted to each other when the second magnetic
11  member is placed in proximity above the first magnetic member.

12  IV.  CONCLUSION
13
14      Based on the foregoing, the Court concludes that:

15      1.   "plurality of sockets" in claim 1 of the '858 Patent
16           means two or more openings into which an inserted part
17           is designed to fit;

18      2.   "magnets" in claims 1-3 of the '858 Patent means
19           permanent magnets;

20
21      3.   "being oriented such that the maximum magnetic
22           attractive force between said magnets is oriented
23           approximately parallel to lenses in said conventional
24           eyeglasses" in claim 1 of the '858 Patent means that
25           when the auxiliary eyeglasses are attached to the
26           conventional eyeglasses, the permanent magnets mounted

27  _____

28  [19] Presumably, Revolution meant to say "magnetic member."

REV 00036

REV 00878

on the conventional eyeglasses are positioned relative
to the magnets mounted on the auxiliary eyeglasses such
that the greatest possible amount of magnetic force
attainable between the magnets will be in a plane
approximately parallel to the plane of the lenses of
the conventional eyeglasses;

4. "mounted to form recesses in said first pair of
sockets" in claim 1 of the '858 Patent means positioned
sufficiently below the outer peripheral edges of the
sockets so as to define an opening between the magnets
and the outer peripheral edges;

5. "whereby said extended magnets in said second pair of
sockets engage said recesses to automatically align and
secure said auxiliary eyeglasses when mated with said
magnets forming said recesses in said first pair of
sockets" in claim 1 of the '858 Patent means that when
the magnets forming the recesses and the extended
magnets contact each other, this contact between the
extended magnets and the recesses causes the auxiliary
eyeglasses to align and secure to the conventional
eyeglasses with little assistance from the wearer;

6. "providing maximum resistance to a downward movement of
said auxiliary eyeglasses thereby preventing detachment
of said auxiliary eyeglasses from said conventional
eyeglasses" in claim 1 of the '858 Patent means

37

REV 00037

REV 00879

1   providing the greatest possible amount of resistance to

2   downward movement of the auxiliary eyeglasses so as to

3   keep the auxiliary eyeglasses from separating from the

4   conventional eyeglasses;

5

6   7.   "a protective and decorative coating material on

7       exposed sides of said plurality of magnets" in claim 3

8       of the '858 Patent means a layer of protective and

9       decorative covering material on the visible sides of

10      said plurality of magnets;

11  8.   "matches" in claim 4 of the '858 Patent means resembles

12      or harmonizes with;

13

14  9.   "having a horizontal surface" as used with the first

15      magnetic members in the primary frame in claim 6 of the

16      '545 Patent means that the first magnetic members each

17      have an upwardly facing surface that lies in a plane

18      that is substantially perpendicular to the plane of the

19      lenses of the primary spectacle frame;

20  10.  "having a horizontal surface" as used with the second

21      magnetic members of the auxiliary frame in claim 6 of

22      the '545 patent means having a downwardly facing

23      surface that lies in a plane substantially

24      perpendicular to the plane of the lenses of the

25      auxiliary spectacle frame;

26

27  11.  "secured in said projections" in claim 22 of the '545

28      Patent means that each first magnetic member is

38

REV 00038

REV 00880



inserted into and firmly connected to a corresponding projection in a manner such that the connection is not likely to fail or give;

12. "said first magnetic members capable of engaging second magnetic members of an auxiliary spectacle frame" in claim 22 of the '545 Patent means the first magnetic members have the ability to magnetically attract the corresponding second magnetic members of an auxiliary spectacle frame when placed above the first magnetic member, with or without actual contact;

13. "said arms extending across a respective extension" in claim 34 of the '545 Patent means that at least some portion of each arm reaches across the top of the corresponding extension; and

14. "said first and second magnetic members engage one another" in claim 34 of the '545 Patent means that the first and second magnetic members are magnetically attracted to each other when the second magnetic member is placed in proximity above the first magnetic member.

IT IS SO ORDERED.

Dated: _May 5, 2003_

_Lourdes G. Baird_

LOURDES G. BAIRD
United States District Judge

39

REV 00039

REV 00881