# EXHIBIT E

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.: 09-61515-CIV-COOKE**
**MAGISTRATE JUDGE BANDSTRA**

ASPEX EYEWEAR, INC. AND
CONTOUR OPTIK, INC.

      Plaintiffs,

vs.

HARDY LIFE, LLC., MARCHON
EYEWEAR, INC., NIKE, INC.,
REVOLUTION EYEWEAR, INC.,
AND GARY MARTIN ZELMAN,
AN INDIVIDUAL,

      Defendants.

**(SECOND REVISED) EXPERT REPORT OF JOEL SODANO**

**I.      INTRODUCTION**

1.      I have been retained by Revolution Eyewear, Inc. ("Revolution") and Marchon

Eyewear, Inc. ("Marchon") to provide expert testimony in the above-referenced lawsuit on

behalf of all defendants.

2.      I submit my report pursuant to Fed. R. Civ. P. 26(a)(2)(B).  I have formed the

opinions expressed in this report through my independent evaluation and analysis.  If called upon

to testify in this case, I can competently testify to the matters addressed in this Expert Report, the

attachments thereto, and the materials I relied upon in rendering my opinions.  I may also rebut

any testimony, reports, or opinions proffered by Plaintiffs' witnesses (expert or otherwise).

**A.      Qualifications**

3.      I am currently self-employed as a consultant specializing in the optical and

sunglass industry.  From 1990 to 2008, I was employed by what is now known as Luxottica

Retail, which owns and operates a number of optical and sunglass chains including LensCrafters,

Sunglass Hut, Pearle Vision, Sears Optical, and Target Optical.  Luxottica Retail's brands have

the largest market share in optical and sunglass retailing in North America.  Combined, the Luxottica chains generate $4.0B in annual revenue with 5,000+ stores and 35,000 associates. From 2005 to 2008, I was Senior Vice President, Frames Management, Product Development, and Planning.  My earlier positions included:  Vice President, Frames Management and Development, from December 1998 to January, 2007; Assoc. Vice President, Frames Management and Development, from January 1996 to December, 1998; Senior Director, Frame Buying, from September 1994 to January, 1996; and Director of Frame Buying, from January, 1991 to September, 1994.

4.     Among my responsibilities from at least 1996 to 2008 were all aspects of product development for the Luxottica Retail chains, which included reviewing and analyzing technical drawings and other product illustrations, reviewing and analyzing prototypes, suggesting modifications to product designs, conceiving product configurations and overseeing production of prototypes according to those configurations, and interfacing with manufacturing personnel to implement product designs.  In connection with my frame buying and frame management responsibilities I was also responsible for being thoroughly familiar with the range of both optical and sunglass products in the market.  As described in more detail below, this included "clip-on" products where sunglass clip-ons attach to an optical frame, and further included magnetic clip-on products, where the clip-ons attach magnetically.

5.     As part of my duties, I also became aware of certain patents in the optical field. In some instances, I was involved in negotiations to potentially obtain rights under patents and/or to acquire companies with certain patent rights.  In some instances, I worked with Luxottica's legal department to understand any limitations on Luxottica's ability to make and sell certain potential products.  For example, I became aware of a patent owned by Sunreeve relating to front-mounting magnetic clip-ons, a patent application by Pentax for top-mounting magnetic clip-ons, one or more of Contour's patents relating to top-mounting magnetic clip-on eyewear and a Revolution Eyewear patent relating to bottom-mounting magnetic clip-on eyewear.

W02-WEST:3SMH1\402691395.3

6.      A copy of my curriculum vitae, which includes my employment history and education in more detail, is attached to this Expert Report as Exhibit A.

7.      I have not previously testified as an expert witness; and I have not authored any publications within the preceding ten years.

8.      My compensation for my work in this matter is $250 per hour and is not contingent upon the outcome of this litigation.

**B.      Materials Considered and Reviewed**

9.      In forming the opinions expressed in this Expert Report, I considered and reviewed a number of documents and things, which are identified in a list attached as Exhibit B to this Expert Report.

**C.      Person of Ordinary Skill in the Art**

10.      I have been asked to examine the issue of what the relevant field of art is for U.S. Patent No. RE37,545 ("the '545 patent") and the level of skill in the art at the time of the invention.  The field of art is, generally, clip-on eyewear that attaches to optical eyeglass frames as part of a matching set.

11.      Based upon my experience in the field and review of the documents and related things in this case, one of ordinary skill in the art in this field would be a person with five or more years working in product design and development in the field of eyewear, including clip-on eyewear.  I believe that I am a person of at least ordinary skill in the art, and have been so from the mid 1990s to the present.

W02-WEST:3SMH1\402691395.3

## II.     THE '545 PATENT

**A.     Background**

12.     The '545 patent specification acknowledges two prior art patents that disclosed the use of magnets to attach an auxiliary frame and/or lens to a primary spectacle frame. Specifically, the '545 patent states that U.S. Pat. No. 4,070,103 to Meeker discloses a spectacle frame that includes magnetic material for facilitating attachment of a clip-on sunglass lens to the spectacle frame. The clip-on rim also includes a magnetic strip for engaging with the magnetic material of the spectacle frame.  ('545 patent col. 1, lines 14-20.)

13.     The '545 patent states that U.S. Pat. No. 5,416,537 to Sadler discloses another typical eyeglass frame that includes first magnetic members secured to the temporal portions of the frames and second magnetic members secured to the corresponding temporal portions auxiliary lenses.  Meeker and Sadler disclose what is sometimes referred to in the art as "front-mounting" clip-ons, where the magnets are on the *front* of the primary frame.  In the course of my duties at Luxottica, I became aware in the early 1990s of a magnetic clip-on design presented to me by Alain Mikli.  After reviewing the materials identified above, it appears this design may correspond to Japanese Patent No. 5-40493 to Sadanaga.  Also in the course of my duties at Luxottica, I became aware in the mid-1990s of front-mounting magnetic clip-on eyewear made by Sunreeve and known as Takumi.

14.     The '545 patent specification explains that the front-mounting magnetic auxiliary frames in the prior art "have no supporting members for preventing the auxiliary lenses from moving downward relative to the frames such that the auxiliary lenses may easily move downward relative to the frames and may be easily disengaged from the frames when the users conduct jogging or jumping exercises. … The present invention has arisen to mitigate and/or obviate the afore-described disadvantages of the conventional spectacle frames."  (col. 1, lines 27-40.)

-4-

## B.   Description of the Invention

15.     The '545 patent then includes a summary of the invention, which starts as follows: "The primary objective of the present invention is to provide auxiliary lenses which may be stably secured and supported on the frames."  The summary goes on to explain how the auxiliary frames are stably secured and supported on the primary frames:

> the auxiliary spectacle frame including two side portions each having an arm extended therefrom for extending over and for engaging with the upper portion of the primary spectacle frame, and a pair of second magnetic members secured to the arms respectively for engaging with the first magnetic members of the primary spectacle frame so as to secure the auxiliary spectacle frame to the primary spectacle frame. The arms are engaged with and supported on the upper portion of the primary spectacle frame so as to allow the auxiliary spectacle frame to be stably supported on the primary spectacle frame and so as to prevent the auxiliary spectacle frame from moving downward relative to and so as to prevent the auxiliary spectacle frame from being disengaged from the primary spectacle frame.

> … the second magnetic members are extended downward toward the projections for hooking on the primary spectacle frame.  (col. 1, line 56 – col. 2, line 7.)

16.     I understand this to mean that the auxiliary frames of the invention of the '545 patent are "top-mounting", i.e., the auxiliary frames mount on top of the primary frames.  "Top-mounted" or "top-mounting" is a term commonly used in the eyewear industry for this configuration and for many of the products sold by Aspex.[1]  As described in the portion of the '545 patent quoted above, the end pieces or "arms" of the auxiliary frame extend over and rest on end pieces of the primary frame.  The end pieces of the auxiliary frame house magnets.  The bottom surface of those magnets attach or engage with the top surface of magnets on the end pieces of the primary frame.  In the prior art front-mounting clip-ons described in the '545 patent, only the magnetic attraction between the auxiliary frame magnets and the primary frame magnets held the clip-on in place.  In the '545 patent, the end piece of the auxiliary frame rests on top of the end piece of the primary frame to prevent the clip-on from slipping downwards.

---

[1]     From my experience in the industry and my review of Aspex products, most of Aspex' magnetic clip-on products appear to include a top-mounting auxiliary frame with a primary frame.

17.     The '545 patent then includes a brief description of the drawings and a detailed description of the preferred embodiment.  Below I include the figures and the relevant portions of the written description that refer to the drawings.



FIG. 1 and FIG. 3 are front and top views of a "primary" spectacle frame in accordance with the present invention.

