# EXHIBIT I

Case 0:09-cv-61515-MGC   Document 186-9   Entered on FLSD Docket 10/19/2010   Page 1 of 12

#17/D
2-15-01
R. Shader
H.E.

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Reissue Application )
) REISSUE PATENT APPLICATION
Inventor: Richard Chao )
)
Reissue Application No.: 09/182,862 )
) Art Unit: 2873
)
) Examiner: Mai, H.
Filed: 10/21/98 )
)
Patent No.: 5,568,207 )
)
Title: AUXILIARY LENSES FOR )
EYEGLASSES )
)

CERTIFICATE OF MAILING UNDER 37 C.F.R. § 1.8
I hereby certify that this correspondence is being deposited in the United States Postal Service with sufficient postage as first class mail in an envelope addressed to Box Missing Parts, Assistant Commissioner for Patents, Washington, D.C. 20231, on November 22, 2000.

_____ (Attorney Signature)
Brian I. Marcus, Reg. No. 34,511
Signature Date: November 22, 2000

RESPONSE TO OFFICE ACTION UNDER 37 C.F.R. § 1.111

Assistant Commissioner of Patents
Washington, D.C. 20231

Sir:

This RESPONSE A is in reply to the Office Action mailed ~~July 15, 1999~~.

Amendments

Please amend the above-identified application as follows:

In the Specification,

On column 2, after line 30, please replace "FIG. 8 illustrates another embodiment of a cross sectional view", with --FIG. 8 illustrates another embodiment of a part of a cross sectional view--.

- 1 -

Attorney Docket No.: CONT-01013US1 SRM/BIM
bim/cont/1013us1.012.wpd

At the top of Column 3, please insert:

<u>As shown in Figs. 3-7, the engaging surfaces between magnetic members 14 in primary spectacle frame 10 and the magnetic members 22 in the auxiliary spectacle frame 20 lie in a plane that is substantially horizontal when the eyeglass device is worn.</u>

In the Drawings:

A proposed drawing amendment to FIG. 8 is submitted to replace the original drawing sheet for FIG. 8.

In the Claims,

Please amend Claim 1.

Please add new Claims 3-66.

The claims have been reproduced in full for your convenience.

1.  **(Once Amended)** An eyeglass device comprising:

    a primary spectacle frame for supporting primary lenses therein, said primary spectacle frame including two side portions each having an extension extended therefrom for pivotally coupling a leg means thereto, said primary spectacle frame including two rear and side portions each having a projection secured thereto, said primary spectacle frame including an upper side portion,

    a pair of first magnetic members secured in said projections respectively,

    an auxiliary spectacle frame for supporting auxiliary lenses therein, said auxiliary spectacle frame including two side portions each

- 2 -

Attorney Docket No.: CONT-01013US1 SRM/BIM
bim/cont/1013us1.012.wpd

only the structure described in the specification and equivalents thereof. See *Haney*, 29 U.S.P.Q.2d at 1608. Thus, a claim element might be subject to the limitations of Section 112, ¶ 6, if it is primarily described in terms of function.

For mechanical devices, whether a claim element is deemed expressed in means-plus-function language and therefore subject to the limitations of Section 112, ¶ 6 might not depend on whether the term "means" is used in the claim language. Instead, a claim element might be governed by Section 112, ¶ 6, if it includes primarily a functional claim limitation, as opposed to a structural limitation.

Thus, Section 112, ¶ 6 does not seem to forbid Applicant from claiming "means" without a function, or a function without using the word "means". Section 112, ¶ 6 governs the interpretation of means-plus-function claims. Nowhere in the laws, whether in Section 112, ¶ 6 or other statutes, is there any limitation restricting Applicant from claiming with the word "means".

Rejections Based on § 102

Rejections Under Nishioka

In the last paragraph on page 7, the Office Action rejected Claims 12 and 34 under 35 U.S.C. 102(e) as being anticipated under U.S. Patent No. 5,642,177 by Nishioka (the "Nishioka Patent").

