UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 00-7067-CIV-MORENO/DUBÉ

ASPEX EYEWEAR, INC. et al.,

     Plaintiffs/Counterdefendants,

v.

CONCEPTS IN OPTICS, INC.,

     Defendant/Counterplaintiff,

_____/

## ORDER ON CLAIM CONSTRUCTION

THIS CAUSE is before the Court pursuant to the consent of the parties and an Order of

Reference entered by the Honorable Federico A. Moreno, United States District Judge. The issue

presently before the Court is the construction of the claims found in the subject patents. In

accordance with <u>Markman v. Westview Instruments, Inc.</u>, 517 U.S. 370 (1996), this Court has

reviewed the record in this cause, the Claim Construction briefs filed by the parties (D.E. #571,

#573) and has heard argument of counsel.

### I. The Applicable Law

Claim construction is a question of law for the court, with the focus on the language of the

claims themselves. <u>Texas Digital Systems, Inc. v. Telegenix, Inc.</u>, 308 F.3d 1193, 1201 (Fed. Cir.

2002). There is a heavy presumption that the terms used in the claims "mean what they say and have

the ordinary meaning that would be attributed to those words by persons skilled in the relevant art."

<u>Id.</u> at 1202. Additionally, a court, unless compelled otherwise, will give a claim term the full range

of its ordinary meaning as understood by persons skilled in the relevant art. <u>Id.</u> Dictionaries,



encyclopedias and treatises are particularly useful for the court in determining the ordinary and customary meanings of claim terms. Id.

In Texas Digital, the Court noted that words often have more than one dictionary definition, and thus, the intrinsic record must always be consulted to identify the meaning which "is most consistent with the use of the words by the inventor." If more than one definition is consistent, the terms may be construed to include all of these consistent meanings. Id. at 1203.

The process of interpreting a claim by first looking to the intrinsic evidence of record (the patent itself, including the claims, the specification and the prosecution history) was also discussed by the Federal Circuit in Vitronics Corporation v. Conceptronic, Inc., 90 F.3d 1576 (Fed. Cir. 1996). In that case, the court noted that the first step in the construction process was the words of the claims themselves. The second step that must be taken is a review of the specification to determine whether the inventor used any terms inconsistent with their ordinary meaning. According to the court:

> The specification acts as a dictionary when it expressly defines terms used in the claims or when it defines terms by implication. *Markman*, 52 F.3d at 979, 34 USPQ2d at 1330. As we have repeatedly stated, "[c]laims must be read in view of the specification, of which they are a part." *Id.* at 979, 52 F.3d 967, 34 USPQ2d at 1329. The specification contains a written description of the invention which must be clear and complete enough to enable those of ordinary skill in the art to make and use it. Thus, the specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.

Id. at 1582.

The third step in a claims analysis is for the court to consider the prosecution history of the patent, which encompasses the record of all proceedings before the Patent and Trademark Office, including any express representations made by the applicant concerning the scope of the claim. Id.

According to the court, the analysis of the intrinsic evidence alone will generally resolve any ambiguity in a disputed claim term, and thus, in such cases, reliance on extrinsic evidence would be improper. Id at 1583. As noted by the court:

> In those cases where the public record unambiguously describes the scope of the patented invention, reliance on any extrinsic evidence is improper. The claims, specification, and file history, rather than extrinsic evidence, constitute the public record of the patentee's claims, a record on which the public is entitled to rely. In other words, competitors are entitled to review the public record, apply the established rules of claim construction, ascertain the scope of the patentee's claimed invention and, thus, design around the claimed invention. *See Markman*, 52 F.3d at 978-79, 34 USPQ2d at 1329. Allowing the public record to be altered or changed by extrinsic evidence introduced at trial, such as expert testimony, would make this right meaningless.

Id. at 1583.

The court in Texas Digital further explained the procedure to be utilized as follows:

> Moreover, the intrinsic record also must be examined in every case to determine whether the presumption of ordinary and customary meaning is rebutted. *See id.* Indeed, the intrinsic record may show that the specification uses the words in a manner clearly inconsistent with the ordinary meaning reflected, for example, in a dictionary definition. In such a case, the inconsistent dictionary definition must be rejected. *See id.* ("[A] common meaning, such as one expressed in a relevant dictionary, that flies in the face of the patent disclosure is undeserving of fealty."); *Liebscher v. Boothroyd,* 46 C.C.P.A. 701, 259 F.2d 948, 951, 119 USPQ 133, 135 (1958) ("Indiscriminate reliance on definitions found in dictionaries can often produce absurd results."). In short, the presumption in favor of a dictionary definition will be overcome where the patentee, acting as his or her own lexicographer, has clearly set forth an explicit definition of the term different from its ordinary meaning. *See In re Paulsen,* 30 F.3d 1475, 1480, 31 USPQ2d 1671, 1674 (Fed. Cir. 1994); *Intellicall, Inc. v. Phonometrics, Inc.,* 952 F.2d 1384, 1387-88, 21 USPQ2d 1383, 1386 (Fed. Cir. 1992). Further, the presumption also will be rebutted if the inventor has disavowed or disclaimed scope of coverage, by using words or expressions of manifest exclusion or restriction,

representing a clear disavowal of claim scope. *See Telefex*, 299 F.3d
at 1324, 63 USPQ2d at 1380.

308 F.3d at 1204. The court added that an effort should be made by the court to discern the ordinary
and customary meanings attributed to the words themselves prior to consulting the written
description and prosecution history. Id.