"Referring to the drawings, and initially to FIGS. 1 to 4, an eyeglass device in accordance with the present invention comprises a primary spectacle frame 10 for supporting primary lenses therein.  The primary spectacle frame 10 includes two side portions each having an extension 11 extended rearward therefrom for pivotally coupling leg 12 thereto. The primary spectacle frame 10 includes two projections 13 secured to the rear and side portions thereof for supporting magnetic members 14 therein."  (Col. 2, lines 30-38.)





FIG. 2 and FIG. 4 are front and top views of an auxiliary frame in accordance with the present invention



FIG. 5 and FIG. 6 are front and top views of the spectacle frame and the auxiliary lenses combination;

"An auxiliary spectacle frame 20 is provided for supporting the auxiliary lenses therein and includes two side portions each having an arm 21 extended rearward therefrom for extending over and for engaging with the upper portion of the primary spectacle frame 10 (FIGS. 5 and 6). The auxiliary spectacle frame 20 also includes two magnetic members 22 secured to the arms 21 therefor for engaging with the magnetic members 14 of the primary spectacle frame 10 such that the auxiliary spectacle frame 20 may be stably supported on the primary spectacle frame 10, best shown in FIGS. 5 and 6.

It is to be noted that the arms 21 are engaged with and are supported on the upper portion of the primary spectacle frame 10 such that the auxiliary spectacle frame 20 may be stably supported and secured to the primary spectacle frame 10. The auxiliary spectacle frame 20 will not move downward relative to the primary spectacle frame and will not be easily disengaged from the primary spectacle frame when the users conduct jogging or jumping exercises." (Col. 2, lines 38-55.0

"As shown in FIGS. 3-7, the engaging surfaces between magnetic members 14 in primary spectacle frame 10 and the magnetic members 22 in the auxiliary spectacle frame 20 lie in a plane that is substantially horizontal when the eyeglass device is worn." (Col. 2, lines 64-68.)



# F I G . 7

FIG. 7 is a cross sectional view taken along lines 7--7 of FIG. 6,

"Referring next to FIG. 7, it is preferable that the projections 13 and the magnetic members 14 are located slightly lower than the upper portion of the primary spectacle frame 10; and the end portions of the arms 21 and/or the magnetic members 22 are slightly extended downward toward the projections 13 such that the arms 21 and the magnetic members 22 may hook on the primary spectacle frame 10 and such that the auxiliary spectacle frame 20 may further be stably supported and secured to the primary spectacle frame 10.

In one embodiment, as shown in FIG. 7, magnetic members 14 and 22 are not in contact with each other; magnetic members 14 and 22 are engaged with, but not supported on, each other. Instead, the arm 21 securing the magnetic member 22 is supported on an upper side portion of the primary spectacle frame 10. As shown in FIG. 7, the upper side portion can be an upper part of the side portion securing the projection 13." (Col. 3, lines 1-17.)

W02-WEST:3SMH1\402691395.3

18.     The specification sums up the "present invention" as follows:

"Accordingly, the eyeglass device in accordance with the present invention includes an auxiliary spectacle frame that may be stably secured to the primary spectacle frame and will not move downward relative to the primary spectacle frame and will not be easily disengaged from the primary spectacle frame when the users conduct jogging or jumping exercises."

19.     Thus, the "present invention" is consistently described as top-mounting, and all aspects of the invention require a top-mounting auxiliary frame to achieve the "primary objective" of the invention:  "to provide auxiliary lenses which may be stably secured and supported on the frames."  The physical configuration of the invention requires that the end pieces of the auxiliary frame extend over and rest on end pieces of the primary frame to support the auxiliary frame and prevent downward movement of the auxiliary frame.  The only way to achieve this is with a top-mounted design.  Further, the hooking function described at col. 2, lines 3-10 and col. 3, lines 1-10 requires top-mounting, the end-pieces of the auxiliary frame must extend over the end pieces of the primary frame and the magnet or housing must extend downwards towards the primary frame.  The hooking function would not work in any configuration other than top-mounting.  For example, if the auxiliary frames were bottom-mounting, they would simply fall downward if the magnets became disengaged, and the "hook" would offer no further securing of the auxiliary spectacle frame to the primary spectacle frame. Further, the gap between the magnets described at col. 3, lines 11-17, require top mounting:  "In one embodiment, as shown in FIG. 7, magnetic members 14 and 22 are not in contact with each other … .  Instead, the arm 21 securing the magnetic member 22 is supported on an upper side portion of the primary spectacle frame 10."  If one were to attempt to achieve this in a bottom-mounting configuration, there would be nothing but magnetic attraction to prevent the downward movement of the auxiliary frames, just as in the prior art, and the magnetic attraction would be weakened because of the gap and be more susceptible to the force of gravity.

20.     In sum, the '545 patent only teaches a top-mounted configuration to achieve the objectives of the invention – supporting the auxiliary frame and preventing downward movement of the auxiliary frame during activity.  This configuration requires an end piece on the auxiliary frame that extends over the top of the primary frame.  In other words, the only structure in the

-9-

patent that provides support and resistance to downward movement, other than the magnets disclosed in the prior art, is the end pieces of the auxiliary frame extended over the top of the primary frame.  The '545 patent does not teach a bottom-mounting or any other configuration which achieves the stated objectives.

### III.    INTERPRETATION OF CERTAIN CLAIM TERMS

21.    I understand that the only two claims of the '545 patent that have been asserted against defendants are claims 23 and 35, which provide as follows:

Claim 23

An eyeglass device comprising:

an auxiliary spectacle frame for supporting auxiliary lenses therein, said frame including a front side, a rear side, and oppositely positioned side portions, each of said side portions having an arm extended therefrom, each of said arms having a rearwardly directed free end for securing a magnetic member having a horizontal surface, and a pair of magnetic members respectively secured in the free ends of said arms

said arms and said pair of magnetic members adapted to extend across respective side portions of a primary spectacle frame so that said pair of magnetic members having a horizontal surface can vertically engage corresponding magnetic member surfaces on a primary spectacle frame

Claim 35

The eyeglass device according to claim 23,

wherein said magnetic members of said auxiliary spectacle frame are magnets.

22.    I also understand based on plaintiffs' counsel's representations and Mr. Zaro's deposition testimony that plaintiffs are only making a claim for literal infringement against defendants' accused products.  I also understand that plaintiffs are not making any claims under the doctrine of equivalents, but reserve the right to express opinions on that subject if plaintiffs attempt to do so.

-10-

23.    I am told that literal infringement requires every limitation recited in the claim to be present in the accused product; as opposed to the doctrine of equivalents, where one can allege that a missing element can be met by an equivalent that performs substantially the same function in substantially the same way to achieve substantially the same result.

24.    I am told that an infringement analysis is a two-step process where in the first step the claims must be construed or interpreted.  The second step being to compare the construed claim language to the accused product.

25.    It is my understanding that the law requires claim terms to be construed in light of the specification, that is the written description and the drawings of the invention.  I am told that the patent itself may be the best guide to determining the meaning of any disputed claim term.

26.    I believe that there are at least three terms of claim 23 that require interpretation. I note that Mr. Zaro did not construe any claim terms and, should he attempt to construe terms at a later time, I may wish to offer further opinions.  The three terms are:  (1) "a magnetic member having a horizontal surface", (2) "said arms and said pair of magnetic members adapted to extend across respective side portions", and (3) " so that said pair of magnetic members having a horizontal surface can vertically engage corresponding magnetic member surfaces".  As for the remaining terms of the claims, I believe they should be given their plain and ordinary meaning. Again, I reserve the right to discuss this further should plaintiffs offer additional positions.

27.    As stated above, the written description and the drawings in the '545 patent require the auxiliary frame to be top-mounting.  In construing the claims of the '545 patent, the California Court in Revolution Eyewear, Inc. v. Aspex Eyewear, Inc. et al., Case No. 02-1087 (C.D. Ca.) (the "California Action") held that "the invention disclosed in the '545 patent is limited to a top-mounting design."  (May 6, 2003 Claim Construction Order, p. 32.)  The California Court observed that "the invention described is clearly for a top-mounting design: the written description only describes a top mounting design, the drawings only show a top-mounting configuration and nothing in the prosecution history shows that the inventor

-11-

envisioned anything other than a top-mounting design." (May 6, 2003 Claim Construction Order, p. 31.)