In the Nishioka Patent, the magnets 3 in the auxiliary frame 1 engage vertically with the magnets 7 in the primary frame. The engagement surfaces are parallel to the plane of the lenses. In Claims 12 and 34, the amendment should have removed any possibility of ambiguity. The engagement is on a horizontal position, as opposed to the vertical plane defined by the lenses in the primary frame.

- 45 -

Under Section 102, a claim is anticipated only if each and every element as set forth in the claim is found in a single prior art reference. *Constant v. Advanced Micro-Devices Inc.*, 848 F.2d 1560, 1570 (Fed. Cir. 1988). In other words, every limitation of a claim must identically appear in a single prior art reference for it to anticipate the claim. *In re Bond*, 910 F.2d 831, 832 (Fed. Cir. 1990).

Since the Nishioka Patent at least has not disclosed the horizontal engagement position, the amended Claims 12 and 34 could not have been anticipated by Nishioka.

### Rejections Under Twincome-Pentax

On page 8, Claims 1, 3-7, 10-21, 23, 24 and 34 were rejected under 35 U.S.C. 102(a) as being anticipated by Twincome-Pentax. The basis of the rejection depends on a number of documents. They include materials allegedly presented to the Le Coane Group on June 21, 1995; an enlarged photograph of a portion of a Pentax booth allegedly taken during an IOFT meeting on October 1995 with Information and Data Sheet; and a brochure entitled, "October 1995, IOFT -- Material for New Product Development (Q & A)" allegedly distributed to attendees who visited Pentax's October 1995 IOFT exhibition site.

Initially, Applicant notes that the Interference Proceeding No. 104,051 between Pentax and Applicant based in part on Applicant's present invention has ended with Applicant prevailing.

The Le Coane Group meeting on June 21, 1995 was not public and was not a 35 102(a) event.

35 USC 102 provides in relevant part that:

- 46 -

A person shall be entitled to a patent unless --

(a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent ....

Nothing about the meeting of the Le Coane Group can constitute a 35 USC 102 (a) event.

The meeting of the Le Coane Group took place in Japan, not in the United States. Hence, the meeting of the Le Coane Group is not evidence that the claimed invention was "known or used by others in this county .... before the invention thereof by ... [Applicant]."

The meeting of the Le Coane Group was not a patenting of anything. Hence, the meeting of the Le Coane Group is not evidence that the claimed invention was "patented in this or a foreign country, before the invention thereof by ... [Applicant]."

That leaves the final possibility, which is that something about the meeting of the Le Coane Group meant that the claimed invention was "described in a printed publication in... a foreign country, before the invention thereof by ... [Applicant]." However, the display of the prototype at the meeting was certainly not a printed publication of anything. That leaves the display of the technical drawings at the meeting being "printed publication[s]."

The leading opinion concerning what constitutes a "printed publication" under either 35 USC 102(a) or 35 USC 102(b) is In re Wyer, 655 F.2d 221, 210 USPQ 790 (CCPA 1981) (Rich, J). According to that opinion:

> the printed publication provision was designed to prevent withdrawal by an inventor, as the subject matter of a patent, of that which was already in the possession of the public. Thus, the question to be examined under § 102(b) is the accessibility to at least the pertinent part of the public, of a perceptible description of the invention, in whatever form it may have been recorded. Access involves such factual inquiries as classification and indexing. In other words, such a reference is a "printed publication" and a bar to patentability

- 47 -

> ...upon a satisfactory showing that such document has been disseminated or otherwise made available to the extent that persons interested and ordinarily skilled in the subject matter or art, exercising reasonable diligence, can locate it and recognize and comprehend therefrom the essentials of the claimed invention without need of further research or experimentation.[1]

Applying that statement to the present situation, it is abundantly clear that the technical drawings which were displayed at the meeting of the Le Coane Group were not printed publications. Not only were they not classified or indexed, they were not "disseminated or otherwise made available to the extent that persons interested and ordinarily skilled in the subject matter or art, exercising reasonable diligence,... [could] locate...[them] and recognize and comprehend therefrom the essentials of the claimed invention without need of further research or experimentation."