Additionally, issues which may be present in the construction of a claim include the "claim
differentiation doctrine" and the issue of the effect given to embodiments contained in a
specification. The "claim differentiation doctrine" states that where some claims are broad and
others are narrow, the narrow claim limitations cannot be read into the broad claims. Yarway Corp.
v. Eur-Control, USA, Inc., 775 F.2d 268, 274 (Fed. Cir. 1985). Under the doctrine, a difference is
presumed in the meaning and scope of a term when different claims use different words. See,
Advanced Magnetic Closure, Inc. V. Rome Fastener Corp., No. 98 CV 7766, 2005 WL 1241896
(S.D. N.Y. May 24, 2005). Additionally, the number of embodiments disclosed in the specification
will not be determinative of the meaning of disputed claim terms. Telefex, Inc. v. Ficosa North
America Corp., 299 F.3d 1313, 1327 (Fed. Cir. 2002). It is improper to limit the claims to the
preferred embodiments contained in the specification, but the choice of preferred embodiments by
the patentee "can shed light on the intended scope of the claims." See, Astrazeneca AB v. Mutual
Pharmaceutical Co. Inc., 384 F.3d 1333, 1340 (Fed. Cir. 2004).

## II. The Claims at Issue

The issue before this Court involves the interpretation of the claims contained in two patents
for eyewear. The first patent is referred to as the 545 patent. This patent is a reissue of a previously
issued patent (the 207 patent). The other patent before this Court was issued to the Defendant, and

is referred to as the 730 patent.

### (A) The 545 Patent

There are two claims at issue before the Court in the 545 patent, claims 1 and 17. These claims provide as follows:

(a) Claim 1:

> 1. An eyeglass device comprising:
>
> a primary spectacle frame for supporting primary lenses therein, said primary spectacle frame including two side portions each having an extension extended therefrom for pivotally coupling a leg means thereto, said primary spectacle frame including two rear and side portions each having a projection secured thereto, said primary spectacle frame including an upper side portion,
>
> a pair of first magnetic members secured in said projections respectively,
>
> an auxiliary spectacle frame for supporting auxiliary lenses therein, said auxiliary spectacle frame including two side portions each having an arm extended therefrom for extending over and for engaging with said upper side portion of said primary spectacle frame, and
>
> a pair of second magnetic members secured to said arms respectively for engaging with said first magnetic members of said primary spectacle frame so as to secure said auxiliary spectacle frame to said primary spectacle frame,
>
> said arms being engaged with and supported on said upper side portion of said primary spectacle frame so as to allow said auxiliary spectacle frame to be stably supported on said primary spectacle frame and so as to prevent said auxiliary spectacle frame from moving downward relative to said primary spectacle frame and so as to prevent said auxiliary spectacle frame from being disengaged from said primary spectacle frame.

(b) Claim 17:

> 17. An eyeglass device comprising:

a primary spectacle frame having two side portion extensions, each of said extensions extending laterally away from one another and rearwardly of said frame, each of said extensions having a top side, a front side and a rear side with a first magnetic member secured to said rear side, and

an auxiliary spectacle frame including two side portions each having an arm extending from said front side over said top side, said arms containing corresponding second magnetic members, said arms and said first and second magnetic members supporting said auxiliary spectacle frame on said primary spectacle frame.

The parties dispute many of the phrases contained in the above claims. This Court has examined the pertinent provisions in the claims as set out in the briefing submitted and argued at the hearing. Each of the contested phrases will be addressed below.

## (1) "Primary Spectacle Frame"

The Plaintiffs contend that the term "primary spectacle frame" includes the lens rims (if provided), nose bridge, extensions, projections and magnetic members. In support of the argument related to the extensions being part of the primary spectacle frame, the Plaintiffs cite to the patent specification, figures 1 and 3 and the preferred embodiment shown by figure 5 of the patent. The Plaintiffs also note that courts in both Texas (Aspex Eyewear, Inc. v. E'Lite Optik, Inc., No. 398CV2996D, 2002 WL 1751381 (N.D. TX April 4, 2002) and California (Aspex Eyewear v. Miracle Optics, Inc., No. 01-10396-LGB (C.D. CA February 14, 2003) have ruled that the primary spectacle frame does indeed include the extensions. Additionally, the Plaintiffs refer to the testimony by Concepts' president and the language of the 730 patent.

In support of the argument that the "projections" are also included, the Plaintiffs point to the express language of claim 1; Concepts' admissions during claim construction proceedings and a Markman hearing involving the 207 patent; the description of the preferred embodiment in the patent

specification and the rulings of the other district courts, noted above, which have addressed this issue.

The Defendant argues that the phrase "primary spectacle frame" only includes the two side portions, two rear and side portions and an upper side portion. Thus, according to the Defendant, the "primary spectacle frame" does not include extensions, projections, legs and magnetic members. In support of this contention, the Defendant points to the lack of argument on the issue when addressed by the Texas and California courts. Additionally, on the issue of the "extensions," the Defendant contends that its proposed construction is consistent with manufacturing principles and the ordinary skill in the art, as shown by Exhibit 6 to the Defendant's construction brief. Furthermore, the Defendant argues that its construction is supported by the Plaintiff's 2002 Claim Construction Brief which refers to the extensions being "welded" to the primary spectacle frame and the dictionary definition of the word "including," in light of the claim language.