28.      Given the position taken by plaintiffs, I was surprised to learn when reviewing inventor Richard Chao's deposition transcript in this case that he never thought of a bottom-mount magnetic clip-on until he saw a Revolution bottom-mount magnetic clip-on at some point in the last five years -- a decade or more after he filed the patent application underlying the '545 patent in 1995:

```
11      Q. What I want to know now about is
12      bottom-mounted. When is the first time you thought
13      about a bottom-mounted magnetic clip-on?
14      A. I never thought of it.
15      Q. So is today --
16      A. Well, until I find a product from
17      Revolution.
18      Q. When was that?
19      A. I don't know.
20      Q. So you never thought of a bottom-mounted
21      magnetic clip-on until you saw Revolution's
22      products, correct?
23      A. Yes.
24      Q. And give me your best estimate of when
25      that occurred.

2       A. I cannot remember.
3       Q. I want your best estimate. Was it within
4       the last year?
5       A. No.
6       Q. Was it within the last five years?
7       A. Maybe. Yeah.
8       Q. Can you say for sure it was within the
9       last 10 years?
10      A. Probably less than that.
11      Q. Okay. So your best estimate would be
12      sometime in the last five years?
13      A. Yes.
```

(Richard Chao Dep. at 141-142.)

-12-

I find it hard to believe that the '545 patent specification could describe or that the '545 patent could cover a configuration the inventor never even thought of.

29.     Therefore, I disagree with Mr. Zaro's opinion that "one skilled in the art at the time would have understood that the vertical engagement was capable of occurring between the upwardly facing horizontal surface of the auxiliary spectacle frame and downwardly facing horizontal surface of the primary frame."  In fact, Richard Chao also testified that the available magnets at that time were not strong enough to hold an auxiliary frame to the bottom of a primary frame:

> 3   Q. And the problem solved by your invention
> 4   in 1994 was to make the magnetic attachment of the
> 5   auxillary clip-ons more stable, correct?
> 6   A. Yes.
> 7   Q. Do bottom-mounting magnetic clip-ons solve
> 8   that problem?
> 9   A. If, in these days, the magnets, because
> 10  the magnets is much stronger than the day in 1994.
> 11  So if you ask my opinion in 1994, I would definitely
> 12  say no. But right now, it is hard to say.

 (Richard Chao Dep. at 65) (emphasis added).

> 11  Just to follow up on the last question, in
> 12  1995, bottom-mounting auxillary clip-ons wouldn't
> 13  work because the magnets weren't strong enough,
> 14  correct?
> 15  MR. SCHINDLER: Objection, asked and
> 16  answered.
> 17  MR. HANLE: That was 1994. Now I'm asking
> 18  1995.
> 19  MR. SCHINDLER: Okay.
> 20  THE WITNESS: I believe so.

(Richard Chao Dep. at 66.)

A.     **"a magnetic member *having a horizontal surface*"**

30.     Here, the written description and the drawings require the horizontal surface of the magnetic members on the auxiliary frame to be downwardly facing so that this horizontal surface can engage corresponding upwardly facing horizontal surfaces on the primary frame.  As

set forth above, this is the only way the features and advantages of the invention of the '545 patent can be achieved.

31.     A person of ordinary skill in the art reading the specification and claims of the '545 patent would understand the term "a magnetic member having a horizontal surface" as used in claim 23 to mean *a magnet having a downwardly facing surface.*

32.     In the California Action, the term "having a horizontal surface" as used in claim 6 was interpreted to mean "having a downwardly facing surface that lies in a plane substantially perpendicular to the plane of the lenses of the auxiliary spectacle frame."  (Depo. Ex. 69 p. 32.) Thus, the California court's interpretation of "having a horizontal surface" is consistent with my own.  After the California court's interpretation, plaintiffs added the phrase "having a horizontal surface" to claim 23 of the '545 patent in 2008 (effective March 2009) (see Reexamination Certificate).  Thus, plaintiffs added this term with full knowledge that it had been construed by the California court to mean "having a downward facing surface."

**B.     "said arms and said pair of magnetic members *adapted to extend across* respective side portions of a primary spectacle frame"**

33.     The specification, including the drawings and the written description, requires that the arms and magnetic members of the auxiliary frame extend across the top of end pieces of the primary spectacle frame.  As set forth above, this is the only way the features and advantages of the '545 patent invention can be achieved.

34.     A person of ordinary skill in the art reading the specification and claims of the '545 patent would understand that the term " *said arms and said pair of magnetic members adapted to extend across respective side portions of a primary spectacle frame*" to mean that the arms and magnetic members of the auxiliary frame are made to extend across the top of the corresponding side portions or extensions of the primary frame.

35.     Because a top-mounting configuration is <u>required</u> by the specification of the '545 patent, persons of skill in the art would <u>not</u> understand "*adapted to extend across respective side*

*portions*" to mean that the arms and magnetic members are <u>merely</u> <u>capable</u> of extending across or <u>adaptable</u> to extend across the top of side portions or extensions of the primary frame.  The '545 patent does not disclose the arms and magnetic members in any configuration other than extending across the top of the primary spectacle frame and does not teach how one could use any other configuration to achieve the objectives of the invention.  A person of skill in the art would understand that an auxiliary frame designed for bottom mounting was not made to be top-mounted because the auxiliary frame would not be stable and there would be misalignment between the auxiliary frame and the primary frame, including the bridges of the respective frames and the lenses.

36.     In looking at how this term or similar terms have been interpreted in the past, I learned that Claim 34 of the '545 patent has the following limitation:   *"said arms [of the auxiliary frame] extending across a respective extension [of the primary frame]"*.  This language is quite similar to the "adapted to extend across" language of claim 23.  The Court in the California Action interpreted the Claim 34 language to mean that at least some portion of each arm <u>reaches across the top</u> of the corresponding extension of the primary frame.  (Depo. Ex. 69. p 35.)  Thus, the California court's interpretation is again consistent with my own.

**C.     "said pair of magnetic members *having a horizontal surface* can *vertically engage corresponding magnetic member surfaces* on a primary spectacle frame"**

37.     The '545 patent specification, including the drawings and the written description, requires the magnetic members of the auxiliary frame to engage the magnetic member surfaces on the primary spectacle frame from the top.  As set forth above, this is the only way the features and advantages of the invention can be achieved.  If the magnetic members of the auxiliary frame engaged the magnetic members of the primary frame from the bottom, there would be nothing but magnetic attraction to secure the clip-ons, just as the magnetic clip-ons found in the prior art, including the Sadler and Meeker patents discussed in the '545 patent.

-15-

38.     A person of ordinary skill in the art reading the specification and claims of the '545 patent would understand that the term "said pair of magnetic members having a horizontal surface can *vertically engage* corresponding magnetic member surfaces on a primary spectacle frame " as used in claim 23 to mean that the magnetic members of the auxiliary frame having a downwardly facing surface *engage from the top* upwardly facing magnetic member surfaces on a primary spectacle frame.

## D.     Comments On Mr. Zaro's Report

39.     I have been asked to review and comment on the Expert Report of Lee Zaro dated May 7, 2010 ("Zaro Report").  Despite his criticisms of what defendants allege regarding claim construction, the law requires claim terms to be construed in light of the specification. Nevertheless, the Zaro Report contains no analysis of the specification.  Further, I attended Mr. Zaro's deposition on June 2, and Mr. Zaro stated that he did not even consider the court's claim construction in the California Action.

40.     The Zaro Report states that:  "The claim [23] does not require the 'horizontal surface' [of the magnetic members] to be downwardly facing."  The Zaro Report provides no support for this statement and I strongly disagree.  The '545 patent teaches that the arm of the auxiliary frame <u>must</u> extend over a side portion of the primary frame to support the auxiliary frame and prevent downward movement.  Without this configuration, there would be nothing but magnetic attraction to secure the clip-ons, just as in the prior art.  Since the arms are on top and the magnetic members are secured in the arms, the magnetic member surfaces of the auxiliary frame that engage the corresponding magnetic member surfaces on a primary frame <u>must</u> be downwardly facing.  The '545 patent does not teach how the auxiliary frame arms securing the magnets can be on top and the magnet surfaces can be upwardly facing, yet still engage the magnet surfaces on the primary frame.  Further, in order to achieve the hooking function described in the '545 patent, the arms and/or the magnetic members of the auxiliary frame must extend downward toward the projections on the primary (see col. 3, lines 1-10), that is, the

-16-

magnetic member surfaces of the auxiliary frame must be downwardly facing.  The court in the California Action reached the same conclusion, but Mr. Zaro did not consider the court's ruling.

41.     The Zaro Report assumes that claim 23 allows the arms and magnetic members of the auxiliary frame to extend <u>underneath</u> the end pieces of the primary frame.  I disagree.  The '545 patent teaches that the arm of the auxiliary frame <u>must</u> extend over a side portion of the primary frame to support the auxiliary frame and prevent downward movement.  Without this configuration, there would be nothing but the magnetic attraction to secure the clip-ons, just as in the prior art.  Mr. Zaro also apparently contends that ***adapted to extend across respective side portions of a primary spectacle frame*** may refer to the eye wires on the side of the primary frame.  This is not described in the '545 patent, nor would persons of skill in the art understand the '545 patent to describe such a structure.  Arms that extend next to the eye wire would not achieve the objective of the invention – supporting the auxiliary frame and preventing downward movement – that is achieved by the arm extending <u>over</u> a side portion of the primary frame.  Nor would such a structure necessarily allow vertical engagement as provided in claim 23 – that is vertical engagement could be achieved regardless of whether the arms extend next to the eye wire.  For example, the arms could extend outwardly from the auxiliary frames, without crossing the eye wire, yet still have a magnetic member with a horizontal surface that engages a corresponding magnetic member surface on a primary frame.  The Court in the California Action reached the same conclusion I did, that the arm of the auxiliary frame extends <u>across the top</u> of a side portion of the primary frame.