Moreover, Applicant has not rested purely on the weakness of the Le Coane Group meeting evidence. Applicant is submitting concurrently herewith the declaration of Prof. Richard J, Samuels, a leading academic expert on Japanese business practices. The gist of his declaration is that the meeting of the Le Come Group was not public. Hence, even if the Examiner were to decide that the technical drawings displayed at the meeting of the Le Coane Group were printed, they were not printed publications because they were not made publicly available.

Regarding the enlarged photograph of a portion of a Pentax booth showing four models of Pentax's Magnetic Eyeglass Frame System and the "Information and Data Sheet" that identified certain models of the Pentax system and provided pricing and options for each, Applicant submits that:

    i.    The enlarged photograph does not clearly illustrate the type of frames that were on display.

---

[1] 655 F.2d at 226, 210 USPQ at 794.

- 48 -

  ii. Even if the frames on display were magnetic frames, they might well have been showing the front-mounted frames, whose magnets have coupling surfaces that are substantially parallel to the front surfaces of the lenses.

  iii. No magnets can be identified in the frames shown, let alone magnetic members positioned as claimed. Also, the exhibits do not show eyeglasses with a pair of frames--auxiliary frame with primary frame. The exhibits only show eyeglasses with one frame.

  iv. Thus, those documents cannot be anticipatory prior art against the claimed invention.

Regarding the brochure entitled, "October 1995, IOFT -- Material for New Product Development (Q & A)", Applicant submits that the New Development Q&A was not distributed and was not for distribution to convention attendees at the trade show.

About 30,000 people attended the IOFT meeting in 1995. It was one of the largest conventions held in Japan for the eye wear industry. Any company trying to promote an eye wear product in the largest eye wear trade show should have (a) prepared a different type of brochure, (b) prepared many more brochures than Pentax had, and (c) more widely distributed the brochure, instead of just providing the brochure to a very selected group of people (i.e., the members of the Le Coane Group) in a special meeting presumably arranged during the IOFT.

Twincome is an eye wear product, a fashion product. To promote such a product to the 30,000 eye wear retailers and wholesalers in the largest trade show, a company typically prepares attractive, eye-catching brochures with glossy pictures. Instead, Pentax only prepared a dull Q&A. The content of the Q&A includes discussion of Nd-Fe-B magnet $\neq$ 3,000 gauss, and potential health hazards. It is highly unlikely that a company would only prepare such type of brochure to promote an eye wear product to the general attendees in the largest eye wear trade show.

To promote an eye wear product in the largest trade show, a company typically prepares materials enough for 20% of the attendees. With IOFT typically having about 30,000 attendees, Pentax should have prepared 6,000 brochures.

Instead, Pentax (i) only distributed the brochures to 14 people, (ii) did not distribute the brochure to anyone else, and (iii) allegedly left another 56 copies on a table, which Pentax was unaware of their whereabout at the end of the conference. Seventy copies is just 0.25% of the 30,000 attendees--too few brochures for the biggest trade show, and the biggest opportunity for Pentax to promote the product.

The Q&A New Development Brochures is a very dull publication, with only a very limited number prepared. The only recorded distribution was to a small group of people. Regarding the remaining 56 copies, Pentax was unaware of their whereabout.

It is only logical that the brochures were prepared only for a special group of people during such a large trade show. The brochures were probably distributed to them at a special meeting, and were not for the general attendees of the IOFT. That would have explained the dullness of the brochure and the limited number prepared for so big a trade show.

The IOFT was not a 35 USC 102(a) event, and the Q&A is not a 35 USC 102(a) document, for much the same reasons that the meeting of the Le Coane Group was not a 35 USC 102(a) event and the technical drawings are not 35 USC 102(a) documents.

As for the IOFT, it was in Japan, and there was no evidence that it was attended by Americans or that any information concerning Pentax's display of its magnetic eye wear at the IOFT was transmitted to the United States prior to the critical date. Hence, there is no evidence that whatever Pentax disclosed at the IOFT was "known...by others in this country...before the invention... by...[Applicant]."