In regard to the "projections," the Defendant contends that they are separate components secured to the rear and side portions of the primary spectacle frame. The Defendant acknowledges that as part of the 2001 Markman briefing it agreed that the projections were part of the primary spectacle frame. However, the Defendant asserts that based on further investigation since the issuance of the 545 patent, this position has been revised. In support of this revised position, the Defendant once again cites to the language of the claims, the manufacturing process and the ordinary skill in the art. The Defendant also cites to the language from the specification which it contends shows the clear intent of the inventor to "clearly disavow and denounce any invention encompassing projections included as part of the primary spectacle frame." (D.E. #576, p. 19).

The Defendant also makes an argument related to the magnetic members, which it contends

7

should not be seen as part of the primary spectacle frame. As support for this position, the Defendant points to a statement made by the Plaintiffs in their Claim Construction Brief and the language of claim 1 and of the specification which provides that "the magnetic members are secured to the primary spectacle frame." According to the Defendant, since all of these sources refer to the magnetic member being "secured" to the primary spectacle frame, it must be separate, since an object cannot be secured to itself.

At the hearing, the Plaintiffs responded to the arguments related to the "magnetic members" by citing to the admissions made by the Defendant in the earlier patent construction claim proceeding and the patent specification which describes a preferred embodiment in which the magnetic members are housed in projections which are part of the frame, as follows: "The primary spectacle frame 10 includes two projections 13 secured to the rear and side portions thereof for supporting magnetic members 14 therein."

The plain language of the claims as set out above, the patent specifications and the preferred embodiments of the invention reflected in the patent all support the Plaintiffs' construction of the term "primary spectacle frame." Accordingly, this Court finds that the term "primary spectacle frame" means the entirety of the primary eyeglass frame with the exception of the lenses, the plastic nose pieces and the leg means ("temple pieces") which extend back over the wearer's ears. The primary spectacle frame thus includes the lens rim (if provided), nose bridge, extensions, projections and magnetic members.

(2) **"A pair of second magnetic members...for engaging with said first magnetic members"**

The focus of the construction of this phrase is on whether the "magnetic members" must be

permanent magnets and whether the "engaging" is limited to magnetic members that do not touch. The resolution of these issues requires the construction of the terms "magnetic members" and the term "for engaging with."

(a) <strong>"magnetic members"</strong>

The Plaintiffs contend that "magnetic members" means "either permanent magnets or ferromagnetic members, but at least either the first or second magnetic members must be a permanent magnet." According to the Plaintiffs, this construction is consistent with the ordinary meaning and dictionary definition of the term magnetic and is also supported by the patent specification, the prior art reference in the Sadler patent and in accordance with the doctrine of claim differentiation, as shown by the use of the terms magnets and magnetic members in the claims. The Defendant contends that there is no need to define the term since it is not relevant to the present action. In any event, the Defendant argues that the Plaintiffs' proposed construction is not supported by the dictionary definition or the prior art. According to the Defendant, the term at issue should be defined simply as "magnetic member."

The word "magnetic" is defined in the dictionary as "magnetized or capable of being magnetized: capable of being attracted by a magnet." Webster's Third New International Dictionary 1359. This definition is consistent with the construction proposed by the Plaintiffs since it clearly includes a piece of metal which, while not magnetic itself, is capable of being attracted by a magnet. In addition to the ordinary meaning of the term supporting the view taken by the Plaintiffs, a review of the patent prosecution history, specifically the Sadler patent, discloses that the meaning of the term as used in this prior art was also consistent with this construction, as demonstrated by the following language contained in the Sadler patent:

9

> The second magnetic members 17 may be made of a permanent
> magnetic material or a ferromagnetic material. At least one of the
> first and second magnetic members must be made of a permanent
> magnetic material in order for a magnetic attraction to exist.

(D.E. #571, Ex. 16, at 3/21-25). This Court also agrees with the Plaintiffs as to the doctrine of claim differentiation, in light of the limitation of the term "magnetic members" to "magnets" in other claims of the 545 patent. The provisions of those claims are as follows:

> 3. An eyeglass device as recited in claim 1 wherein the first and the
> second magnetic members are magnets.
>
> 8. An eyeglass device as recited in claim 6 wherein the first magnetic
> members are magnets.
>
> 9. An eyeglass device recited in claim 6 wherein the first and second
> magnetic members are magnets.
>
> 13. The eyeglass device according to claim 12, wherein said first and
> second magnets members are magnets.

(D.E. #571, Ex. 1, 4/4- 5/9). See also, Miracle Optics at p. 15-20.

Accordingly, this Court construes the term "magnetic members" to mean either permanent magnets or ferromagnetic members, but at least either the first or second magnetic members must be a permanent magnet.

### (b) "extend downward for hooking"

A dispute is also present between the parties as to language concerning the magnetic members which the Defendant would include in construing the claims. Specifically, the language relates to whether the auxiliary frame magnetic members are required to "extend downward toward projections for hooking." This language is taken by the Defendant from the Summary of Invention section of the patent, which provides in pertinent part as follows:

> The projections and the first magnetic members are arranged lower
> than the upper portion of the primary spectacle frame, the second
> magnetic members are extended downward toward the projections for
> hooking on the primary spectacle frame so as to further secure the
> auxiliary spectacle frame to the primary spectacle frame.

(D.E. # 573, Ex. 2, at column 2, lines 3-8). The Defendant also points to Figure 7 of the patent, which it contends constitutes the sole embodiment regarding the arrangement of the magnets attached to the auxiliary frame.