## IV.     COMPARISON OF THE CLAIMS AND THE ACCUSED PRODUCTS

42.     I understand that the products of Revolution Eyewear accused of infringing claims 23 and 35 of the '545 patent are those listed in Exhibit C, and the products of Marchon Eyewear accused of infringing Claims 23 and 35 are those highlighted in Exhibit D.  My opinions herein relate only to these accused products.  I reserve the right to supplement my analysis and opinions if additional products are accused.

-17-

43.     I have reviewed representative samples of the Revolution and Marchon products at issue in this case.  Despite certain minor difference, I understand that all the products are bottom mounted and any differences between the products are not material to any of the claim limitations of claims 23 and 35.  Thus, my opinions regarding non-infringement apply to all accused products.

44.     I am told that for there to be literal infringement, the only assertion made by plaintiffs, each and every element of claim 23 or each and every element of claim 35 must be found in the accused products.  As set forth below, the following elements are <u>not</u> present in any of the accused products.  I understand that claim 35 depends from claim 23, and that the elements of claim 23 are incorporated into claim 35.  Thus, if elements of claim 23 are not present in the accused products, those same elements will not be present with respect to claim 35. Accordingly, the Revolution and Marchon products at issue do not infringe claims 23 or 35 of the '545 patent.

45.     The chart below provides a comparison of the claims of the '545 patent, as they would be interpreted by persons of skill in the art, with Revolution's and Marchon's accused products, showing the absence of these claim elements in all of the accused products.[2]

---

[2]     The photographs below of the Revolution product are of model REV 546, which is representative of all Revolution accused products.  The photographs below of the Marchon product are of model FLEXON 885-MAG, which is representative of all Marchon (Flexon, Nike and Calvin Klein) accused products.

| Claim 23 Language | My Interpretation of the Claim Term | Comparison of The Accused Products with My Interpretation |
|---|---|---|
| "a magnetic member having a horizontal surface" | a magnetic member having a downwardly facing surface | The magnets on Revolution's and Marchon's auxiliary frames have an upwardly facing surface **not** a downwardly facing surface.<br><br><br>*Revolution Auxiliary Frame Showing Upwardly Facing(Silver) Magnet Surface*  *Revolution Auxiliary Frame Showing (Red) Epoxy Surface Covering Bottom of Arm*<br><br>*Marchon Auxiliary Frame Showing Upwardly Facing (Silver)*  *Marchon Auxiliary Frame Showing (Gray) Epoxy Surface* |

-19-

| | | *Magnet Surface* | *Covering Bottom of Arm* |
|---|---|---|---|
| "said arms and said pair of magnetic members adapted to extend across respective side portions of a primary spectacle frame" | said arms and said pair of magnetic members are made to extend across the top of respective side portions or extensions of the primary spectacle frame | The arms and magnetic members of Revolution's and Marchon's auxiliary frames are made to extend <u>underneath</u> the respective side portions of the primary spectacle frame, and <u>not</u> to extend <u>across the top</u> of the primary spectacle frame.<br><br><br>*Revolution Product with Arms and Magnets of Auxiliary Frame Extending Underneath Side Portions of Primary Frame* | <br>*Marchon Product with Arms and Magnets of Auxiliary Frame Extending Underneath Side Portions of Primary Frame* |

W02-WEST:3SMH1\402691395.3

| "so that said pair of magnetic members having a horizontal surface can vertically engage corresponding magnetic member surfaces on a primary spectacle frame" | so that said pair of magnetic members having a downwardly facing surface can *engage from the top* upwardly facing magnetic member surfaces on a primary spectacle frame. | The magnetic members of Revolution's and Marchon's auxiliary frames are upwardly facing and engage the downwardly facing magnetic member surfaces on a primary spectacle frame from the bottom, <u>not from the top</u> |
|---|---|---|

The magnetic members of Revolution's and Marchon's auxiliary frames are upwardly facing and engage the downwardly facing magnetic member surfaces on a primary spectacle frame from the bottom, <u>not from the top</u>

  

*Revolution Auxiliary Showing Upwardly Facing(Silver) Magnet Surface*

*Bottom of Revolution Primary Frame Showing Downwardly Facing (Silver) Magnet Surface*

*Revolution Auxiliary Frame with Upwardly Facing Magnet Surfaces Engaging Downwardly Facing Magnet Surface on Primary Frame from the Bottom*

  

*Marchon Auxiliary Frame Showing Upwardly Facing (Silver)Magnet Surface*

*Bottom of Marchon Primary Frame Showing Downwardly Facing (Silver) Magnet Surface*

*Marchon Auxiliary Frame With Upwardly Facing Magnet Surface Engaging Downwardly Facing Magnet Surface of Primary Frame From the Bottom*

Note that the "corresponding magnetic member surfaces" are on the bottom of the primary frame, not the top, which does not have a "magnetic member surface."

-21-

46.     The Zaro Reports states that "the Accused Products have a 'downwardly facing surface that lies in a plane substantially perpendicular to the plane of the lenses of the auxiliary spectacle frame' [as] the exemplary products illustrate."  Mr. Zaro is incorrect.  Claim 23 refers to "a magnetic member having a horizontal surface", not merely that "the Accused Products have a downwardly facing surface."  The downwardly facing surface must be the surface of a magnetic member.  The auxiliary frame magnetic members in the accused products do <u>not</u> have a downwardly facing surface; rather, they have an upwardly facing surface.  The downwardly facing surface on the arms of the accused products is an epoxy surface, not the surface of a magnetic member.  Persons of skill in the art would never consider an epoxy surface to be the surface of a magnetic member.

47.     The Zaro Report further states that:

The only difference between the upwardly facing surface of the magnets (which are shown in just prior photos) and the downwardly facing surface is an epoxy coating on the downwardly facing surface of the magnet. … The epoxy coating does not impede the magnetic properties of the downwardly facing surface of the magnets in the auxiliary spectacle frame.

48.     These statements are also incorrect.  First, the downwardly facing epoxy surfaces are slightly rounded, while the upwardly facing magnet surfaces are flat, and protrude upwardly from the arm to allow them to protrude into pockets in the primary frame.  The flat upwardly facing magnet surfaces of the auxiliary frame allow more surface area contact with the downwardly facing surfaces of the primary frame, which allows for a more secure hold.  Second, the rounded, downwardly facing epoxy piece on the bottom of the arms is not a magnet or coating of a magnet.  Rather, the magnet has a thin nickel-copper coating to prevent rust/corrosion with a thickness of approximately 10 microns (.01 millimeters).  The epoxy piece is not for purposes of "coating" and is up to 100 times thicker than the nickel-copper coating (up to 1 millimeter).  Thus, the downwardly facing surface on the arms of the accused products is not a magnetic member surface or even a magnetic member coating.

49.     Further, the epoxy on the bottom of the arms of the accused products certainly impedes the magnetic properties of the magnets by increasing the distance between the magnets of the auxiliary frame and the magnets on the primary frame.  As even someone not skilled in the art can observe, the strength of magnetic attraction decreases as one increases the distance between magnetic materials.  Mr. Zaro admitted at his deposition that the strength of magnetic attraction decreases as the thickness of the epoxy increases.  In fact, as the distance between magnet surfaces increases, the magnetic attraction decreases exponentially.  Thus, a clear purpose of the epoxy is to **<u>decrease</u>** magnetic attraction, further supporting the fact that this epoxy piece is not a magnetic member surface and the arms and magnetic members of the auxiliary frame are not adapted to extend across the top of the side portions of the primary frame.

50.     The Zaro Report states that "The Accused Products have arms with a pair of magnetic members adapted to extend across the respective side portions of a primary spectacle frame."  I disagree.  The arms and magnetic members of the accused products are specifically made to extend underneath side portions of the primary frames, and not across the top of side portions of the primary frame for several reasons.  First, when one mounts the accused auxiliary spectacle frames on the bottom of their matching primary frame such that the arms extend underneath the primary frame, the lenses align; when one attempts to mount the auxiliary frames on top such that the arms extends over the primary frame, the lenses are misaligned, i.e., the auxiliary lenses are significantly higher than the primary lenses.