- 50 -

Attorney Docket No.: CONT-01013US1 SRM/BIM
bim/cont/1013us1.012.wpd

As for the Q&A, there is no evidence that it was classified or indexed anywhere in a fashion that made it "accsessib[le] to at least the pertinent part of the public..." or that it was "disseminated or otherwise made available to the extent that persons interested and ordinarily skilled in the subject matter or art, exercising reasonable diligence, c[ould] locate it...." Hence, it is not available as a reference under 35 USC 102(a). In re Wyer, 655 F.2d 221, 210 USPQ 790 (CCPA 1981).

A document distributed to a limited group, even if there is no requirement of secrecy, does not automatically make the document a publication. For example, an internal corporate memorandum is not a publication because, by its nature, it is an internal document, not intended to be distributed and not in fact distributed beyond a single organization or company. In re Katz, 592 F.2d 1169, 201 USPQ 71 (CCPA 1979). It has even been held that limited distribution beyond a single organization may not constitute publication. For example, in Ex Parte Suozzi, 125 USPQ 445 (POBA 1959), twenty-five copies of a search report marked "unclassified," circulated to various individuals and agencies, was held not to be a publication. The Board of Appeals stated that, "[E]ven assuming that there was no prohibition against the author of the report or the named or other official recipients of copies thereof, in giving copies or imparting information contained in said report to others who would be classed as the public in general, this would be merely permissive and would not show unequivocally that there was in fact any publication of the report."

The concept of access has been taken by the courts to mean free access to the public. For example, in RCA Corp. v. Data General Corp., 701 F. Supp 456, 468, 8 USPQ 2d 1305, 1315 (D. Del. 1988), aff'd, 887 F.2d 1056, 12 USPQ 1499 (Fed.Cir. 1989), an infringer failed to show that a memorandum filed in a special patent library research institute constituted prior publication as of the relevant date because it was "unclear from the disputed testimony whether a member

Attorney Docket No : CONT-01013US1 SRM/BIM
bim/cont/1013us1.012.wpd

of the public would be permitted access to the memorandum even if he or she had specifically asked to see it."

The Q&A was not published within the meaning of the word "published" under the statute. The Q&A was distributed by Pentax to a special group of people. Any communications between Pentax and that special group are not by definition communications to the public at large. Information exchanged solely within this group is not information that is accessible by the public. As far as the evidence shows, out of the 30,000 IOFT attendees, the Q&A was only given out to a special group of 14. There were also 56 copies of the Q&A left out on a table that were gone at the end of the IOFT. However, there is no evidence as to what happened to those copies. They may well simply have been thrown away by a janitor at the end of the IOFT.

A reading of the Q & A confirms the intent of Pentax was not to provide information to the public. The document itself is in the nature of advance information or sales training literature and not in the form of a document for general release to the public. For example, the document concerns such issues as product liability and potential health hazards of the product. A sales brochure released to the public in general would not include such information and would have been disclosed to many more IFOT attendees.

The Q & A was circulated in small numbers to a single group. And the Q & A, based on its content, appears to be a communication intended to educate the recipients on working with the public. Thus, even if the Q&A is considered to be "printed" within the meaning of 35 USC 102(a), it was not a "publication" within the meaning of 35 USC 102(a) for the same reasons that the technical drawings exhibited at the meeting of the Le Coane Group were not "publications" within the meaning of 35 USC 102(a)--namely, they were not distributed publicly.

- 52 -

In the event that the Examiner, upon reexamination, determines that an action other than an allowance is appropriate, the Examiner is requested and authorized to telephone Applicant's attorney prior to taking such action, if the Examiner feels that such a telephone call will advance the prosecution of the present application.

Should further questions remain, the Examiner is invited to contact the undersigned attorney by telephone.

Enclosed is a PETITION FOR EXTENSION OF TIME UNDER 37 C.F.R. § 1.136 for extending the time to respond up to and including November 22, 2000.

The Commissioner is authorized to charge any underpayment or credit any overpayment to Deposit Account No. 06-1325 for any matter in connection with this response, including any fee for extension of time, which may be required.

Respectfully submitted,

Date: November 22, 2000      By: _____
                                 Brian I. Marcus
                                 Reg. No. 34,511

FLIESLER, DUBB, MEYER & LOVEJOY LLP
Four Embarcadero Center, Suite 400
San Francisco, California 94111-4156
Telephone: (415) 362-3800

- 53 -