The Plaintiffs take issue with this determination, and argue that the Defendant is improperly relying on a preferred embodiment to limit the scope of the claim; that there is nothing in the language of claims 1 and 17 which requires that the auxiliary frame magnetic members extend downward for hooking; that claim 17 does not even require projections and that the construction is incorrect under the doctrine of claim differentiation. In support of the last of these arguments, the Plaintiffs point to the presence of the Defendant's desired language in claim 2, in contrast to the language's absence from claims 1 and 17.

This Court agrees with the interpretation put forth by the Plaintiffs based on the lack of specific language in the disputed claims despite the language being present elsewhere, and on the fact that the Defendant improperly seeks to make the "preferred embodiment" of Figure 7 into the only embodiment possible under the patent. Accordingly, the construction urged by the Defendant as shown on page 3 of the Claim Construction Chart submitted to this Court is rejected.

### (c) "for engaging with said first magnetic members"

The Plaintiffs argue that the phrase "for engaging with said first magnetic members" means "that the surfaces of the second magnetic member either contact the corresponding surfaces of the first magnetic members, or magnetically attract the corresponding surfaces of the first magnetic

members without actual contact." In other words, according to the Plaintiffs, the patent is not limited

to only magnetic members that do not touch. In support of this construction, the Plaintiffs point to

what it considers the ordinary meaning of "engage"; the doctrine of claim differentiation; the

decision by the court in Miracle Optics and the absence of anything in the intrinsic record which

would require that the magnetic members engage without touching. The Plaintiffs also contend that

the extrinsic testimony by the inventor and the Plaintiffs' expert does not establish that the limitation

should be imposed.

In contrast to the Plaintiffs' interpretation, the Defendant contends that the non-touching

magnetic construction is required based on the specification of the patent, including Figure 7, the

prosecution history and statements made at a prior Markman hearing. According to the Defendant,

the "non-touching" magnetic members configuration is the only configuration identified for the

magnetic members in the 545 Reissue Patent and therefore, that it must be read into all of the claims

of that patent. (D.E. #576, p. 21).

The Defendant relies on testimony by Richard Chao before the U.S. Patent and Trademark

Office and in a deposition. (D.E. #573, Exs. 3,4). In the Patent Office statement, Mr. Chao was

asked the question as to what was the distinctive feature of the invention. In response, Chao stated:

> It is mainly about the magnetic members, vertical attraction of
> magnetic members. After the magnetic members join together, they
> should be fixed there to prevent disengagement. There should be a
> gap between the magnetic members.

(D.E. #573, Ex. 3).

The deposition of Richard Chao is cited to by both parties (D.E. #573, Ex. 4; D.E. #577, Ex.

27). In the excerpt relied on, Chao stated that in the 207 patent there was no gap described in the

words even though there was in the description of the drawings. (p. 146). In response to the question of whether the invention would work if there were no gaps in the magnet, the following colloquy occurred:

> A: But it's not perfect. It's not perfect item. Not perfect product.
>
> Q: It's better with the gap than without the gap?
>
> A: Yes.

(p. 147-148).

The Defendant also relies on testimony from David Chao during a prior Markman hearing held in this case. Specifically, his testimony that Figure 7 was the only drawing in the 207 patent which showed a cross-section of the magnetic members and that in the drawing, the magnetic members do not touch. (D.E. #573, Ex. 5, p. 46). However, the Plaintiffs point to additional testimony by Chao during the same hearing in which he was asked about the interpretation of the term "for engaging with" as found in the patent language. The following colloquy occurred:

> Q: In claim one, the patent also refers to the magnets on the auxiliary frame being engaged with the magnets on the primary frame. Do you see that?
>
> A: Yes.
>
> Q: As a person of ordinary skill in the art, do you have an understanding of the words "engaged with" in that context?
>
> A: Well, it means it may touch or it may not touch. It doesn't matter, as long as they come together by magnetic force.

(D.E. # 571, Ex. 12, p. 59).

The word "engage" is defined in the dictionary as "to attract and hold" and "to be or become in gear (as of two gear wheels working together): interlock and interact." Webster's Third New

International Dictionary 751. This definition is consistent with the construction proposed by the Plaintiffs since it includes both non-touching attraction as well as actual contact.

Additionally, the presence of the language in claims 10 and 11 which states that "first magnetic members are not in contact with the second magnetic members" brings into play the doctrine of claim differentiation so as to not limit the claims of 1 and 17 as urged by the Defendant. Similarly, the preferred embodiment shown by Figure 7 does not mandate the construction urged by the Defendant. Furthermore, the extrinsic evidence presented by Richard and David Chao does not show that the claim must be constructed to include only non-touching magnets. Rather, it shows at most, what is the preferred embodiment of the invention, not a limiting requirement of the claims to be construed.

Accordingly, this Court construes the term "for engaging with first magnetic members" to mean that the surfaces of the second magnetic members either contact the corresponding surfaces of the first magnetic members, or magnetically attract the corresponding surfaces of the first magnetic members without actual contact.

(3) **"two side portions each having an extension extended therefrom"** (Claim 1) and **"two side portion extensions"** (Claim 17).

The Plaintiffs contend that these phrases, while differing in language, should be construed to have the same meaning-"those portions of the primary spectacle frame which extend outwardly and rearwardly of the lenses or lens rim (if provided) to pivotally connect to the legs." According to the Plaintiffs, this construction is consistent with Figures 1 and 3 of the patent and the construction applied by the court in Miracle Optics.

14

The Defendant does not propose a construction of the term, but rather, argues that the double inclusion doctrine requires that the language be stricken from the claim. This Court agrees with the construction found in <u>Miracle Optics</u>, which is supported by Figures 1 and 3 of the patent. Additionally, the double inclusion doctrine is not applicable since the record shows that the claim elements, even if the same, perform different functions. (D.E. #577, Ex. 27, p. 104).