51.     Second, when one mounts the accused auxiliary spectacle frames on the bottom of their matching primary frame, the magnets of the auxiliary frame protrude securely into mating pockets on the bottom of the primary frame; when one attempts to mount the auxiliary frames on top, the rounded epoxy rests on top of the flat primary frame surface, creating instability.

52.     Third, when one mounts the accused auxiliary spectacle frames on the bottom of their matching primary frame, the auxiliary frames are securely attached to the primary frames; when one attempts to mount the auxiliary frames on top, the auxiliary frames are not securely

attached and easily fall off.  In fact, Mr. Zaro could not shake the auxiliary lenses off the primary frame when mounted on the bottom, but they easily fell off when he attempted to mount them on top, even when he merely turned the primary frames upside down.  Thus, the arms and magnetic members of the auxiliary frame are not adapted to extend across the top of side portions of the auxiliary frame.

53.     Under Mr. Zaro's contention that "said arms and said pair of magnetic members adapted to extend across respective side portions" may include extending "across" the side of the eye wire, the accused products do not do so.  Because the arms of the Revolution and Marchon accused products extend rearwardly, the entire magnetic member is located <u>behind</u> the eye wire, and does not "extend across" the eye wire.  As shown in the representative figures below, the entire recess for the magnetic member is <u>behind</u> the eye wire of the primary frame and thus the magnetic member of the auxiliary frame is not "adapted to extend across" the eye wire.

 

This further supports my belief that the term "adapted to extend across respective side portions" means *adapted to extend across the top of respective side portions or extensions*.  There is simply no reason described in the '545 patent for the magnetic members of the auxiliary frame to extend across the *side* of the eye wire portion of the primary frame; the '545 patent clearly and repeatedly describes a reason for the magnetic member to extend across the *top* of a side portion of the primary frame, that is, to rest on an upper surface of the primary frame to prevent downward movement.

-24-

54.     The Zaro Report does not construe "vertically engage" as used in the claim term "so that said pair of magnetic members having a horizontal surface can vertically engage corresponding magnetic member surfaces on a primary spectacle frame."  As addressed above, the specification only teaches the auxiliary frame magnetic members engaging the primary frame from the top, and the claim should be construed accordingly.  As also addressed above, the magnetic members of the auxiliary frames in the accused products engage the primary frame from the bottom, not from the top.

55.     The Zaro Report states that the "Accused Products are capable of being engaged via the downwardly facing surface of the magnetic members of the auxiliary frame with the upwardly facing surface of a primary frame as shown in the exemplary frames below."  In an attempt to support this contention, Mr. Zaro includes photographs of the auxiliary frames of the accused products resting on top of primary frames specially manufactured by Aspex (although the Zaro Report does not disclose that the photographs show primary frames not made or sold by defendants).  These specially manufactured primary frames are different than defendants primary frames in at least two significant respects:  the end pieces have been lowered in relation to the lenses, and there are magnet surfaces on top of the specially manufactured primary frames.  Even with these changes to the primary frames, I disagree with Mr. Zaro's statement that the accused auxiliary frames are "capable of being engaged via the downwardly facing surface of the magnetic members of the auxiliary frame with the upwardly facing surface of a primary frame."  First, the magnetic members of the auxiliary frame do not have a downwardly facing surface (they are upwardly facing); rather, the downwardly facing surface of the auxiliary frame arms is epoxy.  Second, the accused auxiliary frames do not "engage" the magnetic surfaces of the specially made primary frames in the way "engagement" is described in the patent.  Rather, the attraction is weak, and the auxiliary frames detach easily.  The '545 patent specifically describes auxiliary frames which are stably supported on and will not be easily disengaged from the primary spectacle frame when the users conduct jogging or jumping exercises.

W02-WEST:3SMH1\402691395.3

56.     The Zaro Report also ignores or overlooks the relationship between the "adapted to extend across" limitation and the "vertical engagement" limitation.  Claim 23 states:  "said arms and said pair of magnetic members *adapted to extend across respective side portions* of a primary spectacle frame **so that** said pair of magnetic members having a horizontal surface can *vertically engage* corresponding magnetic member surfaces on a primary spectacle frame."  Therefore, it is the extension of the arms across side portions of the primary frame that allows the vertical engagement.  The arms of the accused auxiliary frames are not adapted or made to extend across side portions of a primary frame **so that** they can engage the primary frames from the top.  When one attempts to place the accused auxiliary frames on top of the matching primary frames, there is misalignment of the lenses, and weak and unstable attraction so that the auxiliary frames easily fall off.

## V.     OPINIONS REGARDING VALIDITY

### A.     Legal Principles Regarding Prior Art

57.     I understand that a patent claim can be invalid under the patent laws for various reasons, including, for example, anticipation or obviousness in light of the prior art, failure to satisfy the written description requirement, failure to disclose the best mode, indefiniteness, or failure to provide an enabling disclosure.  In arriving at my opinions, I have applied the following legal standards and analyses regarding patent invalidity.

### 1.     Burden Of Proof

58.     I understand that defendants have the burden to prove invalidity by "clear and convincing evidence."  The clear and convincing evidence standard is a higher standard than the preponderance of the evidence standard, but a lower standard than the beyond a reasonable doubt standard.

59.     I understand that United States patents are presumed valid because they are subject to an examination process at the PTO.  I understand that the PTO does not expressly

W02-WEST:3SMH1\402691395.3

construe the claims of a patent, and that a Court's later construction of claims may impact their validity.

2.      Prior Art

60.      I understand that "prior art" is defined by statute, but generally refers to all of the prior developments in the field used to assess whether the claimed subject matter is novel and nonobvious.  In general, the prior art consist of publications and patents dated before the invention or more than one year before the filing of the patent application, as well as prior art devices that were on sale or in public use in this country before the invention or more than one year before the filing of the patent application.

3.      Anticipation

61.      I understand that a patent claim is anticipated if all of the elements, features or "limitations" of the claim are found expressly or inherently in a single prior art document or device.  If the claim is anticipated, the claim is invalid.

4.      Obviousness

62.      I understand that if all of the elements of the patent claim are not found in a single prior art reference, a patent claim will still be invalid if the differences between the claimed subject matter and the prior art are such that the claimed subject matter as a whole would have been obvious at the time the invention was made to a person of ordinary skill in the art.  If a claim is obvious, the claim is invalid.  In determining whether the subject matter of a claim would have been obvious, one or more prior art references may be combined in order to encompass the claimed invention in such a way that the combination of elements, features or limitations would have been obvious at the time the invention was made to a person of ordinary skill in the art.

63.      I understand that the following are considered in determining whether a patent claim recites obvious subject matter:

a.   the scope and content of the prior art;

W02-WEST:3SMH1\402691395.3

    b.  the level of ordinary skill in the relevant art at issue;

    c.  the differences between the prior art and the claims at issue; and

    d.  objective indicia of non-obviousness, if any.

64.    I understand that that the obviousness of an invention is to be determined as of "the time the invention was made." I have been told and assume for purposes of my opinions herein that date the invention was made was November 7, 1995, the filing date of the parent application of the '545 patent. Thus, prior art for the purpose of applying 35 U.S.C. § 103 includes only references with effective dates before this date.

65.    I understand that, in patent law, the level of ordinary skill in the art is based upon factors such as the educational level of those who work in the industry and the sophistication of the technology involved, in addition to the type of problems encountered in the art, prior art solutions to those problems, and the rapidity with which innovations are made in the particular technology. I understand that prior art is reasonably pertinent if it is in the same field as the claimed invention, or is from another field that a person of ordinary skill in the art would look to in trying to solve the problem. I also understand that a hypothetical person of ordinary skill in the art is presumed to have knowledge of all the contents of the relevant prior art.

66.    I understand that a patent claim may be obvious if the prior art or other factors would have suggested to or motivated one of ordinary skill in the art to combine certain prior art references to arrive at the elements of the claim. I understand that this suggestion or motivation may come from the references themselves, the fact that certain references are of particular interest in the relevant field, the fact that the very nature of the problem can cause an inventor to examine certain references to seek a solution to that problem, the fact that a reference discloses a solution to a similar problem, or from the knowledge of one of ordinary skill in the art. I understand that the motivation or suggestion to combine cannot come from hindsight.

67.    I understand that the patentee may try to rebut a showing of obviousness with objective indicia of non-obviousness, such as commercial success, long-felt need and failures of others. However, a nexus between the merits of the claimed invention and evidence of these

indicia is required in order for the evidence to be given substantial weight in an obviousness decision.  Moreover, I understand that a strong case of obviousness based upon the prior art cannot be overcome by such evidence.