Accordingly, this Court construes the terms "two side portion extensions" and "two side portions each having an extension extended therefrom" as meaning those portions of the primary spectacle frame which extend outwardly and rearwardly of the lenses or lens rims (if provided) to pivotally connect to the legs.

### (4) "two rear and side portions"

The Plaintiffs argue that the phrase "two rear and side portions" should be construed to mean "those portions of the primary spectacle frame (including the lens rims, extensions, projections, and magnetic members) that are located towards the side of the frame but behind the frontal plane of the frame, i.e., behind the face of the frame that is visible when looking at the frame from the front." In support of this construction, the Plaintiffs rely on the specification, specifically Figure 3 and raise the same arguments made above in response to the Defendant's contentions related to the applicability of the doctrine of double inclusion. No construction has been proposed by the Defendant.

Based on the patent specification and the determination made above related to the doctrine of double inclusion, this Court adopts the construction proposed by the Plaintiffs. Accordingly, "two rear and side portions" is construed to mean those portions of the primary

spectacle frame (including the lens rims, extensions, projections, and magnetic members) that are located towards the side of the frame but behind the frontal plane of the frame, i.e., behind the face of the frame that is visible when looking at the frame from the front.

(5) **"having a projection secured thereto"** and **"a pair of magnetic members secured in said projections"**

The dispute surrounding these terms deals with the question of whether the magnetic members must be completely enclosed in the projections. According to the Plaintiffs, complete enclosure is permitted based on the preferred embodiment shown in Figure 7 and the ordinary meaning of the word "in." The Defendant argues a contrary construction is mandated due to the illustrations contained in Figures 3 and 7 and the decision by the court in Miracle Optics.

A review of Figure 7 shows that the magnetic member depicted is completely enclosed by the projection. As acknowledged by the Defendant, this figure represents a preferred embodiment, and thus, supports the Plaintiffs' contention that the patent is not limited to magnetic members that are not completely enclosed. Additionally, the plain meaning of "in" also allows for the construction urged by the Plaintiffs. Furthermore, as noted by the Plaintiffs, the decision by the court in Miracle Optics cited to by the Defendant actually construes different claims with distinct language, and thus, the opinion is given little weight on this issue.

Based on the foregoing, this Court finds that the proper construction to be given is that it not be limited to magnets that are not completely enclosed in the projections.

(6) **"a first magnetic member secured to said rear side"** (Claim 17)

The Plaintiffs urge this Court to construe the phrase "secured to said rear side" as meaning "that each first magnetic member is connected to the rear side of the corresponding

16

extension in a manner such that the connection is not likely to fail or give way. The first

magnetic member can be directly secured to the rear side of the extension, or indirectly through

the use of a projection or similar type of housing or mounting collar. The first magnetic member

may also be secured to other portions of the primary spectacle frame, (e.g., the lens rims) in

addition to the extension." According to the Plaintiffs, this construction is consistent with the

patent specification and the ordinary meaning of the word "secure" as well as being consistent

with the construction of the phrase by the court in <u>Miracle Optics</u>.

The Defendant contends that the proper construction of the term means "the first

magnetic member 14, partially surrounded by the projection 13, is secured to the rear side of the

extension 11 and that the first magnetic member 14 is not part of the primary spectacle frame

10." In support of this construction, the Defendant cites to the language of Claim 17, the figures

of the patent and the language of the specification.

The Defendant's construction that the magnetic members can only be partially surrounded

has been rejected by this Court, as set out above. Additionally, this Court finds that the plain

language of Claim 17 and the meaning of "secure" support the Plaintiffs' proposed construction.

Accordingly, this Court will adopt the construction found by the court in <u>Miracle Optics</u> and

construe the term "secured to said rear side" to mean "that each first magnetic member is

connected to the rear side of the corresponding extension or to other portions of the primary

spectacle frame in a manner such that the connection is not likely to fail or give away." <u>Miracle</u>

<u>Optics</u> at p. 51.

(7) **"said primary spectacle frame including an upper side portion"**

According to the Plaintiffs, the proper construction of the phrase "said primary spectacle

17

frame including an upper side portion" means "the top portion of the primary spectacle frame that is visible when viewing the primary spectacle frame from the top, including the top portions of the lens rims, extensions, projections, and magnetic members." The Plaintiffs contend that this construction is supported by the plain language of Claim1, the representations shown in Figures 3 and 5 and the ruling by the court in the E'Lite Optik case.

As noted earlier, this Court has determined that the extensions, projections and magnetic members are part of the primary frame. Accordingly, this Court must also find that the upper surfaces of these components constitute a part of the "upper side portion" of the primary frame. This determination is consistent with the finding by the court in E'Lite Optik; with the representations contained in Figures 3 and 5 and the claim language. Accordingly, for these reasons and based on the findings made earlier in this order related to the construction of the term "primary spectacle frame," this Court construes the term "said primary spectacle frame including an upper side portion" to mean the top portion of the primary spectacle frame that is visible when viewing the primary spectacle frame from the top, including the top portions of the lens rims, extensions, projections and magnetic members.

### (8) "arms"

The dispute surrounding the construction of the term "arms" centers on how far the arms can extend, in light of the claim construction provided by the court in Miracle Optics. Both parties in this case acknowledge that the Miracle Optics court held that the arms, as the terms were contained in claims 12 and 16, could not extend "past the rear edge of the projection containing the magnetic members of the primary frame." Miracle Optics at 52. According to the Defendant, that same determination should be made in this case and this Court should therefore

construe the term, as contained in Claims 1 and 17 to mean that "the auxiliary arms are prohibited from extending beyond the rear edge of the projections attached to the primary frame."