**B.    Comparison of Claims with Prior Art**

68.    I have been told and understand that the following references are prior art to the '545 patent:  (1) Japanese Patent Application No. H07-156856 (Iwamoto); (2) the Twincome-Pentax Documents (as identified in the '545 patent); (3) Japanese Patent No. 5-40493 (Sadanaga); (4) U.S. Patent No. 5,642,177 (Nishioka); (5) U.S. Patent No. 5,867,244 (Martin); and (6) Japanese Patent No. 3011174 (Boston Club).

69.    Claims 23 and 35 of the '545 patent are anticipated by Iwamoto and the Twincome-Pentax Documents.  Further, if claims 23 and 35 of the '545 patent are construed broadly to cover auxiliary frames regardless of the orientation of the magnet surfaces (which construction is required to allege that Revolution's and Marchon's accused products infringe), such claims are anticipated by Sadanaga.

| Claim 23 | Sadanaga, Iwamoto and Twincome-Pentax |
|---|---|
| An eyeglass device comprising: | Sadanaga discloses an eyeglass device including primary and auxiliary spectacle frames for supporting lenses.  (See Figs. 1 and 2) <br><br> Iwamoto discloses an eyeglass device including primary and auxiliary spectacle frames for supporting lenses.  (Figs. 1 and 4). <br><br> The Twincome-Pentax Documents (as identified in the '545 patent) disclose an eyeglass device including primary and auxiliary spectacle frames. |
| an auxiliary spectacle frame for supporting auxiliary lenses therein, said frame including a front side, a rear side, and oppositely positioned side portions, | Sadanaga discloses an auxiliary spectacle frame for supporting auxiliary lenses, said auxiliary frame including a front side, a rear side, and oppositely positioned side portions (the sides of the rims).  (See |

| | |
|---|---|
| each of said side portions having an arm extended therefrom, each of said arms having a rearwardly directed free end for securing a magnetic member having a horizontal surface, and a pair of magnetic members respectively secured in the free ends of said arms | Fig. 2)  The side portions have an arm extended therefrom (first projection member 14), each of said arms having a rearwardly directed free end for securing a magnetic member (14b), and a pair of magnetic members (14b) respectively secured in the free ends of said arms.  As shown in Fig. 5 and 7, the magnet 14b and cover 14c are directed rearwardly, which spans the gap which necessarily exists between the primary frame and the auxiliary frame. The magnet 14b has cylindrical recess 14d that has a horizontal surface at the top or top and bottom. |
| | Sadanaga also teaches that the surface of the magnetic member can be horizontal as well as vertical (although the projection members holding the magnets extend "outwards in the transverse direction, these projection members may occupy any other suitable positions on the respective frames"). |
| | Iwamoto discloses an auxiliary spectacle frame for supporting auxiliary lenses, said auxiliary frame including a front side, a rear side, and oppositely positioned side portions.  (See Figs. 4, 5 and 6)  The side portions have an arm extended therefrom (42), each of said arms having a rearwardly directed free end 42a for securing a magnetic member, having a downwardly facing horizontal surface, and a pair of magnetic members respectively secured in the free ends of said arms ("the magnet may be set in a portion of the second attractive portion 42a"). |
| | The Twincome-Pentax Documents (as identified in the '545 patent) disclose an auxiliary spectacle frame for supporting auxiliary lenses therein, said frame including a front side, a rear side, and oppositely positioned side portions (F), each of said side portions having an arm extended therefrom, each of said arms having a rearwardly directed free end for securing a magnetic member having a horizontal surface, and a pair of magnetic members respectively secured in the free ends of said arms (H). |
| said arms and said pair of magnetic members adapted to extend across respective side portions of a primary spectacle frame so that said pair of magnetic members having a horizontal surface can vertically engage | If the claim does not require the arms to extend over the primary frame, Sadanaga discloses arms and magnetic members 14 and 14b adapted to extend across side portions of a primary spectacle frame (second projection member 5) so that said pair of magnetic members 14b having at least horizontal |

| corresponding magnetic member surfaces on a primary spectacle frame | surfaces (*e.g.*, the top or top and bottom of the recess (14d)) can vertically engage corresponding magnetic member surfaces (the circumference of projection 5c) on a primary spectacle frame, as shown in Figs. 5 and 7 (top views).  Sadanaga also teaches vertical engagement by stating that "these projection members may occupy any other suitable positions on the respective frames"). <br><br>  <br><br> Iwamoto discloses arms and magnetic members adapted to extend across side portions of a primary spectacle frame (Figs. 6-8) so that said pair of magnetic members having a downwardly facing surface can engage corresponding upwardly facing magnetic member surfaces on a primary spectacle frame ("the magnet may be set in both a portion of the first attractive portion 24a and a portion of the second attractive portion 42a"). <br><br> The Twincome-Pentax Documents disclose a pair of arms and magnetic members (H) adapted to extend across respective side portions of a primary spectacle frame (B) so that said pair of magnetic members having a horizontal surface can vertically engage corresponding magnetic member surfaces on a primary spectacle frame. |
| **Claim 35** | |

W02-WEST:3SMH1\402691395.3

| The eyeglass device according to claim 23, | See above re elements of claim 23 |
|---|---|
| wherein said magnetic members of said auxiliary spectacle frame are magnets | Sadanaga discloses that the magnetic members in the auxiliary frames are magnets.<br><br>Iwamoto discloses that the magnetic members in the auxiliary frames may be magnets  ("the magnet may be set in a portion of the second attractive portion 42a").<br><br>The Twincome-Pentax Documents disclosed that the magnetic members of the auxiliary spectacle frame were magnets. |

70.     Thus, each of the Sadanaga, Iwamoto and Twincome-Pentax Documents disclose each element of claims 23 and 35 and these claims are invalid as anticipated.

71.     The Zaro Report states that "Sadanaga does not contain 'arms having a rearwardly directed free end', 'magnetic members having a horizontal surface' or 'said pair of magnetic members having a horizontal surface can vertically engage corresponding magnetic member surfaces on a primary spectacle frames.'"  Mr. Zaro is incorrect.  Figures 5, 6 and 7 of Sadanaga are top views of the arm and engagement elements.  Below left is Fig. 5 which has been inverted to have the same orientation as Fig. 6 in the center and Fig. 7 on the right.  Fig. 5 shows the arms (projection member 14).  As best shown in Fig. 6, the free end of the arm is directed rearwardly to engage with the projection member 5 on the primary frame.  There is a cover 14c over the magnet 14b secured free end of the arms.  The portion of the cover directed rearwardly has been colored yellow in each of the figures to illustrate the point.

W02-WEST:3SMH1\402691395.3



72.     As shown in Fig. 7, the magnet 14b has a cylindrical recess 14d for receiving a projection 5c attached to the primary frame.  The top and bottom surfaces of the cylindrical recess 14d are horizontal surfaces of the magnet 14b that vertically engage with the top or top and bottom of projection 5c.  Because projection 5c is intended to engage magnet 14b, the projection 5c is a magnetic member.  Note that the front surface of the recess 14d (oriented towards the bottom of the page in Fig. 7) appears to be the caulking pin 14a, not a magnet; thus, the front end of the projection 5c does not appear to horizontally engage the magnet.

73.     Sadanaga states that although the projection members holding the magnets extend "outwards in the transverse direction, these projection members may occupy any other suitable positions on the respective frames".  Mr. Zaro contends that "other suitable positions" only teaches different horizontal mounting positions such as the top of the eye wire or the bottom of the eye wire.  I disagree.  Sadanaga is referring to the direction in which the projection members extend, not the position of the projection members on the rim.  The inherent alternatives to extending outwards would include extending rearwardly (as well as frontwardly), which would provide an additional orientation allowing vertical engagement of magnetic members in the projections.

-33-

74.     Claims 23 and 35 are also rendered obvious by Iwamoto, the Twincome-Pentax Documents or Sadanaga, alone, in combination with each other or in further combination with Nishioka, Martin and/or Boston Club.

75.     If claims 23 and 35 of the '545 patent are construed broadly to cover auxiliary frames regardless of the orientation of the magnets surfaces (which construction is required to allege that Revolution's and Marchon's accused products infringe), such claims are rendered obvious by Sadanaga, alone or in combination with Martin, Boston Club, Iwamoto and/or the Twincome-Pentax Documents.

76.     If claims 23 and 35 of the '545 patent are construed broadly to cover auxiliary frames regardless of the orientation of the magnets surfaces (which construction is required to allege that Revolution's and Marchon's accused products infringe), such claims are rendered obvious by Nishioka in combination with Martin, Boston Club, Sadanaga, Iwamoto and/or the Twincome-Pentax Documents.