The Plaintiffs note that the <u>Miracle Optics</u> decision is on appeal, and that in their opinion, the construction was wrongly decided. Additionally, the Plaintiffs contend that the holding in <u>Miracle Optics</u> is not the final determinative factor, since that court did not rule that other components attached to the arm could not extend past the rear edge of the projections. Specifically, the Plaintiffs cite the flanges illustrated in Figure 5 and the testimony by Concepts' president that the flanges are not part of the arms. According to the Plaintiffs, the term "arms" as contained in claims 1 and 17 should be construed to mean that "the arms themselves may not extend past the rear edge of the projections containing the magnetic members of the primary frame, but any other components attached to the arms may extend past the rear edge of the projections."

This Court will follow the interpretation given by the court in <u>Miracle Optics</u> and find that the arms cannot extend past the rear edge of the projection containing the magnetic members of the primary frame. However, this Court also agrees with the Plaintiffs that the determination made by the court in <u>Miracle Optics</u> was related solely to the "arms" and did not consider any possible attachments to the arms, such as the flange noted in Figure 5 and by the Plaintiffs. Accordingly, this Court additionally construes "arms" to find that the limitation noted above as to extension of the arms does not preclude any other components attached to the arms from extending past the rear edge of the projections.

(9) **"each of said extensions extending laterally away from one another and rearwardly of said frame"** (Claim 17)

The Plaintiffs contend that the above quoted phrase should be construed to mean "that the extensions extend sideways away from one another and behind the face of the frame that is visible when looking at the frame from the front." In support of this construction, the Plaintiffs point to the ordinary meaning of the words; Figure 3 of the patent and the testimony from an expert for the Defendant.

According to the Defendant, the phrase cannot be properly construed "due to unsupported and technically improper verbiage." (D.E. #573 at p. 20). In applying the dictionary definitions, the Defendant asserts that the result would be a U-shaped member directed at the rear portion of the primary frame, a result distinct from that shown in Figure 3. The Plaintiffs counter that the Defendant's construction seeks to distort the claim language.

The determination of this construction issue turns on three terms- "laterally," "away" and "rearwardly." The first term, "laterally" is defined as "by, to or from the side." Webster's Third New International Dictionary 1276. The second term, "away" is defined as "in another direction; *esp:* in the opposite direction." Id at 152. The definition of the final term "rearwardly" is "directed toward the rear." Id. at 1891.

These terms are consistent with the representation contained in Figure 3, which shows the extensions going to the side of the lens rims (laterally), and then in opposite directions from each other (away) and finally, with each going to the rear of the front of the frames (rearwardly). This determination is also consistent with the deposition of Gerald Hibnick cited by the Plaintiffs, in which he admits that the extensions are lateral components which are depicted as projecting

20

"laterally" away from their respective lens rims. (D.E. #571, Ex. 18).

Based on the foregoing, this Court construes the term "each of said extensions extending laterally away from one another and rearwardly of said frame" to mean that the extensions extend sideways from one another and behind the face of the frame that is visible when looking at the frame from the front.

(10) **"said arms and said first and second magnetic members supporting said auxiliary spectacle frame on said primary spectacle frame"** (Claim 17).

The Plaintiffs argue that the correct construction of the term quoted above would be that "the arms and the first and second magnetic members maintain in position the auxiliary spectacle frame on the primary spectacle frame." In making this argument, the Plaintiffs rely on the ordinary meaning of the word "support," the patent specification and the construction provided by the court in Miracle Optics. The Defendant urges a different construction- "the auxiliary spectacle frame 20 arms 21 touch the extensions 11 associated with the primary spectacle frame 10 and that in accordance with Figure 7, the magnetic members 14, 22 do not touch." (D.E. #576, p. 25).

This Court has already discussed the issue of whether the magnetic members can touch, and has resolved this issue in favor of the construction set forth by the Plaintiffs. This determination also supports the construction proposed for the term at issue. Additionally, the Plaintiffs' construction is supported by the patent drawings and the ordinary meaning of the term "support" -"to hold up or in position." Webster's Third New International Dictionary 2297. The Court also notes the construction reached by the court in Miracle Optics.

Accordingly, it is the determination of this Court that the phrase "said arms and said first

and second magnetic members supporting said auxiliary spectacle frame on said primary spectacle frame" should be construed to mean that the arms and the first and second magnetic members maintain in position the auxiliary spectacle frame on the primary spectacle frame.

### (B) The 730 Patent

There are four claims present in the 730 patent, which provides as follows:

> 1. An eyeglass device comprising:
>
> a primary eyeglass frame including two lens rims for containing lenses in said primary eyeglass frame;
>
> a pair of side projection members, each of said side projection members of said pair attached to and extending from the side of one of the two primary eyeglass lens rims of said primary eyeglass frame;
>
> a pair of protective mounting collars disposed on said pair of side projection members, each one of said pair of protective mounting collars mounted on one of said pair of side projection members;
>
> a pair of magnetic members, each of said pair of magnetic members enclosed in one of said pair of said protective mounting collars of said primary eyeglass frame;
>
> an auxiliary lens frame for engaging and attachment with said primary eyeglass frame including two lens rims for containing lenses in said auxiliary lens frame;
>
> a pair of side projection members, each of said side projection members attached to and extending from the side of one of said auxiliary lens frame's two lens rims;
>
> a pair of protective mounting collars disposed on each of said pair of side projection members of said auxiliary lens frame, each one of said protective mounting collars terminating in an upper peripheral edge and a lower peripheral edge and mounted on each of said pair of auxiliary lens frame side projection members;
>
> a pair of magnetic members, each of said pair of magnetic