77.     Below is a table comparing claim 23 with the prior art identified above.

| Claim 23 | Prior Art |
|---|---|
| An eyeglass device comprising: | Sadanaga discloses an eyeglass device including primary and auxiliary spectacle frames for supporting lenses.  (Figs. 1 and 2) |
| | Iwamoto discloses an eyeglass device including primary and auxiliary spectacle frames.  (Figs. 1 and 4) |
| | The Twincome-Pentax Documents (as identified in the '545 patent) disclose an eyeglass device including primary and auxiliary spectacle frames. |
| | Nishioka also discloses an eyeglass device including primary and auxiliary spectacle frames.  (See Fig 1) |
| | Martin also discloses an eyeglass device including primary and auxiliary spectacle frames.  (See Fig 2) |
| | Boston Club discloses an eyeglass device including primary and auxiliary spectacle frames.  (See Figs. 1 |

W02-WEST:3SMH1\402691395.3

| | and 2.) |
|---|---|
| an auxiliary spectacle frame for supporting auxiliary lenses therein, said frame including a front side, a rear side, and oppositely positioned side portions, each of said side portions having an arm extended therefrom, each of said arms having a rearwardly directed free end for securing a magnetic member having a horizontal surface, and a pair of magnetic members respectively secured in the free ends of said arms | Sadanaga discloses an auxiliary spectacle frame for supporting auxiliary lenses, said auxiliary frame including a front side, a rear side, and oppositely positioned side portions (the sides of the rims).  (See Fig. 2)  The side portions have an arm extended therefrom (first projection member 14), each of said arms having a rearwardly directed free end for securing a magnetic member (14b), and a pair of magnetic members (14b) respectively secured in the free ends of said arms.  As shown in Fig. 5 and 7, the magnet 14b and cover 14c are directed rearwardly, which spans the gap which necessarily exists between the primary frame and the auxiliary frame.  The magnet 14b has cylindrical recess 14d that has a horizontal surface at the top or top and bottom.<br><br>Sadanaga also teaches that the surface of the magnetic member can be horizontal as well as vertical (although the projection members extend "outwards in the transverse direction, these projection members may occupy any other suitable positions on the respective frames").<br><br>Nishioka also discloses an auxiliary spectacle frame for supporting auxiliary lenses, said auxiliary frame including a front side, a rear side, and oppositely positioned side portions (the sides of the rims).  (See Fig. 1)  The side portions have an arm extended therefrom (the protrusion containing magnet 3), each of said arms having a rearwardly directed free end for securing a magnetic member (3), and a pair of magnetic members (3) respectively secured in the free ends of said arms.<br><br>Iwamoto discloses an auxiliary spectacle frame for supporting auxiliary lenses, said auxiliary frame including a front side, a rear side, and oppositely positioned side portions.  (See Figs. 4, 5 and 6)  The side portions have an arm extended therefrom (42), each of said arms having a rearwardly directed free end 42a for securing a magnetic member, having a downwardly facing horizontal surface, and a pair of magnetic members respectively secured in the free ends of said arms ("the magnet may be set in a portion of the second attractive portion 42a").<br><br>The Twincome-Pentax Documents (as identified in the '545 patent) disclose an auxiliary spectacle frame |

|  | for supporting auxiliary lenses therein, said frame including a front side, a rear side, and oppositely positioned side portions (F), each of said side portions having an arm extended therefrom, each of said arms having a rearwardly directed free end for securing a magnetic member having a horizontal surface, and a pair of magnetic members respectively secured in the free ends of said arms (H). |
|---|---|
|  | Martin discloses an auxiliary spectacle frame for supporting auxiliary lenses (22), said auxiliary frame including a front side, a rear side, and oppositely positioned side portions.  (See Fig. 2)  The side portions have an arm extended therefrom 40, each of said arms having a rearwardly directed free end. Martin discloses that the arm may have a horizontal surface. |
|  | Boston Club discloses an eyeglass device including primary and auxiliary spectacle frames.  (See Figs. 1 and 2.)  Boston Club discloses an auxiliary spectacle frame for supporting auxiliary lenses, said auxiliary frame including a front side, a rear side, and oppositely positioned side portions.  (See Figs. 1 and 2)  The side portions have an arm extended therefrom (13), each of said arms having a rearwardly directed free end and a horizontal surface (16). |
| said arms and said pair of magnetic members adapted to extend across respective side portions of a primary spectacle frame so that said pair of magnetic members having a horizontal surface can vertically engage corresponding magnetic member surfaces on a primary spectacle frame | If the claim does not require the arms to extend over the primary frame, Sadanaga discloses arms and magnetic members 14 and 14b adapted to extend across side portions of a primary spectacle frame (second projection member 5) so that said pair of magnetic members 14b having at least horizontal surfaces (*e.g.*, the top or top and bottom of the recess (14d)) can vertically engage corresponding magnetic member surfaces (the circumference of projection 5c) on a primary spectacle frame, as shown in Figs. 5 and 7 (top views).  Sadanaga also teaches vertical engagement by stating that "these projection members may occupy any other suitable positions on the respective frames"). |



Nishioka discloses arms and magnetic members (3) adapted to extend across (using plaintiffs' apparent construction) side portions of a primary spectacle frame (protrusions holding magnet 7) so that said pair of magnetic members can engage corresponding magnetic member surfaces on a primary spectacle frame.

Iwamoto discloses arms and magnetic members adapted to extend across side portions of a primary spectacle frame (Figs. 6-8) so that said pair of magnetic members having a downwardly facing surface can engage corresponding upwardly facing magnetic member surfaces on a primary spectacle frame ("the magnet may be set in both a portion of the first attractive portion 24a and a portion of the second attractive portion 42a").

The Twincome-Pentax Documents disclose a pair of arms and magnetic members (H) adapted to extend across respective side portions of a primary spectacle frame (B) so that said pair of magnetic members having a horizontal surface can vertically engage corresponding magnetic member surfaces on a primary spectacle frame.

Martin discloses arms (40) adapted to extend across the top of side portions (18) of a primary spectacle frame so that said pair of arms can vertically engage corresponding surfaces on a primary spectacle frame. (See Col. 3:19-28: "clips 40 and 42 that clip

| | … adjacent and above temple blocks 18 and 20. … a <u>downward</u> force is applied to maintain outer clips 40 and 42 in firm contact with frames 12 and 13 of conventional eyewear 10.") |
|---|---|
| | Boston Club discloses arms (13) adapted to extend across respective side portions of a primary spectacle frame (18) so that a horizontal surface (16) can vertically engage corresponding surfaces on a primary spectacle frame ("horizontal piece in direct contact with the upper surface of the block"). |
| **Claim 35** | |
| The eyeglass device according to claim 23, | See above re elements of claim 23 |
| wherein said magnetic members of said auxiliary spectacle frame are magnets | Sadanaga discloses that the magnetic members in the auxiliary frames are magnets. |
| | Nishioka discloses that the magnetic members in the auxiliary frames are magnets. |
| | Iwamoto discloses that the magnetic members in the auxiliary frames may be magnets  ("the magnet may be set in a portion of the second attractive portion 42a"). |
| | The Twincome-Pentax Documents disclosed that the magnetic members of the auxiliary spectacle frame were magnets. |

78.     The Zaro Report states that "there would be no motivation for a person skilled in the art to combine Sadanaga, Martin, Nishioka and/or Boston Club to arrive at claim 23."  I disagree.  At least as of November 7, 1995, it would have been obvious to persons of skill in the art knowing the contents of the foregoing prior art references to combine the references to solve the problem that the magnets are easily disengaged in front-mounting magnetic clip-ons.  This would have involved the use of known techniques (magnets to attach the auxiliary frames and "arms" resting on top of a horizontal surface on the primary frame) to improve similar products; and applying a known technique to a known product ready for improvement to yield predictable

results.  Vertical engagement would have been "obvious to try" in that it was one of very few predictable solutions, e.g., horizontal engagement or engagement in a diagonal plane.

79.    The Zaro Report states that Martin "does not contain any magnets and it also does not disclose horizontal magnet surfaces or a vertical magnet engagement."  However, Martin does disclose arms on an auxiliary frame with horizontal surfaces that vertically engage with horizontal surfaces on a primary.  Sadanaga, Nishioka, Iwamoto and Twincome-Pentax all demonstrate that it was known to place magnets in the arm of an auxiliary frame.

80.    The Zaro Report states that "Nishioka does not disclose rearwardly directed arms, horizontal magnet surfaces or vertical engagement with the primary frame."  I note that claim 23 does not require "rearwardly directed arms", but rather arms with "having a rearwardly directed free end."  In any event, Sadanaga, Iwamoto and the Twincome-Pentax Documents all teach horizontal magnet surfaces and vertical engagement and both Martin and Boston Club teach vertical engagement.

81.    Thus, the foregoing prior art references, Sadanaga, Iwamoto, the Twincome-Pentax Documents, Nishioka, Martin and Boston Club, alone or in combination, disclose and/or render obvious each element of claims 23 and 35, and these claims are invalid as obvious.