22

members having the entirety of their sides enclosed in one of said pair of said auxiliary lens frame protective mounting collars;

a pair of flanges, each of said flanges attached to and extending beyond the bottom peripheral edge of said protective mounting collars of said auxiliary lens frame, said flanges further having a curvature similar to the curvature of said pair of protective mounting collars of said primary eyeglass frame whereby the alignment of said auxiliary magnetic members directly atop said magnetic members of said primary eyeglass frame arranges the auxiliary lens frame and the primary eyeglass frame in the engaged configuration wherein the lens rim of said primary eyeglass frame and the lens rim of said auxiliary lens frame are aligned and the relative movement of the auxiliary lens frame and the primary eyeglass frame is restricted in all directions; in particular, movement in the up and down directions is primarily limited due to the magnetic attractive forces of said aligned auxiliary lens frame and said primary eyeglass frame magnetic members and relative movement in the side to side directions is limited primarily by said flanges attached to said auxiliary lens frame's protective mounting collars positioned behind said protective mounting collars of said primary eyeglass frame.

2. The eyeglass device of claim 1 wherein said flanges of said auxiliary frame at least partially curve around the corresponding mating primary eyeglass frame protective mounting collars when the auxiliary lens frame and primary eyeglass frame are arranged in the engaged configuration, thereby further limiting the relative movement of the auxiliary lens frame and the primary eyeglass frame.

3. The eyeglass device of claim 1 wherein said magnetic members of said auxiliary lens frame and said primary eyeglass frame are further enclosed in their respective protective mounting collars with the top and bottom of said magnetic members flush with the top and bottom peripheral edges of said protective mounting collars.

4. The eyeglass device of claim 1 wherein said primary eyeglass frame protective mounting collars are mounted separately from the primary eyeglass frame lens rims.

The parties dispute the construction which should be given to several of the terms

23

contained in the claims. Each of the disputed terms will be addressed below.

### (1) "side projection members"

According to the Plaintiffs, the side projection members "are those portions of the primary eyeglass frame that are attached to and extend outwardly and rearwardly from the sides of the lens rims, and pivotally connect to the legs or temple pieces." In support of this construction, the Plaintiffs point to the Figure 7 of the patent; the language of the specification and the asserted concessions made by Concepts during an earlier Markman hearing. In essence, the construction urged by the Plaintiffs is that the side projection members are part of the primary eyeglass frame.

Concepts, on the other hand, contends that the "side projection members" are not in fact part of the primary eyeglass frame, by reference to the language of claim1, clause 2, which requires each of the pair of side projection members "to attach to and extend from the side of one of the two primary eyeglass lens rims of the primary eyeglass frame." According to the Defendant, the unambiguous language of the claim, "attach to and extend" precludes finding that the side projections are included as part of the primary eyeglass frame. The Defendant also argues that the reliance on the specification rather than the claim language is improper, and disputes the contention that it has admitted in the past that the side projection member is part of the primary eyeglass frame.

Figure 7 is described in the patent as "a detailed view of the side projection of the primary eyeglass frame." (D.E. #573, Ex. 16). A review of Figure 7 shows the side projection at issue extending from the primary eyeglass frame lens rim. Additionally, language contained in the Summary of the Invention and in the Detailed Description of the Preferred Embodiments refers

to "two side projection members thereof," with the "thereof" referring to the primary eyeglass frame; a reference to "magnets contained on the two side projection members of the primary eyeglass frame"; the statement that the side projection members of the auxiliary frame "are similar in shape to the side projection members of the primary eyeglass frame" as well as the statements that the "primary lens frame also has two side projection members attached to and extending from the side of each lens rim" and that the side projection members of the auxiliary lens frame are kept "above the side projection members of the primary eyeglass frame." (Ex. 16).

This Court finds that the construction put forth by the Defendant cannot stand in light of the repeated language cited above, as well as the representation made in Figure 7. Accordingly, this Court determines that the side projection members are part of the primary eyeglass frame and thus, will construe the term "side projection members attached to and extending from" to mean those portions of the primary frame that are attached to and extended outwardly and rearwardly from the sides of the lens rims, and pivotally connect to the legs or temple pieces.

### (2) **"protective mounting collars"** and **"magnetic members"**

The issue surrounding the construction of the term "protective mounting collars" and "magnetic members" also involves a determination of what constitutes the "primary eyeglass frame." According to the Plaintiffs, the protective mounting collars are "the part of the primary eyeglass frame which hold and support the primary eyeglass frame magnetic members." Thus, both of these elements form part of the primary eyeglass frame. In support of this construction, the Plaintiffs point to Figure 7; the patent specification language which states that these elements are part of the primary eyeglass frame, and once again asserts a prior concession on this issue by

25

Concepts.

Concepts agrees with the Plaintiffs' contention that "magnetic mounting collar means a structure that holds and supports a magnetic member of the primary eyeglass frame," but adds a clarification that it means a structure which holds and supports a magnetic member "associated with" the primary eyeglass frame. (D.E. #576, p. 32). The Defendant argues that this clarification is consistent with the language of claim 1, which provides that neither the protective mounting collars nor the magnetic members are part of the primary eyeglass frame.