## C.    Enablement

82.    I understand that a patent claim will be invalid for lack of enablement if the patent specification does not teach one of ordinary skill in the art to make and use the full scope of the claimed invention without undue experimentation.  I further understand that, under the enablement requirement, the scope of the claims must be less than or equal to the scope of the enabling disclosure.

83.    It is my opinion that, if claims 23 and 35 of the '545 patent are construed broadly to cover auxiliary frames regardless of the orientation between the arms of the auxiliary frame and the side portions of the primary frame (which construction is required to allege that

-39-

Revolution's and Marchon's accused products infringe), such claims are invalid because the '545 patent fails to teach those in the art how to make and use the full scope of the invention without undue experimentation. Specifically, the '545 patent teaches that it is necessary for the arms of the auxiliary spectacle frame to extend over and engage with the upper portion of the extensions of a primary spectacle frame, so that the upper portions of the primary spectacle frame stably support the arms of the auxiliary frame. (See col. 1:55-col. 2:2, col. 2:5-6, col. 2:40-56, col. 3:18-24, Figs. 1-7.) The '545 patent states that the prior art does not teach how to prevent the auxiliary frames from moving downward relative to the primary frames in the absence of supporting members underneath the surfaces of the auxiliary frames. (Col. 1:26-32.) The '545 patent does not teach how the arms of the auxiliary frame will be stably supported unless they extend across the top surface of the extensions of the primary frame.

**D.     Written Description Requirement**

84.     I understand that a patent claim is invalid for failure to satisfy the written description requirement if the original specification does not allow a person of ordinary skill in the art to recognize that, as of the priority date of the patent, the inventor actually invented what is claimed in the patent. I understand that the patent must convey with reasonable clarity to those skilled in the art that, as of the filing date, that the applicant was in possession of the full scope of the claimed invention as construed. I further understand that the purpose of the written description requirement is to prevent the inventor from extending his invention beyond what he or she reasonably conveyed in the original disclosure. In making this determination, courts will compare the claims in the patent with the patent specification, including the various embodiments of the original application. I understand that the written description should include such descriptive means as words, structures, figures, diagrams, formulas, etc., that fully set forth the claimed invention. I understand that the claims of a patent must particularly point out and distinctly claim the subject matter that the applicant regards as his or her invention.

85.     It is my opinion that, if claims 23 and 35 of the '545 patent are construed broadly to cover auxiliary frames regardless of the orientation between the arms of the auxiliary frame

and the side portions of the primary frame (which construction is required to allege that Revolution's and Marchon's accused products infringe), such claims are invalid because they fail to meet the written description requirement.  Specifically, the '545 patent describes that it is necessary for the arms of the auxiliary spectacle frame to extend over and engage with the upper portion of the extensions of a primary spectacle frame, so that the upper portions of the primary spectacle frame stably support the arms of the auxiliary frame.  (See col. 1:55-col. 2:2, col. 2:5-6, col. 2:40-56, col. 3:18-24, Figs. 1-7.)  The '545 patent does not describe how the arms of the auxiliary frame will be stably supported unless they extend across the top surface of the extensions of the primary frame.  The '545 patent states that the prior art does not disclose how to prevent the auxiliary frames from moving downward relative to the primary frames in the absence of supporting members underneath the surfaces of the auxiliary frames.  (Col. 1:26-32.) The written description of the '545 patent does not show that the patentee had possession of an auxiliary frame which was not "top-mounting" and stably supported by extensions of a primary frame.

## E.     Indefiniteness

86.     I understand that a patent claim is invalid for indefiniteness if one of ordinary skill in the art is unable to understand the bounds of the claims when read in the light of the specification.  I further am informed that this requirement for precision and definiteness in claim language is to apprise the public of the scope of the invention.  A claim is indefinite if it is insolubly ambiguous as construed, and no narrowing construction can properly be adopted.

87.     It is my opinion that, to the extent plaintiffs contend claims 23 and 35 of the '545 patent should be construed to cover auxiliary frames regardless of the orientation between the arms of the auxiliary frame and the side portions of the primary frame (which construction is required to allege that Revolution's and Marchon's accused products infringe), such claims are invalid because they are indefinite.  Claim 23 provides that the arms and magnetic members of the auxiliary frame are "adapted to extend across" respective side portions of a primary spectacle frame, and that the magnetic members can "vertically engage" surfaces on the primary frame.

-41-

Absent the clarity provided by the specification that "extending across" means "extending across the top of", and that "vertically engaging" means that the arms and magnetic members engage the top of the primary frame, this claim language is indefinite.  (See col. 1:55-col. 2:2, col. 2:5-6, col. 2:40-56, col. 3:18-24, Figs. 1-7.)

## VI.    AMENDMENT AND SUPPLEMENTATION

88.    I reserve the right to supplement and amend this report to the extent new information becomes available, law applicable to the opinions I have rendered changes, or as otherwise permitted by the Court or the applicable rules.

89.    I also reserve the right to prepare demonstrative exhibits setting forth and describing the opinions set forth above and as otherwise permitted by the Court or the applicable rules.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, in Las Vegas, Nevada on this, 7th day of October, 2010.

Joel Sodano

PROOF OF SERVICE

STATE OF CALIFORNIA, COUNTY OF ORANGE

I am employed in the County of Orange; I am over the age of eighteen years and not a party to the within entitled action; my business address is 650 Town Center Drive, 4th Floor, Costa Mesa, California 92626-1993.

On **October 8, 2010**, I served the following document(s) described as **(SECOND REVISED) EXPERT REPORT OF JOEL SODANO** on the interested party(ies) in this action by placing true copies thereof enclosed in sealed envelopes and/or packages addressed as follows:

**See Attached Service List**

**BY E-MAIL OR ELECTRONIC TRANSMISSION:** Based on a court order or agreement of the parties to accept service by electronic transmission, I caused the documents to be sent to the persons at the electronic notification addresses listed in the attached service list. The electronic notification address from which I served the documents(s) is jfrancis@sheppardmullin.com.

I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on October 8, 2010, at Costa Mesa, California.

JEANETTE D. FRANCIS

## SERVICE LIST

*Attorney for Plaintiffs Aspex Eyewear, Inc., and Contour Optik, Inc.*
Jacqueline Becerra, Esquire
email: becerraj@gtlaw.com
Ericka Yolanda Turk, Esquire
email: turkmooree@gtlaw.com
**GREENBERG TRAURIG**
1221 Brickell Avenue
Miami, Florida 33131
Telephone: 305.379.0534
Telecopy: 305.579.0717

*Attorney for Plaintiffs Aspex Eyewear, Inc., and Contour Optik, Inc.*
Michael Nicodema, Esquire
email: nicodemam@gtlaw.com
Barry J. Schindler, Admitted Pro Hac Vice
email: schindlerb@gtlaw.com
MetLife Building
**GREENBERG TRAURIG**
200 Park Avenue
New York, New York 10166-1400
Telephone: 212.801.9200
Telecopy: 212.801.6400

Todd Schleifstein, Admitted Pro Hac Vice
**GREENBERG TRAURIG**
200 Park Avenue
Florham Park, NJ 07932
email: schleifsteint@gtlaw.com
Telephone: 973.360.7900
Telecopy: 973.301.8410

*Attorney for Defendants Marchon Eyewear, Inc., and Nike, Inc.*
W. Barry Blum, Esquire
email: bblum@gjb-law.com
Martin J. Keane, Esquire
email: mkeane@gjb-law.com
**GENOVESE JOBLOVE & BATTISTA, P.A.**
100 S.E. 2nd Street, Suite 4400
Miami, Florida 33131
Telephone: 305.349.2300
Telecopy: 305.349.2310

Scott W. Hansen, Admitted Pro Hac Vice
email: shansen@reinhartlaw.com
**REINHART BOERNER VAN DEUREN**
1000 N. Water Street
PO Box 2965
Milwaukee, WI 53201-2965
Telephone: 414.298.8123
Telecopy: 414.298.8097

*Attorney for Defendants Marchon Eyewear, Inc., and Nike, Inc.*
Edgar H. Haug, Admitted Pro Hac Vice
email: ehaug@flhlaw.com
Brian S. Goncalves, Admitted Pro Hac Vice
email: bgoncalves@flhlaw.com
David Herman, Admitted Pro Hac Vice
email: dherman@flhlaw.com
Porter F. Fleming, Admitted Pro Hac Vice
email: pfleming@flhlaw.com
**FROMMER LAWRENCE & HAUG LLP**
745 Fifth Ave.
New York, New York 10151
Telephone: 212.588.0800
Telecopy: 212.588.0500

Mark P. Walters, Admitted Pro Hac Vice
email: mwalters@flhlaw.com
**FROMMER LAWRENCE & HAUG LLP**
1191 2nd Avenue, Suite 2000
Seattle, WA 98101
Telephone: 206.336.5690
Telecopy: 212.588.0500