In connection with the term "magnetic members," the Defendant argues that clause 4 of claim 1 unambiguously requires the magnetic members to be positioned inside protective mounting collars located out on a side projection member at a distance from the primary eyeglass frame and not attached to the primary eyeglass frame itself. According to Concepts, no further analysis is required to determine the issue in its favor. Additionally, however, Concepts points to Figure 7.

As with the projections, as discussed above, language contained in the patent supports the Plaintiffs' construction. Specifically, this Court notes the references to "the protective mounting collars of both the auxiliary lens frame and the primary eyeglass frame'; "the protective mounting collars of the primary eyeglass frame"; "the corresponding and attracting magnets on the primary eyeglass frame"; "the protective mounting collar encloses and completely surrounds the sides of the primary frame's magnetic members"; "the magnetic members of the primary eyeglass frame"; "the primary eyeglass frame's protective mounting collars"; "behind said protective mounting collars of said primary eyeglass frame" and "said primary eyeglass frame protective mounting collars." Based on the language of the specification, the claims and the representation shown

in Figure 7, this Court finds that the "protective mounting collars" and "magnetic members" are part of the primary eyeglass frame and that a "protective mounting collar" is a structure that holds and supports a magnetic member of the primary eyeglass frame.

> (3) **"movement in the up and down directions is primarily limited due to the magnetic attractive forces of said aligned auxiliary lens frame and said primary eyeglass frame magnetic members."**

According to the Plaintiffs, the dispute involved in the construction of this phrase is over the word "primarily." The Plaintiffs seek to have this Court construe the above quoted term to mean that "the sole means of limiting relative motion between the primary eyeglass frame and the auxiliary lens frame in the up and down directions is the magnetic attractive forces of the aligned auxiliary lens frame and primary eyeglass frame magnetic members." In support of this construction, the Plaintiffs rely on the patent specification which is claimed to distinguish the prior art 207 patent on the basis that the magnetic members of that patent's primary frame could only limit vertical or downward relative motion between the auxiliary and primary frames. According to the Plaintiffs, this construction is further supported by distinctions made by the patentee during prosecution, in which it was contended that the flanges of the 730 patent were the required means of limiting relative motion between the frames in the forward, rearward and side-to-side directions.

In its response brief, Concepts indicates that it agrees that the relative motion between the engaged "primary eyeglass frame" and "auxiliary lens frame" is limited in the up and down directions by the magnetic attractive forces of the "magnetic members" associated with the "primary eyeglass frame" and the "magnetic members" which are a part of the "auxiliary lens frame." Concepts adds that therefore, "movement in the up and down directions is primarily

limited due to magnetic attractive forces of said aligned auxiliary lens frame and said primary

eyeglass frame magnetic members" means that the magnetic attracting forces exerted by the

engaged "magnetic members" limit the up and down movement of the engaged "auxiliary lens

frame" and "primary eyeglass frame." (D.E. #576, p. 35-36).

It appears that the parties do not dispute the construction and thus, this Court finds that

the movement between the primary eyeglass frame and the auxiliary lens frame in the up and

down direction is limited by the magnetic attractive forces of the aligned auxiliary lens frame and

primary eyeglass frame magnetic members.

**(4) "relative movement in the side to side direction is limited primarily by said flanges attached to said auxiliary lens frame's protective mounting collars."**

The Plaintiffs contend that this term means "the sole means of limiting relative motion

between the primary eyeglass frame and the auxiliary lens frame in the side to side direction is

the  flanges attached to said auxiliary lens frame's protective mounting collars."  In its responsive

brief, the Defendant agrees that the relative movement between the engaged primary eyeglass

frame and auxiliary lens frame is limited in the side to side direction by the auxiliary lens frame

"flanges." According to the Defendant, the language at issue should be interpreted to mean that

the auxiliary lens frame is equipped with flanges which are part of the auxiliary lens frame and

which restrict side-to-side motion.

The briefing of counsel shows that the parties do not dispute the construction and thus,

this Court finds that the movement between the primary eyeglass frame and the auxiliary lens

frame in the side to side direction is limited by the flanges attached to the auxiliary lens frame.

### III. Joint Status Report on Agreed Terms

This Court has not addressed other terms which the parties have agreed to in their briefing and argument.  For purposes of clarity, the parties shall have until **2:00 p.m. on June 15, 2005** to file a Joint Status Report specifically setting out the agreed constructions.  **A copy of the Joint Status Report shall be delivered directly to the chambers of Magistrate Judge Dubé within the time provided.**

**DONE AND ORDERED** this _____ **9** _____ day of June, 2005.


ROBERT L. DUBÉ
UNITED STATES MAGISTRATE JUDGE


cc: Honorable Federico A. Moreno
    Attached Service List (via fax)

## SERVICE LIST

### Aspex Eyewear, Inc. v. Concepts In Optics, et. al.,
### 00-7067-CIV-MORENO/DUBÉ

John C. Malloy, III. Esq.
Malloy & Malloy
2800 Southwest 3rd Avenue
Miami, Florida 33129

Barry J. Schindler, Esq.
Michael A. Nicodema, Esq.
Greenberg Trauig LLP
200 Park Avenue, 34th Floor
New York, NY 10166

Gary E. Lambert, Esq.
Lambert & Associates
92 State Street
Boston, MA 02109

Joseph W. Beasley, Esq.
Josephs, Jack & Miranda, P.A.
2950 S.W. 27th Avenue
Suite 100
Miami, Florida 33133